UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

     v.

CHARLES LIGGINS, et al.

No. 21 CR 618

Honorable Martha M. Pacold

**GOVERNMENT'S *SANTIAGO* PROFFER AND MOTION TO ADMIT**
**EVIDENCE PURSUANT TO FEDERAL RULE OF EVIDENCE 801(d)(2)(E)**

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:    */s/ Jason A. Julien*
    JASON A. JULIEN
    ANN MARIE E. URSINI
    CAITLIN WALGAMUTH
    Assistant United States Attorneys
    219 S. Dearborn Street, Rm. 500
    Chicago, Illinois 60604
    (312) 353-5300

TABLE OF CONTENTS

I.   INTRODUCTION.................................................................................................. 1

II.  OVERVIEW OF THE CONSPIRACY TO MURDER CARLTON WEEKLY IN AID OF RACKETEERING, AS CHARGED IN COUNT THREE OF THE SUPERSEDING INDICTMENT...... 2

III. OVERVIEW OF O-BLOCK AS AN ENTERPRISE ENGAGED IN RACKETEERING ACTIVITY. 3

A.   O-Block is an enterprise as defined in Title 18, United States Code, Section 1959(b)(2). .............................................................................................................. 3

B.   O-Block engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1). ...................................................................... 6

C.   O-Block has a deadly rivalry with STL/EBT dating back at least a decade. .... 7

D.   O-Block is "cliqued up" with neighboring Black Disciple factions..................... 9

E.   "Dead Bitches".................................................................................................... 9

IV.  GOVERNING LAW ......................................................................................... 10

A.   Existence of and Membership in the Conspiracy ............................................ 10

B.   "In Furtherance of" the Conspiracy ................................................................ 14

C.   Alternative Bases for Admissibility of Statements .......................................... 17

i.   A Defendant's Own Statements........................................................................ 17

ii.  Non-Hearsay Statements.................................................................................. 18

iii. Statements Against Penal Interest.................................................................... 19

iv.  Co-Conspirator statements after *Crawford* ...................................................... 20

V.   THE EVIDENCE DEMONSTRATING THE EXISTENCE OF THE CHARGED CONSPIRACY AND THE DEFENDANTS' PARTICIPATION IN THE CONSPIRACY......................................... 21

A.   The Conspiracy to Murder Carlton Weekly on August 4, 2020 ...................... 22

i.   Ralph Turpin and Witness 2 saw Weekly inside of Milani Boutique. ............... 22

ii.  Smart, Roberson, Liggins, Thomas, and Offerd began making their way to E. Oak Street to murder Weekly. .............................................................................................. 23

iii. Roberson made statements in furtherance of the conspiracy to Cooperator 4, acknowledging that Roberson was on his way to murder Weekly............................... 25

iv.  Turpin placed at least one phone call to report Weekly's Location. ................ 26

v.   Smart, Roberson, Thomas, Liggins, and Offerd murdered Weekly and then split up in different directions. ............................................................................................. 31

vi.  Offerd made statements in furtherance of the conspiracy to Witness 6. ........ 31

vii. Roberson made additional statements in furtherance of the conspiracy to Cooperator 4................................................................................................................ 33

i

viii.   Roberson made additional statements in furtherance of the conspiracy to Witness 7, this time, for purposes of concealment. ................................................... 35

ix.   CPD seized Roberson's Chrysler 300 the day after the murder, and Roberson called CPD to get it back. ......................................................................................... 36

x.   Charles Liggins made statements in furtherance of concealment of the conspiracy to murder Weekly. ....................................................................................... 38

B.   O-Block Chains ................................................................................ 38

C.   Social Media ................................................................................ 48

D.   Tattoos ................................................................................ 54

VI.   COCONSPIRATOR STATEMENTS ............................................................. 56

VII.   CONCLUSION ................................................................................ 60

# TABLE OF AUTHORITIES

## Cases

*Beeson v. United States* 90 F.2d 720 (7th Cir. 1937) .................................................. 16

*Bourjaily v. United States* 483 U.S. 171 (1987) .......................................................... 11

*Crawford v. Washington* 541 U.S. 36 (2004)................................................... 10, 20, 21

*Davis v. Washington* 547 U.S. 813 (2006) ................................................................... 10

*Garlington v. O(Leary* 879 F.2d 277 (7th Cir. 1989) ................................................. 16

*Salinas v. United States* 522 U.S. 52 (1997) ............................................................... 13

*United States v. Alviar* 573 F.3d 526 (7th Cir. 2009) ...................................... 1, 11, 15

*United States v. Ashman* 979 F.2d 469 (7th Cir. 1992)............................................... 16

*United States v. Ayala* 601 F.3d 256 (4th Cir. 2010)................................................... 14

*United States v. Bolivar* 532 F.3d 599 (7th Cir. 2008) ............................................... 14

*United States v. Bustamante* 493 F.3d 879 (7th Cir. 2007)......................................... 15

*United States v. Coe* 718 F.2d 830 (7th Cir. 1983) ..................................................... 12

*United States v. Cox* 923 F.2d 519 (7th Cir. 1991) ..................................................... 15

*United States v. Cozzo* 2004 WL 1151630 (N.D. Ill. 2004) ........................................ 15

*United States v. Cruz-Rea* 626 F.3d 929 (7th Cir. 2010) ............................... 10, 14, 15

*United States v. Curry* 977 F.2d 1042 (7th Cir. 1992)................................................ 20

*United States v. Curtis* 37 F.3d 301 (7th Cir. 1994) ................................................... 16

*United States v. Curtis* 324 F.3d 501 (7th Cir. 2003) ................................................. 13

*United States v. Feldman* 825 F.2d 124 (7th Cir. 1987)............................................. 14

*United States v. Gajo* 290 F.3d 922 (7th Cir. 2002)....................................... 15, 16, 19

*United States v. Gaytan* 649 F.3d 573 (7th Cir. 2011) ......................................... 17, 18

*United States v. Gil* 604 F.2d 546 (7th Cir. 1979) ...................................................... 12

*United States v. Godinez* 110 F.3d 448 (7th Cir. 1997) .............................................. 17

*United States v. Guyton* 36 F.3d 655 (7th Cir. 1994) ................................................. 12

*United States v. Hamilton* 19 F.3d 350 (7th Cir. 1994)........................................ 19, 20

*United States v. Handlin* 366 F.3d 584 (7th Cir. 2004) ............................................. 13

*United States v. Hargrove* 508 F.3d 445 (7th Cir. 2007) ..................................... 10, 20

*United States v. Harris* 585 F.3d 394 (7th Cir. 2009) ...................................... 1, 11, 12

*United States v. Haynes* 582 F.3d 686 (7th Cir. 2009) ............................................... 15

*United States v. Herrera-Medina* 853 F.2d 564 (7th Cir. 1988).......................... 12, 19

*United States v. Hoover* 246 F.3d 1054 (7th Cir. 2001)............................................. 10

*United States v. Irorere* 228 F.3d 816 (7th Cir. 2000) ............................................... 12

*United States v. Johnson* 200 F.3d 529 (7th Cir. 2000) ....................................... 14, 15

*United States v. Johnson* 592 F.3d 749 (7th Cir. 2010) ............................................ 12

*United States v. Johnson* No. 08 CR 466, 2011 WL 809194 (N.D. Ill. Mar. 2, 2011) 57

*United States v. Jones* 275 F.3d 648 (7th Cir. 2001) ................................................. 13

*United States v. Kaden* 819 F.2d 813 (7th Cir. 1987).............................................. 16

*United States v. Lewis* 641 F.3d 773 (7th Cir. 2011)................................................ 19

*United States v. Lindemann* 85 F.3d 1232 (7th Cir. 1996) ....................................... 16

*United States v. Longstreet* 567 F.3d 911 (7th Cir. 2009) ........................................ 13

*United States v. Loscalzo* 18 F.3d 374 (7th Cir. 1994) ............................................. 11

*United States v. Mahkimetas* 991 F.2d 379 (7th Cir. 1993) ...................................... 14

*United States v. Maholias* 985 F.2d 869 (7th Cir. 1993) ........................................... 17

*United States v. Maloney* 71 F.3d 645 (7th Cir. 1995) .............................................. 16

*United States v. Martinez de Ortiz* 907 F.2d 629 (7th Cir. 1990) ............................. 11

*United States v. McClellan* 165 F.3d 535 (7th Cir. 1999) .......................................... 57

*United States v. Molinaro* 877 F.2d 1341 (7th Cir. 1989) .......................................... 15

*United States v. Molt* 772 F.2d 366 (7th Cir. 1985) ................................................... 15

*United States v. Montana* 199 F.3d 947 (7th Cir. 1999) ............................................ 18

*United States v. Monus* 128 F.3d 376 (6th Cir. 1997) ............................................... 15

*United States v. Nagib* 56 F.3d 798 (7th Cir. 1995) ................................................... 19

*United States v. Nicksion* 628 F.3d 368 (7th Cir. 2010) ...................................... 10, 20

*United States v. Noble* 754 F.2d 1324 (7th Cir. 1985) ............................................... 13

*United States v. Petrozziello* 548 F.2d 20 (1st Cir. 1977) .......................................... 10

*United States v. Potts* 840 F.2d 368 (7th Cir. 1987) .................................................. 17

*United States v. Prieto* 549 F.3d 513 (7th Cir. 2008) ................................................ 16

*United States v. Rea* 621 F.3d 595 (7th Cir. 2010) .................................................... 15

*United States v. Rivera* 136 F. App'x 925 (7th Cir. 2005) ......................................... 16

*United States v. Santiago* 582 F.2d 1128 (7th Cir. 1978) ................................. 1, 10, 11

*United States v. Smalls* 605 F.3d 765 (10th Cir. 2010) ............................................. 20

*United States v. Sophie* 900 F.2d 1064 (7th Cir. 1990) ................................. 13, 15, 16

*United States v. Stephenson* 53 F.3d 836 (7th Cir. 1995) .......................................... 16

*United States v. Thompson* 944 F.2d 1331 (7th Cir. 1991) ....................................... 10

*United States v. Tuchow* 768 F.2d 855 (7th Cir. 1985) ................................... 12, 18, 19

*United States v. Van Daal Wyk* 840 F.2d 494 (7th Cir. 1988) ........................ 12, 15, 19

*United States v. Volpendesto* 746 F.3d 273 (7th Cir.) ............................................. 20, 21

*United States v. Watson* 525 F.3d 583 (7th Cir. 2008) ............................................. 20

*United States v. Westmoreland* 240 F.3d 618 (7th Cir. 2001) ................................... 19

Rules

Fed. R. Evid. 801(a) ................................................................................................... 18

Fed. R. Evid.801(d)(2)(E) ..................................................................... passim

Fed.R.Evid. 801(d)(2)(A) ............................................................................. 17

Federal Rules of Evidence 104(a) .................................................................. 1

The United States of America, by its attorney, Morris Pasqual, Acting United States Attorney for the Northern District of Illinois, submits the following proffer of evidence as to the admission at trial of certain coconspirator statements against defendants Charles Liggins, Kenneth Roberson, Tacarlos Offerd, Christopher Thomas, Marcus Smart, and Ralph Turpin, and moves for the admission of such statements pursuant to Federal Rules of Evidence 104(a) and 801(d)(2)(E), and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

## I.  INTRODUCTION

In this submission, the government describes the law governing coconspirator statements, outlines some of its evidence establishing the violent crimes in aid of racketeering ("VCAR") conspiracy charged in Count Three of the superseding indictment, and sets forth some of the coconspirator statements for which a pretrial ruling by the Court is requested, in accordance with *Santiago*, 582 F.2d at 1130-31, and established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris,* 585 F.3d 394, 398, 400 (7th Cir. 2009).

This submission does not detail all of the government's evidence that would establish the existence of the VCAR conspiracy or all of the coconspirator statements that were made in furtherance of the charged racketeering conspiracy. Rather, this submission highlights for the Court certain of the government's evidence sufficient to establish the existence of the VCAR conspiracy described in Count Three of the superseding indictment and the participation of the coconspirators. As a result, this submission does not list all of the government's evidence and witnesses, nor does it

provide all of the evidence that will be presented by identified witnesses. Finally, by presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed.

## II. OVERVIEW OF THE CONSPIRACY TO MURDER CARLTON WEEKLY IN AID OF RACKETEERING, AS CHARGED IN COUNT THREE OF THE SUPERSEDING INDICTMENT.

On the afternoon of August 4, 2020, Carlton Weekly, who made music under the stage name "FBG Duck," was shopping for clothes for his son's birthday in Milani Boutique on East Oak Street in the Gold Coast. At approximately 3:59 p.m., Ralph Turpin and a friend of Turpin's entered into Milani Boutique and noticed Weekly. Weekly is a Gangster Disciple from the "STL" faction. Turpin did not like Weekly prior to August 4, 2020, and knew to call rival Weekly's rival gang members who would come downtown to kill Weekly. As a result, as set forth in further detail below, Turpin made at least one phone call inside of Milani Boutique to Weekly's rival gang members to come downtown to kill Weekly.

Approximately three minutes after Turpin entered Milani Boutique, at about 4:02 p.m., O-Block Black Disciples, who have a bitter, deadly rivalry with the STL Gangster Disciples, began scrambling to make their way downtown. They departed their neighborhood at approximately 4:06 p.m. in two cars, with Kenneth Roberson, Charles Liggins, and Christopher Thomas inside of Roberson's gray Chrysler 300, and Tacarlos Offerd and Marcus Smart inside of Offerd's black Ford Fusion. By the time the two cars arrived on E. Oak Street, at 4:26 p.m., Weekly was standing outside of a different store, Dolce & Gabbana, waiting to go inside. A total of four shooters—

2

two from each car—exited and fired 38 times in 12 seconds, hitting Weekly 16 times, the person standing behind Weekly in line three times ("Victim 1"), and Weekly's friend who was in her car two times ("Victim 2"). Turpin was standing across the street on the phone watching as the shooting unfolded.

Roberson, Liggins, Smart, Thomas, and Offerd have each been identified from surveillance footage inside of the Parkway Gardens Homes ("Parkway Gardens") on the south side of Chicago, from which they departed to murder Weekly, and to which Roberson, Liggins, and Thomas returned after the murder. Offerd, who had just purchased his Ford Fusion on July 28, 2020, returned it to the dealership immediately after the murder, but, along with Smart, was picked up from the dealership by a former girlfriend. The five of them have been identified in the surveillance video by friends, a security guard at Parkway Gardens, girlfriends, fellow gang members, a rival gang member, and other witnesses. Similarly, Turpin was captured on audio and video confessing to what he had done inside of Milani Boutique, although Turpin did not know he was being recorded.

## III. OVERVIEW OF O-BLOCK AS AN ENTERPRISE ENGAGED IN RACKETEERING ACTIVITY.

### A. O-Block is an enterprise as defined in Title 18, United States Code, Section 1959(b)(2).

O-Block is a street gang and criminal enterprise situated in Parkway Gardens on the south side of Chicago. O-Block is a faction of the larger Black Disciples street gang. Parkway Gardens is a fenced-in apartment complex consisting of approximately 35 buildings and is located between approximately 63rd Street and 66th

3

Street on S. Dr. Martin King Jr. Drive. Because Parkway Gardens is fenced-in and employs security guards at various checkpoints, O-Block members and Black Disciples from neighboring, allied factions have described Parkway Gardens as a "fortress" and "headquarters." This setup makes it difficult for opposing gang members to easily ambush O-Block members.

O-Block is comprised of members who engage in violent criminal acts, including murder and assault. O-Block is also comprised of drug dealers. Some O-Block members make "drill" music, often bragging about their criminal activities, publicly claiming responsibility for acts of violence committed by O-Block, taunting rival gang members, and mocking opposing gang members and their associates who have been murdered. O-Block members also use social media platforms to promote O-Block and disparage their rivals.

At times material to the allegations in the superseding indictment, O-Block had meetings where O-Block business was discussed, including acts of violence committed against O-Block members and violence to be committed against O-Block rivals. For example, Cooperator 1, a Black Disciple initiated through the "Newtown" faction, but who lived in Parkway Gardens from approximately 2006 or 2007 to 2011 and continued to be active as a Black Disciple while living in Parkway Gardens may testify at trial. If Cooperator 1 is called to testify at trial, the government expects that Cooperator 1 will testify that while he lived in Parkway Gardens, O-Block members (O-Block was called "WiiiC City" at that time) would have weekly or bi-weekly meetings with $20 dues that were paid at each meeting. If a member did not pay

4

dues, that member would be charged interest for unpaid dues. The money was pooled together for various purposes, including memorials and funerals for deceased members, bond money for members, and for purchasing firearms. Cooperator 1 continued to live close to Parkway Gardens after moving out of Parkway Gardens in 2011.

Cooperator 2, a current O-Block member, may also testify at trial. If called to testify at trial, the government expects that Cooperator 2 will testify that he moved to Parkway Gardens in the late 2000s and became an O-Block member in approximately 2007. Cooperator 2 will testify that O-Block members continue to have meetings, and that only shooters and drug dealers are invited to the meetings. Cooperator 2 has been to meetings where firearms and narcotics were distributed to O-Block members. Cooperator 2 will testify that, at the times material to the superseding indictment, O-Block had structure, a hierarchy, and rules that O-Block members were expected to abide by. Both Cooperator 1 and Cooperator 2 will testify that O-Block members may have received a "violation" if they did not abide by the rules, including, but not limited to, an organized beating, and that violations for O-Block members were discussed in meetings.

Cooperator 2 will testify that, at times material to the superseding indictment, the leaders of O-Block were "Boss Top" [known to law enforcement as Individual A], "Duke" [known to law enforcement as Individual B], "BJ" [known to law enforcement as Individual C], defendant Charles Liggins, and Dayvon Bennett, a/k/a "King Von," when he was alive. Bennett was murdered in Atlanta, Georgia, on or about November

6, 2020. Cooperator 1 and Cooperator 2 may testify that defendant Marcus Smart began to emerge as a leader within O-Block after Bennett was murdered. According to Cooperator 2, Smart kept a fund for commissary and bond for incarcerated O-Block members, but Smart wouldn't necessarily collect the money at meetings. Smart would go around every week or every other week and collect $100 from members. According to Cooperator 2, this has been going on in O-Block for "forever."

### B. O-Block engaged in racketeering activity as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1).

The government expects that Cooperator 1, if called, will testify that O-Block members made their money by committing burglaries and robberies, and by selling drugs when he lived in Parkway Gardens. According to Cooperator 1, O-Block members controlled the drug trade inside of Parkway Gardens when he lived there and continue to do so today. According to Cooperator 1, O-Block members would use vacant apartments to store firearms and narcotics, and no one could sell drugs inside of Parkway Gardens without the permission of the O-Block members.

The government expects that if called, Cooperator 2 will testify that marijuana, "pills," and heroin are distributed in the meetings. Cooperator 2 has personally seen O-Block members selling heroin and marijuana in Parkway Gardens, and Cooperator 2 himself was a drug dealer. O-Block members are generally the only people who can sell drugs in Parkway Gardens, and O-Block members enforce that. However, according to Cooperator 2, other people who are not O-Block members can come into Parkway Gardens and sell drugs if they pay a percentage.

According to Cooperator 2, O-Block members are expected to shoot at opposing gang members, and that is the only way to rise through the ranks in O-Block outside of having a lot of money from selling drugs or making music. Killers have more respect within O-Block than people who just shoot, and killing a high-profile opposition member—often referred to as an "opp"—will increase status within O-Block even more.

### C. O-Block has a deadly rivalry with STL/EBT dating back at least a decade.

Cooperator 2 lived in Parkway Gardens and was active as a younger O-Block member back when O-Block was still called WiiiC City. Odee Perry, an O-Block member, was murdered by STL member Gakirah Barnes on August 11, 2011.[1] STL member Cooperator 3, who may testify at trial, will testify if called that Gakirah was his sister and he has first-hand knowledge that she murdered Perry. Thereafter, Cooperator 2 will testify, WiiiC City became known as O-Block in Odee Perry's memory.[2] The antagonism between O-Block and STL increased after Perry's murder. Cooperator 2 will testify that O-Block members were expected to shoot at and kill STL members in order to maintain or increase their status within O-Block, and that killing a high-profile STL member would substantially increase an O-Block member's status. If an O-Block member did not shoot at the opps, that person would from then

---

[1] Pronounced Ja-ky-ruh Barnes.

[2] Cooperator 2 may also testify that WiiiC City was briefly known as "Keta World" after a beloved Parkway Gardens resident named Keta passed away from natural causes shortly before Odee Perry was murdered.

on be treated like a "goofy." Which is to say, at a minimum, that person's status would decrease.

Cooperator 3 will testify that he has witnessed murders committed by O-Block members in STL territory. Specifically, the government expects that Cooperator 3 will testify that he witnessed the murder of Dale Fischer, a/k/a "Squirrel," in STL territory in December 2011. According to Cooperator 3, Fischer was not a gang member, but lived in STL territory. Fischer was murdered by O-Block member "T. Roy" [known to law enforcement as James T. Johnson] and "600" member "D. Rose" [known to law enforcement as Individual D]. As explained in further detail below, 600 is a Black Disciple faction allied with O-Block.

Cooperator 3 was also present for and witnessed the murder of his sister Gakirah Barnes by O-Block member Dayvon Bennett in STL territory on April 14, 2014. Cooperator 3 was also shot by Bennett during the incident. Cooperator 3 was able to escape and saw Johnson waiting for him at the end of the alley he was about to run through, so instead Cooperator 3 was able to wait until Bennett and Johnson left. Before leaving, Cooperator 3 observed Bennett stand over Barnes and shoot her multiple times. Witness 1, who may also testify at trial, also observed this murder. Witness 1 later saw Bennett come back to the neighborhood after the murder and state, in a threatening manner, that Bennett was from O-Block.

Cooperator 3 will testify if called that STL members and O-Block members antagonized each other online, including with respect to deceased O-Block and STL members. Specifically, Cooperator 3 may testify that O-Block member Individual A

antagonized Cooperator 3 after Barnes's murder during a FaceTime call, with Individual A claiming to be the one who drove the shooters to STL territory.

### D. O-Block is "cliqued up" with neighboring Black Disciple factions.

Cooperator 2 will testify if called that O-Block is "cliqued up" or allied with several neighboring Black Disciple factions. O-Block and "600" have been cliqued up since Cooperator 2 became an O-Block member. Cooperator 2 will testify that O-Block later became cliqued up with "Lamron" (64th Street and Normal Blvd.) in the early 2010s, and THF (which stands for "Trigger Happy Family"), sometimes referred to as THF 46 and THF 44, shortly thereafter. If a gang faction is "cliqued up" with another gang faction, they work together and inherit and adopt each other's conflicts. So, if 600 or THF is cliqued up with O-Block, 600 and THF would also be in conflict with STL.

### E. "Dead Bitches"

On July 10, 2020, Weekly released a song entitled "Dead Bitches." According to a number of witnesses who will testify, including Cooperator 2, rappers from STL and rappers from O-Block, 600, and Lamron would often disparage the other side in their music. Dead Bitches, however, was a particularly blistering diss record. In the song, Weekly raps in a disrespectful manner about a number of dead O-Block members, including Odee Perry, T. Roy [Johnson], Keta, and Sheroid Liggins, defendant Liggins's younger brother. The government expects that Cooperator 2 and others will identify the names of individuals disrespected in the song at trial.

As of August 4, 2023, Dead Bitches has almost 41 million views on YouTube.[3] Weekly currently has approximately 430,000 subscribers to his YouTube channel.

## IV. GOVERNING LAW

Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[4]

### A. Existence of and Membership in the Conspiracy

In accord with *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), this Court must determine whether statements by the defendants' coconspirator will be admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination, this Court must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy …." *Id*. at 1143

---

[3] https://www.youtube.com/watch?v=SKaJT8yWbGs (last viewed August 4, 2023).

[4] No Sixth Amendment confrontation issues arise by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant because they are not testimonial. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) and *Crawford v. Washington*, 541 U.S. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

(quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If this Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Under *Santiago*, the government must make a preliminary offer of evidence to show: (1) a conspiracy existed; (2) the defendants and declarant were members of the conspiracy; and (3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134-35; *see also, e.g., United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009). According to *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule (Fed. R. Evid.801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (*en banc*).

11

While this Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and the defendants' participation in it, *United States v. Bourjaily*, 483 U.S. 171, 178, 180 (1987); *United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009), the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and a defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson*, 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).[5]

There is no requirement, under Rule 801(d)(2)(E), that the government establish all elements of a conspiracy, such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548-50 (7th Cir. 1979). The government need only establish the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means)

---

[5] The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted. Accordingly, statements by coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant out of cocaine not hearsay because showed membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988) (addressing "war stories" about the drug trade); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988) (statements had non-hearsay value to establish knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867-69 (7th Cir. 1985) (pre-conspiracy statements admissible to set scope of anticipated conspiracy).

and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-550; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator. *Longstreet,* 567 F.3d at 919; *Jones*, 275 F.3d at 652.

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590

(7th Cir. 2004) ("it is irrelevant when the defendant joined the conspiracy so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A coconspirator who has become inactive or less active in the conspiracy nevertheless is liable for his coconspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context and/or other evidence) that the declarant was in fact a coconspirator. *Id.*

## B.    "In Furtherance of" the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea,* 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to

14

be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted). That statements were made to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala,* 601 F.3d 256, 268 (4th Cir. 2010).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, 2004 WL 1151630 *2-3 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009) (quotations and citations omitted). *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

- to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000);[6]

- to recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937-38; *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009), abrogated on other grounds by *United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012);

- to identify other members of the conspiracy and their roles, *Alviar,* 573 F.3d at 545;

- to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

---

[6] Statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997).

- as an assurance that a coconspirator can be trusted to perform his role, *United States v. Sophie*, 900 F.2d 1064, 1073-74 (7th Cir. 1990); *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

- to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

- to control damage to an ongoing conspiracy, *United States v. Johnson,* 200 F.3d 529, 533 (7th Cir. 2000); *United States v. Molinaro,* 877 F.2d 1341*,* 1343-44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

- to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

- to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

- to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008);

- "describing the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992);

- statements to outsiders "to serve as a salesmanship technique to enhance his position in the eyes of [the outsider] and give confidence about the ability of the organization," *United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir. 1995); *United States v. Curtis*, 37 F.3d 301, 308 (7th Cir. 1994).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera,* 136 F. App'x 925, 926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility."*).

### C.    Alternative Bases for Admissibility of Statements

Various statements made during the course of a conspiracy are independently admissible and do not require a Rule 801(d)(2)(E) analysis. A defendant's own statements, for example, are admissible against him pursuant to Rule 801(d)(2)(A), without reference to the coconspirator statement rule.

### i. A Defendant's Own Statements

A defendant's own admissions are relevant to establish the factual predicates for the admission of coconspirator statements against him. *See United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997). Many statements described herein and sought to be admitted against the defendant are independently admissible and do not require a Rule 801(d)(2)(E) analysis. A defendant's own admissions, for example, are admissible against him pursuant to Federal Rule of Evidence 801(d)(2)(A), without reliance on the coconspirator-statement rule.[7] *See United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993); *see also* Fed.R.Evid. 801(d)(2)(A) (providing that a "statement" is not hearsay if "[t]he statement is offered against a party and is . . . the party's own statement, in either an individual or a representative capacity"). Additionally, a defendant's own admissions are relevant to establishing the factual predicates for the admission of coconspirator statements against him. *See United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997); *United States v. Potts*, 840 F.2d 368, 371-72 (7th Cir. 1987).

---

[7] Rule 801(d)(2)(A) provides in pertinent part that a "statement" is not hearsay if "[t]he statement is offered against a party and is … the party's own statement, in either an individual or a representative capacity."

Moreover, statements during a conversation with a defendant that are offered by the government to provide context for a defendant's statements are, as a general matter, admissible as non-hearsay. For example, in *United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011), the Seventh Circuit addressed the district court's introduction of a confidential informant's recorded statements to the defendant. The Court held that the challenged statements were non-hearsay because they were offered not for their truth but to put the defendant's "own words in context and to help the jury make sense out of his reaction to what [the informant] said and did." *Id.* at 580 (defendant's responses "would have been unintelligible without the context provided by [the informant's] statements"). Likewise, a statement that is incapable of verification— such as a suggestion, question, offer, demand, or order—does not constitute hearsay because it "do[es] not make any truth claims." *United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999).

### ii. Non-Hearsay Statements

The coconspirator statement rule is not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification. An example would be an order or a suggestion. *See United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). This is because a "statement" is defined as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Fed. R. Evid. 801(a). Thus, a statement which is incapable of verification, such as an order or a mere suggestion,

18

is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See Tuchow*, 768 F.2d at 868.

Finally, the coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c).[8] Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *Gajo*, 290 F.3d at 929-30; *see also United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.

### iii. Statements Against Penal Interest

Under Federal Rule of Evidence 804(b)(3), a hearsay statement is admissible if (1) the declarant is unavailable; (2) the statement was against the declarant's penal interest at the time it was made; and (3) corroborating circumstances exist indicating that the statement is trustworthy. *See United States v. Lewis*, 641 F.3d 773, 783 (7th Cir. 2011). When determining whether a statement is against penal interest, each portion of a proffered out-of-court statement is examined to determine whether it subjected the declarant to criminal liability. *United States v. Westmoreland*, 240 F.3d 618, 626 (7th Cir. 2001). A statement may satisfy this requirement if it would be

---

[8] Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

probative at trial against the declarant. *United States v. Nagib*, 56 F.3d 798, 804 (7th Cir. 1995). Applying this standard, the Seventh Circuit has held that a declarant's inculpatory statements made to friends and acquaintances about crimes committed by the declarant and his associates are admissible. *See, e.g. United States v. Hamilton*, 19 F.3d 350, 357 (7th Cir. 1994) (holding that a jailhouse conversation between two codefendants which incriminated a third codefendant but was also inculpatory of the first two co-defendants was admissible against the third codefendant); *United States v. Curry*, 977 F.2d 1042, 1056 (7th Cir. 1992) (affirming the district court's decision to allow a co-defendant's inculpatory statement which also incriminated the defendant in because it was not made in an attempt to curry favor with law enforcement, but was made to an acquaintance).

Such statements against penal interest are admissible against non-declarant defendants. *See United States v. Volpendesto*, 746 F.3d 273, 288 (7th Cir.) *cert. denied sub nom. Sarno v. United States*, 135 S. Ct. 382 (2014) and *cert. denied sub nom. Polchan v. United States*, 135 S. Ct. 383 (2014); *United States v. Watson*, 525 F.3d 583, 587-88 (7th Cir. 2008); *United States v. Hamilton*, 19 F.3d 350, 356 (7th Cir. 1994). *See also United States v. Smalls*, 605 F.3d 765, 773-81 (10th Cir. 2010).[9]

### iv.  Co-Conspirator statements after *Crawford*

Only "testimonial" statements implicate the Confrontation Clause, *Crawford v. Washington,* 541 U.S. 36 (2004), and a statement made in furtherance of a

---

[9] There is no Confrontation Clause problem since "[a] statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes." *Watson*, 525 F.3d at 589.

conspiracy is not a testimonial statement. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (rejecting confrontation clause claim as to introduction of coconspirator statements because such statements are not testimonial); *United States v. Hargrove*, 508 F.3d 445, 448 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial). Further, even if a hearsay statement does not qualify for admission under Rule 801(d)(2)(E), or any other hearsay exception, that fact alone would not create a Confrontation Clause issue because only testimonial statements implicate the right to confront a witness. *Crawford*, 541 U.S. at 68 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as . . . would an approach that exempted such statements from Confrontation Clause scrutiny altogether."); *see also Volpendesto*, 746 F.3d at 289 ("[a] statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes.").

## V.     THE EVIDENCE DEMONSTRATING THE EXISTENCE OF THE CHARGED CONSPIRACY AND THE DEFENDANTS' PARTICIPATION IN THE CONSPIRACY

At trial, the government's evidence will establish that Charles Liggins, Kenneth Roberson, Tacarlos Offerd, Christopher Thomas, and Marcus Smart, conspired with each other and others to murder Weekly for the purpose of maintaining and increasing their position in O-Block, an enterprise engaged in racketeering activity. At trial, the government's evidence will also establish that Ralph Turpin aided and abetted Weekly's murder and the conspiracy to murder Weekly.

As set forth below, the evidence that establishes the existence of this VCAR conspiracy meets the preponderance of the evidence standard applicable at this stage of the proceedings. Below, the government has summarized some of the evidence that it will present at trial regarding the existence of the charged conspiracy.

## A. The Conspiracy to Murder Carlton Weekly on August 4, 2020

### i. Ralph Turpin and Witness 2 saw Weekly inside of Milani Boutique.

According to video surveillance footage from several businesses along E. Oak Street, CPD POD camera footage, cell phone video recorded by a security guard at a store working on E. Oak Street (which captured defendant Ralph Turpin speaking on the telephone), and Witness 2, who may testify at trial, Witness 2 and Turpin traveled to E. Oak Street on the afternoon of August 4, 2020, to buy clothes for Witness 2's children. According to Victim 2 and video surveillance footage, Victim 2 and Weekly had also traveled to E. Oak Street to purchase some presents for Weekly's son's birthday. Victim 2, who drove Weekly to E. Oak Street that day, waited outside in her vehicle parked on the street while Weekly shopped inside of their first stop of the afternoon, Milani Boutique, located at 50 E. Oak Street. According to the owners of Milani Boutique, who may testify at trial, Milani is a boutique that sells children's clothing and Weekly had shopped at the store before.

At approximately 3:59 p.m., while Weekly was inside of Milani, Turpin and Witness 2 entered into Milani. While Turpin and Weekly were both still inside of Milani, Turpin placed at least one phone call to alert others, including the named defendants, that Weekly was inside of Milani. The government will introduce

22

evidence at trial of Turpin recounting this conversation minutes later, unaware that he was being recorded. Minutes later, at approximately 4:02 p.m. the other five named defendants began scrambling in Parkway Gardens to make their way downtown to murder Weekly.

### ii. Smart, Roberson, Liggins, Thomas, and Offerd began making their way to E. Oak Street to murder Weekly.

Specifically, at approximately 4:02 p.m., Smart ran across a parking lot away from where Offerd's black Ford Fusion was parked and ran up a flight of stairs. Smart ran past a group of three people by the stairwell, which included Roberson. Roberson then turned and ran up the stairwell after Smart. After a few minutes, Smart ran down the stairwell wearing different clothes, dressed in all black. Thomas ran down next—dressed in all black (including a black, striped Adidas jacket) and putting a black baseball cap onto his head—followed by Roberson, who was wearing the same clothes he was wearing when he went up the stairs. Liggins came down last, also dressed in dark clothing and a baseball cap turned to the back. Smart entered into Offerd's Ford Fusion while Liggins, Thomas, and Roberson entered into Roberson's gray Chrysler 300. The cars departed the parking lot in Parkway Gardens at approximately 4:06 p.m.

A CPD license plate reader and multiple CPD Police Observation Devices ("POD" and "POD camera") captured the Chrysler and Fusion traveling from Parkway Gardens to E. Oak Street at multiple points traveling in tandem. Roberson's Chrysler 300 was registered to Roberson on the day of the murder, and Offerd's Ford Fusion was registered to Offerd on the day of the murder.

23



*(Roberson's Chrysler 300 on the way to E. Oak Street)*



*(Offerd's Ford Fusion on the way to E. Oak Street)*

24

Based on the timing, the number of data points (at least one license plate reader, eleven POD cameras (on the way to commit the murder), and private surveillance footage), and the path that the vehicles traveled (I-90/94 to Lake Shore Drive), the path and timing is consistent with the vehicles traveling directly from Parkway Gardens to E. Oak Street without making any stops. This is corroborated by data from Roberson's cell phone. The data from Roberson's cell phone is consistent with Roberson traveling from Parkway Gardens directly to E. Oak Street at the time of the murder, and then back to Parkway Gardens right after the murder.

### iii. Roberson made statements in furtherance of the conspiracy to Cooperator 4, acknowledging that Roberson was on his way to murder Weekly.

According to Cooperator 4, who may testify at trial, and information retrieved from Cooperator 4's cell phone, Roberson and Cooperator 4 were exchanging text messages while Roberson was traveling to murder Weekly, and shortly after Roberson and his coconspirators had murdered Weekly. Specifically, Cooperator 4 and Roberson were exchanging text messages because Cooperator 4 was attempting to return a firearm to Roberson. At 4:19 p.m., while POD camera footage would show that Roberson was on Lake Shore Drive nearing E. Oak Street (which is corroborated by Roberson's cell phone data), Roberson texted Cooperator 4 to take the gun to Parkway Gardens because they were "on Duck rn [right now]," meaning on the way to kill Weekly.



### iv. Turpin placed at least one phone call to report Weekly's Location.

Weekly exited Milani and entered into Victim 2's vehicle at approximately 4:04 p.m. As stated above, Smart, Liggins, Roberson, Thomas, and Offerd appeared to have received some news at approximately 4:02 p.m. and left Parkway Gardens at approximately 4:06 p.m. traveling directly towards Weekly's location on E. Oak Street. Weekly and Victim 2 pulled away from the curb in front of Milani at

approximately 4:05 p.m., returning minutes later and parking in front of Dolce and Gabbana. Dolce and Gabbana, located at 68 E. Oak Street, is on the same side of the street as Milani. Turpin exited Milani—without Witness 2—at approximately 4:07 p.m. Turpin entered into a clothing store down and across the street, Moncler, located at 33 E. Oak Street, at approximately 4:10 p.m. Turpin discussed what had occurred inside of Milani while speaking on the phone inside of Moncler. Because Turpin was speaking in a wild and agitated state, a security guard inside of Moncler began to record him. The security guard, Witness 3, who may testify at trial, began recording Turpin at 4:13 p.m.



Turpin asked someone that he was speaking to on the phone, "[w]hat's D Thang number?" and went on to tell the person to whom Turpin was speaking to have "D Thang" call Turpin. Multiple witnesses are expected to testify that D Thang is Dontay Banks, Jr., the older brother of Individual E.[10] Multiple witnesses will testify that individual E is a high-ranking Black Disciple and, at times material to the superseding indictment, was and is a part of a Black Disciple faction allied with O-Block, Lamron.

---

[10] Dontay Banks, Jr., a/k/a D Thang, was murdered on or about June 6, 2021.

Minutes later, Turpin began discussing a woman who Turpin did not name specifically, but who Turpin referenced as being in a romantic relationship with Weekly and having Weekly around Turpin's child. Turpin described the woman as "bogus," and went on to state, "It's over with now though." Witness 4, who may testify at trial, identified Turpin in the video as her child's father. Witness 4 also acknowledged that she had been in a romantic relationship with Weekly, but was not at the time of Weekly's murder. Should Witness 4 testify at trial, the government expects that Witness 4 will testify that she was heartbroken upon learning of Weekly's death because she loved Weekly. Witness 4 will also testify that, on the day of Weekly's murder, after Weekly's murder, she received a text message from Turpin that contained simply three laughing emojis. Witness 4 will testify that she was not in regular contact with Turpin, as her child has a cell phone allowing Turpin and her child to communicate directly.

Witness 5, who has known Turpin for many years and who may testify at trial, will testify that prior to August 4, 2020, Turpin did not like Weekly over jealously stemming from Weekly's relationship with Witness 4.

While Turpin was discussing the unnamed woman, Turpin received an incoming phone call from a telephone number associated with D Thang. Based upon Turpin's cell phone records Turpin's other phone calls inside of Moncler and Milani would have likely been video calls as opposed to calls using a telephone number. However, this call from the telephone number associated with D Thang was an actual telephone call. Turpin answered the phone call from the number associated with D

Thang at 4:18 p.m. Turpin told the caller that he and Witness 2 saw Weekly inside of Milani. Turpin told the caller that Turpin had people on the phone and on the way downtown while he, Weekly, and Witness 2 were still inside of Milani Boutique. Turpin then told the caller that when Weekly left Milani, he followed Weekly outside and reported as much to "Bad Ass" [known to law enforcement as THF member Individual F]. According to Turpin, Bad Ass then told Turpin to see what kind of car Weekly was getting into. Turpin then told the caller that Turpin was standing outside of Milani when Weekly pulled off, and after walking up the street a little bit, someone began chasing Turpin down the street with a gun.

Witness 2 may testify at trial that in the above exchange, Turpin was providing Weekly's location. Turpin eventually stood across the street from Weekly on the phone for several minutes until Weekly was murdered at 4:26 p.m., walking over to Weekly to get a better look after Weekly had been gunned down.



*(Turpin in the white tee shirt and jeans while Weekly was lying in the street dying. This camera view is approximately six minutes behind.)*

### v. Smart, Roberson, Thomas, Liggins, and Offerd murdered Weekly and then split up in different directions.

According to video surveillance, Offerd's Fusion and Roberson's Chrysler 300 arrived at Dolce & Gabbana at approximately 4:26 p.m., with the Chrysler trailing the Fusion. Two people, including Smart, exited from the passenger's side of the Fusion, and started shooting at Weekly while Weekly was standing on the sidewalk. Weekly and Victim 1, who was in line behind Weekly, ran away from the shooters, circled around the back of Victim 2's car and attempted to hide, but the shooters aggressively pursued Weekly. According to Victim 2, she picked up Weekly's gun and shot at the individuals who exited from Offerd's Fusion. This detail is not public and is significant for reasons that follow. Liggins and Thomas then exited from the passenger's side of Roberson's Chrysler. The rear passenger, Thomas, stood over and shot at Weekly while Weekly was on the ground. The shooting lasted about 12 seconds in total, but the shooters fired 38 times, hitting Weekly 16 times, Victim 2 twice, and Victim 1 three times. The shooters got back into their respective vehicles and Roberson's Chrysler pulled away from the scene first, followed by Offerd's Fusion.

### vi. Offerd made statements in furtherance of the conspiracy to Witness 6.

Offerd purchased the Ford Fusion from Midway Autohaus in in Bridgeview, Illinois, on July 28, 2020. On the date of the purchase, Offerd was accompanied by Witness 6. Witness 6, who may testify at trial, is Offerd's ex-girlfriend and the mother of one of Offerd's children. Offered lied about his employment on the financing application for the vehicle, and, Witness 6 is expected to testify, Offerd manufactured

pay stubs in order to create the impression that he was employed. This was discovered on or about August 3, 2020, prompting Offerd to begin a text message exchange with an employee of Midway Autohaus on that day, continuing through August 4, 2020. Witness 6 will testify that she assisted Offerd in negotiating what to say to Midway Autohaus in terms of Offerd returning the vehicle, and that Offerd planned to return the car on August 4, 2020.

According to cell phone records and photographs of the car dealership employee's text messages, at 4:35 p.m., approximately nine minutes after the murder, Offerd texted the car dealership employee that Offerd was on his way to return the car to the dealership. Witness 6 will testify that Offered spent the night at her house on the night of August 3rd/morning of August 4th, and that she and Offerd had discussed that she would give Offerd a ride home from the dealership when he was ready. Witness 6 will testify that she received a phone call from Offerd the afternoon of August 4th, awaking her from a nap, telling Witness 6: (1) that Offerd was on his way to the dealership; (2) to meet him at the dealership; and (3) to text him the address of the dealership. Shortly thereafter, Witness 6 texted Offerd the address for the dealership at 4:39 p.m.

Witness 6 arrived at the dealership at approximately 5:15 p.m., beating Offerd to the dealership. Offerd arrived 10-15 minutes later. Offered arrived at the dealership with Smart and Offerd's cousin, Ezell Rawls.[11] Offerd then directed Witness 6 to drop Offerd, Smart, and Rawls off at a different O-Block member's

---

[11] Rawls died by suicide on or about August 24, 2021.

residence, [Individual G], which she did. Witness 6 identified Individual G in photos as an O-Block member. After Offerd instructed Witness 6 to take him, Smart, and Rawls to Individual G's house, the three did not speak for the remainder of the ride.

In approximately late August or early September 2021, Witness 6 became aware of a video that a blogger made and uploaded to YouTube indicating, in summary, that Offerd was involved in Weekly's murder, purporting to include police scanner audio from August 4, 2020, relating to Offerd, Offerd's Ford Fusion, and music that Offerd had made. Someone texted the video to Witness 6. Witness 6 asked Offerd about the video. Offered responded to Witness 6 that people were "praying on his downfall," that "they" hoped he got "locked up" so that "they" could have sex with his current girlfriend, that Offerd "don't know nothing" and that he didn't want to talk on the phone about it. In a later conversation, after Witness 6 indicated to Offerd that she had been contacted by law enforcement, Offerd told Witness 6 that she "don't know nothing" which Witness 6 understood to mean that Offerd did not want Witness 6 to tell law enforcement where she dropped Offerd off at on August 4, 2020.

### vii. Roberson made additional statements in furtherance of the conspiracy to Cooperator 4.

After murdering Weekly, Roberson continued his text message exchange with Cooperator 4 about Weekly, at this point, gloating. Specifically, at 4:40 p.m., while Roberson was still driving back to Parkway Gardens, Roberson texted Cooperator 4

to check Spot News.[12] At 5:20 p.m., after Roberson had arrived at Parkway Gardens, Roberson sent Cooperator 4 a link to a news story about Weekly's murder.



Cooperator 4 will testify that several days later, Roberson met with Cooperator 4 and confessed to Cooperator 4 in-person to having participated in the murder. However, in the version of events Roberson relayed to Cooperator 4, Roberson embellished his role, describing himself as a shooter, which is inconsistent with the surveillance video. According to Cooperator 4, Roberson told Cooperator 4 that Roberson was in the backseat and fell as he got out to start shooting. Roberson told Cooperator 4 that Roberson started shooting from the street and a woman started

---

[12] Spot News is an individual in Chicago that follows police scanners and reports the news on social media. The Spot News handle has a high number of followers and is known as a way people in the Chicagoland area get their news or verify various criminal acts that take place inside Chicago and its surrounding suburbs.

shooting back at him, so "C Murda" [meaning Liggins] shot her. As stated above, this detail about the offense is not public.

Roberson made the following, additional statements to Cooperator 4 about the offense:

- The defendants used Roberson's Chrysler 300 to commit the murder, and there was more than one car used to commit the murder.

- That three or four people murdered Weekly, but "C Murda" was the only name that Cooperator 4 remembered.

- That CPD seized Roberson's Chrysler after the murder.

- That Dipset, a gang faction where Roberson is from originally, is cliqued up with O-Block, and as a result, in conflict with STL, where Weekly is from. Roberson indicated that this is a part of the reason why Roberson participated in the murder.

- That O-Block member Dayvon Bennett had placed a hit out on Weekly prior to the murder, and this is additionally why Roberson participated in the murder.

- That "C Murda" offered Roberson an O-Block chain after they murdered Weekly and told Roberson that Roberson might as well become O-Block, but Roberson turned the O-Block chain down because Roberson was from Dipset.

### viii. Roberson made additional statements in furtherance of the conspiracy to Witness 7, this time, for purposes of concealment.

At approximately 9:56 a.m. on the day after the murder, Witness 7, who may testify at trial, sent Roberson a link to a news story about the murder via Instagram. Witness 7 followed up her message by writing to Roberson, "I know you ain't take your car to go do this shit[.]" In response, Roberson twice instructed Witness 7 to "Unsend that shit[.]"



*(Witness 7's Instagram username redacted.)*

Witness 7 will testify that she saw a news article about a Chrysler similar to the one Roberson drove being used to commit Weekly's murder, and she knew that Roberson and Weekly did not get along, which is what prompted her to message Roberson. Witness 7 asked Roberson to call her via Apple FaceTime, which he did. When they spoke, Roberson asked Witness 7 why she sent him the message, and why she thought Roberson used his car to commit the murder. Roberson then indicated that he did not know what Witness 7 was talking about, and the two changed the subject.

### ix. CPD seized Roberson's Chrysler 300 the day after the murder, and Roberson called CPD to get it back.

CPD had, in fact, seized Roberson's Chrysler on August 5, 2020, in the aftermath of Weekly's murder. After securing a search warrant for the Chrysler,

during the search of the Chrysler, CPD recovered contact information for Liggins from inside of the Chrysler that appeared to have been written by Liggins ("My # 1773-557-6775," IG: Oblock_C_Murda," etc.). CPD also recovered a spent .357 shell casing from the passenger's side of the Chrysler resting in between the windshield and the hood. According to Caryn Tucker, who has been disclosed as an expert in firearms/toolmarks examination, the spent .357 shell casing recovered from the Chrysler and the sole .357 shell casing recovered from the scene of the murder were fired from the same gun.

Thereafter, Roberson, and one of his girlfriends at the time, Witness 8, called CPD to have the Chrysler 300 returned to Roberson. Witness 8, who may testify at trial, will identify the Chrysler 300 in pictures that CPD took after CPD seized the Chrysler as Roberson's Chrysler 300. Witness 8 will testify if called that she called CPD at Roberson's direction on his behalf to have the Chrysler returned to her. Witness 8 will testify that CPD informed her that only the registered owner, Roberson, could get the car. Witness 8 then lied to CPD, indicating that she had power of attorney over Roberson's affairs in order to get the car returned to her on Roberson's behalf.

CPD Sergeant Jorge Rivera, who may testify at trial, will testify if called that Witness 8 called him at least 12 times inquiring about the Chrysler 300 from August 6, 2020, to August 7, 2020. Sgt. Rivera will also testify that Roberson called Sgt. Rivera asking that the car be released to Witness 8 on August 7, 2020, and August 11, 2020. On August 7, 2020, when Sgt. Rivera indicated to Roberson that Roberson

37

would need to come to CPD, show identification, and fill out a form in order to get the Chrysler 300, Roberson told Sgt. Rivera that Roberson was out of town. Roberson never retrieved the Chrysler 300 from CPD.

### x. Charles Liggins made statements in furtherance of concealment of the conspiracy to murder Weekly.

On or about October 14, 2021, after the defendants had been arrested on the indictment, Liggins spoke to an acquaintance, believed to be Individual H based on the telephone number called and the subject of the conversation, via a jail call. During the call, Liggins instructed the person he called to tell "Duke" that everyone needed to get new phones. Liggins went on to discuss the murder with the person he called, describing the case as "weak." Specifically, Liggins indicated that law enforcement had shown him a video of the crime scene and the shooters' faces could not be seen because they were wearing masks. Liggins went on to state that video of him and his co-defendants, whom he did not name specifically, going up and down the stairs in Parkway Gardens, "ain't nothing."

### B. O-Block Chains

Several members of O-Block wore gold necklaces with diamond-encrusted gold pendants at times relevant to the conspiracy to murder Weekly. Specifically, several members wore "O-Block chains" in the months leading up to Weekly's murder, and several more members began wearing O-Block chains in the weeks and months that followed Weekly's murder.

The O-Block chains were purchased from and manufactured by Icebox Diamonds & Watches in Atlanta, Georgia, at various points throughout calendar year

2020. According to an Icebox representative and co-owner, Witness 9, Dayvon Bennett purchased the O-Block chains on Bennett's account throughout 2020. Specifically, Bennett spent $128,000 on O-Block pendants in 2020.



*(Six of the O-Block pendants, including Bennett's larger pendant)*

On or about January 24, 2020, Bennett purchased an O-Block pendant that he wore for $30,000. Bennett's pendant was approximately five times larger and more expensive than the pendants he purchased for other O-Block members later in the year.



On or about July 2, 2020, Bennett ordered five O-Block pendants for $6,000 each, which he picked up on August 7, 2020. Bennett ordered five more O-Block pendants on July 9, 2020, for $6,000 each, which he picked up on August 14, 2020. Bennett ordered two more O-Block pendants on August 14, 2020, and additional one on August 28, 2020, an additional one on September 17, 2020, and an additional one on September 28, 2020. Bennett also ordered at least one pendant that read "THF" on September 17, 2020, for $8,000.

The back side of Bennett's pendant contained additional references to O-Block, including the names of deceased O-Block members underneath the words "Long

Live," including "Keta," "Odee," "Patoon," "Sheroid," "Jmoney," and "T.Roy." The back of Bennett's pendant also contains multiple references to "64," meaning 64th Street and S. King Drive where Parkway Garden is located. Bennett's pendant also states, "O-Block for Life."



On or about August 10, 2020—six days after the murder—Smart was present inside of Icebox Diamonds & Watches with Bennett shopping for additional O-Block pendants.



*(Smart on the left and Bennett on the right)*

Liggins, Offerd, Smart, and Thomas have each publicly posted pictures of themselves wearing O-Block chains. For example, on or about August 9, 2020, Liggins posted a picture to his Instagram account of him wearing an O-Block chain:



On or about August 28, 2020, Smart posted a picture to his Instagram account of him wearing an O-Block chain:



On or about September 22, 2020, Thomas posted stories on his Instagram account of Thomas wearing an O-Block chain:



On or about June 20, 2021, the user of YouTube account "Losā dosā64" uploaded a music video for the song "Never Change" performed by Offerd with Offerd wearing an O-Block chain:



Witness 6 identified the person performing this music video as Offerd. However, Witness 6 indicated that, according to Offerd, Offerd did not own his own O-Block chain and had instead borrowed one to shoot this music video.

When Liggins and Smart were arrested for the charges in the indictment and superseding indictment, both were in possession of O-Block chains. The rear of Liggins's O-Block pendant reads "C Murda" at the top (an alias for Liggins), "Long Live the guys" on the left side, and "Sheroid Squad 1992 – 2012" at the bottom. For the reasons stated above, "Sheroid Squad 1992 – 2012" is a reference to Sheroid's younger brother Sheroid Liggins. According to reports from the Chicago Police

Department, Sheroid C. Liggins was born on November 21, 1992, and murdered on February 16, 2012, near 6421 S. King Dr. in Chicago.



The rear of Smart's O-Block chain reads "Muwop" at the top (an alias for Smart) and the names of deceased O-Block members, including Johnson ("T. Roy" and sometimes referred to as "Troy").



### C.     Social Media

At all times material to the allegations in the superseding indictment, members of O-Block have publicly claimed membership in or association with O-Block on various social media platforms, including Facebook, Instagram, and YouTube. Liggins, Roberson, Offerd, Thomas, and Smart have all either claimed membership in O-Block on social media or posted some association with O-Block on social media at times material to the superseding indictment.

In June, July, and August 2020, Liggins's Instagram and Facebook display names were "Oblock_C_Murda" (Instagram) and "Cmurda Oblock" (Facebook). For example:



*(Redacted)*





*(Redacted. Liggins on the far left and Thomas on the far right)*

In the header of Roberson's Instagram profile, Roberson referenced O-Block and other Black Disciples factions cliqued up with O-Block, including 300 (Lamron) and 600:



Thomas's Instagram username and Facebook display name also both contained references to O-Block in the time-period before and immediately after the murder:



*(As of September 15, 2020)*



*(Redacted. Posted on August 10, 2020)*

In Offerd's song "Never Change," referenced above on page 46, Offerd states

multiples times throughout the song's chorus, "O-Block, Munna Gang. This s**t will

never change."[13] Offerd's username for his Instagram account is "6los_munna4." As

stated above, 64 is a common reference among O-Block members to 64th and S. King

Drive where Parkway Gardens is located.

---

[13] https://www.youtube.com/watch?v=Rz6kYW2448M (last accessed July 28, 2023).

52



*(As of September 22, 2020)*



*(Redacted. Offerd on the left and Ezell Rawls on the right. As of September 22, 2020).*

As referenced above on page 44, Smart's Instagram profile is "muwopfrmdao" [as in Muwop from O-Block] and depicts Smart wearing an O-Block necklace in multiple posts:



*(A minor's name and image redacted. As of September 15, 2020)*

**D.    Tattoos**

Many O-Block members have "O-Block" tattooed on themselves. Witness 6 will testify at trial that Offerd has an O-Block tattoo. Dayvon Bennett had both O-Block and 600 tattooed on himself:



*(600 on Bennett's left bicep. "Odee" underneath "O-Block.")*

Defendant Smart has both "O-Block" and "Sheroid" tattooed on himself:



## VI.   COCONSPIRATOR STATEMENTS

All of the statements identified above as having been made by defendants Liggins, Roberson, Offerd, Thomas, Smart, and Turpin, whether orally to another person, such as to Witness 4, Witness 6, Witness 7, or Cooperator 4, via text message, or on social media, are admissible in evidence as admissions by a party opponent under Rule 801(d)(2)(A).

However, many of these same statements were also made during the course of and in furtherance of the VCAR conspiracy to murder Weekly and maintain or increase position in O-Block. The statements between the coconspirators and to others outside of the conspiracy in furtherance of the VCAR conspiracy to murder Weekly fall into a number of categories, all concerning subjects integral to the conspiracy and its success, and to further the objectives of O-Block as an enterprise. These statements will be introduced through the testimony of witnesses, including but not limited to those noted above, other individuals who will be compelled to testify, consensually recorded in-person appearances and telephone recordings, including the recordings referenced throughout this submission, as well as recorded jail telephone calls involving the defendants, their associates, and their unindicted coconspirators.

Given the extent and number of such statements in this case, the government does not, and cannot, detail each and every proposed coconspirator statement of each witness or document. Nor does *Santiago* or the Seventh Circuit's precedent require the government to set forth the specific, verbatim coconspirator statement. Instead, the Seventh Circuit has specifically stated that categories of statements, such as those set forth below, suffices. *See United States v. McClellan*, 165 F.3d 535, 554 (7th Cir. 1999) (rejecting the argument that the "government is bound to give notice in advance of trial of co-conspirator statements it intends to introduce at trial"); *United States v. Johnson*, No. 08 CR 466, 2011 WL 809194, at *8 (N.D. Ill. Mar. 2, 2011) (rejecting defendant's argument that the government failed to "specifically identif[y]

the statements it intends to introduce" and rejecting defendant's request "that the Government be required to specifically identify each statement by a co-conspirator it intends to introduce"). Nevertheless, the government has provided numerous specific examples of coconspirator statements here. The coconspirator statements offered at trial will concern the subjects listed below, and include, but are not limited to, the coconspirator statements discussed above:

1. Statements made by Roberson to Cooperator 4 regarding Weekly's murder, including the following:

   a. Statements made by Roberson to Cooperator 4 that Roberson and his coconspirators were on their way to murder Weekly, in order to publicly take credit for an act of violence against a rival gang member and maintain or increase his position in O-Block;

   b. Statements made by Roberson to Cooperator 4 in the immediate aftermath of Roberson and his coconspirators having just murdered Weekly, including directing Cooperator 4 to check Spot News and sending Cooperator 4 a link to a news story regarding Weekly's murder, in order to publicly take credit for an act of violence against a rival gang member and maintain or increase their position in O-Block;

   c. Roberson confessing days later to Cooperator 4—including who was with Roberson—and even embellishing his own role in the murder, in order to publicly take credit for an act of violence against a rival gang member and maintain or increase their position in O-Block;

2. Statements made by Offerd to Witness 6 on the day of Weekly's murder, including:

   a. That Offerd was on the way to Midway Autohaus and needed a ride from the dealership;

   b. To take Offerd and his coconspirators to Individual G's residence;

3. Statements made by Offerd to the employee from Midway Autohaus on the day of Weekly's murder, including:

    a. That Offerd was on his way to the dealership in order to return the Ford Fusion, for the purpose of concealment and to avoid detection by law enforcement by getting rid of the vehicle he had just used to murder Weekly;

4. Statements made by Roberson to Witness 7 for the purpose of concealment, including:

    a. Directing Witness 7 to "unsend" a message to Roberson regarding Roberson having used his own vehicle to commit Weekly's murder;

5. Statements made by Roberson to Witness 8 for the purpose of concealment, including:

    a. Directing Witness 8 to call CPD to get back the Chrysler that Roberson and his coconspirators used to commit Weekly's murder;

    b. Statements Witness 8 made on Roberson's behalf in order to try to get the Chrysler back from CPD;

    c. Statements Roberson himself then made to CPD to get the Chrysler back from CPD after Witness 8's efforts had failed;

6. Statements made by Liggins to Individual H for the purpose of concealment, including:

    a. Directing Individual H to tell "Duke" to tell "everyone" to get new phones in the immediate aftermath of Liggins's arrest;

As is evident from the categories' description, all such statements made by coconspirators furthered the conspiracy. Thus, under the case law summarized above, all such statements are properly admitted at trial as coconspirator statements under Fed. R. Evid. 801(d)(2)(E).

## VII. CONCLUSION

The above is an outline of the evidence that the government will introduce to establish that the charged conspiracy existed. Based upon this proffer, the government respectfully requests that this Court find that categories of coconspirator statements listed above, as well as coconspirator statements like them, are admissible pending the introduction of evidence to support this proffer.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:     */s/ Jason A. Julien*
JASON A. JULIEN
ANN MARIE E. URSINI
CAITLIN WALGAMUTH
Assistant United States Attorneys
219 S. Dearborn Street, Rm. 500
Chicago, Illinois 60604
(312) 353-5300

## CERTIFICATE OF SERVICE

I, Jason A. Julien, an attorney, certify that I served a copy of the foregoing Government's *Santiago* Proffer and Motion to Admit Evidence Pursuant to Federal Rule of Evidence 801(d)(2)(E) by filing the same using the CM/ECF System, and that a copy will be provided to all parties of record designated to receive notice.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:     */s/ Jason A. Julien*
       JASON A. JULIEN
       ANN MARIE E. URSINI
       CAITLIN WALGAMUTH
       Assistant United States Attorneys
       219 S. Dearborn Street, Rm. 500
       Chicago, Illinois 60604
       (312) 353-5300