UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 21 CR 618 |
| v. | |
| CHARLES LIGGINS, et al. | Honorable Martha M. Pacold |

## GOVERNMENT'S MOTION TO ADMIT CERTAIN ACTS AS DIRECT EVIDENCE OF CHARGED OFFENSES OR, IN THE ALTERNATIVE, PURSUANT TO FEDERAL RULE OF EVIDENCE 404(b)

The government intends to introduce evidence at trial establishing:

(1) The existence, activities, and purposes of the O-Block street gang, including evidence that O-Block members committed murders and other violent crimes, engaged in narcotics trafficking, and publicly displayed and pronounced various markers of their affiliation with O-Block. This evidence is directly relevant to establishing that O-Block was an "enterprise" engaged in "racketeering activity," as required under 18 U.S.C. § 1959;

(2) Defendant Tacarlos Offerd's use of falsified documents to obtain a vehicle used in the charged murder. This evidence directly establishes Offerd's participation in the murder and his efforts to conceal that participation, including Offerd's decision to relinquish his vehicle immediately following the murder;

(3) That defendant Ralph Turpin was twice pulled over for traffic offenses he committed while using a vehicle consistent with the vehicle he drove the day of the charged murder. This evidence helps establish Turpin's participation in that

murder and rebut an anticipated effort to excuse an incriminating phone call Turpin made nearly contemporaneous to the charged murder.

To the extent this Court finds that the above-described evidence does not constitute direct evidence of the charged offenses, the government seeks to admit the same evidence pursuant to Federal Rule of Evidence 404(b) for the non-propensity purposes described further below.

## I.    FACTUAL BACKGROUND

### A. The Charges

On April 5, 2023, defendants Charles Liggins, Kenneth Roberson, Tacarlos Offerd, Christopher Thomas, Marcus Smart, and Ralph Turpin were charged in a seven-count superseding indictment with:

- Murder as a violent crime in aid of racketeering activities, in violation of Title 18, United States Code, Sections 1959(a)(1) and 2 (Count 1) (as to all defendants);

- Using, carrying, brandishing, and discharging a firearm during and in relation to a crime of violence, namely, murder in aid of racketeering activities; and causing the death of a person through the use of the firearm during and in relation to a crime of violence, in violation of Title 18, United States Code, Sections 924(j)(1) and 2 (Count 2) (as to Liggins, Roberson, Offerd, Thomas, and Smart);

- Conspiracy to commit murder in aid of racketeering activities, in violation of Title 18, United States Code, Sections 1959(a)(5) and 2 (Count 3) (as to all defendants);

- Assault with a deadly weapon in aid of racketeering, in violation of Title 18, United States Code, Sections 1959(a)(3) and 2 (Counts 4 and 6) (as to Liggins, Roberson, Offerd, Thomas, and Smart); and

- Using, carrying, brandishing, and discharging a firearm during and in relation to a crime of violence, namely, assault with a deadly weapon in aid of racketeering activities, in violation of Title 18, United States Code, Sections

924(c)(1)(A) and 2 (Counts 5 and 7) (as to Liggins, Roberson, Offerd, Thomas, and Smart).

Dkt. 120.

## B. The Enterprise

As alleged in the indictment, defendants were all members and associates of an enterprise known as the O-Block street gang.[1] O-Block, a subset of the Black Disciples, operates primarily out of a Chicago apartment complex, the Parkway Gardens Homes ("Parkway Gardens"). Parkway Gardens itself is sometimes referred to as O-Block, or simply, "the O."

O-Block members identify themselves as such through tattoos, jewelry, social media handles, and online postings and, in some instances, through music videos and song lyrics. O-Block members operate according to a hierarchy, and members attain higher status and power in the gang by shooting others. This is particularly true if they kill opposing gang members (known as "opps") and even truer if they kill opps who hold a high rank or status in the opposing gang. O-Block members also attain status in the gang by accumulating wealth, including through drug dealing or by developing a music career.

O-Block members act as a group with a common purpose. For example, they pay dues to the gang and enforce the gang's territory (including by limiting who is permitted to sell drugs in Parkway Gardens). They also honor deceased O-Block members, including by having their names engraved on O-Block jewelry. Indeed, O-

---

[1] A more detailed description of the enterprise is set out in the Government's *Santiago* proffer. Dkt. 191.

Block's name itself is an homage to one of its deceased members—Odee Perry—who was killed in 2011 by an opposing gang member.

O-Block has a years-long, violent rivalry with the STL set of the Gangster Disciples. "STL" is a reference to the area near 63rd Street and South St. Lawrence Avenue in Chicago. STL is sometimes also referred to as "TookaVille," named after Shondale "Tooka" Gregory, who was killed by members of the Black Disciples in 2011. The rivalry between O-Block and STL has been marked by murders and attempted murders of and by members of both gangs, as set out in some detail in the government's *Santiago* proffer. *See* Dkt. 191.

### C. The Murder of Carlton Weekly

The charges against all defendants center around the murder of Carlton Weekly—including the manner in which that murder took place as well the reasons underlying it. Weekly, who rapped using the stage name "FBG Duck," was a member of the STL set of the Gangster Disciples. In the eyes of O-Block—and other gang sets with which O-Block was allied, or "cliqued up" with—Weekly was a rival or an "opp."

On July 10, 2020, Weekly released a song, "Dead Bitches," with lyrics disparaging deceased members of O-Block. For example, "Dead Bitches" referenced "Odee" (i.e., Odee Perry, the Black Disciple killed in 2011 and for whom O-Block is named); "Sheroid" (i.e., Sheroid Liggins, an O-Block member who was killed in 2012 and who was the brother of defendant and O-Block member Charles Liggins); and "T. Roy" (i.e., James T. Johnson, an O-Block member killed in 2017).

On August 4, 2020, less than a month after Weekly released "Dead Bitches," Weekly was shot and killed, and two other individuals were shot and injured, while Weekly shopped for his son, in Chicago's Gold Coast neighborhood.

More specifically, at around 3:59 p.m., defendant Turpin entered a retail store, Milani Boutique, located at 50 E. Oak Street. When Turpin entered, Weekly was already in the store. Weekly left the store at approximately 4:05 p.m., followed shortly thereafter by Turpin. Turpin is a Black Disciple and is associated with "Trigger Happy Family" (often referred to as "THF" or "THF 46") a gang set of the Black Disciples that was "cliqued up" with O-Block. As a result of that association, Turpin knew that THF members and O-Block members wanted Weekly dead and would travel to Oak Street to kill him.

The government believes that Turpin alerted the other defendants to Weekly's location. At approximately 4:02 p.m., while Weekly and Turpin were both still in the boutique, the other five charged defendants—all of whom were located at Parkway Gardens—appeared to get some news. Surveillance video from Parkway Gardens shows some of these five defendants running up stairs toward apartments and returning dressed in black. By approximately 4:06 p.m., these five defendants (and a sixth individual, now deceased) had left Parkway Gardens in two vehicles heading toward Oak Street.

Defendants Roberson, Liggins, and Thomas traveled to Oak Street in Roberson's gray Chrysler 300. Defendants Offerd and Smart rode in Offerd's black Ford Fusion. All the while, Weekly continued shopping. After Weekly left the

boutique, he got into a car, rode up Oak Street, turned back around, and got out of the car to stand in line outside of the Dolce & Gabbana store that is also on Oak Street. Around the same time, Turpin went into Moncler, a store located a few storefronts down from Dolce & Gabbana, on the other side of the street.

While Turpin was in Moncler, he made a phone call that was partially audio- and video-recorded by a store security guard. On the call, Turpin stated he was "lacking," i.e., was not armed; that he had seen "Duck" [Weekly]; and had provided the address for Milani Boutique. He added that some people were already "on their way." In other words, having earlier alerted others to Weekly's location, Turpin was now providing a status report on his effort to have Weekly murdered.

At around 4:18 or 4:19 p.m., approximately seven minutes before Weekly was murdered and while five defendants were still en route from Parkway Gardens, defendant Roberson exchanged text messages with another person. In sum, the individual contacted Roberson to let Roberson know that he/she wanted to give Roberson back a gun.[2] Roberson responded at 4:19 p.m. that this person should take the gun to "the O" because Roberson was "on Duck." In other words, Roberson could not accept the firearm in person because he was busy traveling to kill Weekly. (Later that afternoon, after Weekly was killed, Roberson sent the same individual a link to a news story about Weekly's murder.)

After the murder, the five defendants drove away from the scene in Offerd's Ford Fusion and Roberson's Chrysler 300. On or about July 28, 2020, Offerd had

---

[2] This individual was later charged with unlawful possession of the firearm. The gun referenced in the call was not used in the offenses set forth in the superseding indictment.

purchased the Ford Fusion from a dealership using fraudulent pay stubs to establish his income. On or about August 3, 2020, the dealership discovered the fraud and communicated with Offerd on August 3rd and 4th, asking him to return the vehicle. According to phone records, at 4:35 p.m. on August 4, 2020, approximately nine minutes after Weekly was murdered, Offerd told the dealership that he was on his way to return the car. In fact, Offerd, accompanied by co-defendant Smart, drove the Ford Fusion to the dealership immediately after Weekly's shooting and returned the vehicle to the dealership.

After Weekly was killed and the two vehicles containing five of the defendants left the area, Turpin walked a short distance from where he had been standing on Oak Street to check out the murder scene. Video from the area shows Turpin walking down Oak Street in the direction of where Weekly had been killed. As he walked, Turpin held his phone up to his face as though he were on a call. Turpin walked to a point where he was almost directly across the street from where Weekly had been killed. While still on the phone, he stopped, stood up high on his toes to look in Weekly's direction, turned around, and walked away.

Based on video from the area and eyewitness testimony the government expects to introduce at trial, Turpin drove to, and left, Oak Street in his silver Buick vehicle. On two separate occasions, in 2017 and 2020, Turpin was pulled over for traffic offenses, and both times he was driving a silver Buick like the silver Buick he drove on August 4, 2020, to and from Oak Street.

## II.   LEGAL BACKGROUND

### A. Evidence Establishing Existence, Purpose, and Activities of Enterprise Constitutes Direct Evidence of Charged Offenses.

To prove the alleged violation of 18 U.S.C. § 1959(a) (violent crimes in aid of racketeering, or "VCAR"), the government must prove beyond a reasonable doubt that the O-Block street gang was an "enterprise," within the meaning of the statute; that the enterprise was engaged in racketeering activity; that the defendants committed the charged act of violence, namely, Weekly's murder; and that they did so to gain entrance to or maintain or increase their position in the enterprise. Seventh Circuit Pattern Instructions – Criminal, Statutory Instruction for 18 U.S.C. § 1959(a), at page 816-18 (2022).

The term "enterprise" refers to "a group of people associated together for a common purpose of engaging in a course of conduct," whether legal or not. Seventh Circuit Pattern Instructions – Criminal, Statutory Instruction for 18 U.S.C. § 1961(4), at page 820. In determining whether an enterprise existed, a jury may consider the group's ongoing organization or structure, either formal or informal, and whether its members functioned as a continuing unit. *Id.* The government must also show the enterprise is "engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2).

The Seventh Circuit has upheld the admission of evidence of "uncharged criminal acts . . . to prove the nature of an enterprise and the defendant's participation in it," even where the uncharged acts were committed by uncharged individuals. *United States v. Salerno*, 108 F.3d 730, 739 (7th Cir. 1997) ("[i]t is

8

difficult to comprehend how one could prove the existence of an enterprise . . . without presenting evidence of the crimes that detail the structure, common purposes, and continuity of the charged enterprise."); *see also id.* (rejecting argument that evidence "was irrelevant in demonstrating the charged enterprise because it detailed [defendant's] extortionate activities with others not explicitly named in the indictment as members of the enterprise"); *United States v. Olson*, 450 F.3d 655, 670-71 (7th Cir. 2006) (evidence that gang member retaliated against a rival gang member for "disrespect," as was required of members of the gang, was appropriately admitted to tie racketeering acts to the enterprise); *Perez v. United States,* 2015 WL 9460137, at *7 (N.D. Ill. Dec. 22, 2015) ("Evidence that other members of the gang trafficked in drugs, possessed firearms, and committed violent acts was thus relevant and necessary to prove the existence of the conspiracy, the pattern of racketeering activity, and the connection of these activities to interstate commerce.").

### B. Rule 404(b) Permits Admission of Other-Acts Evidence for Non-Propensity Purposes, Such as Motive, Identity, and Plan, Which Can Also Be Relevant To Establishing Charged Offenses.

"[W]here the 'bad acts' alleged are really direct evidence of an essential part of the crime charged"—as the government maintains above—"Rule 404(b) is inapplicable." *United States v. Alviar,* 573 F.3d 526, 538 (7th Cir. 2009) (citation omitted). In the alternative, however, Rule 404(b) provides an avenue of admissibility.

Under Rule 404(b), evidence of other crimes, wrongs, or acts is admissible to show a non-propensity purpose such as "motive, opportunity, intent, preparation,

plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b); *United States v. Bell*, 624 F.3d 803, 808-11 (7th Cir. 2010) (Rule 404(b)'s list is not exhaustive).

In *United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014) (*en banc*), the Seventh Circuit "set the roadmap for determining" whether a particular piece of evidence simply proves "that the defendant had a propensity for committing crime" or whether it satisfies some other legitimate purpose. *See United States v. Brewer*, 915 F.3d 408, 415 (7th Cir. 2019). Under *Gomez*, "after a Rule 404(b) objection, the proponent of the other-act evidence must demonstrate that the evidence is relevant to a legitimate purpose 'through a chain of reasoning that does not rely on the forbidden inference that the person has a certain character and acted in accordance with that character on the occasion charged in the case.'" *Id*. (quoting *Gomez*, 763 F.3d at 860). "If the proponent does so, the district court must then use Rule 403 to determine 'whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice,' taking into account 'the extent to which the non-propensity fact for which the evidence is offered actually is at issue in the case.'" *Id*. (quoting *Gomez*, 763 F.3d at 860); *see also United States v. Thomas*, 897 F.3d 807, 813 (7th Cir. 2018).

Importantly, "[e]xclusion is not required merely because some propensity inference can be drawn from the other-act evidence; rather, the other-act evidence is admissible provided that the other-act evidence's relevance to another purpose is established by some propensity-free chain of reasoning." *United States v. Ferrell*, 816 F.3d 433, 444 (7th Cir. 2015) (internal quotations omitted). "[T]he proponent is not

10

required to negate every imaginable propensity inference an observer might draw." *Id*. at 447. Instead, "[o]ther-acts evidence is excluded if its relevance to another purpose is established only through the forbidden propensity inference." *United States v. Norweathers*, 895 F.3d 485 (7th Cir. 2018) (district court did not abuse its discretion by admitting evidence of an email exchange in which defendant discussed drugging and having sex with young boys; although emails were inflammatory, they were also highly probative of defendant's identity and intent, which were relevant to child pornography offenses).

Other-act evidence may not be admitted unless the evidence is sufficient for the jury to find by a preponderance of the evidence that the other act was committed; however, the court is not required to make a preliminary finding about whether a party in fact committed the other-act as a condition of admissibility. *Gomez*, 763 F.3d at 853-54; *United States v. Thomas*, 986 F.3d 723, 731 (7th Cir. 2021).

Prior acts of violence may be introduced under Rule 404(b) as evidence of motive, intent, and capacity to commit murder. *United States v. Garcia-Meza* 403 F.3d 364, 368 (6th Cir. 2005) (in murder case, evidence defendant previously assaulted his wife appropriately introduced to show motive, where government presented evidence that defendant's assault and murder of his wife were both motivated by jealousy).

Under Rule 404(b), the Seventh Circuit also has upheld the introduction of evidence of pre-conspiracy crimes for the non-propensity purposes of establishing how the scheme developed and the relationship between co-conspirators. *See United*

*States v. Prevatte,* 16 F.3d 767, 776 (7th Cir. 1994) (explaining that evidence of prior criminal acts admissible "when those acts show the formation of the conspiracy or the prior relationship between conspirators"; upholding district court's admission of prior acts which "demonstrate[d] how the conspiracy at issue developed" and "evidence[d] why [a defendant] continued to involve himself in criminal activity"); *see also Gomez,* 763 F.3d at 854 (contemplating admission of evidence under Rule 404(b) "to show a criminal relationship between defendant and an accomplice").

### C. Evidence Admitted Under Rule 404(b) Must Also Satisfy Rule 403.

Evidence of prior acts admitted under Rule 404(b) is, like any inculpatory evidence, inherently prejudicial. Federal Rule of Evidence 403, however, permits the exclusion of otherwise relevant evidence only to the extent that the evidence's "probative value is *substantially outweighed* by the danger of *unfair* prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." (Emphasis added.) "Unfair prejudice 'does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis.'" *United States v. Gibbs*, 182 F.3d 408, 429 (6th Cir. 1999) (quoting *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993)).

In *Gomez*, 763 F.3d at 857, the Seventh Circuit noted that the degree to which a fact is contested matters to the fact-specific balancing called for under Rule 403, explaining that the probative value of the evidence increases based on "the degree to which the non-propensity issue actually is disputed." *See also Huddleston v. United*

*States*, 485 U.S. 681, 684 (1988) ("Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct."). Prior act evidence can also have significant probative value when related to potential defenses. *See, e.g., United States v. Dunkin*, 438 F.3d 778, 780 (7th Cir. 2006) (prior bank robbery had "considerable" probative value "to demonstrate the implausibility of a defense of coercion").

Further, prejudice to defendant can be diminished through a limiting instruction. *See Gomez*, 763 F.3d at 860 (An "[a]ppropriate jury [instruction]" that "may help to reduce the risk of unfair prejudice inherent in other-act evidence.").

## III. ARGUMENT

### A. Uncharged Acts Committed by O-Block Members Constitute Direct Evidence of the Enterprise's Existence, Purpose and Activities or, in the Alternative, Are Admissible Under Rule 404(b) To Establish Those Non-Propensity Purposes.

As noted above, to prove the alleged crimes, the government must prove that the O-Block enterprise existed, that it engaged in activities in or affecting interstate commerce, and that the defendants committed violent acts in order to maintain or increase their status in the enterprise. More specifically, and as alleged in the indictment, O-Block was an enterprise that had among its purposes, "[a]quiring, preserving, and protecting power, territory, operations, and proceeds for the enterprise through the use of threats, intimidation, and violence, including, but not limited to, murder and other acts of violence, and the illegal trafficking in controlled substances"; "[p]romoting and enhancing the enterprise and its members' and

13

associates' activities, including by publicly claiming responsibility for acts of violence committed by the enterprise and taunting rival gang members"; "increasing the enterprise through the use of social media platforms and music"; and "[t]aking steps designed to prevent law enforcement's detention to the enterprise's criminal activities." Dkt. 120 at 2.

To make the requisite showing, at trial, the government intends to introduce evidence that (1) the O-Block enterprise had a long history of violence, including the commission of murders directed at its "opps," particularly STL Gangster Disciples and those who lived in STL territory; (2) members and associates of O-Block, including defendants, engaged in drug trafficking activity, including by using Parkway Gardens apartments to store drugs; (3) members and associates of O-Block, including defendants, possessed firearms, shared firearms, and hid firearms for each other; and (4) defendants were members and associates of O-Block and demonstrated their membership on social media, by wearing or posing with O-Block pendants, and by getting tattoos of names for the enterprise and its members. As described further below, each of these categories constitutes direct evidence of the crimes charged; in the alternative, to the extent these categories fall under Rule 404(b)'s ambit, they are admissible for non-propensity purposes, most significantly, identity, plan, and motive.

### i. Prior Acts of Violence by the Enterprise

The government will offer evidence of (1) how the enterprise valued and encouraged violence against "the opps" and (2) specific acts of violence and attempted

acts of violence (other than those charged in the indictment) by members and associates of O-Block (other than the charged defendants). This category of evidence is central to the government's case, both because the government must prove the existence and purposes of the enterprise, and also that the defendants' charged acts of violence were carried out in order to maintain or increase their status in the enterprise. The government also anticipates that these issues will be hotly contested at trial, as defendants will argue that O-Block was not a formal enterprise but rather a loose association of individuals motivated by personal, individualized vendettas.

As further described in the government's *Santiago* proffer (Dkt. 191 at 7), the government will introduce testimony and evidence that O-Block valued violence, especially against high-level "opps." Violence was a way to increase status within the enterprise, and violence on behalf of the enterprise was publicly glorified in members' music and social media posts. The government also intends to introduce evidence regarding the relative status and value conferred by the O-Block enterprise on shooters, killers, drivers, and "spotters" (i.e., those who identified the locations of opps), and how members of O-Block could—and did—develop reputations as being particularly adept at different roles. Conversely, the government will also introduce evidence that *not* shooting at or killing opps decreased an individual's status in the enterprise. Persons who were seen as not serious about the purposes of the enterprise, such as killing opps and bringing in money, were deemed "goofy," i.e., a person with low or no status in the enterprise and who could not be trusted by the enterprise to perform critical assignments. The government will also introduce evidence that the

O-Block enterprise allied with, or "cliqued up" with other gang sets and that, when they did so, the enterprise and their cliqued-up sets would share opps.

In terms of specific acts of violence, the government anticipates introducing evidence of the 2011 murder of Dale Fischer, while Fischer was in STL Gangster Disciple territory, by O-Block member "T. Roy" and others. The government also intends to introduce evidence of the 2014 shooting murder of Gakirah Barnes in STL territory by Dayvon Bennet (later killed), a rapper who performed as "King Von" and publicly held himself out as a member of O-Block. The testimony the government intends to introduce about these murders is summarized in the *Santiago* proffer, as are the references to "T. Roy" and others on "Dead Bitches." *See* Dkt. 191 at 7-10. These murders, along with any others the government may seek to introduce at trial, are part of the years-long cycle of violence and retributive violence between O-Block and STL.

Paying homage to these deceased members and others was important to O-Block as an enterprise and was one of its unifying features. For example, as described in detail in the government's *Santiago* proffer (Dkt. 191 at 38-48), members of O-Block, including some defendants, wore O-Block pendants with the names of deceased members inscribed on the backs, and O-Block itself is named for one of its deceased members, Odee Perry. By the same token, O-Block conferred respect on the enterprise's shooters and killers when they took out "opps."

Evidence of the specific murders described above and evidence of the enterprise's use and encouragement of violence are direct evidence of the charged

offenses. The government must prove the enterprise existed and its purposes, and one of the purposes identified in the indictment is violence against rivals. Further, the government must demonstrate that defendants acted to increase or maintain status in the enterprise. O-Block's veneration of violence was real. Murders were committed by both sides of the long-standing rivalry between O-Block and STL, they were retributive, they were designed to protect power, and there was no better way to gain power and status in the enterprise than killing an opposing gang member, particularly a high-level opposing gang member who was a successful rapper and who had disparaged the enterprise's dead members.

In the alternative, to the extent the murders described above do not constitute direct evidence, they are admissible under Rule 404(b) for the non-propensity purpose of establishing defendants' motive and plan for killing Weekly and to help establish their identity as Weekly's killers. In the same vein, the evidence demonstrates an absence of mistake. Turpin did not err when he provided Weekly's location to Weekly's rivals; he did so because Turpin knew that Weekly's rivals would come to Oak Street to kill Weekly, and that is precisely what occurred minutes later while Turpin watched. Additionally, the other five defendants did not find themselves on Oak Street by accident on August 4, 2020; the drivers among them were not oblivious to the fact that the shooters were going to get out of the car and try to kill Weekly.

Moreover, the prior acts described above satisfy Rule 403's considerations as well. The probative value of the murders is high, as they help establish the purposes, activities, and history of enterprise, and help establish and explain defendant's

17

motivations as members of the enterprise. That probative value is also not substantially outweighed by a prejudicial effect. *See Salerno*, 108 F.3d at 738 (overruling a 403 objection to allow evidence of uncharged crimes in order to prove the "enterprise" elements of a VCAR murder and VCAR murder conspiracy prosecution). The government is not introducing prior acts of violence committed by the charged defendants, but rather by other members of the enterprise. And in any event, the jury already will hear about the cold-blooded murder of Weekly in the middle of the day in a highly trafficked part of the city. Lastly, the government can prepare an appropriate limiting instruction to mitigate any undue prejudice.

### ii. Drug Trafficking

Additionally, the government intends to introduce evidence that the O-Block enterprise, including some defendants, engaged in drug trafficking, which is one of the purposes of the enterprise alleged in the indictment.

The government intends to introduce evidence and testimony that O-Block members sold drugs out of Parkway Gardens and controlled who had the ability to sell drugs within Parkway Gardens. The government also intends to introduce specific evidence regarding the drug trafficking activities of some of the defendants. Specifically, the government may introduce a recorded conversation in which defendant Roberson spoke to other individuals about cocaine that was missing from Roberson's stash in Parkway Gardens (Roberson was in an agitated state and used the word "coke" repeatedly) as well as some money that Roberson owed defendant Liggins. Liggins was added to the recorded call, and Roberson and Liggins discussed

18

"coke" as "$600 worth of work," and that it (the cocaine) was bagged up. Roberson later spoke to another person about his call with Liggins, during which Roberson repeatedly referred to Parkway Gardens as "our block" in the context of the conversation he was recounting that he had with Liggins. The government may also introduce evidence that defendant Offerd kept controlled substances in associates' apartment in Parkway Gardens.[3]

Defendants' drug trafficking activities are direct evidence of the charges. One of the purposes of the enterprise listed in the indictment is to acquire, preserve, and protect territory, operations and proceeds through the illegal trafficking in controlled substances.

### iii.  Evidence of Affiliation With O-Block

The government intends to introduce evidence that defendants embraced membership or affiliation with O-Block in the form of tattoos and jewelry bearing O-Block's name, the names of deceased members, and other important names or symbols, and in rap lyrics celebrating violence against O-Block's opposition. Such evidence serves as direct proof of the existence of the enterprise and defendants' respective affiliation with the enterprise and, given that it does not represent an "other act," does not raise the propensity concerns addressed by Rule 404(b). But to the extent such evidence implicates Rule 404(b), it is admissible for the non-propensity purposes of proving defendants' motive and demonstrating the relationship between the co-conspirators.

---

[3] A suppression motion related to these items is pending. *See* Dkt. 155, 199.

More specifically, the government intends to introduce evidence that several members of the enterprise had "O-Block" pendants from Icebox Diamonds & Watches, located in Atlanta, as described in the government's *Santiago* proffer. *See* Dkt. 191 at 38-47. Dayvon Bennett (a/k/a "King Von") wore a large O-Block pendant which he purchased for himself in January 2020, and he also purchased several smaller pendants in July through September 2020, some of which were for the charged defendants. *Id.* The O-Block pendants were customized, containing names of the person for whom the pendant was intended; the names of deceased members of O-Block; words of symbols related to O-Block (e.g., references to "64," for 64th Street and S. King Drive, where Parkway Gardens is located, and "WiiiC City," the name of O-Block before Odee Perry's death); a symbol appearing to be a target or crosshairs; and, in at least one case, the name of a gang set with which O-Block was cliqued up – "THF," with which defendant Turpin is affiliated. *Id.*

The government also intends to introduce evidence that some members of the enterprise, including defendants Smart and Offerd, had "O-Block" tattoos. *Id.* at 54-56.

The government further intends to introduce evidence that members and associates of the enterprise used "O-Block" and symbols relating to O-Block on social media to demonstrate their affiliation with the enterprise. *Id.* at 48. For example, defendant Liggins' social media handles included "Oblock_C_Murda" and "Cmurda Oblock," he used the hashtag, "#oblock" and posted photos of him wearing an O-Block pendant. Defendant Roberson's social media postings include references to O-Block

20

and other Black Disciples factions cliqued up with O-Block. *Id.* Defendant Thomas posted using the social media handles, "Oblock Cthang" and "oblock64cthang." *Id.* On August 10, 2020, only about a week after Weekly's murder, he posted, "Baby I'm Oblock." *Id.* One of defendant Offerd's social media handles is "6los_munna4," which combines his nickname "Los" and "64," a number affiliated with O-Block.

In addition, the government intends to introduce evidence that members and associates of the enterprise, including defendants Smart and Offerd, created and shared music, the videos and lyrics of which reference their relationship with O-Block and describe violent acts by the enterprise. Defendant Offerd posted a music video for a song called "Never Change," the lyrics of which included, "O-Block, Munna gang. This s**t will never change," in which Offerd wore an O-Block pendant. The song appears to refer to his enduring affiliation with O-Block. Defendant Smart posted a video of him performing a portion of an unreleased song, in which he sings the lyrics, "dude from 63rd [STL] couldn't get back up," and "we had to mask up," while wearing an O-Block pendant.[4]

---

[4] https://www.youtube.com/shorts/3iL9pT_8mSA (last accessed August 11, 2023)



These acts are direct evidence of the enterprise as alleged in the indictment and are not governed by Rule 404(b). *United States v. Zelaya*, 908 F.3d 920, 928 (4th Cir. 2018) (police officer testimony that defendant had gang tattoos and admitted he was a member of MS-13 was not impermissible "bad acts" evidence excludable under Rule 404(b); "Here, the government had to prove that Ordonez-Vega was a member of MS-13 as an element of its RICO and VICAR charges. It submitted the contested evidence for that narrow purpose, and therefore, the evidence is not subject to a Rule 404(b) analysis."). Even to the extent the above could be construed as falling under Rule 404(b), evidence of gang membership is admissible for non-propensity purposes, including to demonstrate the relationship between and among co-conspirators and the motivations they had for harming a member of a rival gang. *United States v. Westbrook*, 125 F.3d 996, 1007 (7th Cir. 1997) (evidence of gang affiliation "is

admissible in cases in which it is relevant to demonstrate the existence of a joint venture or conspiracy and a relationship among its members"); *see also United States v. King*, 627 F.3d 641, 649 (7th Cir. 2010); *United States v. Lloyd*, 71 F.3d 1256, 1265-66 (7th Cir. 1995) (upholding admission of evidence showing gang affiliation where it was used, in part, to explain the defendant's motivation for possessing a firearm).

Gang affiliation evidence described in this section survives Rule 403 balancing handily: gang affiliation is highly probative in this case, where the defendant's motivations are to increase or maintain status in an enterprise and where the defendant's common purpose is based on the goals of the enterprise which with they are affiliated. *United States v. Suggs*, 374 F.3d 508, 516-17 (7th Cir. 2004) ("Gang affiliation is particularly relevant, and has been held admissible, in cases where the interrelationship between people is a central issue, such as in a conspiracy case."). In addition, the government would be amenable to a limiting instruction on this topic.

### B. Offerd's Use of False Documentation Is Direct Evidence of His Participation in the Charged Murder and Efforts To Conceal That Participation or, in the Alternative, Admissible for the Non-Propensity Purpose of Identity.

As described above, Offerd gave a car dealership false information to obtain the Ford Fusion that he and other defendants rode to and from the site of Weekly's murder. He also returned the Ford Fusion to the car dealership within an hour of Weekly's murder, texting a car dealership employee that he was on the way nine minutes after weekly's murder. Offerd's use of false documentation is therefore direct evidence of the charged offense. It helps establish Offerd's identity as one of the persons involved in Weekly's murder—as someone who drove to the scene of the

murder, who fled afterwards, and who took steps to conceal his participation in the murder by ridding himself of the Ford Fusion.

As described above, five of the defendants rode from Parkway Gardens to Oak Street in two vehicles, one of which was a black Ford Fusion. Additionally, Offerd texted the car dealership minutes after the murder that he was on his way – in other words, at the time he was writing the text message, he was in the Ford Fusion and on the road. It will be highly probative that before, during, and immediately after the murder, Offerd had access to a black Ford Fusion that is consistent in appearance with the Ford Fusion used in the murder, as captured by surveillance video from Parkway Garden, Oak Street, and points in between, including a CPD license plate reader indicating that it was Offerd's Ford Fusion. This is consistent with Offerd being in one of the vehicles used in the murder shortly after the murder occurred. Offerd in fact drove to the dealership, which was approximately 19 miles away from where Weekly was killed, with defendant Smart in tow, and arrived there sometime between approximately 5:15 p.m. and 5:30 p.m. The timing is consistent with Offerd driving directly to the dealership, with his co-defendant, immediately after the shooting.

Even if Offerd's tendering of false records to the dealership is covered by Rule 404(b) rather than as direct evidence, it is admissible for the non-propensity purpose of identification and to stave off a quasi-alibi defense or related jury confusion regarding Offerd's whereabouts the afternoon of the murder. After Weekly was killed, Offerd did not return to Parkway Gardens; he went to a car dealership. A jury could

24

reasonably wonder why someone involved in a murder would casually run an errand after. The government should be permitted to introduce evidence that Offerd had a time-sensitive reason to rid the vehicle and a logical place to rid himself of it.

Finally, the falsification of records in order to obtain a car is not so prejudicial as to outweigh the probative value of the evidence surrounding Offerd's return of the car, particularly in comparison with the violent nature of the crimes for which he is charged. *Old Chief v. United States*, 519 U.S. 172, 180 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."). In addition, an appropriate limiting instruction can help mitigate any prejudice.

### C. Turpin's Previous Traffic Stops in a Silver Buick Are Direct Evidence of Turpin's Access to a Silver Buick at the Time of the Murder, Thus Undermining Any Efforts by Turpin To Excuse an Incriminating Phone Call.

As described above, Turpin was involved in traffic stops—in 2017 and 2020—in which he was pulled over in a silver Buick consistent with the silver Buick he used to get to and from Oak Street the day of Weekly's murder. Those traffic stops provide direct evidence of Turpin's role in the offense by helping to establish his access to a silver Buick at the time of the murder.

More specifically, at trial, the government will present a partially recorded phone call in which Turpin participated after first seeing Weekly on Oak Street. On the call, Turpin referenced people being "on their way," which the government will argue meant that Turpin had already provided Weekly's location to O-Block members

who were on their way to Oak Street to kill Weekly. The government anticipates that Turpin may argue at trial that, on the call, he was simply asking associates for a ride home. This explanation does not make sense, though, when Turpin drove himself to and from Oak Street in a silver Buick. In fact, the government will present evidence at trial that, as depicted by CPD POD camera video and confirmed by Witness 2, Turpin went over to his silver Buick after leaving Moncler with a clear path to leave Oak Street, but instead went to stand across the street from Weekly while speaking on the phone and watching Weekly for several minutes until Weekly was murdered. The prior traffic stops are therefore direct evidence of Turpin's role in the offense. They help establish his possession of and control over a silver Buick near the scene of the murder, thus providing support for his participation in the crime. They also severely undercut his efforts to explain away an incriminating phone call.

To the extent the traffic stops could be viewed as "other acts" for purposes of Rule 404(b), they are relevant to the non-propensity purposes of proving Turpin's control and possession over the silver Buick, which again is relevant to establishing his presence at the murder scene, thus corroborating his role in the offense.

Further, the traffic stop evidence survives Rule 403 analysis. Turpin's involvement in traffic stops are relatively minor infractions in comparison with the charged conduct. It is unlikely a jury would reach a propensity conclusion that, because Turpin had been pulled over a few times, he was therefore more likely to provide someone's location so that the person could be murdered. Additionally, the government does not intend to introduce the reason for the traffic stops or the result

of the stops, including whether the stops resulted in conviction or punishment. The government only intends to introduce evidence of the timing of the stops and the vehicle in which Turpin was stopped. Thus, the government submits that the traffic stops' high probative value significantly outweighs any miniscule prejudicial effect. Finally, an appropriate limiting instruction can also help mitigate any prejudice.

## IV.    CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court admit the evidence described above, either as direct evidence of the charged offenses or pursuant to Rule 404(b).

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:     */s/ Jason A. Julien*
JASON A. JULIEN
ANN MARIE E. URSINI
CAITLIN WALGAMUTH
Assistant United States Attorneys
219 S. Dearborn Street, Rm. 500
Chicago, Illinois 60604
(312) 353-5300

## CERTIFICATE OF SERVICE

I, Jason A. Julien, an attorney, certify that I served a copy of the foregoing Government's Motion to Admit Certain Acts as Direct Evidence of Charged Offenses, or, In the Alternative, Pursuant to Federal Rule of Evidence 404(b), by filing the same using the CM/ECF System, and that a copy will be provided to all parties of record designated to receive notice.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney


By:  */s/ Jason A. Julien*
JASON A. JULIEN
ANN MARIE E. URSINI
CAITLIN WALGAMUTH
Assistant United States Attorneys
219 S. Dearborn Street, Rm. 500
Chicago, Illinois 60604
(312) 353-5300

28