UNITED STATES DISTRICT
COURT NORTHERN DISTRICT
OF ILLINOIS EASTERN
DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>v.<br><br>CHRISTOPHER THOMAS,<br>    Defendant | )<br>)<br>)  No. 21 CR-618<br>)<br>)<br>)  Honorable Martha M. Pacold<br>)<br>)<br>) |

**DEFENDANT CHRISTOPHER THOMAS' RESPONSE TO GOVERNMENT'S MOTION TO EXCLUDE PROPOSED EXPERT DR. GEOFFREY LOFTUS  (DOC. 276)**

Now comes defendant Christopher Thomas through his attorneys, Ellen Domph and Keith Spielfogel, and hereby respond to the Government's Motion to Exclude Proposed Expert Dr. Geoffrey Loftus  (Dkt. 276) as follows:

**I. GOVERNMENT'S POSITIONS**

A. Expert Dr. Geoffrey Loftus' Credentials

The government begins its motion by stating that "the government does not dispute that Dr. Loftus has the requisite knowledge to qualify as an expert in the field of human perception and memory (or at least certain aspects of that field)." That position is correct. Dr. Loftus is one of the world's foremost experts in the field of human perception and memory. He has testified at trial on these subjects on numerous occasions including in the Northern District of Illinois.  Judge Amy J. St. Eve in a memorandum opinion in *Sanders v. City of Chicago Heights*, 13 C 221, (Dkt. 204, pg.5, August 18, 2016) stated:

1

> Over the past 30 years, Dr. Loftus has testified as an expert in perception and memory in approximately 385 cases. These cases have been tried in state courts, United States federal courts, and in a United States military court. *See, e.g., Grant v. Stimson,* No. NMCM 96 01188, 1996 WL 927707, at *1 (U.S. Navy-M. Ct. Crim. App. June 28, 1996) ("Dr. Geoffrey Loftus, Ph.D., [is] a highly regarded expert in the area of memory and eyewitness identification."). Included in this experience is Dr. Loftus' expert opinion testimony in the Circuit Court of Cook County and in the United States District Court for the Northern District of Illinois.

See also Judge Virginia M. Kendall's Memorandum Opinion in *Blackmon v. City of Chicago,* 19 C 767, (August 30, 2022) denying a Daubert challenge to his testimony and detailing Dr. Loftus' credentials, methodology, and bases underlying his opinions.

B. Government's Bases for Exclusion

Not contesting Dr. Loftus' credentials, methodology, or bases for his opinions, the government instead argues (1) "Defendant Thomas's proposed expert testimony is not an appropriate vessel for promoting any argument as to the admissibility of these identifications"; (2) "Admissibility is a determination for the Court. Any expert testimony offered on the subject thereafter at trial would invade the province of the jury, namely, assessing the reliability and credibility of the witness identifications."; (3) the proposed testimony is not helpful to the jury and is historically disfavored in the Seventh Circuit; (4) the defense can cross examine and argue its position at trial and; (5) Rule 403 supports exclusion.

**II. RESPONSE TO GOVERNMENT'S ARGUMENTS**

1. Admissibility

The government argues "The Court should reject Defendant Thomas's attempt to advance his arguments against admissibility to the jury because determination of the admissibility of this evidence belongs to the Court alone." (pg. 6).

2

Should this Court determine TG's and MW's identifications are admissible at trial, the defense does not intend to argue to the jury or to suggest in any other way that TG and MW should not have been allowed to testify because their testimony should have been suppressed. No where in defendant Thomas' Motion to Suppress Suggestive Identifications is Dr. Loftus' name or opinions mentioned. The Court has denied the defense an evidentiary hearing so any decision as to whether Dr. Loftus would have testified at that hearing is resolved. In short, there exists no connection between Dr. Loftus' trial testimony and the admissibility of TG's and MW's testimony.

To the extent that the government's motion is suggesting that if the witnesses are permitted to testify as to identifications the defense should be limited in the manner and method it chooses to attack those identifications, its argument should be rejected. The fact that the Court may allow the jury to hear TG's and MW's identification testimony does not mean that their testimony must be accepted by the jury. It simply means the jurors get to hear it along with all of the other evidence. Their identification testimony can be totally discounted by the jury much like a defendant's confession that is ruled admissible at trial can be totally discounted if the jury determines it is unreliable. One of the ways in which TG's and MW's identifications can be questioned at trial is through Dr. Loftus' expert testimony to the jury detailing the scientific bases that exist in this case that diminish the weight that should be given to their identifications off of the Camtasia video.

    2. If TG's and MW's identification testimony is admitted, an expert's opinion would then invade the province of the jury.

The government argues, "Any attempt by Defendant Thomas's expert to opine

on the reliability of the identifications emanating from the procedures and footage used here, and of which the jury will be equally aware, would inappropriately invade the province of the jury." Pg.10.

Judge Kendall in *Blackmon* confronted the issue posed by the government in our case:

> Defendants move to exclude Dr. Loftus's testimony as confusing and misleading, arguing that it "amount[s] to [an] improper attempt[]" to assail the eyewitnesses' credibility (specifically challenging, for example, Dr. Loftus's conclusions about "how stress affects witnesses")). This is not a fair characterization of Dr. Loftus's opinions. *At no point does he invade the province of the jury by, for example, injecting his personal views about whether certain testimony is believable, and he makes no comment as to whether any witness in this case has embellished their testimony.* (*emphasis added*) "It's not my conclusion that these witnesses were lying. Rather, they were likely testifying on the basis of a memory, that seemed very strong and very real to them . . . . It's just, for whatever of the many reasons that we've been talking about today, their memor[ies] of [Blackmon] as the offender were incorrect."), ("I always, when I evaluate cases like this, begin with the default assumption that [eyewitnesses] are accurately describing the contents of their memory.")).
>
> Instead, Dr. Loftus specifically addresses the reliability of witness identifications considering an array of confounding factors - including the fallibility of memory and human error in conducting photo arrays. ("[M]ost of my testimony has a bottom line of having to do with reliability."), (operationalizing the terms "reliable" and "unreliable" as used in this case), ("I was retained to . . . render opinions about . . . when identifications and memories may be unreliable, and to apply those scientific principles to the case at hand."), (describing the methodology used in this case and concluding that "the [eyewitnesses'] identifications were [likely] unreliable");- (discussing possibility that the witnesses provided unreliable identifications that should thus be given little weight)). Dr. Loftus applied his decades of experience in psychology to the facts of this case to reach his conclusions. As such, his opinions about human perception and memory are the proper subjects of expert testimony here. *See Phillips, 668 F.3d at 916* ("[N]othing is obvious about the psychology of eyewitness identification. . . . Lawyers' talk is no substitute for data."); *Williams*, 522 F.3d at 811-12 ("It takes data rather than intuition to answer questions [about the psychology of identification procedures]."); Newsome, 319 F.3d at 305-06 (explaining that expert testimony in this area can be "invaluable"); *see also, e.g.,*

> *Sanders*, 2016 U.S. Dist. LEXIS 109733, 2016 WL 4398011 at *6 (denying motion to exclude Dr. Loftus in a similar case, finding his testimony would "help[] jurors evaluate the reliability of eyewitness testimony by taking into account the psychology of eyewitness identification.").(citations to Dkt #s removed)

As Judge Kendall ruled in *Blackmon* that Dr. Loftus' testimony would not invade the province of the jury, neither would it invade the province of the jury in our case. He will not be injecting his personal views about whether certain testimony is believable. He will make no comment on whether a witness has embellished his or her testimony. He will testify, if asked, that when he evaluates a case he always begins with the default assumption that the person testifying to an identification is accurately describing the content of their memory. Instead, he will address the reliability of witness identification based on several factors. He will describe the Signal-Detection Theory to the jury and will apply it to TG's and MW's identifications off of the Camtasia video. He will describe the roles priming bias and visual hindsight bias play in an identification and will apply them to the procedures present in this case. These are concepts the jury will be unfamiliar with and will only learn about through his testimony.

The government posits that Dr. Loftus' testimony would invade the province of the jury in assessing the reliability and credibility of the witness identifications. The opposite is true. The preclusion of his testimony would leave the jurors without important testimony that they can assign whatever weight they deem appropriate in reaching a verdict in this case.

See also argument II number 3 directly below.

5

    3. the proposed testimony is not helpful to the jury and is historically disfavored in the Seventh Circuit

The government, citing *United States v. Redwood*, 216 F. Supp. 890 (N.D. ILL.2016) states that the Seventh Circuit has "historically disfavored expert testimony regarding eyewitness perception and memory" because the reasonableness and reliability of an identification is appropriately assessed by the jury.

The same argument proposed here was made by the government in *Sanders, Id* at pg. 10. Judge St. Eve noted the following:

> In their motion, Defendants argue that the general trend is "to preclude expert testimony on the reliability of witness identification on the ground that it invades the province of the jury as a trier of fact." *People v. McGhee,* 964 N.E.2d 715 (1st Dist 2012);[3] *see also United States v. Carter,* 410 F.3d 942, 950 (7th Cir. 2005) ("jurors understand that memory can be less than perfect"); *but see United States v. Bartlett,* 567 F.3d 901, 906 (7th Cir. 2009) ("It will not do to reply that jurors know from their daily lives that memory is fallible."). *Despite Defendants' argument to the contrary, Seventh Circuit case law does not reflect a "general trend" to exclude expert testimony regarding eyewitness identifications – nor does Seventh Circuit case law support Defendants' argument that expert identification testimony is only necessary in "special situations."* (emphasis added)

Judge St. Eve went on to discuss the Seventh Circuit's law on the issue of the need (helpfulness) for expert testimony on the issue of identification testimony:

> "More specifically, the Seventh Circuit has discussed expert testimony in relation to eyewitness identification evidence in detail and under various circumstances. *See United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009); *United States v. Williams,* 522 F.3d 809, 812 (7th Cir. 2008); *Newsome v. McCabe,* 319 F.3d 301, 306 (7th Cir. 2003). In *Bartlett*, the Seventh Circuit explained:
>
> It will not do to reply that jurors know from their daily lives that memory is fallible. The question that social science can address is *how* fallible, and thus how deeply any given identification should be discounted. That jurors have beliefs about this does not make expert evidence irrelevant; to the contrary, it may make such evidence vital, for if jurors' beliefs are mistaken then they may reach incorrect conclusions. Expert evidence can help jurors evaluate whether their beliefs about the reliability of

6

> eyewitness testimony are correct. Many people believe that
> identifications expressed with certainty are more likely to be correct;
> evidence that there is no relation between certitude and accuracy may
> have a powerful effect.

*Id.* at 906 (emphasis in original). The Seventh Circuit has also reasoned that "[i]f there is one thing known about eyewitness identification, it is that 'common sense' misleads more often than it helps." *Williams*, 522 F.3d at 811. The Seventh Circuit in *Williams* further articulated:
> The problem with "common sense" is that experience tells us
> what leads to *confidence* about whether we have seen a given
> person before but does not provide reliable ways to test whether
> that confidence is justified. People confuse certitude with
> accuracy and so are led astray. Psychologists have established
> that certitude often is unwarranted.

*Id.* (emphasis in original); *see also Webster v. Daniels,* 784 F.3d 1123, 1143 (7th Cir. 2015) ("We have often pointed out the dangers of relying on 'common sense' when social science reveals that common assumptions are wrong."). In addition, the Seventh Circuit has discussed the fallibility of eyewitness identification testimony in the context of a finding of probable cause for arrest:

> [N]othing is obvious about the psychology of eyewitness
> identification. Indeed, one point well established in the
> psychology literature is that most people's intuitions on the
> subject of identification are wrong. *See* Christopher Chabris &
> Daniel Simons, *The Invisible Gorilla: How Our Intuitions Deceive
> Us* (2010). We held in *United States v. Williams,* 522 F.3d 809
> (7th Cir. 2008), that someone who contends that a particular kind
> of procedure led to an unreliable identification needs evidence – if
> not from an expert's affidavit, then from published work such as
> Elizabeth F. Loftus, et al., *Eyewitness Testimony: Civil and
> Criminal* (4th ed.2007), the standard text in this field.
> *Phillips v. Allen,* 668 F.3d 912, 916 (7th Cir. 2012).

> In sum, the Seventh Circuit's guidance in the field of human perception
> and eyewitness identification teaches that nothing is obvious about the
> psychology of eyewitness identification, evaluating the fallibility of
> eyewitness testimony often takes more than common sense, and expert
> evidence helps jurors evaluate the reliability of eyewitness testimony by
> taking into account the psychology of eyewitness identification. *See id*.;
> *Bartlett*, 567 F.3d at 906." *Sanders Id* at 10-12.

The Illinois Supreme Court in 2016 in the case of *People v. Lerma*, (2016 IL

118496, 47 N.E.2d 985) changed the direction of the admissibility of expert testimony on the issue of identification in the State of Illinois. In that case the state sought to exclude the testimony of Dr. Loftus on much the same grounds as the government is seeking to do so in its motion. The trial court excluded his testimony. The Appellate Court reversed based on that exclusion. The Supreme Court affirmed the appellate decision. In *Lerma* the state, citing Illinois Supreme Court (*People v. Enis*, 139 Ill.2d 264, 564 N.E.2d 1155, (1990)) and Appellate Court cases through 2012, argued that exclusion of expert testimony on the issue of identification was a common accepted practice in Illinois. In *Lerma* the court stated:

> The decades since *Enis*, however, have seen a dramatic shift in the legal landscape, as expert testimony concerning the reliability of eyewitness testimony has moved from novel and uncertain to settled and widely accepted. Indeed, as the Supreme Court of Pennsylvania recently noted, there is now "a clear trend among state and federal courts permitting the admission of eyewitness expert testimony, at the discretion of the trial court, for the purpose of aiding the trier of fact in understanding the characteristics of eyewitness identification." *Commonwealth v. Walker*, 625 Pa. 450, 92 A.3d 766, 782-83 (Pa. 2014 (collecting demonstrative cases from 44 states, the District of Columbia, and 10 federal circuit courts). The reason for this trend is that, although findings of the sort described in Dr. Fulero's and Dr. Loftus's reports are now "widely accepted by scientists," those same findings "are largely unfamiliar to the average person, and, in fact, many of the findings are counterintuitive." *State v. Guilbert*, 306 Conn. 218, 49 A.3d 705, 72 (collecting cases and studies demonstrating this point).

In our case the issue is one of identification. An essential contention of the defense of Christopher Thomas is that certain particular kinds of procedures led to unreliable identifications. Those procedures included the discussion of defendant Thomas and the showing of photographs to witnesses prior to their identifications off the Camtasia video. The procedures included the manner in which the Camtasia video was presented to the witnesses. The impact of those procedures on the identifications

8

can only be explained to the jurors through the testimony of Dr. Loftus. He will offer specialized knowledge unknown to a layperson. Defense counsel cannot stand before the jury and explain to them how the Single Detection Theory plays a role in the identifications. Nor can it explain to the jurors how the procedures primed the witness and how their identifications are a result of visual hindsight bias. His testimony is essential to the jury being informed of all the factors regarding the identification testimony it will hear at trial. Only through hearing his testimony can the jury return a verdict based on a full knowledge of the evidence.

### 4. The defense can cross-examine and argue its position at trial

The government argues that any issues as to the reliability of TG's and MW's identifications can be fully vented through cross-examination. In *Barrett*, the court noted that the trial judge excluded the testimony of the identification expert on two bases. The first basis was "that jurors could determine the reliability of identifications using the evidence from direct and cross-examinations." The court gave short shrift to this contention:

> The first of these reasons is weak. Doubtless lawyers will ask questions designed to assist the jurors in evaluating whether a witness is telling the truth. But the problem with eyewitness testimony is that witnesses who *think* they are identifying the wrongdoer--who are credible because they believe every word they utter on the stand--may be mistaken. *Id* at 906.

No amount of vigorous cross-examination of TG and MW will reveal to the jury the scientific concepts described above that will be explained to them by Dr. Loftus.

9

5. Rule 403 supports exclusion

The government argues that Dr. Loftus' testimony should be excluded because multiple witnesses who had familiarity with Thomas will identify him at trial, therefore, obviating the necessity of Dr. Loftus' testimony. TG and MW are the multiple witnesses. Neither is a witness to the shooting. TG's identification came about after he had a discussion with agents about Christopher Thomas and after he was shown still photos the government asserts contained a photo of Thomas. His identification came about in the grand jury as the government directed his attention to certain persons in the video. MW, as set forth in previous motions filed by Mr. Thomas, is a paid informant who identified Mr. Thomas at different times each of the three times he viewed the Camtasia videos. He too was shown photographs of Mr. Thomas. TG's and MW's identification came off of a video that, at a very minimum, is of questionable clarity.

In *Lerma* two expert reports had been submitted to the court by the defense. The first from a Dr. Fulero and the second by Dr. Loftus. On the issue of familiarity leading to reliability the court held:

> Dr. Fulero's report did not specifically address identifications made by witnesses who were acquainted with the accused prior to the crime. Neither did Dr. Fulero's report specifically address the scope of his testimony and whether he would comment or offer an opinion on the credibility of Clark's identification in this case. But Dr. Loftus's report *did* address both of these matters directly, and it contradicted both of the trial court's previous assumptions about what Dr. Fulero would say on these points. Again, after reading Dr. Fulero's report, the trial court concluded that expert eyewitness testimony was unnecessary in this case both because "everyone knows" that acquaintance identifications are reliable and because Dr. Fulero's testimony would likely "operat[e] as [an]opinion on the credibility" of the eyewitnesses themselves. Dr. Loftus's report, however, directly addressed both of these points and stated the very opposite of what the trial court had previously assumed. According to Dr. Loftus's report, the factors impacting the

10

> reliability of eyewitness identifications *can* operate even when the witness is previously acquainted with the accused, and Dr. Loftus's testimony would *not* include any opinion as to the credibility of any specific witness or any specific identification.

Dr. Loftus' testimony will explain to the jury how all of the above factors affect the reliability of both witnesses' identification. It is highly probative on the single issue involved in the case against Mr. Thomas.

The government asserts the litany of Rule 403 preclusions: unfair prejudice, confusing the issues, presenting cumulative evidence, and wasting time as bases for the court to exclude Dr. Loftus' testimony. The government is only unfairly prejudiced by his testimony if the Court considers that evidence explaining the lack of reliability of the witnesses' identification is prejudicial. The government seems to take the position that evidence inculpating a defendant is probative but evidence possibly negating culpability is prejudicial.

Dr. Loftus' testimony does not confuse the issues in the case. The issue is identification. His testimony goes directly to that issue and to none other. The government argues throughout its motion that the jurors have the ability to assess the evidence in the case. If that is the case then certainly they will be able to assess what weight should be given to the testimony of Dr. Loftus without becoming confused.

Dr. Loftus' testimony is not cumulative of any other evidence the jury will hear in this case. No one will be testifying to the matters he will bring before the jury.

It is not a waste of time in a case where Mr. Thomas is facing a life sentence and the issue is identification, to permit an expert on human perception and memory to testify about the pitfalls of the identifications made by TG and MW—pitfalls that the jury will have no knowledge of and pitfalls that go to the most probative issue in this

case.

### III. CONCLUSION

For the reasons stated above, Christopher Thomas requests that this Court deny the Government's Motion to Exclude Proposed Expert Dr. Geoffrey Loftus.

Respectfully submitted,
/s/ Keith Spielfogel
/s/Ellen Domph
Attorneys for Christopher Thomas

KEITH SPIELFOGEL
190 S. LaSalle St
Suite 540
Chicago, IL 60603
T: (312) 236-6021
spielfogel@sbcglobal.net

ELLEN R. DOMPH
53 W. Jackson Blvd.
Ste. 1523
Chicago, IL 60604
T: (312_ 922-2525
edomph@gmail.com