**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **No. 21-CR-00618-2** |
| | ) | |
| | ) | |
| **CHARLES LIGGINS, a/k/a** | ) | |
| **"C Murda," KENNETH ROBERSON,** | ) | |
| **a/k/a "Kenny" and "Kenny Mac"** | ) | |
| **TACARLOS OFFERD, a/k/a "Los,"** | ) | |
| **CHRISTOPHER THOMAS, a/k/a** | ) | |
| **"C Thang," and** | ) | |
| **MARCUS SMART, a/k/a "Muwop"** | ) | |

**REPLY IN SUPPORT OF
DEFENDANT ROBERSON'S MOTION FOR A MISTRIAL**

NOW COMES the Defendant, KENNETH ROBERSON, replying in support of his request for a mistrial, filed after a member of the media was excluded from watching some of the cross-examination of Rakeem Wilton, as follows:

## I. **INTRODUCTION**

> **The explicit, guaranteed rights to speak and to publish concerning what takes place at a trial would lose much meaning if access to observe the trial could, as it was here, be foreclosed arbitrarily.**
>
> *Richmond Newspapers v. Virginia*, 448 U.S. 555, 576-77, 100 S. Ct. 2814, 2827 (1980).

On December 12, 2023, Defendant filed his Motion for a Mistrial (Dkt. 406) because a member of the press, Aleta Williams, was wrongfully excluded from the courtroom. In his motion, supported by a Declaration (Dkt. 406-1), Mr.

Roberson explained how Ms. Williams had been excluded from viewing the testimony of Rakeem Wilton, a critical Government witness. As detailed in Defendant's original filing, Wilton was upset because Ms. Williams had erroneously reported that he or his mother had received $2,700 from the Government in connection with his testimony. The Declaration explains when Wilton's mother reached out and told Ms. Williams of her mistake, she quickly took to the airways to correct.

The Government has offered nothing from anyone that disagrees with Ms. Williams' Declaration. It is uncontroverted. If this were a civil dispute, the Court would grant summary judgment, finding no relevant facts are disputed.

The Government has responded by making a passing attempt at obtaining approval for the exclusion (Dkt. 418). It mischaracterizes the dispute as being over a picture being posted of Wilton's mother, although it knows that never happened. There is no evidence that any photo was ever posted before Ms. Williams was excluded. It once described the issue as "doxing" and now does so again; a made up allegation without evidence.

The false narrative does not, in the end, matter. The Government does not dispute Ms. Williams' version of events. It does not dispute that she had been in communication with Wilton's mother, and that the communications were always friendly and amicable. It does not dispute that Wilton's mother contacted Williams to advise her that no one in her family had been paid to testify, or that Williams published a timely correction. Nor does the

2

Government claim to have found or ever been aware of any evidence of misconduct by Williams, or any evidence in support of Wilton's statement that Williams had posted a picture of his mother. The Government does not claim that there was a security emergency which somehow excused its failure to seek Court approval, as required by the law. The Government does not dispute that it acted because Wilton was upset, not because Williams did anything wrong. Simply, the Government fails to reveal any factual support for Williams' exclusion.

The witness was upset about something that never occurred. What really sparked his paranoia is immaterial. That the marshals and agents, government actors, knew that the Wilton's allegations were untrue is an important fact. Claims that the Government wanted to remove Ms. Williams for her own safety are pretextual; this removal of a member of the public and press was really an attempt at pacifying the Government's witness. The real reason Ms. Williams was removed was because the Government wanted to hide Wilton's unprovoked rage from the jury. To avoid scrutiny, the Court and defense were told of a non-existent threat or other malfeasance, something that the Government actors (prosecutors and/or marshals who were present) knew or should have known was untrue.

Mr. Roberson understands that there will be great reluctance to admit any mistakes were made. After all, the Court and the parties have invested

thousands of hours and months of time into this case. No one wants to have to re-do. But it is unfortunately what the law requires.

## II.  <u>BACKGROUND</u>

On December 6, 2023, Rakeem Wilton testified on direct and began his cross-examination in this case. On December 7, 2023, he returned to the courthouse to conclude his testimony. Before Wilton entered the courtroom, Aleta Williams, who was covering this case for her YouTube channel "Mickey Truth," was excluded from the courtroom. The Court was not asked to approve the exclusion.

Responding on the facts, the Government attempts to spin the details through the Affidavit of Kyleen Cowie, a Chicago Police detective who is "assigned to the United States Attorney's Office assisting them with violent crimes in aid of racketeering and RICO trials," currently assisting with this trial. Dkt. 418, ¶1. She was not the individual who approached, spoke with, or escorted Ms. Williams. She does not even claim to be present for or to have witnessed most of those events. She does not address the events explained by Ms. Williams, leaving Ms. Williams' Declaration unchallenged.

As Ms. Cowie explains in her Affidavit, on the morning of December 7, 2023, she was advised that Wilton was "on edge because of a 'blogger' posting overnight." Dkt. 418 He had told "agents" (not her) that Williams had posted a picture of his mother on the internet. According to Cowie, Wilton was "agitated

and angry." He allegedly expressed concern for his mother's safety. *Id.*, ¶¶4-5. He supposedly also said that if he saw Williams in the courtroom he was going to "do whatever I got to do to [expletive] her up." *Id. at 481*, ¶7. Cowie claims she understood that to be a specific and credible threat.

The affidavit continues "Other agents involved in the proceedings had also seen the posting understood to be posted by Ms. Williams on the internet and knew what she [Ms. Williams] looked like." *Id.,* ¶8.[1] Revealingly, the affidavit does not claim the "other agents" who had seen the "posting" had seen any photo of his mother as claimed by Wilton, likely because there was no photo, or identified anything improper. Ms. Williams had published a discussion of the previous day's testimony, and that is what the Government investigation, if any, confirmed.

As to the exclusion itself, all Ms. Cowie explains was that she saw Ms. Williams being approached by a United States Marshal while Ms. Williams was inside the courtroom, and her then being escorted out of the courtroom.

The Government claims that Wilton had discussed his threat with Ms. Cowie, and the marshals, "understood Wilton to be making a credible threat

---

[1] To be clear, there was never any "posting." All that then existed were two YouTube videos, one posted on Ms. Williams channel, and a second where both she and Mr. Wilton were guest on a third-party's channel, discussing Wilton's testimony from the day before. For Wilton, this was in violation of the Court's order "THE COURT: Okay. We are going to break here for the day. So, sir, you may be excused for the day. So, if you could please step out, you are not permitted to discuss your testimony overnight. You are on the stand." Transcript pg. 6651.

5

against Williams, given Wilton's tone and demeanor; her knowledge of Wilton's criminal history and gang affiliations; and the heightened concerns related to security at trial." (Footnote omitted) Dkt. 418, pg. 5.[2] If true, then Wilton was threatening to commit a crime in open court. That threat ought to have been disclosed to the defense; it was not.

It is also a bizarre reason. Any suggestion that Wilton could have carried out his threat is irrational, and not capable of passing the laugh test. To begin, Wilton was in the "custody" of law enforcement. He had been transported by agents to the courthouse and clearly they took the appropriate steps to ensure that he was not armed. They would not want an armed passenger in their vehicle or entering the courthouse.

Once in the courtroom, to present a "credible threat," Wilton would have had to exit the witness box, bypass the court security officer, run past counsels' table, which for the Government included two FBI agents, and avoided the phalanx of marshals seated in the first row and throughout the courtroom. The suggestion that he could have done so defies logic.

Understandably then, the Government fails to explain how Williams would have been imperiled by sitting in the courtroom while Wilton testified, or how he could have ever come close to carrying out his threat, yet they declare

---

[2] In a footnote, the Government writes that Wilton was violent, because his "criminal history includes convictions for the aggravated use of a weapon and conspiracy to commit murder." The weapon charge was an aggravated unlawful use of a weapon charge, which under Illinois law is a possessory charge – it is a charge for simply possessing a weapon, no use is involved, and conspiracy, his only other offense, is an *inchoate* crime.

it. They provide a nonsensical conclusion without support because they know it could not have happened.

It is troubling that Ms. Cowie confirms that at least one AUSA was aware of Wilton's threat. *Id.*, ¶¶9 and 11.[3] The Government did not share the information with the Court or the defense. Thus, the Court was deprived of any opportunity to weigh in on the exclusion, and the defense was deprived of valuable *Brady* material.[4]

The Government goes through a long-winded discussion of the case, while complaining about others who have not been allowed to attend (also without the defense's knowledge), as if that were somehow relevant. It includes irrelevant references to the attempted identification of certain "cooperators." But the Government does not suggest attempts to identify witnesses was illegal or improper, just something they did not like. Nor does the Government point to any instance where a witness, Wilton included, was threatened or endangered. How could they? Their own cooperators were posting videos and

---

[3] It is clear the AUSAs were aware, and their supervisor had come up to the 25th floor to assist with the situation. Cowie's Affidavit confirms this "Detective Kyleen Cowie communicated his threat to federal prosecutors." (plural) Dkt. 418-1, ¶9, Dkt. 418, pg. 5.

[4] Surely, if the agents had seen the videos, as well as an AUSA, they were aware of Wilton's interview both violated the Court's order and was impeaching.

   Q. We have to break for the day, Mr. Wilton. We'll come back to this. Not like yesterday, don't talk to anyone about your testimony overnight.

   A. Man, I ain't talked to nobody about nothing, bro. Try it again. Try it with another sucker. Transcript pg. 6652.

outing themselves. Wilton was on YouTube talking about his testimony while he was still testifying.

The Government also cites to "heightened security concerns" relating to the trial. The claim turns the issue on its head. Any security concern did not originate or emanate from Ms. Williams, or any other spectator. All concern originated with the Government witness. The courtroom has been a safe environment. All who enter are required to go through the building inspection, which includes metal detectors on the first floor, and again, through a separate security checkpoint including a second metal detector outside the courtroom. Spectators are required to deposit any cell phones or other objects into locked boxes outside the courtroom.

Here, the Government was placating an out-of-control child-like witness, one having a meltdown, by removing Ms. Williams, and it was a means to an end. Ms. Williams exclusion was bad parenting.

## III.   <u>ARGUMENT</u>

In its response the Government has chosen to ignore the law. There is simply no precedent favoring extrajudicial exclusion of the public or press from trials. The public trial has deep historical underpinnings and it is that right at issue. The extrajudicial unilateral decision to deny the public access is a profound violation of Mr. Roberson's right to a public trial.

### A. The Public Trial Is Fundamental, and Exclusion Requires a Hearing in Advance

The trial has always been open to all who cared to observe. *Richmond Newspaper v. Virginia*, 448 U.S. 555, 564 (1980). "Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account. Recordation, appeal, whatever other institutions might present themselves in the character of checks, would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance." 1 J. Bentham, Rationale of Judicial Evidence 524 (1827). *Id.*, at 569.

As the Supreme Court has emphasized, "[t]he central aim of a criminal proceeding must be to try the accused fairly." *Waller v. Georgia*, 467 U.S. 39, 46 (1984). The public-trial guarantee, enshrined in both the First and Sixth Amendments, exists to protect the right to a fair trial.[5] Indeed, the Seventh Circuit has linked the right to a public trial with that of a fair trial, "The right to *public* trial also concerns the right to a *fair* trial." *Walton v. Briley*, 361 F.3d 431, 434 (7th Cir. 2004) (emphasis in original); *see also United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1029 (11th Cir. 2005) ("Public trials and judicial proceedings are rooted in the principle that justice cannot survive behind walls of silence, and in the traditional Anglo American distrust for secret trials."); *Union Oil v. Leavell Co.*, 220 F.3d 562, 567 (7th Cir. 2000) ("[e]ven disputes about claims of national security are litigated in the open.").

---

[5] While the Sixth Amendment provides a defendant with a right to a public trial, the First Amendment provides the public with that same right. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980). The Sixth Amendment right "is no less protective of a public trial than the implicit First Amendment right of the press and public." *Waller*, 467 U.S. at 46.

9

The public trial allows for scrutiny over judicial proceedings. This serves important policy concerns, including:

- allowing for contemporaneous review of testimony in an open forum to safeguard against the abuse of power by the Government or the court;
- discouraging perjury;
- requiring the parties to fulfill their duties and responsibilities conscientiously;
- encouraging unknown witness to come forward to be heard;
- guarding against favoritism;
- exposing substantial allegations of police misconduct; and
- increasing confidence in the judicial system.

*See*, *e.g.*, *Walton*, 361 F.3d at 432; *Waller*, 467 U.S. at 46-47; *In re Associated Press*, 162 F.3d 503, 506 (7th Cir. 1998); *In re Oliver*, 333 U.S. 257, 270, 68 S. Ct. 499, 92 L. Ed. 682 (1948) ("The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power."); *Press-Enterprise Co. v. Superior Court*, 104 S. Ct. 819, 823 (1984) ("Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system"); *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 606 (1982) ("Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process - an essential component in our structure of

self-Government."); Wayne LaFave, et al., 6 *Criminal Procedure* §24.1 (3d ed. 2007); Akhil Reed Amar, *Sixth Amendment First Principles*, 84 Geo. L.J. 641, 677-81 (1996). *See also* Fed. R. Crim. P. 26 (emphasis added) ("In every trial the testimony of witnesses *must* be taken in open court, unless otherwise provided by a statute or by rules adopted under 28 U.S. §§1071-2077). The public-trial right is so fundamental that a violation is treated as a structural trial error that is not subject to the harmless error analysis. *Waller*, 467 U.S. at 49-50, n.9.

While the guarantee is not absolute, the Supreme Court has held that trial closures are to be "rare and only for cause shown that outweighs the value of openness." *Press-Enterprise*, 464 U.S. at 509. Overcoming the constitutional presumption of access to trial proceedings is a "formidable task." *In re Associated Press*, 162 F.3d at 506. The Court has articulated a four-part test that the party seeking to exclude the public must satisfy [here meaning the prosecutors]. Specifically, "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Waller*, 467 U.S. at 48; *see also Walton*, 361 F.3d at 433 (same).

Even now, the Goverment has not attempted to show any "overriding interest that [was] likely to be prejudiced" absent closure, and that closure of the courtroom was "no broader than necessary to protect that interest."  The

11

Government confesses error when it fails to address the requirements for exclusion of the public.

The idea that a member of the public and press can be excluded from a public trial because a witness is upset about that member's presence is the antithesis of a public trial. In a public trial, witnesses must testify in front of everyone, friend, and foe, those rooting for the witness and those rooting against. When a witness, whether through a demand or behavior, can dictate who is allowed to observe a trial, we have irretrievably eroded the idea of a public trial.

Notably, allowing access to the public is a right "created for the benefit of the Defendant." *Gannett Co., v. DePasquale,* 443 U.S. 368, 380 (1979). The open proceeding ensures the ability to see a Defendant is being fairly dealt with and "keep(s) his triers keenly alive to a sense of their responsibility and to the importance of their functions." *In re: Oliver*, 333 U.S. 257, 270 N. 25 (1948).

Mindful of their shallow position, the Government's analysis misses the point — it relies upon cases in which a court approved the closure in advance, rather than those where the court was not asked. While the Government seeks to explain the events and have *after-the-fact approval*, the cases require the trial court to conduct a hearing before any exclusion and to make findings, as a prerequisite. Thus, the Government cannot cite to this Court a single case when exclusion properly preceded court approval. Nor does the Government cite any

case where the Government had the power to temporarily exclude an observer *without* court approval. That is understandable, there are no such holdings.

It is too late for this Court to assess the factors and determine it would have agreed. Rather, this exclusion from trial is structural error:

> The Court recognized, however, that some errors should not be deemed harmless beyond a reasonable doubt. *Id.,* at 23, n. 8, 87 S. Ct. 824, 17 L. Ed. 2d 705. These errors came to be known as structural errors. See *Fulminante*, 499 U. S., at 309-310, 111 S. Ct. 1246, 113 L. Ed. 2d 302. The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. Thus, the defining feature of a structural error is that it 'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.' *Id.,* at 310, 111 S. Ct. 1246, 113 L. Ed. 2d 302. For the same reason, a structural error 'def[ies] analysis by harmless [error] standards.' *Id.,* at 309, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (internal quotation marks omitted).

*Weaver v. Massachusetts*, 582 U.S. 286, 294-95, 137 S. Ct. 1899, 1907-08 (2017).

On review an appellate court can determine that the trial court did not err in excluding somebody after a hearing but an appellate cannot find that the trial court would have acted properly *if* it had considered the issue. The same is true of this trial court. No court has upheld exclusion absent pre-exclusion consideration by the lower court.

Knowing all of this, the Government surprisingly relies on *Walton v. Briley*, 361 F.3d 431 (7th Cir. 2004). There, the court was evaluating whether a state court trial, much of which had been held during "late evening hours" when the courthouse was closed and the public could not enter, violated the Defendant's right to a public trial. On *habeas* review, the District Court found

13

that the issue was waived because the defendant's state court counsel had failed to object to the late-night proceedings, while still recognizing that the defendant's right to public trial had been denied by the courthouse closure. The Seventh Circuit reversed, holding that "because there had not been a knowing and voluntary waiver of his right to a public trial, Defendant's Sixth Amendment right had been violated." The Government's reliance is misplaced. *Walton* supports the defense.

Still citing *Walton*, the Government urges this Court to look at the *Waller* factors then cited by the Seventh Circuit, claiming, without explanation, that they are satisfied here. Dkt. 418, pgs. 11-12. It is hard to understand the Government's argument. They do not analyze the factors, even after saying they apply. It never "show[s] an overriding interest which is likely to be prejudiced by a public trial," or that exclusion would protect that interest..[6]

The Government merely, and only, suggests that Williams' previous attempt to speculate about the identity of Government witnesses posed a safety concern, a new reason that is not contained in Cowie's Affidavit. It is an incredible claim. The Government never asked the Court to exclude anyone from the trial for that reason. It never requested that if Williams came, she be barred. How could it? There is no logical connection between pretrial speculation as to a witness's identity and observing their public testimony. And

---

[6] While it is true there is another room where the trial is being broadcast, that room is an "overflow" room, intended to be used when the main courtroom is full. Its purpose is to expand public viewing, not to be a substitute for it.

14

the discussion of Wilton's testimony after he had publicly testified could not have provided a reason for exclusion.

The Government knew that it needed the Court's approval before exclusion. After all, virtually contemporaneous with this exclusion, indeed preceding it, the Government sought the Court's blessing when another individual was barred. While the Government apparently was unaware of the procedure that needed to be followed before then, the defense was, and in that case it saved the Government from itself. But having been spared that time, the Government then concealed the exclusion of Ms. Williams from the Court and the parties. Simply, the Government did not want to risk their witness acting out in front of the jury or their testimony being restricted, so it made the decision that Ms. Williams had to go.[7]

### B. The Government's Unilateral Exclusion of Ms. Williams Was Not "Trivial" to Mr. Roberson's Sixth Amendment Right to a Public Trial, Or Her First Amendment Right to Attend.

The Government offends when it seeks to characterize this exclusion as "trivial." The argument finds its origins in *Braun v. Powell*, 227 F.3d 908 (7th Cir. 2000), a *habeas* case examining the exclusion of a member of the jury venire who had not been selected, excluded because the trial court had a "policy" of not allowing the unselected venire to watch the proceedings. Holding the exclusion did not call for a new trial, the court characterized it as trivial because the

---

[7] While the Government did say that someone was being interviewed, their reason for it was false, and no one was ever told of the exclusion.

individual excluded had no relation to any of the defendants and did "not appear to have had any effect on encouraging witnesses to come forward or discouraging perjury." Still, the court "caution[ed] that the exclusion of any spectator runs the risk of violating the Sixth Amendment." at 920.

Applying *Braun*, the Government argues that Roberson has not articulated how the exclusion deprived him of a fair trial and cannot explain how Wilton's testimony was affected by Williams' absence. That argument ignores the structural error aspect. The Defendant does not have to show prejudice, it is presumed. The Government misplaces the burden on Roberson rather than where it belongs, upon the Government. "The party who wishes to close the proceedings . . . show[s] an overriding interest which is likely to be prejudiced by a public trial."

The point of *Braun* is that excluding the juror was tangential to the trial and all its parts. Here, the exclusion of Ms. Williams was motivated by and integral to insuring the continued cooperation of Wilton, and improving his demeanor before the trier of fact. If Ms. Williams had remained who knows how Wilton would have acted. The intent of the exclusion was to calm the witness and that goes to the heart of his demeanor. Ms. Williams presence was not trivial. If it were, what was it that Rakeem Wilton was so upset about?

It is important to note that the Government does not suggest that it and its proxies would have failed to control Wilton, nor does it consider the possibility that perhaps Wilton should not have continued to testify. Instead, it

16

flips the law on its head when, without any support, it asks the defense to articulate how the exclusion deprived it of a fair trial. The Defendants cannot tell this Court how Wilton's testimony would have differed, with any precision, because they did not get to observe Wilton's demeanor with Ms. Williams in the room.

Even if the burden were not the Government's to meet, their argument that this was trivial is ridiculous. Ms. Williams is a member of the modern media. "With the advent of the Internet and the decline of print and broadcast media . . . the line between the media and others who wish to comment on political and social issues becomes far more blurred." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 352, 130 S. Ct. 876, 75 L. Ed. 2d 753 (2010). *See also* James Yeh, '*I'm Out Here—I Am the News for Our People.' How Protestors Across the Country Are Keeping Informed*, COLUMBIA JOURNALISM REV. (Aug. 5, 2020), https://perma.cc/2TUL-7FMX. Her video reporting on this case has garnered thousands of views. As the Government writes, a key focus of her reporting on the case related to Rakeem Wilton, who was previously identified as cooperator No. 3. She traveled to Chicago to provide on-site reporting relating to Mr. Wilton's (and others') public testimony. The fact the Government believes she is not media is just plain wrong.

After Mr. Wilton saw this reporter in the courthouse, he had what can only be fairly characterized as a tantrum — yelling at the Government and running out of the witness room. He ran down the stairs from the 25th floor —

17

presumably heading out of the building in the middle of his testimony — before being stopped by Chicago Police detectives. While the Government asserts that law enforcement managed to calm him down, it does not provide any information on how they regained the control of their witness. The only logical explanation is because they likely told him Ms. Williams was gone from the courtroom, and thus would no longer be able to go on YouTube to let her viewers know what he was saying. This placated Wilton because he did not like what she reported; more specifically, he did not like who her reports reached.

After all, she went on the same podcast he went on, moments after he did, in the middle of his testimony. Plainly, that appearance is what spurred his anger; had it not been, he would have raised the issue the first day he testified when Ms. Williams was present. Instead, he threw his tantrum the morning after their back-to-back mid-testimonial appearance on *16Shotem Visualz'* YouTube page.

Mr. Wilton wanted to be the person who controlled the public narrative about what he was testifying to. That is why he brazenly violated the Court's order to participate in an hour-long video interview about his testimony that garnered more than 100,000 views (the clips from it have also been viewed over 100,000 times). He was upset that Ms. Williams was reaching the same audience that he thought he planned to manipulate. This conclusion only became more obvious when Wilton went back on the podcast the next night, immediately confronting the host for having her on:

RW:    On Tookah I heard a little bitch got up here on your platform and was playing on my name, on Tookah, like in real life.

16:    So, this the thing, I'm trying to give you chance to say what's valid and what's not.

RW:    Man, in real life though right, they gone click in when they click on that shit. On Kyra, I aint never been paid by the feds.

16:    She said you volunteered.

    *exchange[8]*

16:    So, if you telling on the dead, this is a situation where you volunteered to do it right, like you wasn't in a situation…

RW:    Bro stop playing with me bro, on Tookah grave, cuz if we was in person, on Kyrah, I'd press you in real life bro.

16:    Bro you aint gonna do shit to me.

*FBG Butta Explains Testifying + Him and 16 Shotem Gets in Heated Argument*, 16ShotemVisualz (December 7, 2023) available at https://www.youtube.com/watch?v=hldvzhDO5-s&t=1s.

Threats are just part of his act; made to get what he wants.

Another Government "trivial" argument is that Wilton still behaved aggressively despite Ms. Williams' exclusion, so it is a no harm-no foul situation. The position is unworthy of consideration. It has zero legal support.

The difference between being aggressive while answering difficult questions on the stand and however he would have acted with a member of the

---

[8] Mr. Wilton goes on to explain how he teaches people how to "play the justice system" by telling on deceased people, like he did in this case.

media in the gallery were likely to have been vast. Further, being a bad witness for the Government and insulting defense counsel does not amount to being "aggressive" as the Government suggests. The arc of his testimony was that he had a bad life, but put those tendencies behind him; the instant situation proves that narrative untrue. The exclusion allowed the Government to continue to present the jury with the façade that Rakeem Wilton is a troubled person seeking redemption and justice for lost friends, rather than a criminal with a few too many loose screws. It also presumes Wilton could not have been any worse. Given the lengths to which the Government went to remove Ms. Williams, it is likely that her presence would have exacerbated Wilton's already troubled demeanor, such that the Government could no longer be vouching for his credibility.

In addition, the Government argues the exclusion was "trivial" because the subject matter was otherwise reported on.[9]  That a member of the old-fashioned media was still reporting was not Mr. Wilton's concern. He was not running through the halls of the courthouse yelling at the Government about the Chicago Tribune or Sun Times's reporters, or about local TV. Mr. Wilton was concerned with a member of the new media, something he is well familiar with. It is his livelihood. He is the self-proclaimed "King of YouTube" having morphed his life and image as a criminal and gang member into a content creator of the same themes. Wilton knows that traditional newsprint media and

---

[9] Defendant is unable to locate any legacy media reporting of Wilton's testimony.

20

the five o'clock news are not where the audience he targets gets their information. He focuses on those who look to YouTube, Facebook, Instagram, Reddit, and other online media to obtain information, particularly the sect of social media that flocks to the internet to satisfy their infatuation with this case and Wilton's type of lifestyle in Chicago. His reputation, and the money he so proudly boasts about earning as "King of YouTube" depend on maintaining his criminal and gang member reputation.

Last, Government claims that Ms. Williams is not a media member and thus her exclusion was "trivial," is demeaning at best—not just to her, but to the people who provide information in online and streaming media.[10] The Government has seen what she reported, and it does not challenge her accuracy. She is a working journalist. The Government's argument relegates to lesser status an entire group of millions of people, of all races, classes, and cultures, because of their online method of consumption is in its view somehow of inferior public significance to that provided by the legacy media.

Ms. Williams traveled to Chicago, watched the trial, and then she told people what she watched. That is reporting. It has always been what reporters

---

[10] The Governments own pleading shows that they are reaching for straws: "The government does not believe this Court needs to resolve that issue, though, where courts have indicated that members of the press and general spectators are on equivalent footing for purposes of a Sixth Amendment right-to-public-trial analysis. See, e.g., Nixon v. Warner Comm'cns, Inc., 435 U.S. 589, 610 (1978) ("[W]hile the guarantee of a public trial is a safeguard against any attempt to employ our courts as instruments of persecution, it confers no special benefit on the press.") (cleaned up); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 573 (1980) ("media representatives enjoy the same right of access as the public")." Dkt. 418, pg. 12.

have done: view an event and explain it. Here, because Wilton did not like how close-to-home the reporter's reach was, the Government prevented the reporting from happening.

Again, the fault is of no consequence — nor the prejudice (which is clear) — the fact of the matter is structural error occurred and because the Government cannot go back in time and ask the Court for permission where it inexplicably did not; that error cannot now be cured.

## VI.    <u>CONCLUSION</u>

For all these reasons, the Defendant respectfully requests an evidentiary hearing on the exclusion, that the Court order the impound of the law enforcement electronic messaging on this subject, that a mistrial be granted, and for all such further and other relief as this Court deems just and appropriate.

Respectfully Submitted,

KENNETH ROBERSON,

By: <u> /s/ Steven Greenberg </u>
     One of His Attorneys

**Steven A. Greenberg**
**Greenberg Trial Lawyers**
**53 W. Jackson Blvd., Suite 315**
**Chicago, IL 60604**
**(312) 879-9500**
***Steve@GreenbergCD.com***

**Cheryl T. Bormann**
**Law Offices of Cheryl Bormann**
**53 W. Jackson Blvd., Suite 315**
**Chicago, IL 60604**
**(312) 588-5011**
***Cheryl.T.Bormann@gmail.com***