977

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )
-vs-                            )   Case No. 21 CR 618
                                )
CHARLES LIGGINS, KENNETH        )   Chicago, Illinois
ROBERSON, TACARLOS OFFERD,      )   October 19, 2023
CHRISTOPHER THOMAS, MARCUS      )   9:30 a.m.
SMART and RALPH TURPIN,         )
                                )
                Defendants.     )

VOLUME 5
TRANSCRIPT OF PROCEEDINGS - TRIAL
BEFORE THE HONORABLE MARTHA M. PACOLD AND A JURY

APPEARANCES:

For the Government:     MR. JASON A. JULIEN
                        MR. SEAN HENNESSY
                        MS. ANN MARIE E. URSINI
                        MS. CAITLIN S. WALGAMUTH
                        Assistant U.S. Attorneys
                        219 S. Dearborn Street
                        Chicago, IL 60604
                        (312) 353-3500
                        jason.julien@usdoj.gov
                        sean.hennessy@usdoj.gov
                        annmarie.ursini@usdoj.gov
                        caitlin.walgamuth@usdoj.gov

For Defendant           MS. CYNTHIA LOUISE GIACCHETTI
Liggins:                Law Office of Cynthia Giacchetti
                        53 West Jackson, Suite 1035
                        Chicago, IL 60604
                        (312) 939-6440
                        Cg@cgdefense.com


* * * * * * * * * * * * * * * * * * *


PROCEEDINGS REPORTED BY CERTIFIED STENOGRAPHER
TRANSCRIPT PRODUCED WITH A COMPUTER

978

APPEARANCES:   (Continued)

For Defendant Liggins:

MR. GREGORY T. MITCHELL
Law Office of Gregory T. Mitchell
19150 Kedzie Avenue, Suite 205
Homewood, IL 60430
(708) 799-9325
Mitchlaw00@sbcglobal.net

For Defendant Roberson:

MR. STEVEN GREENBERG
Greenberg Trial Lawyers
53 West Jackson, Suite 315
Chicago, IL 60604-6060
(312) 879-9500
Steve@greenbergcd.com

MS. CHERYL T. BORMANN
Cheryl Bormann
53 West Jackson, Suite 315
Chicago, IL 60604-6060
(312) 588-5011
Cheryl.t.bormann@gmail.com

For Defendant Offerd:

MR. JOHN SOMERVILLE
9924 S. Walden Parkway
Chicago, IL 60643-1702
(773) 505-1706
Jville62@gmail.com

MR. RICHARD S. KLING
Chicago-Kent Law Offices
565 W. Adams, 6th Floor
Chicago, IL 60661
(312) 906-5075
Rkling@kentlaw.iit.edu

For Defendant Thomas:

MS. ELLEN R. DOMPH
Law Offices of Ellen R. Domph
53 West Jackson, Suite 1544
Chicago, IL 60604
(312) 922-2525
Edomph@gmail.com

MR. KEITH ALLAN SPIELFOGEL
190 S. LaSalle Street, Suite 540
Chicago, IL 60603
(312) 236-6021
Spielfogel@sbcglobal.net

979

APPEARANCES: (Continued)

For Defendant
Smart:                    MR. MARC M. BARNETT
                          Law Offices of Marc M. Barnett
                          53 West Jackson, Suite 1442
                          Chicago, IL 60604
                          (312) 217-5019
                          Barnett.marc163@gmail.com

                          MS. MICHELLE MARIN
                          Criminal Defense Lawyer of Chicago
                          53 West Jackson Boulevard
                          Chicago, IL 60604
                          (312) 719-0376
                          Criminaldefenseofchicago@gmail.com

For Defendant
Turpin:                   MR. PATRICK EAMON BOYLE
                          Law Offices of Patrick E. Boyle
                          155 North Michigan Avenue, Suite 562
                          Chicago, IL 60601
                          (312) 565-2888
                          Privpat3@hotmail.com


Also Present:             Ms. Christina Case, FBI
                          Mr. Domonique Dixon, FBI




Court Reporter:

            KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                   Official Court Reporter
                 United States District Court
          219 South Dearborn Street, Suite 2328A
                   Chicago, Illinois  60604
                 Telephone:  (312) 435-5569
              Kathleen_Fennell@ilnd.uscourts.gov

(Proceedings heard in open court; venire out:)

THE COURT:  Good morning, everyone.

MR. BOYLE:  Good morning.

THE COURT:  Anything to raise before we start?

MS. URSINI:  Not for the government, your Honor.

THE COURT:  Okay.  Also, sorry, let's do appearances.

MS. URSINI:  Ann Marie Ursini, Caitlyn Walgamuth, and Sean Hennessy for the United States.  We'll be joined shortly by Jason Julien.  Good morning, your Honor.

MR. KLING:  Richard Kling, John Somerville for Mr. Offerd who is present in court.

MR. MITCHELL:  Cindy Giacchetti, Greg Mitchell for Mr. Charles Liggins.

MR. BARNETT:  Marc Barnett and Michelle Marin for Marcus Smart.

MR. SPIELFOGEL:  Keith Spielfogel and Ellen Domph for Mr. Thomas.

MS. BORMANN:  Cheryl Bormann for Mr. Roberson. Mr. Greenberg is before Judge Kendall right now.  He should be here momentarily.

THE COURT:  Okay.

MR. BOYLE:  Patrick Boyle.  Attorney Adams is dealing with other issues and also engaging in trial preparation on behalf of Mr. Ralph Turpin who is here in custody.

THE COURT:  Okay.  Good morning, everyone.  So I

think we'll go ahead and start with the next panel, which is the third panel. It will just take us a minute to bring them, so we can proceed with that.

(Pause.)

THE COURT: Okay. Are we ready?

MR. BOYLE: Yes, Judge.

MR. BARNETT: Yes.

THE COURT: Let's just do one more round of appearances.

MR. JULIEN: Good morning, your Honor. Jason Julien, Ann Marie Ursini, Caitlyn Walgamuth, and Sean Hennessy for the United States.

MR. KLING: Richard Kling and John Somerville for Mr. Offerd who is present in court.

MR. MITCHELL: Cindy Giacchetti, Gregory Mitchell for Mr. Charles Liggins.

MR. BARNETT: Marc Barnett and Michelle Marin for Marcus Smart.

MS. DOMPH: Ellen Domph, Keith Spielfogel for Mr. Thomas who's present.

MS. BORMANN: Cheryl Bormann and Steve Greenberg here for Mr. Roberson.

MR. BOYLE: Good morning, your Honor. Patrick Boyle on behalf of Mr. Ralph Turpin who's present before you in custody.

THE COURT: All right. Thanks, everyone.

So the panel is here, for the most part, and we can start. Just a couple notes. Juror 65 is still -- that's one who had previously tested -- or had COVID and was recently finished with the five-day quarantine, but I had asked for that juror to please continue to test before coming back. And apparently they're still waiting on a test result, so they are not here today, 65. So that's a note about 65.

73 and 74 are not here. We asked the panel to be here at 9:00. Given that they're not here yet, we should just proceed, I think, and then if they show up later today, we'll ask them to come back for the next panel, so that would be on Tuesday with Panel 4.

So that's 73 and 74.

Okay. So apart from that, are we ready?

MR. SPIELFOGEL: Did we ever hear back from 49?

THE COURT: Okay. We did not hear back from 49.

THE CLERK: All rise.

(Venire enters courtroom.)

THE CLERK: You can be seated. We have eight, eight and then five.

THE COURT: Good morning, everyone. Welcome to federal court. I'm Judge Pacold, and I will be presiding over this case. You've met the court clerk. To my left is the court reporter, and in the corner back here there were,

they've stepped out, are some lawyers on my staff.

Today we'll be picking a jury to serve in a criminal case. Last week you came in to complete the questionnaire, and I spoke to you at that time. And as I mentioned both when I spoke with you then and also in the cover letter that you received when you came in to complete the questionnaire, it is hard to predict how long a trial will last, but I estimate that this trial will take about six to nine weeks, Monday through Thursday. We will not be meeting on Fridays generally.

Once we are up and running, our trial days usually start around 9:30 a.m. and end at 5:00 p.m. We appreciate very much your willingness to serve on a jury. I imagine many of you were not pleased to receive the summons to serve as a juror.

Keep an open mind. Jury service is one of the most important duties we have as American citizens. Our legal system, our system of justice, is the envy of the world, and a big part of that is our jury trial system, people from the community giving the parties a fair trial. That -- this is how we resolve disputes fairly and peacefully, and we need you to do it.

The other thing I'll say at the outset is that you may be surprised at how rewarding and interesting jury service is. It's very common for jurors to come into the room feeling

annoyed or apprehensive about getting picked, but at the end of the trial, they are amazed at how educational and enlightening the experience was.

So keep an open mind. This is your duty as an American citizen, but it can be very rewarding.

The way we pick a fair and impartial juror is by telling you a little bit about the case and then asking you a series of questions. Some of those are going to be show-of-hands questions for the whole group, and then some of those are going to be individual questions for each of you. And so that process is going to take some time. It could take a number of hours today, and it is possible it also could take more time tomorrow.

And so I am going to ask for your patience throughout the process. I understand you've already been very patient with the process that started last week and then coming back, coming back today. There's going to be more time, more breaks, and I understand the process involves a lot of waiting, and I want to thank you very, very much for your patience.

I want to also tell you a couple things that I mentioned before on Tuesday and that I will continue to mention throughout the process, and I don't mean to be a broken record, but I'm repeating these things because they are very important.

You must not talk about the case with anyone or do any texting or research about the case.

Again, in the cover letter that you received back last week when you came in to fill out the questionnaire and also when I spoke to you last week when you were here to fill out the questionnaire, I mentioned the rule that you not communicate about the case or do any research into the case.

It's very important that you not look at outside information. Outside information may be incomplete, inaccurate, or legally irrelevant. It's not fair to the people who have worked hard to get their day in court if the process gets compromised or corrupted by outside information.

Also, just a couple words about the process that we're going to be undertaking today and possibly tomorrow. My goal in asking questions is to ensure that we have a fair and impartial jury. It's not to embarrass anyone or reveal private information to the world.

We do have a setup which is called the sidebar system where we can communicate using these headsets and the microphones so that only the lawyers and the parties and my staff, so basically the people at the tables and then my staff, can hear and I can hear what you're saying. If there's any answer that you would rather give -- as we get into the questioning, if there's any answer that you would rather give through that system, just please let me know. You can say

sidebar or just say you'd like to answer separately, and we can shift over to that system.

I may also interrupt you or have us go over to that system when you're answering a question if I think it's better to talk about it off to the side, and I don't mean to be rude or interrupt you. That's just how we try to keep the process fair to everyone while also moving things along as quickly as possible.

The first thing we're going to do is administer an oath to you, where you promise to tell the truth during this process. If I could ask, please, that the clerk administer the oath.

THE CLERK: I need all the jurors to stand and raise your right hand.

(Venire sworn.)

THE CLERK: Thank you. You can be seated.

THE COURT: Next I want to make sure that you're seated in the same order that I have and it's by juror number. And I'm just going to ask a few juror numbers here just to make sure we have the right order.

So Juror No. 51? Juror No. 52? Juror No. 53? Juror No. 54? Juror No. 55? Juror No. 56? Juror No. 57? Juror No. 58? And Juror No. 59? Juror No. 60? 61? 62? 63? 64? 66? 67? And I'm sorry, what's your number?

PROSPECTIVE JUROR: 68.

THE COURT: 68.

Okay. 69? 70? 71? 72? 75?

Okay. Thank you.

And we will be referring to you by your juror number throughout this process rather than by your name. Your anonymity is a tool used by federal courts to avoid contact between jurors and parties, similar to the use of different elevator banks during trial.

I'll come back to the elevator banks in a moment, but in other words, your anonymity is an ordinary practice used to provide a fair and impartial determination. It is also to help ensure that no one attempts to communicate with you. So for those reasons, we are going to refer to you by the juror number that you were assigned when you checked in and which we just used right now.

Your names and contact information are not made available to the parties or the media, and we will only refer to you by that number. And all that said, if anyone, whether family, friends, the media, or anyone attempts to communicate with you about the case through any method, you must inform me right away.

Coming back to the elevator banks, we have two elevator banks in the building. And one is the south bank, which is towards this side of the building to my left, and the other is the north bank to my right. We are closer here to

988

the south bank, and I'm going to ask the jurors to use the south bank, please, if you're coming and going.

I will ask the parties and lawyers to use the north bank. And so that's, again, another tool we're using to try to avoid contact between jurors and lawyers and parties.

Along those same lines, if you see the lawyers, if you do happen to see the lawyers or the parties in the hallway or just around the building or anywhere, they will not speak to you. It's not because they're being rude. It's because I've instructed them not to have contact with you. So if you see them, they just will not be speaking to you, and they're not being rude.

Please just take a quick look to your left and right just to remember where you're seated. If we take a break and you leave the courtroom, when you come back in, please do come back to the same place in the same order.

Also, just so you're aware, there are a lot of lawyers in the room, of course. Lawyers may be coming and going at different times, even while there's proceedings going on. You may see a lawyer get up, leave, come back. That is normal, and they just sometimes have things that they need to take care of outside the courtroom, and they're coming, you know, they're going in and out of the room. That's normal and not anything to be concerned about.

Okay. So now let me turn to some show-of-hands

questions. I mentioned we're going to do some of the questioning through show of hands as a group. Then we're also going to be doing some individual questioning. So now we're going to start with show-of-hands questions.

First of all, is there anyone here who has difficulty understanding and speaking English? If you have difficulty understanding and speaking English, please raise your hand.

No one raised their hand.

Is there anyone here who is not 18 years old? If you're not 18 years old, please raise your hand.

Okay. And so can I please just ask for your Juror No., sir?

PROSPECTIVE JUROR: 57, I'm 69 years old.

THE COURT: Oh, okay. No, I mean --

(Laughter.)

MR. GREENBERG: Benjamin Button.

THE COURT: Okay. So just to clarify, if you have not yet reached the age of 18, so anyone who is 17 or younger, if you've not yet reached 18, please raise your hand. If you are 18 or older, no need to raise your hand.

Okay. So no one's raised their hand.

That's a good clarification.

Is there anyone here who is not a United States citizen? If you are not a United States citizen, please raise your hand.

Okay. No one raised their hand.

Is there anyone here who has previously been convicted of a felony crime in either state or federal court? And if you're not sure whether a prior conviction was a felony, please do go ahead and raise your hand so we can figure that out.

Okay. No one's raised their hand.

All right. And this next one I'm going to -- I'll ask the question, then I'm going to give you some more information, try to break down this question a little bit.

But is there anyone here who has not resided in the Eastern Division of the Northern District of Illinois for at least one year? So the -- I'll tell you in a second which counties are in the Eastern Division of the Northern District of Illinois, and the question is have you not resided in one of these counties for at least one year? So if you have lived in one of these counties for at least one year, then don't raise your hand. If you have not lived in one of these counties for at least one year, then please do raise your hand.

So those counties that are in the Eastern Division are Cook, Lake, Kane, DuPage, Kendall, Will, Grundy, and LaSalle.

So anyone who has not resided in one of those counties for at least one year, please raise your hand.

Okay.  No one's raised their hand.

Is anyone taking any medication that might affect your ability to concentrate, understand, consider, and weigh the evidence in this case?  If you -- if you are, please raise your hand.

Okay, sir, and could you please just tell us your juror number?

PROSPECTIVE JUROR:  60.

THE COURT:  60.  Okay.

Okay.  And so we'll follow up separately on that.

Any other -- anyone else taking any medication that might affect your ability to concentrate, understand, consider, and weigh the evidence in this case?  If so, please raise your hand.

Okay.  No one raised their hand.

All right.  You just took an oath to tell the truth here in court.  Now thinking back to the questionnaires, on the questionnaires, which you filled out last week, there was a line in those questionnaires that asked you to swear or affirm that your answers in the questionnaires were truthful, and so I'm just going to ask that same question again.

Do each of you swear or affirm that your answers in the questionnaires were truthful?  If so, please raise your hand.

Okay.  Everyone's raised their hand.

All right. Now I am going to tell you a very brief preview of what this case is about, and then I will ask the lawyers to introduce themselves and anyone else at the tables.

After that, I will ask whether any of you know anything about the case or know any of the people involved.

So in terms of the brief preview of what the case is about, this is a criminal case involving six defendants. Count One of the indictment charges defendants Charles Liggins, Kenneth Roberson, Tacarlos Offerd, Christopher Thomas, Marcus Smart and Ralph Turpin with the murder of Carlton Weekly, also known as FBG Duck, in aid of racketeering activity.

Count Two charges defendants Liggins, Roberson, Offerd, Thomas and Smart with using, carrying, brandishing and discharging a firearm during and in relation to a crime of violence, namely, the murder of Weekly, in aid of racketeering activity, and causing the death of Weekly through the use of the firearm.

Count Three charges all six defendants with conspiracy to commit the murder of Weekly in aid of racketeering activity.

Counts Four and Six charge defendants Liggins, Roberson, Offerd, Thomas and Smart with the assault with a dangerous weapon of Victim 1 and Victim 2, respectively, in aid of racketeering activity.

Counts Five and Seven charge defendants Liggins, Roberson, Offerd, Thomas and Smart with using, carrying, brandishing, and discharging a firearm during and in relation to a crime of violence, namely, the assault with a dangerous weapon of Victim 1 and Victim 2, respectively, in aid of racketeering.

All defendants have pleaded not guilty to each of the particular charges against them. Each defendant is presumed to be innocent of each of these charges. Before any defendant can be convicted, the government must prove that defendant's guilt beyond a reasonable doubt.

Now I'm going to ask counsel to introduce themselves and the people at their tables, beginning with the prosecution, and then the defense.

MR. JULIEN: Good morning. My name is Jason Julien, and I'm an Assistant United States Attorney.

MS. URSINI: Good morning. My name is Ann Marie Ursini, and I'm also an Assistant United States Attorney.

MS. WALGAMUTH: Good morning. My name is Caitlyn Walgamuth, and I'm also an Assistant United States Attorney.

MR. HENNESSY: Good morning. My name is Sean Hennessy. I am also an Assistant United States Attorney

AGENT DIXON: Good morning. May name is Domonique Dixon, Special Agent of the FBI.

MR. JULIEN: We're also joined by Special Agent

Christine Case, who's a Special Agent with the FBI.

MR. KLING: Good morning, folks. My name is Richard Kling, and I'm one of two lawyers who represent Tacarlos Offerd, who is the young man standing to my right.

MR. SOMERVILLE: Good morning, ladies and gentlemen. My name is John Somerville. I also represent Mr. Offerd.

MS. GIACCHETTI: Good morning, ladies and gentlemen. My name is Cindy Giacchetti, and I represent, along with Greg Mitchell, I represent Charles Liggins who's before you this morning. Good morning.

MR. MITCHELL: Good morning.

MS. MARIN: Good morning. I'm Michelle Marin, and this is Marc Barnett. We both represent Marcus Smart.

MS. DOMPH: Good morning. My name is Ellen Domph, and I represent Mr. Thomas who's before you.

MR. SPIELFOGEL: Good morning. My name is Keith Spielfogel. I also represent Mr. Thomas.

MS. BORMANN: Good morning. My name is Cheryl Bormann. Along with Mr. Greenberg here, I represent Kenneth Roberson.

MR. BOYLE: Good morning, everyone. My name is Patrick Boyle. At trial I'll be joined by Attorney Joshua Adams, and we'll be representing this gentleman, Mr. Ralph Turpin.

THE COURT: Okay. So having heard a brief preview of

the case and having heard introductions, does anyone know anything about this case or know the people involved? If so, please raise your hand.

Okay. No one raised their hand.

Let me go on to a question about do you recognize any names? So -- we had a question that was like this in the questionnaire, so there was a list of names that was attached to the questionnaire and at the end of the questionnaire, there's a question asking you: Do you recognize any of these names that were on the list that was attached to the questionnaire?

So we're going to be looking at that answer to that question separately, and so I'm not asking about -- now I'm not asking about that list of names that was attached to the questionnaire, but I'm asking a similar question. I'm just going to give you some other names that may or may not be on that list that you saw already, and I'm going to ask whether you recognize any of these names.

So I'm going to tell you the names, and then I'm going to ask do you recognize any of these names. If so, please raise your hand. And, again, they may not be on that same list that you already saw with the questionnaire.

So the names are: Gregorio Torres, Diamond Jones, Candace Grayson, Dorian Hollie, Joseph Batko, Lana Batko, Cashell Williams, Special Agent Catherine Siemon with the FBI,

996

Detective Michael McKenna with the Chicago Police Department.

Does anyone recognize any of those names that I just listed?

No one raised their hand.

Okay. And so we just had introductions. We just -- I just listed some names. It's a good time for a reminder that from this point forward until we complete this process, you are not to discuss this case with anyone and you are not to do any research about the case, and you must not, for example, Google anything about the case or do any kind of research anywhere. It's not just Google, it's no research whatsoever, but that does include Google.

All right. Let me then ask some questions about whether you understand and accept some principles of law.

And so I'm going to ask whether you understand and accept these principles; if so, please raise your hand.

Do you understand and accept that each defendant is presumed innocent of the charges against him? Do you understand and accept that principle?

Everyone's raised their hand.

Do you understand and accept that before a defendant can be convicted, the government must prove that defendant guilty beyond a reasonable doubt?

And everyone's raised their hand.

Do you understand and accept that a defendant is not

required to offer any evidence on his own behalf? Do you understand and accept that principle?

Everyone's raised their hand.

And do you understand and accept that if a defendant does not testify, it cannot be held against him? Do you understand and accept that principle?

Okay. Everyone's raised their hand.

Going on to the next question.

Do you hold any philosophical or other beliefs that might affect your ability to sit in judgment of another person? If you hold any such beliefs, please raise your hand.

No one's raised their hand.

Jurors have to make their decision based on the evidence they hear during the trial. People, of course, have life experiences and common sense and people bring those things to jury duty and deliberations; but ultimately, the facts have to be based on the evidence in trial, not on facts you believe are learned from sources outside the courtroom.

Do any of you believe you would have any difficulty with that? If so, please raise your hand.

No one's raised their hand.

At various times during the case, I will instruct you about the applicable law. It is your obligation to follow my instructions about the law whether you agree with the law or not. If you were to find that you disagreed with the law as I

have given it to you in the instructions, would you have any difficulty following that law and reaching a verdict by applying that law to the evidence? If you anticipate having any difficulty, please raise your hand.

Okay. No one raised their hand.

Is there anything that I haven't talked about but is on your mind and may affect your ability to serve as a juror, to find the facts based on the evidence in trial, to follow the instructions on the law as I give them to you, or to make a decision at the end of the case or to be fair to all parties?

Okay. No one's raised their hand.

All right. So that concludes the show-of-hands questioning. What we will do now is we will go into the individual questioning. For that process, I'm going to ask, please, that the potential jurors all step out, and you can return to the jury room here. The courtroom deputy will escort you, and then we'll -- actually, let me ask the first juror, so that would be Juror 51, if you could please stay here, and we'll go into your questioning.

And if everyone else could please step out. Thank you very much. And also, this is also a good time to remind you, you're leaving the courtroom. At this point, also during any breaks we may be taking, a reminder, please do not discuss the case with anyone, including outside people, including your

fellow potential jurors. No texting, no calling, no emailing, no in-person discussions with anyone about the case, and no researching the case, including looking things up online or anywhere.

Thanks.

THE CLERK: All rise.

(Venire exits courtroom.)

MR. KLING: Judge, may we have a lawyer sidebar?

THE COURT: Sure.

(Proceedings heard at sidebar:)

MR. KLING: I think it was Juror No. 58 who was in the far right front part of the box who was on his phone during your questioning. I saw him walk out on his phone, still on his phone. I don't know whether any other jurors were, but I'm positive he was.

MR. JULIEN: Your Honor, we were also going to bring Juror 58 to your attention. He appears to be in distress. He's making faces. He appears to be pained. So we were going to suggest if, after Juror 51 is done, we bring 58 in next to question him.

I didn't see him on his phone, but I'm glad that Mr. Kling is bringing that to your attention as well. But something is going on. I know at one point, the CSOs came over and said something to Juror 58.

THE COURT: I did see the CSOs go over there, and I

1000

thought maybe that was because he was on the phone. I didn't --

MR. KLING: I noticed him grimacing and --

THE COURT: Yeah.

MR. KLING: -- moving his shoulders.

THE COURT: Yeah, I saw some of that, too, just some facial expressions. So that makes sense to basically question him out of order right after this. Thanks.

(Proceedings heard in open court:)

THE COURT: Okay, good morning, sir.

PROSPECTIVE JUROR: Good morning.

THE COURT: And what is your Juror No.?

PROSPECTIVE JUROR: 51.

THE COURT: Okay. I'm going to actually hand you a copy of your questionnaire. The courtroom deputy will hand you that.

PROSPECTIVE JUROR: Thank you.

THE COURT: All right. We'll just have some follow-up questions here off the questionnaire.

So one is could you just tell us please your current occupation without stating the name of your employer?

PROSPECTIVE JUROR: I've been retired since I was 61.

THE COURT: Okay. And what did you do -- what were your principal jobs in your career before you retired; and, again, not saying the name of your employers, but just what

did you do?

PROSPECTIVE JUROR: I worked for the same company for 38 years, so I started off in an entry-level position as a sales engineer and then gradually progressed up, where the last ten years or so, I was on the executive staff, and I led a business unit of about $350 million in revenue.

THE COURT: Okay. And what type of employer -- what was the business that your employer was engaged in? Again, not telling us the name or enough information to identify it, but just giving us a sense of the nature of the business?

PROSPECTIVE JUROR: Yeah, it was involved with the design and manufacture of controls for appliances.

THE COURT: Okay. And let me ask also -- and were they commercial appliances or --

PROSPECTIVE JUROR: Both.

THE COURT: Okay.

PROSPECTIVE JUROR: The larger share of it was residential though.

THE COURT: Okay. Some other follow-ups from here, and I may be jumping around in order here to some degree.

So let me also just ask on the next page of the questionnaire, there's a couple, Questions 11 and 12, about media that you read or review regularly, and you gave answers there. But just a more general question about different media sources that you may have seen, and now I'm asking both about

1002

anything you listed in response to these questions, but also just more generally. So thinking about any kind of media, including print, newspaper, magazine, also just anything online, articles you could have seen online, social media, radio, TV, anywhere you might have received information, have you seen anything, heard anything, read anything about this case?

PROSPECTIVE JUROR: No, I have not.

THE COURT: Okay. All right. How about question -- so I'm now just going forward to Question 33. That's asking -- there may be evidence in this case that one or more defendants, witnesses, or victims was a member of a gang. Do you have any beliefs or feelings about gang membership that would make it difficult for you to be fair and impartial? You answered: Just a general feeling of dislike.

One of the questions I asked of the group was about the duties of a juror. One of the main duties of a juror is to be able to keep an open mind, listen to the evidence as it's being presented here in court, make a decision at the end of the case once -- waiting to make a decision until you've heard all the evidence with an open mind, and then deciding, based on what you've seen presented and heard presented here in court, not on outside information.

So do you anticipate having any difficulty doing that if you were chosen to serve on the jury, given your answer

here?

PROSPECTIVE JUROR: No, I don't think so. My answer came out of, I guess, a lack of knowing or, you know, fear of the unknown.

THE COURT: Okay. But if you were chosen as a juror, would you be able to listen to the evidence with an open mind and make a decision without a thumb on the scale for one side or the other?

PROSPECTIVE JUROR: Yes, I believe so.

THE COURT: Okay. How about Question 35? So I'm just going on to the next answer.

So -- and that has to do with firearm ownership, and you mentioned you own a shotgun for hunting and significant other has a pistol for target shooting.

Is there anything about your firearm ownership that would -- it's just a similar question as the last one I asked you. Is there anything about -- and there may be testimony or evidence in this case about firearms.

Is there anything about your own firearm ownership that would affect your ability to keep an open mind as you're listening to the evidence and make a decision, once you've heard all the evidence at the end of the case, without a thumb on the scale for one side or the other?

Anything about your firearm ownership that would affect your ability to do that?

1004

PROSPECTIVE JUROR:  I don't think so, no.

THE COURT:  Okay.  How about Question 38?

So this is referring to the fact that you may hear about rap music, drill rap music, performers, lyrics and videos if you were selected as a juror in this case, and is there anything that would make it difficult for you to be a fair and impartial juror in this case?

You answered there:  Not a fan of rap.  I guess just a clarification, were you -- what were you saying there?

PROSPECTIVE JUROR:  Just I'm not a fan of rap, I guess.  I don't really understand a lot of it.  I mean, I do have some rap songs on my own playlist, right, but --

THE COURT:  Okay.

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Are you saying not a fan of rap in the sense that you are -- you have negative feelings towards rap, or that you don't know much about it?

PROSPECTIVE JUROR:  It's the latter.  I really don't know much about it.

THE COURT:  Okay.  And you mentioned you do have some rap songs on your playlist, and I don't mean to ask intrusive questions, but can you -- what are any of those songs?

PROSPECTIVE JUROR:  "Baby Got Back" by Sir Mix-a-Lot.  There's -- I got an Eminem song.  I think there's maybe one or two others, but I have like an 800-song playlist, so I

couldn't tell you --

THE COURT: Okay.

PROSPECTIVE JUROR: -- each and every one of those 800.

THE COURT: Okay. Let me also just go on to Question 42. That's asking about you or a close family member or friend living or working in some neighborhoods that are listed there. You answered your son and daughter-in-law lived in the Gold Coast. Is that -- do they live there now, or was it before?

PROSPECTIVE JUROR: They moved about a year ago, so now they live up on Irving Park, so they no longer live on the Gold Coast.

THE COURT: Okay. How long did they live there before? So if they moved around a year ago, how long were they in the Gold Coast before that?

PROSPECTIVE JUROR: I'm guessing between four and five years.

THE COURT: Okay. And this case may involve testimony about an incident that occurred in the Gold Coast.

If -- and it may involve evidence about events in the Gold Coast. Is there anything about the fact that your son and daughter-in-law used to live in the Gold Coast that would affect your ability to consider the evidence with an open mind?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  How about 43.  So this is asking do you have a problem with your hearing, eyesight, or any other physical disability that would in any manner affect your ability to see or hear the evidence presented at trial?

Could you tell us about that?

PROSPECTIVE JUROR:  Yeah, I've got, like, tinnitus, so ringing in my ears, which is pretty constant, but I don't feel like I'm having any difficulty today hearing and understanding anybody, so --

THE COURT:  Okay.  How about -- and you continued in your answer there to refer to -- to potentially some hearing loss.  Is that the same or different from the tinnitus that you just mentioned?

PROSPECTIVE JUROR:  So I hear real well at, like, lower frequency levels, and where I have difficulty is higher frequency sounds.

THE COURT:  Okay.  Are you having any difficulty hearing anything so far today?

PROSPECTIVE JUROR:  No.

THE COURT:  And I guess could you give us any more information about -- some examples maybe of things that would be more difficult for you to hear?

PROSPECTIVE JUROR:  Typically, I have more trouble, like, if I'm in a -- like, a crowded area, like a restaurant,

1007

hearing others at the table speaking clearly. So it's more of an issue for me like that than if it's just one person speaking and they're not -- if someone speaks really super fast, I may have a little bit of difficulty at times, but for the most part, I would say no, no difficulty.

THE COURT: Okay. Let me also ask about Question 45. So that's asking about the schedule, and anything that -- is there anything that would pose an extreme hardship for you? Can you tell us more about your answer there.

PROSPECTIVE JUROR: As far as the travel from where I live?

THE COURT: Yes.

PROSPECTIVE JUROR: Yeah, I mean, like, today it took me two hours to get in here. You know, I took the Metra, so it's a two-hour trip each way no matter how I look at it.

THE COURT: Okay. Do you think that if you were chosen as a juror and were here for six to nine weeks that -- that's a long commute undoubtedly. Do you foresee that, you know, being difficult for you to maintain, or even, you know, becoming a distraction?

You know, if you're commuting that long at the beginning and end of the day Monday through Thursday for six to nine weeks, do you envision it becoming difficult to focus during the day and listen to the evidence if you're doing that long of a commute?

PROSPECTIVE JUROR:  There's a chance that it could be a little bit of a distraction.  I mean, I've kind of fallen into my ways after being retired for four years, so you kind of get on a little different schedule as far as the rhythm of your life, right?  But I think I could probably handle it if asked to be part of the jury.

THE COURT:  All right.  Let me ask the lawyers if they have any follow-up, please.

MS. WALGAMUTH:  No questions from the government. Thank you.

THE COURT:  Thanks.

MR. BOYLE:  Good morning, sir.

Just, I guess, on that last point with that four-hour roundtrip and I think you described the pattern you have now in retirement, do you think that would kind of cut into just something like sleep?

PROSPECTIVE JUROR:  A little bit, but I can probably nod off on the train, too.  I mean, you know how that goes.

MR. BOYLE:  Right, but like just for today, was it a different wake-up call basically to get here on time?

PROSPECTIVE JUROR:  I got the same wake-up call every day.  We have three cats, and at 5:00 a.m. I have to get up and feed them, so -- I mean, that's part of my rhythm right now as it is.

So it probably wouldn't be that difficult for me to,

you know, catch a train at 7:00 a.m. or whatever it is and be down here on time.

MR. BOYLE:  And your answers regarding firearms, it sounds like you and your wife have them for recreational purposes?

PROSPECTIVE JUROR:  Yeah, I still -- I probably should have sold the shotgun a long time ago.  I haven't gone hunting for, like, 25 years.

MR. BOYLE:  But your wife enjoys, like, target practice?

PROSPECTIVE JUROR:  And she hasn't done that for a while either, but she does have the target pistol.

MR. BOYLE:  And regarding your feelings about gangs, you mentioned like a fear of the unknown?

PROSPECTIVE JUROR:  Yeah.

MR. BOYLE:  What do you know about gangs or Chicago gangs?

PROSPECTIVE JUROR:  Virtually nothing.  Just, you know, whatever you hear on the news, you know, day to day.  I mean, that's the largest extent of what I really would know.

MR. BOYLE:  But what kind of things do you hear from the media?

PROSPECTIVE JUROR:  You know, clearly there's a lot of violence in Chicago, so, I mean, you know, you hear reports of, you know, there was a drive-by shooting of this or that.

1010

I mean, just those types of things.

MR. BOYLE: Thank you, sir.

PROSPECTIVE JUROR: You're welcome.

MS. DOMPH: I have a couple questions.

Could you tell us why your son and daughter-in-law left the Gold Coast and moved -- did you say up to the Irving Park area?

PROSPECTIVE JUROR: Oh, yeah. Well, it's basically because they wanted to raise their rent another $500 a month, and then so they decided to move up to the place they live now. It's a much bigger apartment for less money. It's as simple as that.

MS. DOMPH: And I'm curious, what kind of music do you listen to on your 800-song playlist?

PROSPECTIVE JUROR: Well, a wide variety. You know, I got country music. I got a lot of rock and roll. I mean, I grew up in the, you know, '60s, '70s, '80s, so I got a lot of Beatles, I got a lot of Rolling Stones. Even got Patsy Cline and Frank Sinatra. So it's a wide range of music.

MS. DOMPH: And I'd like to ask you about Question 44 on your questionnaire.

You were asked based on your -- on the limited information you'd received, is there anything that might affect your ability to be fair to either the government or the defendants? And you said: I don't think so.

I sense a hesitation. Was there a hesitation that you might perhaps -- there might perhaps be something that would affect your ability to be fair?

PROSPECTIVE JUROR: I don't think so. I probably should have just wrote "no," to be straightforward with you, but --

MS. DOMPH: So there's -- because you wrote "no" to other questions --

PROSPECTIVE JUROR: Yeah.

MS. DOMPH: -- that talked about situations that may not be -- you may not be familiar with, but this particular one you said, "I don't think so."

No hesitation meant?

PROSPECTIVE JUROR: No.

MS. DOMPH: On page 10, you -- I think it looks like you have, am I right, three -- Question 10, sorry. Did I say page 10 -- three children?

PROSPECTIVE JUROR: Correct.

MS. DOMPH: And they're adult children, I see.

PROSPECTIVE JUROR: Yes.

MS. DOMPH: Could you tell us what they do for a living?

PROSPECTIVE JUROR: My daughter is now a paralegal for Will up in Wisconsin. It's a -- I forget exactly what they do. She just took the position.

1012

I have a son that works for PPM Solutions, it's a financial firm.

THE COURT: Let me also just ask you when you are describing their employment, please don't give names of their employers, so just tell us --

PROSPECTIVE JUROR: Okay.

THE COURT: -- what the type of employer is.

PROSPECTIVE JUROR: Right.

THE COURT: Sorry. Didn't mean to interrupt.

PROSPECTIVE JUROR: And then my youngest son, he works for a consulting firm that consults on medical benefits.

MS. DOMPH: Regarding your -- you said your daughter is a paralegal?

PROSPECTIVE JUROR: Yes.

MS. DOMPH: Do you know what the firm's business is, what kind of cases they take?

PROSPECTIVE JUROR: They -- it's a not-for-profit, I think, so they take on, like, cases that are, like, you know, for a cause kind of thing, right, and they challenge different -- I really don't know a lot about the firm. Like I said, she just took the job.

MS. DOMPH: Oh, it's recent?

PROSPECTIVE JUROR: Yeah, yeah. In fact, she's still -- she's not formally a paralegal yet. She's, you know, but she got hired as one and she's taking classes to

1013

accomplish that.

MS. DOMPH: Thank you.

PROSPECTIVE JUROR: You're welcome.

MR. KLING: I just had a couple of questions if I may.

Way back here.

PROSPECTIVE JUROR: Oh, there you are.

MR. KLING: How are you?

How long have you lived in the Oswego area?

PROSPECTIVE JUROR: About 25 years.

MR. KLING: Okay. That's all I have. Thank you.

MR. BARNETT: I have a question. Good morning, first of all. Hi.

So I noticed on Question 12, I think you were asked about news sources, and I noticed you listed "Law & Order." Do you -- I just want to make sure. How do you feel about that? Do you think that's an accurate reflection of our legal system?

PROSPECTIVE JUROR: No, not really. It's a --

MR. BARNETT: So it's a TV show.

PROSPECTIVE JUROR: Yeah, it's a TV show.

MR. BARNETT: So what goes on in this courtroom is what you'll pay attention to.

PROSPECTIVE JUROR: Correct.

MR. BARNETT: And the instructions as to the law.

1014

PROSPECTIVE JUROR:  Right.

MR. BARNETT:  Okay.  That's all.

MS. BORMANN:  Good morning.  How are you?

PROSPECTIVE JUROR:  Good morning.

MS. BORMANN:  Just a couple questions about the tinnitus, which I know a little something about.

So there's going to be evidence in this case that are audio recordings, and there's a lot of talkover during the audio recordings and a lot of interference with conversations.

One of your jobs will be to listen to those audio recordings and discern who's saying what.

Do you think that your hearing loss is going to have some difficulty -- let me rephrase that.

Do you think you're going to have some difficulty being able to listen and pick out voices during audio recordings because of the tinnitus and the moderate, I think you called it moderate to moderately severe hearing loss?

PROSPECTIVE JUROR:  I don't think so.

MS. BORMANN:  Okay.  You told us that you have some difficulty listening, like, in a loud restaurant.

PROSPECTIVE JUROR:  Right.

MS. BORMANN:  And why is that?

PROSPECTIVE JUROR:  Because of, like, the overall noise in the restaurant area.

MS. BORMANN:  And is it because you have difficulty

picking out where sounds are coming from?

PROSPECTIVE JUROR:  No.

MS. BORMANN:  Can you describe a little further --

MS. WALGAMUTH:  Your Honor, objection.  Can we do a quick sidebar?

THE COURT:  Sure.

(Proceedings heard at sidebar:)

MS. WALGAMUTH:  Your Honor, this witness has explained the extent of his hearing loss.  Ms. Bormann is attributing it to moderate or severe.  That is not what he said.  He's explained himself several times and been unequivocal that he can hear things in a courtroom, in fact, on this audio recording example she gave.  And I think further pursuing this is just asked and answered and candidly a bit of a waste of time.

MS. BORMANN:  Judge, the jury questionnaire that the gentleman filled out says exactly that, that he suffers from moderate to moderately severe sensorial neural hearing loss, so I am not sure what the objection is.

THE COURT:  Okay.  I will -- I will allow the questioning in light of that answer on the questionnaire.  All right.

(Proceedings heard in open court:)

THE COURT:  Okay.  You may proceed.

MS. BORMANN:  Thank you.

1016

Sir, on your questionnaire, you described the issue as being a -- let me make sure I quote it -- moderate to moderately severe sensory neural hearing loss.

So what we're trying to figure out is how that would affect what you can hear and pick apart when there's a lot of noise happening?

Can you give us a description about that? That's what I was trying to get to, like whether it's a restaurant or wherever it is.

PROSPECTIVE JUROR: I'll share with you what the audiologist told me.

THE COURT: Oh, and I'm so sorry, if you can speak into the microphone. I'm sorry.

PROSPECTIVE JUROR: Yeah. No, I'll share with you what the audiologist told me when I had the hearing test.

So the frequencies I can hear real well are typically vowels because, I mean, they are usually at a lower level frequency, and where I have the hearing loss is at higher frequency levels, which typically are where consonants, when they're spoken, kind of come in. That's what she told me. I don't know if that helps you.

MS. BORMANN: It does. Thank you.

And so have you experienced that, what your audiologist told you, have you experienced what -- do you have any experience that would corroborate what your audiologist

described to you?

PROSPECTIVE JUROR: No, not -- not really. I just know when I'm having dinner at the restaurant and then there's four or five of us, and sometimes I can't really pick out what somebody at the far end of the table may be saying, you know, it's --

MS. BORMANN: Sir, I didn't mean to interrupt. I'm sorry.

If you were chosen to sit on the jury in this case, and you couldn't understand something, how would you make that known?

MS. WALGAMUTH: Objection, your Honor.

THE COURT: Okay. Let's go back on the sidebar.

(Proceedings heard at sidebar:)

MS. WALGAMUTH: Your Honor, Ms. Bormann is injecting an example of this juror not being able to hear something. He's explained in every answer that he can hear. He can hear people talking one on one. He can hear audio recordings. This will not be a crowded restaurant, where he has to listen to someone at the far end of the table.

And so I just think Ms. Bormann is just repeatedly asking the juror questions he has made clear that he won't have an issue with this trial.

MS. BORMANN: Judge, if he does have an issue, and he's already told us that he has difficulty picking out voices

and where they come from, then it's incumbent upon us to provide some sort of method by which he can fix the issue rather than just ignore it.

So I want to determine whether or not there's some sort of way that he could make it known.

THE COURT: So I don't -- you know, all the answers so far have supported, as far as I could tell, that I don't -- I'm not hearing a potential problem, I mean, because it's not going to be a crowded restaurant. It's going to be -- and I know there will be a lot of audio recordings, but that's just a different situation from a crowded restaurant with a lot of other interference and competing noises.

And so I don't -- yeah, I guess I think -- I do think at this point, and I did want to give a fair opportunity to explore the issues that he identified because we obviously need someone that can hear and see the evidence, but I don't know -- I mean, does anyone have any experience with setting up a process for a juror to flag?

MS. BORMANN: Yes.

MS. WALGAMUTH: Your Honor, if I may, I think the issue of a juror being able to not hear or notice something is possible for any juror, it's not specific --

MS. GIACCHETTI: I can't hear government counsel.

MS. WALGAMUTH: I'll speak up a little more.

MS. GIACCHETTI: Thank you.

MS. WALGAMUTH: The question Ms. Bormann asked would be the same for any juror who might have missed a word or looked away at an exhibit shown, so I don't think it's appropriate to ask this juror that he must identify a process for himself when he's answered no fewer than ten questions to say that he will not have any hearing issues in a trial setting or listening to audio recordings.

THE COURT: Well, I mean, I guess I would say that the problem that I'm running across with the question is that it's basically asking him to initiate the process and initiate the design of the process.

You know, if we were going to have some process, that's a separate question that we would need to talk about whether we have one or not, but I don't think the way to kind of introduce the issue and tee it up is to ask a juror who doesn't have any control over the process.

So that's the problem where I'm running into with the question.

MS. BORMANN: Judge, I agree with you, and maybe we could solve this by you providing him the option. I mean, frankly we like him. I just want to make sure that he feels comfortable if he can't hear something -- and I'm going to tell you, I've listened to the audio and I have a hard time with it. So, you know, that's where we are.

So if we're going to put on somebody who has

difficulty discerning voices when there's a lot of other ambient noise, then we should probably put in place a way for him to signal that there's an issue.

MS. WALGAMUTH: Your Honor --

MR. KLING: How about, Judge, if he doesn't understand, just raise his hand?

MS. BORMANN: Right.

MS. WALGAMUTH: May I briefly respond, your Honor?

THE COURT: Sure.

MS. WALGAMUTH: I am -- the government is not opposed to Ms. Bormann's suggestion, but the appropriate time for that is when a jury has been selected and it's disclosed to all jurors.

I'll also note that all the evidence will go back with the jurors for their review during deliberation, so he'll have multiple opportunities.

But the point Ms. Bormann raises should not be for this juror to be told he can raise his hand when he's only a potential juror. It can be an instruction given to the entire jury once selected about how to note for the Court if they have to use the restroom or if they missed something or if they otherwise need something at that point.

MS. DOMPH: I'd like to interject something. There's been a few jurors that say they either wear hearing aids or they have hearing loss. I don't even know if this man wears

hearing aids.

I'm not getting the impression that he's profoundly deaf. I don't know if we should ask him if he wears hearing aids, but --

THE COURT: I think it's fair to ask that. I mean, if someone has answered anything on the questionnaire that, you know, raises that possibility, then I think it's fair to ask.

So I think that's okay. I guess my --

MS. DOMPH: I don't want to ask it. I'm just suggesting that we've had others and we haven't gone through a process if they don't understand.

So that's just my two cents.

THE COURT: Okay. I mean, I think that we -- I think the issue of, you know, what should be the process if a juror doesn't understand is something that is worth talking about. I just don't think we should tee it up or initiate that, the design of that process or what, if anything, will be the response to it in the middle of this juror's questioning.

MS. BORMANN: Judge, here's -- let me put this idea forward. Instead of asking him to design the process -- and obviously that's not what I meant -- what I really want to get to is would he feel comfortable letting us know if there was an issue.

MR. BOYLE: Yes, Judge, and I think you could ask him

that very quickly.

MS. BORMANN:  Yeah.

THE COURT:  Okay.  All right, sounds good.  All right, any other -- well, all right, fine.  Thanks.

(Proceedings heard in open court:)

THE COURT:  Okay.  Sir, if there was any issue where you couldn't hear the evidence, would you feel comfortable letting us know if there was that type of issue?

PROSPECTIVE JUROR:  Yes, I would.

THE COURT:  Okay.  And let me ask, is there any other follow-up from any of the attorneys?

MS. WALGAMUTH:  Not from the government.

MS. BORMANN:  Thank you.

MR. BARNETT:  No, your Honor.

THE COURT:  Okay.  Thank you very much, sir.

PROSPECTIVE JUROR:  You're welcome.

(Prospective Juror 51 exits courtroom.)

THE COURT:  So next will be Juror 58 just as a reminder.

Also, Juror 74 actually has now arrived.  I am going to tell that juror or ask the Jury Department to tell that juror to please return with the next panel because I just -- at this point, we went through the whole introductory --

(Prospective Juror 58 enters courtroom.)

PROSPECTIVE JUROR:  Do I write anything down?

1023

THE CLERK: No, in case the judge has a question for you.

THE COURT: And let's please go on the sidebar.

Good morning, sir.

PROSPECTIVE JUROR: Good morning.

THE COURT: I'm just going to speak quickly with the lawyers on the sidebar for a minute.

Thank you, very much.

(Proceedings heard at sidebar:)

THE COURT: I just wanted to explain about Juror 74. Juror 74 has now arrived, but, of course, they missed the introductory comments, and so I think at this point, it's best just to ask that juror to come back with the next panel.

Anyone disagree with that?

MS. DOMPH: No.

MR. JULIEN: No, your Honor.

MR. BARNETT: No, your Honor.

THE COURT: Okay. So we'll ask 74 to come back with Panel 4.

Thanks.

(Proceedings heard in open court:)

THE COURT: Okay. Good morning, sir.

PROSPECTIVE JUROR: Good morning.

THE COURT: Can I ask you what you do?

PROSPECTIVE JUROR: What I do?

1024

THE COURT: Yes, or any jobs you've held?

PROSPECTIVE JUROR: Right now, I'm kind of jobless. I'm looking for a new job currently. In the past, I worked as a cashier, POS in Oak Lawn, and UPS in Hodgkins.

THE COURT: Okay. And can I ask about some follow-up questions from the questionnaire that you filled out before?

PROSPECTIVE JUROR: Sure.

THE COURT: So one question is just on Questions 11 and 12 that are on the questionnaire. They are about what media sources do you read or review regularly for news and entertainment.

PROSPECTIVE JUROR: Right.

THE COURT: And you listed some responses there. Thinking about the places that you listed here, but also just more generally about any -- anything you might have seen on the news or seen either on -- in print or online or on social media, on the radio, on TV, any kind of media in any kind -- of any kind, have you ever heard or seen anything about this case?

PROSPECTIVE JUROR: Not at all actually.

THE COURT: All right. How about Question 34. That's asking do you have any beliefs or feelings about gun ownership, whether guns should or should not be legal, or whether guns are a societal problem that would make it difficult for you to be fair and impartial. You answered yes

to that.

Could you tell us more about that answer?

PROSPECTIVE JUROR: When it comes to gun ownership, I believe that it should be legal for self-defense reasons, as long with the proper training as well and everything, proper background checks, you know.

THE COURT: Okay. And one of the important responsibilities of a juror is to make a decision based only on the evidence that's presented in court, so a juror needs to be able to keep an open mind, to listen to all the evidence that's presented in court, and then to ultimately make a decision at the end of the case based on the evidence that's presented here, not on outside information.

Do you anticipate having a problem doing that, given your beliefs with respect to firearms?

PROSPECTIVE JUROR: Honestly, I don't think so.

THE COURT: Okay. So this question was asking do you have any beliefs or feelings about gun ownership, whether guns should or should not be legal, or whether guns are a societal problem that would make it difficult for you to be fair and impartial? And you answered yes to that, and so I just wanted to check that -- what did you mean by that?

So do you have any beliefs about guns that would make it difficult for you to be fair and impartial? You answered yes.

PROSPECTIVE JUROR: Oh, I'm sorry. What I meant to say was that, yes, I have beliefs about guns when it comes to the self-defense; but no, it won't make it any difficult to choose based off the evidence given to me.

THE COURT: Okay. How about Question 35? So that's asking about have you or anyone in your household ever owned or fired a firearm. You answered yes, a pistol.

Can you tell us more about that, who -- do you own one, or is it another person in your household?

PROSPECTIVE JUROR: It was -- it was my step -- my stepfather. He has his own pistol for self-defense. That's what I referred to. I myself do not own a gun whatsoever, but my stepfather does.

THE COURT: Okay.

MR. KLING: May I ask that he speak into the mic? We can't hear him back here.

THE COURT: Yes. Please, if you could try to speak into the mic, and if you need to adjust that, feel free so that you're speaking directly into it.

PROSPECTIVE JUROR: I myself do not have a gun, but my stepfather does, and that's what I was referring to on the questionnaire.

THE COURT: Okay. Thanks.

Is there anything about your stepfather's gun ownership that would affect your ability to decide this case

based solely on the evidence presented here in court?

PROSPECTIVE JUROR: No.

THE COURT: How about Question 45? So that's asking about the schedule, and whether there's anything about the schedule, and this is, as I mentioned before, it's difficult to know how long a trial will last, but we are estimating six to nine weeks, Monday through Thursday.

Is there anything about that schedule that will pose an extreme hardship for you, remembering that jury service is an obligation of citizenship?

PROSPECTIVE JUROR: When I wrote yes on that, I was thinking about the fact that I was still looking for a job and I had job interviews coming up here and there. So that's what I meant by that.

THE COURT: Okay. And do you have job interviews coming up that is going to -- where this trial would be conflicting with them and interfere with your ability to -- with your job search?

PROSPECTIVE JUROR: At the time when I answered this, yes, but thankfully I got through all of that, so no.

THE COURT: Okay. Also, I -- and I -- I wanted to just doublecheck. When you're in court, I just want -- and I don't mean to put you on the spot or something, but I wanted to doublecheck.

Were you using a phone at all during the court

earlier?

PROSPECTIVE JUROR: Just the -- I did because I had a call coming in, and I blocked it off.

THE COURT: Okay.

All right. And I just want to make sure you understand that during the court proceedings, so, you know, any further court proceedings throughout the entire trial, jurors would not be permitted to be on their phones. Do you understand that?

PROSPECTIVE JUROR: Yes.

THE COURT: And would you have any difficulty with that?

PROSPECTIVE JUROR: No.

THE COURT: Okay. And also just, as I explained before, jurors cannot communicate with anyone about the case. So whether you're in court or out of court, a juror is not permitted to discuss the case with anyone, either in person or through a telephone or online or anywhere at all. Do you understand that?

PROSPECTIVE JUROR: Yes.

THE COURT: Any difficulty complying with that?

PROSPECTIVE JUROR: No.

THE COURT: Okay. How about -- I mentioned before jurors cannot research the case, so you cannot, if you were chosen as a juror, be either on the phone, on a computer, in

print, anywhere, you cannot be googling things, you can't be looking things up about the case, anything about the parties, anything about any -- anything about the case? Do you understand that?

PROSPECTIVE JUROR: Yes.

THE COURT: Any difficulty complying with that?

PROSPECTIVE JUROR: No.

THE COURT: Okay. Let me ask the parties if you have any follow-up questions?

MS. DOMPH: Yes.

THE COURT: Please proceed.

MS. DOMPH: Hi. Good morning.

PROSPECTIVE JUROR: Good morning.

MS. DOMPH: Can you -- I'm over here.

PROSPECTIVE JUROR: Oh.

MS. DOMPH: I just was curious who you live with? Do you live alone? Do you live with family?

PROSPECTIVE JUROR: I live with my family. Currently my mom, my stepfather, my sister and stepbrother.

MS. DOMPH: And without telling me where they work, the names, can you tell me what they -- if they work and what they do for a living?

PROSPECTIVE JUROR: For my mom, she works at an office. I'm not sure. I don't remember what the name of the business was.

1030

MS. DOMPH: You don't need to tell us any names.

PROSPECTIVE JUROR: Oh, okay.

For my stepdad, he's an IT person. My stepbrother is currently going to high school, and my sister is working at a store.

MS. DOMPH: Thank you.

You said that you watch adult cartoons and YouTube. What kind of things do you watch on YouTube?

PROSPECTIVE JUROR: Just a couple episodes of "Family Guy" here and there.

MS. DOMPH: Sorry?

PROSPECTIVE JUROR: A few episodes "The Simpsons" or "Family Guy". That's what I was referring to.

MS. DOMPH: Oh, okay. And do you listen to any kind of music?

PROSPECTIVE JUROR: A variety, rock or pop basically.

MS. DOMPH: Do you listen to rap at all?

PROSPECTIVE JUROR: Not really, no.

MS. DOMPH: Thank you very much.

PROSPECTIVE JUROR: You're welcome.

MR. BOYLE: Good morning.

PROSPECTIVE JUROR: Good morning.

MR. BOYLE: What did you study in college?

PROSPECTIVE JUROR: For college, I was studying a mix of things, but the main goal was going for computer science.

1031

MR. BOYLE:  And did you accomplish that?

PROSPECTIVE JUROR:  Not yet.  Unfortunately, due to the COVID stuff that happened between 2020 and 2021, I kind of fell out of it, but I want to get back into it soon enough.

MR. BOYLE:  Thank you.

PROSPECTIVE JUROR:  Welcome.

MR. SOMERVILLE:  I have a question, please.  John Somerville.  Good morning, over here way in the back.

PROSPECTIVE JUROR:  Oh, good morning.

MR. SOMERVILLE:  Good morning.

So one of the rules in here is that the people accused of this crime are presumed innocent.  Can you tell us what that means to you?

PROSPECTIVE JUROR:  What it means to me is that until all the evidence has fully been shown to the jurors, you cannot accuse someone of being guilty until the evidence has been shown.

MR. SOMERVILLE:  And the other rule is that the government has the burden of proof beyond a reasonable doubt before someone could be guilty.

What does that mean to you?

PROSPECTIVE JUROR:  To me, that means that you can't just be calling out accusations here and there.  You can't just say that someone's guilty without any evidence.

MR. SOMERVILLE:  Thank you.

PROSPECTIVE JUROR: Welcome.

MS. GIACCHETTI: Excuse me, I have a couple questions. I'm way back here.

You mentioned that you believe that people should be able to have guns for self-defense reasons and that your stepfather has a gun for self-defense reasons.

Can you explain that a little more? What type of self-defense or --

PROSPECTIVE JUROR: My -- for my stepfather, he has, like, a holster so he can holster his gun whenever he has to go out of town, and he keeps his guns locked up in a safe secured by a pass code that even I don't know of. So I figured that's what I meant basically. Just in case whenever you're alone at night and someone tries to mug you, for example.

MS. GIACCHETTI: Thank you.

PROSPECTIVE JUROR: Welcome.

MR. KLING: I have a question. Way back here. How are you?

PROSPECTIVE JUROR: Fine. How about you?

MR. KLING: Have you ever heard the expression where there's smoke, there's fire?

PROSPECTIVE JUROR: Yes.

MR. KLING: And do you have any feelings that these guys, the six people who are sitting in front of you, wouldn't

be here unless they did something?

PROSPECTIVE JUROR: I suppose so. Otherwise, they wouldn't be here.

MR. KLING: I have nothing further.

MR. MITCHELL: I just have a couple, Judge.

Can you see me back here?

I was watching you when you were in the jury box, and it appears to be that you turned away from the judge or you were distracted in some kind of way.

Is it something about the trial that has caused you to be uncomfortable?

PROSPECTIVE JUROR: No, I'm sorry. That was just something personal from something else, something unrelated to the trial.

MR. MITCHELL: Okay. Because I know it was on the phone, but I also, again, when the judge was talking, you literally were turned away from her, and I just wanted to know, are you -- is there something about you not wanting to be here, or no?

PROSPECTIVE JUROR: No. It's just I've been having a lot of trouble outside of the jury duty with my own personal life, and it's been a frustrating week for me and frustrating month, in fact.

MR. MITCHELL: And does that, whatever is going on with you personally, was it a distraction today?

PROSPECTIVE JUROR:  A little bit, yeah.

MR. MITCHELL:  And has it been resolved, or do you think that other things might come up while you're sitting as a juror that might distract you in a way that you essentially won't be focused on what has to be the evidence here?

PROSPECTIVE JUROR:  I'm going to try not to let it distract me as much as I can.

MR. MITCHELL:  How do you plan to do that?

PROSPECTIVE JUROR:  Some -- I was trying some breathing techniques earlier in the jury office or whatever to help me calm down and just try and forget my problems for now basically.  So I figured if there was a way I could substitute that for when I'm in court, well, that could work out.

MR. MITCHELL:  And so just so I understand it, you were having some anxiety, some difficulty before you came into the jury box, correct?

PROSPECTIVE JUROR:  Yes.

MR. MITCHELL:  And you attempted to do something to keep that from affecting you when you came into court?

PROSPECTIVE JUROR:  Yes.

MR. MITCHELL:  And it didn't work?

PROSPECTIVE JUROR:  Oh, no.  I attempted beforehand, no, because I was distracted.

MR. MITCHELL:  And is there anything you can tell us to assure us that whatever is going on, and clearly things are

going to go on for the next six to nine weeks, that you won't be distracted in this case? Because this is very important for you to be able to listen and focus and understand what's going on.

PROSPECTIVE JUROR: For me, I'm going to make sure that I'm as best focused as I can be because I want to make sure that I don't make the wrong choice when it comes to deciding a verdict. I want to make sure I see all the evidence. I want to make sure that I get all the details so I can properly lay out my facts and arguments and make a proper decision.

MR. MITCHELL: Thank you, Judge.

MR. KLING: Judge, may we have a lawyer sidebar for a moment?

THE COURT: Sure. Also let me just ask because I forgot earlier. What's your juror number?

PROSPECTIVE JUROR: No. 58.

THE COURT: Okay. Thank you.

(Proceedings heard at sidebar:)

MR. KLING: Judge, I don't know whether it's possible, but realistically, the fact that he says he has -- I don't know if you can pursue what those problems are. They may be minimal problems, which don't really affect it. They may be -- I have no idea. But he obviously indicated he was distracted and has problems and should be pursued but, quite

1036

frankly, I don't know how you're going to do it.

THE COURT: I mean, anyone have other -- I think I could ask, I mean, it's -- I could. I mean, I could bring him on the sidebar and ask him on the sidebar.

MR. KLING: That would be my suggestion.

MS. GIACCHETTI: Judge, I'm just wondering what the -- as the government has had actually a better view of him if this is something we can agree to cause?

There's a level of distraction and anxiety that he's already indicated that I don't think is good for either side.

So I'm wondering if we need to do that, or if the government's seeing the same thing that could not only affect his ability to sit as a juror but to deliberate with other jurors.

MS. URSINI: Your Honor, for the government, we have not had an opportunity to ask this potential juror any questions. I do have a few questions for him, including about the job situation and whether that's been settled, or if that's going to cause him some stress.

That may or may not be the personal issue that he's talking about, so I wonder if we can explore that, and to the extent that we still have questions about kind of what's going on with his personal life, that your Honor can probe those in a way that's appropriate.

THE COURT: Okay. So stay off the sidebar. You can

ask your questions. Then we go back on the sidebar, and I can ask about the other follow-up?

MS. URSINI: I think that makes sense, your Honor.

MR. BOYLE: Yes, your Honor.

THE COURT: Okay. That's fine. I also -- I mean, it sounds like that means the government does not agree at this point that he -- that it should be for cause.

MS. URSINI: Not at this point, your Honor.

THE COURT: Okay.

MR. BOYLE: Some of the defendants also believe that would be premature.

THE COURT: Okay. All right.

(Proceedings heard in open court:)

THE COURT: Okay. We'll have continued follow-up from the lawyers.

MS. URSINI: Good morning. This is Ann Marie Ursini over here.

PROSPECTIVE JUROR: Good morning.

MS. URSINI: You told us a few minutes that you had answered yes to a question on the questionnaire about hardship, and that was because at the time you filled out the questionnaire, you were in the middle of looking for a job; is that right?

PROSPECTIVE JUROR: Yes.

MS. URSINI: Okay. And then I think you told us that

you got through all of that and so you were in a different situation today as you sit here.

PROSPECTIVE JUROR: Yes.

MS. URSINI: Without telling us sort of where you applied or where it would be, did you end up getting a job?

PROSPECTIVE JUROR: I have an orientation coming up on Saturday, which I assume would mean yes.

MS. URSINI: Okay. Without, again, telling us where the job is, can you give us a sense of generally what type of job or what field it's in?

PROSPECTIVE JUROR: Type of job, working in the grocery store basically.

MS. URSINI: Okay. As you've heard, this trial could take anywhere from six to nine weeks. You could be sitting here for quite a while.

Is there anything about that fact, and I think the judge has told you the schedule, but we anticipate it will be, you know, a full workday Monday through Thursday.

Do you anticipate that that's going to be an issue, given that you're just starting a brand new job?

PROSPECTIVE JUROR: I -- perhaps, yes. I hope that the store understands, but, yeah, that was one of my worries when I was filling the questionnaire out.

MS. URSINI: Okay. I want to try to better understand how concerned you might be about that.

Do you think if you were selected to be a member of the jury and you were asked to sit here for several weeks during the trial, that your concern about the new job would be something that was in the back of your mind the whole time?

PROSPECTIVE JUROR: Yes.

MS. URSINI: Okay. Do you think that the fact that would be in the back of your mind, would that be distracting to you and your ability to focus on this case?

PROSPECTIVE JUROR: I -- I hope not. I don't think so.

MS. URSINI: I know we all have good intentions, and I know that that's your hope. Do you think realistically it would distract you though?

MR. GREENBERG: Objection, Judge. He answered the question.

THE COURT: Okay. That's fine. I'll -- you don't need to answer that.

Any other follow-up?

MS. URSINI: Not from the government, your Honor. Thank you.

THE COURT: Okay. Any other follow-up at this point from the lawyers? Otherwise, I would like to speak with the lawyers, and if you could wait a minute before joining, but --

MR. MITCHELL: Judge, I have a follow-up.

THE COURT: Okay.

1040

MR. MITCHELL: Sir, back here again. The concern and the discomfort you expressed today and frustration, I guess you said, was that related to the job or something else?

PROSPECTIVE JUROR: It's also kind of related to -- just general anxiety right now.

MR. MITCHELL: So the distraction that you felt today was not because you didn't have a job or anything, because you had that lined up. It was something personal, something else?

PROSPECTIVE JUROR: Yeah, it was something else.

MR. MITCHELL: Okay. That's it, Judge.

MR. KLING: I know it's uncomfortable in a large courtroom full of strangers.

Would you be willing to share with the lawyers and the judge what that something else is that's bothering you?

PROSPECTIVE JUROR: I suppose that something else would just mean a general anxiety that I might say something weird or say something wrong, I suppose.

MR. KLING: Say something weird or say something wrong to whom or how or under what circumstances? I'm not sure that I understand what you mean by that.

PROSPECTIVE JUROR: It's basically just the anxiety that I'm just -- it's my first time doing this, my first time being called in for jury duty. I'm not used this kind of stuff. So I'm very sorry if I answer weirdly or talk in a weird way.

1041

MR. KLING: You don't need to be sorry. Everybody is interested in just getting the truth and making sure that you're comfortable and you're the appropriate type of juror. There's nothing for you to apologize.

MR. SPIELFOGEL: Your Honor, can we have a sidebar, please?

THE COURT: Sure.

(Proceedings heard at sidebar:)

MR. SPIELFOGEL: Your Honor, I believe based on the answers that he has just given --

MS. GIACCHETTI: Can't hear you, Keith.

MR. SPIELFOGEL: I'm sorry. I believe based on the answers he has just given that, I mean, I can feel his anxiety. I think everyone here recognizes that he is extremely anxious, and to be putting him in this situation I -- I just think is so unfair to him and I think we should stop questioning him.

MR. MITCHELL: Judge, my concern was after I saw him, and I think the government saw it as well, he literally rolled his eyes up, he turned away, he started looking on his phone, the marshals came in, told him to put his phone away, and then he looked down, and he was with his fingers and he was -- he literally, all the jurors, as you were questioning were facing you. He, his body was actually turning the other direction, and so I -- I just saw that it was as if he was really not

wanting to be here, and that's why I raised the issue.

MR. GREENBERG:  Judge, although I disagree with everything they had said up to now, it appears he's crying.

THE COURT:  I think I saw that just now as well.

MS. URSINI:  Your Honor, the government withdraws its objection to the motion to strike for cause.

THE COURT:  Okay.  So we're going to excuse this juror, No. 58, for cause, and we'll just allow him to leave.

Does anyone have any objection to allowing him to leave the building right now, or do we want to keep him through --

MS. URSINI:  No objection.

THE COURT:  -- at least lunch?

MS. DOMPH:  No objection.

MR. MITCHELL:  No objection.

THE COURT:  Also we're probably going to take a break now anyway.  So, okay, thanks everyone.

(Proceedings heard in open court:)

THE COURT:  Okay.  Thank you very much, sir.  That concludes the questioning, and so thank you.  You may --

PROSPECTIVE JUROR:  You're welcome.  You're welcome, your Honor.

THE COURT:  It's finished.

PROSPECTIVE JUROR:  Leave the questionnaire here?

THE COURT:  Yes.  Please just leave the questionnaire

here.

(Prospective Juror 58 exits courtroom.)

THE COURT: Okay. Anything to raise before we take the break?

MR. JULIEN: No, your Honor.

THE COURT: All right. So we'll be back at 11:30.

(Recess from 11:15 to 11:31 a.m.)

THE COURT: All right. Everyone ready to pick back up?

THE CLERK: You guys ready?

MR. SPIELFOGEL: Yes.

THE COURT: Okay. Just a few notes. We're about to go into the questioning of 52. Just in terms of where some of the other jurors that -- where the numbers have come up earlier, what's the status.

Juror 67, that juror I had previously allowed not to come in today even though they're on this Panel 3 because of a family member's surgery that's today. So that juror, 67, we've asked to come in on Tuesday with the next panel, Panel 4. And that juror sent an email to say thank you. That juror is grateful and happy to be with their family member today.

I also realize that I misspoke earlier when the panel was here and I was explaining when, you know, how long this questioning could go, I told them it might go into tomorrow. That was not correct. It might go into Monday. Tomorrow is

Friday.

So I'm going to have to correct that with or at least through the courtroom deputy let anyone that needs to come back for the second day of questioning, we'll need to tell them Monday, not tomorrow.

Juror 73 has just not shown up at all or contacted us, so we don't know what the status is of Juror 73. And that's similar to Juror 49, who also has been a no-show since Juror 49 was last here.

Juror 74 did come to the courthouse today but late, and so missed the opening -- the introduction and show-of-hands questions, so we've asked 74 to please return with the next panel, which would be Panel 4 on Tuesday.

And that's all the just miscellaneous notes on status that I had.

Anything else before we bring in Juror 52?

MS. BORMANN: Just a clarification.

So 65, 67 and 74 are all -- I'm sorry -- are all coming in with Panel 4; that's the bottom line, right?

And then 73 is just missing in action.

THE COURT: Correct. Now, 65, the one, I guess, qualification with 65 is that 65 was the juror who had tested positive for COVID before. That juror reached out, it looks like actually on this past Tuesday, October 17, saying: Following up on our emails from yesterday. I took another

home COVID test this morning, and unfortunately the result was still positive, though my symptoms have improved a lot in the past two days. Today -- and, again, this was on Tuesday, October 17. Today is day 6 of my illness, according to the CDC isolation guidelines. I will wait to follow further instructions from the judge. Thank you, and apologies for any inconvenience this causes.

So this juror, 65, at this point, I've asked that juror to come back with the next panel, or come here with the next panel on Tuesday, but, again, still subject to the testing. So if that juror is still testing positive as of Tuesday next week, then I'll just ask them to delay again.

MS. BORMANN: Thank you.

THE COURT: All right.

THE CLERK: All rise.

(Prospective Juror 52 enters courtroom.)

THE COURT: Good morning, ma'am.

PROSPECTIVE JUROR: Good morning.

THE COURT: Can I ask you what you do for a living without giving the name of your employer?

PROSPECTIVE JUROR: I'm a court clerk.

THE COURT: Okay. And any other significant jobs before that? And, I'm sorry, how long have you been in your current occupation?

PROSPECTIVE JUROR: I've been a court clerk for a

little over a year.

THE COURT: Okay. Also, I'm sorry, can I just ask for your juror number? I meant to ask that at the beginning.

PROSPECTIVE JUROR: 52.

THE COURT: Okay. And so any other -- you've been a court clerk for over, a little over a year. Any other prior significant jobs before that? And, again, not giving us the name of your employers, but just telling us the types of jobs that you have had before that?

PROSPECTIVE JUROR: Well, I've -- in the same place, I've held other positions. Like, I worked as a civil appeals clerk, Chancery Division, in the warehouse.

Prior to that, I was a substitute teacher. I worked at a university. And that's about it, yeah.

THE COURT: Okay. Let me ask, please, some follow-up questions from the questionnaire, and so going next to -- and I'll be jumping around a little bit here.

Going next to Questions 11 and 12. Those are asking about different media sources that you may read or review regularly for news and entertainment, and you gave some answers there in response to Questions 11 and 12.

Thinking about the places that you listed there in response to those questions, but also just more generally about anywhere else you might be getting news or entertainment, so that would be in print, newspapers,

magazines, and also online, so websites, social media, and radio and TV, and just really any kind of news or information source at all that you may have seen, have you ever heard or seen or read anything about this case?

PROSPECTIVE JUROR: No, never.

THE COURT: Okay. Then let me also go on to Question 16. So that's asking about whether you or any close relatives or friends have ever worked in or applied for a law enforcement or a security-related job? And you gave an answer there: Yes, security guard.

And without giving any names of the person you were thinking of there, is that -- who is that and is that --

PROSPECTIVE JUROR: My nephew.

THE COURT: Okay. And also not giving the name of the employer, but just saying generally how long has your nephew worked as a security guard?

PROSPECTIVE JUROR: Oh, for quite a long time. It's like his profession.

THE COURT: Okay. And again not giving like a specific employer or location, but does he work for a company or -- and where generally -- what type of business does he work at?

PROSPECTIVE JUROR: Well, I do know he's worked for companies, but specific locations, I don't know.

THE COURT: Okay. Is it in the Chicago area, or is

it in a different city?

PROSPECTIVE JUROR:  I believe so, in the Chicago area.

THE COURT:  Okay.  Have you ever discussed his work with him?

PROSPECTIVE JUROR:  No, not really.

THE COURT:  Okay.

All right.  Is there anything -- so, and this is a question I may be asking with other questions and that I asked earlier of the whole group when everyone was here.

One of a juror's main responsibilities is to be able to decide the case based solely on the evidence that's presented here in court and not on outside information.

So a juror needs to be able to keep an open mind, listen to the evidence as it's presented here in court, and then make a decision once they've heard all of the evidence with an open mind.

Is there anything about your nephew's employment as a security guard that would affect your ability to do that in this case?  To keep an open mind, to listen to the evidence as it's presented, and make a decision after hearing all the evidence with an open mind?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  And let me ask about Question 25. That's asking about have you or any relatives or close friends

ever been arrested, charged with a crime, convicted of a crime, jailed or imprisoned? You answered: Yes. I don't know the specific circumstances.

Is there anything, and I understand you did write "I don't know the specific circumstances" there. Is there anything else you can tell us about what you were referring to in your answer there?

PROSPECTIVE JUROR: Well, I do have a relative, a nephew, who has been arrested, charged with a crime, has been jailed, in prison, but I don't know, like, the details of what he was charged with, what he was convicted with.

THE COURT: Okay. And around -- can you tell us just approximately when that was and where, like which city?

PROSPECTIVE JUROR: Well, I know it's -- I know the City of Chicago. I don't know if there were other places, but -- I'm sorry, what was the other question?

THE COURT: Sorry, just the approximate timing, around when was this? And it doesn't have to be exact, just, you know.

PROSPECTIVE JUROR: Well, I do know he has a recent case, so -- and that's just the latest of many. When it started, he was -- let's see, now he's 49, so he started at a very young age in his teens.

THE COURT: Okay. And you mentioned that you don't know the specific circumstances.

1050

PROSPECTIVE JUROR:  No.

THE COURT:  Is there anything about your nephew's experience that left you with strong feelings one way or another about police, defendants, prosecutors, defense lawyers, or the court system?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  And is there anything at all about your nephew's experience that would affect your ability to decide this case based solely on the evidence presented here in court?

PROSPECTIVE JUROR:  No, I don't think so.

THE COURT:  Okay.  Going on to Question 36.  So that's asking:  Have you or any close relative or friend ever had a drug problem or been involved in drug treatment?  If so, please describe the circumstances.  And you answered:  Yes. I'm not clear on what circumstances to describe.

This question is really getting at a similar -- it's a similar point as the other questions.  There may be evidence in this case that relates to drug distribution, and so it's asking about, you know, has any potential juror who's filling out the questionnaire had an experience themselves that might affect the way that they view the evidence in the case?

And so I guess with that kind of information about why we're asking the question, I don't know if that would help at all?

PROSPECTIVE JUROR: Yes. I mean, I understand. My relative had the drug problem not due to any criminal activity. I mean, I know drugs is criminal, but, I mean, she made the choice, and it wasn't a coercion or anything.

THE COURT: Okay. And is there anything about your relative's -- is this a recent -- let me just go back to some of the kind of timing and where it was.

Is it in Chicago or somewhere else? Is it -- and around what time frame was it?

PROSPECTIVE JUROR: It was in Chicago, and that was, oh, in the '90s.

THE COURT: Okay.

PROSPECTIVE JUROR: Yeah. She --

THE COURT: Okay.

PROSPECTIVE JUROR: She's been clean for some years now.

THE COURT: Okay. So it was some time ago. Is there anything about her experience there that would affect your ability to decide this case based on the evidence presented here in court as opposed to outside information?

PROSPECTIVE JUROR: No.

THE COURT: Okay. And then Question 42, so going on to that question, that's asking do you or a close family member or friend live or work in the following neighborhoods in Chicago: Washington Park, Grand Crossing, Parkway Gardens

or the Gold Coast? And you answered yes to that.

Can you tell us which neighborhood?

PROSPECTIVE JUROR: Grand Crossing.

THE COURT: Okay. And is it you or a family member or friend?

PROSPECTIVE JUROR: It's me.

THE COURT: Okay. And is there -- so there may be evidence in this case that relates to that neighborhood.

Is there anything about your residence in that neighborhood that would affect your ability to keep an open mind as you're hearing the evidence in this case?

PROSPECTIVE JUROR: I'm sorry, can you ask that again?

THE COURT: I'm sorry, confusing question.

So, again, just going back, a juror needs to be able to keep an open mind throughout the case. They need to be able to listen to the evidence as it's being presented, again, keep an open mind, not listen to the evidence with a thumb on the scale for one side or the other.

And so as with the other questions, what we're trying to do here is make sure we have a fair and impartial jury, and if someone has any experience with either any of these topics or lives in one of the areas where there might be evidence that's coming in during the case that's about -- that relates to that neighborhood or the topic that someone's had

experience with, we are just trying to find out is that going to affect someone's ability to be -- to keep an open mind, to just judge the case based on the evidence presented here in court, or is someone going to be really concerned or distracted by the fact that they're hearing evidence about a neighborhood that they live in or have some experience with?

So I don't know if that --

PROSPECTIVE JUROR: It does.

No, it wouldn't affect my ability.

THE COURT: Okay. All right. So with that, let me ask the lawyers if they have any follow-up.

MR. HENNESSY: Yes, your Honor. Thank you.

Good morning, ma'am.

PROSPECTIVE JUROR: Good morning.

MR. HENNESSY: A quick question about your current employment. Could you tell us what type of court or subject area that court presides over?

PROSPECTIVE JUROR: It's traffic.

MR. HENNESSY: Okay. Thank you.

PROSPECTIVE JUROR: Uh-huh.

MR. KLING: Judge, may we have a lawyer's sidebar for one second.

THE COURT: Sure.

(Proceedings heard at sidebar:)

MR. KLING: I know we've kept employment anonymous.

I want to ask her whether she works in the Circuit Court of Cook County, what system she works in and then whether she has any exposure to criminal cases, jury trials, et cetera. But I thought I'd run it by you before I ask her.

THE COURT: I think that's fair. Thank you.

(Proceedings heard in open court:)

MR. KLING: I am way over here, so I'm going to stand so we can see each other, way back here. How are you?

PROSPECTIVE JUROR: I'm good. Thank you.

MR. KLING: Can you tell us what court system you work in?

PROSPECTIVE JUROR: Traffic.

MR. KLING: In Circuit Court of Cook County?

PROSPECTIVE JUROR: Circuit Court, yes, Cook County.

MR. KLING: Do you ever make it into the courtroom as a court clerk, actually seeing trials?

PROSPECTIVE JUROR: Other than traffic, no.

MR. KLING: But you do make it into the courtroom?

PROSPECTIVE JUROR: Oh, yes. I'm in there with the judge and the city attorney.

MR. KLING: And do you deal with the lawyers who come into the courtroom?

PROSPECTIVE JUROR: Yes.

MR. KLING: Have you seen any trials in the courtroom?

PROSPECTIVE JUROR: Yes.

MR. KLING: Have you seen any jury trials in the courtroom?

PROSPECTIVE JUROR: No.

MR. KLING: Based on your experience in the court, would you not discuss your courtroom experiences with your other prospective jurors if you were chosen?

PROSPECTIVE JUROR: Well, no, I wouldn't discuss it with them. I've been instructed not to.

MR. KLING: Okay. You mentioned you were in a number of different assignments in terms of within that system. You mentioned the warehouse, et cetera.

PROSPECTIVE JUROR: Yes.

MR. KLING: Have you ever been assigned to a criminal court?

PROSPECTIVE JUROR: No.

MR. KLING: Thank you, ma'am. That's all I have. Now I'll sit down.

PROSPECTIVE JUROR: Okay.

THE COURT: Any other follow-up?

MS. BORMANN: I have a couple.

Good morning still, I think. How are you?

PROSPECTIVE JUROR: I'm good. Thank you.

MS. BORMANN: So on the issue of the clerking situation, I think you said that you worked in the appellate

1056

division for a while; is that right?

PROSPECTIVE JUROR: Civil appeals.

MS. BORMANN: Civil appeals.

PROSPECTIVE JUROR: Prepared the --

MS. BORMANN: That was my next question, was it civil or criminal? It was civil.

Thank you. I have nothing else.

THE COURT: Other questions?

MR. BOYLE: Just, good morning.

Just briefly. Your nephew's experience in the criminal justice system, has that left you -- this might have already been asked. If it has, I apologize.

Has that left you with any particular opinions about prosecutors or defense attorneys or anything else?

PROSPECTIVE JUROR: No.

MR. BOYLE: Thank you.

MR. BARNETT: One -- still good morning.

PROSPECTIVE JUROR: Yes.

MR. BARNETT: Was your nephew in a gang do you know of? Are you aware of if some of the problems he got into are gang related? You said he was -- he got, you know, exposure to the court system quite often.

PROSPECTIVE JUROR: Whether or not he was in a gang, I'm not aware. I wasn't -- me and my nephew are ten years apart, so while I was living my life, he was doing what he was

doing, and --

MR. BARNETT: Thank you. That's fine. Thank you.

THE COURT: Any other questions?

Okay. Thank you very much, ma'am.

PROSPECTIVE JUROR: Okay.

(Prospective Juror 52 exits courtroom.)

(Prospective Juror 53 enters courtroom.)

THE COURT: Good afternoon, ma'am.

PROSPECTIVE JUROR: Hi.

THE COURT: Can I just ask some -- actually, first, let me ask you, please, what's your juror number?

PROSPECTIVE JUROR: 53.

THE COURT: Thank you. So I'll just have a few follow-up questions from the questionnaire. I may be skipping around here and going out of order sometimes, but -- and also if at any point throughout if you'd like to answer on the sidebar system, just let me know that, please.

PROSPECTIVE JUROR: Yes.

THE COURT: So first of all, what's your current occupation? And also please don't give the name of your employer, just tell us what you do.

PROSPECTIVE JUROR: I'm actually a multi manager. I manage two people.

THE COURT: Okay. How long have you been doing that?

PROSPECTIVE JUROR: About two years.

THE COURT: Okay. And before that, any other significant jobs or types of employers?

PROSPECTIVE JUROR: I was actually in banking for 28 years.

THE COURT: Okay. Let me ask on Questions 11 and 12, so now skipping ahead a little bit, to these questions.

These are about different media sources that you read or review regularly for news and entertainment, and you gave some answers here.

Thinking both about the places that you listed here but also more generally about all media sources that you might have ever read or seen or heard, so that includes print, newspapers, magazines, also anything online, websites, social media, radio, TV, just anywhere where you might be getting news or any entertainment, have you ever heard anything at all or seen anything at all about this case?

PROSPECTIVE JUROR: No.

THE COURT: Okay. Let me go on to the next page, so Question 18. This is asking about have you or anyone close to you ever been involved in a lawsuit as a party or witness? And can you tell us about that?

The answer that you gave there, and, again, not naming any specific people that might have been involved, but just telling us generally what that answer was?

PROSPECTIVE JUROR: I was actually involved in a

lawsuit with discrimination.

THE COURT: Okay. And around when was -- just when approximately was that?

PROSPECTIVE JUROR: Around 2000 -- it could have been around 2018, '19.

THE COURT: Okay. And around or where -- where was that? In Chicago or --

PROSPECTIVE JUROR: Well, it happened in Elgin, but I definitely had the case out in Chicago.

THE COURT: Okay. And do you remember whether it was state or federal court?

PROSPECTIVE JUROR: It was actually just state court.

THE COURT: Okay. And as part of that lawsuit, was it -- was it-employment-related?

PROSPECTIVE JUROR: Yes, it was employment-related.

THE COURT: Okay. And I see, just skipping ahead a few questions to Question 24, that question is: Have you ever testified in court or before a grand jury or in a deposition?

And is your answer there also related to the same lawsuit?

PROSPECTIVE JUROR: That's correct.

THE COURT: Okay. So -- and what kind of testimony? Was it in court or in a deposition?

PROSPECTIVE JUROR: It was in a deposition.

THE COURT: Okay. Is there anything at all about

that case that left you with strong feelings one way or another about lawyers, parties to cases, the court system, anything of that nature?

PROSPECTIVE JUROR:  Well, it left me in a good space, place.

THE COURT:  Okay.  Let me -- and is there anything about that lawsuit that would affect your consideration of this case if you were chosen for the jury here?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Let me go on to Question 20, and it looks like there may be other questions here where you gave answers related to the same matter, which is 22, 25, 28?

Are those all related to the same issue?

PROSPECTIVE JUROR:  No, that was a separate issue.

THE COURT:  Okay.  A separate issue from the case we were just talking about?

PROSPECTIVE JUROR:  Right.

THE COURT:  Okay.  But so Question 20 is asking have you or any relatives or close friends ever been the victim of a crime?  And can you tell us more about your answer there?

Also, if at any point you would like to answer on the sidebar system, please just let me know that.  We can do that.

PROSPECTIVE JUROR:  Okay.

Well, it was actually a case with my brother.  He ended up murdering his wife.  It was really something that was

minute to our family, it was shock, because sometimes when things hit home, that's when you realize truly how the justice system is and what we needed to do to try to support family and friends.

THE COURT: What time frame was this?

PROSPECTIVE JUROR: Back in around 2014.

THE COURT: Okay. And it -- so, first of all, I -- I just want to -- I'm sure, I mean, I can imagine that that's obviously an incredibly difficult experience, and so I just want to -- I don't mean to ask intrusive questions.

PROSPECTIVE JUROR: No, that's okay.

THE COURT: I just have to ask as part of this process.

So one thing, and let me also just back up and explain why I'm asking. So the jurors have to be able, and I was asking some questions of the whole group when they were all here along these lines.

A juror, one of their most important responsibilities is to be able to decide this case based only on the evidence that's presented here in court, not on outside information and things that are just different matters. They have to be able to keep an open mind throughout the trial, be able to listen to the evidence as it's coming in without a thumb on the scale for one side or the other, without being distracted by other things, and then they have to be able to make a decision at

the end of the case, again, you know, having kept an open mind throughout the process, listening to all the evidence, and making a decision at the end.

So a lot of these questions are really trying to get at that. Because if someone's had an experience that relates to some of the evidence that might have come up -- that might be coming up during the case, or, you know, is about a similar topic or just has had any kind of experience with the court system, we -- we just need to know that to -- and then determine whether that's something that the juror can set aside or whether it's something that would potentially influence them.

So that's really why I'm asking these kinds of questions. And so can I -- and so one thing about this case is it may involve testimony from police officers or law enforcement. It may involve evidence or testimony about violence, and so what I'm now asking you about is have you had experience with -- so let's just focus on the police officers for a second.

As part of your brother's -- this incident and the legal proceedings, did you have any dealings with police officers?

PROSPECTIVE JUROR: No.

THE COURT: Okay. Did you -- were you involved in any way in the follow-up kind of investigation or legal case

1063

that came out of that?

PROSPECTIVE JUROR: No. I was just there for, you know, support, being in court, hearing it out.

THE COURT: And is there anything about that -- so your experience with that case, is there anything about that process that would affect your ability to, you know, to serve as a juror in this case, meaning be here throughout the process, keeping an open mind, listening to the evidence as it's being presented here, and then making a decision based on what's presented here in this case in court here, as opposed to some outside information or other experience?

Is there anything about what you -- about your experience there that would affect your ability to -- to serve as a juror here?

PROSPECTIVE JUROR: It may affect my ability due to something that may come up that may trigger some feelings and emotions. That was an extremely difficult case, and it was hard for me and my family.

And to be, you know, quite honest with you, there could be something that could trigger that for me. I really don't know what it would be. It could be along the lines of just, you know, what had transpired.

Now that I'm even talking about it now, it's kind of bringing up emotions, and I really wouldn't want that. I'm not for sure if I can really do it fairly. I'm just keeping

1064

it honest.

THE COURT:  Okay.  Let me ask about a couple other questions here.

So there is a question that asks about -- it's 39, Question 39.  It says one of the victims in the case who was allegedly shot and killed was a man named Carlton Weekly who performed under the stage name FBG Duck.  Are you familiar with Carlton Weekly, a/k/a FBG Duck?  And you answered:  Yes, heard of him.

How have you heard of him?

PROSPECTIVE JUROR:  One of my managers that I manage, her daughter actually knew of the individual.  I've never heard of him until they had spoke about it at the time of the incident.

THE COURT:  Okay.  And so do you remember anything that you heard about -- about him from -- and so this was, again, one of your managers, her daughter knew of this person, and then how did you hear about it?  They were -- your manager and her daughter were discussing?

PROSPECTIVE JUROR:  Yeah, it was a conversational piece.  They actually came into one of the locations, and they were speaking on it, and that was it.  So I kind of heard about it, never commented on it because I didn't know the individual.

THE COURT:  Okay.  And around when was this?

PROSPECTIVE JUROR: I would say maybe about -- could have been two, three months ago, something around that.

THE COURT: Okay. If you were selected as a juror in this case, is that something you would be able to set aside, anything you might have heard from them?

You know, is that something you would be able to set aside and listen to the evidence presented here in court and make a decision at the end of the case?

PROSPECTIVE JUROR: Yeah, I could set it aside due to me not knowing, you know, the individual, and then I didn't get into much of the conversation. I just overheard it.

THE COURT: Okay. And do you remember anything about the conversation, what you heard?

PROSPECTIVE JUROR: I just heard that she knew the individual.

THE COURT: Okay.

PROSPECTIVE JUROR: And that he was -- yeah, that he was murdered. That was it.

THE COURT: Okay. Let me also ask also about Question 45, which is the schedule.

Is there anything about the schedule that will pose an extreme hardship for you, remembering that jury service is an obligation of citizenship?

PROSPECTIVE JUROR: Well, I kind of mentioned hardship due to possibly the time frame, but nothing really

1066

that would, you know, bestow me from doing that.

THE COURT: Let me ask the lawyers if you have any follow-up questions?

MR. JULIEN: Good afternoon.

PROSPECTIVE JUROR: Good afternoon.

MR. JULIEN: I want to follow up on the last question the judge was just asking you about.

You just indicated, I'm talking about question No. 45, that as far as the schedule goes, you wouldn't have any issues serving as a juror; but it looks like you wrote down hardship medically.

Can you tell us a little bit about what you meant there?

PROSPECTIVE JUROR: Well, what the medically, that means that I am an actual diabetic, and I have a Dexcom, and I didn't want it to go off or anything or cause any disruption, so I just wanted to say medically that's what I was dealing with.

MR. JULIEN: Do you think if we were able to take breaks throughout the trial that you would be able to serve as a juror and, you know, make sure you're taking your medication at the time you need to take it?

PROSPECTIVE JUROR: Yes. I'm well on a good schedule for that.

MR. JULIEN: So there's nothing about you being a

diabetic that you think would make it such that you couldn't be a juror in this case?

PROSPECTIVE JUROR: Correct.

MR. JULIEN: I want to ask you about your answers to a couple more questions, Nos. 29 and 33.

Now, to start with 29, the questionnaire asks if basically this case may involve testimony from informants or cooperators, and if there are anything about that that would make it difficult for you to evaluate that testimony fairly and impartially.

And it looks like your answer to me is your religious beliefs.

Could you tell us a little bit more about that?

PROSPECTIVE JUROR: I just know that I was raised a Christian, and I just wanted to make sure that I look at things fairly far as what I believe, and that was my religious basis.

MR. JULIEN: Do you think that if the case involved testimony from a cooperator that you would have a problem receiving that testimony?

PROSPECTIVE JUROR: No.

MR. JULIEN: So I'm trying to make sure I understand what you were getting at here. Are you saying that basically you're going to look at everything fairly?

PROSPECTIVE JUROR: Correct.

MR. JULIEN: Ah, okay.

I want to ask you about your answer to question No. 33, and the question asks ultimately do you have any beliefs or feelings about gang membership that will make it difficult for you to be fair and impartial?

Your answer was: Yes, you don't believe in gangs. Could you tell us a little bit about why you said, yes, that that would make it fair -- it would make it difficult for you to be fair and impartial?

PROSPECTIVE JUROR: Because I believe individuals are themselves. When it comes to gangs, that's an individual choice and when a person does something, that's that own individual person.

Some people when they think of gangs as a whole, I look at it as separate individuals that are doing something that is strictly on them.

So when it comes to gangs, I don't really believe in gangs. I just feel that everybody is accountable for their own action.

MR. JULIEN: Are you saying that -- could you -- I'm sorry. I'm having trouble following what you're saying. It sounds like what you're saying to me is let's say there's a case where there are a few people who were charged with or alleged to have done something, and there may be an allegation that they're part of a gang.

Is what you're saying ultimately that you wouldn't -- you're not going to look at the fact that they're in a gang? What you're going to look at is what they did individually or didn't do individually, is that what you're saying?

PROSPECTIVE JUROR: Correct.

MR. JULIEN: Okay. If the judge were to give you an instruction in this case that you had to determine whether a gang existed, do you think that you could follow that instruction? In other words, if the judge asked you to evaluate the evidence and to determine --

MS. BORMANN: Judge, objection. Can we have a sidebar?

THE COURT: Sure.

(Proceedings heard at sidebar:)

MS. BORMANN: Judge, the issue for the jury is not whether or not a gang exists. It's -- the issue is whether or not there's an enterprise, and there's a definition of that. There are lots of gangs that would not be enterprises under VICAR.

MR. JULIEN: Judge, I think maybe we're talking semantics here, so I'm just trying to put this in laymen's terms.

And my concern ultimately is it sounds like the juror may have an issue with -- the juror -- the jury is going to have to determine that an enterprise existed with respect to a

number of counts, and it sounds like what she's saying to me is that she would disregard that and just maybe look to individual conduct?

And what I'm trying to make sure I understand is that she wouldn't have a problem if what she ultimately had to decide was that an enterprise existed and that a crime was committed to further the goals of that enterprise or to increase someone's standing in that enterprise or to gain entrance to it, that that wouldn't be a problem for her.

MS. BORMANN: Judge, that's inserting the elements of the case into the juror, and it's not permissible.

I suggest that if Mr. Julien wants to know that, he could simply ask whether she would follow the law, and that is, if he were to prove a certain enterprise committed acts that were illegal and defined as an enterprise, whether she could follow that.

MR. MITCHELL: Judge, I have a problem with that, too, because I think the instruction is going to say -- the juror is going to be with each individual --

MS. BORMANN: Right.

MR. MITCHELL: -- and just going to see each individual. So I don't -- I think she's already said that, so I don't think we need to start going through what a gang is versus an enterprise. That will become much later when she gets selected.

MR. JULIEN: I don't think that's what she said.

Again, Judge, I'm not trying to be repetitive. I wouldn't be asking this question but for her answer, which was that I don't -- basically I'm paraphrasing -- I don't really care about gangs. I just kind of look at the individual conduct.

In this case, she's going to have to care about gangs. She's going to have to look at -- we're talking about a murder and whether it was, the people who committed it did so to either gain entrance to or maintain or increase their position in it, and there's going to be a lot of evidence about the existence of a gang.

And what it sounds like she's saying is I'm going to disregard that and just focus on the individuals.

I'm happy for suggestions if the Court wants to ask these questions, but I think they're appropriate based on what she said about her belief in essentially the existence of gangs and people's roles in them.

MR. BARNETT: Your Honor, the problem is the confusion between proving an enterprise and proving the murder. The murder is an individual -- they'll have to prove each individual defendant committed it. The fact that they were in a gang or not in gang really doesn't matter, but it does matter in the broad scheme.

I think it would be -- I think she -- what she's

saying is I'm going to hold each individual defendant responsible for what they did. If that means also they're involved in an enterprise, then it's up to the government to prove that. But you can't ask her -- start explaining to the defendant the difference between an enterprise and a gang. It's confusing for the lawyers. She's not going to be able to get that.

I think that is for later when she's being instructed.

MS. BORMANN: And, Judge, to go back to my initial objection, the idea that gangs somehow equal enterprise is just wrong. Gangs don't necessarily perform illegal acts. So I have an objection to Mr. Julien's question.

MR. JULIEN: That's fine, your Honor. I think I understand everybody's position, but I disagree with this idea that gangs are irrelevant to what the charges are because what the charges are in Count One, Count Three, Count Four and Count Six, she's going to have to find that an enterprise existed, that it affected interstate commerce, so on and so on, that -- and then we're talking about a murder as one element of like a six-element offense, and big portions of that are the existence of an enterprise, in this case, a gang, we call it the O-Block street gang in the indictment, and that it existed, that they participated in it, that this crime, if we're talking about murder, the conspiracy to commit the

murder, the assaults with a dangerous weapon, were committed for the reasons that are set forth in the VICAR statute.

MR. BOYLE: Your Honor, I'm sorry to add in, but this is for Defendant Turpin.

My interpretation of what she said was that I think she would acknowledge that gangs certainly exist here in Chicago and the surrounding areas, but that -- I don't think she believes in them, but I think in response to Mr. Julien's question, I think what she was essentially saying, she doesn't believe gang membership is an excuse for an individual's conduct. You know, well, I was in a gang, that's why I participated in this.

I think her point is that whether or not someone's in a gang, it always come down, to her, the individual's actions, and they should be held responsible for that. The gang membership just in and of itself is not an excuse. That was my interpretation, and I don't know if maybe more open-ended questions could get to that.

MR. JULIEN: That's fine. I just think there's some confusion as to what she meant, and I was going to ask some open-ended questions. I wasn't going to try to define or go through the instructions with her, your Honor.

THE COURT: Okay. I think -- so I think it's fine. Listening to her answers, I can see how they could be interpreted either in the way that Mr. Boyle just described,

and that interpretation would be she believes that gangs exist, but she does not think that gang membership is an excuse, and it's really an individual choice. You know, someone's actions are their individual choice. It's not an excuse to be a member of a gang. That could be one interpretation.

Another interpretation that I think is a fair one is Mr. Julien's interpretation, which is, you know, she -- could -- one interpretation would be that she -- and she wrote directly on her questionnaire, I don't believe in gangs. So that could be taken as a questioning, and I think as she answered, one interpretation could be she is questioning whether gangs exist.

And so I just think it's fair to ask some more questions to explore what exactly she was saying there. I would try to keep them open-ended so as not to try to start instructing her on the law of VICAR or enterprise, or, you know.

So, I guess we could go back to questioning, but try to keep it open-ended, and asking her more what she thinks, not trying to give her premises or instructions.

MR. JULIEN: Understood, your Honor.

THE COURT: Okay. Thanks everyone.

(Proceedings heard in open court:)

THE COURT: Okay. We'll have some additional

follow-up.

MR. JULIEN: So I'm sorry to belabor this point. We're just trying to make sure we all understand what you -- what you believe with respect to Question No. 34.

Do you believe that gangs exist?

PROSPECTIVE JUROR: Yes, I believe they exist.

MR. JULIEN: Do you believe that people can be members of a gang?

PROSPECTIVE JUROR: Yes.

MR. JULIEN: Can you just tell us in your own words what you meant when you said that you look to individual conduct, what someone did or what someone didn't do?

PROSPECTIVE JUROR: Well, I guess it's just my upbringing. I haven't been around gangs. I live in the suburbs. So when it come to gangs, I just think, once again, that people do things on their own individual trait. I've never looked at it as a whole.

However, now that I'm listening to it, yeah, of course, I do know that gangs exist. I do know that they're out there, but people do things on their own accordance. So when it comes to gangs, knowing that that was something that I was never truly around, I just think when people do things, it's on their own actions. It's what they do.

MR. JULIEN: Do you think it's possible that people could do things to, you know, support the interests of a gang

1076

if they were a part of it?

PROSPECTIVE JUROR: Yes, yes.

MR. JULIEN: Thank you.

PROSPECTIVE JUROR: Okay.

MR. KLING: Judge, I have a number of follow-up.

Way over here.

PROSPECTIVE JUROR: Oh, hi.

MR. KLING: You understand that there are six individuals who are charged before you with various criminal offenses, right?

PROSPECTIVE JUROR: Correct.

MR. KLING: Would you require the government to -- would you consider each of the six individuals individually as to whether or not the government proves their allegations against that individual?

PROSPECTIVE JUROR: Yes, individually, yes.

MR. KLING: You'd give individual consideration as to whether -- what the charges are against each person and whether the government proves them beyond a reasonable doubt?

PROSPECTIVE JUROR: Yes.

MR. KLING: Great. A couple questions, which I'm sorry if it's going to be painful.

Did your brother go to trial?

PROSPECTIVE JUROR: Yes, he did.

MR. KLING: Was it a bench trial or jury trial?

1077

PROSPECTIVE JUROR:  It was a jury trial.

MR. KLING:  And where was the trial?

PROSPECTIVE JUROR:  It was in DeKalb County.

MR. KLING:  Did you attend the trial?

PROSPECTIVE JUROR:  Yes, I did.

MR. KLING:  How long did the trial last?

PROSPECTIVE JUROR:  I would say about three to four weeks.

MR. KLING:  And you're concerned as to whether or not things -- you know this is a murder case, in part.  You're concerned as to whether or not things that you hear in this case will be emotionally draining on you because of your experience with your brother?

PROSPECTIVE JUROR:  Correct.

MR. KLING:  Could you put that out -- it's not going to be out of your mind and out of your heart obviously; your brother was convicted.

But could you evaluate the evidence here based on what's established here and not allow your brother's conviction to implicate -- to impact on what you decide here?

PROSPECTIVE JUROR:  That's a hard question.

I'm not really for sure.  I just -- I don't want anything to trigger.  I wouldn't know what the -- what the conversations or what would take place, so I really wouldn't know what would trigger it.

1078

So I honestly can't answer that as a yes or no.

MR. KLING: And the triggering, you're concerned, is going to be emotionally draining on you?

PROSPECTIVE JUROR: Correct.

MR. KLING: I have nothing further.

MR. MITCHELL: I just have a short follow-up.

Understanding that something -- I'm over here.

PROSPECTIVE JUROR: Okay. Sorry.

MR. MITCHELL: Understanding that, again, that was a very trying and traumatic time for you, and it's possible something might trigger.

Do you think that the trigger would cause you not to listen to the evidence if you were here and listening to evidence?

PROSPECTIVE JUROR: No, it wouldn't cause me not to be able to listen. It's just that it would be something that I feel it would be an emotion.

MR. MITCHELL: Okay. And assuming that that might happen and that you would get emotional, would that cause you then to somehow be unfair in making your decision as to how you evaluate that evidence?

PROSPECTIVE JUROR: No, it wouldn't cause me to be unfair.

MR. MITCHELL: Okay. Thank you.

PROSPECTIVE JUROR: You're welcome.

THE COURT: Any other follow-up?

MR. JULIEN: Not from the government, your Honor.

MS. BORMANN: No, Judge.

MR. MITCHELL: Nothing further, Judge.

THE COURT: Actually, can we go on the sidebar really quickly?

(Proceedings heard at sidebar:)

THE COURT: Does anyone request follow-up on 34 or 36? Those are about gun ownership, drug problem.

MS. BORMANN: No, Judge.

MS. DOMPH: No.

MR. JULIEN: No, your Honor.

THE COURT: Okay. So any other follow-up whatsoever?

MR. JULIEN: No, your Honor.

MR. BARNETT: No, your Honor.

THE COURT: Okay, thanks.

(Proceedings heard in open court:)

THE COURT: Okay. Thank you very much, ma'am. And your questioning is concluded, so thank you.

PROSPECTIVE JUROR: Thank you. You're welcome.

THE COURT: Let me also just let everyone know we're about to take the lunch break. We'll come back in an hour, so 1:35.

And, ma'am, I asked everyone and would just ask you again please not to discuss or research the case during the

1080

break.

PROSPECTIVE JUROR:  Of course.

THE COURT:  Thank you.

(Prospective Juror 53 exits courtroom.)

THE COURT:  Anything to raise before we leave for the break?

MR. JULIEN:  No, your Honor.

THE COURT:  Okay.  See you back in an hour.

(Court adjourned, to reconvene at 1:35 p.m.)

1081

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,            )
                                     )
              Plaintiff,             )
-vs-                                 )   Case No. 21 CR 618
                                     )
CHARLES LIGGINS, KENNETH             )   Chicago, Illinois
ROBERSON, TACARLOS OFFERD,           )   October 19, 2023
CHRISTOPHER THOMAS, MARCUS           )   1:39 p.m.
SMART and RALPH TURPIN,              )
                                     )
              Defendants.            )

VOLUME 5
TRANSCRIPT OF PROCEEDINGS - TRIAL
BEFORE THE HONORABLE MARTHA M. PACOLD AND A JURY

APPEARANCES:

For the Government:     MR. JASON A. JULIEN
                        MR. SEAN HENNESSY
                        MS. ANN MARIE E. URSINI
                        MS. CAITLIN S. WALGAMUTH
                        Assistant U.S. Attorneys
                        219 S. Dearborn Street
                        Chicago, IL 60604
                        (312) 353-3500
                        jason.julien@usdoj.gov
                        sean.hennessy@usdoj.gov
                        annmarie.ursini@usdoj.gov
                        caitlin.walgamuth@usdoj.gov

For Defendant           MS. CYNTHIA LOUISE GIACCHETTI
Liggins:                Law Office of Cynthia Giacchetti
                        53 West Jackson, Suite 1035
                        Chicago, IL 60604
                        (312) 939-6440
                        Cg@cgdefense.com


           * * * * * * * * * * * * * * * * * * *


         PROCEEDINGS REPORTED BY CERTIFIED STENOGRAPHER
              TRANSCRIPT PRODUCED WITH A COMPUTER

1082

APPEARANCES: (Continued)

For Defendant Liggins:
MR. GREGORY T. MITCHELL
Law Office of Gregory T. Mitchell
19150 Kedzie Avenue, Suite 205
Homewood, IL 60430
(708) 799-9325
Mitchlaw00@sbcglobal.net

For Defendant Roberson:
MR. STEVEN GREENBERG
Greenberg Trial Lawyers
53 West Jackson, Suite 315
Chicago, IL 60604-6060
(312) 879-9500
Steve@greenbergcd.com

MS. CHERYL T. BORMANN
Cheryl Bormann
53 West Jackson, Suite 315
Chicago, IL 60604-6060
(312) 588-5011
Cheryl.t.bormann@gmail.com

For Defendant Offerd:
MR. JOHN SOMERVILLE
9924 S. Walden Parkway
Chicago, IL 60643-1702
(773) 505-1706
Jville62@gmail.com

MR. RICHARD S. KLING
Chicago-Kent Law Offices
565 W. Adams, 6th Floor
Chicago, IL 60661
(312) 906-5075
Rkling@kentlaw.iit.edu

For Defendant Thomas:
MS. ELLEN R. DOMPH
Law Offices of Ellen R. Domph
53 West Jackson, Suite 1544
Chicago, IL 60604
(312) 922-2525
Edomph@gmail.com

MR. KEITH ALLAN SPIELFOGEL
190 S. LaSalle Street, Suite 540
Chicago, IL 60603
(312) 236-6021
Spielfogel@sbcglobal.net

1083

APPEARANCES: (Continued)

For Defendant
Smart:                      MR. MARC M. BARNETT
                            Law Offices of Marc M. Barnett
                            53 West Jackson, Suite 1442
                            Chicago, IL 60604
                            (312) 217-5019
                            Barnett.marc163@gmail.com

                            MS. MICHELLE MARIN
                            Criminal Defense Lawyer of Chicago
                            53 West Jackson Boulevard
                            Chicago, IL 60604
                            (312) 719-0376
                            Criminaldefenseofchicago@gmail.com

For Defendant
Turpin:                     MR. PATRICK EAMON BOYLE
                            Law Offices of Patrick E. Boyle
                            155 North Michigan Avenue, Suite 562
                            Chicago, IL 60601
                            (312) 565-2888
                            Privpat3@hotmail.com

Also Present:               Ms. Christina Case, FBI
                            Mr. Domonique Dixon, FBI

Court Reporter:

            KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                    Official Court Reporter
                 United States District Court
            219 South Dearborn Street, Suite 2328A
                    Chicago, Illinois  60604
                  Telephone:  (312) 435-5569
              Kathleen_Fennell@ilnd.uscourts.gov

1084

(Proceedings heard in open court:)

THE COURT: Okay. Ready to proceed?

MR. KLING: Yes, we are.

THE COURT: All right. So, we'll question now Juror No. 54.

(Prospective Juror No. 54 enters courtroom.)

THE COURT: Good afternoon, sir.

PROSPECTIVE JUROR: Hello.

THE COURT: If I could ask you first of all, what's your juror number?

PROSPECTIVE JUROR: 54.

THE COURT: And could you please speak into the microphone. If you need to adjust it or move it, feel free.

PROSPECTIVE JUROR: Okay.

THE COURT: What do you do, without telling us the name of your employer?

PROSPECTIVE JUROR: I am a software engineer for a bank.

THE COURT: Any other significant jobs before that?

PROSPECTIVE JUROR: Predominantly software engineering for the DOD and then --

MR. KLING: Judge, I'm sorry. We can't hear back here.

THE COURT: Okay.

PROSPECTIVE JUROR: All right.

1085

THE COURT: You can pull the microphone towards you and just move it up if that would be helpful.

PROSPECTIVE JUROR: Okay.

THE COURT: All right. I'm sorry. If you could just give your answers again. So, what do you do now?

PROSPECTIVE JUROR: I'm a software engineer for a bank.

THE COURT: And how long have you been doing that?

PROSPECTIVE JUROR: I've been in this for a year-and-a-half.

THE COURT: Any other significant jobs before that?

PROSPECTIVE JUROR: Software engineer for two federal agencies, one as a contractor.

THE COURT: I'm going to ask some follow-up questions from the questionnaire, beginning with Questions 11 and 12. Those have to do with media sources that you read or review for news and entertainment.

You listed some sources in response to those two questions, 11 and 12. Thinking both about your answers there and also any other place that you may have seen news or information, including print, newspapers, magazines, also online, anywhere, you know, websites, social media, radio, TV, any form of media, have you ever seen anything or heard anything about this case?

PROSPECTIVE JUROR: No.

1086

THE COURT: Okay. Skipping forward to Question 19, that's asking, "Do you have any close relatives or friends who are criminal defense attorneys, prosecutors, or judges? If so, please describe what they do and their relationship to you."

You answered, "My close friend's girlfriend is a prosecutor in DeKalb in Georgia."

Do you -- have you discussed her work with your friend or with her herself?

PROSPECTIVE JUROR: Not details of it, no. Mostly just when she switched jobs.

THE COURT: Okay. And what was she doing before that?

PROSPECTIVE JUROR: She was just in a -- she was in Fulton and then moved to DeKalb.

THE COURT: And in both places, was she a prosecutor?

PROSPECTIVE JUROR: Yep.

THE COURT: And how long, approximately, has she been a prosecutor?

PROSPECTIVE JUROR: That, I don't know. I guess since college, and she's a few years younger than me, so maybe like three or four.

THE COURT: Okay. Anything about what you've heard about her job or anything about her experience as far as you know about it that would affect your ability to decide this

1087

case based on the evidence presented here in court without a thumb on the scale for one side or the other?

PROSPECTIVE JUROR: No.

THE COURT: Okay. Skipping forward to Question 36, you answered there, "Not sure if alcohol counts, but my dad drinks a lot."

There may be some evidence in this case that relates to drug distribution. Is there anything about your dad's experience that would affect your ability to listen to the evidence here in this case with an open mind and make a decision fairly, without -- again, without a thumb on the scale for one side or the other?

PROSPECTIVE JUROR: No.

THE COURT: Okay. Let me ask the lawyers if they have any follow-up.

MS. URSINI: Not from the government.

MR. KLING: I have a couple of questions out of curiosity. You've indicated in Question No. 13 that you are interested -- I'm sorry, 12. Complex Sneakers Show. What is a Complex Sneakers Show.

PROSPECTIVE JUROR: It's a podcast about sneakers.

MR. KLING: Okay. And where do you do bouldering around the Chicago metropolitan area.

PROSPECTIVE JUROR: Primarily at First Ascent, primarily the one around Block 37 or Humboldt Park.

1088

MR. KLING: Okay. I have nothing further.

MR. MITCHELL: I've got a couple of questions. Primarily, on No. 19, you indicated that your friend's girlfriend has been a prosecutor.

PROSPECTIVE JUROR: Um-hum.

MR. MITCHELL: Yes?

PROSPECTIVE JUROR: Yep.

MR. MITCHELL: And do you talk to her or talk about what she does with your girlfriend or directly to the friend yourself?

PROSPECTIVE JUROR: Not in any great way, just asking her if she likes her new job and the like.

MR. MITCHELL: Has she discussed any kind of cases that she's worked on down there in Fulton County or DeKalb?

PROSPECTIVE JUROR: Not in any detail, no.

MR. MITCHELL: When you say, "Not in any detail," what --

PROSPECTIVE JUROR: Like say if something was crazy or like a crazy case, but she doesn't go into any details about it. She just says it was over the top, I guess.

MR. MITCHELL: There's been a couple of cases down there that have been pretty much in the national news. Has she talked to you about any of those cases?

PROSPECTIVE JUROR: No. I don't talk to her too often.

MR. MITCHELL:  And what about your girlfriend?

PROSPECTIVE JUROR:  Sorry?

MR. MITCHELL:  What about your girlfriend talking about the cases?  Friends, criminal cases in Atlanta, Fulton County that her friend as a prosecutor talks about?  Has she talked about any of the cases at all?

PROSPECTIVE JUROR:  No.

MR. MITCHELL:  Nothing further, Judge.

MS. GIACCHETTI:  Your Honor, could I have a sidebar, please.

THE COURT:  Sure.

(Proceedings heard at sidebar:)

MS. GIACCHETTI:  Judge, Question 7 is that he did some work for two different federal agencies.  I think the only federal agency we have here is FBI, but I would want to know if one of those was, and then what kind of contact he might have had with any FBI agents.

I just don't want to do it improperly, given what -- you know, the restrictions; and I'd prefer perhaps if you could do it in a way that you feel comfortable.

THE COURT:  Sure.

MR. GREENBERG:  And, Judge, could we ask the court reporter to scoot about 6 inches this way so I can see.  Thank you.

THE COURT:  I think on the question for

Ms. Giacchetti, maybe I'll first just start it asking more generally about the mission of the agency and see if it's law enforcement-related and then go from there. I mean, if it is law enforcement-related, then maybe I will ask if it's the FBI. I mean, there's not enough -- there's probably enough software engineers working for the FBI that it's not really disclosing -- unless anyone wants other information.

MS. GIACCHETTI: I would think so. It's a past job, so --

MS. URSINI: I think asking whether the primary function of either or both agencies was law enforcement would be a good start.

THE COURT: Okay.

Also, just on the last -- the questions from Mr. Mitchell, I think the way I understood his written answer on 19 is that his close friend's girlfriend is the prosecutor, so I just want to make sure -- if you wanted to re-ask anything along the lines you were asking about, I don't know if --

MR. MITCHELL: I can clear it up, Judge, if I can.

THE COURT: Okay. So, why don't -- I'll just turn the floor over to you, and then I'll ask the other questions we were just talking about.

MR. MITCHELL: Thank you, Judge.

THE COURT: Okay.

(Proceedings heard in open court:)

MR. MITCHELL:  Hi, sir.  Again, I'm back over here. I just wanted to clarify.  I didn't mean to confuse you. According to your answer, you say on 19, my close friend's girlfriend is a prosecutor in DeKalb in Georgia.

PROSPECTIVE JUROR:  Um-hum.

MR. MITCHELL:  And my question was, has your friend, your close friend, whose girlfriend is a prosecutor --

PROSPECTIVE JUROR:  Right.

MR. MITCHELL:  -- talked to you about some of the cases that she's worked on?

PROSPECTIVE JUROR:  No.

MR. MITCHELL:  Okay.

THE COURT:  All right.  And I have a couple follow-up questions on Question 7, which is about your prior employment.

PROSPECTIVE JUROR:  Um-hum.

THE COURT:  And you mentioned just now and also in the questionnaire that you previously were a software engineer for two different federal agencies.

PROSPECTIVE JUROR:  Yeah.

THE COURT:  The second as a contractor.

PROSPECTIVE JUROR:  I guess I don't know how else to say it.  It was like the DOD/Air Force, and then the Bureau of Land Management.  I don't know if that's a federal agency, federal employer.  I'm not sure what the term is.

THE COURT: Okay. Okay. Can I just ask in any capacity or, you know, with any prior employer, have you had dealings with law enforcement? So, you know, some agencies have law enforcement personnel working at the agency, and so I -- in carrying out the functions of the agency. And so in any prior employment or really at any time, have you been working with law enforcement officers?

PROSPECTIVE JUROR: No.

THE COURT: Okay. I don't have any other questions. Anything further from the lawyers?

MS. URSINI: No, your Honor.

MR. MITCHELL: No.

THE COURT: All right. Thank you very much, sir.

(Prospective Juror No. 54 exits courtroom.)

(Prospective Juror No. 55 enters courtroom.)

THE COURT: Good afternoon, ma'am.

THE CLERK: Good afternoon.

THE COURT: Can I ask you what your juror number is, please.

THE WITNESS: 55.

THE COURT: And what do you do?

THE WITNESS: I'm a special ed TA in a school district, elementary school.

THE COURT: Any other -- and you've been doing that, I see here, for 11 years, is that right?

1093

PROSPECTIVE JUROR:  Um-hum.

THE COURT:  Okay.  Any other significant jobs before that?

PROSPECTIVE JUROR:  Before that, I worked in either office or retail.  I was loss prevention in retail.

THE COURT:  Let me ask about some other follow-ups from the questionnaire.

So, first of all, there were a couple of questions, 11 and 12, that ask about news sources that you may have read or reviewed regularly.  And so thinking about the sources you listed in response to those questions and also any other news sources at all that would be online, in print, radio, TV, have you ever heard anything or seen anything at all about this case?

PROSPECTIVE JUROR:  I don't recall that; but, I mean, I watch the news, so if it was something that was on the news, I -- local news, ABC, WGN, I would have heard about it.  But I don't recall at this time.

THE COURT:  Okay.  Let me also ask about Questions 18 and 22, so -- and actually, I think it's also 24 and 26.  So, there are different answers here where it's asking about a lawsuit -- involvement in lawsuits, witness to a crime, testimony in court, dealings with the police or law enforcement.

And in response to all these questions, you mentioned

retail theft cases as a loss prevention manager. And in one of the answers, you say this was 30 years ago.

PROSPECTIVE JUROR: Yes.

THE COURT: Can you just tell us briefly what you were referring to in these answers?

PROSPECTIVE JUROR: I was -- in the early '90s, I was a loss prevention manager for a -- it was a -- it was called Mervyn's. It was like a Kohl's. It would be about that type of a retail situation.

I was the manager. I witnessed lots of shoplifting, retail theft, employees stealing things, things like that. So, I dealt with police that way, filed reports, called the police, filed complaints. I testified in court a few times. Most people just pled guilty, so -- but I did have to testify a few times.

THE COURT: Which court would it have been?

PROSPECTIVE JUROR: This was in Michigan.

THE COURT: Okay. And all this was around 30 years ago?

PROSPECTIVE JUROR: Yeah, early '90s, so over 30 years ago, actually.

THE COURT: Okay. So, is there anything about your interactions with police or your dealings with the court system, your testimony, anything about what you've just described that would affect your ability to judge this case

based solely on the evidence that's being presented here in court as part of this case?

PROSPECTIVE JUROR:  I don't think so, not to my knowledge.  I think I would be objective.

THE COURT:  Okay.  How about questions -- so, I'm now skipping over to Questions 34, 35.  They're about gun ownership, beliefs or feelings about gun ownership, and experience with firearms.

And I see you gave answers there to both of those questions.  Can you just tell us -- can you just tell us more about those questions?

PROSPECTIVE JUROR:  Okay.  We own many firearms in my household.  My husband and I are both -- believe in the Second Amendment that guarantees us rights.  Neither of us object to legislation for safety to keep, you know -- I think you need to be a responsible gun owner.

THE COURT:  Okay.  And similar to -- you know, a lot of these questions throughout the questionnaire are ultimately getting back to the same questions that I was asking the group earlier, which is an important responsibility of a juror is to be able to judge the facts in this case with an open mind, so listen to the evidence as it's being presented with an open mind, wait until all the evidence is presented before making a decision, and just throughout the entire process listening to the evidence without a thumb on the scale for the -- either

1096

one side or the other.

So, it's really in that context that I'm asking all -- many of these questions on the questionnaire. And so thinking about that question, is there anything about your beliefs or feelings about gun ownership or your own experience with firearms -- understanding that there may be evidence in this case about firearms, is there anything about your beliefs or feelings or your own gun ownership that would affect your ability to listen to the evidence with an open mind?

PROSPECTIVE JUROR: I don't think so. I think I would -- I would hope that I would do my best to be objective.

THE COURT: Okay. And any hesitation there?

PROSPECTIVE JUROR: No. I mean, I just -- I worry that as a human, I might -- I don't want to have my own opinions or biases take precedence, because like you said, I need to listen to what's being presented in court.

THE COURT: Okay. And let me also ask about Question 45, which is about the schedule. Is there anything about the schedule that would present an extreme hardship for you, remembering that jury service is an obligation of citizenship?

PROSPECTIVE JUROR: Well, I mean, I can get down here. I take the train. So, as long as the train, I'm not sitting for three hours on that, I'd be fine. I don't think the schedule -- I'm not looking forward to it. It's a lot of

time; and I work in a public school, and I don't get subs.  My sub got canceled for today, so that does weigh on my mind.

THE COURT:  Would it weigh on your mind enough where it would -- you know, it would be a concern to you if you were here?  Because, I mean, again, a responsibility of a juror is to be able to focus and listen to the evidence and be focused such that they are able to make a decision at the end of the case and have heard all the evidence.

So, is it going to be -- is there going to be an issue at work that would be -- that would affect your ability to focus on the evidence?

PROSPECTIVE JUROR:  No.  I think right now, a lot of it's because it's up in the air and I don't have a -- you know, a concrete answer.  So, I'm telling my employer, "Well, I don't know if I'll be here.  I'm not sure.  I might be.  I might not."

If it was a decided thing that I was going to be here, then that wouldn't -- that would take a lot of that pressure off.

THE COURT:  Okay.  Let me ask if there are any follow-up questions from the lawyers.

MR. BOYLE:  Yes, your Honor.  May I?

THE COURT:  Yes.

MR. BOYLE:  Good afternoon.  You told us about your experience working in retail about 30 years ago, correct?

PROSPECTIVE JUROR:  Yes.

MR. BOYLE:  And what part of Michigan was that?

PROSPECTIVE JUROR:  I worked down in -- near Detroit. I worked in Madison Heights and also in Dearborn.

MR. BOYLE:  Okay.

PROSPECTIVE JUROR:  Oh, and Lansing, outside of Lansing, too.

MR. BOYLE:  Okay.  And can you briefly describe kind of the nature of that?  Would you actually see shoplifters, or would you be kind of in one of those rooms where they've got all the cameras or --

PROSPECTIVE JUROR:  We had cameras.  We also went out on the sales floor and walked around, basically pretending you were a customer.  We also monitored our employees through our cameras.  Sometimes if we thought there was theft going on, we would have a hidden camera put in and watch that way.

MR. BOYLE:  And then if you saw someone shoplifting, would you have to go confront them personally, or how did that work?

PROSPECTIVE JUROR:  Yes.  I had people that I worked with.  We had a team.  They would have to exit the store before we could approach them, but yeah.

MR. BOYLE:  And then you -- I guess if you recovered the object or -- you'd call local police?

PROSPECTIVE JUROR:  Yeah.  We'd bring them back to

1099

the office and go through -- fill out all of our paperwork, call the police. The police would follow through with the courts.

MR. BOYLE: Okay. And you a few moments ago mentioned your biases, correct? Like everyone else, I think you acknowledge you have some biases?

PROSPECTIVE JUROR: I'm sure I probably do, yeah.

MR. BOYLE: Are you comfortable kind of describing what some of those might be?

PROSPECTIVE JUROR: Go ahead and ask. Yeah. What do you want to know?

MR. BOYLE: I mean, like what in particular? Do you have -- lean one way or another?

PROSPECTIVE JUROR: I think politically, I'm probably more liberal, at least than a lot of my family. I think when we're talking about gun rights, I think I have a right to own a firearm; but I'm not opposed to being told I need to maybe take training, be responsible, lock them up, that sort of thing.

MR. BOYLE: Thank you.

PROSPECTIVE JUROR: Okay.

MS. DOMPH: Good afternoon.

MR. KLING: Quick question. You were a criminal justice major?

PROSPECTIVE JUROR: I was, yes.

MR. KLING: What did you intend or think about doing with that degree?

PROSPECTIVE JUROR: I had originally thought maybe I would go into police work. I ended up after graduating from college just going into retail loss prevention. I met my husband there, and then life took me elsewhere.

MR. KLING: Thank you.

MS. DOMPH: Good afternoon. Over here. You said that you were a strong believer in the Second Amendment?

PROSPECTIVE JUROR: I'm a believer in the Second Amendment. I don't know that I'm a strong one like, you know, you're going to have to fight my guns. I'm not like that.

MS. DOMPH: So, you believe -- do you believe that you should be able to own a firearm to protect yourself?

PROSPECTIVE JUROR: Absolutely.

MS. DOMPH: And you said you believe that one should be a responsible gun owner?

PROSPECTIVE JUROR: Yes, I do.

MS. DOMPH: Does that mean -- to be responsible, does that mean that you should go through legal channels like getting a FOID card --

PROSPECTIVE JUROR: Yes.

MS. DOMPH: -- or a concealed carry card before you own a firearm?

PROSPECTIVE JUROR: Yes, I do. I believe that.

1101

MS. DOMPH: Do you have any feelings, personal feelings if you were to hear evidence that there was distribution of guns, lots of guns, to those who you could draw an inference did not have the license to have those guns?

PROSPECTIVE JUROR: Yeah, I probably would think that was wrong.

MS. DOMPH: And if you thought it -- if you think it's wrong, could you then set aside those personal feelings of it being wrong and consider only the evidence and the law in the case before you?

PROSPECTIVE JUROR: I would do my best. The judge said earlier that that might happen. We would hear things, and she might say that -- give us certain directions as to how the law should be applied; and I would do my best to do that.

MS. DOMPH: Doing your best, could you explain? I'm not sure -- I'm not sure I really -- I know what you're saying.

PROSPECTIVE JUROR: Okay.

MS. DOMPH: I think we all say about a lot of things that we're going to do our best. But you just told me that you think it's wrong --

PROSPECTIVE JUROR: I do.

MS. DOMPH: -- in the hypothetical that I gave you. So, if it's wrong, how can you set that aside when you're considering the evidence in this case?

PROSPECTIVE JUROR: I don't have to agree with every law. I don't have to agree with, like the judge was saying, everything -- all of what her directions were, but I need to carry them out the way -- whatever the directions would be.

MS. DOMPH: As a -- as a retail loss prevention manager, I think you said you came in contact with law enforcement?

PROSPECTIVE JUROR: Um-hum.

THE COURT: And did you testify for the prosecution when you were a retail loss prevention manager?

PROSPECTIVE JUROR: Yes.

THE COURT: And so in a case -- in a case like this, a case that's in court, would you tend to believe law enforcement above other witnesses that may come before you at the trial?

PROSPECTIVE JUROR: Probably on its face, I would. I mean, you hear -- just like -- that's why we can't listen to the media because you hear the way things are spun a certain way. But if I haven't learned anything in the last few years, it's that the way something is presented to you by the media or the first time it's presented might not be actually what's happened, just looking at all the social issues in the last few years that have come up. You find out the story's actually a little bit different afterwards.

MS. DOMPH: So, let me see if I understand. You

would tend to believe law enforcement more than other witnesses that you heard from in this case?

PROSPECTIVE JUROR: Probably initially, yes.

MS. DOMPH: And you say initially. What do you mean?

PROSPECTIVE JUROR: Well, I do understand that there's -- you know, the prosecution's going to present their case, and then the defense presents their case, so you're going to get a different spin on it. And then that's what you decide, what the jury would decide based on, after you've heard both sides.

So, I'm sure I'm going to get a certain story from the prosecution, but I'm sure I'm going to get a different one from the defense; and you have to figure out what the truth is somewhere in the middle there.

MS. DOMPH: But if I understand -- if I do understand you, you say you're predisposed to believe law enforcement over lay witnesses?

PROSPECTIVE JUROR: Probably overall, yes.

MS. DOMPH: Thank you.

MR. BARNETT: One question. You understand that in a case like this, in a criminal case, the defendants don't have to put on any witnesses?

PROSPECTIVE JUROR: Yes, I understand.

MR. BARNETT: They don't have to say anything?

PROSPECTIVE JUROR: Yeah, I do understand that.

1104

MR. BARNETT: So, I thought I heard you say, "I'd listen to what the police said, and then I'd listen to what the other witnesses say," but there may not be any other.

So, the question is: Would you naturally believe everything an officer said just because he was a police officer? Would you have a tendency to believe that that would be true?

PROSPECTIVE JUROR: I probably would have a tendency to believe, if that was the only side I was hearing, yeah. And if there was nothing else to say that he wasn't right, he or she wasn't right or wrong, I would probably believe them, yes.

MR. BARNETT: Well, there might be nothing to say, but there might be cross-examination --

PROSPECTIVE JUROR: Yeah. I mean in -- yes, that's what I'm talking about. I understand -- like I said, the prosecution is going to present their way, and the defense is going to present their way, whether it might be witnesses or eyewitness testimony. I don't know. But I know there would be two different sides somehow presented there.

MR. BARNETT: Thank you.

MS. GIACCHETTI: Judge, I -- my question is: Do you also understand that even after you hear the evidence, that the question is not what's in the middle so much as did the government meet its burden of proving what they've charged

beyond a reasonable doubt?

PROSPECTIVE JUROR: So, then I would have to believe the government much substantially more, is that what you're saying, than --

MS. GIACCHETTI: I'm wondering what your understanding --

PROSPECTIVE JUROR: Yeah, that's the --

MS. GIACCHETTI: What's your understanding of that concept?

PROSPECTIVE JUROR: That they have to prove so that I'm not questioning my decision at all, so that I completely believe in what they've said and I don't think there's any chance that the defense could say different. I have to believe the prosecution completely.

MS. GIACCHETTI: Okay. And you also understand that in doing that, you have to honor the fact that there is a presumption that the defendants are innocent?

PROSPECTIVE JUROR: Yes, I understand. I do.

MS. GIACCHETTI: Thank you.

MS. WALGAMUTH: Your Honor, the government has a few questions. Any more on the defense side?

MR. GREENBERG: I thought I might chime in.

MS. WALGAMUTH: Go ahead. I couldn't see you.

MR. GREENBERG: Thank you.

Good afternoon. So, you've testified in court, you

said, right?

PROSPECTIVE JUROR:  Just once or twice, yeah.

MR. GREENBERG:  Okay.  And I assume when you testified, there was a prosecution, and there was a defense, right?

PROSPECTIVE JUROR:  They were both -- I can recall two times that I have, and there was just the judge.  There was no jury or anything, but just the prosecution, the defense, and the judge.

MR. GREENBERG:  So based on that, what do you think the defense's job is in a case?

PROSPECTIVE JUROR:  To prove that the prosecution was wrong.

MR. GREENBERG:  Okay.  When the judge was talking to you earlier and she asked for a show of hands, she was talking about how the defendants don't have to present any evidence, right?  So, how would we prove to you that the prosecution was wrong if we didn't present any evidence?

PROSPECTIVE JUROR:  That's a good question.  I would -- well, I guess I'd just have to believe the prosecution.  I'd have to believe that their -- the evidence that they have is consistent.  There's not loose threads left hanging.  That's if the defense didn't want to present -- wasn't presenting a defense.

MR. GREENBERG:  Okay.  So, you talked earlier about

the Second Amendment, right?

PROSPECTIVE JUROR: Um-hum.

MR. GREENBERG: And your understanding of the Second Amendment is it has to do with self-defense?

PROSPECTIVE JUROR: Um, no, I mean, not the way I think it's in the Constitution. It just says that we have a right -- my interpretation is -- and I know there's a lot -- there's all different sides, and we can argue about that forever.

MR. GREENBERG: We're not going to do that today.

PROSPECTIVE JUROR: Okay. No, I don't think it's necessarily just self-defense. I mean, I grew up in Michigan, and November 15th is opening day hunting season. It is a holiday, pretty much. I lived out in the boonies, and there was no school because they don't want kids waiting out by the bus with -- it was just the way it was. It wasn't just for self-defense. It was for sports, too.

MR. GREENBERG: You said you guys have many guns?

PROSPECTIVE JUROR: We do.

THE COURT: Approximately how many?

PROSPECTIVE JUROR: Well, I personally own two. I own a handgun and a rifle. They're both .22s. My husband owns -- through purchasing himself, he owns -- oh, my gosh, he owns ARs. He has a Glock. He has several handguns. He has .22s. He has all kinds of -- yeah. He's more the sportsman

than I am, compared to him.

MR. GREENBERG: Okay. And you -- so, I want to kind of try to tie all this together, and I want you to think about -- about, you know, how you would approach it.

The government has to prove someone did something beyond a reasonable doubt, right? We agree with that basic concept?

PROSPECTIVE JUROR: I do.

MR. GREENBERG: And you've told us that, you know, you would tend to believe police officers, correct?

PROSPECTIVE JUROR: Probably, yeah.

MR. GREENBERG: All right. Just because they were police officers, right?

PROSPECTIVE JUROR: Yes.

MS. WALGAMUTH: Judge, can we please have a sidebar?

THE COURT: Yes.

(Proceedings heard at sidebar:)

MS. WALGAMUTH: Your Honor, we're having concerns that perhaps unintentionally and likely unintentionally, defense are misquoting back this juror's statements in her questioning. She did, I believe, say --

MR. GREENBERG: I'm sorry. Can you start over? I was trying to figure out what I did wrong.

MS. WALGAMUTH: What I was saying was perhaps unintentionally, I think defense is misquoting back or

1109

misattributing her statements. She did say that she would be more likely -- potentially be more likely to believe a police officer, but I think there's some confusion in the questioning about what she would need to believe the prosecution.

And I understand that was for a guilty verdict, so I'd just ask that these questions can be broken down, and instead of directing this witness, simplifying the question to address one topic at a time.

MR. GREENBERG: Sure.

THE COURT: Okay. I do think that in general, you know -- and I guess this is not just with this juror, but with really any of them, of course we are doing -- this entire process is supposed to uncover, you know, if there's a basis for a for-cause challenge, also to inform everyone's exercise of peremptories.

I do think that the way a question is worded sometimes can result in confusion on the part of a layperson, especially when we start talking about the legal instructions. And so ultimately, I just want to ask people to be mindful of that as we're asking questions.

I -- and the problem is it's tough to totally avoid that because of, you know, the nature of the process is also to try to -- I mean, I think there's times where you kind of have to get into it. It's unavoidable.

But I also think -- so, I'm listening to everyone's

answers with that in mind, that we are asking laypeople about legal concepts they may not be familiar with. Ultimately, the question is: Can this person, even if they right here can't respond on a specific legal topic, are they able to set aside outside information when they're assessing the facts? Are they able to follow my instructions on the law, which they have not yet received?

So, that's just one kind of point generally.

MR. GREENBERG: Okay.

THE COURT: All right.

MS. WALGAMUTH: Your Honor, just to follow up on that, we agree, your Honor, and I think that here, we can -- these questions have been asked in various ways; and I think she's given an answer pretty consistently that she would follow the judge's instructions, so the government would ask that we move on, maybe ask Mr. Greenberg to ask one additional follow-up at this point.

THE COURT: Okay. So, I'll give you a chance to follow up, and I guess I won't set a specific limit right now; but I -- it is a fair point that -- I'm just asking everyone to keep in mind time and whether things have been covered.

MR. GREENBERG: Thank you.

THE COURT: All right. Thanks.

(Proceedings heard in open court:)

THE COURT: Okay. We'll have some additional

1111

follow-up from the lawyers.

MR. GREENBERG:  Thank you.

So, as you look -- the judge told you about the presumption of innocence, right?

THE WITNESS:  Uh-huh.

THE COURT:  You have to answer out loud because he writes it down.

PROSPECTIVE JUROR:  Yes.

MR. GREENBERG:  Thanks.

And as you look at all of these gentlemen over here, do you have any difficulty with the idea that right now, they're presumed to be 100 percent innocent?

PROSPECTIVE JUROR:  No.

MR. GREENBERG:  Okay.  You're hesitating.

PROSPECTIVE JUROR:  I'm looking around.  I just -- I understand what you're saying.  No, I don't think that -- I don't feel that I would have that problem.

MR. GREENBERG:  Okay.

PROSPECTIVE JUROR:  I wonder about it.  I think about it, yeah.

MR. GREENBERG:  All right.  If the government were to put on their case, you were to sit here for six weeks, and no one on this side of the room ever got up and asked a single question, okay, of any witness, the judge would still tell you that they were still presumed innocent at that point.

1112

Would you have any difficulty with that?

PROSPECTIVE JUROR: No. I think -- well, I think I -- if that happened and the only story I heard was the prosecution side, I would probably be more inclined to believe them, yeah.

MR. GREENBERG: Okay. And would you be more inclined -- I think this was asked, but I just want to clarify.

Would you be more inclined to believe police officers just because they were police officers, even if you were told that you shouldn't do that?

PROSPECTIVE JUROR: Well, if that's all I heard and I didn't have a reason to not believe them, I probably would believe them. I'd take them at face value.

MR. GREENBERG: Okay. So, my question is: If the judge told you consider their testimony the same as everyone else. The prosecution calls police officers and non-police officers, but it only comes from one side. Would you tend to believe the police officers because they were police officers?

PROSPECTIVE JUROR: Compared to the other people that testified?

MR. GREENBERG: Yes.

PROSPECTIVE JUROR: No, not necessarily, no. If that was all I heard, if that was the story, if it was a consistent story, if it was the same story and it wasn't contradictory,

1113

yeah, I would probably believe them just the same.

MR. GREENBERG: Can I have just one second, Judge.

So, if they were to testify differently, the government's witnesses, so you hear two different stories, one from a police officer and one from a non-police officer, what would you do then?

PROSPECTIVE JUROR: Well, if the stories were conflicting, I don't know. I guess it would come down to which one I believed and just who I thought was being truthful.

MR. GREENBERG: Okay. Thank you.

MR. KLING: Judge, may I just ask a couple?

THE COURT: Yes.

MR. KLING: Have you ever heard of the concept where there's smoke, there's fire?

PROSPECTIVE JUROR: Yes, I've heard that, yeah.

MR. KLING: Do you sit there and believe that these six defendants wouldn't be here unless they probably did something that's against the law?

MS. WALGAMUTH: Objection, your Honor.

THE COURT: All right. Can we go on the sidebar?

(Proceedings heard at sidebar:)

MS. WALGAMUTH: Your Honor, this has been just asked by Mr. Greenberg about whether these defendants sitting here are presumed innocent. She said yes. She said she

1114

would follow your instructions.  I believe this is the third or fourth time a variation of this question has been asked. The juror has given consistent answers.

THE COURT:  So, I do think it is starting to get repetitive; and it is not the exact same wording, but it is the same concept.  And so -- and the other concern I have, honestly, is just that there are ways that -- when -- again, we're dealing with laypeople.  They have not received any instructions on the law yet.

There is -- the purpose of the voir dire is to determine whether they could follow the instructions on the law, so I realize that presents a problem because, you know, how do you get the answer to that when they haven't heard the instructions yet.

I mean, it's the same issue with the evidence.  How do you guarantee that they're going to be able to hear a particular piece of evidence and assess it, you know, objectively without them having seen exactly what it is?  But that's just a problem that's inherent in any criminal trial, any trial at all, civil or criminal, where you can't preview the entire trial in order to conduct the voir dire.

So, there's just some inherent limitations to the process.  I think we have to be real careful not to turn it into some kind of, like, quiz on legal principles for laypeople where if they give a wrong answer, it means that we

assume they can't follow the instructions on the law, which they're just not familiar with as laypeople.

So, again, I'm trying to give a full, complete opportunity for voir dire, so I'm not going to cut off the questioning. I'll let you ask the questions, but again asking everyone to keep in mind, you know, let's try to avoid repetition. We have a lot of jurors left to question. And also, this concept of it is not a quiz for laypeople on legal principles that they just don't know or have reason to know.

MR. BOYLE: And, your Honor, I believe there's another issue with repetition. It's almost human nature that if you've been asked a question once and you gave what you thought was a genuine, honest answer, and you keep getting asked a different slight variation of that question, it's human nature to think, "Gee, maybe I didn't get it right the first time," and then you end up changing it; and then it's actually -- we have a less understanding of what this person's genuine beliefs are.

That's just my observation at this point.

THE COURT: I agree with that. So, again, I'm also -- I'm trying to balance these issues with giving everyone a chance to ask their questions, so I'm not going to stop it right now; but we're coming close to that point where I'm going to stop it.

MR. KLING: I'll make it easy. I'll withdraw it,

1116

Judge.

THE COURT: Okay. Thanks.

(Proceedings heard in open court:)

THE COURT: Okay. Any other follow-up?

MS. WALGAMUTH: The government just has a few questions briefly, your Honor.

THE COURT: Okay.

MS. WALGAMUTH: Thank you.

You've heard from a number of the attorneys at the table today -- tables today. I think one question we just have is that the judge -- if you are a juror in this case, the judge will give you instructions on how to apply what evidence and facts you hear to the relevant law. Will you follow those instructions?

PROSPECTIVE JUROR: Yes. I was hoping that we would get instructions like that because I'm not a lawyer, so, yeah.

MS. WALGAMUTH: Thank you.

That's all the questions from the government. Thank you.

THE COURT: Okay. Any other follow-up?

Okay. Thank you very much, ma'am.

(Prospective Juror No. 55 exits courtroom.)

(Prospective Juror No. 56 enters courtroom.)

THE COURT: Good afternoon, sir.

PROSPECTIVE JUROR: Good afternoon.

THE COURT: Could you tell us what you do without saying where you work?

PROSPECTIVE JUROR: I'm a consultant.

THE COURT: And any particular type of consulting?

PROSPECTIVE JUROR: Finance and accounting.

THE COURT: How long have been doing that?

PROSPECTIVE JUROR: Since January of this year.

THE COURT: And let me ask, what's your juror number? I just forgot to ask at the beginning.

PROSPECTIVE JUROR: 56.

THE COURT: Thank you.

And then any significant jobs before your current job, again, not saying the name of your prior employers?

PROSPECTIVE JUROR: I worked for a bank before that.

THE COURT: Let me ask about media that you read or review. And there are questions in the questionnaire about this. 11 and 12 are the questions. You gave some answers there about news sources or entertainment sources that you read or review.

Thinking about those sources that you've listed there, and also just more generally across any kind of media that you might have heard or seen, either print, newspaper, magazines, or online, so websites, social media, radio, TV, any kind of media at all, have you ever heard or seen or read anything about this case?

1118

PROSPECTIVE JUROR: No.

THE COURT: Okay. And let me ask Question 19, this is asking, "Do you have any close relatives or friends who are criminal defense attorneys, prosecutors, or judges?" You said your best friend is a lawyer, but does mainly family law. Does that friend do any criminal law?

PROSPECTIVE JUROR: No, he does not.

THE COURT: Okay. How about Question 35? That's asking about you or anyone in your household ever own or fire a firearm. And you answered yes, your mom was in the Marines.

So, is there anything -- this case may involve evidence involving firearms. Is there anything about your mom's experience with firearms that would affect your consideration of the evidence in this case?

PROSPECTIVE JUROR: No. And I never watched her fire or anything. Both my parents were in the Marines, but, yeah, I don't know much about guns, so --

THE COURT: Okay.

MR. KLING: Judge, I'm sorry. Again, can you ask him to speak into the mic?

THE COURT: Yeah. Sorry. If you can just move the mic closer. Thanks.

PROSPECTIVE JUROR: Sorry. Better?

THE COURT: Yes, thanks.

All right. There's going to be -- actually, I'm

sorry. Could you just repeat your last answer because -- so everyone can hear?

PROSPECTIVE JUROR: Okay. Both of my parents were in the Marines, and they both handled firearms; but I never watched, or I don't know much about firearms, so --

THE COURT: Okay. I'm going to ask the lawyers if they have any follow-up questions.

MR. HENNESSY: Thank you, your Honor.

Good afternoon, sir.

PROSPECTIVE JUROR: Good afternoon.

MR. HENNESSY: If I could direct you to your response on No. 12. And it says -- for TV, radio shows, and so on, for news and entertainment, you wrote, "Spotify/Crime Junkie." What did you mean by Crime Junkie?

PROSPECTIVE JUROR: It's a station on Spotify, and it just -- they go over just cases, unsolved cases. It's pretty much they -- they tell stories about certain crimes that happened in the past.

MR. HENNESSY: Okay. Do you listen to that for entertainment purposes?

PROSPECTIVE JUROR: Yeah, I find it interesting just learning about -- or just I find it interesting just hearing about cases.

MR. HENNESSY: If you were selected to serve as a juror in this case, would you be able to separate anything

that you heard from that Crime Junkie podcast from what you learned and heard in this courtroom?

PROSPECTIVE JUROR: Yeah, absolutely.

MR. HENNESSY: Okay. Thank you.

PROSPECTIVE JUROR: Um-hum.

THE COURT: Other follow-up?

Okay. I'm not hearing anything, so thank you very much, sir.

(Prospective Juror No. 56 exits courtroom.)

(Prospective Juror No. 57 enters courtroom.)

THE COURT: Good afternoon, sir.

PROSPECTIVE JUROR: Hello. Good afternoon.

THE COURT: What's your juror number?

PROSPECTIVE JUROR: 57.

THE COURT: And what's your occupation?

PROSPECTIVE JUROR: I'm a copy editor.

THE COURT: And I see here that you're retired, is that right?

PROSPECTIVE JUROR: Semi-retired.

THE COURT: Okay. So, how much are you working?

PROSPECTIVE JUROR: Oh, I'd say about two or three hours a day.

THE COURT: Okay. How long have you been doing that work, or how long have you been a copy editor?

PROSPECTIVE JUROR: About 30 years.

1121

THE COURT: And any other significant jobs before that?

PROSPECTIVE JUROR: No, it's been strictly copy editor.

THE COURT: Okay. I see on your questionnaire, you said, "advertising, consulting." Were those -- what were those?

PROSPECTIVE JUROR: I've worked for, for example, Leo Burnett.

THE COURT: Oh, okay. And also, no need to give names.

PROSPECTIVE JUROR: No names?

THE COURT: No need for that.

PROSPECTIVE JUROR: Advertising agencies here in Chicago, and also consulting groups.

THE COURT: Okay. And when was that work? So now, the advertising agencies and consulting groups, what time frame was that?

PROSPECTIVE JUROR: I'd say the advertising groups were about 10 years.

THE COURT: Okay.

PROSPECTIVE JUROR: And the consulting group was about five years.

THE COURT: All right. And were you also working as a copy editor for those -- so, those groups, the advertising

and consulting, was the work you were doing, was it copy editing, or was it some other type of work?

PROSPECTIVE JUROR: Proofreading, copy editing.

THE COURT: What do you -- when you're currently copy editing, what types of -- and again, not giving particular either employers or companies you're working with, but what sort of material are you copy editing now?

PROSPECTIVE JUROR: Tools for catalogues.

THE COURT: Let me -- and just over time, have you ever copy edited a newspaper?

PROSPECTIVE JUROR: Yes, I've worked for a newspaper.

THE COURT: Okay. What time frame was that?

PROSPECTIVE JUROR: What type of newspaper?

THE COURT: What time frame?

PROSPECTIVE JUROR: That would be in the 1980s.

THE COURT: Okay. Was that here in Chicago?

PROSPECTIVE JUROR: No -- well, it was here in Chicago for a while, and then Europe.

THE COURT: Okay.

MR. GREENBERG: I'm sorry. And where?

THE COURT: Can you say that again? And also, I'm sorry, if you could speak into the microphone.

PROSPECTIVE JUROR: Oh, sure.

THE COURT: Thanks.

PROSPECTIVE JUROR: I was here in Chicago for the

newspaper for a while, and then I went to Europe.

THE COURT: Okay. And when you were in Europe, were you copy editing for a newspaper there?

PROSPECTIVE JUROR: The same newspaper I was working for in Chicago.

THE COURT: Okay.

PROSPECTIVE JUROR: They had transferred me to Europe.

THE COURT: What time frame was this?

PROSPECTIVE JUROR: Oh, I'd say it was the early 1980s until the end of the 1980s.

THE COURT: And that was -- when you were in Chicago working for the newspaper and also when you were in Europe working for the newspaper, that was all through the 1980s?

PROSPECTIVE JUROR: Yeah. The first few years was here in Chicago in Naperville, and the rest of that time was in Europe.

THE COURT: Okay. Let me ask about your -- the media that you review. So, that would be Questions 11 and 12 on the questionnaire. And I'm actually going to be asking about a variety of follow-ups from the questionnaire.

But just to turn to those questions first, you listed here in response to these questions different media that you review for news and entertainment. Thinking about those sources that you listed here, but also just more generally

1124

about any media that you may have seen or heard or read, whether it's in print or online or radio, TV, wherever, have you ever seen, heard, read anything about this case?

PROSPECTIVE JUROR: No, I have not.

THE COURT: Okay. How about going on to Question 20? This is asking about, "Have you or any relatives or close friends ever been the victim of a crime? If so, what type of crime?" And just asking for some other information.

And you gave an answer there. Can you tell us briefly what that was about?

PROSPECTIVE JUROR: I'm sorry. Could you repeat it?

THE COURT: Just asking briefly, if you could tell us briefly about your answer to Question 20. So, you gave an answer to Question 20, and I'm just trying to ask you more about that answer. What was -- what is it you're referring to when you answered Question 20?

And if -- do you have a copy of your questionnaire there with you?

PROSPECTIVE JUROR: Oh, that would help.

THE COURT: Yeah, sorry. So, just flipping over to Question 20 --

PROSPECTIVE JUROR: Oh, I was the victim of fraud.

THE COURT: Okay. And just briefly, if you could just tell us, you say here that was 10 years ago. The fraud was online.

1125

PROSPECTIVE JUROR:  Yes, it was.

THE COURT:  Okay.  So, can you give --

PROSPECTIVE JUROR:  Yeah, it was online, and it was telephone line.  It was somebody defrauded me on telephone.

THE COURT:  Okay.

PROSPECTIVE JUROR:  I should have said that.

THE COURT:  Okay.  And you answered yes here.  Was that in response to whether anyone was prosecuted for that crime?

PROSPECTIVE JUROR:  Yes, they were.

THE COURT:  Okay.  Did you deal with the police as part of that incident?

PROSPECTIVE JUROR:  Yes, I did.

THE COURT:  How so?

PROSPECTIVE JUROR:  Well, I had reported it to the police, you know.  I let them know all about it.

THE COURT:  Okay.  And then did you have any dealings with the police other than when you reported it?

PROSPECTIVE JUROR:  No, no.

THE COURT:  All right.

PROSPECTIVE JUROR:  They eventually sent me some documents saying they had caught the perpetrators.

THE COURT:  Okay.  And then did you ever have to go to court and participate in the case that came out of that?

PROSPECTIVE JUROR:  No, not at all.

1126

THE COURT: Did that experience leave you with any strong feelings one way or another about the police, about defendants, about prosecutors, defense lawyers, the court system, anything -- anything along those lines?

PROSPECTIVE JUROR: Not at all.

THE COURT: All right. How about Question 23? This is asking about prior jury service, and you mentioned something there. It says, "20 years ago, trial jury, car accident, city court, Chicago."

PROSPECTIVE JUROR: Um-hum.

THE COURT: So, that was here in the city?

PROSPECTIVE JUROR: Yes.

THE COURT: And it was around 20 years ago?

PROSPECTIVE JUROR: Um-hum.

THE COURT: It involved a car accident?

PROSPECTIVE JUROR: Yeah, yeah.

THE COURT: Okay. How long did the trial take?

PROSPECTIVE JUROR: It was plea bargained.

THE COURT: Oh, okay. Did you -- was the trial -- did it start?

PROSPECTIVE JUROR: No, it never did.

THE COURT: Oh, okay. So, the jury never reached a verdict, but that is because there was no need for a verdict?

PROSPECTIVE JUROR: Right. They never really called us in, yeah.

1127

THE COURT: Okay. How about Questions 31 -- and I think it's 36 is also related.

PROSPECTIVE JUROR: Um-hum.

THE COURT: So, can you tell us what you were referring to in those -- in those answers?

PROSPECTIVE JUROR: Oh, sure. I have been sober of alcohol and drugs for 30 years. It will be 32 on Halloween, as a matter of fact. And before then, I was rather enslaved by it, let's say.

36 is -- the only group I really belong to is AA here in Chicago.

THE COURT: And I -- I just -- I don't mean to ask intrusive questions. I have to ask as part of the process.

PROSPECTIVE JUROR: Yeah, I understand.

THE COURT: It's just that, as 31 says, the charges in this case involve the allegations -- different kinds of allegations; and it does include drug trafficking, and you may hear evidence if you're selected for the jury about drug trafficking.

And so thinking back to when we were all here and I was asking questions of the group, one of the main responsibilities of a juror is that they have to be able to set aside outside experiences and listen to the evidence with an open mind --

PROSPECTIVE JUROR: Um-hum.

THE COURT: -- and evaluate the evidence fairly without a thumb on the scale for one side or the other.

And so I guess, you know, in that context, you mentioned you've had this experience with drugs and alcohol. It has been many years. But is it something that would affect your ability to judge the evidence based solely on what's presented here in court, as opposed to outside information?

So, would it affect your ability to keep an open mind if you're hearing evidence about drug trafficking?

PROSPECTIVE JUROR: No. As you mention, you want me to keep an open mind to deal with the facts as they're stated in the trial, and that's what I would do.

THE COURT: Okay. Let me also ask about 37. So, that's asking about, "During this case, you may hear about Chicago-based rap music performers. You may also hear lyrics from these songs and see music videos or images from music videos. Are you familiar with music and artists associated with what some may call Chicago drill rap? If so, please say how you are familiar with this music and artists."

And you said radio and TV and online. So, are you familiar with Chicago-based rap music performers or Chicago drill rap?

PROSPECTIVE JUROR: Only fleetingly with Chicago rap. And I don't really listen too much to current rap. My interest in rap is from the 1980s.

THE COURT: Okay. And can you tell us -- I know you said it was only fleetingly, but can you just tell us more about what you do know about Chicago rap?

PROSPECTIVE JUROR: Well, you know, I hear it in cars. When cars are passing by, I hear it going on. It's very rhythmic-based, and it's very to the point and at times graphic.

THE COURT: Okay. And then you also mentioned your interest in rap was from the 1980s. Can you tell us more what that -- what were you referring to there?

PROSPECTIVE JUROR: There was a certain form of rap at the time that was just starting, and it was -- never used, for example, curse words that much. It was more what they call hip hop now, with various voicings and stereo effects.

Interestingly enough, I bought a lot of records in Europe. In Amsterdam, they were selling rap records. So, you know, there was a whole store devoted to it, so I collected a lot of records from that era.

THE COURT: So, you may hear about -- as this question is asking, during this case, you may hear about Chicago-based rap music performers. If you were selected as a juror in this case, would -- would any of the knowledge that you've just described, would that affect your ability to keep an open mind and listen to the evidence in this case and --

PROSPECTIVE JUROR: I would keep an open mind. As a

matter of fact, I would be interested in that personal artistic expression, yes.

THE COURT: Okay. How about Question 43? So, this is asking about any problem with your hearing, eyesight, or any other physical disability that would in any manner affect your ability to see or hear the evidence presented at trial. And you said, "No. I wear hearing aids, though."

And you did say no. Any issues at all hearing anything today?

PROSPECTIVE JUROR: No, I've been okay. You know, I have a level -- level software on my phone that I can turn up or down when I hear something, so, no, I should be okay.

THE COURT: Okay. I'm going to ask the lawyers if they have any follow-up questions.

MR. JULIEN: Not from the government, your Honor.

MS. DOMPH: No, Judge.

MR. BARRETT: No.

MS. GIACCHETTI: No.

THE COURT: Okay. Thank you very much, sir.

PROSPECTIVE JUROR: Should I leave the questionnaire here?

THE COURT: We'll collect it through the courtroom deputy. Thanks.

PROSPECTIVE JUROR: Okay. Thank you.

THE COURT: Thank you.

1131

(Prospective Juror No. 57 exits courtroom.)

THE COURT: Just a reminder, we're going to question Juror 59 now because we already excused 58 for cause.

(Prospective Juror No. 59 enters courtroom.)

THE COURT: Good afternoon, ma'am.

PROSPECTIVE JUROR: Hi.

THE COURT: Hi. If you could please speak into the microphone. It's just so everyone can hear.

And first let me just ask you, please, what your juror number is.

PROSPECTIVE JUROR: 59.

THE COURT: Okay. Let me ask, please, what your occupation is without saying the name of your employer.

PROSPECTIVE JUROR: I'm a business manager.

THE COURT: All right. And any other -- how long have you been doing that?

PROSPECTIVE JUROR: 11 years.

THE COURT: Any other significant jobs before that?

PROSPECTIVE JUROR: Mostly all in the accounting field, so controller, chief accountant, stuff like that.

THE COURT: Okay. Let me ask about some follow-ups from the questionnaire.

PROSPECTIVE JUROR: Sure.

THE COURT: Going to Questions 11 and 12, those are about different media that you read or review. You listed

some answers there.

Thinking about the answers you already gave here, but also about media generally that you may have heard or seen, so print, newspapers, online, websites, social media, TV, radio, just anywhere at all that you might be hearing news or information, have you ever heard anything at all about this case?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Let's go on to Question 20. So, that's asking about, "Have you or anyone close to you ever been the victim of a crime?"  You mentioned your sister's house was broken into and there was no prosecution.

Can you tell us where and when that was, approximately?

PROSPECTIVE JUROR:  Probably 20 years ago.  She lives in Romeoville.

THE COURT:  Okay.  Anything about that incident that would affect your consideration of this case if you were chosen as a juror?

PROSPECTIVE JUROR:  No.

THE COURT:  How about Question 23?  That's asking about prior jury duty.  You listed yes, jury duty, possibly 1980, and some other information.

So, where was that?

PROSPECTIVE JUROR:  I was at the court in Madison.

1133

THE COURT: Okay.

PROSPECTIVE JUROR: And honest, I'm guessing '80 because I really don't know specific dates. It's so long ago.

THE COURT: And that's fine. And is -- how long was the trial?

PROSPECTIVE JUROR: It was just three day, I believe.

THE COURT: Was it civil or criminal?

PROSPECTIVE JUROR: It was criminal.

THE COURT: Don't -- without telling us what the verdict was, did the jury reach a verdict?

PROSPECTIVE JUROR: Yes, the jury reached a verdict.

THE COURT: Were you the foreperson?

PROSPECTIVE JUROR: No.

THE COURT: Okay. Let's go on to Question 25. This is asking about prior arrests or criminal charges or convictions or imprisonment. And you gave an answer here, yes, and concerning a family member.

And also -- so, let me just ask, I was going to ask some more -- just ask you to give some basic information expanding on this; but at any point, if you'd like to go on the sidebar system, we could do that if you would be more comfortable doing that.

PROSPECTIVE JUROR: No, it's okay.

THE COURT: Okay. So, could you tell us a bit more about that? And basically where and when was this?

PROSPECTIVE JUROR:  I can tell you that my brother was one of the town drunks, so to speak, so drunk and disorderly was often something he would go to the jail for, not necessarily -- I don't think he ever went to court about that.

There was an incident where he was accused of sexual assault.  He was drunk and fell asleep with some young girl. And she was upset because he didn't continue to pursue her, so she pressed some false charges, and they were dismissed, so --

THE COURT:  Okay.  When --

PROSPECTIVE JUROR:  But he's no longer with us, so --

THE COURT:  Your brother has passed away?

PROSPECTIVE JUROR:  Yes.  Yep, yeah, I'm sorry.

THE COURT:  When was this that you were just mentioning?  When were the incidents?

PROSPECTIVE JUROR:  I'm thinking of the -- I'm thinking of the late '70s, 1970s.

THE COURT:  Okay.

PROSPECTIVE JUROR:  Okay?

THE COURT:  Is there anything at all about his experience -- well, let me just ask -- back up a little bit.

So, as part of those episodes, did you ever deal with the police?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  And did you ever go to court in

connection with any of those incidents?

PROSPECTIVE JUROR: No. No, I did not.

THE COURT: All right. Is there anything about your brother's experiences that would affect your consideration of this case?

PROSPECTIVE JUROR: Absolutely not.

THE COURT: Okay. How about Question 26? That's about prior interviews or questioning by the police or law enforcement. Could you tell us more about that? And when and where was that, and just basics of what that was about?

PROSPECTIVE JUROR: Within the last year, we have a young autistic boy that lives next door to us, and he's not always under control. His parents -- he tends to wander. And we've had a lot of new people in our neighborhood, a lot of new homeowners, and they were complaining that this child could be somebody that was dangerous to their children.

So, when the police came by, it's like, you know, if you knew who Toma was, he's a nice young man. He's just not verbal and just can't communicate. His parents need to keep a better handle on him. But he's probably 20 years old and 6-1 and a big child and hard to control.

So, just answering questions, trying to get them to understand that he's not a danger to anybody, so --

THE COURT: Okay. Anything about that interaction with the police that would affect your consideration of this

1136

case?

PROSPECTIVE JUROR: No, ma'am.

THE COURT: All right. Let me ask about Question 36. That's asking about any drug problem or drug treatment that you or any close relative or friend has ever had.

PROSPECTIVE JUROR: Um-hum.

THE COURT: So -- and just to back up a little bit, this case may involve allegations of drug trafficking, and so that's why I'm asking about this topic.

PROSPECTIVE JUROR: Okay.

THE COURT: So, let me, I guess, first just ask you to expand a bit on that answer.

PROSPECTIVE JUROR: Okay. Our youngest is -- she hung around with some strange kids in high school and started drinking, unbeknownst to us. And then she got to a point where when she graduated high school, she was drinking on a regular basis. Everything she earned from her part-time job, she went -- it went to drinking. And so we ended up putting her in alcohol rehab.

THE COURT: Okay. And what time frame was this?

PROSPECTIVE JUROR: Probably seven years ago.

THE COURT: Okay. And so anything about that experience that would affect your consideration of this case?

And what I mean by that is a juror has to be able to keep an open mind, listen to the evidence as it's presented

here in court, make a decision at the end after hearing all the evidence and not putting a thumb on the scale for one side or the other.

And as I mentioned, there may be evidence in this case that involves drug trafficking. So, now thinking about the fact that you've had the experience you just mentioned, is there anything in that experience that would pose a problem for you where you couldn't set that aside and evaluate the evidence based solely on what's presented here in court?

PROSPECTIVE JUROR: I don't think so. I don't know much about drug trafficking, so I don't -- I don't think I have an opinion either way.

THE COURT: Okay.

PROSPECTIVE JUROR: I don't see anything there.

THE COURT: Okay.

PROSPECTIVE JUROR: Sorry.

THE COURT: Let me ask also about Question 43, which is, "Do you have a problem with your hearing, eyesight, or any other physical disability which would in any manner affect your ability to see or hear the evidence presented at trial?" You said, "I wear hearing aids, so no."

Any issues so far hearing?

PROSPECTIVE JUROR: No, I was very pleased with the sound in the courtroom. Very nice. Very impressive.

THE COURT: Okay. And let me also ask about

1138

Question 46, which is: Do you recognize a name on that attached list of names?

PROSPECTIVE JUROR: Well, when you put -- when you put a name like a Michael Kelly in an Irish city, you know, I know a Michael Kelly, not necessarily this Michael Kelly.

The Michael Kelly I know happens to be, like, 82 years old, and he lives in Plainfield. I don't think he's connected with this case; but it was a name, so I had to tell you what -- sorry.

THE COURT: Okay. Thank you.

PROSPECTIVE JUROR: Sorry. It's weird, but, you know --

THE COURT: No. Thank you for mentioning it.

So, let me at this point ask the lawyers if you have any follow-up questions.

MR. BOYLE: Good afternoon, ma'am.

PROSPECTIVE JUROR: Hi.

MR. BOYLE: How are you?

PROSPECTIVE JUROR: Wonderful. Thank you.

MR. BOYLE: You talked about your brother had been accused of something he didn't do. Do you remember that?

PROSPECTIVE JUROR: Yes.

MR. BOYLE: And then you said because they were false charges, that case got dismissed?

PROSPECTIVE JUROR: Yes.

1139

MR. BOYLE: And by dismissed, do you mean like dismissed by the police or dismissed by prosecutors or he was found not guilty?

PROSPECTIVE JUROR: I don't believe it ever went to court, so I guess -- I don't know exactly who dismissed it, but I don't believe they ever went to court on anything like that, so --

MR. BOYLE: Thank you.

MR. MITCHELL: Judge, I have a couple.

THE COURT: Yes, please.

MR. MITCHELL: Hi. I'm back over here.

PROSPECTIVE JUROR: I see you.

MR. MITCHELL: The answer to No. 26, you indicated that your daughter was hanging around strange kids, and you used the term "strange kids." Can you explain why you described them as strange kids and what made them strange?

PROSPECTIVE JUROR: Sometimes -- this was during, like, high school, so sometimes they would go to school; sometimes they wouldn't go to school. Most of the time, their mother didn't know what they were doing. I didn't exactly know what they were doing, either.

So, not really strange kids, just -- I guess I was a goody girl in school, so I wasn't used to having -- hanging around people that wouldn't go to school or go to class and ditch and things.

1140

So, that's -- sorry. That's probably a bad -- probably a bad combination of verbiage, so --

MR. MITCHELL: Are you talking about kids who were smoking cigarettes, using drugs, using alcohol?

PROSPECTIVE JUROR: Smoking cigarettes, using alcohol. Not drugs, that I know of.

MR. MITCHELL: Okay. And then on No. 37, it was asking you about Chicago-based rap music. My question, how often did you visit the city of Chicago?

PROSPECTIVE JUROR: How often do I visit the city of Chicago?

MR. MITCHELL: Yes.

PROSPECTIVE JUROR: You know, I'm a suburban person, so I stay -- there's a few places. We'll come to ballgames and things like that.

I have heard rap music, but I don't know who anybody is; and I'm the older generation, so I kind of tune stuff out when I don't understand what they're talking about.

MR. MITCHELL: I just wanted to know, with respect to your -- what do you know about Chicago? I mean, if it's rap music, do you visit --

MS. WALGAMUTH: Objection, your Honor.

MR. MITCHELL: I'm sorry. Do you visit Chicago at all?

MS. WALGAMUTH: Your Honor, objection. Can we go to

1141

sidebar?

THE COURT: Yes.

(Proceedings heard at sidebar:)

MS. WALGAMUTH: Your Honor, I don't understand the relevance of what familiarity this juror has with the city of Chicago as it relates to this case. Maybe Mr. Mitchell can explain that. But I think this line of questioning is just unnecessary and outside of the scope of any of her answers.

MR. MITCHELL: I think the question, Judge, I wanted to make sure that she talks about rap music or Chicago rap, or is there something about Chicago that's distinctive? Does she know anything about Chicago at all?

THE COURT: Okay. So, I'll allow the questioning. I do think on this Question 37, she answered, "Not familiar," so I don't know that this particular answer really called for further follow-up; but I also -- you know, I'm just trying to give people a chance to ask follow-ups. So, I'll allow that question.

MR. MITCHELL: Thank you.

(Proceedings heard in open court:)

THE COURT: Okay. We'll have some additional questioning from the lawyers.

MR. MITCHELL: It's me again.

PROSPECTIVE JUROR: Okay.

MR. MITCHELL: You said you do -- you are familiar

with rap music, but you don't know the difference between Chicago rap or anything else?

PROSPECTIVE JUROR: No clue. Sorry. I really don't. I'm sure there's a difference, but I'm not that musically inclined to know those kind of things.

MR. MITCHELL: And my question was: Did you know that Chicago had a particular style of rap music or anything at all about Chicago particularly?

PROSPECTIVE JUROR: Not about Chicago rap music, no.

MR. MITCHELL: Okay. Thank you.

PROSPECTIVE JUROR: Sorry.

MR. BARRETT: Your Honor, I have a very quick one. Good afternoon.

PROSPECTIVE JUROR: Hello.

MR. BARNETT: Hello. You indicated that your brother was accused or arrested for something that he didn't do and it never made it to court because they probably determined that he -- you know, the charges or the accusations were groundless. Is that pretty much it?

PROSPECTIVE JUROR: That's what I believe, yes.

MR. BARNETT: Suppose you're in a situation where people do make it to court, like this situation.

PROSPECTIVE JUROR: Um-hum.

MR. BARNETT: Do you think there's something more afoot then? Because they made it to court, there's more

1143

likelihood that they did do something?

PROSPECTIVE JUROR:  Not necessarily.

MR. BARNETT:  So, you're able to give them a fair trial --

PROSPECTIVE JUROR:  Sure.

MR. BARNETT:  -- hear all the evidence?

PROSPECTIVE JUROR:  Yeah.  That's the idea.

MR. BARNETT:  Thank you.

THE COURT:  Any other follow-up?

MS. WALGAMUTH:  Not from the government.  Thank you.

THE COURT:  Okay.  I'm not seeing anything.  Thank you very much, ma'am.

(Prospective Juror No. 59 exits courtroom.)

THE COURT:  It's 3:00 o'clock, so I'd like to take the break.  We'll come back in 15 minutes.

And we'll -- I really want today to get to some of the legal issues, so we'll continue with a few more jurors after that; and then we'll try to pause at some point here and then pick up with the questioning on Monday.

But at this point, let's take the break and come back in 15 minutes, please.

(Recess had from 3:00 o'clock to 3:15.)

(Proceedings had in open court:)

THE COURT:  Are we ready?

MR. BARNETT:  Yes.

1144

THE COURT: All right.

So was just also -- before we bring in the next juror, which is Juror 60, I wanted to talk about the schedule. So I am hoping to give us some time today to do the inventory of outstanding legal issues and come up with a plan for resolving them in order to leave us enough time to do that before the end of the day.

I know that the defendants need to leave by 4:30, and, you know, if we had to, we could continue after that. I mean, even better would be if we could finish by 4:30. So I was thinking maybe we stop the questioning at no later than 4:00, maybe even a couple minutes before 4:00, to leave us some time to deal with these legal issues.

Ideally, we could get through -- since we're spending two days per questioning of a panel, halfway through this panel would be Juror 63, I guess. Somewhere around there. We didn't question 60- -- oh, wait. I guess -- 65 and 67 are not here, but those are after 63. And we also spent time on the introductory stuff today, which we won't have on Monday. So I think if we make it through maybe around 63, that would put us in a good spot in terms of finishing at a reasonable pace on Monday with this panel.

So what I was thinking is just keep going for a while here, ideally getting through at least Juror 63, but also not ending any later with the questioning than 4:00, so that we

have time to deal with outstanding legal issues.

MS. DOMPH:  Yes, Judge, that works.

MR. MITCHELL:  That works.

MR. BARNETT:  Thank you.

THE COURT:  Okay.

So let's, please, start with Juror 60.

(Prospective Juror 60 enters courtroom.)

THE COURT:  Good afternoon, sir.

PROSPECTIVE JUROR:  How you doing?

THE COURT:  If you could please just pull the microphone a little bit closer -- and you can move it if you need to -- just to be able to speak into it so everyone can hear.

Let me first just ask you, what's your juror number?

PROSPECTIVE JUROR:  60.

THE COURT:  Okay.

And I do want to follow up before I forget on the show-of-hands question.  So earlier, when we were all here in court and I was asking different show-of-hands questions, I asked a question about, is anyone taking medication that could affect their ability to concentrate.  And you raised your hand.

Can you tell us more about that?  And, also, either for that question or if there's anything at all that you would prefer to answer on the sidebar system, we can use that.

PROSPECTIVE JUROR: I take medication for conjection (phonetic) heart failure, high blood pressure, and my cholesterol.

THE COURT: Okay.

PROSPECTIVE JUROR: And kidney problems.

THE COURT: Okay.

All right. And is there anything about that medication that would affect your ability to concentrate or to focus on the evidence that's being presented during the trial?

PROSPECTIVE JUROR: Yes. One of them might make me drowsy and stuff.

THE COURT: Okay.

MR. GREENBERG: Judge, could he speak in the mic, please?

THE COURT: Sure.

Yes, if could you please --

PROSPECTIVE JUROR: Medication, I might get drowsy.

THE COURT: Okay.

And is that something that you're taking regularly?

PROSPECTIVE JUROR: Yes.

THE COURT: All right.

Let me just ask the lawyers if you can please go on the sidebar.

(Proceedings had at sidebar:)

THE COURT: Does anyone have other follow-ups?

MR. BARNETT: No.

MR. MITCHELL: Judge, my dad takes similar medications in his condition. Certain types of --

THE COURT: Sorry, Mr. Mitchell, if you could please speak into the microphone. The court reporter is asking.

MR. MITCHELL: Okay. I'm sorry. Can you hear me now?

My dad takes these medications for this same issue. Certain times of day is better than others. It's usually the ending of the day that the drowsiness and things come down, but they have to take certain -- so you might ask him in his practice or his -- is it certain things in the morning, afternoon, breaks, that kinds of things.

THE COURT: Okay. Thanks.

(Proceedings had in open court:)

THE COURT: Okay, sir, are there certain times of day when -- you mentioned that -- actually, let me start over.

So you mentioned that you're taking medication that could make you drowsy. Is that -- does that tend to happen at any particular time of day? Is that usually in the morning, afternoon, or any particular time when that might happen?

PROSPECTIVE JUROR: Usually in the morning. And a couple of medication I got to take twice a day. So it can happen any time.

THE COURT: Okay.

1148

Is there any kind of predictability to it, or is it unpredictable when it can happen?

PROSPECTIVE JUROR: It's unpredictable.

THE COURT: Okay.

And, just generally, how often does it tend to happen?

PROSPECTIVE JUROR: I'm not for sure, but usually when I stand up, I get a little dizzy and might faint.

THE COURT: Okay.

Can I just ask the lawyers to go back on the sidebar.

(Proceedings had at sidebar:)

MR. BARNETT: Under the circumstances, I think that we should cause -- strike him for cause.

MS. DOMPH: No, Judge, I have a question first. I'm sorry. I see that he works --

THE COURT: I'm sorry, one second.

(Brief pause.)

THE COURT: The court reporter is having some difficulty hearing. I have been -- can you just test once more, just say something and let's just make sure the court reporter can hear.

(Brief pause.)

MS. DOMPH: Judge, before we run into the cause issue, it looks like he works full-time as a security guard. Or I don't know full-time. I shouldn't say that. Could we

talk about his employment vis-a-vis his medications?

THE COURT: Yes. That's a good point. I can ask him is he maintaining full-time employment; and, if so, how does that --

MS. DOMPH: Well, how does he manage the medications while working as a security guard. Maybe you could inquire a little bit more what kind of security job it is, whether it's active, passive.

THE COURT: Okay.

MR. MITCHELL: And, Judge, I think Ms. Giacchetti has pointed out he put "No" at the pointed questions. So ask him about that.

THE COURT: The hardship question?

MR. MITCHELL: Yes, Judge.

THE COURT: Or maybe also the physical disability question.

MR. MITCHELL: Yes.

THE COURT: Okay.

(Proceedings had in open court:)

THE COURT: Okay, sir, I just have some more questions.

So one is about your current occupation. You listed here that you are working as a security guard; is that correct?

PROSPECTIVE JUROR: Correct.

1150

THE COURT: And how long have you been doing that?

PROSPECTIVE JUROR: About a good 13 years.

THE COURT: Okay.

Are you currently working in that capacity full-time?

PROSPECTIVE JUROR: Yes.

THE COURT: All right.

How do you -- and, I'm sorry, I'm not trying to ask intrusive questions. It's just that I have to ask questions as part of this process. But how do you manage your medications while working as a security guard?

PROSPECTIVE JUROR: Most of the time, I sit down. So I don't do too much walking.

THE COURT: And is your job -- and maybe this -- this is basically what you just said, but is it mainly kind of active or passive type of work that you're doing during the day?

PROSPECTIVE JUROR: It's not active. Well, I work at a bank, so --

THE COURT: Okay. And you're mainly sitting during the day?

PROSPECTIVE JUROR: Yes.

THE COURT: Are you -- what are you doing? Are you just -- is there anything particular -- are you monitoring cameras? Are you monitoring people in the bank? What is it that you're doing?

PROSPECTIVE JUROR:  The people that comes in and out.

THE COURT:  Okay.

PROSPECTIVE JUROR:  No cameras.

THE COURT:  Okay.

Can I also just ask, so Questions 43 and 45, those things are asking about:  Do you have a problem with your hearing, your eyesight, any other physical disability which would in any manner affect your ability to see or hear the evidence presented at trial?

You answered "No" to that.

And, then, Question 45 was asking about the schedule:  Is there anything about the schedule that will pose an extreme hardship for you?

And you answered "No" to that, as well.

Let me -- so I just want to make sure I understand, how do you think about -- so your answer about the medication, how do you think about that relative to the other answers here or other questions here?

PROSPECTIVE JUROR:  I'm not understanding you.

THE COURT:  Yes, that's a confusing question.

When I asked on the questionnaire, do you have a problem with your hearing, your eyesight, or any other physical disability which would in any manner affect your ability to see or hear the evidence presented at trial, you answered "No" on the questionnaire.  And that's Question 43.

But then earlier today, when we did the show of hands, I asked a question about medication and whether anyone is taking medication that could affect their ability to concentrate, and you raised your hand at that point. And, then, also just now you've been telling -- you've mentioned that there are occasions where, because of the medication you're taking, you may be drowsy.

So I guess I was just wondering, why did you answer "No" to Question 43, which is about is there anything that might affect your ability to see or hear the evidence at trial? Are those consistent, is really what I'm asking?

PROSPECTIVE JUROR: I don't have a problem with hearing or seeing. It's just I never know when I might get dizzy.

THE COURT: Understood.

PROSPECTIVE JUROR: It just happens.

THE COURT: Understood.

And so how about question -- let me just also ask about Question 45: Is there anything about the schedule that will pose an extreme hardship for you?

So the trial -- as I mentioned, the length of the trial is unpredictable, but we're estimating approximately six to nine weeks. Is there anything that will pose an extreme hardship for you if you are selected as a juror?

PROSPECTIVE JUROR: Well, I catch the bus, and

sometimes you never know what might happen during the time I'm traveling.

THE COURT:  Okay.  And let me -- sorry, I don't know if I fully understood.  Can you just say that again?

PROSPECTIVE JUROR:  I ride the bus in the morning to get here.  It might be a problem sometime with the CTA.

THE COURT:  Okay.

PROSPECTIVE JUROR:  They start at a certain time.  I have to get the first bus or something to get down here.

THE COURT:  Okay.

How long did it take you to get here today?

PROSPECTIVE JUROR:  About a hour and 15 minutes.

THE COURT:  Okay.

Let me ask about Question 23, which is prior jury service.  And you answered "Yes" to that question:  Have you ever served on a jury or on a grand jury?

PROSPECTIVE JUROR:  I did.

THE COURT:  Okay.

Can you tell us when that was approximately?

PROSPECTIVE JUROR:  It was in March 2020.

THE COURT:  Okay.

And where it was?

PROSPECTIVE JUROR:  Actually, I forgot.

THE COURT:  Okay.

Was it in the city or suburbs or --

PROSPECTIVE JUROR:  It was down here, downtown.  It might have been the Daley building -- Daley Center.

THE COURT:  Was it civil or criminal?

PROSPECTIVE JUROR:  Civil.

THE COURT:  And without -- or how long was that trial?

PROSPECTIVE JUROR:  Maybe a month-and-a-half.

THE COURT:  And without telling us what the verdict was, did the jury reach a verdict?

PROSPECTIVE JUROR:  They did.

THE COURT:  Were you the foreperson?

PROSPECTIVE JUROR:  Excuse me?

THE COURT:  Were you the foreperson?  Were you the foreperson of the jury?

PROSPECTIVE JUROR:  What you mean by that?

THE COURT:  Well, there's a foreperson who is designated to basically be the one that hands the note if there's a note or tells the -- communicates with the court clerk.

PROSPECTIVE JUROR:  No.  No, I wasn't.

THE COURT:  Okay.

Let me ask the lawyers if you have any follow-up questions.

MR. KLING:  I do, Judge.

Way over here.  How are you?

1155

PROSPECTIVE JUROR:  Okay.

MR. KLING:  You've been at the bank for 13 years as a security officer?

PROSPECTIVE JUROR:  Not at the bank but different places.

MR. KLING:  But working full-time as a security officer?

PROSPECTIVE JUROR:  Yes.

MR. KLING:  And I assume wherever you've worked, they've been comfortable with your performance?

PROSPECTIVE JUROR:  Yes.

MR. KLING:  And you've never had a problem at work where, as a result of your medication, you fainted or couldn't do your work, have you?

PROSPECTIVE JUROR:  No.  I just got on medication.

MR. KLING:  But it hasn't affected your ability to perform your job, has it?

PROSPECTIVE JUROR:  It haven't.

MR. KLING:  I have nothing further.  Thank you.

MR. HENNESSY:  I have a few, your Honor.

Good afternoon, sir.  Sorry, I'm over here.  How you doing?

PROSPECTIVE JUROR:  Okay.

MR. HENNESSY:  When did you start taking these medications?

1156

PROSPECTIVE JUROR: 2022 --

MR. HENNESSY: 2022?

PROSPECTIVE JUROR: -- it started. A good year.

MR. HENNESSY: A good year. Okay.

And you have been consistently working while on these medications?

PROSPECTIVE JUROR: Yes.

MR. HENNESSY: And I think you said that sometimes the medications might make you dizzy or drowsy?

PROSPECTIVE JUROR: Yes.

MR. HENNESSY: What do you do when they make you dizzy?

PROSPECTIVE JUROR: I just sit down and don't get up.

MR. HENNESSY: What do you do when they make you drowsy?

PROSPECTIVE JUROR: Just sit down and wait till it passes.

MR. HENNESSY: Okay. How often would you say that happens?

PROSPECTIVE JUROR: Not often, but it do happen.

MR. HENNESSY: So, when it does happen, about -- if you had to estimate, how long would the duration of that episode be?

PROSPECTIVE JUROR: Maybe ten minutes or so.

MR. HENNESSY: Ten minutes or so? Okay.

PROSPECTIVE JUROR:  15.

MR. HENNESSY:  Have those instances happened while you've been on the job?

PROSPECTIVE JUROR:  Yes.

MR. HENNESSY:  What do you do in those instances when you're working and you have a drowsy spell?

PROSPECTIVE JUROR:  Like I say, I will sit down and just wait till it passes.

MR. HENNESSY:  Are you working within a team when you're at work?

PROSPECTIVE JUROR:  No.

MR. HENNESSY:  Okay.

Do -- when you have one of these drowsy spells, do you go and talk to anybody about it?

PROSPECTIVE JUROR:  No.

MR. HENNESSY:  Okay.

Do you think that these drowsy spells have impacted your ability to do your job?

PROSPECTIVE JUROR:  No.

MR. HENNESSY:  Okay.

And so I just want to get this clear.  Do you think these drowsy spells would impact your ability to sit on the jury here?

PROSPECTIVE JUROR:  I do.

MR. HENNESSY:  Okay.

1158

So help me understand the difference between sitting on the jury here and having a drowsy spell and being at work and having the same instance.

PROSPECTIVE JUROR: Actually, I might not pay attention to some of the stuff going on.

MR. HENNESSY: Okay. Thank you.

PROSPECTIVE JUROR: You're welcome.

MR. BOYLE: Good afternoon, sir.

PROSPECTIVE JUROR: How you doing?

MR. BOYLE: Not pay attention to stuff happening at the trial or sometimes you can kind of take a moment at work and kind of zone out a little bit? What did you mean?

PROSPECTIVE JUROR: At the trial.

MR. BOYLE: Okay. Thank you.

(Brief pause.)

THE COURT: Other follow-up?

MR. BARNETT: Sir, you're employed as a security guard, correct? Correct?

PROSPECTIVE JUROR: Yes.

MR. BARNETT: Okay.

And you don't want to lose the job, correct?

PROSPECTIVE JUROR: Yes.

MR. BARNETT: So did you tell anybody when you get these dizzy spells, or do you just kind of hope it passes and -- because you don't want to get fired or lose your job?

1159

I'm just asking. Is that the problem?

PROSPECTIVE JUROR: Yes.

MR. HENNESSY: Objection, your Honor.

THE COURT: Let's go on the sidebar.

(Proceedings had at sidebar:)

MR. HENNESSY: Thank you.

I think the question as it's posed is a bit argumentative. But more importantly, I already asked him what he does if this happens at work. And I specifically asked him if he goes and tells anybody about it, and he said no.

THE COURT: Okay.

Response?

MR. BARNETT: That's fine, Judge. As long as he doesn't -- I was just getting at the reason he might be protecting himself at work and that's why he doesn't tell anybody. That's all. It's not a problem. I'm done asking questions.

THE COURT: Okay.

(Proceedings had in open court:)

THE COURT: Any other questions?

(No response.)

THE COURT: Okay. Thank you, sir.

PROSPECTIVE JUROR: Thank you.

(Prospective Juror 60 excused from courtroom.)

(Prospective Juror 61 enters courtroom.)

THE COURT: Good afternoon, ma'am.

PROSPECTIVE JUROR: Hi.

THE COURT: Can I ask what your juror number is, please.

PROSPECTIVE JUROR: 61.

THE COURT: All right.

And let me ask also what's your current occupation, without saying the name of your employer?

PROSPECTIVE JUROR: I'm a librarian, and I'm the manager of the Children's Services Department.

THE COURT: Okay.

And let me also just ask you, it's already, hopefully, close by, but please just try and speak into the microphone --

PROSPECTIVE JUROR: Oh, sorry.

THE COURT: -- so you can be heard.

No. Thank you.

And how long have you been in that occupation?

PROSPECTIVE JUROR: I've been a librarian for 12 years.

THE COURT: Let me also just ask about some other questions off of the questionnaire.

So some questions here, 11 and 12, are about news and media --

PROSPECTIVE JUROR: Uh-huh.

1161

THE COURT: -- that you read or view regularly. And you gave answers here and listed some sites. Just thinking more generally -- so thinking about these sources that you've listed here, but also just more generally about any media you may have seen, newspapers, magazines, anything in print, also anything online, also TV, radio, just any kind of media -- have you ever seen or heard anything about this case?

PROSPECTIVE JUROR: No, I haven't.

THE COURT: All right.

Let me ask about Question 19, which is: Any close relatives or friends who are criminal defense attorneys, prosecutors, or judges?

And you answered there: Father-in-law retired lawyer, but I believe in accounting.

PROSPECTIVE JUROR: Yeah. I know he did prosecute some cases, but they weren't criminal, I don't believe.

THE COURT: Okay.

How about Question 23, prior jury service? You did serve on a jury in 2018 in Van Nuys, California --

PROSPECTIVE JUROR: Yes.

THE COURT: -- it looks like?

PROSPECTIVE JUROR: Uh-huh.

THE COURT: Okay.

What type of case was it, civil or criminal?

PROSPECTIVE JUROR: It was civil.

THE COURT: How long was the trial?

PROSPECTIVE JUROR: Three days.

THE COURT: Without saying what the verdict was, did the jury reach a verdict?

PROSPECTIVE JUROR: Yes.

THE COURT: I don't have any other questions. Let me just ask whether the lawyers do.

MR. JULIEN: No, your Honor.

MS. BORMANN: Yes, briefly.

Ma'am, good afternoon.

So I'm looking at the answer to No. 19.

PROSPECTIVE JUROR: Uh-huh.

MS. BORMANN: And that's where you say he's a retired -- your father-in-law --

PROSPECTIVE JUROR: Uh-huh.

MS. BORMANN: -- is a retired lawyer, but you believe in accounting. So something spurred your memory and you now think he was a prosecutor?

PROSPECTIVE JUROR: Well, I actually -- it's really -- I know he did a lot of, like, international law cases, so it was, like, all overseas. And I think it all had to do with, like, financial matters.

MS. BORMANN: Okay.

PROSPECTIVE JUROR: So I probably misinterpreted the question at first and then tried to, like, correct that in my

answer.

MS. BORMANN: Oh, I got it.

PROSPECTIVE JUROR: Uh-huh.

MS. BORMANN: So does your father-in-law live in Illinois?

PROSPECTIVE JUROR: Yes.

MS. BORMANN: Okay.

And I'm assuming he's still alive since --

PROSPECTIVE JUROR: Yes.

MS. BORMANN: -- he still lives here? Good.

PROSPECTIVE JUROR: Uh-huh.

MS. BORMANN: Okay.

And so the -- do you have conversations with him about his career doing financial -- sounds like --

PROSPECTIVE JUROR: Not really.

MS. BORMANN: -- financial crime stuff?

PROSPECTIVE JUROR: He's not the chatty type. So, no.

MS. BORMANN: Welcome to manhood. Okay. So -- my partner's offended.

Anyway, at some point, has he talked to you about prosecuting those cases?

PROSPECTIVE JUROR: No.

MS. BORMANN: Do you have any reason to believe that you couldn't sit here and listen to the evidence as it came in

1164

in court and assess folks' credibility and disregard the ones you don't believe and credit the ones you do regardless of what your father-in-law did?

PROSPECTIVE JUROR: Oh, yeah. I have no reason to think that would interfere.

MS. BORMANN: Okay. Thank you.

MS. GIACCHETTI: I have a quick question, and it may have been asked.

The jury trial that you were on reached a verdict. Were you the foreperson?

PROSPECTIVE JUROR: No.

MS. GIACCHETTI: Thank you.

Judge, and could I have just a quick sidebar with you on this?

THE COURT: Sure.

(Proceedings had at sidebar:)

MS. GIACCHETTI: Judge, I noticed that there was, on 14, an organization that she listed and it was blacked out. I'm wondering if you could just tell us the nature of that organization?

THE COURT: Sure. Just give me a minute, please.

(Brief pause.)

THE COURT: I'm going to have to just get the original from the juror.

(Brief pause.)

1165

MR. GREENBERG:  Is this -- this is No. 65?

THE COURT:  61.

MR. GREENBERG:  Oh, I'm sorry.  I'm sorry.  Okay.  I thought it was 65.  I'm sorry.

THE COURT:  No problem at all.  So --

MR. GREENBERG:  It wasn't blacked out on 65.

THE COURT:  Oh, I see.

MR. GREENBERG:  That's why I was going to -- okay.

THE COURT:  So just in terms of what's the nature of the organization, it's -- the field is related to her occupation.

MS. GIACCHETTI:  That's fine, Judge.  That's all I want.

(Proceedings had in open court:)

THE COURT:  Any further questions?

MR. BOYLE:  Good afternoon.  How are you?

PROSPECTIVE JUROR:  Good.  How are you?

MR. BOYLE:  I know you have great access as a librarian to all types of books.  You said that one of your hobbies is reading.

PROSPECTIVE JUROR:  Uh-huh.

MR. BOYLE:  What do you like to read?

PROSPECTIVE JUROR:  Mysteries, teen fiction, graphic novels, memoirs.

MR. BOYLE:  Thank you.

1166

THE COURT: Anything further?

(No response.)

THE COURT: Okay. I'm not seeing anything else.

Thank you very much, ma'am.

PROSPECTIVE JUROR: Thank you.

(Prospective Juror 61 exits courtroom.)

MR. BARNETT: Your Honor, just a reminder. It's five to 4:00.

THE COURT: Thanks.

(Prospective Juror 62 enters courtroom.)

THE COURT: Good afternoon, sir.

PROSPECTIVE JUROR: Hi.

THE COURT: Can I ask what your juror number is, please.

PROSPECTIVE JUROR: 62.

THE COURT: And what do you do?

PROSPECTIVE JUROR: I'm a remodeling contractor.

THE COURT: How long have you been doing that?

PROSPECTIVE JUROR: About five years.

THE COURT: Anything -- any other significant types of jobs before that?

PROSPECTIVE JUROR: I've done a lot of retail work, but not really anything significant.

THE COURT: Okay.

Let me ask, in terms of media that you read or review

regularly, there's some questions on the questionnaire, 11 and 12 are about that. Thinking about the answers you gave there, but also just more generally about any media, whether it's print or online or TV, radio, any format, have you ever seen or heard anything about this case?

PROSPECTIVE JUROR: No.

THE COURT: Okay.

How about Question 19: Do you have any close relatives or friends who are criminal defense attorneys, prosecutors or judges?

You said "No."

PROSPECTIVE JUROR: Correct, yeah.

THE COURT: Okay.

And you did mention your wife's aunt, but you don't know what kind of lawyer she is.

PROSPECTIVE JUROR: Yeah. I --

THE COURT: Okay.

PROSPECTIVE JUROR: And, yeah, I seldom talk to her. I don't think I've seen her in eight years, so just --

THE COURT: Okay.

How about Question 20? So this is asking: Have you or any relatives or close friends ever been the victim of a crime? And you gave an answer there.

Can you tell us what that was about?

PROSPECTIVE JUROR: He was just surrounded by a group

of kids and they beat him up and took his wallet and his backpack, and he had to go to the hospital. Had a concussion, that kind of thing.

THE COURT: This was your -- it says here --

PROSPECTIVE JUROR: A good friend of mine, yeah.

THE COURT: Okay.

And you said here that this was in July of 2022?

PROSPECTIVE JUROR: Uh-huh.

THE COURT: Where was it?

PROSPECTIVE JUROR: It was somewhere in the Uptown neighborhood of Chicago.

THE COURT: And were you there for this?

PROSPECTIVE JUROR: No. He was actually coming -- he was on his way to my house when it happened.

THE COURT: Okay.

Did you ever deal with the police or the court system as part of that?

PROSPECTIVE JUROR: No.

THE COURT: One of the main responsibilities of a juror is to be able to decide the evidence based solely on what's presented here in court, not on other outside information. Is there anything about that experience of your friend that would affect your ability to fulfill that responsibility of a juror?

PROSPECTIVE JUROR: Not that I can think of.

THE COURT: Okay.

How about Question 25: Have you or any relatives or close friends ever been arrested, charged with a crime, convicted of a crime, jailed or imprisoned? And you gave an answer there.

Could you please tell us that -- what that answer is about.

PROSPECTIVE JUROR: My brother and his friends burned down a Porta Potty when they were in high school, and they got caught.

THE COURT: Okay.

And this was in, you say here, around 2002?

PROSPECTIVE JUROR: Yeah. Like I said, back in high school, so --

THE COURT: Okay.

Where was this?

PROSPECTIVE JUROR: Deerfield, Illinois.

THE COURT: Okay.

Anything about that episode that would affect how you might consider this case if you were selected as a juror?

PROSPECTIVE JUROR: I can't imagine how.

THE COURT: Okay.

How about 34? This is about beliefs or feelings about gun ownership and do you have any beliefs or feelings on that topic that would make it difficult for you to be fair and

1170

impartial?

You said: I do have beliefs. I don't know they would make it difficult, though.

Can you expand on that?

PROSPECTIVE JUROR: I guess my beliefs are more with the gun culture in America as a whole, you know, versus specific instances. I think we're just a little too obsessed with the firearms as a whole as a country, and it's -- but I, you know, don't think people shouldn't have -- the Second Amendment's an important thing. So I don't -- yeah. Well, I don't think it would cloud my judgment at all. But I -- because I don't know if it would actually directly -- like, my feelings would relate in the same way to this case necessarily. But --

THE COURT: Okay.

PROSPECTIVE JUROR: -- I do think -- yeah, you know, guns could be a problem. So I don't know if that's -- if -- maybe there is some -- just looking at myself, I don't think I would be -- I would be able to, you know, not be impartial towards it. But I, you know -- I guess that would be something I have to think more about. But it's not -- nothing immediately comes to mind that would make me think I couldn't be impartial.

THE COURT: Okay.

And, ultimately, again, if you were selected as a

juror, you would need to be able to listen to the evidence with an open mind, decide the case based on the evidence presented here in court, not on outside information. And you would need to be able to decide the case being fair to both sides without a thumb on the scale for either side. You need to be able to follow my instructions on the law.

Do you think you could do all of that?

PROSPECTIVE JUROR: I think I can.

THE COURT: Okay.

How about Question 35, so that's asking about: Have you or anyone in your household ever owned or fired a firearm?

PROSPECTIVE JUROR: Yeah. I never really owned one. And my answer on the paper was I shot at the rifle range at Boy Scout camp. So that was more just something to do in the summer, so --

THE COURT: Okay.

And I guess similar to what we were just talking about, would your experience at camp in the summer affect your consideration of this case?

PROSPECTIVE JUROR: I don't think so. I don't think being a lousy shot makes a difference here.

THE COURT: Okay.

How about Question 36, so -- and just backing up to, I guess, the last couple questions. This is -- it's a similar type of question. It's just on a different topic. And the --

as it explains here, there may be -- I think it's in a different question, in 31. But it says: The charges in this case involved allegations of -- on various topics, including the illegal use or possession of firearms and drug trafficking.

And so that's really the context in which I'm asking these questions.

And so in response to 36, you gave an answer about a friend's drug problem. Can you tell us more about that?

PROSPECTIVE JUROR: Yeah. I had a friend who had a on again, off again; you know, was in treatment a couple times for heroin. And, then, in -- I think it was just before the pandemic, I believe -- I think it was 2019 -- he died of an overdose and -- yeah.

THE COURT: Okay.

Was it a close friend?

PROSPECTIVE JUROR: I wouldn't say a close friend. But --

THE COURT: Okay.

PROSPECTIVE JUROR: -- someone I had known for a while, but we weren't very close.

THE COURT: Okay. Nonetheless, that's a very -- I mean, that's obviously a very difficult -- that's a terrible thing. And so is there anything about the fact that you knew this person and this is someone you knew and that person died

of an overdose that would affect your ability to consider the evidence in this case with an open mind?

And, again, the evidence may include testimony or other evidence about drug trafficking.

PROSPECTIVE JUROR: I don't think it will be an issue.

THE COURT: Okay.

How about Question 42, that's about -- that is asking whether you or close family member or friend live or work in various neighborhoods in Chicago, including Gold Coast. And you mentioned you used to live in the Gold Coast, but that was around 2006 to 2007.

Anything about the fact that -- there is a possibility that evidence in this case may include testimony or other evidence about the Gold Coast. Anything about that that would affect your ability to keep an open mind about the evidence?

PROSPECTIVE JUROR: I don't think so.

THE COURT: Okay.

How about Question 43: Any problem with your hearing, eyesight, any other physical disability that would in any manner affect your ability to see or hear the evidence presented at trial?

PROSPECTIVE JUROR: Yeah, I have a little hard of hearing in my left ear, but it's -- I don't know if it would

1174

affect my ability to hear things.  I can still hear out of it.  It's just not nearly as good as the right ear.

THE COURT:  Okay.

Have you had any difficulty hearing today?

PROSPECTIVE JUROR:  Not so far.

THE COURT:  Okay.

And are there any particular places or circumstances where you do notice a difficulty hearing?

PROSPECTIVE JUROR:  Not -- nothing in particular.  It's just kind of an all the time --

THE COURT:  Okay.

PROSPECTIVE JUROR:  It doesn't work as well as the other.

THE COURT:  Okay.

How about Question 45?  So that's asking about the schedule.  I mentioned we don't -- it's hard to predict how long a trial will last, but we estimate six to nine weeks and it's Monday through Thursday.

Is there anything about that schedule that will pose an extreme hardship for you?

PROSPECTIVE JUROR:  Aside from -- like I said in there, I've got ADHD.  This has been a bit trying the last couple weeks with all this.  But I do struggle with, you know, focusing and, you know, sitting still for long periods.  And it -- if -- yeah, I struggle.

And I'm not saying it like -- I could try.  Like, I do have some control over myself.  But it's -- you know, I do know my -- my mind tends to wander after -- you know, if I'm just sitting in one place for a long time.

So, you know, like six to nine weeks for the trial, like you've said, I can see a world where I would maybe not be the ideal juror in that case.

THE COURT:  Okay.

We would be going -- it would be a significant time commitment.  You would be here Monday through Thursday, 9:15 to 5:00 p.m.  We would be taking breaks during the day.  We would be taking mid-morning, mid-afternoon, lunch breaks.  Would that change your answer?

PROSPECTIVE JUROR:  It might make it better, but I -- it's still -- I -- I'm sure I would still struggle with it.  It was an issue in school.  It's been an issue my whole life.  So I do think it would be just -- yeah, I -- I could see it being an issue for me personally.  That's all.

THE COURT:  Okay.

PROSPECTIVE JUROR:  I could fight through it.  Like I said, you know, I went to school for -- you know, and fought through it then.  I can get through it, but it's -- my brain can wander at times.  I don't know if it's -- yeah.

THE COURT:  Okay.

Let me ask the lawyers if you have any follow-up.

1176

MS. DOMPH:  I have one question.

Question 38, it's the question that says:  Is there anything about the fact that you may hear about drill rap music performers' lyrics and videos that would make it difficult for you to be a fair and impartial juror in this case?

Your answer:  No, question mark.

What did that mean?

PROSPECTIVE JUROR:  The question mark was more of a -- I don't know how hearing about a specific type of music would affect your impartiality.  It was more of a question mark towards the question, I guess.  Just editorializing on my part.

But, no, I don't think it would affect my ability to be impartial.

MS. DOMPH:  So it was more like --

PROSPECTIVE JUROR:  It really --

MS. DOMPH:  -- it's kind of an odd question?

PROSPECTIVE JUROR:  -- is that really a thing?  Yeah.  Does that really happen?  Is that really a circumstance that exists?

MS. DOMPH:  Thank you.

THE COURT:  Any other questions?

MS. URSINI:  No, your Honor.

THE COURT:  Okay.  Thank you.

1177

Thank you, sir.

(Prospective Juror 62 exits courtroom.)

THE COURT: Okay. Let's just discuss the schedule, please, for a minute. So it is after 4:00. It's almost 4:10. We did not get through Juror 63, but we got close.

I think we should just pause now. Maybe do -- does it make sense to do for-cause challenges to the jurors we finished -- we've questioned today? I mean, the problem with that is then we are not -- if we're trying to conclude by 4:30, we're going to again run into the deadline and not have time to do the legal issues.

So any suggestions?

MR. JULIEN: So the answer is, it depends. If we get through some folks and, let's say, you agree on motions that we have for cause, would you not have those folks come back Monday is the question.

So my inclination is we just got to get the list of legal rulings out there. We've been deferring it for a while, and I'm sure everybody knows that. So we just at some point need to tally up what it is we need to talk about and then carve out the time to talk about it. I am concerned about that, just kind of delaying it. I know there's a good reason for it, that there are things we just need to get through. But at the same time, I don't want folks to have to come back on Monday who may not otherwise need to come back if they're

going to be excused.

So, I don't know, maybe a compromise is let's talk about the list of legal things now and, like yesterday, maybe we can run through some of these for-causes after the defendants have been excused if their counsel are willing to waive their presence for that portion.

MS. GIACCHETTI:  Judge, I think we'd rather waive presence for the inventory than the --

THE COURT:  Than the for-cause?

MS. GIACCHETTI:  Than the for-cause because we obviously would want our clients' input on the jurors, so --

MR. JULIEN:  I understand that.  And I respect that. I don't think we're going to get through that in 20 minutes. "That" being the for-cause challenges.

THE COURT:  The for-cause challenges?

Well, okay, let me --

MS. GIACCHETTI:  Maybe we could determine what we have in for-cause challenges?  Would that help figuring out if we can get it done?

THE COURT:  Yes.  But do you need some time to confer about that?  Because that takes some time, too, right? Yesterday we had some time to confer about that.

Okay.  Let me just tell you very quickly -- so why don't we -- I think we should go then to the for-cause challenges.  Let me just tell you my list, and it's very high

level.  And this would take more discussion than just listing the topics.  But let me just give you my list of the open issues that I'm aware of.

Number one, handful of outstanding juror issues.  And I'm referring to ones we talked about earlier.  Some people, you know, are being postponed, coming back later, but just trying to keep track of who is in, who is out in the process.

Number two, Santiago proffer.  And the government has filed a written filing on that.  We need to discuss what -- whether the defendants would like to file a written response and, if so, when.

Three, 404(b), we have the open issue with respect to Mr. Offerd and the text with the dealership and other issues surrounding that.

Number four -- and on that one, I don't think there are outstanding briefing or outstanding anything.  It's just more of a ruling.  Although, I may have a question on that before we actually do the ruling.

Number four is the exhibit list.  We've got to go through the list exhibit by exhibit, confirm which exhibits are still at issue and which have been resolved between the parties and just make sure we have the current updated list and know which things are still outstanding and need rulings.

Number five, outstanding motions in limine.  There are a couple -- I did many rulings on motions in limine, but

1180

there were a couple outstanding.  There was one on dying declarations.  There was one on authentication.  There may be one or two others I'm forgetting right this second.  But I think those go hand in hand with the exhibit list, at least some of them.

Number six is the MW issues.

And number seven is the motion with respect to Dr. Loftus.

And I think also I just saw that there was another motion filed by the government, perhaps today, but very recently.

So that's my high-level list of the outstanding issues.  We need to have a process to get each of those resolved in time for openings.  Perhaps I could just ask the parties to confer after today and --

MR. BOYLE:  And I'm sorry, your Honor, what was the last thing you said about openings?  I was trying to look for an e-mail.

THE COURT:  Oh, sure.  Well, I need to get you rulings on these issues in time for you to incorporate the rulings into the openings.  And so if there is any more prioritization, any more detail on prioritization that you have than just that general point, then I would be interested in knowing that and welcome that, of course.

MR. BOYLE:  Thank you, Judge.

THE COURT: Okay.

MR. GREENBERG: Judge, I would -- I don't know if the government intends to use any of the exhibits in their opening, but I would object because even if we resolve exhibits before openings, they're always subject to objections at trial. And, typically, I don't see exhibits in opening statements.

MR. JULIEN: Just in the interest of time today, your Honor, I'd just ask for an opportunity to confer with the defense on that. The plan is -- and I think it's still kind of fluid what the opening looks like, but I think the plan is to use some exhibits. I've used exhibits, other people have used exhibits, and usually we reach some agreement on what we're going to show or not show.

However, I mean -- I think this is just a general principle -- there is a risk, depending on what it is. We could show something in opening or talk about something in opening, and if it doesn't come in, I'm sure that Mr. Greenberg or any other of the defense lawyers will point out to the jurors that we talked about some evidence and it didn't bear out or they didn't hear about it.

But I would ask for an opportunity for us to just confer on that point.

THE COURT: Okay.

Can I just ask, in the interest of time, can we -- I

just listed those issues.  Can I ask the parties to confer about those and just come up with what is your requested process for resolving them.  Do you want to file responses?  Do you want to just argue it in court?  If so, when do you envision that argument occurring?  And just taking into account the fact that -- I mean, you can hopefully build in when you would ideally like to have rulings on these different things, as well.

And, then, we will need to talk about the proposal.  But we can figure out -- let's come back to, at the end of today when you can be ready to report back on your proposal as to that plan.

In the meantime, let's go to the for-cause stuff and see if we can resolve any of that in time for 4:30.  I know we're getting very tight on time here at this point.

So do you want to just take a few minutes here to confer about which jurors you might be looking to challenge for cause in the ones we've challenged today -- or discussed -- questioned today?

MS. DOMPH:  Yes.

THE COURT:  Okay.

(Brief pause.)

MR. JULIEN:  So I know the defendants are still conferring on what their for-cause strikes are.  We haven't gotten theirs.  But we have at least three.  After conferring

with the defendants, I know that those three are opposed.  And so I'm just pointing out, in the interest of time, your Honor --

THE COURT:  Okay.

MR. JULIEN:  -- if the defendants want to be here, we're going to have to argue those on Monday.

THE COURT:  Okay.

MR. JULIEN:  Because we won't get through it in six minutes.

THE COURT:  Okay.

MR. BOYLE:  Rich, are you opposing all of the government's?

MR. KLING:  Not all of them.

MR. JULIEN:  It was my understanding that --

MR. KLING:  We will -- we'll look through the other --

MS. DOMPH:  Things are fluid.

MR. KLING:  Right.

MR. JULIEN:  Are you opposing any of them?

MR. KLING:  We will oppose 62.

MR. JULIEN:  All right.  So that's going to take six minutes if we --

MS. DOMPH:  Then we're opposing -- you want 53?

MR. JULIEN:  Right.

MR. KLING:  53.

1184

MR. MITCHELL: We're opposing that.

MR. JULIEN: So there are at least two that are opposed.

MR. BOYLE: We might have agreement on one and maybe that juror could be excused for Monday, or you're not comfortable with that?

MR. JULIEN: Let's go off the record again for a second.

MR. BOYLE: Okay.

(Discussion was held off the record.)

MR. JULIEN: So it appears that we do have agreement as to at least one prospective juror. That would be Juror No. 60. The government would move to excuse that juror for cause. And it's my understanding from the defendants that that is agreed.

THE COURT: Okay.

MR. JULIEN: Juror No. 60 is the juror who takes the medication. He raised his hand during the first show-of-hands set of questions indicating that he was on medication that might make it difficult for him to pay attention and -- during a trial. During questioning from your Honor, from other people, he indicated he would have some trouble staying awake, his drowsiness is unpredictable, he doesn't know when it would affect him. And as best as he could when it happens, all he can do is sit down and try to push through it.

For those reasons, we don't think he's going to be able to pay attention. His -- when it happens, when he's not able to be as attentive as he should be as a juror in this case, it's not something that we can predict or schedule around. And so we move to excuse him for cause.

THE COURT: Okay.

And anything to add from the defense?

MS. BORMANN: No objection, Judge.

THE COURT: Okay. He'll be excused for cause. That's Juror No. 60.

We also -- obviously earlier, we excused Juror 58 for cause. So just --

MS. BORMANN: Right.

THE COURT: -- a reminder of that from this group.

The other challenges that the government has are opposed, then?

MR. SPIELFOGEL: Correct, your Honor.

MR. JULIEN: Yes, your Honor.

MR. GREENBERG: Some people are opposing --

MR. SPIELFOGEL: Right.

MR. GREENBERG: -- some not.

THE COURT: And that would be -- I'm sorry, which jurors is that?

MR. JULIEN: The government is going to move to excuse Juror 53 and 62 for cause.

1186

MR. KLING:  And the defense does not have an agreement with respect to that.

THE COURT:  Okay.

MS. BORMANN:  Judge, we, for Mr. Roberson, agree to 62.  We do not agree to 53.

MR. KLING:  Cheryl, we can't hear you back here.

MR. BOYLE:  I think it's 62.

MS. BORMANN:  We do not -- Mr. Roberson --

MR. GREENBERG:  We agree to 62, but not 53.

MS. BORMANN:  Correct.

MR. MITCHELL:  And for Mr. Liggins, Judge, we agree to 62, but not 53.

MR. SPIELFOGEL:  As to Mr. Thomas, it's the same thing, Judge:  We agree as to 62 and not as to 53.

MR. KLING:  Judge, we'll also agree to -- Mr. Offerd will also agree to 62, but not to 53.

MR. BARNETT:  As for Mr. Smart, just for the record, we also agree with Offerd's representation.

MR. BOYLE:  Mr. Turpin does not oppose 62.  So it sounds like maybe we all agree now?

MS. BORMANN:  Yes.

MR. BOYLE:  Okay.

THE COURT:  Okay.

MR. BOYLE:  So we're going to be arguing over Juror 53 Monday.

THE COURT: Okay, right. And I do remember Juror 62, and this was the juror who had the answer about his ability to focus presenting an issue -- or inability to focus.

So is that the basis of --

MS. URSINI: That's right, your --

THE COURT: -- the challenge?

MS. URSINI: -- Honor. The government would move to strike this juror because he indicated that his -- because of his ADHD, his mind tends to wander. He has a difficult time sitting still. He's had issues in school and his whole life and suggested that he would struggle with it and that he has, in fact, been struggling sitting here for the jury selection process already.

THE COURT: Okay.

And that is unopposed by all the defendants as I heard just now.

Okay. So that juror is excused for cause. That's 62.

So we have 53 to argue on Monday.

Are there any other agreed challenges?

MR. BOYLE: No, your Honor.

THE COURT: Okay.

I mean, I could ask everyone to come back in here so that I can remind them -- or just let them leave for the day and remind them not to discuss the case or we can have the

1188

courtroom deputy do that.  Anyone have a preference?

MR. SPIELFOGEL:  I'm fine with the deputy, your Honor.

MR. BOYLE:  As long as they're reminded, Judge, yes, thank you.

MR. JULIEN:  We're fine with Ms. O'Shea doing it, your Honor.

MS. BORMANN:  That's fine, Judge.

THE COURT:  Okay.

So everybody should return on Monday, except for 60, who's been excused for cause, and 62, who's been excused for cause.

MR. MITCHELL:  58.

THE COURT:  58 also was excused for cause, but he has left earlier, so he will not be returning on Monday.  So everyone else does need to return on Monday from this group.

Okay.  And let me also just ask -- I know it's now past 4:30.  Does anyone have thoughts on when you'll be able to just propose a schedule for the consideration of -- or, you know, further input or argument, whether it's written or verbal, on the open issues?

MR. SPIELFOGEL:  Your Honor, as to the issue of MW, we're going to be filing something this weekend.

MR. BARNETT:  And Mr. Smart will, as well.  We'll have it in before Monday.

THE COURT: Okay.

MR. KLING: Judge, as to the 404(b) objection on Offerd, we had stated it in the motion. We -- there's a drop of argument I'd like to make, but there's nothing more that we're going to submit.

THE COURT: Okay.

MR. KLING: Another issue, Judge, is I had issued -- I had indicated there was a potential issue with respect to the racial composition. I did not make a formal motion. But in any event, I will withdraw that in light of the panel that came in this afternoon.

THE COURT: Okay.

MS. GIACCHETTI: Judge, as to the Santiago proffer issue, I'd like -- I need some time to take a look at the government's response. I'm sorry I didn't get to do that. I might be able to file something by Monday. If not, I will be prepared to orally argue.

THE COURT: Okay.

MS. GIACCHETTI: It's just a matter of what I can get done or whether it even makes sense and whether oral argument would make more sense, so -- but I can't make that assessment because, frankly, I just haven't been able to look at the response.

THE COURT: That's fine. Understand. And I think with the -- given the other issues, that's fine. We can just

sort of stagger things.  So, I guess, any other scheduling thoughts?

MR. JULIEN:  Your Honor, can we just have, with respect to 404(b), MW issues, Santiago -- and if counsel want to file things over the weekend for Mr. Thomas and Mr. Smart, that's great -- but can we just have Monday be the deadline for Santiago and 404(b) or anything else they -- anyone wants to file, with the exception of response to the motion that we just filed today with respect to Mr. Roberson's expert?  So any of the other outstanding issues, I think, are already fully briefed, with the exception of things that people -- they've just indicated to you they may want to file.  And we'd just like Monday to be the day to file those things.

THE COURT:  Does that work?

MR. BARNETT:  As to Smart, that works.  That's fine.

MS. GIACCHETTI:  And as to the Santiago, as long as if I don't file on Monday I still can get up and argue it, I have no problem with that.

THE COURT:  Okay.  That's fine.

Is that okay from the government?

MR. JULIEN:  Just to clarify, are we going to argue about -- as long as we're not arguing new things, I guess. So --

MS. GIACCHETTI:  I didn't hear you.  I'm sorry.

MR. JULIEN:  As long as we're not arguing new

concepts. I guess we would like some notice of what it is we're arguing. So if we're talking about having an argument -- Mr. Liggins doesn't file anything additionally with respect to Santiago and on Tuesday or Wednesday we argue as to the motion as it's briefed, we are fine with that. But if it's, you know, on Tuesday or Wednesday we're arguing about something else, we would just like to know what the something else is.

MS. GIACCHETTI: And, then, Judge, if there is a something else and I need to write something, then I'm just going to ask for a little additional time past Monday. Monday I should know. That's what I can say. And if something has to be written, I just may not be able to get it by Monday because I want to be ready on all these other things, too, as well as that one.

THE COURT: Okay. Let's just talk through. So say -- what does the schedule look like if we need a written response or argument sometime after Monday? What if it were Tuesday on Santiago for a written response? Would that still leave us enough time to resolve it --

MR. JULIEN: I think it depends on --

THE COURT: -- later?

MR. JULIEN: -- when you want to set the time aside. So we had talked yesterday maybe about a half day. I mean, maybe that's ambitious. So I don't know if there's a day, if

it's Thursday or when it is.  If it's Thursday, it's probably fine.  But if it's some other time, if it's Tuesday afternoon or Wednesday morning, maybe it's not fine.  I don't know.

THE COURT:  Okay.

MS. GIACCHETTI:  Judge, can I clarify?  I think the Santiago issue that's left has to do with what conspiracy the government is talking about.  We are still, as I understand it, as to in-furtherance issues, going to deal with that almost on a weekly basis because we don't know what the statements are.

Do I understand that correctly?

MR. JULIEN:  So we did not file -- there are two things that are kind of going on with respect to Santiago.  On the one hand, you had asked us to file the statements that we're going to file.  But I think before we do that, though, we have to decide -- so you had also asked us, hey, government, there's -- tell me what the conspiracy is.  That's what we filed.  And so depending how that shakes out is going to determine what it is we file.

THE COURT:  Okay.  So it sounds like we don't -- we're first focused on this issue of what's the conspiracy.  The "in furtherance" is after we get through this next step of what's the conspiracy.

MR. JULIEN:  Correct.

MS. GIACCHETTI:  That's what I understood, too.  I

just want to make sure I understood it right so I understand what I'm assessing for Monday morning.

THE COURT: Right. Okay. So I think in light of that, at least it narrows what --

MS. GIACCHETTI: Yes. It's very helpful.

THE COURT: Okay.

MS. GIACCHETTI: Thank you.

THE COURT: So, in light of that, can you be ready to either file something on that issue on Monday or -- "that issue" meaning what's the scope of the conspiracy -- or what's the conspiracy for the Santiago proffer?

MS. GIACCHETTI: Yes.

THE COURT: Or --

MS. GIACCHETTI: Yes. I should be able to. But, again, I may look at it and think everything's in there and we're going to argue it. And I'll let the government know.

THE COURT: Okay.

So then Monday will be the deadline for additional filings.

You know, I do understand there's a lot of different moving parts. If we have -- I also think that realistically probably the best way to do this, rather than trying to attack everything at once in one long marathon thing, is to try to -- try hard to finish questioning in time to do kind of -- you know, chip away at it day by day. So I don't know if

that's going to -- it's realistic or if it's going to hold up, but that's what I'm going to try to do. And, hopefully, that means that as we wrap up more things, it will naturally become more manageable -- okay, we tied off this loose end, now we're going to go on to this next thing tomorrow -- and that will help.

MR. GREENBERG: Judge, speaking of loose ends, the government filed a motion today to bar our expert. That's not going to come up for quite sometime. We're not going to talk about it in opening. So if we could just file a response in due course. You know, it will be a couple of weeks or something. But it sounds like we have enough on our plate that you won't get bored in the meantime.

THE COURT: Okay. Any issue from the government?

MR. JULIEN: Can we confer on that issue? I'm not asking that they file something on Monday. We just filed what we filed today. But I do think we need to set a deadline on it and let us just talk about what that deadline -- at least exchange some thoughts, whether we agree or not, what we think it ought to be.

THE COURT: Okay. So please confer on the schedule on that issue of that new expert motion.

MR. GREENBERG: We'll figure out --

MS. GIACCHETTI: Could we request also for co-defendants a copy of the expert disclosure? Because I

1195

don't think we have that.  Not that we're going to take -- but just makes -- we need to know.

MS. URSINI:  Your Honor --

THE COURT:  Is that all right?

MS. GIACCHETTI:  I assume there's been a Rule 16 disclosure --

MR. GREENBERG:  This is ours.

MS. GIACCHETTI:  -- to the government?

I understand that.  We'd like to see it.

MS. URSINI:  Your Honor, this is publicly on the docket now as exhibits to the government's motion that was filed today.

THE COURT:  Okay.

MS. DOMPH:  We're talking about theirs.

THE COURT:  So does that resolve the issue?

MR. SPIELFOGEL:  Yes.

THE COURT:  Yes.

So the disclosure the government mentioned is attached as public exhibits to its motion.

All right.  On the exhibit lists -- so all additional filings are due Monday, except for the new expert motion. And, then, we're just going to try to accomplish more day by day next week.

Is there a sense of when we can do the exhibit list or go through the exhibit list?  Or would you recommend trying

to prioritize other things first?

MR. JULIEN:  Your Honor, I think we -- we can keep it the same priority.

So based on the last conversation we had about it, we created a new exhibit list.  Basically, it shows what we changed from the one we filed to what's been added.  We just got it since we've been sitting here in court today.  So we can exchange that to the defendants this evening, and they can take a look at it.

MR. SPIELFOGEL:  Is this exhibit list number, what?  Four?  Five?

MR. JULIEN:  Well, it's not an exhibit list.  What it is is a comparison.  So based on what the conversation or what the request was from at least one of the defendants -- but I understood this to be from a number of defendants -- the defendants wanted to see what was different from the one that we filed initially back in August to the most recent version of it.  We created a -- basically, a comparison so you can see what's different.  And that's what we want to send to them this evening.

MS. GIACCHETTI:  Yeah, I think I requested that, Judge.  So --

MR. KLING:  Judge, may I ask if our clients --

MR. GIACCHETTI:  -- reports and --

MR. KLING:  -- could be waived because it's 4:30 --

THE COURT: Yes.

MR. KLING: -- and they're not going to get fed?

THE COURT: Yes.

And also can we release the jurors?

MS. DOMPH: Yes.

MS. BORMANN: Yes.

THE COURT: Okay.

(Defendants excused from courtroom.)

THE COURT: Can we just talk really quickly? Is there anything else we need to address at this point?

MR. JULIEN: Your Honor, I think we accomplished everything.

I did just -- closing the loop or closing the thought on the exhibit issue, so, I think you can continue to think about and rule on the papers that you already have. Those issues that are in the briefing with respect to Mr. Liggins and Thomas, those are still live issues. And so the changes that we had talked about a couple days ago to the exhibit list resolved some issues, but I don't think they resolved those. So --

THE COURT: Okay.

MR. JULIEN: -- you can still rule on those papers.

THE COURT: Okay.

Anything else?

MR. JULIEN: Not from the government, your Honor.

1198

MR. BOYLE:  No, thank you, your Honor.

MR. BARNETT:  No, your Honor.  Thank you.

THE COURT:  Thank you, everyone.

(Court adjourned until 9:30 a.m. on 10/23/23.)

*   *   *   *   *

C E R T I F I C A T E

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Kathleen M. Fennell*

_____

*/s/ Charles R. Zandi*

_____

*/s/ Joseph A. Rickhoff*                October 20, 2023

_____    _____

Official Court Reporters                          Date
United States District Court
Northern District of Illinois
Eastern Division