5680

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )
-vs-                                )   Case No. 21 CR 618
                                    )
CHARLES LIGGINS, KENNETH            )   Chicago, Illinois
ROBERSON, TACARLOS OFFERD,          )   November 30, 2023
CHRISTOPHER THOMAS, MARCUS          )   9:23 a.m.
SMART and RALPH TURPIN,             )
                                    )
                    Defendants.     )

VOLUME 27
TRANSCRIPT OF PROCEEDINGS - TRIAL
BEFORE THE HONORABLE MARTHA M. PACOLD AND A JURY

APPEARANCES:

For the Government:     MR. JASON A. JULIEN
                        MR. SEAN HENNESSY
                        MS. ANN MARIE E. URSINI
                        MS. CAITLIN S. WALGAMUTH
                        Assistant U.S. Attorneys
                        219 S. Dearborn Street
                        Chicago, IL 60604
                        (312) 353-3500
                        jason.julien@usdoj.gov
                        sean.hennessy@usdoj.gov
                        annmarie.ursini@usdoj.gov
                        caitlin.walgamuth@usdoj.gov

For Defendant           MS. CYNTHIA LOUISE GIACCHETTI
Liggins:                Law Office of Cynthia Giacchetti
                        53 West Jackson, Suite 1035
                        Chicago, IL 60604
                        (312) 939-6440
                        Cg@cgdefense.com


        * * * * * * * * * * * * * * * * * *


        PROCEEDINGS REPORTED BY CERTIFIED STENOGRAPHER
              TRANSCRIPT PRODUCED WITH A COMPUTER

5681

APPEARANCES:    (Continued)

For Defendant            MR. GREGORY T. MITCHELL
Liggins:                 Law Office of Gregory T. Mitchell
                         19150 Kedzie Avenue, Suite 205
                         Homewood, IL 60430
                         (708) 799-9325
                         Mitchlaw00@sbcglobal.net

For Defendant
Roberson:                MR. STEVEN GREENBERG
                         Greenberg Trial Lawyers
                         53 West Jackson, Suite 315
                         Chicago, IL 60604-6060
                         (312) 879-9500
                         Steve@greenbergcd.com

                         MS. CHERYL T. BORMANN
                         Cheryl Bormann
                         53 West Jackson, Suite 315
                         Chicago, IL 60604-6060
                         (312) 588-5011
                         Cheryl.t.bormann@gmail.com

For Defendant Offerd:    MR. JOHN SOMERVILLE
                         9924 S. Walden Parkway
                         Chicago, IL 60643-1702
                         (773) 505-1706
                         Jville62@gmail.com

                         MR. RICHARD S. KLING
                         Chicago-Kent Law Offices
                         565 W. Adams, 6th Floor
                         Chicago, IL 60661
                         (312) 906-5075
                         Rkling@kentlaw.iit.edu

For Defendant
Thomas:                  MS. ELLEN R. DOMPH
                         Law Offices of Ellen R. Domph
                         53 West Jackson, Suite 1544
                         Chicago, IL 60604
                         (312) 922-2525
                         Edomph@gmail.com

                         MR. KEITH ALLAN SPIELFOGEL
                         190 S. LaSalle Street, Suite 540
                         Chicago, IL 60603
                         (312) 236-6021
                         Spielfogel@sbcglobal.net

5682

APPEARANCES: (Continued)

For Defendant
Smart:                    MR. MARC M. BARNETT
                          Law Offices of Marc M. Barnett
                          53 West Jackson, Suite 1442
                          Chicago, IL 60604
                          (312) 217-5019
                          Barnett.marc163@gmail.com


For Defendant
Turpin:                   MR. PATRICK EAMON BOYLE
                          Law Offices of Patrick E. Boyle
                          155 North Michigan Avenue, Suite 562
                          Chicago, IL 60601
                          (312) 565-2888
                          Privpat3@hotmail.com

                          MR. JOSHUA B. ADAMS
                          Law Offices of Joshua B. Adams, PC
                          900 W. Jackson Blvd., Suite 7 East
                          Chicago, IL 60607
                          (312) 566-9173
                          Josh@adamsdefenselaw.com

Also Present:             Ms. Christine Case, FBI
                          Mr. Domonique Dixon, FBI




Court Reporter:

              KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                      Official Court Reporter
                    United States District Court
              219 South Dearborn Street, Suite 2328A
                      Chicago, Illinois  60604
                     Telephone:  (312) 435-5569
                 Kathleen_Fennell@ilnd.uscourts.gov

5683

(Proceedings heard in open court; jury out:)

THE CLERK: 21 CR 618, United States versus Liggins, et al.

If you can state your name for the record, we'll start with government counsel.

MR. JULIEN: Good morning, your Honor. Jason Julien, Caitlyn Walgamuth, Sean Hennessy, and Ann Marie Ursini for the United States.

MR. KLING: Good morning, Judge. John Somerville and Richard Kling for Mr. Tacarlos Offerd, who is present in open court.

MR. MITCHELL: Good morning, Your Honor. Cindy Giacchetti, Gregory Mitchell, Charles Liggins, who is present in court, Judge.

MS. DOMPH: Ellen Domph and Keith Spielfogel for Mr. Thomas.

MR. BARNETT: Good morning, your Honor. Marc Barnett and Michelle Marin on behalf of Marcus Smart.

MS. BORMANN: Good morning, Judge. Cheryl Bormann and Steve Greenberg on behalf of Mr. Roberson.

MR. BOYLE: Good morning, your Honor. Patrick Boyle and Joshua Adams, who had to step away to another court for a status, on behalf of Mr. Ralph Turpin, who's present before you.

MR. KLING: Judge, in answer to your question of

5684

whether there are issues that need to be addressed before the jury, there are a bunch of issues that we need to address.

THE COURT: Okay. Well, let's at least -- let's get the agenda out there first, and then we'll start going through them in whatever priority makes sense.

So is someone in a position -- if it needs to be multiple people, let's just first identify -- just list the issues, and then we'll talk about which ones we need to spend time on before 10:00 a.m.

MR. KLING: Judge, as to Mr. Offerd, we're going to be requesting that the matter be put over at least until this afternoon if not until tomorrow.

We received a new substantial dump of discovery materials this morning at 8:09, is when it came in to my email. I don't read very well when I'm on the expressway.

I have not had a chance to read it. It's apparently 46 files relevant to both the witness who testified yesterday and to witnesses who are expected today. I am not prepared to go through.

If I have to examine without reviewing these materials, Mr. Offerd will be denied effective assistance of counsel under the Sixth Amendment.

MR. BARNETT: Your Honor, we would definitely join in that.

The cross-examination of a potential dangerous

5685

witness is very important. I would like to see the materials. I have not had an opportunity to read them. I don't know what they contain, but I need to be able to make my own decision on that.

So I would join in that.

MR. GREENBERG: Judge, I know that at least with respect to the upcoming witness, for the first time I believe they're identifying our client in preparation that took place I think yesterday or the day before.

MS. GIACCHETTI: Judge, I think that some of -- I can't tell, because literally -- yesterday I was told -- as you know, I've been asking for material relating to Mr. Wiley, who's the next witness, 2008 and 2011 cooperator.

I don't even know if this is it. I literally -- they said they were going to send it to me. I waited in my office until 10:00. I then went home. I got a little nap. At 3:00 in the morning, I came down from my bedroom to find my phone to see if it was there, and it wasn't.

And then again -- I think I got told at 8:00 something this morning, as I was heading here, that I could get it in USA FX. I did ask for a copy. I have a hard copy. I don't know if that's what this is. I don't know if there's more things that are in USA FX.

It's a problem.

MR. JULIEN: I think I can knock some of this out

5686

pretty -- or knock some of it down pretty easily, your Honor. I don't know anything about 46 files. There are one, two, three, four, five things that were produced this morning, the overwhelming majority of which has already been produced.

So one of the productions is admonishments, CHS admonishments for David Sloan. I sent those on Sunday to everybody, indicating that the official, quote/unquote, production would be coming. But that was one of those requests that we got over the holiday weekend, went and had some people run into the office to get it. And I just sent it out as soon as I got it. But everyone has had it. We've been asked questions about it in court on Monday, so everybody has that.

But this is just a part of an official production of things that everyone has.

So that's admonishments for David Sloan. That's No. 1.

No. 2 is admonishments for Martell Wiley, was produced at the same time on Sunday.

Another thing is a report documenting the conversation that Mr. Spielfogel and I had with Mr. Sloan a couple days ago when we were trying to figure out the story about what was going on with his brother.

It happened in real time here in court. We got the information. FBI agents are under a duty to write reports, so

they wrote a report. But there is no new information that can be gleaned from that report because we all got the information together in real time. So that's not anything new.

So that's three of the five things that have been produced as of this morning.

No. 4 is a report relating to a meeting that happened with Mr. Wiley on Monday.

I think -- I think I heard Mr. Greenberg say that Mr. Wiley identified Mr. Roberson for the first time on Monday. He did not. He's identified him repeatedly, including --

MR. GREENBERG: On the video.

MS. BORMANN: On the video.

MR. JULIEN: On the video in grand jury in 2021.

That grand jury transcript has been filed. It's part of the public docket. There's nothing new. It's a one-page report. And among the things that are in it are me admonishing Mr. Wiley as to the ruling from your Honor that I'm not going to ask him any questions relating to Mr. Thomas.

So there's nothing new to be gleaned from that report. If it's two pages, it may be with a cover page, but it's a very short report, and we can produce a hard copy of it. But there -- again, no new information.

So the only thing that is new here -- and it seems like we're in a situation where no good deed goes

5688

unpunished -- is the CHS file relating to Mr. Wiley.

We've indicated we didn't think that anything in it was *Brady* and *Giglio*, and it's not. We don't think it's relevant. We produced it anyway, just so we wouldn't have to fight about it.

I wasn't informed that Ms. Giacchetti was in her office waiting for it. If someone had reached out to us, I could have provided a status update on it. We were in court. We went home last night. We redacted PII relating to other people. We sent it out as soon as we could. And when she asked for hard copies of it, we produced those or printed those out as well. We handed them over to Mr. Mitchell this morning, and they're looking through it.

But, Judge, there's nothing of any probative value or relevance in that file. We just produced it because it's been a point of contention.

So there is no need to hold this over for any period of time. We should begin this morning. We can get anybody hard copies of anything they want. But, again, most of this stuff is stuff that they've already had. It's just an official production.

MS. BORMANN: Judge, I'd like to be able to agree with Mr. Julien, but since I don't have a copy of it, I can't.

MR. BOYLE: Right. I mean, it should go without saying, I mean, all of these defendants -- the government

5689

chose to charge all these defendants in the same indictment. I get that one defense counsel is making specific requests. But when that is produced, it should be produced to all of the attorneys.

So I would appreciate hard copies of whatever Ms. Giacchetti received, and also hard copies of what was produced this morning.

I, too, printed -- had time to print out the index, but I didn't have time to print out the substantive reports. So I would appreciate that.

MR. BARNETT: As well as Mr. Smart. I do not have hard copies.

MS. GIACCHETTI: Judge, I'm going through this very fast, and I'm seeing reports from 2022 from Kevin Doyle which appear to relate to Mr. Wiley that, as far as I know, I've never seen these reports before.

This is 3500 material, much less -- and likely *Giglio* and *Brady*. I can't do that analysis trying to read this.

But they can't put this witness on. We can't cross-examine this witness without time to -- you know, how is it not relevant, a report of 7/29/2022, 8/1/2022. This isn't even -- I mean, there may be 2008, 2011 stuff in. Siemon, Catherine Siemon, 7/3/2023.

And now could some of these be duplicates? I suppose, but I've got to go back to my old file to see that.

5690

And if so, why are they sending me duplicates?

But it isn't true that it's just -- I disagree with the argument that 2008 and 2011 are irrelevant. I haven't gotten to that yet, but I'm looking at stuff that we should have been given. And I'm talking about, I believe, Wiley, though when they sent it to us, it just says CHS, so I'm never a hundred percent sure. But I'm just going to assume it's Wiley. And I haven't seen any of these before, at least not in this format.

MR. KLING: And, Judge, I certainly -- I accept Mr. Julien's representations, but I can't rely on his representations, hey, don't worry about it, there's really nothing in here that you have to worry about.

Mr. -- if I did that, Mr. Offerd would be deprived of effective assistance of counsel. I have an obligation to read these documents. The file says 44 files. I don't know what they are. I don't have hard copy. I can't cross-examine Mr. Wiley unless I have some time to read these documents and prepare.

MR. BOYLE: And based on what Ms. Giacchetti said, it would suggest that we might -- would have wanted this material before agent -- Special Agent Doyle testified. He's testified twice. He's been cross-examined twice. It's my understanding he's not going to be called again in the government's case.

I think we should have had it before Agent Doyle

5691

testified.

MR. JULIEN: They did. Anything that's from Special Agent Doyle or Agent Siemon is duplicative of materials that have been produced for a long time.

The index, your Honor, literally reads Martell Wiley FBI CHS file. We just copied stuff from the file. Opening -- all opening and closing documents, including things that they've had already, but including things that they didn't have from 2008 and 2011, which we didn't think were relevant. We didn't agree. We produced it because it was at issue, and we just wanted to produce it, and they have it.

But in terms of things from Special Agent Doyle or anything during the relevant time frame when he was a CHS for this case, it's been produced and it's duplicative.

MS. GIACCHETTI: Actually, I'm reading things that simply are not. I've never seen them before. They're about probation violations. I'm sorry that I'm the only person that --

MR. SPIELFOGEL: What's the date?

MS. GIACCHETTI: The dates are -- well, I can't -- oh --

(Discussion held off the record.)

MS. GIACCHETTI: No, they're not. They're things about the nature of which somebody spoke to Probation Officer Landermyer regarding the CHS's status. On July 28th, the CHS

contacted the writer saying there was trouble with probation. I've never heard about this.

MR. SPIELFOGEL: July 28th of what year?

MS. GIACCHETTI: July 29th of 2022.

MR. KLING: And, Judge, quite frankly, without sounding rude, I don't care what Mr. Julien thinks is relevant. It's not up to him, it's up to defense as to what's relevant to the defense. He doesn't make that decision.

He gives us the documents. We decide whether we can use them and how. You decide whether they're relevant if we're going to cross-examine from them, but it's not up to Mr. Julien to decide if they're relevant.

MR. BARNETT: Just for the record, I do not have a copy of what Ms. Giacchetti is referring to. I have nothing.

MR. JULIEN: We're downstairs printing physical copies for everybody right now, your Honor.

MS. GIACCHETTI: Judge, being a lawyer requires you to read things, to think about things, to strategize about things.

I mean, I might be able to do a cross on the fly if someone hands me one piece of paper and I'm already prepared for it. I'm pretty good at that. I can't do it with this.

And these are new, and they should have been turned over. I'm not saying every piece of it, but certainly what I just read, I have never, ever heard of. And apparently

5693

Mr. Spielfogel doesn't have this report either, so -- which makes me wonder what else we haven't gotten.

MS. BORMANN: Judge, I don't know what I don't know. But the bottom line on all of this is I need time. I prepped, and now I have new stuff.

According to Mr. Julien, there's no new identification of Mr. Roberson, but I can tell by a comparison of the grand jury transcript and this report that there's at least one at minute 13:25 that doesn't appear in the grand jury transcript. I don't know why that is. All I can do is search. I'm looking at Mr. Greenberg's computer. That's the closest thing I have.

We need time. I want to take a look at it. I might be able to say, yeah, I can do it, but I can't do that without looking at it and analyzing it.

THE COURT: Okay. So, I mean -- I think we at least should get -- and the government is printing the copies now. So, I mean, just getting that done would be good.

And then I think it would be helpful to -- well, I think that probably just needs to be the first step.

So why don't we -- I mean, around how long would the government estimate that will take?

MR. JULIEN: We've had someone printing for the last 20 minutes or so. Give me one moment.

THE COURT: Okay.

5694

MS. BORMANN: Judge, additionally, I guess in the report there's a reference, the first time I've ever heard of it, of some group called Brain Dead. Apparently that was part of the interview that happened two days ago. And it's not in any discovery I've ever seen.

There is -- for the first time I find out that the -- Mr. Wiley is going to say, apparently, that he went to the hospital after Mr. Roberson saved him from being beaten. That's brand new.

And for the first time, there's some discovery that Mr. Wiley is claiming that while he was in Minnesota, where apparently he has a warrant -- we found out last night -- or yesterday as well for the first time -- Mr. Roberson paid Mr. Wiley approximately $200 via Cash App, none of which I've been provided before and none of which I've investigated.

So I can tell you, I'm not going to be ready for cross today.

MR. JULIEN: Judge, I can just tell you, I don't think half of those things are actually in the report.

But it is the case that Mr. Wiley did indicate for the first time that apparently Mr. Roberson sent him some money, so we documented it and produced it. I'm not going to ask him those questions on direct examination.

But going to the hospital, I don't -- conferring -- that's not in the report. I don't know where that's coming

5695

from.

We're printing physical copies of everything for everyone.

MS. DOMPH: Bates number, please, Cheryl?

MR. GREENBERG: Judge, Mr. Wiley claims that Mr. Roberson basically saved his life in jail. Never happened. We have no way of establishing it. Now he's embellished and claimed, apparently according to this report, that he went to the hospital after that, which if he was at the Cook County Jail, there would be records of. So we would need to get those records, because it certainly is our position that Mr. Roberson and Mr. Wiley did not interact.

We don't have any records showing they did, other than they may have been in a cell for one night together. But if this gentleman is going to claim that Mr. Roberson rescued him and he ended up in the hospital, there would be records of that. So, of course, it would also be relevant if there weren't records of that.

MS. BORMANN: And, Judge, the -- so the record is clear, that can be found at Bates number FBI Main_032-000007.

MS. GIACCHETTI: I'm sorry, what was that?

MS. DOMPH: 507?

MS. BORMANN: Five zeroes, one, two, three, four, five zeroes and a 7.

MS. DOMPH? Oh. I can't hear you --

MR. JULIEN: Judge, I now have the report in front of me, and the word "hospital" is nowhere in the report.

So information that's in this report is information that's been provided previously. In fact, me and Ms. Bormann had a conversation about this either yesterday or two days ago.

They were not in a cell one night together. They were cellmates for about eight months together. And me and Ms. Bormann reached an agreement that we didn't need to redact that information from his direct examination. They were fine with us disclosing how Mr. Wiley and Mr. Roberson knew each other, which is that they were cellmates in Cook County Jail in about 2014, and that's also in his grand jury transcript.

MS. BORMANN: Judge, apparently -- and this is the problem when you do things on the fly -- I interpreted "after being beaten, taken to a higher cell" as being treated by Cook County. It's unclear to me whether or not he was treated or not.

Apparent -- I mean, what I know about Cook County Jail is, after somebody has been beaten, generally they're treated, so I would expect there would be records of that.

I -- I can't tell you what else I don't know.

MS. GIACCHETTI: It looks like what I got is just a subset of what was loaded up, because I don't have that report of the most recent Wiley interview. I have what is FBI MISC.

5697

So if you're making the same copies for everyone that you're making for me, I think they're incomplete. And I'm happy to let you look at what I have so you know that. But I'm not seeing any FBI 302 in here.

MS. BORMANN: And, Cindy, for the record, the report starts at FBI Main_032-00005.

MR. JULIEN: That is correct. We are -- we understood Ms. Giacchetti's request to be for the CHS file, so we brought physical copies of that.

Based on the discussions that people were having, we are making copies of everything for everyone, including -- so, no, we didn't give Mr. Mitchell and Ms. Giacchetti that one-page report, but we've been downstairs making copies of everything for everyone.

MS. GIACCHETTI: Okay. Thank you.

MR. KLING: Judge, I think the bottom line is in terms of the jury, one way or the other, we are going to need some time. How much time you're going to give us to review the new documents, but we're certainly going to need some time.

THE COURT: Okay. I mean, it would be helpful just to see -- I mean, I don't know this right now until we have the copies, but it would just be good to know, you know, what's the volume, so then -- I think once we have the copies, that will inform the next steps.

In terms of -- okay. So -- I don't know how much extra time it would take, but if the government is able to -- if you could make me a copy, too, I would appreciate it.

MR. JULIEN: Yes. I've inquired on the ETA -- I haven't gotten an answer back on the ETA. I'm sure that our paralegal was furiously making copies of everything for everyone and hasn't seen the message.

THE COURT: Okay.

MR. GREENBERG: Want to chat about expert witnesses?

THE COURT: I was going to -- okay, so we now do have some more time before 10:00, but probably we should -- I mean, maybe we should -- I would like to, first of all, let the jury know that it's not going to be 10:00. But I guess maybe we hold a little bit in case we get the copies before 10:00.

I mean, I think once we have the copies, if we can then get a little bit more specificity on when -- when -- which part of it was previously produced. That way -- but once we have the copies, we can have a better, more useful discussion.

MS. GIACCHETTI: And, Judge, I did have a number of issues I was going to talk to the government about, about Wiley, but I walked into a -- is the word maelstrom? Something like that.

THE COURT: That sounds about right.

MS. GIACCHETTI: So -- but those might be issues, but

5699

they may not. So I think that's probably well down the road of what we have to do first, so --

THE COURT: Okay. So then let's try, I guess, ideally by 10:00 to be in a position to give an updated estimate to the jury. But I guess let's just wait until we have the copies.

And then in the meantime, yeah, are there other things we can use the time that we have for? One is potentially the expert issue. Anything else?

MR. JULIEN: We need to immunize Mr. Wiley, so that's something that should happen outside of the jury's presence anyway. We could do that.

THE COURT: Okay.

MR. BOYLE: On behalf -- I'm sorry, Judge. On behalf of Mr. Turpin, this was an issue I raised a few days ago before Mr. Sloan testified. I believe Mr. Julien and I are on the same page. I don't know who's going to be directing Mr. Wiley, but I assume all these communications are shared.

You know, there's some clear, just pure hearsay that Mr. Wiley states in some of his proffers that relates to my client and perhaps others. So I think none of that's going to be elicited on direct.

I think Mr. Wiley has also made social media posts where I think he's literally drawing on things like the Santiago proffer or the indictment to inform the information

he's given. That should be barred if that's the source of his knowledge.

So, again, I think we're on the same page.

But then there's this kind of other issue -- and another defense counsel was good enough to raise it with me -- this idea, well, you know, I might introduce one of Mr. Wiley's social media things because he says something that's favorable to my client. But the government might then try to introduce that whole video, and he says stuff about your client.

And I'm, like, well, what he's saying about my client is clearly just rank hearsay. And so there's nothing another defense attorney should do when advocating for their client that opens the door to then allowing hearsay on redirect or something to be elicited that hurts other defendants. I think that should go without saying, but I think it needs to be said.

MR. BARNETT: I do, too, your Honor, because it's -- I'm the defense attorney, so -- and I was trying to make -- you know, just to get it clear with other co-defendants' attorneys what I was planning on doing. I'm not sure I will do it, but I was -- just in case.

MR. BOYLE: But that shouldn't be part of his consideration, the idea if I introduce something that isn't hearsay that's useful to my client, then that could possibly

open the door to hearsay against other defendants.

MR. BARNETT: I would have brought it up if it became necessary. I don't know if it will become necessary. I would have brought it up. I would have fronted that. So thank you.

THE COURT: Okay. Does the government have any comments at this point?

MR. JULIEN: I don't know what it is. I can't really respond to it in the abstract. I don't plan to play any of his YouTube videos. But, I mean, I don't know. They have different views over there. And when I see it, I can say what I think ought to happen with it.

We're not going to try to introduce hearsay or things that are not appropriate to introduce under the rules of evidence, but I don't know what it is, so I can't respond to that.

MR. BARNETT: I think it can be handled at the time if necessary, Judge. I don't think -- I think we're good right now.

THE COURT: Okay. All right.

MR. GREENBERG: Judge, can I just address an evidentiary thing from a couple of days ago real quick? Because they're having this discussion about introducing and not introducing.

We had a long discussion about foundation the other day. And I can appreciate, Judge -- and I don't mean this

5702

with any -- you know, if it sounds a little bit -- well, however it comes out.

I know everyone's got different levels of experience, but what happened in the trial, because the government was not required to lay a foundation, is we got the following: Did you pay dues? Yeah. Did you -- did the organization have a hierarchy? Yeah. And they move on.

And now they're going to get up in closing argument and they're going to say, look, you know, you heard testimony that dues were paid. You heard testimony there were rules. You heard testimony there was a hierarchy.

The purpose of foundation is so that the defendants, or whoever it is, the non-proponent of the statement, doesn't have to, on cross-examination, bring out all of the little details.

And what did we learn on cross-examination? You know, we got these broad-based -- between 2011 and 2022, did you attend meetings?

Then we find out on cross-examination that it wasn't until 2014 he attended his first meeting. Then he was in Fargo. Then he was in jail. Then he was back in Fargo. Then he was back in jail. And we really don't know when any of this happened or where it happened or who was present when it happened.

And that's why the law requires -- and I know you

cited a Seventh Circuit case that said that foundation was kind of a loose thing. They have to lay some foundation for this stuff. We should not have to on cross-examination, or we're going to be till St. Paddy's Day, if we have to do it that way, bring out that, you know, you weren't here -- like Mr. Mitchell had to get up there and go through all the different times the individual wasn't there.

Had they been required to lay a foundation, perhaps -- and I understand this is in the abstract -- but perhaps he would have said in 2016, in the spring of 2016, I was present at Parkway Gardens. There was a meeting. At that meeting, rules were explained, dues were collected, so on and so forth.

And then, as the defense, we could have, you know, asked nothing about it. Okay, proven fact. Or maybe Mr. Mitchell would have gotten up there and said, well, isn't it true that from November of 2015 to November of 2016, you were in jail in Fargo, North Dakota? Oh, yeah. So you couldn't have had that -- attended that meeting in 2016 that you told us you attended. So we'd have some idea of what they're talking about.

And I would just ask, going forward -- you know, we were having to object every question. There were a lot of sidebars. They have to lay a foundation for this stuff. They can't just say to a witness, in the past decade, did you

attend a meeting? In the past decade, were there rules? It's just not fair.

And, you know, foundation, again, is directed to -- to -- so that everyone in the courtroom, including the jury, can judge whether it actually took place.

I mean, imagine the trial that's going on down the hall if they had said, at some time while you were working on the post office project, did you have a meeting with Alderman Burke and Alderman Solis? Yes. And what was said at that meeting? Without saying it was in City Hall, it was at Solis's office, it was -- whatever, and who was present and all that.

That's why they have to lay a foundation.

So I just wanted to raise that, Judge. It's kind of a general proposition.

MR. KLING: And, Judge, at the risk of sounding like an evidence teacher, if I can expand on Mr. Greenberg, realistically foundation has to have who was present, where was the conversation, when was the conversation, and what was said for every single conversation. And that's so everybody in the court, including the jury, know what we're talking about, and so that everybody is on the same page with respect to what conversations are being talked about.

We can't do that unless we lay a foundation with who was there, when was the conversation, where was the

conversation, and what was said. And that's basic for every single conversation.

MR. JULIEN: Judge, you issued a ruling. You found that the foundation was sufficient, No. 1.

No. 2, it wasn't elicited for the first time on cross-examination when he started attending meetings. We talked about it on direct and redirect examination, that it was after he shot at some opposing gang members for the first time, and he said that that was 2014 or 2015. On redirect he said it could have been as late as 2016. But those things were elicited on direct and redirect examination.

At the end of the day, if there's information that people want from a witness, they can ask questions to get it. So I'm not really sure why -- there's no live objection here, and anything you would have to say about this at this point would just be advisory. But you had issued a ruling when there was a live objection overruling their objection to this.

MR. GREENBERG: I love it. When he likes the ruling, it's been ruled on and that's it and the end of story for the rest of the trial. I'd like that approach.

Judge, the fact is that there are rules of evidence. They have -- you know, we had another example yesterday where we didn't have any foundation for anything, and then we find out on cross-examination that the witness said he had heard it from somebody and somebody had told -- and it was rank hearsay

because there was no foundation, because there was no evidence establishing when the conversation took place, how it took place, and so forth. And that's just not how -- how a trial is supposed to go.

I realize that it will result in -- in, you know, more tedious questioning, but that's the way it's supposed to be. They are the proponent of the information, and they are supposed to be putting the information out in accordance with the rules of evidence which require that there be some foundation as to what occurred.

MR. JULIEN: So here's how I think a trial ought to go. The Court rules, and people move on, whether they agree with the ruling or don't agree with it, because none of us are the Court, including when your Honor overruled our objection to the details about the cross-examination on the pending gun case coming in, and I said, and I think this is a quote, well, let's just get on with it, because that's what people are supposed to do, accept the Court's rulings. I said that yesterday.

We are wasting time right now. We should be more productive with the time that we have while the jury is here in the building. I know we're waiting on copies, but there are other issues that we can discuss, and we spent the last ten minutes discussing an academic proposition because there's no live objection, your Honor.

5707

MR. KLING: Judge, we wouldn't be wasting time if we had the discovery when we were supposed to get the discovery.

MR. JULIEN: Okay. They had it on Sunday.

People -- it's clear from the index what it is. I mean, I'm not -- I've said enough about that, your Honor.

MR. GREENBERG: You know, I feel like I should be in one of those shows where someone is jumping from either side, like where they have -- where the defendant's cross-examining -- or examining himself on direct and he's, like, asking the question at the podium and then going up to the witness stand, except I feel like Mr. Julien should be sitting on his side of the room and then he should come over here and sit on our side of the room and represent our position on things.

I mean, that's what I feel like.

We're raising the issue, Judge. When they call the next witness, if they don't do what they think they should do, we're going to object again. I'm just raising the issues in an effort to be more productive.

THE COURT: Yeah, I mean, I -- I would have to pull up that exact Seventh Circuit case to get the exact quote, but -- and I understand that -- I definitely see the point that you're making, Mr. Greenberg and Mr. Kling, in that if there were some more specificity about when a particular meeting happened, it would facilitate -- it would facilitate,

5708

you know, cross.

I guess I -- the thing I have some difficulty with, though, is I don't -- I mean, it kind of depends on the context, too. And so if you're talking about someone who -- I don't -- I can't even come up with a hypothetical sitting right here. But, you know, if you're talking about a -- I don't know, some situation where there was a lot more -- there was obviously a lot more, like, kind of formality or, like, rigid, calendared, you know, regularity to whatever meetings, I think then that -- I don't know, maybe you could reasonably require more precision in the setup of it.

But I guess, I don't know, if the government's theory is it was less formal, then I don't know.

I mean -- and also the other thing I just wonder, listening to the arguments, is that wouldn't -- wouldn't those points be things that could be made in closing? You know, that those could all be points, like, well, okay, you're going to -- the government's going to argue that there's an enterprise. Well, what about the fact that, you know -- and I'm not saying -- I'm not making a finding here, I'm just saying, like, why couldn't the argument be exactly what you said.

MR. GREENBERG: Right, the lack of detail. I get that, Judge.

THE COURT: This guy was in North Dakota, he wasn't

5709

there.

MR. GREENBERG: Right.

THE COURT: What meeting, he couldn't say, reasonable doubt, et cetera, et cetera.

MR. GREENBERG: No, I get that. But the purpose of the foundational requirements are to ensure that there is some reliability of the evidence.

And I'm going to do a little research, Judge. It just was something I wanted to raise today. I hadn't researched research. I'm going to do some research and see if I can find a case, since I don't have to look at Mr. Wiley's stuff anymore because I already looked at it.

THE COURT: Okay. No -- and I also take the point that that sort of issue, it is hard to find a case on, because it's very experience driven and it's very -- I mean, I --

MR. GREENBERG: Frankly, it's a hornbook issue, Judge.

THE COURT: Exactly -- well --

MR. GREENBERG: But the ruling you've made is not consistent with the hornbook, so -- but you're the judge, I get that, as Mr. Julien said. So I'm going to see if I can find a better hornbook, a more persuasive hornbook.

MS. GIACCHETTI: Judge, I need to go back to what's been produced here.

I'm reading through materials relating to the

5710

2008/2009 cooperation, and all the addresses have been redacted, and the addresses are crucial.

I'm asking for unredacted. If there's some concern, I'll take it attorneys' eyes only. But I need addresses. I've got to know what he's reporting.

MS. DOMPH: Just one?

THE COURT: Okay. Actually, one case that could be worth looking at is *A.I. Credit Corp. v. Legion Insurance,* 265 F.3d 630, 637 to 38, Seventh Circuit 2001, which is the one that -- those criminal cases that the government cited -- were citing.

So that says: McPherson also suggests that Holsworth's testimony about the conference call is inadmissible because Holsworth did not testify to a foundation, which McPherson insists entails specific testimony regarding the names of the participants and the date of the conversation. But no rule of evidence requires a foundation. Foundation is simply a loose term for preliminary questions designed to establish that evidence is admissible. See Black's Law Dictionary.

MR. GREENBERG: Right.

THE COURT: At trial it is sometimes considered an orderly procedure to produce testimony that a conversation occurred at a particular time and place, and between the witness and someone else, before the witness is permitted to

5711

testify to the conversation's content.

The Federal Rules of Evidence provide that relevant evidence is generally admissible. See Rule 402. And McPherson does not contend that Holsworth's testimony is irrelevant. We find no reason, relevance or otherwise, why the testimony should be excluded. Though Holsworth's testimony regarding the identity of the A.I. Credit representative and the date of the conversation was inexact, it was specific enough to demonstrate the conversation's occurrence and relevance.

And then Rule 401, evidence is relevant if it bears on the existence of any fact of consequence to the determination of the action.

So I guess it's saying -- I mean, if the argument is there was so little -- it was so vague about when this conversation happened or who was there, or that we don't even know whether it occurred at all, and that's a bar to any further testimony about the conversation, then I -- I do think it's kind of a -- it's definitely sort of a case-by-case call on what type of conversation we're talking about.

It was very inexact, like here, fairly inexact. But I think there's at least enough there to -- for the jury, if it wanted, to find that the conversation occurred. I mean, you know, beyond that, I don't know. It's inexact, but --

MR. GREENBERG: Judge, what was the cite of that

5712

case?

THE COURT: 265 F.3d 630, 637 to 38, Seventh Circuit 2001.

MR. GREENBERG: Thank you.

THE COURT: I mean, it does say: At trial it is sometimes considered an orderly procedure to produce testimony that a conversation occurred at a particular time and place and between the witness and someone else before the witness is permitted to testify to the conversation's content.

And I think that -- you know, that is true, for all the reasons you were giving, that it would be more orderly if there's a little bit more information about that. So I guess I would ask the government -- and I was kind of trying to during the prior testimony -- to ask for some more of that.

So to the extent the government's able to do that, then please do that. But I think -- I don't know that -- I don't think there was a problem, an actual problem with the last testimony. I think it can be more orderly if there is a little bit more detail.

MR. GREENBERG: Thank you, Judge.

Sorry, Jason.

THE COURT: Okay. You know, the other thing I would mention is just that *A.I. Credit Corp.* is dealing with a specific conversation. And Sloan, in contrast, was just asked general points. He did not focus on a particular critical

conversation without telling us anything about it. He was just asked general questions and gave general answers. And based on his background and his testimony that he was very involved with O-Block at different points, I would say there's enough basis to conclude that his testimony on the general points was reliable.

Now, I guess that's sort of a chicken-and-egg thing, because, you know, you, from the defense perspective, would say, well, the problem is the general quality of the questions and the corresponding general quality of the answers.

But I -- it also does seem to me that that ultimately could be more of a -- you know, that's something that gets at the quality of the proof and the -- could be addressed in closing, too, if that's what people choose to do.

Okay. So does everyone have copies now?

MR. BARNETT: Yes.

THE COURT: Okay.

MR. KLING: Just so you're clear, Judge, it's roughly three quarters of an inch thick of paperwork that we're going to go through right now.

MS. DOMPH: Judge, it's very substantive, and a lot of it we have not seen.

MR. SPIELFOGEL: Just going through this, you know, leafing through it, and I see -- the first thing I look at, he's lying to probation officers.

5714

I don't want to comment until I've gone through, but it's just --

MS. DOMPH: It's substantive and necessary for the defense.

THE COURT: Let's do -- okay, so I think the first step is just to -- why don't we take 10 minutes. And if the government can, please, in that time try to identify specifically when some of this was produced previously and, you know, just let us know that information.

And in the meantime, the defense can also just have 10 minutes to look at it, and then we talk again about how to move forward.

In the meantime, I think I will -- well, are we ready to tell the jury how late it's going to be, or maybe just do the next 10 minutes and then we get back to them?

MS. DOMPH: Well, Judge, are you saying in 10 minutes you want us to absorb all this?

THE COURT: No. I'm just saying in 10 minutes we talk again about what's going to be the plan.

MS. DOMPH: That's fine.

MR. KLING: Judge, if you're going to allow us the time to review this, then obviously it's going to be a while for the jury. So whatever your pleasure, but we're still going to need the time to review the materials, now or in 10 minutes.

5715

THE COURT: I guess, in 10 minutes I would like to get a better, more accurate estimate for the jury of how long it's going to be before we need them. So I don't -- we can try to do that right now, but it sounds like people are just sort of throwing out impressions from the documents.

I would like if everyone could do like a little bit faster of a skim through it and then --

MS. GIACCHETTI: Judge, can I tell you based on what I'm looking at, there's -- and I'm doing the first cross-examination. There is no way that I can digest this -- and, frankly, there are things redacted in here that they obviously know are important that were redacted.

I can't be ready to cross-examine. So I will tell you right now that I can't cross-examine it. The way it's structured, I go first, and so there will be no way that the defense can -- defense attorneys can say I'm wrong. But there's no way the defense can possibly be ready to competently cross-examine this witness.

And so I can tell you that right now, unless somebody on this group here is going to tell me wrong.

MR. BARNETT: No.

MS. GIACCHETTI: So I think we should start with that proposition, and then perhaps take 10 minutes to figure out what our next position is. But I'm very clear about what I'm going through here is very substantive, very important,

5716

exactly what I predicted was going to be in here. And I have only gotten through probably the first 22 pages.

MR. HENNESSY: Your Honor, if I could add a little detail here.

So Mr. Wiley's CHS file is about 160 pages. 75 or so pages of that comprise criminal history reports for unrelated individuals that are wholly irrelevant to anything that's going on here.

Any materials related to Mr. Wiley's status as a CHS in either 2022 or 2023, the more recent items that we've discussed this morning, are duplicative of items that the defense has already had.

The stuff related to 2008 and 2011, which I think is the crux of what Ms. Giacchetti and the other counsels over there wanted, is limited.

I understand that everyone needs time to take a look at this, and it's just my word. I don't think this is a particularly long review, because I went through it yesterday.

MS. GIACCHETTI: Do you know how to prepare cross-examination, Mr. Hennessy? I don't think you do. I don't just sit and read and then stand up and flail around with a piece of paper, okay? I've spent probably 60 hours on this cross-examination already, and this is another 10 hours of it, in order to put it together in a way that it can be meaningful, acceptable, evidentiary and make sense.

5717

No, I don't care.  It is ridiculous to make that argument that we should just be doing this on the fly on a case where our clients are facing life without parole.

MR. BARNETT:  That's obvious, Judge.  This is obvious, Judge, it really is.  It's obvious.

MR. SPIELFOGEL:  If I could just add.  This is the book of the reports that I had on Mr. Wiley.

MS. DOMPH:  Describe it.

MR. SPIELFOGEL:  Well, it's about, what is it, two inches thick.  It's got all the dates of all the reports that I used when -- before Mr. Julien told us that he would not be identifying our client at all.

There was a long period there where I needed to prepare cross-examination for this witness and probably spent about 75 hours doing that.

I've just sat here and looked through these reports, and I know that Mr. Hennessy is not purposely stating anything that isn't accurate.  I'm seeing one report after the other that is not in here.  And they're substantive.  They're issues that go to his entire --

MS. DOMPH:  Truthfulness.

MR. SPIELFOGEL:  -- his entire role as an informant, and they're in here.  There's no way on God's green earth that a defense attorney could get handed this as the witness is walking into the courtroom and say, okay, go ahead and

cross-examine. There's no way there can be cross-examination today.

And I don't know how much time Ms. Giacchetti is going to need to prepare to cross, because she is doing the lead cross on this. And as she said, I know she's spending hours and hours on it. And then to get handed this is just -- it's amazing.

MS. BORMANN: Judge, just a technical issue.

So I'm looking at the reports, and as I indicated there's an additional identification of my client in a place in the Camtasia video where there had not been one before. Because of the Internet situation, I have no access to the Camtasia video, so I need to review it and I need to review it with my client. That's going to take some time.

I have to go back to the office, upload it, figure out a time to meet with my client, review it. And that's what we're talking about.

THE COURT: Okay. I wanted to just pause for a few minutes so that people can develop these thoughts a little bit more.

So let's pause, and you can think and just formulate your impressions for the next -- why don't we do five minutes at this point, because we just spent some time arguing about it.

So let's talk again in five minutes. In that time,

5719

if the government -- what I would like to hear from the government, if possible, is some more specificity about -- maybe down to Bates numbers, on which things were produced before and when, if that's feasible. And that will help us nail down what is actually new and what is not new. And then we can move forward from there.

Okay. So in -- at 10:20, I will just resume the conversation.

MR. KLING: Judge, we're going to adjourn to the counsel room, if we may.

MS. GIACCHETTI: The closet is a little small for us.

THE COURT: Okay.

MS. GIACCHETTI: So we're going to go out to the room.

(Recess from 10:15 to 10:27 a.m.)

THE COURT: All right. Are we ready to resume?

MR. JULIEN: We are, from the government's perspective, your Honor.

THE COURT: Any updates on --

MR. SPIELFOGEL: Yes.

THE COURT: -- on this?

MR. BOYLE: Judge, the defense attorneys did confer, and I think we have a consensus. And I think that consensus was related to the government's attorneys. And I think there's an agreement.

The idea is that, to respect the jury's time, the government would be allowed to call Mr. Wiley on direct, but with the understanding and agreement that because of the need for discovery review and the possibility that said review of this discovery might make necessary obtaining additional documents, which we will try to do as quickly as possible, that the defense cross would begin the earliest on Monday.

But that is the hope and that's the plan.

MR. JULIEN: Agreed.

THE COURT: Okay. Great.

All right. Well, thank you, everyone, for working that out.

It sounds like then we just need to address the immunity for Mr. Wiley, and then we can bring the jury in; is that right?

Does anyone need to take any further break before we proceed with all that?

MR. JULIEN: We do not.

MS. GIACCHETTI: Just five, Judge.

THE COURT: Okay. You know, actually, let me -- on the foundation point, I have been thinking about that a little bit.

I don't -- so I still think that under that *A.I. Credit* case, what the government brought out was enough for foundation. In other words, I don't think they're required to

give, for every single conversation, specific testimony about the names of participants and the date of the conversation.

But I do think that -- just in terms of, it is more orderly if that kind of information comes out on direct, I would -- I guess I would just encourage the government to do a little bit more of that than before, more for the orderly presentation than because I think it needs -- it actually is required for the evidence to be reliable enough to be considered by the jury.

So I guess I'm not -- I wouldn't -- I don't find a problem with the prior testimony. I just think it would be a little bit helpful if there's some additional kind of tying us to particular time periods or people where possible.

MR. JULIEN: Yes, your Honor.

This I think is just -- we're not really going to have, it's my prediction, this disagreement, as far as the scope of this witness's direct examination. And it will be shorter and more limited in a number of areas. So I don't think the issue is going to present itself.

THE COURT: Okay.

MR. JULIEN: Maybe I'm wrong, but I don't think the issue is going to crop up.

THE COURT: Okay. I think a couple people did request a short break, like a five-, ten-minute break, and then Mr. Wiley, we do the immunity with Mr. Wiley?

MR. JULIEN: In the meantime, yes, your Honor, we'll go locate him and make sure he's here.

THE COURT: Okay. Great. Thank you.

I'll let the jury know it will be about 10 minutes. Thanks.

(Recess from 10:31 to 10:43 a.m.)

THE COURT: Okay. Are we ready for the witness?

MR. JULIEN: Yes, your Honor.

MR. BOYLE: I know Mr. Greenberg was getting a coffee. He should be here any minute.

THE COURT: Oh, okay. Thanks.

Good morning, sir.

THE WITNESS: Good morning.

THE CLERK: Can you stand and raise your right hand?

(Witness sworn.)

THE CLERK: Can you state your name for the court reporter, please.

THE WITNESS: Martell Wiley.

THE COURT: Good morning, sir.

THE WITNESS: Good morning, ma'am.

THE COURT: First, I would like to go through -- go through some questions with you.

So you are -- I am going to enter an order basically on the same issues that I'm about to ask you about, but I just wanted to let you know that you are -- under this order that

5723

I'm going to enter, you are required to testify here today.

Do you understand that?

THE WITNESS: Yes, ma'am.

THE COURT: And you've previously indicated that in your appearance in court here, you may assert your privilege against self-incrimination. Do you understand that?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. So you will not be excused from testifying here on the basis that the testimony may tend to incriminate you. Do you understand that?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. And so as your --

THE WITNESS: You mean -- when you say -- can you clarify that?

THE COURT: Sure. Okay. So as you're testifying -- so you're going to be required to testify today. You understand that?

THE WITNESS: Yes, ma'am.

THE COURT: And you are required to testify without further asserting here today your privilege against self-incrimination. So you're required to testify without asserting that privilege against self-incrimination. Do you understand that?

THE WITNESS: So you're saying I don't have to incriminate myself or do I?

5724

THE COURT:  I'm saying you have to testify without asserting your privilege.

So you have a privilege against self-incrimination.

THE WITNESS:  Okay.

THE COURT:  But you cannot assert it here.

THE WITNESS:  Okay.

THE COURT:  You have to testify without asserting that privilege.  Do you understand?

THE WITNESS:  Yes, ma'am.

THE COURT:  And at the same time, no testimony -- that's because I'm requiring you to testify here today without asserting that privilege against self-incrimination.  Do you understand that?

THE WITNESS:  Yes, ma'am.

THE COURT:  At the same time, no testimony that I am requiring you to give here today may be used against you in a criminal case.  Do you understand that?

THE WITNESS:  Yes, ma'am.

THE COURT:  Except a prosecution for perjury or giving a false statement.

So in other words, if you -- if you perjure yourself, if you gave a false statement, there could be a prosecution for that.  Do you understand that?

THE WITNESS:  Yes, ma'am.

THE COURT:  But other than that sort of prosecution,

any testimony that you give here today, you can't -- you cannot assert your privilege against self-incrimination, but that testimony cannot be used against you in any criminal case --

THE WITNESS: Yes, ma'am.

THE COURT: -- except for the perjury prosecution. Do you understand?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. Have you had a chance to discuss this testimony here and -- the matters I've just gone through with you, have you had a chance to discuss that with a lawyer?

THE WITNESS: Like -- like what are you -- can you clarify that? Like, are you saying did I discuss it with an attorney, like a private attorney?

THE COURT: Do you have any lawyer representing you?

THE WITNESS: No.

THE COURT: Okay.

THE WITNESS: I feel like -- I feel like with this, I don't need a lawyer to tell the truth.

THE COURT: Well, it's good that you -- and you are required to tell the truth.

THE WITNESS: Yes.

THE COURT: So that's good.

And -- okay, do you have any other questions about what I just asked you, all the questions I just asked you?

5726

THE WITNESS: No, ma'am.

THE COURT: Okay. And did anyone threaten you to get you to testify here today?

THE WITNESS: No, ma'am.

THE COURT: Or to not assert your privilege against self-incrimination? Did anyone threaten you in any way?

THE WITNESS: No, ma'am.

THE COURT: Okay. All right.

So with that, I think we can proceed.

All right. So what's going to happen now is we'll go into your testimony. And I'm going to ask first for the jury to come back -- to come into the courtroom.

Actually, before we do that, anyone have any issues or want to go on the sidebar at all?

MR. JULIEN: No, your Honor.

THE COURT: Okay.

MS. GIACCHETTI: No, Judge.

THE COURT: So we're ready for the jury, please. Thank you.

THE CLERK: All rise.

(Jury enters courtroom.)

THE COURT: Good morning, everyone. Thank you for your patience.

We're going to continue with the testimony.

The government may call its next witness.

Case: 1:21-cr-00618 Document #: 495 Filed: 01/31/24 Page 48 of 218 PageID #:10075
Wiley - direct by Julien
5727

MR. JULIEN:  Thank you, your Honor.

The government calls Martell Wiley to the stand.

(Witness sworn.)

MARTELL WILEY, GOVERNMENT'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. JULIEN:

Q.  Good morning, Mr. Wiley.

A.  Good morning.

Q.  Would you please state your name and spell your name.

A.  Martell Wiley.  M-A-R-T-E-L-L, W-I-L-E-Y.

Q.  How old are you?

A.  I'm 39.

Q.  Mr. Wiley, are you a Black Disciple?

A.  No.

Q.  Were you a Black Disciple?

A.  Yes, I was.

Q.  When were you a Black Disciple?

A.  Since I was 15, 2000, like something like that shit.  '98, '99, you know.

Q.  From '98 and '99 until when?

A.  Till I end up getting shot at 15.  Before I went to the joint, did my four years.

Q.  Have you ever lived in Parkway Gardens?

A.  Yes, sir.

Q.  When did you live in Parkway Gardens?

A.   '06, '07, '08, '9, '10.  And then got into it over some miscellaneous shit and -- I mean stuff, sorry.  And I end up moving out.

Q.   Do you remember what year it was you moved out?

A.   Yeah, the end of '10, 2011.  Like, it was the end, like, right on that border of December.

Q.   Okay.  So the end of 2010, early 2011 maybe?

A.   Yep.

Q.   Okay.  Where did you move after you left Parkway Gardens?

A.   I went -- I went on the other side.  I went on the other side.  When I say "the other side," I mean -- they call it Tookaville, STL, whatever.  Like, I moved over there, not because I was joining them, but because, like, the low end is over there.  Like, I'm from the low end, and everybody from the project buildings on both sides, so --

Q.   And I'm going to ask you some more questions about that in more detail in a minute, but generally speaking are we talking about somewhere close by?

A.   Yeah.  Only thing separate that is King Drive.

Q.   Mr. Wiley, do you have information about the Black Disciples, something called O-Block, and some of its members?

A.   Depends on what you're referring to.

Q.   Do you know some O-Block people?

A.   Yeah.

Q.   Is that what you're here to talk about?

A. Yeah.

Q. So now I want to kind of back up a little bit.

What is Newtown?

A. Newtown is on the Low End. That's where I was from. I'm not from there anymore. But that's where I was from. That's where I grew up at.

Q. Yeah, so for people who may not be familiar with that part of Chicago, what do you mean when you say "Low End"?

A. The Low End, from 22nd and 55th, State to the lake.

Q. And is that generally a reference to project buildings?

A. Yeah.

Q. That used to exist?

A. When the projects was up, yeah.

Q. They're not up anymore?

A. No.

Q. So you said from 22nd to about 55th?

A. Yeah, State to the lake.

Q. State Street over to Lake Michigan?

A. Yep.

Q. And where is Newtown within the Low End?

A. It was on -- in between Cottage and Lake Park, to the lake, from like Cottage Grove to the lake. So Ellis, Lake Park, from 35th to 39th.

Q. So you got Cottage Grove on the west and the lake on the east?

A. Yep.

Q. And you said 35th on the north end to about 39th?

A. Yep.

Q. Okay.

A. To 39th south.

Q. And I think you just told us you became a Black Disciple in the late '90's?

A. Yeah, like late -- like -- yeah, probably like -- like you could claim anything you want to, Bro, but unless you know your shit, like, unless you know, like, you know what you into, like, you ain't nothing. You just somebody claiming something. You know, as I got older, I seen it as it went on, you know, got older and shit -- stuff. My fault.

Q. So just kind of backing up, let's talk about the time frame first.

Late '90s is when you say you became a BD?

A. Yeah.

Q. And what do you mean people can just claim stuff? Were you a BD or were you just claiming it?

A. I mean, you just -- when you grow up in the city, like, you ain't even got to be no gang member, but, like, if you -- if another side -- you went to another side, you could just be living over there and get killed. Like, they come through, you would just get killed 'cause you over there.

So that's why most people join gangs is for

protection and, you know, hiding behind the mob, what they called it.

Q. Did you join a gang?

A. Yeah, I joined. I did join.

Q. Were you a full fledged BD?

A. Yeah.

Q. So when we talk about Newtown, is that like one of Chicago's 77 distinct neighborhoods or is that something different?

A. Yeah.

Q. What is it?

A. It's one of the neighborhoods.

Q. When you joined BDs, was Newtown a BD area, or was it something else?

A. Yeah, when I joined it was BDs. But before me, like, all the people was GD.

Q. All right. I'm going to come back and I'm going to ask you some more questions about Newtown momentarily, but there are a couple things I want to go over with you first.

Have you received immunity prior to testifying here today?

A. No, sir.

MR. JULIEN: Your Honor, can we have a sidebar?

THE WITNESS: Oh, excuse me. I mean, my mind is just everywhere, man. So can you -- you said what?

BY MR. JULIEN:

Q. Let me ask the question a different way.

Did the judge instruct you of some things prior to you testifying before this jury?

A. She said that I have to assert myself, that's what you're referring to.

Q. Did the judge tell you that nothing that you would say to this jury can be used against you in a criminal prosecution, in summary?

A. Yes.

Q. And that you can't assert a Fifth Amendment privilege not to incriminate yourself?

A. Yes.

Q. Unless you tell a lie?

A. Yes.

Q. Okay. You understand all of that?

A. Yes.

Q. Okay.

A. Prior to the jury and stuff like that, yeah.

MR. GREENBERG: Objection, Judge. Unless you tell a lie?

THE WITNESS: I didn't understand what he was saying. It was moving too fast.

THE COURT: Okay. Let's just go on the sidebar really quick.

MR. GREENBERG: Well --

(Proceedings heard at sidebar:)

MR. GREENBERG: I think Mr. Julien misstated what you said. And the witness says now that we're talking too fast, or he was talking too fast. But he said that he couldn't assert the Fifth Amendment unless he was telling a lie or something like that.

THE COURT: I think -- I think there was -- in the end what he said was correct. Because the immunity is you must testify, you cannot assert the Fifth Amendment, you -- your testimony cannot be used against you in any criminal case --

MR. GREENBERG: Unless you lie.

THE COURT: -- unless you lie. And that's the perjury prosecution. I think that's basically what he just said right now.

MR. GREENBERG: But he said he didn't understand him, so it doesn't matter that I objected, he's got to -- the witness just said he didn't understand what Mr. Julien said.

MS. GIACCHETTI: It's actually technically wrong. You keep the immunity, but you can be prosecuted for perjury. They can put what you say in the perjury case. But the way it sounded, it sounded like a proffer letter.

In a proffer letter, they say -- you know, they'll say to you it's protected unless you lie and then all deals

are off.

That's not really what immunity is, so I don't -- I understand where Mr. Julien was going, but the way it came out, I think, is not quite accurate.

What you say cannot be used against you except in a prosecution for perjury is a little different than somehow you get immunity, and if you lie, all bets are off. I know that's technical, but I think that's what Mr. Greenberg was reacting to also.

MR. JULIEN: I can rephrase the question in that way, your Honor. That's fine. That was the intent of --

MS. GIACCHETTI: That's what I assumed.

THE COURT: Okay. All right. Thank you.

(Proceedings heard in open court:)

BY MR. JULIEN:

Q. Are you a little nervous here, Mr. Wiley?

A. I mean, I'm -- all these people up in here. This ain't everyday thing for me, you know.

Q. Understood.

I want to make sure I'm clear in what I had asked you.

Do you understand that the Judge instructed you that nothing you say in here can be used against you except for in a prosecution for perjury?

A. Yes.

Q. Okay. Prior to you being here and prior to you testifying to this jury, have you been convicted of some felonies?

A. No -- prior to me being here today?

Q. Yes.

A. Yeah, I been convicted of felonies in the past.

Q. Okay.

A. Yeah.

Q. All right. I want to talk about a few of them.

A. Okay.

Q. And I want to go back about a decade, because there are a few of them, fair?

A. Yep.

Q. Was one of them for obstruction of justice?

A. Yes, sir.

Q. And was that offense in approximately July of 2012?

A. Yes, sir.

Q. What happened there?

A. You won't believe it if I told you. It's a movie.

I was in Danville, Illinois, and the police had -- they was looking for -- chasing somebody who was 6'1", bald-headed, light-skinned. They grabbed me and asked my name, my whole name, and they said, what's your initial, I said Y. And I went to jail for obstruction. And my middle initial is Y.

Q. Were you sentenced ultimately to two years of probation

and 131 days in jail?

A. Yes.

Q. And did you violate your probation on that case in about May of 2015?

A. On -- on the Danville case? On the obstruction?

Q. Yes.

A. Yes.

Q. Were you sentenced to an additional two years of probation and some more days in jail?

A. Yes.

Q. Do you have another felony conviction for, this time two counts, one of them is aggravated domestic battery and the separate count of aggravated domestic battery?

A. Yes, sir.

Q. And was that in about July of 2014?

A. Yes, sir.

Q. What happened there?

A. Broke, being broke. When you in poverty, you know, people -- like your spouse drink, and you ain't -- like you ain't got no money, man. When there ain't no money, it's poverty. I see it now, 'cause I got a wife and married. We don't argue or none of that, so it was poverty.

Q. Were you ultimately sentenced to three years in prison and 24 months of probation for that offense?

A. Yes, sir.

Q. Was your probation revoked on that offense in about January of 2017?

A. Yes, sir.

Q. Do you have another felony conviction for obstructing justice, this time in roughly August of 2016?

A. Yes, sir.

Q. What happened there?

A. The police had came up to me when I got off the bus in Decatur, and they, like -- like, we got a call on you, you're a suspect, you fit the description. I took off on them. They tried to tase me, I took off running.

Q. Did you throw something or get rid of something when you were running?

A. Yeah, I threw a gun. They never recovered it though.

Q. Were you sentenced to two years in prison as a result of that?

A. Yep. Oh, it was added onto what I had going on already. It was -- it was added onto the sentence.

Q. Later on, were you arrested for manufacturing and delivering dangerous drugs in about December of 2019?

A. I took that case. I took it. I didn't serve -- I don't sell drugs. I took the case because I was on parole.

Q. What do you mean when you say you took the case because you were on parole?

A. I was in the car with somebody in Bloomington, and they

got kids and shit. And they told me I was going to jail anyways, so I said, fuck it, it's mines. I mean, excuse my French. I'm just from the streets, too. Try to recover that.

Q. Were you sentenced to 30 months of probation as a result of that?

A. Yes, sir.

Q. Mr. Wiley, right -- as you sit here right now, do you have an active case pending in Minnesota?

A. I got an active case pending in Minnesota, but they confused about it. Like I never been to Rochester, so, you know, they confused about it.

Q. What do you mean when you say they're confused about it?

A. Like, when I went there, they just released me.

Q. So I want to talk about you saying you went there.

A couple years ago, did some FBI agents take you up to Minnesota to turn yourself in and clear up that situation?

A. Yeah.

Q. Did you do that?

A. Yeah.

Q. Do you know why there's a warrant out for you on that case right now then?

A. Yeah. A friend -- a person who you think your friend and shit, they know your information, they duped them and end up getting off with it, and the warrant was stuck.

So I just got to clear it up. Like, I didn't -- told

them it wasn't me, you know, like that shit.  They let me right out though.

Q.  So you said you got to clear it up.  Are you going to get that taken care of?

A.  Yeah, I missed court because I was with you guys.  I missed court when I was in grand jury.

Q.  Are you going to get that warrant situation taken care of?

A.  Yeah.  It ain't me.  Yeah.  I don't run from anyone.  I face my fears now.  I ain't in no gangs.  I got kids.  I got something to live for.  So, yeah, I will be cleaning up all that.

Q.  I'm going to change gears a little bit.

Have you received compensation for providing information to law enforcement in this case?

A.  Yes.  Yes, I received compensation, but it was, like, travel and stuff like that.  I have my own income.  I make money on YouTube, plenty of it.

Q.  Have you received from law enforcement $24,963?

A.  I can't recall that.  I can't even tell you that, like.  I don't know who came up with the prices and anything.  I need to see a receipt.

Q.  Does that number sound about right?

A.  I don't know.  I can't even tell you, Jason.

Q.  Mr. Wiley -- and that's for providing information in this case.

Did you provide information to law enforcement at different times in the past unrelated to this case?

A.   '06, I got bumped with -- with another member and shit, yeah.

Q.   When you say "another member," what do you mean?

A.   It was somebody in a car with us, like we got pulled over, they got locked up for guns and shit, like all type of shit. It was hectic that day.

Q.   And how about in 2011?

A.   I don't remember no 2011.  I don't remember these days. Like 2011, shit, I was in Parkway then.  I was in jail for domestics and all type of shit.  Like, I don't remember that, like, where all this coming from.  I don't know.  I got to do my research.

Q.   Okay.  I want to ask you about YouTube.

A.   Yes, sir.

Q.   Mr. Wiley, you have a presence online.  It's a bit of an understatement.  Is that fair?

A.   That's an understatement.  I'm Michael Jordan on YouTube.

Q.   What do you do on YouTube?

A.   I blog.  I talk against gangs.  I tell the kids they mind is they mind, they are somebody.

     (Court reporter clarification.)

     THE WITNESS:  I tell the kids that they mind is they mind.  They don't need a gun.  You can use your mind without a

gun.  And they are somebody.

So, yeah, I tell them that.

BY MR. JULIEN:

Q.  When did you start posting on YouTube?

A.  2021.

Q.  Did you start posting on YouTube before or after you started providing information --

A.  Yeah, before.  I was already screen recording and doing all that.  Like, I was on there already.

Q.  Do you have -- or do you go by a specific name online?

A.  Yes.

Q.  What is it?

A.  Some call me Trenches News, some call my Swipper, some call me The Goat, some call me -- you know, they just got different names.  Mr. Miyagi.  I go by different names. Captain Planet.

Q.  Swipper you spell with two Ps?

A.  Yep.

Q.  S-W-I-P-P-E-R?

A.  Yep.

Q.  Trenches News.  What's Trenches News?  Is that the name of your channel?  Is that your name?

A.  Yeah, it's the name of my channel.

Q.  From 2021 to now, about how many videos would you say you posted on YouTube --

A.  I got --

Q.  -- from the Trenches News channel?

A.  Got about 17, 1800 videos.  I got about -- I deleted a lot -- I deleted like -- I had to delete like 50 million views.  So I have about 80 million within two years.

Q.  Generally speaking, is one of the things that you talk about on YouTube gangs in Chicago?

A.  Yeah, I talk against them now.  I let them know, like, they're real.  You go to jail, ain't nobody looking out for you.  Ain't only nobody sending you nothing.  Only the girls who you with, if they with you, your mom, your sister.  Like nobody send me nothing.  Every time I went to jail, like, you know, it's always excuse.  Oh, man, you know, it's out of sight out of mind, for real.  That's what that mean.

Q.  Do you talk about your past gang life?

A.  Oh, yeah.  I tell them I got shot.  I tell them like the robbery stories.  If you go on my page you're going to see like all the -- like, I tell them everything I been through, I don't have nothing, domestics and everything.

The three years that I did, the three to four years I did was the best time of my life.  I got time to get in tune with myself.  And when I came out I told myself that I ain't no streets, get your kids, you know what I'm saying?  Like, have the business, stand on business, and that's what I did.

Q.  You also say some pretty wild stuff online.  Is that fair?

A.  I mean, can you clarify that?

Q.  Like inflammatory stuff?

A.  Like can you clarify that?  Break it down.

Q.  Do you talk bad about people online?

A.  No, probably gang members.

Q.  Do you talk bad about gang members?

A.  Yeah, yeah, I talk bad about them.  I shame them, I bash them, I do all of that, yeah, you know.

Q.  Why do you do that?

A.  Because, like, when I try to get my message across, like, if you been standing outside on this blocks from 12 years old to 30 and you ain't made it no real life, that's insanity.  You know.  And I was doing that.  And I had to realize, like, all the time that I wasted.  Like, I got to get in tune with my kids now.  I got to figure out what they like now.  I got to -- you know, like I got to double time.

    And then, ain't no 401(k) plan in this.  So while you out here playing in the field when you get 40 and 50, them pills and all that shit, you gonna need them.  You know what I'm saying?  You're gonna to need medicine.  You ain't going to have it because you wasted your life in the streets.  So it's better to get you a job.

    It's cool to work.  It's cook to work a 9:00 to 5:00 or whatever you got to do to support your family.

Q.  Is some of what you do online as Trenches News and what

you post on your channel for entertainment value?

A.  When it get dry.  When it get dry, we call a thing called click bait, you know.  I might call somebody up and be, like, oh, man, let's say we into it.  And then, you know, we get -- we have some fake words.  Oh, you this, you that, and then it go up, 100,000, 200,000 views.  It just a click bait.

But all my stories are real.  All my stories that I do, like my story times and all that, they real life.

Q.  When you say "into it with somebody," what do you mean by that?

A.  Like, for instance -- I don't want to bring up no names.  But, like, for instance, it was this one guy, he be on YouTube doing interviews.  I know his whole family, his mom and them.  You know, we from the Low End.  We had got into it, but we weren't really into it, because I know his family, you know.

So to the Internet, oh, you and him into it.  No, we ain't into it.  That's my family.  Like, he might say something about my wife, but it was all planned.  He don't know my wife, so it was planned.

Q.  So I want to move away from YouTube, at least temporarily, and come back to Newtown, when you first became a member of the BDs.

How old were you when you first became a BD?

A.  When I first became a BD, I was 15.  14, 15, something like that.

Q.   Were you in school?

A.   Yeah, I was in school.  I was in school.  You know, I was glad that, like -- like, then, the gang members, it's different timing.  Like, they forced you to go to school.  You ain't go to school, you couldn't do nothing.

Like, you can just go and slide on no block and kill nobody, like, you probably be dead.  You can't kill no kid without no -- they make you turn yourself in.  So it was rules.  It was rules and regulations, man.  They ain't got no rules now.

Q.   What kind of rules and regulations did you -- by the way, did you refer to it as like the Newtown set or faction of the BDs?  Did you call it something different?  What did you call it?

A.   You saying --

Q.   Where you were, what did you call it, the Newtown BDs?

A.   I mean, Newtown just the name of the projects.  That ain't no member name or none of that.  That's just the name of the projects, Newtown.

Q.   So what types of rules and regulations are you talking about?  Are we talking about Newtown rules or are we talking about BD rules?

A.   Life rules.  Like shit, that supposed to happen.  Like, I wouldn't say that's a BD rule.  I wouldn't say that's a GD rule.  Like, you supposed to tell the kids to go to school.

You see a kid disrespecting his momma, you supposed to get up on him. Like, you supposed to whoop him. Like, when I was growing up, the community if you don't get whipped by your momma, you gonna to get whipped by your neighbor. So I respect all of that.

Q. Did you have any sorts of guidelines, though, like literature, paper you're supposed to read?

A. Yeah. And that's why these guys are misled and do anything, they don't know their paperwork. If you -- it's a rules to the road, like the rules to the road to the cars, to the book, it's rules to the road. If you understand those rules, you will move better. You will move right. But by them not learning, not understanding -- see you can learn something and memorize something, but to understand it. To understand what those words mean, you know. And that's the difference. I understood what they mean though. I understood it.

Q. Are we talking about BD specific paperwork?

A. Yeah. Any paperwork. BD -- yeah, we talking about specific BD right now, but any paperwork. If you read the policies and procedures, it teach you. It's not made for what people in the streets think it is.

Q. So right now I'm asking specifically about the time period when you first became BD, so late '90s, early 2000s.

A. Yep.

Q. What was the relationship like between did BDs and the GDs at that period of time?

A. At that period of time, depending on where you at. If you on the streets, they was into it. But if you're in jail, it was one love.

Q. Why would it be different if you were on the streets versus if you were in jail?

A. Man, you know what, Jason, I -- I try to figure it out all the time, like, how can they go to jail and kick it, but kill each other on the street. It don't make no sense to me. Like, I never understood it. I never understood it. I can't even explain that to you. Like, how can it be one love and then on the streets, y'all.

I never understand it. It's a snake move to me. It's just to figure out the person, get information while's you in there on the person, it's like a backdoor move. So, you know, that's why I'm out the gang today.

Q. When what do you mean when you say "backdoor"?

A. It's trying to figure out your moves and trying to get close to you to learn, like, where you're hanging out at and stuff like that. That's why they always tell you, hey, don't say nothing to your cellie, or none of that in jail. That goes, like, all around the building, like, don't tell them too much.

Q. On the street then, just the Newtown area, where you lived

at, was there any conflict between the BDs and the GDs around that area?

A.   Oh, yeah.  We was into it with the Ida B. Wells and best of friends now.  You hear me, best of friends.  No wars.  All the people kicking it.  Like, that's a prime example of change in Chicago.

I say that 39th Street, like, I say that's the change, man, 'cause, like, they was in real -- like it's real -- was real beef when I was growing up.  Like people died behind it.  And all them together now.  All them go to parties, picnics, and nothing happen.  They stand on it.

And that's how I'm trying to help the city be a better place, too.  I'm trying to stand on it.

Q.   Were there any specific rivals that you had or other members of your faction around Newtown had at that period of time, late '90s, early 2000s?

A.   I'm gonna to say I had no opps.  I ain't going to lie to you.  I ain't gonna say, like, I went to one of the best high schools in Illinois.  So I ain't going to say that I had no opps.  I ain't gonna tell you that.

But as I got older, like, going into the 2000s, like the '6 and '7s, yeah, yeah, we had some opps, a few problems.

Q.   And who was that?

A.   The Hobos.

Q.   What's the Hobos?

Case: 1:21-cr-00618 Document #: 495 Filed: 01/31/24 Page 70 of 218 PageID #:10097
Wiley - direct by Julien
5749

A.   They was a group.  They was a super team.  You know, it was like Mike Magic Bird on one team, man.  They were standing on shit.  You know, we just happened to be into it.  I didn't even know who they was.  They older guys.  All these guys is, like, way older than me, but, you know.

Q.   And when you say a "super team," what do you mean by that?

A.   It was a super team, man.  They had Mike Magic Bird and a couple of more motherfuckers with them.  They had the team.  Like, they were strong.  They were strong.  They had put fear in people.

Q.   The gang?

A.   Yeah.

Q.   Was it GDs, BDs?

A.   It was mixed.  They was everything.  That's one of the -- I ain't going to say it smart, cause I ain't no gang member no more.  But that's smart.  Like you got everybody with you, like who going to go against you if you got every gang with you.

Q.   The Hobos was that mixture of gangs?

A.   Yeah.

Q.   But where you were at, was it just BDs?

A.   Yeah.

Q.   And what type of issues did you have with the Hobos?  Like, how were they handled?

A.   Man, I ain't even gonna lie to you.

(Court reporter clarification.)

THE WITNESS:  I'm sorry, ma'am.  I'm' sorry.

Well, I came home from boot camp in '07, and I was fresh out of boot camp, and they was, like, oh, we into it with them, you know.  So I just jumped into it.  I had all my breath, my energy.  I could run, you know.  I was fit, so I -- you know.

BY MR. JULIEN:

Q.  Did you personally ever commit any acts of violence against a Hobos member?

A.  Yes, sir.

Q.  What did you do?

A.  We shot down Bowlegs.  And that was the big mistake. Like, when you do something you don't do it right, they come back to hunt.  We lost, like, two guys behind that shit.

Q.  So I want to ask a couple more questions about them.  You said you shot down Bowlegs?

A.  Yeah.

Q.  Is his name Gregory Chester?

A.  Yes, sir.

Q.  And Bowlegs is his nickname?

A.  Yes, sir.

Q.  And what did you mean when you say shot him down?

A.  He was coming out of our building, and we chased him down. We chased him down.  He can run for a big guy, but we chased

him down, and, you know, we just shot him down, thought we killed him. And he ain't die, and that was a mistake. And that's where a super team kicked in at. We lost two guys at a funeral home in broad daylight.

Q. So you say he was leaving out of one of your buildings?

A. Yeah.

Q. Are you talking about somewhere in Newtown?

A. Yeah, he was leaving out one of our buildings and somebody spotted him, like Bowlegs down there. We just jumped on it, like, ran him into him and chased him down.

Q. How many times did you shoot him?

A. They saying it was 19 shots, but it was 17. I know it was 17 times he got shot.

Q. You were trying to kill him?

A. Yeah, for sure. At the time, like, I ain't with that shit no more, but at the time, shit, if you -- you know, it's like -- you part of your environment, flunky, sendoff, whatever you want to call -- I called it a sendoff move, you know. For a motherfucker to be, like, oh, yeah, go ahead and do that, you know, that's a sendoff move, man. I never do that again.

Q. Would that be typical for people who are part of the Newtown BDs to go and engage in acts of violence?

A. I mean, that was my first time engaging in some shit like that, you know. I mean, I'm sorry. I'm sorry for cursing,

ma'am.

But it was my first time engaging in, like, something drastic like that.  But it was a rush.  It was, like, you get a rush from that shit.  I'm sorry.  Damn.

Q.  You said the super team kicked in and you lost two people at a funeral home?

A.  Yeah, lost two people.  Lost two of our guys.  Antonio Bluitt and Sloppo.  Rest in peace.  Good dudes.

Q.  And what do you mean when you saw you lost them?

A.  They got killed outside the funeral home, A. R. Leak.

Q.  Were people selling drugs over in Newton, the BDs?

A.  I mean, when the projects was up, shit, I mean, it was an enterprise.  Shit, I mean, you in poverty, you ain't got no choice but to make money.  When the projects was up.  Ain't no money out on the streets now.  They broke, starving gang bang.  They need to get on YouTube.

Q.  Could anybody, so like a Hobos member or anybody come over and sell drugs in Newtown --

A.  Nah, that's what the problem was.  Like, they was trying to extort people.

MR. GREENBERG:  Judge, I'm going to object and ask for a sidebar.

THE COURT:  Yes.

(Proceedings heard at sidebar:)

MR. GREENBERG:  Judge, I don't understand what the

relevancy of what happened in Newtown and the Hobos. I mean, I did the Hobos trial. I don't think it has anything to do with this case. And he's gone on for a while. Now he's throwing in buzz words like "enterprise." But I don't know what any of this has to do with our case, so I'm making a relevancy objection.

MR. JULIEN: What he's going to say is because of this shooting that he just told us about and because the Newtown projects were torn down around the same time, he fled Newtown and sought shelter in the Parkway Gardens. And that's where I'm going next. But as a result of retaliation from the shooting, in part, he hid out in Parkway.

MR. GREENBERG: He can say that, but he's going into, you know, drug dealing and all sorts of other stuff that really has -- I mean, this has nothing to do with any of the people who are around here.

What happened in '98, you know, really has nothing to do with any of the people that were around here. So he's gone on for a while.

MR. JULIEN: It relates to his familiarity with those things that he saw and observed once he got to Parkway Gardens.

THE COURT: Okay. Any other --

MS. GIACCHETTI: Yes, Judge.

My objection is I don't know how this witness was

Case: 1:21-cr-00618 Document #: 495 Filed: 01/31/24 Page 75 of 218 PageID #:10102
Wiley - direct by Julien
5754

pre-tried, but this is not a question and answer. A question is asked, and the witness just goes off in 85 directions, and that's inappropriate. I don't -- you know, to me, you don't pre-try a witness this way.

And I don't know what the solution is, but it is basically non-responsive. I don't want to be -- we're not here for his entertaining the jury, and that's exactly what's happening here. He's supposed to be asking questions. This is serious.

And, again, I don't know the solution, but I think that the questions should be specific and he should be brought back to what the specific questions are. Otherwise, we just have no idea what's going to come out of his mouth next.

MR. JULIEN: I agree with a lot of that, your Honor, and part of it is, this came up when Mr. Sloan was here. It's just demeanor. I mean, opposite ends of the spectrum. One person it's please speak up, and with him, it's -- I'm trying to keep him focused and reign him in. But absent me getting up there testifying or leading him all the way through, that's just who he is. I can't -- that's just who he is, your Honor.

MR. BOYLE: That's understood, but I would revisit Mr. Greenberg's specific objection. I think it's time to move on. I mean, the idea that he was familiar with drug dealing in Newtown, that's how he could recognize drug dealing at O-Block.

I mean, you know, he had to move away from Newtown and he moved to Parkway.

THE COURT: Okay. I think it is -- I wouldn't say it's irrelevant in the sense that it explains that he's had experience with it.

So I think -- you know, I guess -- but it does start to -- if you dwell on it too much, because it is not the charges here, it's different people, then it starts to get into 403. And so I would say let's try and move on from it like reasonably soon.

MR. JULIEN: Yes, your Honor.

THE COURT: Okay. Thanks.

(Proceedings heard in open court:)

BY MR. JULIEN:

Q. So just coming back, Mr. Wiley, did members -- when you were with there, so let's say from late '90s to mid 2000s, members of the Newtown BDs sell drugs in that area?

A. I mean, yeah, of course, yeah.

Q. Could anybody just --

A. No.

Q. And why not?

A. You ain't from there, first of all. So you ain't just finding Christopher Columbus delaying it, nah, nah. If you ain't from -- if you ain't from the neighborhood, like, you ain't gonna -- like, you ain't gonna go nowhere that you ain't

from. Like ain't nobody just entering no project building.

Like, it ain't just like these blocks, so --

Q. You referenced a couple of times that the projects,
Newtown, was no longer or is no longer up?

A. Yeah, it's no longer up.

Q. What happened?

A. The buildings got tore down.

Q. Do you remember about when that was?

A. 2002.

Q. At some point did you move to Parkway Gardens?

A. Yeah.

Q. Was there a specific reason why you moved to Parkway
Gardens?

A. That's where everybody was, yeah. Everybody from Low End
was on 63rd and, you know, you go where you know people.
Shit, I knew everybody on 63rd, and so that's where I went.

Q. Did you shooting Bowlegs have anything to do with you
going to Parkway?

A. I mean, yeah, part of it, yeah. Yeah. I mean, we used
our heads. If they keep coming through this block and tearing
it up, we not finna stand in front of these row houses, they
gonna have to come to the O, they gonna have to come in
Parkway to get us you know. You going to have to come through
them gates. So, yeah, we did. That's the truth.

Q. So I think you told us at the start that you moved to

Parkway in about 2006?  Does that sound about right?

A.  Yeah, '07.  Like, '06, '07, yeah.  I been at Parkway since 2002, though.  Since our buildings fell, that's where a quarter of our block went, a quarter of our block went through the Tookaville area and all that.  You know, the projects, they spread it out, it went everywhere.

Q.  What do you mean when you say you were over there in 2002?

A.  That's where the majority, like nice amount of people from our project moved to, like the low income into Parkway.

Q.  Were you back and forth or something?  I'm just trying --

A.  I was back and forth.  I was back and forth from Newtown. Like, I stayed in there in '06, but I was everywhere.  Like I ain't just staying there, because I was able to go to Gyro City to steal.  Even when I was in there, I was able to go to the other side with no problem.

Q.  So, again, just to make sure we're on the same page.  '06, '07 you're solidly in Parkway Gardens for at least a period of time?

A.  Yeah.

Q.  Okay.  Where were you staying when you went to Parkway? Like, did you have a lease?  Were you staying with someone?

A.  Yeah, I was staying with someone.  I was staying with a girl.

Q.  Okay.  And eventually you left in 2011?

A.  Yeah.

Q. Okay. So when you first got to Parkway Gardens, 2006, 2007, were there other Black Disciples in Parkway Gardens?

A. Yeah.

Q. Like a few, a lot? Was it all BDs? How was it?

A. It was a mix, like mix. You had some MCs, you had some GDs, you had some Stones. You had BDs, a lot of BDs, but it was mixed.

Q. At some point, did that change?

A. Yeah.

Q. When did that start to change?

A. Probably like '08, '09, when Shorty Freeman started popping up and shit.

Q. Okay. So who is Shorty Freeman?

A. He was the king, like one of the kings, one of the founders. He ain't no founder. He the king. He was the king.

Q. The king of what?

A. The BDs.

MS. BORMANN: Judge, can we have a sidebar, please?

THE COURT: Yes.

(Proceedings heard at sidebar:)

MS. BORMANN: Judge, what happened in 2006 and 2007 and who some fellow was that I don't even know who he was, he's not relevant to this case, all of this is not relevant to the charges here.

MR. JULIEN: Your Honor --

MS. BORMANN: Very remote.

MR. JULIEN: Him explaining how Parkway Gardens used to be mixed conglomeration of gangs and converted into being solidly BD, Black Disciple, I think that's what he said. Of course that's relevant.

THE COURT: I think it is relevant, because it's trying to explain how O-Block, under the government's theory -- I'm not making a finding that this is the case. But under the government's theory, they are trying to -- they are trying to prove that O-Block is an enterprise, and so the history of how that occurred under their theory is relevant.

(Proceedings heard in open court:)

BY MR. JULIEN:

Q. So we were talking about this guy you said was the king of the BDs.

A. Yeah.

Q. All right. So what happened in about '08, '09, to make Parkway become more solidly BD, as you were saying?

A. He was just riding around, you know. Like, the Calumet building got recode in like '04, '05, so all the structure was gone. Like it was just loose schools running around, you know. And he denounced his self in Stateville, 2000, early 2000, he denounced his self, say he's no longer, and then he threw Marvel under the bus. But he end up resurfacing in

Case: 1:21-cr-00618 Document #: 495 Filed: 01/31/24 Page 81 of 218 PageID #:10108
Wiley - direct by Julien
5760

Parkway and was trying to stand on it, you know.

Some people honored it, like, some people respected him. I didn't. Like a lot of people that I know didn't respect him or honor it.

Q. What do you mean when you say he showed up there and started trying to stand on it?

A. He showed up and, you know, "I'm the king," you know, shit like that. But it was over with, like, didn't nobody want to respect that. Like, some people respect it. Some people look up to people and not look at they self as leaders.

Like I always thought myself as -- the same thing as if I was in the streets, like, I thought I was Larry Hoover. I thought I was -- like, I think I'm the best, like, whatever I do. So I always thought myself bigger than what another person. Like, normally you have a flunky, but, no.

Q. So around this time when you said that it became more solidly Black Disciple, what were you all referring to Parkway Gardens as?

A. It was Parkway.

Q. At the time when you were living there, so from 2006, 2007, to -- into 2010 maybe early 2011, did anyone refer to it as O-Block?

A. No.

Q. Is that something that happened later?

A. That happened August of 2011.

Q. So now I want to come back to when you were still there. People called it Parkway. Have you heard of something called WiiiC City?

A. Yeah.

Q. What's that?

A. That was just like what they called they self, wild, insane, crazy, some shit. I thought it was WIC from the WIC office. When they said WiiiC, I'm thinking like Kabooms, Juicy Juice. I ain't know they was talking about, you know, none of that. I'm just keeping it real.

Q. Now, you said that when people started calling Parkway O-Block was August of 2011; is that right?

A. Yeah.

Q. Do you know where the name O-Block comes from?

A. Odee Perry. That was a good friend of mines, man. He was younger than me, but he was a good friend of mines. Like, he was a good friend, like stayed at my house when he ain't go home. Momma was a good lady, you know, so, yeah.

MR. JULIEN: Actually, can we publish, your Honor? I'm showing something that's admitted in evidence.

THE COURT: Yes.

BY MR. JULIEN:

Q. So I'm showing you what's been admitted as Government Exhibit 564. Do you know who that is?

A. Yes.

Q. Who is that?

A. It's Odee Perry.

Q. You said you knew him personally?

A. Yep.

Q. When did you first meet him?

A. Met Odee like '07. Yeah, like '07.

Q. Where did you meet him?

A. In Parkway.

Q. Was Odee someone who lived in Parkway?

A. Yeah.

Q. And what happened in August of 2011? It seemed like you were referring to something.

A. August of 2011, that's when he was killed.

Q. Was Mr. Perry someone who you say -- would say was from Parkway?

A. Yeah, he from Parkway. He from there.

Q. Did he live there when you were living there?

A. Yeah, yep. He lived there, and then he moved out. They moved, but, yeah, he was come -- still coming back.

Q. You said that what is now O-Block is named in honor of Mr. Perry?

A. Yep.

But he was smooth. He a smooth dude, Bro. He ain't like them. Like, he was a smooth -- like, he was smooth.

Q. Earlier --

MR. GREENBERG: Judge, can Michael Jordan be instructed to stop editorializing.

THE COURT: I guess I would say --

THE WITNESS: Thank you for calling me Michael Jordan. Mr. Miyagi next time.

THE COURT: Just so the government's going to keep asking questions. And just try, sir, and answer the question as best you can. Try and focus on the question and answer the question.

THE WITNESS: Yes, ma'am.

THE COURT: Okay.

BY MR. JULIEN:

Q. Mr. Wiley, earlier you referenced the other side where you moved. And I want to ask you -- I'm asking you about right now when you still lived in Parkway Gardens.

Was there some other side when you were there? So from 2006, '7, to 2011?

A. Was it a other side?

Q. Yeah.

A. Yeah, it was other side, but they wasn't into it.

Q. When did they become into it?

A. Ima say, like, 2010. Like, that was the -- when the shit started. Like, you couldn't go to school no more. All type of bullshit, like -- I seen all the kids drop out over there, like, all at once, like, nobody going to school, like. It

was, like, got serious. The raps, the -- everything got serious.

Q. And to be clear, when we say "the other side," what are we talking about?

A. Gyro, STL, the other side.

Q. Starting in about 2010, are you saying that Parkway, by whatever name it was called at that time, later O-Block and STL started to get into it?

A. Yeah, clashing high school, probably high school fights. Females. You know, a female always in the mix of some -- but, yeah.

Q. When you were in Parkway, kind of coming back --

MR. JULIEN: You can unpublish, your Honor. Thank you.

BY MR. JULIEN:

Q. Were you involved in any way with guns with respect to other Black Disciples?

A. Can you clarify that?

Q. Yeah. Did you gather guns? Did you buy guns? Did you do any of those things?

A. Oh, yeah.

Q. Was there one -- or is there one specific instance when you bought guns with other BDs?

A. A few.

Q. A few?

A.   Yeah, a few.

Q.   When was the first time you bought some guns with other Black Disciples?

A.   The time, you're saying?

Q.   Uh-huh.

A.   Like, shit, '06, '07.  Like, we was going to tell the old people.

Q.   Have you ever bought a crate of guns?

A.   Yeah.

Q.   Is there a specific instance when you bought a crate of guns?

A.   Yeah.

Q.   When was that?

A.   2 -- I can't remember the exact date.  It's been a long time.  But, yeah, we bought them.

Q.   Were you living in Parkway Gardens at that time?

A.   Yes.

Q.   Where did the money come from to buy this crate of guns?

A.   Pitching in.  People who got money.  Shit, from everywhere.

Q.   Who was pitching in?

A.   Everybody.  Like, everybody who -- who wanted some guns.  Like, who wanted some -- you know, who wanted to be protected.  Like, whether you were shooting it or not, shit, you was like the block need guns, you know.  Wasn't anybody going to give

Wiley - direct by Julien

5766

them to us, so everybody got to put up something, or, you know.

Q. Are we talking about other BDs?

A. Yeah.

Q. Where did the crate of guns come from?

A. Guy named George.

Q. And where is George?

A. Across the street.

Q. Were they across the street in a van? Were they across the -- like where were --

A. Across the street in a store.

Q. Okay. What kind of store?

A. A regular store. Food store, chips and pops and shit like that.

Q. They sold chips and pops and guns? Tell us --

A. I mean, I don't know if they were selling a lot of that, but I mean, that's where -- that's where we got them from. Like, I don't know if they was just, you know -- shit, that's where we met him.

Q. You all met them at the store?

A. Yeah.

Q. And bought the crate of guns and brought it back to Parkway?

A. No, we ain't take it back to Parkway.

Q. Where did you take them?

A. We take it back to the Low End.

Q. Where on the Low End?

A. We couldn't take it in Parkway, because, like -- it was like, tension with people up in Parkway. Like, they tend to get into it with somebody over some liquor, like some drunk stuff.

MS. DOMPH: Non-responsive to the question. Narrative.

THE COURT: So, sir, I'll just ask, again, try and listen to the question and try and answer that question.

It is a little different from a conversation just in normal -- normal outside the court. It's more -- any kind of testimony in court by anyone is always more -- it's more formal, and it's not like a conversation outside of court.

So just try and listen to the question and try and answer the question as best you can, please.

THE WITNESS: Okay.

BY MR. JULIEN:

Q. So I'm going to change gears a little bit.

Did you observe people having meetings when you were living in Parkway, so from '06, '07, to 2011?

A. I mean, meetings is just part of a gang. Meetings part of, like -- it's just part of the culture.

Q. What do you mean by that?

A. If you're in a gang, you got to have a meeting. How would

you know who the person who run the block or the lowest person on the tail pole?  Like, it's just --

MS. DOMPH:  Non-responsive, narrative.

THE COURT:  Okay.  Let's try again.

So just listen -- just try your best to answer -- or listen to the question the government's asking and try and focus on that question and try and answer it.

BY MR. JULIEN:

Q.  I just want to make sure I understood at least part of your answer.

Did you say that having meetings was a part of --

A.  Yeah, it's part of it, yeah.

MR. KLING:  Judge, objection, foundation.

THE COURT:  So you can ask more questions on foundation.  It's overruled, but ask -- please, go ahead and ask more questions on foundation.

BY MR. JULIEN:

Q.  When you were -- I'm just going to ask -- I'm coming back now to when you were in Newtown.  Did you have meetings when you lived in Newtown?

A.  Yeah.  You know, that was the projects.  This is way different.  It's way different than Parkway.  Like, you couldn't even compare, like, my buildings or any other buildings on Low End to Parkway.

MS. DOMPH:  Objection.

BY MR. JULIEN:

Q. Why is that?

MR. KLING: Judge, objection to the narrative.

MS. DOMPH: Non-responsive.

MS. GIACCHETTI: And irrelevant.

MS. DOMPH: Irrelevant.

THE COURT: So I'm going to overrule that.

Again, sir, I'll just ask you, try and focus on exactly what the government asked and try and answer that question, as best you can.

THE WITNESS: Yeah, I'm trying, but, you know, I have to -- you know, I ain't just like a yes man or no man. Like, I have to explain myself. Like, I have to explain it to him in the way -- I'm sorry.

BY MR. JULIEN:

Q. Let's try it this way: Based on what you said to me --

A. Yeah.

Q. -- would you say that it's true that you were aware of meetings when you were in Newtown?

A. Yeah.

Q. How many meetings did you attend when you were in Newtown?

MR. GREENBERG: Judge, again, I'm going to object to the relevancy of Newtown. We're talking about '98 again.

THE COURT: Overruled.

You can answer.

BY MR. JULIEN:

Q. You can answer.

A. Can you rephrase it? Because he -- I heard him cut you off, like.

Q. How many meetings did you attend when you were --

A. Several, sir, several.

Q. When you moved to Parkway Gardens, did you attend meetings there?

A. No.

Q. Did you see people going to meetings?

A. I mean, yeah, they had they own meetings, because that's they block. So, yeah, they had their own meetings, but I didn't attend.

Q. How did you know that people were having meetings?

A. I mean, when you're in the streets, in the trenches, man, like, certain words, it's time for a meeting.

MS. DOMPH: Objection.

MR. BARNETT: Your Honor, could we get a sidebar, please?

THE COURT: Yes.

(Proceedings heard at sidebar:)

MR. BARNETT: Your Honor, I don't object often, but he should not be commenting on objections properly made by defendant lawyers and disparaging those objections. That is not proper.

MR. GREENBERG: Plus, Judge, he said he didn't attend meetings, so how does he know what occurred at the meetings? I assume they took place behind closed doors.

MR. JULIEN: I don't know. That's why I asked him, how does he know that, and then there was an objection, which I think maybe it was a couple -- relating to something a couple answers ago.

MS. GIACCHETTI: This is the problem of not having foundation. He just said he assumed there's meetings because how else do you operate a gang? But he said he never was at a meeting. So he's not allowed to get up here and pontificate about how -- how you would have to run a gang. It's speculative.

We should move on from meetings. He wasn't on -- he didn't attend any meetings.

MR. JULIEN: Your Honor, he is answering how he knew before there was an objection.

MS. GIACCHETTI: He said, because how else would you run the gang. That's basically what he said.

THE COURT: He -- I think -- okay. He said that he did not attend meetings in Parkway Gardens, but then he did say that -- then he was asked, did you see people going to meetings? He said, I mean, yeah, they had their own meetings because that's their block. So, yeah, they had their own meetings, but I didn't attend.

Question: How did you know that people were having meetings?

He was answering: I mean, when you're in the streets, in the trenches, man, like certain words, it's time for a meeting.

So I think that particular line of questioning he just got cut off and was answering the question about how he knew that meetings were occurring. And so that I would overrule.

I understand there's been other prior objection to him commenting on the objection, which I agree he should not be doing. But this last objection was -- I am overruling that.

MR. BOYLE: I would also anticipate there would not be an additional question, well, what was discussed at those meetings.

MR. JULIEN: I know.

MR. BOYLE. I just wanted to say it.

MR. KLING: And, Judge, I'm going to add the additional thing, lack of personal knowledge, speculation, and hearsay.

THE COURT: But he has personal knowledge of hearing people going to meetings. And I would not consider -- he's being asked, how did you know that people were having meetings, so it's --

MR. KLING: Again, Judge, hearsay and lack of personal knowledge. He heard it from somebody else.

MS. BORMANN: Speculation.

MS. DOMPH: And him knowing it from the streets.

THE COURT: Well, but he's about to ask questions getting into all of this. So I'm overruling all of these objections.

(Proceedings heard in open court:)

BY MR. JULIEN:

Q. So, Mr. Wiley, I had asked you, how do you know that people were having meetings and you were answering.

Could you please answer that question?

A. In Parkway, right?

Q. Yes.

A. Just certain -- just certain, you know, certain -- certain language, certain terminology, you know, everybody to the back, check it out. Like, same words, you already know that, somebody messed up, violation, or, you know, they got to get it together. Something happened that wasn't supposed to happen.

Q. So what does everybody to the back, check it out, what would that mean?

A. Somebody did something. Whether you lost a weapon or you -- it could be anything. You could have hit a kid. You could have shot a kid or some shit like. You could have done

anything, you know.

MS. DOMPH: Objection, speculative.

THE COURT: Overruled.

BY MR. JULIEN:

Q. When you would hear phrases like "everybody to the back, check it out," would you see people dispersing?

A. Yeah, dispersing back there. Like, I wouldn't disperse back there, but, you know, they'll go -- you know they having a meeting. Like, when you're on the streets again, you know.

MR. KLING: And again, objection, foundation. When are we talking? He was there for five or six or seven years, Judge.

MR. JULIEN: Okay. I can --

THE COURT: You can ask questions about foundation.

BY MR. JULIEN:

Q. In 2006 or '7, were people saying "everybody to the back, check it out"?

A. Yeah.

MS. DOMPH: Objection, hearsay. Calls for hearsay, what people are saying.

MR. KLING: And who said it.

THE WITNESS: The person who had the authority to.

THE COURT: Overruled.

BY MR. JULIEN:

Q. In response to -- in 2006 or '7, somebody with authority

saying everybody to the back, check it out --

A.  Yeah.

Q.  -- did you see people dispersing?

A.  Yes.

Q.  Okay.  How about in 2008, was that still happening?

A.  No, it got looser.  It got loose, like, like every man for they self.  Like, it started getting loose.

Q.  What about in 2010 when you were about to leave?

A.  Oh, it was way loose.  It was way, like, loose canon. Everybody who had a gun thought they was the man, you know, anybody.

Q.  Were people giving orders back in 2010?

A.  No, not in 2010.  Nah, it wasn't no orders or none of that.  It was like loose.  It was like every man for they self.  You know, your crowd, whoever you hang with, that's who you ran with, like.  It was like that.

Q.  When Shorty Freeman was there, was he giving orders?

A.  I mean, he tried.  I will tell you he gave orders to people who would listen.

Q.  Did you see people selling drugs when you were living in Parkway Gardens?

A.  Did I see people selling drugs?  Probably some marijuana. That's it.

Q.  So similar question to what I asked you before about Newtown.  Based on what you saw and observed, so somebody from

STL, could they come over and sell drugs in Parkway during that time?

A.   Nah.   I mean, it was free enterprise for whoever come in there, but nobody from STL would be in Parkway hanging out. Like, that would never happen.

Q.   Did you see anybody other than BDs selling drugs in Parkway during that time?

A.   No.   If you was, you was paying somebody.   You know, if you ain't from there, you gonna pay -- you gotta to pay somebody.   You gotta come through somebody to pay somebody.

Q.   So I'm going to ask you some questions about some people you might have seen around that time when you were living in Parkway, or around Parkway.

     I'm showing you -- I'm going to show you two exhibits that are already admitted into evidence.

     MR. JULIEN:   May we publish, your Honor?

     THE COURT:   Yes.

BY MR. JULIEN:

Q.   I'm showing you what's admitted as Government Exhibit 547.

     Do you recognize the person depicted in Government Exhibit 547?

A.   Yeah.

Q.   Who is that?

A.   It's my little -- that was one of my little homies, man. Like, he's smooth, too.   He ain't what people be saying.

That's E-Dogg.

Q. How long have you known E-Dogg?

A. I knew E-Dogg -- well, they family from 35th, so we from the Low End, so I been knowing them before over there.

Q. Do you know him to ever hang out or live in Parkway?

A. Yeah. When I was around, he was hanging out, just normal kid. He was just a normal kid when I was over there. Like, was running around all them, they friends, Sheroid and them and all of them, like, they was just normal kids, man.

Q. People in Parkway?

A. Yeah.

Q. I'm going to show you another exhibit that's admitted in evidence. Government Exhibit 563.

Do you know the person who is depicted in Government Exhibit 563?

A. That's T. Roy.

Q. Is this someone you know?

A. Yeah. Know his whole family, before -- before Parkway, before that, before moving down there, I know him from Low End.

Q. Is this someone that you knew to be in Parkway, spending time there, living there?

A. Yeah, he lived there.

Q. During the time when you lived there?

A. Yep, same building.

Q. So someone you've seen in person?

A. Yeah.

Q. Someone you've spoken to before?

A. Yep.

Q. Is he still living?

A. No, he's deceased.

Q. And, I'm sorry, what did you say his name was? What did you refer to him as?

A. T. Roy.

Q. Do you know his real name?

A. James Johnson.

Q. Do some people refer to the person you just called T. Roy or James Johnson as Troy?

A. Yeah.

MR. JULIEN: May we unpublish, your Honor?

THE COURT: Yes.

BY MR. JULIEN:

Q. At the start you told this jury that you moved to the other side.

A. Yeah.

Q. And you were referring, I think you said, Gyro City and Tookaville?

A. Yeah.

Q. Is that STL?

A. Yeah. I mean, it's all the same. I mean, it's different

Case: 1:21-cr-00618 Document #: 495 Filed: 01/31/24 Page 100 of 218 PageID #:10127
Wiley - direct by Julien
5779

blocks, but it's all the same. It's all the same to me, like, shit, just street names. Don't nobody own nothing.

Q. When did you move to STL?

A. Well, I been over there. I been going on both sides, period. But I moved over there after I got into it with some guys from Parkway in 2010, the end of 2010.

Q. Why did you move over there?

A. A guy named RaRa got killed. And I wasn't even out -- I wasn't even a part of it, none of that. But, you know, since I didn't want to move, you know, when you probably ain't got nowhere else to go, I was willing to stay up in the Parkway, whereas my block had left. Like, all them who started this shit, and they ran. I stayed there. So eventually they started seeing me keep coming back and forth, and they had a problem with it, so I just went over there.

Q. Did you run into any sort of problems in STL, being that you were a BD?

A. No.

Q. Why not?

A. Like I said, the whole Low End over there. I never had a problem on no sides that I went on, because the Low End was over there. If I go somewhere -- the Low End, like they -- they everywhere, the Low End everywhere, so I don't be having problems.

Q. Again, I just want to make sure I better understand what

you mean when you say that the Low End is everywhere. What do you mean you say that?

A. The Low End, 22nd to 55th, State to the lake, the project buildings, when they got tore down, they moved south. They moved south. Like, most of the buildings moved south. Like, from the Low End to the hundreds, like most of the people from the project buildings.

Q. So based on the geography that you're describing to us, Parkway Gardens, what is STL, would not be a part of the Low End?

A. No.

Q. So people from the Low End moved south to places like Parkway Gardens and to STL?

A. Yeah. Or wherever you can move to. Whatever your voucher Section 8 low income, wherever you can move to.

Q. Did you get to know some people over at STL when you moved there?

A. I knew majority of them. Before I even went over there, I knew majority of them, they moms, because they from Low End.

MR. JULIEN: Your Honor, can we publish? I'm going to show some exhibits that are admitted.

THE COURT: Yes.

BY MR. JULIEN:

Q. Showing you what's admitted in evidence as Government Exhibit 500-3.

Do you know the person depicted in Government Exhibit 500-3?

A.   That's 3.

Q.   What do you mean when you say "that's 3"?

A.   That's Duck.

Q.   What's the reference to 3?

A.   Best rapper alive, man.  He was the best rapper.  You know, that was my homie love brother.  Man, like, the coolest dude.  One of the coolest, smoothest dudes, Bro.  Like, if a person just got to know him, man, they will know, like, he's just -- he a real person, Bro.  And that's why I'm here today, for him.

Q.   How long have you known Duck?

A.   I knew Duck damn near all his life, man.  We from the same -- only thing separate my block and his block is Cottage Grove, man.

Like, I know Brick.  When me and Brick got close in '06, like, we been locked in ever since, man.

MS. DOMPH:  Objection.

THE COURT:  Sustained.

So let's -- let's come back to --

THE WITNESS:  Duck.

THE COURT:  Let's just have the government ask the next question.

THE WITNESS:  Okay.

Case: 1:21-cr-00618 Document #: 495 Filed: 01/31/24 Page 103 of 218 PageID #:10130
Wiley - direct by Julien
5782

THE COURT: And then try and focus on the question.

THE WITNESS: Okay.

BY MR. JULIEN:

Q. Was Duck someone you saw when you moved to STL territory?

A. Yes, sir.

Q. Based on what you told us before, it sounds like you said you knew him before you moved to STL?

A. Yes, sir.

Q. All right. I'm going to show you another exhibit.

MR. JULIEN: May we actually unpublish for a moment, your Honor?

THE COURT: Yes.

MR. JULIEN: We can republish, please?

THE COURT: Okay.

BY MR. JULIEN:

Q. Now you're seeing what's admitted in evidence as Government Exhibit 558.

Do you know the person depicted in Government Exhibit 558?

A. Yes, sir.

Q. Who is this?

A. That's Butta, FBG Butta.

Q. How do you know this person?

A. I know his whole family. We from the same place on the Low End. We from 39th, all of us from 39th.

Case: 1:21-cr-00618 Document #: 495 Filed: 01/31/24 Page 104 of 218 PageID #:10131
Wiley - direct by Julien
5783

Q. Is this someone you saw when you went over to STL territory?

A. Yeah. That's why I ain't had no problems over there, because Butta and them was over there already. A lot of people was over there. Duck and them was over there, Brick and them, Trail. Like everybody was over there. They moms from the Low End, so I ain't have no problems.

But that's Butta.

MR. JULIEN: I'm going to show another already admitted exhibit, your Honor.

THE COURT: Okay.

BY MR. JULIEN:

Q. I'm showing you what's admitted in evidence as Government Exhibit 574.

Do you know who this person is?

A. I do, in fact, know who this person is. This is Gakirah Barnes, known as K.I.

Q. How do you know this person?

A. Actually, I was over her when she -- when she passed. When she took her last breath, smoke was coming out of her. I was standing over her.

Q. Is this someone who lived in STL territory?

A. Yes, sir.

Q. Is this someone you got to know when you were living in STL territory?

Wiley - direct by Julien

5784

A.   Yeah.  She was a kid, but, like, I ain't hang with --
like, they ain't hang with me, they was younger.  But, yeah,
you seeing them every day and you talking to them and, you
know, try to guide them the right way.

MR. JULIEN:  I'm going to show another already
admitted exhibit, your Honor.

BY MR. JULIEN:

Q.   Showing you what's admitted as Government Exhibit 568.

Do you recognize the people in this picture?

A.   Yeah, that's Butta and K.I.

MR. JULIEN:  I'm going to show one more already
admitted exhibit, your Honor.

BY MR. JULIEN:

Q.   Showing you what's admitted as Government Exhibit 569.

Do you recognize the person on the left in this
picture?

A.   Yes, sir.

Q.   Who is that?

A.   That's a person who I could really call a true friend.

Q.   Do you know that person's name?

A.   Yeah.  That's Jermaine Robinson, that's Brick.

Q.   And is Brick someone you knew before you moved into STL
territory?

A.   Yup.

Q.   Is that someone who you saw once you moved over in STL

Case: 1:21-cr-00618 Document #: 495 Filed: 01/31/24 Page 106 of 218 PageID #:10133
Wiley - direct by Julien
5785

territory?

A.  I was with him every day.  We was with each other, around each other every day, man.  Like, that's the -- that's the smoothest dude, protector, man.  Like, I loved Brick.

MS. DOMPH:  Objection.

MR. GREENBERG:  Judge --

THE COURT:  Sustained.

MR. JULIEN:  May we unpublish for a moment, your Honor?

THE COURT:  Yes.

BY MR. JULIEN:

Q.  I want to fast forward a couple years, Mr. Wiley.  And I want to ask you about August 4th, 2020.

At some point, did you learn that Duck had been murdered that day?

A.  Yes, sir.

Q.  And did you do anything in response to learning that Duck had been murdered that day?

A.  Yeah, later on.  Later on, after I felt the taunts and taunts and taunts and taunts and taunts and taunts.  So, yeah.

Q.  I'm sorry, I didn't hear what you said.

A.  Later on after the taunts, like, after they was taunting.

Q.  You said taunts, T-A-U-N-T-S?

A.  Yes.

Q.  What did you do after hearing or seeing some taunts?

A. I had called in, and they had called me back.

Q. When you say you "called in," who did you call?

A. To Kav, to talk to Kavner (phonetic), whatever. Whatever you want to say.

Q. Did you reach out to law enforcement?

A. Yeah.

Q. And without being specific, generally speaking, what was the nature of the reason why you were reaching out to law enforcement?

A. I'm a civilian. I look at myself as a civilian. And I ain't no gang member no more, so, you know. Just for Duck, man, like justice for him. It was foul, and I just felt like I had to do what I had to do.

Q. Did you indicate that you could provide information to law enforcement?

A. I mean, if they showed me -- like, if they showed me who it was, I can probably nine out of ten times tell you yes.

Q. I'm just asking --

A. Yes, sir.

Q. -- what you communicated, again, generally speaking, when you reached out and why you reached out?

A. Yes, sir.

Q. Was that the purpose of your reaching out?

A. Yes, sir.

Q. I want to change gears a little bit, Mr. Wiley, and ask

Case: 1:21-cr-00618 Document #: 495 Filed: 01/31/24 Page 108 of 218 PageID #:10135
Wiley - direct by Julien
5787

you whether you know some of the current -- who some of the current O-Block members are.  Okay?

A.  Okay.

Q.  Do you?  Do you know who some of them are?

A.  I mean, depends on who you talking about.  They wasn't there back then, like I probably ran across them, but I don't know 'em.

Q.  Okay.  Let's -- I'm showing you what's admitted in evidence as Government Exhibits 501, 503, 505-1, 505-2.

Do you recognize the person in those photos that I just showed you?

A.  Yeah, that's C Murda.

MR. JULIEN:  Your Honor, these are admitted in evidence.  I'd ask for permission to publish.

THE COURT:  Yes.

BY MR. JULIEN:

Q.  So 501, 503, 505-1 and 505-2, you said this is C Murda?

A.  Yeah.

Q.  How do you know who C Murda is?

A.  That's Sheroid big brother, man.  Sheroid was, like, one of the coolest dudes, like, ever.  That shit hurt me, too, when he got killed 'cause he was, like -- like he was like a pretty boy swag type of guy, you know, like around the females, got a female, and always -- always dressed proper -- always dressed neat, and, you know, shit like that, man.

Q. You're talking about someone named Sheroid?

A. Yeah, his brother.

MR. JULIEN: All right. Your Honor, I'm going to show another exhibit that's already admitted.

BY MR. JULIEN:

Q. Showing you what's admitted as Government Exhibit 562.

Do you recognize the person depicted in Exhibit 562?

A. Yes, sir. Long live Sheroid, man. He was respectful -- the most respectful person out of O-Block, man. He was the top one, respectful to everybody.

Q. Is Sheroid someone you knew in real life?

A. Yep.

Q. Coming back to C Murda, how long have you known C Murda or known who he is?

A. Met C Murda like in '08, '09, some shit like that. He was in jail, just got out of jail or some shit -- some stuff. I'm sorry.

Q. Do you know who his father is?

A. Yeah, his father right there at Cook County Jail commissary.

Q. Have you ever seen C Murda inside of Parkway Gardens?

A. Yeah.

Q. How many times?

A. A few when I see seen him. Yeah, a few times.

Q. And I apologize if you said this. Do you know C Murda's

real name?

A.  Charles.

Q.  Do you know his last name?

A.  Yeah, Liggins.

Q.  Is Charles Liggins or C Murda someone you see here in the courtroom today?

A.  Shit, they all look different now.  I mean -- oh, he back there behind -- behind the guy back there.

Q.  Would you mind describing -- so you've pointed to back there -- just describing an article of clothing that he's wearing?

A.  By the TV, right by the TV.

Q.  What color shirt is he wearing?

A.  A white shirt.

Q.  You said by the TV?

A.  Yeah.

Q.  So in the corner of the room?

A.  Yeah.

MR. JULIEN:  Okay.  Let the record reflect that Mr. Wiley has identified --

MS. GIACCHETTI:  Sorry, objection.

Can we have a sidebar?

THE COURT:  Yeah.

(Proceedings heard at sidebar:)

MS. GIACCHETTI:  I understood our procedure was not

to ask the judge to do anything in relationship to identifications, that you were just going to do it.

MR. JULIEN: Yeah.

MS. GIACCHETTI: We spent a huge amount of time on that.

MR. JULIEN: That's what -- I was not asking. I just said let the record reflect, and I was moving on.

THE COURT: Yeah, I -- I wasn't planning to respond to it. And I -- I guess in terms of the way the government says it, I don't see a problem with "let the record reflect." I just don't plan to respond to it in any way.

MS. GIACCHETTI: Okay.

THE COURT: I mean, if you could -- is there a different way that you would --

MS. GIACCHETTI: No, Judge, I just want to make sure that they're not --

THE COURT: Okay.

MR. JULIEN: How about, to make sure there's no issue with anyone else, I'll just say "the record will reflect," and move on. Would that be --

MS. GIACCHETTI: That makes more sense, yes.

THE COURT: Okay.

MR. BOYLE: Judge, since we're on sidebar, I just want to take advantage of this. It might be somewhat preemptive.

I don't know if Mr. Julien was going to use the mugshots of my client with this witness. They're not -- have not been admitted into evidence.

I would renew my objection. This was a subject of a pretrial motion. Now that your -- which is always somewhat abstract at that stage.

Now your Honor has actually seen the procedure the government is using, showing multiple mugshots, and then having the witness actually identify the individual in court. And the only -- as you know, mugshots are disfavored. The justification -- the only justification the government has used to get those in was this idea that identity is hotly contested.

That is not being contested by Mr. Turpin. And that the idea that these mugshots were closer in time to the events of August 4th, 2020, that also is not accurate because you know the mugshots of Mr. Turpin were taken much later.

There will be a video shown of Mr. Turpin that was made on August 4th, 2020. We are not disputing that that is Mr. Turpin.

So for all of those reasons, the government should not be allowed to show any pictures, any mugshots of Mr. Turpin to any witness. And if the witness wants to, under oath, make some kind of in-court identification, he can do that, and we'll cross-examine it. But there is absolutely no

justification for the use of mugshots of Mr. Turpin.

MR. JULIEN:  Your Honor, we can short circuit through this.  I think I've indicated a couple times that I don't intend to ask this witness anything about Mr. Turpin.  So I'm not showing him a picture of Mr. Turpin.

However, just in the interests of time, I don't know that we need to take this up right now because we may show people who we do intend to ask questions about Turpin, mugshots or pictures of Mr. Turpin, just in the same way that we've shown of other people.

But I'm not going to ask this witness anything about Mr. Turpin.

MR. BOYLE:  That's fine, Judge.

And I appreciate that representation.

And then I guess I'd prefer you not have to make that evidentiary ruling on the fly.  Just wanted to flag it.

THE COURT:  Okay.  All right.  Thank you.

MR. BARNETT:  I do have something also, your Honor.  I know that's what's coming up is going to be some IDs.  I'm assuming they are going to be some IDs of my client.

I don't have any problem with the pictures.  I don't have any problem with the ID, if he can make it, but I've read that he made an offhand comment that's highly disparaging of Mr. Smart.  It's total hearsay.  I don't think that Mr. Julien is going to ask that, but the way this man's testifying, he

can make an offhand, loose remark that would be extremely prejudicial.

And I'm asking that somehow -- I'm fronting it, because I don't want it to happen and cause serious problems. I think Mr. Julien probably knows.

MR. JULIEN: I don't. I'm unaware.

MR. BARNETT: Well, he called him a name, a very disparaging characterization, in one of the 302s that I read. And I don't know if he's going to describe him in that fashion. And it would be almost mistrial if he did. I don't want a mistrial. I don't want it happening, so I'm talking about it now.

MR. JULIEN: Would you mind -- we can step away from the microphone and me and Mr. Barnett just have a moment, and he can tell me what it is?

MR. BARNETT: That would be fine.

THE COURT: That sounds good.

(Counsel conferring.)

MR. JULIEN: I was unaware of the remark, and so here's what I think we probably should do: I'm getting close to where he's going to start -- I'm going to start showing him pictures of Marcus Smart, and Mr. Barnett does not have an issue with me instructing the witness not to say it.

But it may just be, when I get to that point we have to take the lunch break early so that I can have the

Wiley - direct by Julien

conversation with him and say, don't say this.

I don't know if any other defense attorney has --

MS. BORMANN: I'm sorry, we missed the remark, so I can't tell you.

MS. GIACCHETTI: Are you past Mr. Liggins at this point?

MR. JULIEN: When we come back, I'm going to rephrase, the record will reflect that Mr. Wiley has identified Mr. Liggins, and we're going to move on.

But we're inching towards -- do you got any issue with me saying what it is?

MR. BARNETT: Yes.

MR. JULIEN: You do have an issue?

MR. BARNETT: I do. I mean, of course --

MR. JULIEN: No, do you have an issue with me saying right now what it is, at sidebar?

MS. GIACCHETTI: So that the other defense lawyers know what we're talking about.

MR. BARNETT: Oh, no, no, no.

MR. JULIEN: So apparently Mr. Wiley referred to Mr. Smart as a serial killer, and I'm not intending to elicit that. I want to instruct him not to say that. And so I just need time to instruct him not to say that.

MS. BORMANN: We have no objection to that.

MR. BARNETT: And that's fine. That's fine.

MR. GREENBERG: Was the witness there for each of the killings? I'm just wondering.

MR. SPIELFOGEL: Your Honor, one other matter, just so that we don't have to take another break. Mr. Julien and actually Mr. Hennessy and defense for Mr. Thomas have had numerous conversations.

And I know that Mr. Julien is not going to ask him any questions about Christopher Thomas. He's not going to show him any photographs. There's not going to be any identification. We appreciate him telling us that numerous times. And I just want to put that on the record. And I'm sure he will acknowledge that.

MR. JULIEN: Yes.

THE COURT: Okay. Any other issues to raise while we're on the sidebar?

Okay. Sounds like we've covered everything.

So then we will take a break at a good stopping point to allow you to instruct the witness, as we discussed.

MR. JULIEN: Thank you.

THE COURT: Thanks.

(Proceedings heard in open court:)

MR. JULIEN: The record will reflect that Mr. Wiley has identified Defendant Charles Liggins.

BY MR. JULIEN:

Q. Mr. Wiley, I'm going to show you two pictures that have

already been admitted in evidence, Government Exhibit 507 and Government Exhibit 509.

Do you recognize the person depicted in Government Exhibits 507 and 509?

A.  That's Kenny Mac.

Q.  How do you know that's Kenny Mac?

A.  He was in jail with me.  He was my cellie.

Q.  How long have you known Kenny Mac?

A.  Since 2014.

Q.  How long were you the two of you cellmates?

A.  For months.  Like two, three months.  We's in there for months, that's all I'm going to say.  It's been a long time. I done had many cellies.

Q.  And during that period of time, would you see each other every day?

A.  Yeah, yes.

Q.  Do you know his real name?

A.  Kenneth Roberson.

Q.  With respect to Mr. Roberson, when you met him or became associated with him in 2014, was he living in Parkway Gardens at that time?

A.  No, he's not from Parkway.

Q.  Do you see Mr. Roberson in the courtroom today?

A.  Front row, white shirt.

Q.  And generally speaking, where, on the side closest to this

wall --

A. Right here.

Q. -- or the side closest to the door?

A. In the middle.

MR. JULIEN: The record will reflect that the witness has identified Defendant Kenneth Roberson.

BY MR. JULIEN:

Q. I'm going to show you a couple more pictures that have been admitted into evidence.

I'm showing you what's admitted as Government Exhibit 512, 514, 515-1, 515-2 and 515-3.

Do you recognize the person depicted in Government Exhibits 512, 514 and 515-1 through 3?

A. Yes.

Q. Who do you recognize that person to be?

A. That's Los.

Q. Do you know Los's real name?

A. Tacarlos.

Q. How long have you known who Los is or known Los?

A. I known Los since I been in Parkway, since I moved in there. Like, Los, T. Roy, I knew all them. Them the first people I probably met, was them.

Q. So it's someone you've seen in Parkway Gardens before?

A. Yeah.

Q. You ever have a conversation before with --

Wiley - direct by Julien

5798

A.   Yeah, many of them.  He only -- just go ahead.

Q.   Do you remember whether you spoke to Tacarlos, or Los, on or about August 4th, 2020?

A.   Yes.  Before it, yes, yep.

Q.   Under what circumstances?

A.   Just what's up, like, on the phone.

Q.   And was this, like, a voice call?

A.   Yeah, FaceTime.

Q.   You saw his face on August 4th?

A.   Yeah, it was FaceTime.

Q.   Did you call him or were you talking to somebody --

A.   Talking to somebody else and he came past that what's the name.

Q.   He came past what?

A.   Came past the screen.  You know how you ain't been somewhere in a long time, you see somebody, you be like, oh, man, that's Los, put him on the phone, you know, shit like that -- something like that.

Q.   Do you see Tacarlos, or Los, sitting in the courtroom?

A.   Los is in the back.  He in the back, way in the back.

Q.   Could you describe something that he's wearing?

A.   He got his hair in a bun.  He got his hair wrapped up on top.

Q.   What color shirt is he wearing?

A.   Look like a gray and black one.

MR. JULIEN: The record will reflect that the witness has identified Defendant Tacarlos Offerd.

Your Honor, right now is -- I'm about to get into that thing we talked about.

THE COURT: Okay. We're going to take a lunch break at this point. We'll come back at -- in about an hour. So that would be around 1:20.

Reminder to the jury, please don't discuss, research or read news about the case.

Reminder to the witness, sir, you are on the stand, so, please, during the lunch break, do not discuss your testimony with anyone.

All right. Thank you, everyone.

(Jury exits courtroom.)

(Witness exits courtroom)

THE COURT: Okay. Anything to discuss?

MR. JULIEN: Not from the government.

THE COURT: All right. I'm not hearing anything, so we'll be back at 1:20. Thanks.

(Court adjourned, to reconvene at 1:20 p.m.)

5800

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, )
                       )
          Plaintiff, )
                       )
-vs-                  ) Case No. 21 CR 618
                       )
CHARLES LIGGINS, KENNETH    ) Chicago, Illinois
ROBERSON, TACARLOS OFFERD,   ) November 30, 2023
CHRISTOPHER THOMAS, MARCUS   ) 1:27 p.m.
SMART and RALPH TURPIN,      )
                       )
         Defendants. )

VOLUME 27
TRANSCRIPT OF PROCEEDINGS - TRIAL
BEFORE THE HONORABLE MARTHA M. PACOLD AND A JURY

APPEARANCES:

| | |
|---|---|
| For the Government: | MR. JASON A. JULIEN |
| | MR. SEAN HENNESSY |
| | MS. ANN MARIE E. URSINI |
| | MS. CAITLIN S. WALGAMUTH |
| | Assistant U.S. Attorneys |
| | 219 S. Dearborn Street |
| | Chicago, IL 60604 |
| | (312) 353-3500 |
| | jason.julien@usdoj.gov |
| | sean.hennessy@usdoj.gov |
| | annmarie.ursini@usdoj.gov |
| | caitlin.walgamuth@usdoj.gov |
| For Defendant Liggins: | MS. CYNTHIA LOUISE GIACCHETTI |
| | Law Office of Cynthia Giacchetti |
| | 53 West Jackson, Suite 1035 |
| | Chicago, IL 60604 |
| | (312) 939-6440 |
| | Cg@cgdefense.com |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

PROCEEDINGS REPORTED BY CERTIFIED STENOGRAPHER
TRANSCRIPT PRODUCED WITH A COMPUTER

5801

APPEARANCES:   (Continued)

For Defendant
Liggins:                    MR. GREGORY T. MITCHELL
                           Law Office of Gregory T. Mitchell
                           19150 Kedzie Avenue, Suite 205
                           Homewood, IL 60430
                           (708) 799-9325
                           Mitchlaw00@sbcglobal.net

For Defendant
Roberson:                  MR. STEVEN GREENBERG
                           Greenberg Trial Lawyers
                           53 West Jackson, Suite 315
                           Chicago, IL 60604-6060
                           (312) 879-9500
                           Steve@greenbergcd.com

                           MS. CHERYL T. BORMANN
                           Cheryl Bormann
                           53 West Jackson, Suite 315
                           Chicago, IL 60604-6060
                           (312) 588-5011
                           Cheryl.t.bormann@gmail.com

For Defendant Offerd:      MR. JOHN SOMERVILLE
                           9924 S. Walden Parkway
                           Chicago, IL 60643-1702
                           (773) 505-1706
                           Jville62@gmail.com

                           MR. RICHARD S. KLING
                           Chicago-Kent Law Offices
                           565 W. Adams, 6th Floor
                           Chicago, IL 60661
                           (312) 906-5075
                           Rkling@kentlaw.iit.edu

For Defendant
Thomas:                    MS. ELLEN R. DOMPH
                           Law Offices of Ellen R. Domph
                           53 West Jackson, Suite 1544
                           Chicago, IL 60604
                           (312) 922-2525
                           Edomph@gmail.com

                           MR. KEITH ALLAN SPIELFOGEL
                           190 S. LaSalle Street, Suite 540
                           Chicago, IL 60603
                           (312) 236-6021
                           Spielfogel@sbcglobal.net

5802

APPEARANCES: (Continued)

For Defendant
Smart:                    MR. MARC M. BARNETT
                          Law Offices of Marc M. Barnett
                          53 West Jackson, Suite 1442
                          Chicago, IL 60604
                          (312) 217-5019
                          Barnett.marc163@gmail.com


For Defendant
Turpin:                   MR. PATRICK EAMON BOYLE
                          Law Offices of Patrick E. Boyle
                          155 North Michigan Avenue, Suite 562
                          Chicago, IL 60601
                          (312) 565-2888
                          Privpat3@hotmail.com

                          MR. JOSHUA B. ADAMS
                          Law Offices of Joshua B. Adams, PC
                          900 W. Jackson Blvd., Suite 7 East
                          Chicago, IL 60607
                          (312) 566-9173
                          Josh@adamsdefenselaw.com

Also Present:             Ms. Christine Case, FBI
                          Mr. Domonique Dixon, FBI




Court Reporter:

          KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                   Official Court Reporter
                 United States District Court
          219 South Dearborn Street, Suite 2328A
                   Chicago, Illinois  60604
                 Telephone:  (312) 435-5569
            Kathleen_Fennell@ilnd.uscourts.gov

5803

(Proceedings heard in open court; jury out:)

THE COURT: Do we need to go on the sidebar? Okay.

(Proceedings had at sidebar:)

MR. JULIEN: The witness is just having a bit of an unspecified medical issue at the moment. So, when I went in to admonish him about the things we talked about maybe ten minutes ago, he indicated he was having some spasms and, as he was sitting up there on the stand, motioned to one of the law enforcement officers escorting him that it was -- that it started up again and was continuing. So, they took him out to see if they can get that under control.

THE COURT: Okay.

(Brief pause.)

MR. KLING: Judge, just as an aside, by the way, I talked to the government. They will make copies of all the new material, and they will have it over to all defendants at the MCC by tomorrow morning. I wanted to make sure they got them, as well.

THE COURT: Okay. Thank you very much.

(Brief pause.)

MR. JULIEN: I think we're ready, your Honor.

(Brief pause.)

THE COURT: All right. Good afternoon, everyone.

THE WITNESS: Good afternoon.

THE COURT: Ready to resume with the jury?

MR. JULIEN:  We are.

THE COURT:  Okay.

(Jury enters courtroom.)

THE COURT:  Thanks, everyone.  We're about to resume with the testimony.

I just have one quick matter for the lawyers.  Could we just go on the sidebar, please.

(Proceedings had at sidebar:)

THE COURT:  I got an e-mail just now from the public information officer just asking -- forwarding a request from the Sun-Times -- or an inquiry from the Sun-Times just asking whether there are any restrictions on courtroom artists and who they can draw because they are trying to bring in someone to draw a witness today.

I am not aware of any restrictions like that, but I wanted to check before I respond.

MR. JULIEN:  There are none.  Sometimes when there are, we would have them in the order that your Honor entered at the start of this for procedures for the trial.  And, so, there are no restrictions at this point.

MS. GIACCHETTI:  Should we think about whether they should be -- the jury?  I mean, we have an anonymous jury.

MR. GREENBERG:  They don't draw the jurors, Cindy.

MS. GIACCHETTI:  Are they --

MR. GREENBERG:  It's just a matter of policy.  They

5805

don't draw the jurors' faces.

MS. GIACCHETTI: All right. I didn't realize that.

THE COURT: I mean, I could remind them of that since there is an anonymous jury.

MR. JULIEN: I think that would be helpful to do that.

MR. GREENBERG: They never do it, Judge.

MR. JULIEN: I think he's right. They don't. I think an admonishment would be helpful.

I also think -- and, again, I'd just request permission from the defense lawyers to do this. I think it would be helpful to give the witness a heads-up to the extent that's going to start happening because he hasn't seen it happening before and may observe what's happening in the room as it begins to happen.

MR. GREENBERG: So, we would have an absolute objection to that, Judge. It's a public courtroom. They can do what -- they've been doing it forever. It's not like he's going to be on TV. And this is the Michael Jordan of YouTube. So, I find it difficult to believe that he would actually object.

MR. SPIELFOGEL: He'll be thrilled they're --

MS. GIACCHETTI: He'll buy one.

MR. JULIEN: Your Honor, it's not going to be a problem. It's not like he's going to have a choice in the

5806

matter either. It is a public courtroom. It's just that it has not been happening. So, I just, as a matter of awareness, would like to point -- and it doesn't have to be me. Someone can just say to him, this request has been made; it may happen, it may not; but just be mindful that it may happen.

THE COURT: I think since it is a public courtroom, it can just happen generally. So, I think what I'll do is we won't address it with the witness. I will just -- I'll respond to the inquiry that there are no restrictions on the sketch artists, but just a reminder, please don't draw the jury and that's it.

MR. SPIELFOGEL: That's fine, Judge.

THE COURT: Thanks.

(Proceedings had in open court:)

THE COURT: Sorry. Just one second.

(Brief pause.)

THE WITNESS: Excuse me. Your Honor?

THE COURT: Yes, sir.

THE WITNESS: I'm sorry. Can they sidebar with some heat? Because I'm catching spasms up here. Sorry, but the air is nifty.

THE COURT: I'll look into that.

At this point, let's proceed with the questioning --

THE WITNESS: Okay. I was just asking.

THE COURT: -- and I'll check.

You may proceed.

MR. JULIEN:  Thank you, your Honor.

MARTELL WILEY, GOVERNMENT WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION (Resumed)

BY MR. JULIEN:

Q.  Mr. Wiley, I'm going to show you a couple more pictures.

MR. JULIEN:  And these four have also been admitted into evidence.  May I publish, your Honor, or may we publish?

THE COURT:  Yes.

BY MR. JULIEN:

Q.  I'm showing you what's been admitted as Government Exhibit 526, 528-1, 528-2, and 528-3.

Coming back to Government Exhibit 526, do you recognize the person or persons depicted in Government Exhibits 526, '28-1, '28-2 -- 528-2 -- and 528-3?

A.  That's Muwop.

Q.  How do you know who Muwop is?

A.  I know of him.  I don't know him.  Like I know of him.  I seen -- seen him.  But I don't know him.  I don't know him.

Q.  You don't have a personal relationship with him?

A.  Yeah, I don't have a personal relationship.

Q.  Have you ever seen him in person?

A.  Yeah.

Q.  When was the last time you think you saw him?

A.  Years.  Like he probably was a kid.  Like he probably was

younger than what he is now.  He way younger than what he is now.

Q.  Where was the last time you saw him?

A.  Probably 63rd, like marching up 63rd or, you know, just being like a kid like with the rest out what they do, interact with each other.

Q.  Would you mind turning the mike again closer to you?

A.  Yeah.

Q.  You said marching down 63rd?

A.  Yeah.  Like marching down 63rd.  You know how people be deep, how they -- little crowds?  Well, you don't know how they be.  But they -- you know, you get deep with your homies and then you just march, like you march --

MR. KLING:  Objection to the narrative and volunteered information.

THE COURT:  So, why don't you ask the next question.

BY MR. JULIEN:

Q.  Do you see the person you -- by the way, do you know his real name?

A.  Marcus, I think.  Yeah.

Q.  Do you see the person you know as Marcus or Muwop here in the courtroom?

A.  You know what?  I don't see him.  I don't see him.

Q.  Don't see him?  Okay.

MR. JULIEN:  May we unpublish?

THE COURT: Yes.

BY MR. JULIEN:

Q. I'm going to show you now what has been admitted into evidence as Government Exhibit 2000.

MR. JULIEN: May we republish, your Honor?

THE COURT: Yes.

BY MR. JULIEN:

Q. And I'm going to play this -- I'm not going to play the entire thing, but I'm going to play portions of it and I'll pause it, and at times I may ask you some questions, okay?

A. Yep.

(Video played.)

MR. JULIEN: Pause Government Exhibit 2000 at the 20-second mark.

BY MR. JULIEN:

Q. Can you tell the jury, what are we looking at where I have Government Exhibit 2000 paused, generally speaking?

A. You looking at inside of Parkway O-Block. It's on the back. It's the -- I mean, it's like what you call the first lot, second lot, or third lot. It's by lots.

Q. Okay.

You say it's by lots?

A. They call it by lots. You label it by lots. First lot, second lot, third lot.

Q. And this is Parkway Gardens?

Case: 1:21-cr-00618 Document #: 495 Filed: 01/31/24 Page 131 of 218 PageID #:10158
Wiley - direct by Julien
5810

A.   Yeah.

MR. JULIEN:   I'm going to resume playing Government Exhibit 2000 from the 20 second mark.

(Video played.)

MR. JULIEN:   Pause Government Exhibit 2000 at the 1 minute and 5 second mark.

BY MR. JULIEN:

Q.   Do you see anyone you recognize on the screen at this part of Government Exhibit 2000?

A.   That's Tacarlos.

Q.   You said what now?

A.   That's Los.

Q.   Where do you see Los on the screen?

A.   By the black car.  Got out of the black car.

Q.   So, this screen in front of you is a touch screen.  Do me a favor.  Can you take your finger and just mark on the screen somehow where you see -- okay, you've just drawn a circle in yellow at the bottom right portion of the screen?

A.   Yep.

Q.   That's Los?

A.   Yep.

MR. JULIEN:   I am going to resume playing Government Exhibit 2000.

(Video played.)

MR. JULIEN:   Pause Government Exhibit 2000 at the 2

minute, 49 second mark.

BY MR. JULIEN:

Q. Do you recognize anyone on the screen right now at the 2 minute, 49 second mark?

A. Yes.

Q. Who is that? You just drew a circle in yellow on the left side of the screen.

A. That's Muwop.

MR. BARNETT: Your Honor, could we go to sidebar, please?

THE COURT: Yes.

(Proceedings had at sidebar:)

MR. BARNETT: I'm having a bit of a problem to understand how he can identify that person if he can't identify the person in the courtroom and he says he didn't know him. That would have been a motion I would have made before this trial had I known that he said, I don't know him and I only knew him in the sixth grade.

That is so prejudicial to this jury that I'm asking you to instruct the jury that that identification is improper. It's totally improper. On what basis could he say that? I can't tell it's him. I can't tell it's him based on what I just saw. And now he's going to name him and he says he doesn't know him and he didn't know him -- and the last time he saw him was in the sixth grade?

And, so, this is just way too far, Judge. And had I known this -- I did make the motion to not admit his -- and you overruled -- you didn't sustain it because he said he knew him. But now he's saying he doesn't -- he knew him in the sixth grade and can't identify him in the courtroom. How is he doing this?

This is just way of an overreach. And I'm asking you to instruct the jury that the identification is improper. Had I known this and you known this originally, you would not have permitted it. I know you wouldn't have.

MR. JULIEN: I think we all knew it, your Honor. This was brought out after he made the YouTube video, and we talked about it. And there was a motion to reconsider your prior ruling. And you found that this identification and how long he's known Mr. Smart and how long it's been since he's seen him in person goes to the weight of that evidence, not as to its admissibility. He acknowledged it's been a long time, but he's seen him in person.

I point out, though, that the person who is Marcus Smart sitting in the courtroom right now looks very different than the person who's Marcus Smart in 2020 and 2021 in those pictures that were introduced in the evidence.

MR. BARNETT: Judge --

MR. JULIEN: Hang on.

MR. BARNETT: Okay.

Wiley - direct by Julien

5813

MR. JULIEN: And Mr. Wiley identified that person from the relevant time frame, pictures of Mr. Smart from before and after or around the time this -- of this occurrence. And, so, it goes to the weight, your Honor.

The person in the pictures, the person who he said he knew, was Marcus Smart. He just identified Marcus Smart on the video.

MR. BARNETT: Your Honor, we know that the basis of your ruling was personal knowledge. And he said, I've known him since the sixth grade. And in my motion, I said just knowing him since the sixth grade doesn't mean he's known him all through. He is not making this identification based on any knowledge of Marcus Smart. He's making it off the picture. Okay? Because he doesn't -- he said he didn't know him.

At this point, we can renew motions. I'm renewing it. It goes against everything you ruled on. Everything you ruled on. He does not know this man. Okay? And knowing him from -- he even says it on the stand that he doesn't know him since the -- I don't know what he looks like; I knew him when he was in the sixth grade when he was a kid. And now that's good enough?

That's overreach. That's not at all admissible. And the jury should be instructed as to the same, period. This is not a proper identification, based on your Honor's own

5814

understanding of personal knowledge of the person. He is basing this on the picture of Muwop, period. That's it. And based on all your other rulings, this would have not been permitted.

MR. JULIEN: That just wasn't the testimony, your Honor.

THE COURT: Okay. I'm going to overrule the objection. So, Rule 701 provides that a witness who is not an expert may offer an opinion when it is, A, rationally based on the witness' perception; B, helpful to clearly understanding the witness' testimony or to determining a fact in issue; and, C, not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

A lay witness is generally allowed to testify about the identity of a person in a surveillance photograph or video if there is a basis for concluding that the witness is more likely to correctly identify the defendant from the photograph or video than is the jury. *United States vs. Jett*, 908 F.3d 252, 271. Seventh Circuit 2018.

The requirement that the lay opinion be based on the perception of the witness imports into Rule 701 the personal knowledge standard of Rule 602 under *Mendiola*. 707 F.3d at 741.

I think -- and, also, witnesses may match a defendant to surveillance footage if the witness is better situated than

Wiley - direct by Julien

5815

the jury to identify the defendant correctly. See *Tinsley*, 62 F.4th at 386; *Mendiola*, 707 F.3d at 742; *Jackman*, 48 F.3d at 4 to 5, which says that lay opinion testimony identifying a defendant from surveillance photographs is admissible at least when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess, and when the photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no better suited than the jury to make the identification.

Here, the challenge is that the witness is not sufficiently familiar with the defendant. It's not so much about the quality of the photo or video -- or really the video that's here.

MR. BARNETT: Certainly, the -- I would certainly claim that the quality of the video is part of this -- part of my objection, clearly.

THE COURT: Okay. Well, I will consider it to be part of the objection, as well, then.

But I think on both of those fronts, the -- so, the issue is whether he's basically testified to sufficient familiarity with Mr. Smart to be able to have any better basis to identify him than the jury. So, is he in a better position to identify him than the jury based on his personal knowledge of Mr. Smart? And, then, there's also a question about the quality of the video.

Wiley - direct by Julien

5816

So, he did say here today that he does not know him in the sense that he doesn't have a relationship with him. He also said that he knew him when he was much younger, in around the sixth grade. So, that's a while ago. It's very true that between the sixth grade and now, of course, Mr. Smart's appearance would have changed. At the same time, the standard of personal knowledge is -- for purposes of Rule 602 and 701 is fairly low.

So, under -- and I know this is out of circuit, but *United States vs. Bush*, 405 F.3d 909 at 916, Tenth Circuit, 2005, says courts have been liberal in determining the extent of perception required to satisfy the first requirement of Rule 701 and have preferred to leave to juries any assessment of the weight to be given to such testimony when there exists questions regarding the quantity or quality of perception.

I understand that in certain cases from the Seventh Circuit when a law enforcement officer tries to identify someone based off of photos based on only brief, fleeting interactions with them, that is not enough. But I think that there is some difference between -- you've got to also look at the context in which someone has known someone. Seeing someone briefly as an agent is different from seeing someone in, quote-unquote, real life separate from any investigation. And although it is long ago, that to me, it crosses the low threshold of personal knowledge and becomes a matter of weight

for the jury.

MR. BARNETT: Just to be clear so I can get the record straight, this witness said, I don't know him, I have not seen him since the sixth grade, cannot identify him in the courtroom; and he is able to see a video that is absolutely impossible to determine -- you can't see his face, you can't see anything, and that's better than the jury's ability to see the video?

In other words, that -- this witness is helping the jury? In what way other than to give his opinion? In what way? I don't understand that.

THE COURT: Because I think the way that -- in terms of the quality of the video -- so, the Jackman case, which is the First Circuit case, held that lay opinion testimony identifying a defendant from surveillance photos is admissible at least when the witness possessed sufficiently relevant familiarity with the defendant that the jury cannot also possess, and when the photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no better suited than the jury to make the identification.

And I think with a number of points in this video, it falls directly within that type of video. It's not either so unmistakably clear or so hopelessly obscure that the witness is no better suited than the jury to make the identification. It's falling in kind of this middle ground where things such

Wiley - direct by Julien

5818

as, you know, build or gait or things of that nature, separate and apart from someone's face, can be helpful to the jury.

Now, I understand his -- you know, you could say, okay, well, build and gait may differ from someone having seen them back in sixth grade to now. I think it's -- that's sort of -- that's one of these fact questions that's then up to the jury. So, I think it crosses the minimum threshold of personal knowledge. It's perhaps, you know -- the line I was drawing before was if someone has literally never set eyes on this person in their life in real life as opposed to a photo, then they're not better positioned to identify someone from a photo. But this is different. He has set eyes on him. He doesn't have a relationship with him. But that's not necessary. It's --

MR. BARNETT: Well, Judge --

THE COURT: -- seeing him in real life.

MR. BARNETT: Judge, really, suppose he saw him in the third grade. Is that good enough?

THE COURT: I mean --

MR. BARNETT: What --

THE COURT: -- I don't know, but that's not what we have here. We have sixth grade, which is old enough where you could argue some of --

MR. BARNETT: Ten years old?

THE COURT: I mean, you can argue there's enough

similarities. I understand there's -- you know, it's arguable.

MR. BARNETT: All he said is that's Muwop. That's all he said. That's Muwop.

THE COURT: Right.

MR. BARNETT: That's it. Based on nothing.

THE COURT: Okay. I've ruled.

MR. BARNETT: All right. I just want to make it clear that -- what the testimony was.

THE COURT: I mean, the "that's Muwop" was the identification part of it. But I'm talking about his personal knowledge that he explained is sufficient. It crosses the minimum threshold that's sufficient. And so does the quality of the video.

MR. BARNETT: Okay. I just strongly object, and I make it for the record.

THE COURT: Understood.

MR. BARNETT: Okay.

(Proceedings had in open court:)

BY MR. JULIEN:

Q. Mr. Wiley?

A. Yes, sir.

Q. Did you just identify Muwop --

A. Yes, sir.

Q. -- in the 2 minute, 49 second mark?

Wiley - direct by Julien

5820

A.  Yes, sir.

          MR. JULIEN:  I'm going to resume playing Government
Exhibit 2000.

     (Video played.)

          MR. JULIEN:  Pause Government 2000 at the 2 minute,
57 second mark.

BY MR. JULIEN:

Q.  You recognize someone on the screen right now?

A.  Yeah.

Q.  Who?

A.  That's Kenny Mac.

          I'm sorry.  I'm doing it --

Q.  Would you mind --

A.  -- real close.

Q.  -- indicating on the screen where you see Kenny Mac?

A.  Yes.

Q.  You've just drawn a circle in yellow in approximately the
center of the screen?

A.  Yeah.

          MR. JULIEN:  I'm going to resume playing Government
Exhibit 2000.

     (Video played.)

          MR. JULIEN:  Pause Government Exhibit 2000 at the 3
minute, 28 second mark.

BY MR. JULIEN:

Wiley - direct by Julien

5821

Q.   You recognize someone on the screen right now?

A.   That's C Murda.

Q.   Would you mind indicating on the screen where it is you see C Murda?

A.   (Witness complies with request.)

Q.   You've just drawn a circle in yellow in the middle of the screen?

A.   Yes.

MR. JULIEN:   I'm going to resume playing Government Exhibit 2000.

(Video played.)

MR. JULIEN:   I just paused Government Exhibit 2000 at the 34 minute, 26 second mark.

BY MR. JULIEN:

Q.   Do you recognize someone on the screen right now?

A.   Yep.

Q.   Who?

A.   That's Muwop.

Q.   And you've just drawn a circle in the middle of the screen in yellow?

A.   Yep.

MR. JULIEN:   I'm going to resume playing Government Exhibit 2000.

(Video played.)

BY MR. JULIEN:

Q. Do you recognize the person on --

MR. JULIEN: I've paused Government Exhibit 2000 at the 4 minute, 36 second mark.

BY MR. JULIEN:

Q. Do you recognize the person on the left side of the screen?

A. On the left side, yeah. That's Kenny Mac.

Q. And you've just drawn a circle on the left in yellow?

A. Yep.

Q. All right.

MR. JULIEN: I'm going to resume playing Government Exhibit 2000.

(Video played.)

BY MR. JULIEN:

Q. Do you recognize --

MR. JULIEN: I paused at the 4 minute, 40 second mark.

BY MR. JULIEN:

Q. Do you recognize someone on the screen right now?

A. Yep. That's C Murda.

Q. You've just drawn a circle on the left in yellow?

A. Yep.

MR. JULIEN: I've resumed playing Government Exhibit 2000.

(Video played.)

MR. JULIEN: And I've paused at the 4 minute, 46 second mark. I'm actually going to fast forward.

(Brief pause.)

MR. JULIEN: So, I fast forwarded to the 12 minute, 3 second mark. I'm going to resume playing from here.

(Video played.)

MR. JULIEN: I've paused Government Exhibit 2000 at the 12 minute, 25 second mark.

BY MR. JULIEN:

Q. Do you recognize the person who exited the driver's side of a --

A. Yes.

Q. Were you started -- you've drawn a circle on the screen in yellow. Who is that?

A. Kenny Mac.

MR. JULIEN: I'm going to resume playing Government Exhibit 2000.

(Video played.)

MR. JULIEN: I've paused Government Exhibit 2000 at the 12 minute, 59 second mark.

BY MR. JULIEN:

Q. Do you recognize someone on the left side of the screen?

A. In the front, that's Kenny Mac.

Q. You've drawn a circle on the left in yellow?

A. Yes.

MR. JULIEN:  I'm going to resume playing Government Exhibit 2000.

(Video played.)

MR. JULIEN:  I've paused Government Exhibit 2000 at the 13 minute, 10 second mark.

BY MR. JULIEN:

Q.  Can you tell the jury generally what this is that we're looking at on the screen?

A.  They just came out of the first lot.  What would be the first lot they just came out of, and they coming around past the 58 and 56 building of Parkway.  58 -- 6358 and 6356.

MR. JULIEN:  I'm going to resume playing Government Exhibit 2000 from here.

(Video played.)

BY MR. JULIEN:

Q.  Do you recognize someone --

MR. JULIEN:  I've paused Government Exhibit 2000 at the 13 minute, 37 second mark.

BY MR. JULIEN:

Q.  Do you recognize someone in approximately the center of the screen?

A.  Yes.

Q.  Who is that?

A.  That's Kenny Mac.

Q.  And you've just drawn a circle in the center of the

screen?

A. Yes.

MR. JULIEN: I'm going to resume playing Government Exhibit 2000 from here.

(Video played.)

MR. JULIEN: Pause Government Exhibit 2000 at the 14 minute, 52 second mark.

BY MR. JULIEN:

Q. Do you recognize someone on the screen right here?

A. Yep.

Q. Who is that?

A. That's C Murda.

Q. And you've just drawn a circle on the middle of the screen?

A. Yep.

MR. JULIEN: I'm going to resume playing Government Exhibit 2000.

(Video played.)

MR. JULIEN: Paused Government Exhibit 2000 at the 15 minute, 17 second mark.

BY MR. JULIEN:

Q. Do you recognize someone on the screen right now?

A. Yep.

Q. And who's that?

A. That's Kenny Mac.

Wiley - direct by Julien

5826

Q.  And you just drew a circle in yellow in the middle?

A.  Yes.

MR. JULIEN:  I am going to resume playing.

(Video played.)

MR. JULIEN:  Paused at the 16 minute, 9 second mark.

BY MR. JULIEN:

Q.  Do you recognize someone on the screen right now?

A.  That's Kenny Mac.

Q.  And you've just drawn a circle on the left in yellow?

A.  Yep.

MR. JULIEN:  All right.  I'm going to resume playing Government Exhibit 2000.

(Video played.)

MR. JULIEN:  Paused Government Exhibit 2000 at the 17 minute, 2 second mark.

BY MR. JULIEN:

Q.  Do you recognize someone who just went in the right side of a gray car?

A.  Yes, sir.

Q.  Who's that?

A.  Kenny Mac.

Q.  And you just drew a circle on the screen in yellow?

A.  Yep.

Q.  In the middle?

A.  Yep.

MR. JULIEN: And I'm going to resume playing.

(Video played.)

MR. JULIEN: Paused Government Exhibit 2000 at the 17 minute, 10 second mark.

BY MR. JULIEN:

Q. Do you recognize someone on the screen right now?

A. Yeah.

Q. Who is that?

A. That's Kenny Mac.

Q. Would you mark on the screen where you see Kenny Mac?

A. (Witness complies with request.)

Q. Have you drawn two circles on the screen in yellow?

A. It's double.

Q. It's zoomed in?

A. Yeah, it's two people, so I figure circle both of them.

MR. JULIEN: May I have one moment, your Honor?

THE COURT: Yes.

(Brief pause.)

MR. JULIEN: Nothing further, your Honor.

THE COURT: Okay. Let's go on the sidebar quickly, please.

(Proceedings had at sidebar:)

MR. BARNETT: Judge, real quick, I didn't want to interrupt, but you know I'm going to -- same objection coming down.

THE COURT: Understood.

So, if you have no questions, then we need to pause with this witness because we're not going to do the cross today. So, I guess should we break? Should we -- are you planning to call any other witnesses today? Should I just send the jury home at this point?

MR. JULIEN: I think we've got to send them home, your Honor.

THE COURT: Okay.

Anything else before I do that?

What do I tell them in terms of start time Monday? Normal, 9:30?

MR. JULIEN: Normal.

MR. BARNETT: Yes.

THE COURT: Okay.

(Proceedings had in open court:)

MR. GREENBERG: Judge?

THE COURT: Sorry. Let's go back on the sidebar quickly, please.

(Proceedings had at sidebar:)

MR. GREENBERG: I thought we decided we were going to start telling them 10:00 o'clock so we could -- if there was anything that came up, I think that given past history, we should assume that when everyone goes through it, there's going to be some issue. So, I would just tell them 10:00

o'clock. But that's just my two cents.

MR. JULIEN: We would say stick with 9:30, your Honor. We can come early. There's plenty of time now. Maybe we can hammer some things out. Or we can all continue to do what we've done when there's Fridays and weekends, work some things out amongst ourselves.

But I don't think -- if anything, it should be the opposite in the sense that we should be trying to get in more time with the jury, not less.

MR. GREENBERG: Right. And we don't disagree with that, except no one's looked through the materials except for me. And that's why I suggest that, because it seems to be every day.

But I'm just -- you know, if the government -- frankly, if the government was so concerned with the jury's time, they wouldn't keep showing people the same video so they can identify people like that when they didn't see anything. Cumulativeness is the biggest waste of time.

MS. GIACCHETTI: Judge, I kind of think 10:00 o'clock makes sense, too. Even when we get here at 9:00, by the time we confer, about the most we can do is then come up with a list of things for you to decide.

And because of the new discovery -- you know, again, I don't know that even -- it will gel until over the weekend as we're working on our crosses, where we're going to have new

things Monday morning.

But, obviously, if you want to keep it to 9:30, that would be fine. I just think 10:00 is more realistic, given the number of new things we're dealing with. And I don't anticipate they're all going to be worked out over the weekend. That hasn't happened in a long time.

THE COURT: Okay. So, I guess I would like to not get into the habit of telling the jury always 10:00 because we do need to preserve the time with them.

I also would like, if possible -- I know you're already trying to do this, but if possible, if you can try to work things out even outside. It shouldn't be that we have to always do that when -- during the time that we're here in the courtroom.

So, I guess I'd ask that you try and do at least as much of that as you can before the theoretical start time that I'm setting. I guess I -- for a couple specific reasons. This Monday, I will give them 10:00. And the reasons are, number one, Mondays the marshals can't do the early start. So, if I set 9:00, then there's going to be -- I mean, we could set 9:00, but it will be lawyers only until -- that's something we could do. We could just try again, Monday, 9:00 a.m., lawyers only. Marshals can't be here until 9:30. But at least then there's some additional time to confer.

And the other reason I would say for Monday 10:00 is

just that I know -- I mean, there's already been a lot of issues that came up with this witness in particular.  So, I just think realistically to keep -- just to be respectful of the jury's time, I think 10:00 is more realistic right now.  But I don't want to make that a habit, just because we've got to -- have to keep rolling.

Okay.  Thanks.

(Proceedings had in open court:)

THE COURT:  We're now actually going to pause here for the day and I'm going to ask the members of the jury, please, to come back on Monday at 10:00.  Please, no discussing, researching, or reading news over the weekend.  I know with the longer -- over the weekend, it's just extra important.  It's always important to remember those things, but heading into a weekend, just a special reminder about that.  Thank you very much to the members of the jury for your time, as always.

And then, sir, you are on the stand.  So, you remain on the stand over the weekend, and you should not discuss your testimony with anyone.  And it is a longer break because it's the weekend, but it's just standard.  Please don't discuss your testimony with anyone while you're on the stand, including over this weekend break.

THE WITNESS:  I won't go on YouTube.  I promise.

THE COURT:  Certainly not.

5832

Okay.  Thanks, everyone.

(Jury exits courtroom.)

(Witness excused from courtroom.)

THE COURT:  Okay.  So, let's just discuss the plan for this afternoon.  I thought we could at least discuss the expert issue.  Or does anyone have other thoughts on what to cover, if anything right now?

MR. GREENBERG:  Judge, I know Mr. Spielfogel wants to make happy hour.

MR. KLING:  Judge, I have just one request.  Given this witness' history of making YouTube videos, some of which I think you're aware, if there are any over the weekend, that they be tendered by the government before Monday morning at 8:00 o'clock in the morning, so that we're in a position of not having the same problem that we have now.

MR. JULIEN:  Your Honor, we do not control the Internet.  Okay?  So, we come into possession of things.  And when we have them, when we see them, we pretty regularly tender things.  But I don't think it's appropriate for the Court to put this obligation on us, your Honor.  Because these things are publicly available.

He said he's not going to do it.  I hope he doesn't do it.  But to put it on us to troll the Internet for everyplace that he might make a video, I just think, is an unreasonable obligation.  If we come across something, we'll

5833

disclose it, we'll tender it. But to make us have to search and fish for things, I just don't think that's reasonable, your Honor.

MR. GREENBERG: I actually agree with Mr. Julien.

MS. GIACCHETTI: I agree with Mr. Julien, too.

MR. KLING: I'll withdraw my request, Judge.

THE COURT: Okay.

MR. GREENBERG: I'm a subscriber to the channel, so --

THE COURT: Okay. What remains open just in terms of inventory of issues, just so we can at least know -- and of those, what should we -- is there anything we should actually try to deal with right now?

I mean, there was the discovery issue from this morning, but that -- I guess now you just need to review -- the defense now needs to review that.

MR. GREENBERG: We could talk about the expert, Judge. That's fine.

MR. JULIEN: I think we should talk about the expert. But there's at least one other issue that we have. And I don't know that we have to reach a conclusion on it today, but I want to put it on the Court's radar just because we've been asked about the schedule for next week. And at the end of the week is when we usually sit down and map it out.

And upcoming potentially at the end of next week is

5834

TH.  And that's the witness who, apparently, was present and had to be removed.  And, so, we tabled that.  But we need to reach some resolution on how to handle that.

THE COURT:  Okay.

Can we deal with that just by setting a time to make any arguments you'd like about that and then do a ruling, or are people ready to discuss that right now?

I mean, one option is we just pick a time next week to talk about it in between.  That gives you some time to consider what you want to say and confer.

MR. BARNETT:  I would like a little time to look into it, if that's possible.

THE COURT:  Okay.

But thanks for raising it, because then it enables us to tee it up at some point next week.

So, why don't we -- I mean, if you are, from the government, anticipating TH's testimony being approximately end of next week, then it sounds like that's a good thing to check in on even Monday morning to see whether people have positions on that or have had a chance to confer.

Okay.

MR. JULIEN:  And we have one other thing.  And it's just the process for requests for things.  And we don't need to discuss it right now, but I would like to just say something about that today.

5835

THE COURT: Okay. Why don't we -- if you'd like to, go ahead.

MR. JULIEN: I promise I'm not trying to single any person out. Because we receive requests pretty regularly from all of the defense camps. And not -- it's often that not everybody's copied on these things, so I don't know that everyone knows when we're getting requests. But it's pretty regular four out of the six are reaching out about things. Sometimes it's late the night before. Sometimes it's here when it's just the lawyers.

And when it's here or we're before your Honor, of course, we have a limited availability to really do much about that. And, again, I'm just -- this is an amalgamation of things. I think it would just be really helpful if -- I don't know where the breakdown in communication is -- if people could just reach out to us with stuff in advance. Even if we don't reach a resolution, we could start working on things.

But I think part of the problem with showing up and carving out the hour for the lawyers at 9:00 is we have a limited availability to react to things once we are here. Even though the office is downstairs, there's a lot of stuff floating around in this case. It would just be helpful if people could just reach out to us.

THE COURT: Okay.

I mean, I know we talked before about having a

process for additional Santiago proffer -- or Santiago statements. And we haven't had to use that because, I guess, the government hasn't sought to introduce other statements along those lines. But I wonder if something like that would work.

I mean, I assume that there are gating items, like who is going to be the next witness, that could affect how that process works. But, I mean, would it be worth trying to re-institute something like that, sort of a rolling deadline process or -- I'm not sure how that --

MR. JULIEN: I don't want to hamper anybody's ability to reach out to us for stuff. I'm just saying we have limited availability to really do anything about it once we're here and it's kind of the day of.

And, so, I'm just asking -- I don't know if reset is the right word, but it just seems like there's been an increase in, I'm going to ask for whatever it is here on the record and I need an answer immediately. And we just -- we can't do that.

So, if people want to reach out to us, I would just -- I don't want to set a deadline. I don't want to have to send the jury home. I'm not pointing fingers at anybody about anything. It would just be helpful, I think, to us all if people would just reach out to us when we're not in court.

THE COURT: Okay. I mean, that's a fair request

because it does -- the kinds of -- anything that takes time to go look at documents and compile and that sort of thing, if it can be with some lead time, that would, of course, be helpful.

So, I mean, is there anything else like that on the radar that -- where people know something is on the way that we can at least identify now so that you can start working on it tomorrow or tonight or before next week?

MR. SPIELFOGEL: No. The problem, your Honor, is these things come up as we're perfecting our cross-examination. All of a sudden we'll realize that the brother actually passed away or it happened four years ago, and then obviously we're scrambling to ask for information.

But I think all of us, as soon as we realize that there's something that's missing, we make that clear to the government as quickly as possible. I don't think we're sitting here on Monday or Tuesday, or whatever morning, trying to ambush the government. Because, certainly, when we realize we need something, I know that our team, and I'm sure all the other teams, are immediately sending e-mails to the government, what about this?

I mean, I'm not sitting there saying, you know, I'm going to wait until I walk into court because I want to be working on it at that moment. That's why I send the e-mail. I've actually called Jason on Sundays. So --

MR. JULIEN: Mr. Spielfogel's been great about it.

I'm not trying -- I don't want to single anybody out, your Honor. I'm just -- his approach, I think, might be different than where some other folks are at right now.

So, I'm just -- reach out to us even if the answer is something they don't agree with. Then we know and we can tee it up. But -- I don't want to be repetitive.

THE COURT: Okay.

Well, I mean, I think it's a fair request. So, let's try and do that as much as possible.

MR. KLING: We would agree that Mr. Spielfogel is wonderful, Judge.

MS. GIACCHETTI: Judge, my practice is to actually put discovery requests under Giglio. I then routinely get a lot of e-mails telling me I already have it, it's not Giglio. There's a series of -- and that is why with Giglio and Brady I will be putting everything on the record, because that is what the pattern has been. I'm sorry.

But I do. I had a Giglio/Brady request, and then I get a bunch of, you've got it. Oh, oops, no. No, it isn't Giglio. No, it isn't Brady. And then it falls off. Then I get nothing.

So, I will do that. But I will still put it on the record because I have to protect Giglio and Brady in particular.

THE COURT: Okay.

5839

I mean, I know we had that where -- well, I know you mentioned this particular issue with the CHS file. I guess it was earlier this week. So, I mean, at least -- okay. It's now happened -- I don't know if it's a couple times or just this once, but it's happened where -- or I feel like at least we've been through this process this one time. It's revealed some ways in which we could -- some possible process improvements if everyone -- now having been through it, hopefully it will enable everyone to try their best to avoid it going forward.

Okay. I mean, I've been trying to think, are there things I can do to kind of encourage or incentivize everyone to avoid it. I mean, one way to do it would just be to either tell the government you have to have a witness ready to go or to tell the defense you've got to cross. Just basically enforce that more strictly.

So, I can. I mean, I'll -- I'm watching for places to do that. And I'll do that when it's necessary because I just don't want it to be that it turns out it's really -- it's dragging this out.

You know, the other thing I was thinking is if -- I've been trying, okay, let's come at 9:00 so that we can be ready to actually start with the jury at 10:00. And we can do that more. There may come a point where -- so far, there have been things that made it impossible, despite doing that, to

5840

actually start at 10:00 because there's an issue that's related to the witness that's about to go on the stand at 10:00. And I don't want to put them on the stand and then have a bunch of sidebars, which is -- that's not ideal either.

But, you know, that would -- I'm also watching that to see whether -- there may come a point where if we're not efficient with the time before the 10:00 a.m. start, I'm just going to start it and then whatever time we have between when we all arrive to argue legal issues and 10:00 a.m. is going to be the time. And if we don't get through all the legal issues, you know, too bad, we're just going with the jury. So, I am looking at that stuff and thinking about how we can keep it moving.

So, I guess I appreciate everyone's efforts so far. I mean, I've been seeing people have been making efforts, like conferring more to try to avoid the sidebars. So, I don't think it's -- part of it is just due to sheer number of people involved. Some of it's you're just going to have some delays that just flow from that.

So, I do appreciate everyone 's efforts so far. I'm trying to watch it myself and figure out if there are ways to make it more efficient.

MR. GREENBERG: Judge, when I went through the materials this morning on this witness, there were forms that were filled out about admonishing him about being a CHS and

records of payments, when they were made, how they were made, and so forth. We did not get that for the last witness, Mr. Sloan. I believe it should exist.

There was also, it appeared from my perusal -- now, I just perused the stuff this morning, but records regarding when Mr. Wiley got in trouble and caught a case and paperwork regarding what had been done by his handlers regarding that.

So, even though Mr. Sloan has already testified, I would renew a request for those materials as they relate to Mr. Sloan if they exist.

MR. JULIEN: They don't. And here's the -- we provided a lot of information -- we provided a lot of documents today -- or yesterday -- yesterday, today -- that we don't typically provide and we just provided because we're just trying to avoid this thing getting derailed. But we provide the underlying information.

So, like normal course of discovery, no, we're not going to produce a slip someone got paid, but we produced the fact that they got paid. That information was conveyed.

So, there's nothing -- no other information out there as it relates to Mr. Sloan. The information that hasn't been produced, maybe it's in a different form like we just -- here's the file for Mr. Wiley because we're trying to avoid where we're at right now. But we produced information.

MR. GREENBERG: Well, I think they should produce as

5842

a matter of course, whether they have in the past or not, that they admonished someone, what they tell -- the actual form that the agent is supposed to sign that verifies that they told somebody certain things when they signed him up as a CHS, and any paperwork where they admonished the person, as they like to call it, if there was a problem along the way. I think that that should be produced. Whether it has in the past in cases or not, I can't imagine a reason why it wouldn't be.

So, to the extent that may exist for Mr. Sloan, we're asking that it be produced.

MR. JULIEN: Mr. Sloan was admonished one time, and that information was produced on Sunday.

MR. GREENBERG: Okay. That's it? Not on his other arrest or anything?

MR. JULIEN: The one time was on the other arrest.

MR. GREENBERG: Okay.

MR. JULIEN: In addition to the general admonishments, yearly admonishments. Those forms were produced on Sunday.

THE COURT: Okay. So, are we ready to discuss the expert at this point, or are there other things we need to address?

MS. BORMANN: Judge, I just have one thing. Just a reminder to Mr. Julien because we did talk about this earlier.

The date on the paperwork that we had not been provided. Part of the dump this morning, apparently, is -- are confidential source documents with respect to the witness who is currently on the stand, that we've not yet been provided. And they're not dated. So, I don't know when they were created. So -- and that's fine. I just asked Mr. Julien for the date. So, just a reminder.

MR. JULIEN: Your Honor, I haven't seen the entire form, but I can tell you just based on the nature of it, it's something that none of the lawyers have agreed -- all of the lawyers have agreed not to go into anyway. But I'll take a look at the file. But the nature of that is something that everyone has agreed they're not going to inquire about.

MS. BORMANN: I'm probably not going to inquire about it either. I wasn't going to inquire about it before. But I have a document that was drafted by Special Agent Dixon, who is sitting at the table over there. So, it shouldn't be too hard to figure out what date it was drafted.

THE COURT: Okay. Well, why don't -- it sounds like the government's going to look into that, if I understood that right.

MS. URSINI: That's correct, your Honor.

THE COURT: Okay.

So, then it sounds like we can now turn to the expert issues. This is the gang-related expert that was disclosed by

Mr. Roberson's counsel, and then there's a response. The government has moved to exclude, and then there's a response by Mr. Roberson.

I just wanted to tell you up front, I don't know that I'll be ready to rule on it right now. I would like to hear some argument. Would you prefer -- if you can, if you're ready to argue it now, I would like to hear that and then try to get you a ruling hopefully Monday. If you have a different preference or it is extremely urgent and you need to know today, please let me know that.

MR. GREENBERG: Judge, I don't think we need to know today to let him know. We're sort of keeping him in the loop. We're expecting that your Honor's going to make the correct ruling and allow him to testify. But the -- whenever you feel comfortable hearing arguments -- I mean, I assume -- we briefed it, at least from our perspective. The government's briefed it. We've briefed it. I would think it's more you would have questions than restating what's in our brief.

So, if you feel comfortable doing it, we can do it. If you want to wait, I would just ask, you know, at some point here in the next --

THE COURT: Okay.

Any views from the government?

MS. URSINI: I'm happy to argue right now, your Honor.

THE COURT: Okay.

How long do you anticipate that?

MS. URSINI: Did your Honor have particular questions or points that you want us to specifically address or -- the government did not file a written reply in this situation. So, there are a couple of cases the defendant cited that I think are worth discussing. I'm happy to do that. Or we can tailor our discussion to questions from the Court.

THE COURT: You know, I don't know that I have particular questions right now. I mean, I guess I can tell you I looked at the disclosure and I would like to go back and read all of it once more. I also looked at -- I mean, Judge Tharp has a ruling in the Chester case. So, that's the Hobos case.

MR. GREENBERG: That's the Hobos case, Judge, yes.

THE COURT: So, it's 13 CR 774, Docket 781. So, he has a ruling on a motion to exclude a gang expert.

I mean, both in that ruling and then just more generally in other cases, it seems like these experts are often being offered by the government rather than by the defense. And it also looks like, in that ruling, Judge Tharp was going through a variety of things that that expert could and could not testify to. And, so, I mean, I'm trying to find something that kind of summarizes it.

I mean, I guess just the conclusion paragraph. He

5846

granted and denied in part the motion. And, again, this was a government expert. And it says, "Mr. Roti may testify to his observations of Chicago gangs, including their history, decentralization, and specific episodes of violence and other relevant historical events, such as the destruction of public housing or prosecutions of gangs. He may not, however, offer opinion testimony as to the causes of gang decentralization or gang violence. He may not go into great detail about past gang prosecutions. He may provide information regarding the obligations of gang membership, the behavior of gang leaders during shooting wars, and any specific identifying signs, colors, or terms used by the gangs in question. He may not, however, opine as to what gang members 'enjoy' or the mere fact that gang members publicly display their gang affiliation. He may not testify, without more information specific to the gangs at issue in this case, that gang members generally hide guns used in crimes and then recover them when suspicion has passed." And then, "Further objections to specific testimony may be raised" as this expert testifies.

So, I mean, all those conclusions are backed up by different reasoning on each of these points. So, I guess that was sort of what I was trying to figure out is, is there a way to -- I understand there's this whole whether the expert can testify at all or not, which is also an issue, which I've right now just sort of skipped over. But even assuming that

5847

this expert were to testify, are we in a position based on the current filings to do the type of, you know, subtopic-by-subtopic type of ruling that Judge Tharp did in Hobos?

MR. GREENBERG: Judge, I think what would make sense is we can take a look at that ruling. I was in that case, but I, frankly, don't recall it.

I know that I also attached to our filing a copy of an expert that Mr. Berry presented in a case in front of Judge Tharp that I was involved in and what that expert was allowed to get into, which was a little bit more expansive.

And I think it's a little bit different because this is a defense expert. So, you don't have quite the same issues that you would have where the government is presenting the expert. So, I think there's a little bit more leeway in that regard.

But if it would make it more efficient, we can -- I can certainly pull out that ruling and come back and sort of look at what the opinion is, talk to Mr. Williams, and see how we can -- if that's sort of what your -- sort of where you're nudging towards, we can certainly see if we can shortcut a lot of this.

MS. URSINI: Your Honor, I have some thoughts on that, as well.

THE COURT: Okay.

Actually, one quick question. I don't know if I have

5848

the -- you just mentioned, Mr. Greenberg, something related to a case -- another case -- that you had attached. I don't know if I --

MR. GREENBERG: I attached a transcript, Judge, or at least I thought we did. I was here, so I didn't do the actual filing. But I believe we had attached a transcript. But I'll send it -- I'll resend it to your proposed order box.

THE COURT: Okay.

MR. GREENBERG: It's a transcript from a case that Mr. Berry and I did, I think, earlier this year -- it's becoming a blur, but I think it was earlier this year -- where they presented a gang expert which was a Chicago police officer.

THE COURT: Okay. Well, I'll take a look at that.

Okay. So, let me just turn to the government.

MS. URSINI: Thank you, your Honor.

It's the government's position that this expert should not be allowed to testify at all. If the expert is allowed to testify, their testimony should be curtailed in a couple of ways.

First, given the lateness of the disclosure, the expert should not be allowed to testify beyond what has been disclosed, which I think is fair. And I note this because the disclosure itself is admittedly incomplete. It lists -- let me just briefly describe what's -- I'll summarize, I think,

the disclosure. You have it and can go line by line.

But, essentially, there's a list of topics related to gangs generally, such as tattoos, hand signals, et cetera. There is the indication that the expert would testify specifically related to O-Block and Dipset, including defendant Roberson's affiliation with either of those gangs, or lack of affiliation. And, then, there is a general caveat that the expert may testify to other things because trial's, you know, still ongoing and we'll let you know if there's more topics later.

That was the initial disclosure that was provided to the government on October 9th, which was right before we started jury selection and well after the deadlines that the Court had set for notifying us of experts, providing expert information, or even giving us a witness list.

That disclosure has not been updated. Defense counsel provided a corrected version of their response that updated some citations. And we have a new disclosure, in that it's got a signature. So, that's the one update. But it hasn't been substantively updated. So, we do not currently have a complete picture of what defense is purporting the expert is going to testify to. So, we kind of have what we have at this moment.

Given the lateness of the disclosure, we're mid-trial now. This is not something that the defense counsel should be

5850

allowed to amend or expand as trial goes on, for a number of reasons that I set out in my motion.

Even within the categories of what the disclosure does set out, unfortunately the disclosure does not provide a bases for these opinions. It certainly provides that Mr. Williams is an expert in some things. He's a Ph.D. He's certainly got an interesting and varied CV. He's written a book on the Black Disciples. I Googled it. It appears to be largely historical about the Black Disciples, which is a national gang or group of gangs that -- I think the book is primarily focused on the time period of the 1960s.

There's no indication from Williams' CV, or from the disclosure, that he knows anything in particular about O-Block or about Dipset, that he has talked to a member of either of these gang sets, that he has any personal familiarity with these gang sets, that he's conducted any other kind of research specific to these gang sets. And I do think that's an issue.

And I'm not familiar with Mr. -- I'm sorry, with Judge Tharp's opinion. I will take a look at that.

And I certainly am not an expert on every single gang expert that's been brought in this courthouse. Certainly, it's frequent that the government offers gang experts. We didn't do so in this case in part because we had an O-Block member take the stand and be subject to cross-examination and

5851

be able to describe a lot of things about the O-Block gang.

I want to point the Court to a couple of quotations I think are actually quite helpful. And they come from defendant's cases that were cited in the response to our motion. And before I do so, I just want to remind the Court that the whole point of kind of vetting or discussing an expert beforehand and going through Daubert factors, et cetera, is that there needs to be some basis, some relationship between what the expert is going to testify to and what their basis of knowledge actually is. We cited a case, *Carroll vs. Otis Elevator Company* from the Seventh Circuit, on Page 11 in our brief for the citation "whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness testimony."

At this point, we do not have the ability to compare the area of the alleged superior knowledge -- knowledge about O-Block, knowledge about Dipset -- with any background or qualifications of this expert just absent from the disclosure so far.

And the distinction is important. And I think that the distinction is very well set out in *United States v. Ledbetter*. This is a case that was cited by defense counsel for another purpose. But the citation is 929 F.3d 338. This

5852

is from the Sixth Circuit in 2019. And in that case, they discussed a proffered government's expert -- gang expert. And in that case, they were dealing with a defendant who was a member of a subset of the Crips, a national gang that had started in L.A., and the defendant was related to a particular gang set that was allied with the Crips, sort of like here as we allege O-Block is a particular set of the Black Disciples.

And the Court said that a gangs -- and it was citing another case, *United States vs. Rios*, 830 F.3d 403, also from the Sixth Circuit, from 2016.

The Court in Ledbetter said, "True enough, 'a gang expert's testimony is reliable only insofar as it is based on significant experience with the gang about which the expert is testifying.' "Thus," the proposed expert in that case, "Detective Caffey, would not have been a reliable expert on the Short North Posse itself." The Short North Posse was the gang subset of the Crips. "But he did not purport to be. Detective Caffey opined about the national Crips gang, on which he was qualified, and the government used other testimony to show that the Short North Posse fit the description of the Crip set. This exact approach -- eliciting expert testimony on a national gang and separately drawing a link to that local set -- was approved in Rios."

So, that case clearly makes the distinction that an expert may have some understanding and basis to testify to a

5853

national gang, but can still lack the expertise and the background to testify as towards one of those specific gang sets. Here, that background simply has not been supplied.

As to the testimony that the defendant is proffering for the Black Disciples broadly, the disclosure does set out essentially a list of topics. And I'm using sort of the tattoos and the hand signs as a shorthand, but there are a number of other topics listed in the disclosure, which we can go through line by line at any point that the Court prefers.

But I want to point the Court to another case that the defense counsel cited, *U.S. vs. Duvall*. This was a Seventh Circuit case. The citation is 272 F.3d 825. This was from 2001. And this, again, was a government-proffered witness -- an expert witness -- where the Court found that the disclosure was insufficient because it simply listed a number of topics. And given the date of this case, it's clear that this was even before the rules regarding expert notice got more stringent and required more specificity. So, the standard would be even higher today than the standard that the Duvall court was using.

However, in that point, Duvall court said, "The rules require a summary of the expected testimony, not a list of topics. The government's notice provide a list of the general subject matters to be covered, but did not identify what opinion the expert would offer on those subjects. For

5854

example, the statement that Erk --" Erk was their proposed expert "-- would testify concerning 'the manner in which methamphetamine is distributed,' does not in any way identify the particular opinion that Erk offered at trial -- for example, that methamphetamine is typically divided into small packages for distribution.  Similarly, the statement that Erk would testify 'concerning amounts of methamphetamine an individual might have for distribution, as opposed to personal use,' does not identify what amount, according to Erk, will point to intended sales rather than use."

So, I think that once you take a look through that list of topics about gangs generally or Black Disciples generally, I think you'll find some similarities between that language and what has been proposed and found insufficient in Duvall.  If the expert is supposed to testify on X topic but we don't know what the expert's opinion will be about that topic or what conclusions they will reach, I don't know how we evaluate that individual's ability to testify as an expert in the first place, and to probe whether they have the basis of knowledge to do so.

That basis of knowledge, again, it's not in the CV. We're mid-trial now.  I don't know if this is something that the defense counsel has an additional ability to proffer or provide an expert report.  They suggest, I think, in the motion practice that, well, it's okay; we have plenty of time;

we don't need a pretrial disclosure because trial is so long and they won't testify for a while.

I've never actually heard of doing a Daubert hearing in the middle of trial. We don't have Fridays, so I suppose we could do that. But I don't think that that is the typical approach. Certainly, we're happy to do that if that's what the Court thinks makes sense here.

But given where the record is at now, given what we have in the moment, I'm not sure that anything in that expert disclosure is supported -- is one, both supported by the basis of knowledge as seen from the CV or from the expert summary; and, two, is specific enough to actually be notice of an expert opinion.

The last point I'll make is much of what is proposed from the expert at this point, I think, likely fails a 403 balancing test. Daubert is -- cautions that when an expert testifies, that can be powerful and quite misleading and perhaps difficult to understand.

I think in this case, it is particularly problematic, given that, one, much of the expert testimony may be quite dated if they're talking about the origin of the Black Disciples in the '60s. I think that there was an objection today about a witness testifying to what happened in 2006 and 2007 as not being relevant and being "very remote." Obviously, the '60s are far further in time from that.

5856

The specific statement, though, that the expert is going to testify as to whether or not Mr. Roberson is a member of Dipset or of O-Block, the jury has already actually heard testimony on this. They have heard from Mr. Eady that Roberson is Dipset. They heard today from Martell Wiley that Roberson wasn't really from Parkway. They've heard he's got a relationship with Parkway and O-Block. And I think additional information on that point will come out.

At this point, having someone who is purported to be an expert who, to our knowledge, based on what's been filed and shared so far, has no specific understanding of O-Block or Dipset or no specific experience with O-Block or Dipset and, as far as we know from what's been disclosed, hasn't met any specific member of O-Block or Dipset, for a person to come up and be qualified as an expert and testify to the jury about the specific membership or affiliation, or lack thereof, of a specific person to either of these groups, one, isn't particularly helpful and, two, has the danger of sort of asking the jury to supplant the expert's testimony for their own assessment and evaluation of the evidence. And, so, I would caution that that's not helpful and, frankly, prejudicial. It certainly has very little probative value when the jury's getting other information on this, when the government is not arguing that Mr. Roberson isn't Dipset. We elicited that testimony on direct examination.

5857

Again, it is the government's position that none of the expert's testimony should come in. There was an incredibly late disclosure, which was not explained for any reason. The Court set a deadline of, I think, sometime in August to provide information regarding experts.

The only other point I wanted to address was this idea there are somehow other remedies. I think your Honor is considering whether there could be or should be limits on the expert's testimony, and I certainly shared thoughts on that. Other remedies provided by the rule simply weren't appropriate in this case.

It really would not have been appropriate for the government on October 10th, after receiving a disclosure on October 9th, to come to the Court and say, hey, I know that this was supposed to be the day we were starting trial, but we just got this disclosure that was supposed to be disclosed two months ago, and so we want to put a very large, very complicated trial off while the jury had already done -- had come in and already done their questionnaires would not have been the right move in this case. It might be the right move in a different, smaller case. But it was not the appropriate result here.

Defense counsel also suggests in their motion that there's kind of something of a technicality that really the fact that they disclosed anything at all was gratuitous

5858

because the government hadn't officially requested this. The Court ordered that the defense counsel provide expert disclosures, and the Court did so on a schedule that was initially proposed jointly by the government and all of the defense counsel. We had put forward a number of proposed deadlines for various filings, including expert disclosures on both sides of the aisle. Various defendants and, at times, the government had requested extensions for different deadlines for different reasons. Roberson's counsel never requested an extension of that deadline. None was granted. And, so, the government believes that he should not be testifying at trial or that his testimony should be quite limited.

THE COURT: Okay. I want to give Mr. Roberson's counsel a chance to respond. I also -- I have one question, which I'm not making a ruling on whether the timing -- on the timing issue, which I'm still thinking about, but if -- I'm just asking if I were to permit some expert testimony and perhaps rule out certain topics or if that were how it happened, would the government then -- does the government have any sense of how you would then respond? I mean, would you just cross this expert? Would you be looking to present an expert in rebuttal? How would that work?

MS. URSINI: I think that the problem here is that we don't know because we don't have a complete statement of what

this expert would testify to. Sitting here today, we have a couple of things in a disclosure and then a promise more is coming, without specifics. I understand, only because I heard Mr. Greenberg state this in court yesterday, that he would expect the expert to review trial transcripts, for example, and that perhaps that would inform his testimony.

Without having -- the issue is that without having a complete understanding of what this expert is going to speak to, we really -- it's very difficult for us to make a decision as to whether an expert would be required. I mean, I can't speak for my team. We have not had this particular discussion. I think at the very least, we would engage in some cross-examination of the expert.

But that's the problem with a late and incomplete disclosure, is it makes us -- makes it difficult for us to have those discussions and make those decisions. And that's why the rule was amended to encourage and essentially set a framework for pretrial resolution of these issues.

THE COURT: Okay. Well, thank you. Let me give a chance to defense counsel to respond.

MR. GREENBERG: Judge, if I can have one second?

THE COURT: Sure.

(Brief pause.)

THE COURT: Actually, the court reporters are going to need to switch at some point. But we could -- let me just

5860

ask, around how long do you think it will take?

MR. GREENBERG: Ten minutes. I don't know. Fifteen minutes. Not long.

THE COURT: Okay.

MR. GREENBERG: So, Judge, let me see if I can respond in kind.

Judge, there's no doubt we made the disclosure late. We've explained it, why we made it. Part of it, frankly, was I didn't realize that the government wasn't calling an expert because typically in these cases they do call an expert. But part of it was also that we were getting continuing discovery, including a large amount of unredacted discovery that we got.

Ms. Bormann started going through it and she felt that we needed an expert. I think your Honor is familiar. She had to file a request. I think your Honor had her in to talk to her about the request. And, then, we prepared it as quickly as possible. In fact, the disclosure letter was the day -- was actually made the day that my father happened to pass away, and I still managed to get the disclosure letter out that time.

And let me tell you that I'm a big believer -- hold on one second, please.

(Brief pause.)

MR. GREENBERG: I'm a big believer, and I will say this on the record, on plagiarizing things. So, the

5861

disclosure, Judge, that we have made in this case, we have plagiarized much of it from the government's filings in similar cases. And, in fact, the language at the end of it, which they keep complaining about, that says, "The information that we expect the expert to offer is largely dependent upon the testimony that's brought forth during the trial, and that we expect we will have to supplement the disclosure after hearing the testimony sufficiently in advance of any expected testimony," I believe, is lifted almost word for word from government disclosures of expert witnesses.

Why do we have that in there? Because we don't know what the evidence is going to be. There may be things that the expert doesn't have to testify to. There may be additional things that come up that the expert should testify to. You know, I just -- I'm shocked. In this case, what they want is they don't want us to call an expert.

And any idea that this team on this side of the room, the government, doesn't have the adequate opportunity with not only the four of them, but the resources of their office, to very quickly marshal up either cross-examination or their own expert if they feel the need to do so is ridiculous. Anything that they're, oh, my God, they're going to be so surprised, that's just absurd. They know exactly what this guy's going to say. He's going to say the same things that their experts say in cases when they call them.

They don't want us to call an expert in this case because they want instead to put up Mr. Michael Jordan today and Mr. Sloan the other day, and they want to have these people be the experts in this case because they've got these people who are going to say what they need.  But an expert's not going to say what they need.

So, let's talk about, first of all, the qualifications.  This individual has a Ph.D., a master's, and a bachelor's.  They've been in this area for 30 years.  They've presented and been an expert witness in dozens of cases.  We attached all of those materials.  They have those materials.  They know the cases he's testified.  This guy is not a surprise to the government.  To argue that he doesn't have the right kind of expertise because he doesn't work with a Petri dish is just ridiculous, Judge.

And I want to quote -- again, turning back to my theme that I like to plagiarize -- from the government's response to the motion to exclude the testimony of an expert in the case down the hall, the Burke trial, when they want to call somebody to talk about the Chicago City Council and the working of politics:  "Many social --" this is from Page 14: "The test for reliability is flexible.  The factors enunciated in Daubert 'neither necessarily nor exclusively apply to all experts or every case.'"  And they cite Kumho Tire.  And then they go on:  "Many social scientists rely primarily on real-

5863

world experience rather than experimentation to arrive at their conclusions. Unlike scientific or technical experts, a political scientist's testimony (political science is not a science for Rule 702 purposes) cannot be so mechanically scrutinized." Cites some cases, Judge Feinerman.

And, then, it goes on, and they go on and talk about this person is an expert because they've got years of academic study, research, and writing on this, and teaching. And they talk about textbooks that they prepare. That's exactly what our expert has, Judge.

So, for them to get up -- our expert is only one step short of being an actual member of the Black Disciples or the Gangster Disciples and having that level of real-world expertise. And according to the government, that would be the only time that you could have an expert in this area. And if that's their position, then wait till the next time they try and call a Chicago cop to be an expert witness who has talked to people in gangs. That's what our expert has done. Has observed people in gangs. That's what our expert has done. In other words, it's the same exact thing.

This is a thinly veiled attempt to prevent the expert just because they don't like the testimony. The testimony is key. It's not just that Kenny Roberson was in Dipset or O-Block or anything like that. It's how it works.

So, when they're putting someone up there and he's

5864

saying sometime in the last decade there was a meeting, sometime in the last decade there was dues, we're entitled to present expert testimony to counteract that, Judge.

If you don't allow us to call the expert, you're effectively forcing us to call defendants. To not allow an expert in this situation would trample on a defendant's right not to testify because, according to the government, the only people we can get to counteract what they are saying are other gang members who are not charged in this case -- and, of course, then if we call them, the government's going to say, Judge, we've got to admonish them; you know, they're going to testify about crimes. And they're going to do everything they can to scare them off the witness stand. Or we're going to have to call defendants to say things didn't happen or explain how things work.

To argue that talking about the history of gangs after they put up Mr. YouTube today to talk about in 1998 whatever -- he was in New City or Newtown, or whatever he was in, that -- and, oh, Judge, we need the historical context and he needs to talk about this so he can explain stuff. We're entitled to challenge that testimony. And if we want to challenge that testimony with a gang expert, we should be able to, just as you're allowing someone to challenge testimony with an eyewitness expert.

If they provided ballistic evidence and we had hired

a ballistic person, we should be entitled to do that. They can't tell us, well, you've got to go get the guy who loaded the cartridges in the gun to do it. This is absolutely absurd, Judge.

They're not surprised by the disclosure. They've had it for nearly two months now. And they know that it's out there. They call these experts dozens of times over the years, and they've been allowed to do it in every case where they've tried to do it.

Now, if your Honor wants to carbine a little bit what he can testify to, then we can go through it and we can figure out what the areas are and we'll go in those areas. But to say that we shouldn't be allowed to call an expert witness on something that clearly the jurors know nothing about, it would just be wrong. We don't have to accept the government's version of how gangs work and the government's witnesses. And our only way to challenge that testimony can't just be cross-examination. Just like they can get up and cross-examine our expert and then they can -- you said and they might want to call their own expert in rebuttal. And they certainly would be able to do that.

But there's absolutely no legal reason why we shouldn't be able to call this expert.

Any questions?

THE COURT: I don't think so.

I think it's helpful to hear from both of you. And I do think that -- well, I'll go back and reread the filings with everything you've both said in mind. But it is helpful to hear it live, as opposed to just reading.

MR. GREENBERG: Judge, the last thing, just to go back to the case down the hall, Judge Kendall wrote an opinion, which is at Document 318, and she talks in that opinion, she cites other cases, including the Family Secrets case, which was a mob case where an expert was allowed to testify to all of the workings of the mob and the history of the mob going back to Al Capone times. And in this case, certainly, again, everybody knows how the City Council works, they vote and all that stuff, but still, expert testimony is being allowed in this case, just as expert testimony is always allowed in gang cases. So, that's -- her opinion is Docket 318. And interestingly, the opinion was on the eve of jury selection.

THE COURT: This is in the Burke trial?

MR. GREENBERG: Yes. Yeah.

THE COURT: Okay.

MR. GREENBERG: 19 CR 322. I can just -- I mean --

(Brief pause.)

MR. GREENBERG: Judge, I'll just give you my copy. There's a few highlights, but none of it is stuff you don't already know.

5867

THE COURT:  Okay.  Thank you.

MR. GREENBERG:  And I showed it to the government.

(Document tendered to the Court.)

THE COURT:  Thank you.

MR. GREENBERG:  Excuse me one second.

(Brief pause.)

MR. GREENBERG:  Mr. Adams pointed out to me that the expert in the Family Secrets trial, one of the reasons was because there was a uniqueness to how the Chicago Outfit was structured, apparently, as opposed to the Outfit, I guess, in New York or somewhere else.  And the same thing here, Judge. Chicago gangs are uniquely structured.  They're certainly different than, for instance, the Crips and other California gangs are structured.  So, that would be another basis.

THE COURT:  Okay.  Thank you.

Did the government want -- I heard the microphone.

MS. URSINI:  The ominous squeaking.

I agree that Chicago gangs are different and different sets operate differently.  And we don't have any indication that this expert has any particular knowledge in either of those subsets, O-Block or Dipset.  There's been testimony and academic writing or other writing on the GDs, the BDs generally, other specific gang sets, you know, the P. Stones, but not O-Block, not Dipset.

Defense counsel, I think, knew what our witnesses

5868

generally were going to say about enterprise. They had reports, they had grand jury testimony for quite sometime.

And I just want to say I'm not opposed to gang testimony -- gang expert testimony. That's not the government's position. The position is not that we're opposed to the testimony. The position is we don't know what the testimony is. I mean, I'm just hearing the argument now. Is the expert going to testify about O-Block meetings and dues in a way that is somehow different than what the jury has heard? I have no idea what they're going to say or what the basis for that knowledge would be. I just reiterate the same concerns.

THE COURT: Okay.

MR. GREENBERG: Judge, the government also -- the government always has the option of speaking to the individual before they testify, too. I mean, they -- I don't know if he'll talk to them or not, but they always have that option if they want to talk to him. They can always interview a witness. It's not a civil case where it's some controlled -- you know, it's my retained expert like that. So, I'm happy to arrange a phone call for the government if that would assist them in their preparation.

MS. URSINI: The disclosure required Rule 16 is deficient under Rule 16 for all the reasons that we've argued.

MR. GREENBERG: I take that as a "No."

THE COURT: Okay. Let me just go back to the papers,

then, and read them again with everything you've both mentioned in mind. Thank you. It has been helpful to hear about it live instead of just reading. I'll try to get you a ruling on it as early next week as I can.

Let me just ask really quickly about TH.

We're going to take a break. You know what? Actually -- so I would like to take a break now to change court reporters. Is there any -- basically, I just wanted to try to get -- if we could narrow down the issues about TH at all, I want to try to get it done, as opposed to now on Monday we have like a 30-minute thing about TH and we have an hour on MW and then we don't start with the jury until noon.

So, I was going to try to get that kind of preview done. But if you can confer about it -- the question is, do we switch court reporters and come back in 15 minutes or just end?

MR. JULIEN: Let's switch and come back. Let's use the time that we have here this afternoon.

THE COURT: Okay. So then let's take a break now for the next 15 minutes and come back.

(Recess had from 3:24 to 3:54 p.m.)

THE COURT: Okay. Ready to proceed?

MR. JULIEN: We are.

THE COURT: Okay. So, I just wanted to ask about T.H. and whether anyone has thoughts at this point.

5870

MR. JULIEN: We'll just reiterate our position, your Honor. And so this was teed up by counsel for Mr. Offerd, and then there was a motion to exclude her by counsel for Mr. Liggins, and so we provided comments in response to that oral motion.

We don't believe she should be -- her testimony should be excluded. We do think it's not ideal that she was here.

I'll tell you that she is my witness. I've met her in person twice; and I think both times, she was wearing a COVID mask, just kind of given the time of when we had met. And there was a third time that we spoke, and I think she was on her cellphone.

She's represented by counsel, so any time I've interacted with this -- and agents have interacted with her since probably September 2021, it -- her counsel has also been present.

And so, you know, we've had limited interactions with her. We did not recognize that it was her in the courtroom. But she does know people in the courtroom. People in the courtroom know her. And it's unclear when it was first realized that she was here, but I do remember -- and I haven't looked at the transcript. What I understood Mr. Kling to be saying is that she's been here for several days.

And so, I don't know who knew several days before

5871

Monday -- I think this was Monday when this was teed up, several days before Monday that she had been here, but we did not know that she had been here in the courtroom until it was pointed out on the record on Monday.

Her counsel did not know that she had been here. I've not spoken to him on the phone. We just haven't been able to catch each other. But I shot him an e-mail on Monday, and he was surprised to learn that she had been here. I don't know if he's had conversations with her since, but that's just kind of where we're at in terms of the procedure.

In terms of the substance, none of what has -- the testimony that's been elicited to date would impact her testimony. So, as of Monday, the only defendant who had been identified by anyone in court here was Kenneth Roberson. Going forward from Monday is when other defendants began to be identified on the Camtasia video; and the first person to do that was Mr. Sloan, and I don't think he got around to doing that until Tuesday, yeah, Tuesday.

So, none of what she would have heard -- I don't know what the first day she was even here was, but none of what she would have heard or seen would impact her testimony. She's seen the video before. At this point, I think she's seen it more than once. She's made identifications. Your Honor has her grand jury transcript where she made identifications back in 2021.

That was the subject of a motion to suppress, and you issued a ruling with respect to that; but none of the people she identified are Mr. Roberson. She doesn't know Mr. Roberson.

So, again, not to be long-winded, none of the testimony that would have been elicited at any point in the trial would have had the potential to impact her testimony. She's seen the video. She's made identifications. It's part of -- it's on the public docket.

And so that is an extreme remedy to exclude a witness who, honestly, I don't know that we are best suited to have recognized her in the courtroom under the circumstances; and apparently, people did recognize her in the courtroom days before raising this on Monday.

THE COURT: Okay. Any -- any response?

MR. MITCHELL: Yes, Judge. There's essentially, I think, three issues. The first one is just the integrity of the witness's being here. I mean, every witness should have been excluded based on your order. Every party has a requirement to follow your orders and make sure it's enforced.

The witness identified, if she was represented by counsel, that counsel should have been told that she's not supposed to be here, she's been excluded. And that wasn't done as well.

And then with respect to number two is the due

process of the clients here, Judge. There's been in-court identifications made, and this witness should never be allowed, since they were in here at any point so close to these witnesses, to do a witness identification at this point.

So, if we want to talk about excluding testimony, at least that part absolutely has to be excluded, given that she was in court essentially looking at the witnesses from right here today and the last couple of weeks during this whole process when this whole case is about identification.

But you also have to look at how she was prepped. She was in the grand jury. Her grand jury testimony was clearly not certain in regards to what she saw and who she identified. And her being in court during this period of time during the openings, during the presentations of witnesses and the positions, she now knows that identification is the key issue. And yet now the government wants to bring her to testify about that very same issue, when she's here identifying and understanding that it is.

The question becomes whether it can possibly be fair to the defendants at this point to have a person who was in the grand jury for the central purpose to be -- identify and identify individuals from a video, which raises questions in even terms of the identification, and then second be allowed to come in to court and make an identification of --

5874

an in-court identification after sitting here for days right next to the defendants.

And then second, to essentially bolster her testimony and possibly cross-examination in relationship to what she's learned. And we have no idea what she's learned by sitting in here for those three or four days.

The last comment, Judge, and I understand that we're not talking about the integrity of the prosecutors not knowing that she was here and somehow the defendants should have been aware and make them aware that she was here, that somehow we're at fault for not telling them that she was here. I don't think that's an issue.

The real question is when she was identified, there was no hesitation by the government, Marshals, the agents, to get her out of court immediately. The courtroom had several people, black women who were in the front here that had been coming to court. They walked right over to her and escorted her right out. So, to say that they did not know and recognize who she was, Judge, just raises the question of: Is that accurate or not?

And so with all that, we would ask that she be excluded throughout, Judge. This cumulative identification testimony that has been provided, this witness is not critical to this case, the government's case at this point. And clearly, if it was, she would have been clearly instructed

5875

not to be here.

So, to allow this to just simply be considered not significant at this point with respect to defendants' due process rights, we would ask that she should be excluded, Judge.

MS. GIACCHETTI: Judge, just so it's clear, Mr. -- this witness, I believe, is going to be offered as a witness to identify a person in a stairwell as Charles Liggins.

MR. BARNETT: And Marcus Smart as well.

MS. GIACCHETTI: And she hesitated in the grand jury, saying, "This video's not very clear."

And she's sitting here -- it's not whether some other witness on the stand identified it. Every time we stand up, we identify ourselves and Mr. Liggins. And she's sitting over here for weeks, and she now knows who Mr. Liggins is. She's been staring at him. Okay? I mean, I -- at least potentially, she's been on this side, as far as I understand. She's been right near him.

And it taints her identification not only in the courtroom, but of the video that she wasn't sure of to begin with. So, it is a different, but similar issue to her matching the testimony of another witness. That's one of the reasons for exclusions.

And again, we don't try a lot of identification cases in this building, but this is a pure identification case; and

what we've now got is someone who actually sat on that side, heard him called out by his own lawyers. Okay? Because we do it every morning and every afternoon, and, you know, a few feet away from him. And so that impacts both the video identification and the in-court identification, but primarily the video identification, which was tentative to begin with.

And even if it were not, that is totally unfair that witnesses are excluded. And that's one of the reasons, is to preserve the integrity of the entire process. And so certainly, her -- any testimony relating to her identification of Mr. Liggins in that surveillance video should be excluded now because of this.

It is a serious impact, and it doesn't matter if no other witness identified Charles Liggins. I've been identifying him or Mr. Mitchell's been identifying him twice a day, twice a day.

MR. BARNETT: Also, your Honor, similar argument as to Mr. Smart. I don't need to reiterate that. It's the same type of testimony. He's on the stairway. It's rather tentative, but she does identify him.

But she's sitting in the second row watching this. I don't know how long. Could be for weeks, as far as I know. I don't know. But I do know that it has the same type of effect.

I don't know what the extent -- I don't know what --

I would like to check what -- the law on it. I don't know it off the top of my head; but clearly, it seems to be a violation, and she should be barred, I think. But I would like some time to brief it, if you so desire. If not, not, but I would like some time to do that.

MR. JULIEN: May I respond briefly, your Honor?

THE COURT: Yes.

MR. JULIEN: Just on a couple of points. I don't know where the suggestion that she wasn't informed not to come here, where that's coming from. Any contact we have had has been through her counsel, because she's represented by counsel, and I specifically indicated to her counsel that she did not need to be here. And the last correspondence that I had sent to him, which was some time ago, indicated that today, November 30th, would have been the earliest that we needed her to be here today.

So, I don't know where that's coming from, but we are in contact with her counsel, as we are in contact with many other people about just to update where we're at in the schedule. And she was not to be here.

Second, we knew where she was sitting in the courtroom because, again, I haven't reviewed the transcript, but I believe Mr. Kling specifically directed us to where she was and provided a description of her. And so everyone in the courtroom turned around and looked at where she was sitting,

5878

and we figured out that that was her. And that's why we moved into action quickly in the way that we did and had her removed from the courtroom.

The agents asked her for identification. Again, we weren't sure. And it was -- when she was outside is when the determination was made that it was, in fact, her.

The third thing, this isn't -- a violation of an exclusion order for witnesses is not a due process violation. And I have a Seventh Circuit case that I'm looking at. It's *Drake versus Clark*. And the cite is F -- 14, rather, F.3d 351. And let me find the pin cite. It's head note 10, but 358 is the pin cite.

So, "Drake next contends he was denied a fair trial when the trial court's pretrial order to separate witnesses was allegedly violated. The separation of witnesses, however, is not a denial of due process."

And then there's a Seventh Circuit case citation, cert denied by the Supreme Court.

"Thus the district court properly refused to grant Drake habeas relief on this ground. In any event, we agree with the Indiana Supreme Court that the trial court did not abuse its discretion by refusing to strike the testimony of the witness involved in the violation of the separation order.

"As the court noted, 'the trial court was in the best position to evaluate the severity of the violation, and the

5879

trial court did not deem the violation sufficient to warrant the exclusion of the witness's testimony.'"

I'd note that, you know, identification would have been apparent as being an issue to T.H. It was apparent based on the questions and answers that she was asked and gave in the grand jury. Your Honor has that transcript. It's on the docket.

But there are also matters for which that witness is the singular source of information. So, the testimony is important. Issues relating to the purchase of the Ford Fusion that Mr. Offerd bought in July of 2020; issues relating to who picked him up from the dealership on August 4th, 2020, which was T.H.; issues relating to who was with Offerd when T.H. picked Offerd up from the dealership, again, T.H., and who she gave a ride to.

So, she is the singular source of information on those topics beyond identification in the Camtasia video.

MS. GIACCHETTI: She is not a singular source as to Mr. Liggins.

THE COURT: And that's because as to Mr. Liggins, it's the identification --

MS. GIACCHETTI: There's nothing other than the identification as to Mr. Liggins that has any material importance, and there are other people identifying Mr. Liggins on that same portion of the video, multiple, multiple people.

5880

THE COURT: Okay. So, Mr. Barnett asked for a chance to brief it, and I would like to accommodate that request. I don't mean by that to require that everyone else also needs to brief it, I -- because there has been extensive discussion today. So, if you don't -- you know, if that's not something that you would like to do, then you don't have to.

But if you would like to, why don't we pick a date for that. So, I mean, could it be maybe next Tuesday? If this witness is towards the end of next week, would Tuesday be soon enough for that?

MR. JULIEN: Potentially. It just depends on when there's going to be some final resolution on it.

THE COURT: Okay.

MR. JULIEN: Because, yeah, that witness could be the end of next week.

MR. BARNETT: I --

MS. GIACCHETTI: Judge, could we -- I don't know that we can get a brief done, but if we find any cases, we could certainly get them to the Court.

THE COURT: Okay. Yeah. I think -- I mean, that's fine, too.

MR. BARNETT: I could actually get something done, but it won't be -- it will just be like a summary of the cases, just like Ms. Giacchetti talked about.

THE COURT: Yeah. That would be completely fine,

5881

even just some cites, I can just look at the cases myself, too.

MR. BARNETT: Absolutely. Absolutely. I don't think you need my help in reading cases. I know you can -- we'll try to get you something we think is appropriate.

THE COURT: Okay. Sounds good. I'll -- so, if -- I mean, in the meantime, I'll also go back and look at her grand jury testimony, which I think is docket 174, and, you know, consider that, too.

One case that -- just to put one cite out there, which is not a claim that this is, like, exhaustive research in any way, but just because there's one case out there that appears to be on point, there's a case *United States v. Thomas*, 774 F.2d 807-810, Seventh Circuit 1985. And that's -- I mean, the part that seems to be relevant there says, "As for Freel's apparent violation of Federal Rule of Evidence 615, the witness exclusion rule, the case law surrounding Federal Rule of Evidence 615 reveals that absent any indication Freel's presence in the courtroom was the product of government connivance or in some way a willful violation of the rule, it is within the district court's sound discretion to allow the witness to testify. See *United States versus Schaefer*," and then it's continuing after two cites.

And then it says, "We see no abuse of discretion by the district court here. There's no evidence of a willful or

5882

strategic violation of Federal Rule of Evidence 615 by the prosecution or Freel, nor is there evidence Freel's presence throughout the trial prejudiced the defendants. We note Freel's testimony appears limited to one of many financial transactions surrounding the case, which were already documented."

But, you know, I think that -- you know, what I take from that is, just like so many of these evidentiary decisions, it's just this case-specific look at what happened and whether there are particular circumstances that warrant a finding of, you know, real prejudice in that particular situation; and also it does look like one of the questions is whether there was some, you know, willful or strategic act by -- by the government, so I -- or the witness.

And I think, you know, already at this point, at least quite a bit of the information that everyone has on those points, we've talked about. So, I feel like at this point, I can kind of consider all that.

But let me just give you also an opportunity -- I do want to go look at her grand jury testimony because that will help me just remember -- which was attached to the motions to suppress. So -- but that will help me just refamiliarize with that.

Okay. So, I'll do that. In the meantime, if anyone does have further things you'd like to add or cites or any

type of written filing you'd like to make, I will set Tuesday for the deadline for that, Tuesday, December 5th. And that way, I think having had this discussion now, I should be pretty prepared to look quickly at whatever you may or may not file that day and then proceed.

Okay. You know what, so, is there any other grand jury testimony or any other prior, I guess, discovery regarding identifications by T.H. that I should be looking at? Because I guess 174 seems like it's -- I mean, it was attached to the Liggins or Thomas motions to suppress, so I --

MR. JULIEN: It was attached to our response, your Honor.

THE COURT: Ah, okay. Okay.

MS. GIACCHETTI: Judge, I'm looking through our motion to see what were the salient factors that we raised, and, you know, we'll take a look, if it makes sense to pull that out in any way to make sure that you have an understanding also of if there's any other interviews or anything that are relevant to the issue.

THE COURT: Okay. Great. Thank you. I mean, one question is: Is there -- we know that that transcript at least deals with the Liggins identification in the grand jury, but as to Smart, is there --

MR. BARNETT: There is another grand jury -- yes, there is.

5884

THE COURT: Okay.

MR. JULIEN: It's in the same transcript.

THE COURT: Same transcript?

MR. BARNETT: Yes.

MR. JULIEN: But there is a report. I don't remember -- there's a report.

THE COURT: Okay.

MR. JULIEN: And so we can provide that to the Court as well.

MR. BARNETT: That's correct. There is a report, as well as the grand jury.

THE COURT: All right. Thanks. If you could provide that, that would be helpful.

Okay. All right. At least we've made some progress on that. Can I ask, on -- coming back just briefly to the expert issue, if -- so I don't want by this to take off the table the possibility of a ruling based on the timing issue, but, you know, I -- I do -- I just wonder whether it is the sort of situation where it would be helpful to hold a *Daubert* hearing to have more information about the proposed testimony.

If we were to do that, can I just ask, when would be a good time for that? I mean, if we were to do that, I mean, it's tough to fit in, which I know this is part of the government's point is it's just tougher to fit in during the trial; but theoretically, since we're not meeting on Fridays,

5885

we could do one, I don't know, a week from tomorrow, or theoretically, we could do one during the week, although it would eat into the jury time.  We'd have to let the jury leave early one day.

I know you need a decision on that soon, so I don't know that we could put it off much more than, you know, next week sometime.

MR. GREENBERG:  Judge, can you give us a second so we can see if we can check with Mr. Williams as to his availability?

THE COURT:  Yes.  In fact, if you want to do that tomorrow and --

MR. GREENBERG:  We can send an e-mail?

THE COURT:  Yes, or -- yeah.  I think that would be helpful just to know.

MS. BORMANN:  He teaches, so there's a good chance he wouldn't get -- even if I called him, he wouldn't be available right now.

THE COURT:  Okay.

MS. BORMANN:  But I'm happy to give him a call and find out what his availability is.  Maybe -- I mean, could I suggest next Friday?

MR. GREENBERG:  No, you cannot suggest next Friday.

MS. BORMANN:  How about the Friday after?

MR. GREENBERG:  No, no, no.

5886

(Counsel conferring.)

MR. GREENBERG:  Judge, is it something we could do during the lunch break one day?

MS. BORMANN:  That would be fine.

MR. GREENBERG:  I mean, I don't think it will take that long.  I'm fine.  I want to be respectful of the jury's time.

MS. BORMANN:  That's fine with me.

THE COURT:  It is -- I mean, it's --

MR. GREENBERG:  Or do it at the end of the day one day.

MS. BORMANN:  That's fine, too.

THE COURT:  Potentially.  So -- because that -- if we were to try to build it in to, you know, the standard weekly schedule, then it would affect the government's plan, why don't I --

MR. GREENBERG:  That's okay.

THE COURT:  Well, but I --

MR. GREENBERG:  We can do it when you don't allow the witness next week, Judge.  We'll have an open slot.

THE COURT:  Why don't -- when -- I mean, I meant to also ask just generally, how is -- is there any updated projection from the government about the overall length of the case?  And would it be feasible to fit it in sometime next week?

5887

The thing about if we were to do a *Daubert* hearing -- and again, I'm not trying to imply that I'm no longer considering just exclusion on the basis of the timing; but if -- I'm just trying to understand what are the options. If we were to do a *Daubert* hearing and it were to happen sometime next week during the standard trial week, it would disrupt whatever plan the government has right now. And so we just need to know what the effect of that's going to be.

MR. JULIEN: There's going to be an effect, that's for sure. I don't have my copy of the -- I've been keeping a running tab and updating it daily. We are maybe about -- I don't have an updated one on me. That was something we were going to assess after today, candidly.

THE COURT: Okay.

MR. JULIEN: I believe we are about at the halfway point, though I do think after we get through this next slate of witnesses, so the ones next week and depending on how next week shakes out with us beginning the cross of Wiley on Monday, maybe the following Monday, I do think we're going to pick up some speed.

So, halfway, in the sense of like how it looks on paper, but maybe not necessarily halfway in terms of the time that it takes; but don't quote me on that. We can send an e-mail to the courtroom deputy tomorrow after we look at it tonight and in the morning in terms of where we're at, but

5888

next week is a packed week.

THE COURT: Okay. Well, why don't I then just leave it to you to try to confer on what is the expert's schedule and what effect that's going to have on your projected schedule from the government's perspective, and see if there's a time next week when it could occur.

MR. GREENBERG: How long do you think the hearing would take? An hour maybe?

MS. URSINI: Your Honor, may I raise another scheduling point with respect to the *Daubert* hearing?

The hearing would be for the purpose of determining whether the expert's sort of background and qualifications support the opinions that he would be offered to testify for at trial. We do not have a complete statement of those opinions. Without that, we can't really hold the hearing or prepare for the hearing. So, if there's going to be a hearing date, there also needs to be a deadline prior to that by which we have a full and complete statement of the expert's opinions.

MS. BORMANN: A *Daubert* hearing is to determine whether or not the expert's opinion is -- in this case, because he's a sociologist, whether or not it is well-informed and whether or not, frankly, it would assist the jury, his form of expertise. That's the case that Steve cited -- Mr. Greenberg cited from down the hall.

5889

So, it's not about the -- you know, the -- it's not an opportunity for the government to cross-examine the witness on all of his opinions.

MS. URSINI: It's not a hearing that's, "Is this a smart person who knows things and who is well-informed?" It's, "Does their background and qualifications support the opinions for which he's being offered?" We don't know what those are.

MR. GREENBERG: *Daubert* requires the Court to evaluate, one, the proffered expert's qualifications, which again, I'm not sure if they want a hearing on that; two, the reliability of the expert's methodology; and three, the relevance of the expert's testimony, so the relevancy of the gang testimony.

MS. URSINI: This presupposes we know what that testimony essentially will be. Rule 16 requires a complete statement for this very purpose.

MR. GREENBERG: "Still, the district court's role as gatekeeper does not render" -- and again, I'm quoting from the filing -- "does not render the district court the trier of all facts relating to expert testimony. A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide issues of credibility and accuracy."

They have an outline of what the testimony is going to be, Judge. It's sufficient. It's what's provided by the

5890

government, as I have said *ad nauseam*. It's what's provided in other cases.

So, if we need sort of a generalized hearing, that's fine, but I don't think we need to provide any further disclosure in order to have a hearing. And if the government doesn't want to participate in a hearing because they feel that they're not informed, then they won't participate, I guess.

THE COURT: I mean, I guess I -- I haven't seen the government's disclosures in other cases, so I don't have -- I haven't seen a comparison for the level of detail that would be typical in this -- with this sort of expert.

MR. GREENBERG: I could provide that, Judge.

THE COURT: Okay.

MR. GREENBERG: Maybe the government could provide it.

MS. BORMANN: Yeah.

THE COURT: I mean, I guess my -- the reason I asked about the possibility of a hearing is that it's really more -- again, looking back at Judge Tharp's opinion in the Hobos case, it's pretty detailed. It goes kind of, "Okay. This opinion is permissible. That one's not. This one's within the province of the -- a lay -- you know, the ken of the jury, and so it's not permissible. This one is."

And I am a little concerned that with the current

disclosure, I am not able to actually produce that sort of opinion because I don't have the level of detail that -- I haven't seen what the disclosure was before Judge Tharp.

MR. GREENBERG: I have that.

THE COURT: I don't know how Judge Tharp got to that level of detail in his opinion discussing the disclosure without having -- I mean, he obviously was looking at something that gave details that allowed him to discuss those details and rule them in or out. And so I am concerned that I lack that level of disclosure.

I did think, okay, maybe one way to deal with this would be to ask for a supplemental disclosure, and we could do that. I also thought we need to move this case. If I ask for a supplemental disclosure, it's going to be forever. Then maybe we have a *Daubert* hearing another week later. Then, you know, like -- then that cuts into the government's time if they decide they need to respond somehow, look for an expert, whatever, cross, who knows. We're now suddenly farther down the road. And I was just like how can we kind of cut to the chase on this and move it.

So, that's what generated the request. The request led to a lot more back-and-forth about what's going to be the process. And so let me withdraw the request. I'll look at the papers and just make a call.

MR. GREENBERG: Judge, I have that disclosure. I'll

5892

find it, and I'll provide it to the Court from that case.  I should have that because I was in that case.

MS. URSINI:  Your Honor, I think the question here is you can always look to other opinions and things for guidance. Ultimately, it's going to be what this particular witness is going to testify about in this particular case, whether it satisfies 403 in this particular case.  So, it is an individualized assessment.

I guess if your Honor comes to the determination we should have a *Daubert* hearing, we clearly would need to do that quickly, as you have noted.  I think what that would mean is we would have to essentially freeze the scope of that expert's testimony to whatever's already in the disclosure; in other words, that we couldn't then have additional opinions that the expert is going to be proffered to testify to that we don't know about and that would not be subject to that hearing.

In other words, if we have the hearing, it's going to be on whatever it is that he's proffered to testify to, not whatever defense counsel might think three weeks from now it would be helpful to add to his disclosure or supplement or something like that.  So maybe that's one way to do that.

MR. GREENBERG:  That's all fine, Judge.  That's all fine.  We can do that.  We're good with that.

THE COURT:  Okay.  So, I mean, where does that --

5893

MR. GREENBERG: We can have a *Daubert* hearing. We'll get his availability, and we'll -- we'll keep it to what we've already -- what's in the current disclosure.

THE COURT: In the meantime, I will look back at it because I -- you know, it may be -- I just think holding the discussion shed more light on the possibility that perhaps the fastest way to deal with it is to just decide it.

So, let me look back at the papers with that in mind. In the meantime, because if we need to hold a hearing I do think it needs to be sooner rather than later, if you could please check into his schedule, and the government could think about when that could be if we need to do it.

We'll reconsider this on Monday, and by then I'll hopefully know better whether to hold a hearing or not and just know how to proceed.

MS. BORMANN: And, Judge --

MS. URSINI: Thank you, your Honor.

MS. BORMANN: I think the attachment to one of the responses that Mr. Greenberg -- I think was actually our response to the government's motion has attachments to it. And one of the government's disclosures from a previous case was actually attached. So, if you look at the attachments, I think you'll find some information about how the government proceeds on gang experts and how they tender disclosures.

THE COURT: Okay. I do -- let me just look very

quickly at it because I have been looking at a version of it, but I don't know that my version that I've been looking at has all the attachments. So, let me just double-check quickly.

I see. Okay. I was looking at the corrected response, which is 364, which has one attachment, which is the opinion and CV. But I'm looking now back, which I wasn't looking before -- because I've been looking at the corrected one, but there is the original one, which is 350; and that has two attachments, one of which is the transcript of proceedings before Judge Tharp. Sorry. Is that the right --

MR. GREENBERG: Yes. That's from the case I did with Mr. Berry.

THE COURT: Okay. So, this is *United States versus Robinson*?

MR. GREENBERG: Right.

THE COURT: Okay. I'll take a look at that.

MS. BORMANN: And we'll get you whatever disclosures we can find. I'm sure we have a few between us.

THE COURT: Okay. All right. Sounds good.

Okay. Any other -- I think actually, I know of one other issue, which is we just need to nail down the time for everyone to arrive on Monday morning. I think I told the jury 10:00, so what time should we all arrive?

MR. SPIELFOGEL: 9:50?

MS. DOMPH: 9:55.

5895

MS. GIACCHETTI: Judge, I liked the soft 9:00, where you said try to be here at 9:00, but I understand that people will roll in, because I happen to be a roller-in'er. So I'm perfectly happy, if you're going to say 9:00, as long as it's a soft 9:00, as opposed to you're going to shut the door in my face if I get here at 9:01.

THE COURT: Okay. Is everyone okay with that?

MR. SPIELFOGEL: Yes.

MR. MITCHELL: Yes, soft 9:00 is good.

MR. JULIEN: 9:00 is fine, your Honor.

THE COURT: Okay. I also rolled in slightly after 9:00. Okay. That's fine. All right. Is there anything else that we should discuss right now?

MR. JULIEN: No, your Honor.

MR. BARNETT: No, your Honor.

MR. SPIELFOGEL: Have a great weekend.

THE COURT: Everyone have a nice weekend. Thank you.

(Court adjourned, to reconvene 12/4/23 at 9:00 a.m.)

* * * * *

C E R T I F I C A T E

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Kathleen M. Fennell
_____

/s/ Joseph A. Rickhoff
_____

/s/ Charles R. Zandi          December 1, 2023
_____    _____

Official Court Reporters          Date
United States District Court
Northern District of Illinois
Eastern Division

I N D E X

PAGE

MARTELL WILEY

Direct Examination By Mr. Julien                    5727

INDEX TO EXHIBITS

GOVERNMENT EXHIBIT                                  RECEIVED

DEFENDANT'S EXHIBIT                                 RECEIVED