6159

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
-vs- ) Case No. 21 CR 618
)
CHARLES LIGGINS, KENNETH ) Chicago, Illinois
ROBERSON, TACARLOS OFFERD, ) December 5, 2023
CHRISTOPHER THOMAS, MARCUS ) 9:15 a.m.
SMART and RALPH TURPIN, )
)
Defendants. )

VOLUME 29
TRANSCRIPT OF PROCEEDINGS - TRIAL
BEFORE THE HONORABLE MARTHA M. PACOLD AND A JURY

APPEARANCES:

For the Government:     MR. JASON A. JULIEN
                       MR. SEAN HENNESSY
                       MS. ANN MARIE E. URSINI
                       MS. CAITLIN S. WALGAMUTH
                       Assistant U.S. Attorneys
                       219 S. Dearborn Street
                       Chicago, IL 60604
                       (312) 353-3500
                       jason.julien@usdoj.gov
                       sean.hennessy@usdoj.gov
                       annmarie.ursini@usdoj.gov
                       caitlin.walgamuth@usdoj.gov

For Defendant          MS. CYNTHIA LOUISE GIACCHETTI
Liggins:               Law Office of Cynthia Giacchetti
                       53 West Jackson, Suite 1035
                       Chicago, IL 60604
                       (312) 939-6440
                       Cg@cgdefense.com


         * * * * * * * * * * * * * * * * * *


         PROCEEDINGS REPORTED BY CERTIFIED STENOGRAPHER
              TRANSCRIPT PRODUCED WITH A COMPUTER

6160

APPEARANCES:   (Continued)

For Defendant          MR. GREGORY T. MITCHELL
Liggins:               Law Office of Gregory T. Mitchell
                       19150 Kedzie Avenue, Suite 205
                       Homewood, IL 60430
                       (708) 799-9325
                       Mitchlaw00@sbcglobal.net

For Defendant
Roberson:              MR. STEVEN GREENBERG
                       Greenberg Trial Lawyers
                       53 West Jackson, Suite 315
                       Chicago, IL 60604-6060
                       (312) 879-9500
                       Steve@greenbergcd.com

                       MS. CHERYL T. BORMANN
                       Cheryl Bormann
                       53 West Jackson, Suite 315
                       Chicago, IL 60604-6060
                       (312) 588-5011
                       Cheryl.t.bormann@gmail.com

For Defendant Offerd:  MR. JOHN SOMERVILLE
                       9924 S. Walden Parkway
                       Chicago, IL 60643-1702
                       (773) 505-1706
                       Jville62@gmail.com

                       MR. RICHARD S. KLING
                       Chicago-Kent Law Offices
                       565 W. Adams, 6th Floor
                       Chicago, IL 60661
                       (312) 906-5075
                       Rkling@kentlaw.iit.edu

For Defendant
Thomas:                MS. ELLEN R. DOMPH
                       Law Offices of Ellen R. Domph
                       53 West Jackson, Suite 1544
                       Chicago, IL 60604
                       (312) 922-2525
                       Edomph@gmail.com

                       MR. KEITH ALLAN SPIELFOGEL
                       190 S. LaSalle Street, Suite 540
                       Chicago, IL 60603
                       (312) 236-6021
                       Spielfogel@sbcglobal.net

6161

APPEARANCES: (Continued)

For Defendant
Smart:                    MR. MARC M. BARNETT
                          Law Offices of Marc M. Barnett
                          53 West Jackson, Suite 1442
                          Chicago, IL 60604
                          (312) 217-5019
                          Barnett.marc163@gmail.com

                          MS. MICHELLE MARIN
                          Criminal Defense Lawyer of Chicago
                          53 West Jackson Boulevard
                          Chicago, IL 60604
                          (312) 719-0376
                          Criminaldefenseofchicago@gmail.com

For Defendant
Turpin:                   MR. PATRICK EAMON BOYLE
                          Law Offices of Patrick E. Boyle
                          155 North Michigan Avenue, Suite 562
                          Chicago, IL 60601
                          (312) 565-2888
                          Privpat3@hotmail.com

                          MR. JOSHUA B. ADAMS
                          Law Offices of Joshua B. Adams, PC
                          900 W. Jackson Blvd., Suite 7 East
                          Chicago, IL 60607
                          (312) 566-9173
                          Josh@adamsdefenselaw.com

Also Present:             Ms. Christine Case, FBI
                          Mr. Domonique Dixon, FBI


Court Reporter:

          KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                  Official Court Reporter
              United States District Court
          219 South Dearborn Street, Suite 2328A
                  Chicago, Illinois  60604
                  Telephone:  (312) 435-5569
              Kathleen_Fennell@ilnd.uscourts.gov

6162

(Proceedings heard in open court; jury out:)

THE COURTROOM DEPUTY: United States District Court for the northbound district of Illinois is now in session, the Honorable Martha M. Pacold presiding.

21 CR 618, United States versus Liggins, et al.

If you can state your name for the record, we'll start with government counsel.

MR. JULIEN: Good morning, your Honor. Jason Julien, Ann Marie Ursini, Caitlyn Walgamuth, and Sean Hennessy for the United States.

MR. KLING: John Somerville, Richard Kling for Mr. Offerd, who is present in court.

MS. DOMPH: Ellen Domph, Keith Spielfogel for Mr. Thomas.

MS. GIACCHETTI: Cindy Giacchetti and Greg Mitchell on behalf of Mr. Liggins.

MR. BOYLE: Good morning, your Honor. Patrick Boyle and Joshua Adams on behalf of Mr. Ralph Turpin, who's present before you.

MS. BORMANN: Good morning, Judge. Cheryl Bormann and Steve Greenberg on behalf of Kenneth Roberson.

MS. MARIN: Good morning, your Honor. Michelle Marin, and Marc Barnett will be here shortly, for Marcus Smart.

THE COURT: Good morning.

6163

I understand that the witness is on the way and is expected to get here around 9:30, and there's some traffic.

MR. JULIEN: That's correct.

THE COURT: So if that estimate is correct, then we should still be able to start with the jury at 9:30, but it will turn on that estimate. Obviously, we'll need the witness to get started.

But we'll start as soon as the witness is here, ideally at 9:30.

Anything to discuss before then?

MS. WALGAMUTH: Your Honor, for the government, there's at least one issue we want to discuss, but this relates to Mr. Wilton, who is the third witness today. We anticipate he will begin likely right after the lunch break. So I can raise the issue now just to alert you of it, but perhaps we could -- if your Honor would like. If we don't have time right now, we can talk about it over the lunch hour perhaps.

THE COURT: Okay. What's the issue?

MS. WALGAMUTH: So in general, the issue -- this relates actually to the topic we were discussing yesterday with respect to the disclosure or late disclosure of videos intended for cross-examination.

So last night, we requested that any party send us any videos, including YouTube or public source videos, they

6164

intended to seek to use or either admit during the cross-examination so the parties would have a chance to review those.

At 10:00, we received a list of links from counsel for Mr. Roberson. This included about six hours and 48 minutes of video footage, as well as several --

MR. GREENBERG: Why are you complaining about this when I sent you another email this morning, I said this is the one I'm going to play? It was five minutes long.

MS. WALGAMUTH: So last night at -- I will just -- this is new information.

Are you only seeking to introduce the one video and you're not looking to use the link of 15-plus videos? I'm just flagging that we haven't had time to review these 7 hours of footage.

MR. GREENBERG: I -- no.

MS. WALGAMUTH: I have other objections and concerns about the ones that I have reviewed.

MR. GREENBERG: There's a couple of videos, Judge. One's a music video that they're well aware of because they've already played the sort of source for that music video.

Another one is a -- it's five minutes long. And there's one more clip that I sent this morning -- I believe I sent this morning, but I'll resend it now to them -- where the witness -- someone puts a block of cheese in front of him and

6165

says he's a rat, and he pulls out a gun and racks the gun as if he's going to shoot everyone in the room. And that's a fairly recent video.

But those -- the list is long, I don't dispute. They were links -- they were supposed to be links to clips that had been prepared by my associate. They apparently were links to the entire videos.

So if there's any others, I will make sure that they just have the short clip. But I don't think there's any others.

MS. WALGAMUTH: So, your Honor, I think we're in a similar spot in that it seems like there's some clarification that there's at least three videos, and perhaps others that we've not seen yet, with this witness coming up this afternoon. We anticipate his direct will be a few hours, so there is a good chance that cross-examination will begin today. So I just wanted to flag that issue.

We do, however, have objections that we can raise. And perhaps if we want to have a discussion before the jury's -- and the witness is on the stand with respect to the videos he identified and the purpose for this.

So I think this is what he's referring to, I believe, is the "Broke Opps" song by King Von, which is not a government's exhibit and has not been played to any witness at this point in trial. A clip of a video -- and, again, the

6166

purpose under relevance and other bases and 403, we would object to, as well as hearsay. And then a Lil Durk music video. And, again, that would be a relevance and 403 objection.

But -- I can talk further with counsel, but as of this morning, we were aware of, you know, some 17 or 18 links without timestamps or any basis for use with the witness.

MR. GREENBERG: So -- I'm sorry.

Are you done?

MS. WALGAMUTH: Yes.

MR. GREENBERG: So, Judge, let me -- there's a few different things that they're talking about here. Some are with that witness, some might be with Mr. Garrett.

There is a vlog that the government has played in this case. If you recall, it's King Von coming in, it starts out with him handing out money and so forth. That -- and he says at one point during the vlog, we're making a music video.

The video that she's talking about is the music video. We tried to play it earlier with the witness. We had computer issues. We didn't play it. We actually talked about it. But I'm sure that's no surprise to the government. That's something that they've known about. It's a music video that's out there that -- it's just a shorter version, essentially, of the vlog that they've already played, which, of course, is consistent with the defense evidence that we've

6167

been presenting, that much of this is about music.

The second thing that I believe I sent last night, but I'll doublecheck, the -- is that Lil Durk, who some of the testimony is Lil Durk is involved in these activities and behind it. He is a major rapper. He actually did a song recently with Morgan Wallen.

I don't know if your Honor is familiar with Morgan Wallen. Morgan Wallen sold out Wrigley Field. Yeah, sold you out Wrigley Field this summer. He's a country singer, and he actually did a rap song with Lil Durk. And Lil Durk gives Morgan Wallen an OTF necklace, which, again, is something that comes up in many of the videos the government has played here. And they are -- have been, you know, seen on witnesses and so forth.

That is something that just -- as far as I know, just took place of him giving the necklace, and we've got the video from that.

And the other one is the witness that they intend to call today, which they said they'll get to this afternoon -- and I believe they've been well aware of it. I know some of the other defendants knew about this before. The witness MW talks about how his sister, Ms. Barnes, was not killed by King Von. It's about five minutes long, that video, and he talks about how the witness wasn't killed by King Von, he talks about how he's addicted to Ecstasy, and some other

6168

things.

So those would probably be the sum total of the videos that we would intend to play. And we would abandon the rest of the list unless, of course, something comes up in what he says, which then it would be impeachment.

MS. WALGAMUTH: And, your Honor, I'm happy to respond now, but we do have objections with respect to, I believe, all of those videos except potentially, and we've -- Mr. Spielfogel on behalf of Mr. Thomas also shared a link for the video that -- I believe the last video that Mr. Greenberg is referring to, for impeachment purposes.

And with respect to that video, if it is used for impeachment purposes as permitted under the rules and the limited portion of the statement that is, in fact, inconsistent, we wouldn't have an objection to that. And we've already addressed that with counsel for Mr. Thomas.

So I think that one is distinct and may have an appropriate purpose for impeachment if it is used consistent with the rules at that point in the cross-examination.

But, you know, a music video by Lil Durk featuring a country singer, again, this is also beyond relevance to this case. It's also the scope of the direct examination. MW is a witness who is not a member of O-Block. He is a member of the rival gang. He will testify in a limited capacity, we anticipate on direct examination, about two rap videos that

6169

have already been admitted into evidence that relate to his viewing of them with the victim, Carlton Weekly, and his viewing or observation of the filming of a music video and his understanding of those meanings based on his conversations with Weekly and his understanding based on his role in the rival gang and his knowledge of O-Block.

So this witness to show and put on -- this is just a method to get in evidence related to a broader theory.  This witness isn't going to opine generally about rap music and OTF necklaces and how they are given, or OTF necklaces at all.

And so this is just beyond the scope.  It's not relevant.  There's 403 issues here.  And it's just not an appropriate witness to put that on.  We don't anticipate there will be any basis, based on the direct examination or this witness's knowledge, to use that video.

And then additionally --

MR. GREENBERG:  I'm sorry to interrupt.

We're not going to be playing it through MW.  That wasn't -- or what's his -- Rakeem, yeah.  We're not going to be playing it through him.  I was just saying that we had tendered those.  Those are what we had sent.  We're not playing it through him.

MS. WALGAMUTH:  Okay.  So I think we have a -- I think we just need to get on the same page, and perhaps this could be some clear communication from counsel about when you

send a link of videos, what they intend to use them for so we can properly address them ideally between the parties and not with the Court. But this entire conversation is my understanding isn't about this witness that's on the stand today.

So if the Lil Durk video isn't related to this witness, I think that issue can be put aside.

Is that my -- is that your understanding, Mr. Greenberg?

MR. GREENBERG: Yeah, we're not playing it through that witness. He has no appreciation of country music.

MS. WALGAMUTH: Okay. So I think -- your Honor, I can confer with Mr. Greenberg and try to get clarity on what specifically they intend to use with Mr. Wilton, which is the witness at issue today. And perhaps we can spend some time this morning -- or at the lunch break, your Honor, addressing objections, because we do -- at least one of the videos or clips he just discussed we have a number of objections to as well.

THE COURT: Okay. That sounds good.

Is there anything else?

So I understand that now the witness is a little bit delayed past 9:30?

MR. JULIEN: Yes, your Honor.

THE COURT: By how much?

MR. JULIEN: He's 15 minutes out as of 9:22.

THE COURT: Okay.

MR. GREENBERG: We should strike the testimony.

THE COURT: All right. Are there other urgent issues?

Otherwise, I guess I have a couple things, but are there other urgent issues anyone would like to raise?

MR. BARNETT: No.

THE COURT: No? Okay.

All right. And so just -- I do appreciate everyone, you know, being here in time to start the testimony with the jury. I know now we have the witness issue, but at least -- you know, if the witness had been here, we could have started at 9:30, which is an improvement. So I appreciate that. Thank you, everybody.

I would note -- so I am, consistent with what we've just been doing right now, I'm going to try to do that. So we're going to start when I -- barring issues, like the witness not being here, we're going to start with the jury at the time that I told them.

What that means is, it's going to leave us whatever time we have until that time to deal with issues outside the presence of the jury. And what that means, in turn, is that if you do have things to raise outside the presence of the jury, please do try and let me know as soon as possible so

6172

that we can make sure we build in enough time before the start time with the jury.

I think it could be useful to have 9:00 as the start time for everyone else, just so that we have a cushion for that.

One thing also just to be aware of is, we're not starting the discussion -- we're not going on the record, holding court proceedings, until defendants are here, which is appropriate. Obviously, the defendants can and should be here for their trial.

I would point out, though, that if -- if there are things that you want addressed outside the presence of the jury and we are starting at 9:30 promptly with the jury, any time -- basically, if you want to hold legal arguments about issues, if the defense wants to raise issues or get their views heard on issues that the government is raising, that time -- any time that we have before the start time with the jury is the time we're going to have to deal with that. And, therefore, you know, if defendants are not here by 9:00, that is going to cut into the time that we have to deal with those issues. It's just how the schedule is working out.

MS. GIACCHETTI: Judge, my client would waive his presence for those types of issues, so that we can -- if we need to start at 9:00, we can start at 9:00, so we can start at 9:30 with the jury.

6173

We'll advise our client about what happened. But, you know, 10 minutes can make a big difference here, 15 minutes. And so on behalf of Charles Liggins, we waive his presence for that.

MR. BARNETT: I agree with that. I think that's appropriate.

THE COURT: Okay.

MR. GREENBERG: We would do the same with respect to Mr. Roberson, Judge.

There also was an issue, Mr. Roberson gets delayed sometimes because there's some kind of a separatee order, which I did speak to Mr. Hennessy about and I think he was going to see about removing.

MR. KLING: Judge, Mr. Offerd would waive his appearance as well for early discussions.

MS. DOMPH: We can waive Mr. Thomas's appearance for those issues.

THE COURT: Okay.

MR. GREENBERG: Which also would mean that we could stay later, if necessary.

THE COURT: Okay.

MS. GIACCHETTI: Agreed, Judge.

I think we should do everything to be able to optimize our ability to fully present these issues to you, and the defendants understand that.

6174

THE COURT: Okay. I think I've heard from everyone on the waiver of presence with the exception of Mr. Turpin.

MR. ADAMS: We agree. We waive his presence.

And also, just in the separatee order update for Mr. Hennessy, if he has one for us.

THE COURT: Okay. I'm sorry. And I thought I heard from everyone else, but let me just doublecheck.

Was there someone else who did not comment on the waiver of presence?

Okay. So everyone has waived their presence for legal issues.

Okay. So that's helpful. We've addressed that.

Also, should we schedule the *Daubert* hearing for Mr. Williams?

I received from Mr. Greenberg some proposed dates and times, and I think one of them is next week and one of them is this Thursday. So I thought, if we're going to schedule it, we should address it ideally today so that you can just confirm he can be available on Thursday.

I think waiting until next week is probably less ideal, because just the -- you know, it just takes more time, and we're trying to move as rapidly as we can on this issue. So I think we should try and set it for Thursday, if that works for everyone.

MS. BORMANN: What time?

6175

Give me a moment, Judge. I need to figure out the timing wise.

THE COURT: Sure.

MS. BORMANN: It was the afternoon? The email in front of you, was it the afternoon?

THE COURT: I think it was the afternoon. I'll just doublecheck.

MS. BORMANN: Fine with us.

MR. JULIEN: Thursday, the 14th?

THE COURT: I think it was December 7, so this coming Thursday, between 12:00 and 5:00 p.m., or all day on December 13 are the options.

So, I mean, if people are okay with --

MR. GREENBERG: December 7th between 12:00 and 5:00, and all day on the 13th and all day Monday, which obviously went past.

THE COURT: Yes. So, I mean, I guess I was just looking at the 7th between 12:00 and 5:00, or the 13th. And as between those two, I thought the 7th was better because it's sooner, but if you disagree with that -- and just the theory being if we get that done sooner, we'll know sooner what's the result, which then allows everyone to plan.

MS. BORMANN: That's fine, Judge.

I can reconfirm with Dr. Williams when we take a break. But -- assuming he's not in class. But, yeah, that

6176

was one of the times he gave us.

I asked him for two weeks coming out. That was the end of last week, so that's why he gave us all of his availability during the next two weeks.

MR. JULIEN: Your Honor, how much time do you envision setting aside for the hearing?

THE COURT: I thought an hour, maybe.

I mean, does anyone think we need more than that?

MS. BORMANN: No.

My intention is to, you know, basically lay his qualifications down and then let the government ask whatever they want.

THE COURT: I mean, we could build in two hours if that would be safer.

MR. JULIEN: Can you give us a moment, your Honor?

THE COURT: Sure.

(Counsel conferring.)

THE COURT: One point just is that the purpose of the hearing was, in part, to refine -- I don't want to say it's a substitute for the disclosures, but it's to fill in the disclosures. And, therefore, I don't -- I don't know that his -- I mean, his qualifications is fine to talk about at the hearing, but the real purpose was not a question about his qualifications. It was more what is he going to say.

MS. BORMANN: Judge, if the government wants to

stipulate to his qualifications or the Court will recognize him already, then that would dispense with a lot of the background.

His experience, however -- and that is, frankly, 50 years or so of being involved in the south side gang situation and the gang culture, including interviews, et cetera, with Black Disciples, Gangster Disciples, all of the issues relevant to this case, I'll intend to introduce that. And then, you know, what we've laid out with respect to our earlier proffer is kind of where we're going.

So happy to ask about that as well.

THE COURT: Okay.

MR. JULIEN: So, your Honor, after talking this over, effectively that's going to end the day on Thursday, which is fine. So I think we should just say after the lunch break because we're going to have to send the jury home, unless you envision them hanging out until it's done and us putting another witness on.

THE COURT: No. I think that -- I mean, I don't -- I would envision putting it at the end of the day on Thursday, for however long it takes, so -- and I wouldn't want the jury to be waiting that whole time.

So, I mean, I think the only question is, can we get a little bit more testimony done after the lunch break or not, and maybe it's just -- it's not worth it at that point and

6178

best just to turn to the hearing.

MR. JULIEN: Yeah, your Honor, I think it really depends on where we're at in the cross-examination, not of the next witness, but of the one after that witness, so RW, who might start this afternoon.

So this universe where he's done on Wednesday and then we just have a day to put on two witnesses who might be shorter witnesses, and maybe that takes us to the lunch break, at which point we could start with the *Daubert* hearing.

But then, again, it's just like we're -- that's the end of the day. Or potentially the cross-examination of RW bleeds into Thursday, and so maybe that's less of an issue then because, you know, there's less of a chunk of a day that we have to account for and fill.

Maybe that's a long way of saying it just depends on how we do today and tomorrow where we're at in terms of making sure all of the hours of the day are accounted for in a way that is most useful.

THE COURT: Okay. So then why don't we plan on that hearing occurring Thursday afternoon. And if -- so I -- I guess I am sorry not to have a definitive time for Mr. Williams, but if he could just be available that afternoon. And that way, depending on how the testimony is going with the witnesses, we can just start that at a time after lunch that makes sense.

MR. GREENBERG: We could also, Judge, just skip lunch and just tell the jurors we're going to let them go at 1:00 or something like that, and just go a little later in the morning. You know, just -- I mean, but we could see how the witnesses go.

MR. JULIEN: Our preference would be to just let's see how the witnesses are going. What I want to do, and defer to the Court on this, is just use as much jury time as we can use.

So I would rather not -- if it turns out the *Daubert* hearing takes an hour and a half and we start it at 1:00, you know, we've burned two hours that we otherwise could have used, if that makes sense, on Thursday afternoon.

So if it shakes out that we're going to start this hearing at 2:00, then that's fine. But if it -- in other words, there's no need to start the hearing unnecessarily at noon if we have time left over in the afternoon that we could have used.

MS. BORMANN: And, Judge, I can ask him -- tell him that we can update him as -- by tomorrow, because we should have a better idea by tomorrow.

The problem for his 5:00 p.m. is pretty tight because he teaches that evening, and so -- so that's kind of the back end.

THE COURT: Okay.

6180

MS. BORMANN: But if we can -- I'll ask him to hold the afternoon open, and then we can update him tomorrow. How does that sound?

THE COURT: That sounds good. And that's fine about the 5:00 p.m. end time, because I think we need to try to stick with that time anyway for just other reasons for the marshals.

Okay. Any other comments on the plan?

So we're just going to ask him to please hold Thursday afternoon, and then we're going to see how the testimony is going Thursday with the fact witnesses, and sort of start the -- play it by ear a little bit on what time exactly we start the hearing. So as to make the best use of the jury's time that we can.

And I understand that TG is now coming through security.

MR. JULIEN: Yes. He's up here now, your Honor.

THE COURT: Okay.

MR. JULIEN: Do you want us to bring him in, your Honor, or is there anything else?

THE COURT: I don't have anything else.

Does anyone have anything before we bring in the witness and then the jury?

Okay. We can proceed.

(Witness enters courtroom.)

THE COURT: All right. We can proceed with the jury.

Good morning, sir.

THE WITNESS: Good morning.

THE CLERK: All rise.

(Jury enters courtroom.)

THE COURT: Good morning, everyone.

We're going to resume with the examination.

TERRANCE GARRETT, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

DIRECT EXAMINATION

BY MR. JULIEN:

Q. Good morning, Mr. Garrett.

A. Good morning.

Q. I want to change gears a little bit from where we left off yesterday and ask you about August 4th of 2020.

Were you at work on August 4, 2020?

A. Yes.

Q. In Parkway Gardens?

A. Yes.

Q. On that day, did you receive a report about someone named -- or referred to as FBG Duck as it relates to your work at Parkway Gardens?

A. Yes.

Q. Did you -- without getting into the specifics of what that report was, did you and members of your security team take any action in respect -- after receiving that report?

A. Yes.

Q. And what, if anything, did you do after you received that report?

A. We were instructed to hold down the main gate on the property, make sure that we're checking for IDs, people who come into the property. Just -- just be on alert. Just was -- we were just directed to hold the main gate, make sure that we check every vehicle that come into the property, make sure that everybody came into the property had an ID.

Q. Was traffic routed --

MS. GIACCHETTI: Judge, I'm sorry, could we just get a time on that, please?

THE COURT: Yes.

MS. GIACCHETTI: Of what time that happened? Thank you.

BY MR. JULIEN:

Q. The time -- what time did you go to work on August 4, 2020?

A. I was there about -- I was early there that day, so probably about 4:00.

Q. And what time did you receive these instructions to begin taking these actions that you just told us about?

A. Roughly probably about, so I was there about 4:00 -- so between 4:00 and maybe 6:30.

Q. Was traffic routed in any different direction?

6183

A.  Yes.

Q.  Was the property locked down in any way?

A.  It was -- it was just more hands on deck.  We just made sure that we had everybody at the gate, and we was checking for people that come into the gate for IDs and stuff like that.

Q.  I want to show you -- switching gears a little bit somewhat --

MR. JULIEN:  And, your Honor, may we publish?

THE COURT:  Yes.

MR. JULIEN:  Mr. Garrett, I want to show you what's already been admitted in evidence as Government Exhibit 2000. I'm going to fast forward Government Exhibit 2000 to the 19-second mark and play it for about a second.

(Video played.)

MR. JULIEN:  So I've paused it at the 20-second mark.

BY MR. JULIEN:

Q.  Can you tell us generally what we're looking at where I have it paused right now on Government Exhibit 2000?

A.  Yeah, this is the community center parking lot.

Q.  It's that same parking lot that we talked about yesterday, Government Exhibit 2001-1?

A.  Yes.

MR. JULIEN:  I'm going to play Government Exhibit 2000 for about 27 seconds.

(Video played.)

MR. JULIEN:  I've paused Government Exhibit 2000 at the 45-second mark.

BY MR. JULIEN:

Q.  Mr. Garrett, do you recognize anyone on the screen right now on Government Exhibit 2000?

(Pause.)

BY THE WITNESS:

A.  I can't see it.

MR. JULIEN:  Okay.  I'm going to resume playing.

(Video played.)

MR. JULIEN:  I've paused Government Exhibit 2000 at the 1-minute-6-second mark.

BY MR. JULIEN:

Q.  Do you recognize anyone on the screen right now in Government Exhibit 2000?

A.  Yes.

Q.  And who is that?

A.  Carlos.

Q.  Would you mind indicating on the screen where it is you recognize Carlos?

A.  At the bottom of the screen getting out the black vehicle.

Q.  You can draw with your finger if you --

A.  (Witness complied.)

Q.  So you just made a yellow circle around someone?

Garrett - direct by Julien

6185

A.  Yes.

MR. JULIEN:  I'm going to resume playing Government Exhibit 2000 for about a minute.

(Video played.)

MR. JULIEN:  I've paused Government Exhibit 2000 at the 1-minute-52-second mark.

BY MR. JULIEN:

Q.  Mr. Garrett, do you recognize anyone on the screen right now?

A.  Yes.

Q.  Who is that?

A.  Carlos.

Q.  And would you mind indicating on the screen where it is you recognize Carlos?

A.  (Witness complied.)

Q.  You've drawn a yellow circle on the left side of the screen?

A.  Yes.

MR. JULIEN:  All right.  I'll clear that out.

And I'm going to resume playing Government Exhibit 2000 for about a minute.

(Video played.)

MR. JULIEN:  I've paused Government Exhibit 2000 at 2-minute-and-49-second mark.

BY MR. JULIEN:

Q.  Mr. Garrett, do you recognize anyone on the screen right now?

A.  Yes.

Q.  Who's that?

A.  Marcus.

Q.  Is that the person on the left side of the screen in the stairwell?

A.  Yes.

MR. JULIEN:  I'm going to resume playing Government Exhibit 2000 for about 40 seconds.

(Video played.)

MR. JULIEN:  I've paused Government Exhibit 2000 at the 3-minute-30-second mark.

BY MR. JULIEN:

Q.  Mr. Garrett, do you recognize anyone on the screen right now?

A.  Yes.

Q.  Who is that?

A.  Charles.

Q.  Is that the person in the center of the screen?

A.  Yes.

MR. JULIEN:  I'm actually going to fast forward Government Exhibit 2000 right now.

So I've fast forwarded it to the 4-minute-23-second mark, and I'm going to start playing from here.

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 29 of 285 PageID #:10537
Garrett - direct by Julien
6187

(Video played.)

MR. JULIEN:  I've paused Government Exhibit 2000 at the 4-minute-35-second mark.

BY MR. JULIEN:

Q.  Mr. Garrett, do you recognize anyone on the screen right now?

A.  Yes.

Q.  Who's that?

A.  Christopher.

Q.  And would you mind indicating on the screen where it is you recognize Christopher?

A.  In the middle of the screen walking down the stairs.

Q.  The person in the center of the screen?

A.  Yes.  The first person.

MR. JULIEN:  I'm going to resume playing Government Exhibit 2000 for about five seconds.

(Video played.)

MR. JULIEN:  I've paused Government Exhibit 2000 at the 4-minute-40-second mark.

BY MR. JULIEN:

Q.  Do you recognize anyone on the screen right now?

A.  Yes.

Q.  Who's that?

A.  Charles.

Q.  And where on the screen is Charles?

A.  He's coming -- he's in the middle of the screen coming down the stairs.

Q.  On the left side of the screen?

A.  Yes.

MR. JULIEN:  Mr. Garrett, I'm going to fast forward Government Exhibit 2000 again.

I've fast forwarded it to the 14-minute-31-second mark, and I'm going to play from here for about 20 seconds.

(Video played.)

MR. JULIEN:  So I paused at the 14-minute-52-second mark.

BY MR. JULIEN:

Q.  Mr. Garrett, do you recognize anyone on the screen right now?

A.  Yes.

Q.  Who's that?

A.  That's Charles.

Q.  And would you mind indicating on the screen where it is you recognize Charles?

A.  He's coming up the stairs, middle of the screen.

MR. JULIEN:  I'm going to play this for about 20 more seconds.

(Video played.)

MR. JULIEN:  I paused Government Exhibit 2000 at the 15-minute-17-second mark.

BY MR. JULIEN:

Q. Mr. Garrett, do you recognize anyone on the screen right now?

A. Yes.

Q. And who's that?

A. Christopher.

Q. And would you mind indicating on the screen where it is you recognize Christopher?

A. He's on the concrete getting ready to approach the stairs.

Q. Would you mind taking your finger and just circling on the screen where it is you recognize Christopher?

A. (Witness complied.)

Q. So you've drawn a circle in the upper center portion of the screen?

A. Yes.

MR. JULIEN: May I have one moment, your Honor?

THE COURT: Yes.

(Counsel conferring.)

MR. JULIEN: Nothing further, your Honor.

THE COURT: Okay. Cross?

MS. DOMPH: Yes.

I need a moment to set up.

THE COURT: Sure.

MR. SPIELFOGEL: She's going to set up right there.

MR. JULIEN: Take it down?

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 32 of 285 PageID #:10540

Garrett - cross by Domph

6190

MS. DOMPH: Please.

(Pause.)

CROSS-EXAMINATION

BY MS. DOMPH:

Q. All right. Good morning.

A. Good morning.

Q. Mr. Garrett, you were or still are a security guard, am I right?

A. Yes.

Q. And as far as working at Parkway Gardens, that you said started in 2014?

A. Yes.

Q. And it was called -- was it called Protech back then?

A. Yes.

Q. And then the name changed to Kates?

A. Yes.

Q. And you were at Parkway Gardens, I think you testified yesterday, until January 2021?

A. Yes.

Q. And Kates is called Kates Security and Detective Agency Group; is that right?

A. Kates Detective and Security Agency.

Q. Yeah. They have the word "detective" in there?

A. Yes.

Q. And have you ever worked as a detective for them?

A.   No.

Q.   How does one become a detective for Kates?

A.   That I don't know.

Q.   So let me understand your duties at Parkway.

You started when it was Protech.  You started out as a guard.  Were you an armed guard?

A.   Yes.

Q.   And you -- your duties were to walk the property; is that right?

A.   Yes.

Q.   And then you advanced, if I understood you -- and if I got it wrong please tell me.  You advanced to an armed booth guard, dispatch?  Is that the advancement?

A.   Dispatch, yes.

Q.   Okay.  So you go from making rounds, so to speak --

A.   Uh-huh.

Q.   -- to then being dispatch.  And I think you explained to us yesterday that dispatch, you were responsible for observing security cameras, answering phones.  I don't know if you said that, but you answered phones; is that right?

A.   Yes.

Q.   And then you, as the dispatcher, you're -- are you in a little booth?

A.   No.

Q.   An office?

Garrett - cross by Domph

6192

A.   In an office, yes.

Q.   And in relation to that parking lot and that community center, where was the office?

A.   The office is located at 6414, so it was right in the back.

Q.   Okay.  And as the dispatcher, you would inform the security teams, your old job, of suspicious activity if there was any?

A.   Yes.

Q.   You wore a uniform.  Am I right about that?

A.   Yes.

Q.   And I think it had, at least when Kates had it, the name Kates Security on the back of your clothing?

A.   Yes.  On the side.

Q.   On the side.

A.   On a patch.

Q.   And you were armed; is that right?

A.   That's correct.

Q.   And you had handcuffs.

A.   That's correct.

Q.   There -- during your tenure there, which if I understand you was 2014, beginning -- could you tell me what month you began?

A.   No, I can't.  I can't remember.  I don't recall.

Q.   But you left in January 2021.

A. Yes.

Q. How many security guards worked there, including what you were, just armed guards and dispatchers?

A. You talking about with Protech or with Kates?

Q. Start with Protech. How many?

A. Well, it all depends. You know, the deployment changed.

Q. Well, give me a rough number.

A. It could go anywhere between four to 10, 12 officers.

Q. Per shift?

A. If need be, yes.

Q. So what was the total population of security guards when you worked for Protech? Not per shift, but total.

A. Total? Maybe about 30 officers.

Q. And it increased when Kates took it over?

A. Yes. Depending on the day. Again, depending on what took place, the deployment changed.

Q. But the whole population of security, including armed guards and dispatchers, for example, what was the population of that in 2020?

A. Hmm, say about -- about the same, about 12, 15 at the most.

Q. Total or on shift?

A. On shift.

     So the total probably -- like I said before, it changed. It all depends on what -- what occurred, what took

place.

Q. Okay. Well, you did say Monday through Wednesday there were less guards at Parkway --

A. Yes.

Q. -- than on Thursday to Sunday, right?

A. Yes.

Q. And there was roughly, what, on Monday to Wednesday, six or seven?

A. Morning shift can run four. Evening shift can run about six, seven guards.

Q. And then the Thursday to Sunday, it could go as high as 20 officers, right?

A. If need be, yes.

Q. Okay. In addition to employees of Kates or Protech, as it originally was, Chicago police were employed to work at Parkway in plain clothes. Did I get that right?

A. Yes, that's off duty.

Q. And during your tenure there, were there off-duty CPD there the whole time from 2014 to 2021?

A. It was off-duty POs, yes.

Q. About how many do you think, if you can estimate, you know, while you worked there?

A. Like, I mean, I can give a number, but like I said before, it changes, so --

Q. Well, give me what you think the maximum employment of

CPD -- off-duty CPD was.

A. Well, with Protech we had off-duty POs. I wouldn't say CPD.

Q. POs, police?

A. Yes, off-duty police.

Q. Where did they come from?

A. Different departments.

Q. Suburban?

A. Yes.

Q. But policemen?

A. Yes.

Q. Okay. And Kates, you were saying?

A. Kates, that's when we employed CPD officers, along with Cook County sheriffs.

Q. About how many, roughly? I know it's not easy --

A. Maybe about five maybe.

Q. Five per shift?

A. Yes, about five. Between Thursday and Friday, yeah, we bring the POs in, yes. So about five.

Q. And these police officers, which include Chicago Police Department, plain clothes, right?

A. Yes.

Q. And vests that identify them actually as police.

A. Yes.

Q. Now, have you applied to be a police officer, Mr. Garrett,

in any force?

A. Yes.

Q. What force?

A. I have applied for two, Cook County -- Cook County and CPD.

Q. When did you apply?

A. I can't -- give and take. I don't remember offhand.

Q. Well, was it before you started working at Parkway in 2014?

A. No.

Q. During?

A. Yes.

Q. And so is it sometime between 2014 and 2021?

A. Yes.

Q. And so CPD, you said, right?

A. Uh-huh.

Q. What happened?

A. I applied, but I didn't pursue it.

Q. What does that mean?

A. I didn't follow through. I didn't achieve -- I didn't just go through with it.

Q. You made a decision that you didn't want to be a CPD?

A. At the time, I just made a decision I wasn't going to go through with it. I was just looking to explore different things.

Q. What do you have to go through when you apply?

A. Just a basic written exam, physical, and that's about it.

Q. And did you say Cook County Sheriff, too?

A. Yes.

Q. And what period -- do you know when you applied for Cook County Sheriff?

A. It was an ongoing thing with them.

Q. Pardon?

A. It was an ongoing thing with them, so --

Q. Is it pending now?

A. Yes.

Q. And are you waiting to hear?

A. Yes.

Q. Now, did you have to go through the same kind of thing that you say you went through to try to be a CPD?

A. Yes.

Q. And when do you think you'll hear?  Did they give you any information about when you might become a Cook County Sheriff, if at all?

A. Well, you have to go through the background and all that, so just have to wait till they reach back out to you.

Q. So it's fair to say, is it not, that you do aspire to be a police officer of sorts, whether it's a sheriff or a policeman.

A. Somewhat along them lines, yes.

Garrett - cross by Domph

6198

Q.  I mean, you applied and you're waiting for sheriff.

A.  Yes.

Q.  Have you ever applied to the FBI?

A.  No.

Q.  You had to think for a second.  Are you thinking about doing it?

A.  No.

Q.  When you got involved in this case, you did work closely, though, if I understand, with the FBI.  Am I right?

A.  Yes.

Q.  And I think you also worked with CPD.  I'll call Chicago police CPD.  You understand that, right?

A.  Yes, yes.

Q.  You worked with them, too, right?

A.  Yes.

Q.  When you left Parkway working for Kates in January 2021, you -- if I understood your testimony, you got promoted, right?

A.  Yes, that's correct.

Q.  And when did the promotion actually take place?  Were you still at Parkway and you got word that you'd be promoted?

A.  Yes.  I was still working at Parkway that -- I was told that a promotion, that when we didn't renew the contract, that I'll go into the field as a field supervisor.

Q.  Did you apply for that while you were at Parkway, to be a

Garrett - cross by Domph

6199

field supervisor?

A.  No.

Q.  It just became open and then you had to fill out paperwork?

A.  Well, it was a position that was offered to me and then I took it.

Q.  As far as other jobs -- let me ask you some questions about jobs other than at Parkway.

You worked, did you not, for Kenosha County Sheriff's Department in some way?

A.  Yes.

Q.  When was that, Mr. Garrett?

A.  That was, I want to say, 2020 -- '22, 2022.

Q.  So let me understand.  You were working for Kates here as a site -- a field supervisor, right?

A.  Uh-huh.

Q.  And you also got a job at Kenosha for the sheriff department?

A.  I worked for Kates as a field supervisor, and I took a leave of absence, and then I went to work Kenosha County Sheriff Department.

Q.  So why did you take a leave of absence from Kates and go up to Kenosha?

A.  Because I didn't want to travel back and forth.

Q.  Oh, were you living in Kenosha?

MR. JULIEN: Objection, can we have a sidebar?

THE COURT: Yes.

(Proceedings heard at sidebar:)

MS. DOMPH: I don't think there's a sidebar here.

MR. JULIEN: There used to be one up there, there isn't one anymore.

I'm going to make the same objection I made yesterday when Mr. Wiley was on the stand, to revealing the specifics of where it is that Mr. Garrett is living. I'm not really sure where this is going, but he doesn't need to reveal, given the dynamics in this case, where it is he's living and where he's coming from to make the points that Ms. Domph wants to make on cross-examination.

MS. DOMPH: Judge, I don't care where he lives. I want the history of his jobs. And it happens that he's in Kenosha, and I want to know why he left Kates. Did he have problems at Kates? I'm going to go into all his jobs.

MR. JULIEN: Your Honor, the question was, do you live near Kenosha, which is what prompted my objection.

MS. DOMPH: Well, he said he didn't want to commute. That was the logical response on my part.

THE COURT: So I understand -- I mean, I understand why you asked that. It is a logical question.

At the same time, now that we know about the issue that Mr. Julien flagged, I think let's just move on from -- I

think it's fair to ask about his work history, but I would just try to stay away from the specific area, to the extent you can do that.

MS. DOMPH:  Okay.

THE COURT:  Thanks.

(Proceedings heard in open court:)

BY MS. DOMPH:

Q.  What did you do for the Kenosha County Sheriff's Department?

A.  I was a correctional officer.

Q.  In the jail?

A.  Yes.

Q.  And about how long did you do that job?

A.  For a year.

Q.  One year?

A.  Yes.

Q.  Mr. Garrett, did you work for the Brinks Company ever?

A.  Yes.

Q.  And is Brinks the company that has the trucks, the armored trucks, that pick up money?

A.  Yes.

Q.  And when you worked for Brinks, were you a driver of one of those trucks?

A.  Yes.

Q.  And how long were you with Brinks, and what years, if you

recall?

A.  I don't recall, but I worked for Brinks for maybe about two, three years maybe.

Q.  And was -- were your duties to drive to banks?

A.  Yes.

Q.  And get their money?

A.  Yes.

Q.  And how many banks would you say a day you went to?

A.  It varies.  It depends on the run.  It varies.

Q.  Roughly, average?

A.  Maybe about, hmm, 30, 40.

Q.  And so you've been inside banks?

A.  Yes.

Q.  Did you also work for Windy City Security --

A.  Yes.

Q.  -- Company?

A.  Yes.

Q.  And how long did you work for them?

A.  A long time ago.  I don't recall.

Q.  Was it possibly just two days?

A.  Windy City?  No, I worked longer than two days.

Q.  And what kind of security was Windy City?  What were you security for, or who were you security for?

A.  I worked at a nursing home.

Q.  Did you also work for A&R Security?

A.  Yes.

Q.  And what kind of security did you do -- and when was that?

A.  That was a while back, too.  I can't -- I can't give you a date for that.

Q.  2011 sound good?

A.  Roughly.

Q.  And what did you do for them?

A.  I worked -- I did different things, banks, grocery stores, apartment -- not apartment complex, but a complex that housed different things in it, you know.

Q.  7-Elevens maybe, convenience stores, did you do those?

A.  No.

Q.  So basically your history, your job history, is as a security person, correct?

A.  Yes.

Q.  And looking now to be actually law enforcement with Cook County Sheriff.

A.  Yeah, that's a possibility, yes.

Q.  Well, you're hoping, right?  You applied.

A.  Yeah, yeah.

Q.  As far as your schooling, am I right, that you also went to school, I think college, and studied criminal justice?

A.  Yes.

Q.  And how many years did you do that, Mr. Garrett?

A.  I was in school for maybe about two, three years, but I

Garrett - cross by Domph

6204

didn't graduate with a degree or anything.

Q.  But you stuck with criminal justice?

A.  Yes.

Q.  And you're still interested in criminal justice, right?

A.  Yes.

Q.  While -- going back to Kates and Parkway, while you were working there, I think you said yesterday that you would assist Chicago police, right?

A.  Yes.

Q.  And is it fair for me to say that you would consider yourself a law enforcement officer?

A.  No.

Q.  So as a security person that's armed, carries handcuffs, and possibly holds people waiting for police, in your mind that's not law enforcement?

A.  No, that's security.

Q.  Well, it's not officially law enforcement, right?  It's not official.  Right?

A.  Right.

Q.  It's official, I guess, when you're working for an actual police department.

A.  Right.

Q.  But it's quite -- you do a lot of similar things, right?

A.  That's correct.

Q.  I think yesterday when you testified, if I heard you

Garrett - cross by Domph

6205

right, you were talking about when you monitor the dispatch and you see something suspicious, you used the word "deploy" your guards, right?

A.   Uh-huh.

Q.   That's a very law enforcement term, wouldn't you agree?

A.   Yes.

Q.   And it's also a military term, right?

A.   Yes.

Q.   It means, like, send out, right?

A.   Right.

Q.   Send out the officers.

A.   Right.

Q.   Let me turn your attention to the residence, the Parkway Gardens.

     If I understand, it's a residence on the south side, correct --

A.   Correct.

Q.   -- of Chicago?

A.   Correct.

Q.   And are there approximately 694 units in the complex?

A.   Yeah, that sounds about right.

Q.   Yeah.

     And there's at least 2,000 tenants, right?

A.   Yes.

Q.   And the apartments at Parkway are two and three bedrooms,

right?

A. Yes.

Q. Because they encourage families to live there, right?

A. Right.

Q. And, in fact, there are lots of families in those -- maybe all families in those 694 units?

A. Yeah, that's correct.

Q. And those families have -- obviously families, children, right?

A. Yes.

Q. And there's a lot of young men and young women, right?

A. Right.

Q. Teenagers, right?

A. Right.

Q. Little kids, little children?

A. Right.

Q. In fact, I think there's a playground that we could see on the video Exhibit 2000 that the government showed you. Isn't that a playground for children --

A. Yes.

Q. -- in that camera view?

A. Yes.

Q. And it's fair to say that you got to know some of the residents while you worked there, right?

A. Yes.

Q. And there's also lots of people hanging around there.

A. Yes.

Q. Coming and going.

A. Yes.

Q. Nonresidents?

A. Right.

Q. I want to draw your attention to Christopher Thomas. I think you testified yesterday that you have seen him around Parkway Gardens; is that right?

A. Yes.

Q. And I think you also said something like you saw him through the duration of your tenure.

A. Yes.

Q. Something like that you said?

A. Uh-huh.

Q. And so that would have been, as we've understood from today and yesterday, 2014 to the end of 2021, essentially, if you left in January of 2021, right?

A. Uh-huh.

Q. And as far as seeing him throughout this duration, this means to you -- let me ask you this -- that you saw him during every one of the years that you say you worked there?

A. I -- I don't understand your question. You're saying that I seen him every time since I been there?

Q. No, I'll rephrase it.

Garrett - cross by Domph

6208

A.   Okay.

Q.   Because you said you've seen him during your tenure --

A.   Uh-huh.

Q.   -- so I'm asking you, if your tenure was about seven -- about six or seven years, did you see him in every calendar year?  Example, did you see him in 2014?  Did you see him in 2015 and so on?

A.   Yes.

Q.   And let me just randomly pick a year.

        2015, okay?  Did you see him in 2015 every month of the year?

A.   I -- I can't answer that, because I can't go back -- I can't remember from every year that I seen him, no.

Q.   So the answer is you don't remember?

A.   I couldn't say to you that I seen him January, February, March, no, I cannot.  But I have seen him in 2015, I seen him there.

Q.   So you could have seen him 10 times?

A.   I could have seen him 10, I could have seen him 12, yes.

Q.   How about in 2016?  Did you see him, for example, in May 2016?

A.   I can't recall back from May 2016.

Q.   How about June 2016?

A.   I can't recall from June 2016.

Q.   How about August, September, October, will it be the same

answer, that you really don't know when you saw him?

A. Yeah, because I can't remember back from 2016 what day or what month that I seen him.

Q. Yeah, but you said you saw him your whole tenure, and now I'm trying to get you to be specific, and you're telling me, if I understand you, that you just can't remember.

A. I don't remember the dates or the days from 2016, whether it was January or February or March, but I know that I seen him.

Q. All right. I want to turn your attention to your involvement with this case.

And I think a couple -- a few minutes ago, you told Mr. Julien that on August 4th, 2020, you arrived at the Parkway Gardens at around 4:00.

A. That's correct.

Q. Did I hear that right?

A. Yes.

Q. Your shift on August 4th was 6:00 p.m. to 2:00 a.m., am I right?

A. That's correct.

Q. And I'll get into all the times you've met with the government, the agents. You did not inform them that you arrived on August 4th at 4:00 p.m. at the Parkway Gardens; is that right?

A. When you say I did not inform them --

Q. I'm sorry?

A. When you say I did not inform them?

Q. Yeah, you never told them you arrived at 4:00. You told them your shift was 6:00 p.m. to 2:00 a.m.

A. Right. That's my shift, right.

Q. So you didn't tell them about getting there at 4:00, getting there early that day, right?

A. No.

Q. Okay. So to be very crystal clear, you were not at Parkway Gardens at the time that you looked at the video today -- the timestamp on the video, excuse me, on August 4th.

A. Okay. I don't understand your question. You asking was I at Parkway -- I don't know the time.

Q. I'll make it easier.

A. Okay.

Q. You looked at some video, I think it was Government Exhibit 2000, right?

A. Okay, okay.

Q. Yesterday and a few minutes ago.

A. Okay.

Q. And there was timestamps on it --

A. Yes.

Q. -- right?

A. Uh-huh.

Q. You were not at Parkway Gardens viewing that surveillance

Garrett - cross by Domph

6211

video at the time of those stamps, right?

A.  I don't know.  I don't remember what the timestamp was.

See, August 4th, was it then?  Don't recall.

Q.  You weren't?

A.  August 4th?

Q.  August 4, 2020.

A.  I was -- I was at Parkway, yes.

Q.  But you weren't viewing this then, right?

A.  Um --

Q.  You were shown this by the government later, maybe even a year later, right?

A.  No.  This --

Q.  Do you not understand my question?

A.  No, because I don't understand what you're saying.

Q.  It's fair for me to say that you were not observing this activity at Parkway, that you just looked at a video on August 4th, 2020.  You did not observe it firsthand.

A.  Right.  No, we have dispatchers for that, no.

Q.  I'm just talking about you.

A.  Okay.

Q.  You did not.

A.  No.

Q.  Okay.  Perfect.

A.  Okay.

Q.  And you were not an eyewitness to any allegation in this

case, right? Eyewitness, saw something happen.

A. No.

Q. Your involvement stemmed from working at Parkway Gardens, right?

A. Yes.

Q. And I think you said that you had some information about Duck and the place -- it was locked down at the entrance, right?

A. Yeah.

Q. Where you had to have people show their IDs?

A. Right.

Q. Okay. You also, did you not, assist in turning over the video surveillance, assisted a guy named Mr. Hooks, you told us yesterday.

A. Yes.

Q. And that was surveillance of some of the areas of Parkway, right?

A. Yes.

Q. And so you knew right away that the Chicago Police Department, at least, was investigating the murder of Carlton Weekly, also known as Duck. You knew that.

A. You're saying that I knew right away that they were --

Q. Well, August 4th.

A. Well, we got some --

Q. When you did the lockdown.

A.   Right, we did the lockdown, right, to take precaution, yes.

Q.   So you're aware.

A.   Yes.

Q.   You're aware there's an investigation.

A.   Yes.

Q.   You also eventually learned that the investigation became federal, right?

A.   Later on, yes.

Q.   Later on, like in September 2020, right?

A.   Yes.

Q.   And so let me draw your attention to you getting involved with the federal government, the agents and the prosecutors.

     If I understand correctly -- and please tell me if I'm wrong -- you first met with the federal agents, FBI to be specific, on September 1st, 2020.

     Does that sound right, Mr. Garrett?

A.   Yeah.  Somewhere along them lines, yes.

Q.   Yeah.

     And you volunteered to speak to them; is that right?

A.   Yes.

Q.   Okay.  So you volunteer, and you had a meeting.  Was it at the office of the FBI on Roosevelt, or where was it, if you know?

A.   At the office.

Garrett - cross by Domph

6214

Q.   The very first time.  Sorry.

A.   It was at the office, yes.

Q.   Is that on Roosevelt, the FBI main office?

A.   Yes.

Q.   And at that time, you met with three agents, right?

A.   Yes.

Q.   And not these prosecutors or any prosecutors.

A.   No.

Q.   And it's fair for me to say that the agents didn't put on any kind of audio to record the meeting you had with them, right?

A.   Right.

Q.   Nor did they put on a video to take a video of your meeting with them.

A.   Right.

Q.   And at the very beginning of that meeting, you spoke about Christopher Thomas, am I right?

A.   I spoke about different people.  I can't remember if we started off with him or not.

Q.   Yeah, fair enough.  That was quite a while ago.

      But you spoke at that meeting about Christopher.

A.   Yes.

Q.   Because I think you told the ladies and gentlemen yesterday that you claim that he's a Black Disciple, right?

A.   Yes.

Q. And so you talked about Mr. Thomas, or Christopher, I think as you called him, being in your opinion a Black Disciple, right?

A. Yes.

Q. And you also told him in your opinion he affiliated with Black Disciples?

A. Yes.

Q. And to be completely honest, you weren't that fond of the Black Disciples at Parkway. Is that a fair statement?

A. Um --

Q. As a group. I think you called them a gang yesterday.

A. Well, it's a lot of gangs. It just was one of the gangs that was there.

Q. There's more than one gang there?

A. I said that was one of the gangs that was there, so --

Q. What other ones are there?

A. No, just them, BDs.

Q. Okay. So you weren't crazy about it, right?

A. I'm not crazy about any gangs.

Q. Okay. Fair. Fair enough.

And so after -- you're at this meeting with these agents and they show you a photograph of Christopher Thomas; is that right?

A. Yes.

Q. And I'm going to try to manipulate this machine and put it

up.

Is this the photograph that they showed you of Christopher on September 1st, 2020?

A. It could have been. I don't recall.

Q. Would looking at the photograph that's attached to the FBI's report refresh your memory, or would you agree that you were shown that photograph?

A. I could have been shown this photograph. I don't recall.

Q. But you recognize that photograph?

A. I recognize the person in the photograph, yes.

Q. No. Do you recognize that you were shown that photograph is my question?

A. I don't recall. I can't remember if I was showed this particular photograph.

Q. Well, it was quite a while ago. Right?

A. Yes.

Q. So would looking at the photographs that the FBI showed you refresh your memory that were you shown that on 9/1?

A. Yes.

MS. DOMPH: May I approach, Judge?

THE COURT: Yes.

MS. DOMPH: I'm going to -- first of all, I'm going to mark that one Exhibit --

MR. SPIELFOGEL: 7.

MS. DOMPH: -- Thomas Exhibit 7, for identification

at this point.

BY MS. DOMPH:

Q.   I'm just going to hand you this and ask you if you, looking at this in the pile here, refreshes your memory about September 1st.

When you're done looking at it, I'll retrieve that from you.

And ignore my Post-its.

A.   Yes.

Q.   So Thomas No. 7, that's -- thank you -- that's on your screen was a photograph that were you shown on September 1st by the FBI agents?

A.   Yes.

Q.   And does that truly and accurately depict or represent the photo that was shown to you?

A.   Yes.

MS. DOMPH:   Judge, I'd move Thomas Exhibit 7 into evidence and ask to publish.

MR. JULIEN:   One moment.

(Counsel conferring.)

MR. JULIEN:   No objection.

THE COURT:   Okay.

MS. DOMPH:   Just the individual photo.

THE COURT:   Okay.   It's admitted and you may publish.

(Defendant Exhibit Thomas No. 7 received in evidence.)

BY MS. DOMPH:

Q. So, Mr. Garrett, that's a photo of Mr. Thomas, correct?

A. Yes.

Q. Kind of just like a pose, someone's taking a picture of him?

A. Yes.

Q. Looks like he's kind of reasonably well dressed?

A. I suppose.

MS. DOMPH: Thank you.

We can unpublish that.

BY MS. DOMPH:

Q. So, Mr. Thomas -- strike that.

Mr. Garrett, not Mr. Thomas.

A. Yes.

Q. Mr. Garrett. So it's fair, is it not, that you were aware that on September 1st, 2020, the FBI was interested in Mr. Thomas? No secret.

A. Yes.

Q. And it's fair to say they were interested in him and they put him in your mind, Christopher Thomas? A fair statement?

A. Well, they've been interested in him. It wasn't in my mind.

Q. Well, once they pointed him out, you were aware of their interest, and then you knew that. It stayed in your mind; it didn't go anywhere, right?

A.   I had knowledge of it, yes.

Q.   Thank you.

     You also met with the government, including FBI agents, on multiple occasions between the 9/1/2020 and as late as November 11th, 2023, right?

A.   Yes.

Q.   So you met with them around ten times, if I'm counting right?

A.   That's probably -- probably right.

Q.   Could be more?

A.   Or less.

Q.   Okay.  Fair enough.

     And you met with them on September 9th, 2020, so about a week or so after your first meeting; is that right?

A.   Yes.

Q.   Does that sound right?

A.   Yes.

Q.   And you, I believe, were shown photos on that day, am I right?

A.   Yes.

Q.   And I'm going to mark this Thomas Exhibit No. 8, and put it up on the Elmo, and ask -- oh -- sorry.  Technology.  -- if you recognize this photo as being shown to you on the 9th of September, 2020?

A.   Yes.

Q. And you identified that person in that meeting as Ezell Rawls; is that right?

A. Ezell, yes.

Q. Ezell?

A. Uh-huh.

Q. Rawls; is that right?

A. I don't remember if I said Rawls or not.

Q. Ezell?

A. Ezell, yes.

Q. And I think yesterday you said he was from Parkway?

A. Yes.

Q. And I even think you claimed he was a Black Disciple, right?

A. Yes.

Q. Does this photograph depict Ezell as you knew him when you picked him -- identified him on 9/9/20?

Is that what he looked like to you?

A. Yes.

MS. DOMPH: Judge, I would move Thomas Exhibit 8 into evidence and publish, please.

MR. JULIEN: No objection.

THE COURT: It's admitted and you may publish.

(Defendant Exhibit Thomas No. 8 received in evidence.)

BY MS. DOMPH:

Q. So this is the fellow we just discussed, Ezell --

A. Uh-huh.

Q. -- that you said lived in Parkway Gardens during your tenure, right?

A. Yes.

Q. And you said he was a Black Disciple.

A. Yes.

MS. DOMPH: We can unpublish.

THE COURT: Okay.

BY MS. DOMPH:

Q. I'm going to show you what's already in evidence as 704-5.

(Counsel conferring.)

MS. DOMPH: One moment, please, Judge.

THE COURT: Sure.

(Pause.)

BY MS. DOMPH:

Q. I'm going to show you what has already been marked as Government Exhibit 704-5, and ask you if you recognize the individual that I'm going to point to as Ezell.

A. I cannot see that.

Q. Say that again, please?

A. I cannot see it.

Q. So you can't see his face is what you're saying?

A. Yeah. And it's a little blurry.

Q. Well, not so much blurry. It's just that his face is turned away from you, right?

A. Yeah.

Q. Are you still trying to contemplate whether that's Ezell?

A. No, I can't see it.

Q. Thank you.

Now, you not only met with the government, you also went into the grand jury, am I right?

A. Yes.

Q. More than once, right?

A. Yes.

Q. Twice.

A. Yes.

Q. And before you went into the grand jury the first time, which I believe was on September 10th, 2020, you met with the government; is that correct?

A. Yes.

Q. And you went over your testimony, right?

A. Yes.

Q. And did they type up a document for you to look at about what you were going to say in the grand jury?

A. I knew I was given a document afterwards of what I said in the grand jury.

Q. You were given it afterwards?

A. Yes.

Q. But before you went into the grand jury, were they reading from that document they ended up giving you?

A.   No.

Q.   You went into the grand jury the second time on August 26th, 2021, right?

A.   Yes.  Sounds about right.

Q.   Sounds right.

And you again met with them before you went into the grand jury, met with the government, I mean, right?

A.   Yes.

Q.   And maybe one or two of these people sitting at the government table?

A.   Yes.

Q.   And, again, they went over your testimony with you?

A.   Yes.

Q.   Did they give you a typed version of what you were going to say before you went into the grand jury?

A.   No.

Q.   And when you went into the grand jury, you were focused, again, at one point on Christopher Thomas, am I right?

A.   I believe so, yes.

Q.   Yes.

And I'm going to mark this as Thomas 9?  10?

MR. SPIELFOGEL:  9.

BY MS. DOMPH:

Q.   And ask you if you recognize this photo that were you shown in the grand jury on 8/26/21.

And don't worry about that grand jury exhibit number, but it is from the grand jury.

Do you recognize that photo?

A.   Yes.

Q.   And that's a photo, again, of Christopher Thomas?

A.   Yes.

Q.   And that was shown to you early on in your testimony in the grand jury on 8/26/21, right?

A.   Yes.

Q.   And does that accurately depict or show Christopher Thomas as you saw in the grand jury on August -- in August 2021?

A.   Yes.

MS. DOMPH:  Judge, I would move into evidence Thomas 9.  I'm skeptical, is it 9 or 10?

MR. JULIEN:  It's 9.

Can we have one moment?

MS. DOMPH:  No, that's okay.

THE COURT:  Yes.

(Counsel conferring.)

MR. JULIEN:  No objection.

THE COURT:  Okay.

MS. DOMPH:  Move into it into evidence and publish, please, Judge.

THE COURT:  Yes.

(Defendant's Exhibit Thomas No. 9 received in evidence.)

BY MS. DOMPH:

Q. So, Mr. Garrett, this is the photo that you were shown of Christopher Thomas in the grand jury, right?

A. Yes.

Q. Well, the second time you went to the grand jury, right?

A. Yes.

Q. And, again, it kind of looks like a posed photo, doesn't it? Someone's just saying, let me take a picture of you?

A. Yes.

Q. And in the grand jury, after you were shown that photo of Christopher, you were shown another photo, a group photo; is that correct?

A. Yes.

(Counsel conferring.)

BY MS. DOMPH:

Q. And I'm going to ask you to look at this photo.

Do you recognize this photo -- whoops -- this is Thomas 10.

Do you recognize this photo as a photo that you were shown in the grand jury in August 2021?

A. Yes, that's correct.

Q. And is this a true and accurate copy of the photo that you were shown in the grand jury on that date?

A. Yes, this is the photo I was shown.

MS. DOMPH: Okay. So may we -- move to admit Thomas

10 and publish.

MR. JULIEN:  No objection.

THE COURT:  It's admitted.  You may publish.

(Defendant's Exhibit Thomas No. 10 received in

evidence.)

BY MS. DOMPH:

Q.  So, Mr. Garrett, in the grand jury, you were asked to
identify individuals in this photo, right?

A.  Yes.

Q.  And you were asked to identify the person on the far left
that I'm pointing to, right?

A.  Yes.

Q.  And you identified that as Ezell.

A.  Yes.

Q.  You were also asked to look around and see if you could
identify anyone else, right?

A.  Yes.

Q.  And you did identify someone else, didn't you?

A.  I believe so.

Q.  And you identified the person whose face is blurred out,
who may or may not have something in front of his face, you
did identify that person, didn't you?

A.  I believe so, yes.

Q.  Yeah.  And who did you identify that as?

A.  Christopher.

Q. And the fellow standing in -- standing up in the background, I'll point to it, that's a guy named Welch, right?

A. Yes.

Q. And he's kind of sort of really tall, isn't he?

A. Yes.

Q. You met with the agents again -- well, you met with them a few times, but I'm just going to -- a few more times, but I'm just going to draw your attention to the date of October 5th, 2023. Does that sound familiar?

A. Yes.

Q. And you met with agents -- it looks like Agent Dixon and Christine Case. You know them?

A. Yes.

Q. They're sitting at that table, right?

A. Yes.

Q. This table over here.

And you were shown a group of pictures again, photographs, of Christopher Thomas?

A. Yes.

Q. And you were being focused, again, on Christopher Thomas.

A. I wouldn't say just I was focused on that particular picture or whatever, or I was shown multiple pictures.

Q. Yeah, but I'm not saying you were just focused on Christopher. I'm saying, without a doubt, the agents focused you on him at one point in the interview?

A. Well, I was showed multiple pictures, so --

Q. Well, of course, they did because they showed you pictures of him, right?

A. Yes.

Q. So this is Thomas 11.

(Counsel conferring.)

BY MS. DOMPH:

Q. I'm just going to show you a picture, Thomas 11, and ask you, Mr. Garrett, to look at this picture. And it's in evidence as a Government Exhibit -- it's in evidence as a Government Exhibit, so I might not confuse the issue. And I'll call it Thomas 11 right now for purposes of you identifying it.

You were shown this when you met with the agents on October 5th, 2023, right?

A. Yes.

Q. And you recognize that as a photo of Christopher as it was shown to you on that date by the agents or the government.

A. Yes.

Q. And it's accurate as to what you were shown that day?

A. Yes.

MS. DOMPH: I'd move Thomas Exhibit 11 into evidence and ask to publish.

MR. JULIEN: No objection.

THE COURT: It's admitted, and you may publish.

(Defendant's Exhibit Thomas No. 11 received in evidence.)

BY MS. DOMPH:

Q. So, on October 5th, again, at one of your meetings with the government, before you came to court here, they focused you on Christopher Thomas, right?

A. Yes.

Q. I think you said yesterday that Christopher Thomas was tall?

A. Yes.

Q. Right, was tall?

A. Yes.

Q. Okay.

So there's a few people at Parkway Gardens that are tall, am I right?

A. Yes.

Q. There is a guy named Little Derrick. He's really tall, isn't he?

A. I don't know that name.

Q. You know what, I'm going to try to see if I can show you.

This is going to be Government 715.

Before I show you that, let me ask you -- so you don't know that name, Little Derrick?

A. No.

Q. You might know him by sight -- and give me a moment and

I'll show you and ask you if you know him.

A. Okay.

Q. Do you know a fellow named Loco, Eugene, real tall guy?

A. No. The name doesn't ring a bell.

Q. How about a guy named Twilla?

A. No.

Q. Parkway Gardens people, right? You don't know -- strike that.

You don't know everybody at Parkway Gardens, is that a fair statement?

A. Yes.

MS. DOMPH: Okay. Let me see if I can manage this.

I'm going to stop it at the 49:50 mark.

(Video played.)

MS. DOMPH: Judge, I would actually like to publish this because 715, Government 715, is already in evidence.

THE COURT: You may.

It's published.

BY MS. DOMPH:

Q. So see where my cursor is on this gentleman with the blue jacket standing against the wall?

A. Yes.

Q. Do you recognize this guy?

A. Yes.

Q. That's Twilla, right?

A.   I don't know his name, but I recognize him.

Q.   So he's a Parkway Gardens character, right?

A.   Yes.

Q.   Really tall guy?

A.   Yes.

          MS. DOMPH:  All right.  Let me try this.

     (Video played.)

          MS. DOMPH:  Tricky business here.

     (Video played.)

BY MS. DOMPH:

Q.   Okay.  I'm going to draw your attention to my cursor, the gentleman in the brown coat, hat, like a baseball-cap-type hat.  Do you see that?

A.   Yes.

Q.   Do you recognize that guy as Little Derrick?

A.   I recognize him, but I don't know his name.

Q.   Another guy at Parkway Gardens that's extremely tall.

A.   Yes, he's tall.

Q.   Maybe like 6'6"?

A.   No.

Q.   You don't know, right?

A.   No.

Q.   Just very tall.

          Fair enough.  Fair enough.

          MS. DOMPH:  We can unpublish, Judge.

THE COURT: Okay.

BY MS. DOMPH:

Q. Now, I want to go back to Brinks, the Brinks job of yours.

Wait a second, let me get this off.

So it's fair to say that you've been inside a bank many times as a Brinks truck driver, right?

A. Uh-huh.

Q. And also, I'm going to guess, as a bank patron because you may have a bank account, right?

A. Yes.

Q. And you're aware, because you worked for Brinks and you worked closely in banks, that inside the doorjamb -- do you know what a doorjamb is? The entrance of the door, the inside?

A. Uh-huh.

Q. Inside the doorjamb in banks are height indicators, measuring tapes. Are you aware of that?

A. Yes.

Q. And the reason those, what they call height indicators are, they're like tape measures built into the jamb, is because banks that have surveillance cannot figure out someone's height by looking at surveillance, so they add the doorjamb indicator. Is that a fair statement?

A. Yes.

Q. Mr. Garrett, I'm going to ask you a question about your

life experience.

I'm sure that you, and probably everyone else in this room, has seen somebody walking down the street at a distance from the back, and you're sure it's your friend, body shape, height, and you're quite surprised and happy that you might be seeing your friend.

You go up to this person whose back is turned to you. Excuse me, Joe, or whatever their name is. And the person turns around, and it's not Joe. You mis-recognized.

That has happened to you before, has it not?

A. Yes.

Q. And on more than one occasion, right? It happens to all of us.

A. Yes.

(Counsel conferring.)

MS. DOMPH: I'm going to show you something that's already in evidence. Thomas No. 2 or 3. I can't read the writing.

May I approach Mr. Spielfogel?

MR. SPIELFOGEL: I believe it's 2.

MS. DOMPH: It's his handwriting.

(Counsel conferring.)

MR. SPIELFOGEL: Clearly.

MS. DOMPH: Clearly.

MR. SPIELFOGEL: A 2.

MS. DOMPH: I'd ask to publish this. It's already been admitted in evidence.

THE COURT: Yes.

BY MS. DOMPH:

Q. Mr. Garrett, I'm going to show you what was Government's No. 2 already admitted in evidence.

MR. JULIEN: Thomas.

BY MS. DOMPH:

Q. Thomas No. 2, I'm sorry, not Government, Thomas No. 2. Do you recognize that person as a guy named Gleesh?

A. I recognize him, yes.

Q. Gleesh. Named Gleesh, or you just don't remember the name?

A. I don't recognize him as Gleesh.

Q. You recognize him as someone?

A. Yes.

Q. Okay. Well, let me ask you to look at that jacket there.

Wait, do you recognize him as someone from Parkway?

A. No, I just recognize him by -- yeah, from Parkway.

Q. Yeah.

A. Uh-huh.

Q. And, in fact, I think though, historically when you met with the government, I think you identified Gleesh as this guy.

A. Okay.

Q. Okay. This is Gleesh?

A. I recognize him, yes. I don't recognize him as Gleesh. I know his name.

Q. Okay. What's his name? You're talking about his real name.

A. Yes.

Q. What is that?

A. Devonte.

Q. Okay. Fair enough. Fair enough.

And I want you to look at that jacket. That is Adidas jacket, right?

A. Yes.

Q. So their trademark is three stripes down the arms, right?

A. Yes.

Q. They make lots and lots and lots of jackets, right?

A. Yes.

Q. They make track suits with the bottoms, too?

A. Yes.

Q. And you see them all over the city, right?

A. Yes.

Q. And you see them all over Parkway Gardens during your tenure?

A. I've seen them, yes.

Q. In fact, this guy has it on, right?

A. Yes.

Q. And you know him.

A. Yes.

Q. And you claim that he's a Black Disciple?

A. Yes.

MS. DOMPH: Unpublish.

BY MS. DOMPH:

Q. Now, Mr. Garrett, you were contacted by an investigator for the defense a couple days ago, right?

A. Yes.

Q. And I think by telephone, right?

A. That's correct.

Q. And you took the call, right?

A. I did.

Q. And you told the investigator -- he identified himself as an investigator, right?

A. Yes.

Q. And he wanted to speak to you about this case, right?

A. Yes.

Q. And you told him that you had been advised by your attorney not to speak to anyone; is that right?

A. No.

Q. That's not right?

A. No, that's not right.

Q. Did you tell -- he identified himself as Kai, right?

A. Yes.

Q. And it was on December 3rd, 2023, correct?

A. Yes.

Q. And he explained that he worked for the defense attorney, right?

A. Yes.

Q. And you related that I would have to talk to your attorney because you were told that you were not supposed to talk to anyone. Is that the conversation more precisely?

A. I told him he can talk to my attorney if he have any questions. And that was the end of the call. That was it.

Q. What?

A. I told him he can talk to the attorney if he have any questions, and then that was the end of the call.

Q. Okay. So you didn't say exactly what I quoted --

A. No.

Q. -- is what you're saying today?

A. Yes.

Q. But, in essence, you weren't going to talk to him, right?

A. That's correct.

Q. And you said you had to talk to your attorney, right?

A. I said he could talk to the attorney, and I told him the attorney's name.

Q. Your attorney, you said, Mr. Julien?

A. That's correct.

Q. So you do consider Mr. Julien your attorney, right?

A. He's the attorney for the case, yes, that's correct.

Q. But your attorney, I'm asking.

A. Yes.

MS. DOMPH: May I have a moment?

THE COURT: Yes.

(Counsel conferring.)

MS. DOMPH: Thank you very much, Mr. Garrett.

No further questions.

Let me gather everything.

THE COURT: Okay. At this point, let's just take the morning break. So we'll be back in 15 to 20 minutes.

Please, to the members of the jury, don't discuss, research or read news about the case.

To the witness, you're on the stand, please don't discuss your testimony with anyone.

Thank you.

(Jury exits courtroom.)

THE COURT: Anything to raise before we leave?

MR. JULIEN: Not from the government.

THE COURT: Okay. See you back in a little bit.

(Recess from 11:15 to 11:38 a.m.)

(Witness resumed stand.)

THE COURT: Okay. Are we ready for the jury?

MR. JULIEN: Yes. Yes, your Honor.

MR. ADAMS: Yes.

THE COURT:  All right.

THE CLERK:  All rise.

(Jury enters courtroom.)

THE COURT:  All right.  Cross.

MS. GIACCHETTI:  Thank you, Judge.

CROSS-EXAMINATION

BY MS. GIACCHETTI:

Q.  Good morning, Mr. Garrett.

A.  Good morning.

Q.  I just have a couple of questions.

I want to talk about King Von, Dayvon Bennett.

A.  Okay.

Q.  You spoke about him on direct.

He -- by the time you were working at Parkway Gardens, he was not residing there; is that correct?

A.  I'm sorry, say that again?

Q.  By the time you started at Parkway Gardens, he was not living there.

A.  That's correct.

Q.  Okay.  And he -- but he would come back to make videos, right?

A.  That's correct, yes.

Q.  Because at a certain point, he became extremely popular as a rap music artist; isn't that right?

A.  Yes.

Q. Okay. And when he would come back, he didn't get permission to make those videos from -- from you, is that right it, or from security?

A. That's correct.

Q. Okay. And what would happen is there would be -- because of his popularity, there would be crowds gathering for this video; isn't that right?

A. Yes.

Q. And that creates an issue with security. You can't do crowd control for somebody's private video, right?

A. Yes.

Q. All right. And so he would be asked to leave; is that right?

A. Yes.

Q. And sometimes he would say, can I stay, because we've only got the camera guy, or we need to get this done, and kind of gave you a little problem about that; is that right?

A. Yes.

Q. Okay. But eventually, you made them leave because they shouldn't have been there and they created an issue of crowds with you; is that right?

A. That's correct.

          MS. GIACCHETTI: Okay. I have no other questions, your Honor.

          THE COURT: Okay, further cross?

CROSS-EXAMINATION

BY MR. SOMERVILLE:

Q. Good morning, Mr. Garrett.

A. Good morning.

Q. You are familiar with the Parkway Gardens surveillance video system, correct?

A. Yes.

Q. I think you described it as motion activated?

A. Yes.

Q. So if the camera is going and things are moving in the camera, it should keep recording, right?

A. Yes.

Q. And if things don't move for a while, the camera will stop recording, generally, correct?

A. Yes.

Q. And then if things move again, it will click on.

A. Yes.

Q. So I'd like to ask you a few questions about some video at Parkway Gardens.

        MR. SOMERVILLE:  It's Government Exhibit 2001-1 to begin.  It's in evidence.

        Your Honor, may we please publish to the jury?

        THE COURT:  Yes.

BY MR. SOMERVILLE:

Q. Okay.  Can you see the video in your screen, Mr. Garrett?

A.   Yes.

Q.   Now I'm going to play it, and I think there's a guy in a blue hat that will be moving.  Tell me what happens, okay?

A.   Uh-huh.

        MR. SOMERVILLE:   I'm starting at the run time of 11:30.

        (Video played.)

BY MR. SOMERVILLE:

Q.   What happened to him?

A.   He no longer was in the playground area.

Q.   And he was walking when that happened, right?

A.   That's correct.

Q.   So was the camera supposed to stay on while the things were moving?

A.   The camera is pointed directly into the playground, so when he no longer was there, it stopped.

Q.   Okay.  Today you're saying the camera is focused in the playground?

A.   Yes.

Q.   Didn't you say yesterday that it was focused in the driveway?

A.   Yes, I did.

Q.   Hmm.

A.   They have multiple cameras in this parking lot.  They have two types of cameras.

Q. And this is 6434 site, correct?

A. Yes.

Q. Did you say yesterday that if things stopped moving, it will run for five minutes, then shut off?

A. I don't recall that.

Q. Is that how it works?

A. If somebody walks -- depending on where the camera is angled for the motion, if somebody walk in the camera area, it will records, and because the camera the way it's angled, it would pick up. You would be able to see any other activity while it's recording, but it will stop because it's directly towards -- this particular camera is directly towards the playground.

Q. Okay. So let's go to the driveway.

You see the driveway in the right part of the picture?

A. Yes.

Q. You see two cars in the driveway?

A. Yes.

Q. Okay. I stopped it at 10:24.

Okay. Now, tell me what happens to the cars, okay? Those black cars. Oh, there, you see the --

A. Yep.

Q. -- kind of circle there? Do you see the two cars there in the blue between the two blue lines?

A. Yes.

Q. Okay. So tell me what happens to them, okay? Or tell the jury, not me.

(Video played.)

BY MR. SOMERVILLE:

Q. Did the cars disappear?

A. Yes.

Q. So when they moved, the camera didn't turn back on, did it?

A. Once they left, that was it. The motion was not activated.

Q. All right. I'm going to move to some footage that was shown to you around 12:38 in the run time.

Okay. Do you see the black car backing in by the slide?

A. Yes.

Q. Okay. Keep an eye on that, please. It's running at 12:36.

See the door open and somebody get out?

A. Yes.

Q. Okay. I'll stop it there.

Now, the person who got out -- I'm going to try to zoom in a little bit. The person that got out and his back to the camera, is that person wearing a light-colored hoodie or top garment, a light-colored top?

A.  Yes, like a greenish.

Q.  Okay.  Now I'm going to go to 19:08 on the run time.

Can you see the black car still there by the slide?

A.  Yes.

Q.  Did the door just open?

A.  Yes.

Q.  Did the door just shut?

A.  Yes.

Q.  And I think on your direct examination with Mr. Julien, you said that the person that got out the car and was standing there in the parking lot -- did you identify who that was?

A.  Yes.

Q.  Who did you say it was?

A.  Carlos.

Q.  Okay.  I'm going to zoom in.

Would you say that that person's top is dark or light colored?

A.  Dark.

Q.  Okay.  So that person just walked away from the black car there, right?

A.  Uh-huh.

Q.  Now, I want you to keep an eye on the black car there, and tell me, before the black car drives away, does the person in the dark top get back in the driver's seat, okay?  Can you watch for that?

Garrett - cross by Somerville

6246

A.   Uh-huh.

Q.   Thanks.

(Video played.)

MR. SOMERVILLE:  This is why I used my other computer.  This one doesn't have fast forward.

So maybe I'll get my other computer, but maybe not.

(Video played.)

BY MR. SOMERVILLE:

Q.   While this is playing a little bit, keep an eye on that driver's door, okay?

But I'm just going to say a few more things.

Oh, do you see the light-colored hoodie coming back towards the car?

A.   Yes.

Q.   Okay.  Does he get in the driver's side there?

A.   No.

Q.   Now, the video jumps.  You've already described why that happens, right?

A.   Yes.

Q.   And it could jump from as much as five minutes or two minutes, any number of seconds, correct?

A.   That's correct.

Q.   And obviously, when it's not recording, you can't see what's going on there, right?

A.   Unless you're in dispatch, you see a live feed.

Q. But on this camera when it jumps --

A. Right.

Q. -- obviously you can't see what's happening, right?

A. Right.

Q. I'm going to go to -- all right. We're getting close.

Still, dark top has not gotten into the driver's side of the black car, right?

A. That's correct.

Q. Should be about 10 seconds more. And tell me if the black car drives out without the black top -- oops, there it goes.

Did you see it now?

A. Yes.

Q. That black car that Carlos got out from drove away, right?

A. That's correct.

Q. And from the time he got out until the car drove away, you did not see him get back in, correct?

A. That's correct.

Q. Now, I'm going to go on a run time to 57:33.

Is that a view of the same parking lot?

A. Yes.

Q. And you call that the community center lot?

A. Yes.

Q. In about five seconds, tell me if you see a white Kates Security vehicle driving in the driveway.

Do you see it?

A. Yes.

Q. Is that a Kates Security vehicle?

A. Yes.

Q. How do you know that?

A. Because of the wording and the vehicle itself.

Q. Okay. Now, the timestamp up at the top here now is 3:34 and 41 seconds p.m., right?

A. Yes.

Q. Do you know who was driving that security vehicle?

A. No, I don't recall.

Q. Did you investigate to find out who was driving that security vehicle that drove in the community center parking lot at this time?

A. No.

Q. Was that important to the investigation?

A. I have no knowledge of that.

Q. Do you know where that security vehicle went as it drove out of this picture?

A. It appears it went to the side.

Q. Is that the small parking lot with the tree in front of the camera?

A. Yes.

MR. SOMERVILLE: So I'm going to jump this video to about 1:09:02.

(Video played.)

BY MR. SOMERVILLE:

Q. Did you see the security vehicle drive out of this parking lot when you ever viewed this video before?

A. No, I don't recall.

Q. Were you ever -- whoops, stop it there.

I stopped it at a run time of 1:09:02.

Did anyone ever ask you to investigate, to find out who was driving that car?

A. No.

Q. And then it drives out of the driveway there, right?

A. Yes.

Q. Then it actually turns left, do you see that, at the end?

A. Yes.

Q. All the other cars turned out or came in to the right. Do you know why that Kates Security vehicle turned left there?

A. Turned left to get on the sidewalk to go into the other side of the parking lot, I'm assuming.

Q. And they're making the rounds?

A. Yes.

Q. Okay. I'm going to go to 201-3.

Okay. This is the camera that's called 6430 site, correct?

A. Yes.

Q. What color is the timestamp up at the top?

A. Yellow.

Q. You can read that pretty clearly?

A. Yes.

Q. Does the tree kind of block the view of the camera?

A. In a way it does.

Q. Whose job is it to have the tree trimmed so it doesn't block the camera?

A. The property manager.

Q. Did you ever report that to them to get that done?

A. We have.

Q. Now, do you see in the lower left-hand corner of the picture the front of a white vehicle and a tire?

A. Yes.

Q. I'm going to do a blue line over there.

Do you see it in the left -- lower left of the screen?

A. Yes.

Q. Do you know what that is?

A. It's a Kates vehicle.

Q. I'm sorry?

A. Kates vehicle. It's a vehicle. It's one of ours.

Q. Is it instructed to park there out of the camera's view?

A. They can park anywhere in the parking lot they choose.

Q. Is that the same vehicle that drove in in the other camera?

A. It appears to be, yes.

Q. And, again, no efforts were made to find out who the driver of that vehicle was?

A. No.

MR. SOMERVILLE: All right. I'm going to go to a 14:41 run time.

Well, change that.

I'm going to go to 6:50 in the run time. We need a run time.

So I'm playing it at a 6:45:47.

(Video played.)

BY MR. MR. SOMERVILLE:

Q. All right. Can you look back at the security vehicle in the lower left?

A. Yes.

Q. Where I put that line?

A. Yes.

Q. The passenger door of that vehicle appears to open up, and the timestamp at the top is 3:48:03.

So tell me if you can see a shadow or evidence -- I know you're not a detective, but if the front passenger door of that security vehicle opens up, based upon the shadows that appear right near the tire as I play it. Okay?

A. All right.

Q. Do you see it?

A. Yes.

Q. Did that appear to be the door of your security vehicle opening up?

A. Yes.

MR. SOMERVILLE: I'm going to play it -- bless you.

(Video played.)

BY MR. SOMERVILLE:

Q. Do you see a shadow there coming out?

A. Yes.

Q. Does that look like a person getting out the passenger's side of that vehicle?

A. It does.

Q. Do you know who was in the passenger's side of that vehicle?

A. No.

Q. Now, over to the right of the vehicle, you see a person in a yellow T-shirt?

A. Yes.

Q. And do you see a black vehicle?

A. Yes.

Q. About how far would you say that your security vehicle is from that black vehicle that appears to have a license plate in the front window? How far away?

A. Maybe about 25 to 30 feet.

Q. You're saying that the front of that white security vehicle is 25 or 30 feet away from the person in the yellow

shirt?

A. Yes.

MR. SOMERVILLE: Now I'm going to go to 14:41 run time.

(Video played.)

BY MR. SOMERVILLE:

Q. That black vehicle appears to have moved now at 14:30, correct?

A. Yes.

Q. Do you see a person in a white T-shirt standing next to the driver door?

A. Yes.

Q. Do you know who that person is?

A. No.

Q. Okay. Now, the door is opening up, right?

A. Yes.

Q. And I think -- do you know -- did you identify, when Mr. Julien was asking you questions, identify who that person was getting out the driver's door?

A. Yes.

Q. Who did you say it was?

A. Carlos.

Q. And, again, I'm going to zoom in.

What color is the top he's wearing, dark or light?

A. Dark.

Q. Okay. Are you able to see his face in this video?

A. No.

Q. So I'm going to play it a little more, and I think that person in the dark top comes back to the -- like the Y of the open driver's door and the frame of the car. Do you see that, the door open there?

A. Yes.

Q. And the person in the dark top is in the Y of the door and the frame of the car?

A. Yes.

Q. Now, did you see him bend down and his rear is going in towards the seat?

A. Yes.

A. Yes.

MR. SOMERVILLE: Now, tell me -- I'm going to go -- try to go frame by frame, because there's a jump. There is a jump in the video. So tell me if you see the door completely close or if the video jumps and you don't see it completely close without the jump. I'm going to play it.

(Video played.)

BY MR. MR. SOMERVILLE:

Q. Did you see that?

A. Yes.

Q. Did it jump?

A. Yes.

Q. And that was -- well, what's the timestamp up there now?

A. 3:58. 3:58.

Q. 3:58 and 20 seconds?

A. Yes.

Q. Do you know what time it was when it jumped?

A. No, I have to look at it again. I didn't see it.

Q. Okay. 3 -- it's at 3:58:03 right now. See it up at the top?

A. Yep.

Q. I'm going to predict that 3:58:09 -- I'm going to predict it's going to jump to 3:58:18.

Tell me if the video jumps about nine seconds right here, okay?

(Video played.)

BY MR. SOMERVILLE:

Q. Boom. Did you see it jump?

A. Yes.

Q. Okay. Now, people are moving, getting in the car, and the video jumped, right?

A. Yes.

Q. I'm going to move -- I don't want to show you all the jumps. You know that this camera jumps and skips videoing in what's going on in that lot, right?

A. Yes.

Q. Okay. The tree, not trimmed, right?

Okay. You see the black car going in reverse there?

Garrett - cross by Somerville

6256

I stopped the video, but did you see it move in reverse?

A.  Yes.

Q.  Okay.  Now it's going to go backwards there.  I'm going to stop it there.

Are you able to see in the camera if people are getting in or out of that black car right now as it's stopped with a 15:26 run time?

A.  No.

Q.  Why?  Why can't you see it?

A.  Because of the trees blocking it.

Q.  Exactly.  We're on the same page.

Now I'm going to go to 20:48 on the run time.  I'm starting to press play.  Tell me if you see the security vehicle drive out.

(Video played.)

THE WITNESS:  Yes.

BY MR. SOMERVILLE:

Q.  And what's the timestamp at the top?

A.  4:04:56.

Q.  How far is that security vehicle from that black car right now?

A.  Not even one feet.  It's right there on it.

Q.  Okay.  So I'm going to change videos.  I'm going to switch gears, as Jason says.  Let me switch gears.

He's better at the computer than I am.

MR. SOMERVILLE: I'm going to ask your Honor, may we please publish Government Exhibit 2000 already in evidence?

THE COURT: Yes.

MR. SOMERVILLE: Now, I'm going to press play.

I forgot to ask to unpublish that other one, but this is in evidence.

Did you unpublish it? Thanks. Sorry, Henry.

BY MR. SOMERVILLE:

Q. So have you heard the word Camtasia?

A. I'm sorry, say it again?

Q. Have you heard the word Camtasia?

A. No.

Q. So this Government Exhibit 2000 has been referred to as Camtasia, but I'll call it 2000.

This is a clip, an exhibit, with video from all different places put into this one clip. That's what it is.

So I'm going to go to -- so it shows a lot of what we've already seen, and we'll try not to do that again. I'm going to go to 5:31 run time.

I'll go to 5:49.

6:16.

Okay. I'm going to start playing at a run time of 6:08.

(Video played.)

BY MR. SOMERVILLE:

Q. Can you see that, sir?

A. Yeah.

Q. Do you see the black car moving?

A. Yes.

Q. I'm stopping it at 6:14.

Are you able to see who's driving that black car right now in the video?

A. No.

Q. Are you able to see anybody in that black car right now?

A. No.

MR. SOMERVILLE: Okay. I'm going to jump to 6:26.

(Video played.)

BY MR. SOMERVILLE:

Q. All right. There, it just switched to a different camera.

All right. Do you know where this is, this intersection that's pictured in Government 2000?

A. Yeah.

Q. Does that look like 63rd -- well, it says right there, 6231 South Wentworth?

A. Yes.

Q. How far is this video from Parkway Gardens?

A. Hmm, maybe about four blocks, maybe.

Q. Now, have you seen any video for the four blocks between Parkway Gardens and here, like up and down 63rd Street, at this time?

A.   I'm sorry, say that again?

Q.   Have you seen any video from 63rd Street, which is the street pictured here, on 63rd Street between here, Wentworth, going back to Parkway Gardens?

A.   No.

Q.   So you don't know if people got in or out of the cars on 63rd Street, do you?

A.   No.

          MR. SOMERVILLE:  So I'm going to play it at 6:28:29.

     (Video played.)

BY MR. SOMERVILLE:

Q.   Okay.  Do you see the black car with the license plate in the lower right-hand corner?

A.   Yeah, I seen the black car, yeah.

Q.   Are you able to see who's driving that car at this time?

A.   No.

          MR. SOMERVILLE:  Now I'm going to jump to -- I'm going to try to get to 6:50.

          I'm going to go further.

     (Video played.)

BY MR. SOMERVILLE:

Q.   All right.  Do you recognize what this is?

A.   Yes.

Q.   What is it?

A.   Lake Shore Drive.

Garrett - cross by Somerville

6260

MR. SOMERVILLE: All right, I'm going to play it from 6:52.

(Video played.)

BY MR. SOMERVILLE:

Q. All right. Do you see this Fusion that I put lines around?

A. Yes.

Q. Can you see who's driving that car from this camera?

A. No.

(Video played.)

BY MR. SOMERVILLE:

Q. Do you see the black car I'm putting lines around? Do you see that?

A. Yeah.

Q. Can you see who's driving the car there?

A. No.

Q. All right. Do you see the black car? It moved a little bit.

A. Yep.

Q. Is that glare -- is that glare in the window?

A. Yes.

Q. Real glare?

A. Yes.

Q. Okay. I'm going to jump to -- I'm going to jump to Government Exhibit --

MR. SOMERVILLE: Can we please unpublish?

THE COURT: Yes.

MR. SOMERVILLE: Okay. May we please -- may we please publish Government Exhibit 2023, already in evidence?

THE COURT: Yes.

BY MR. SOMERVILLE:

Q. Okay. So I'm almost finished, Mr. Garrett.

I'm going to go to a run time around 18:04. Let me get a run time first.

Okay. Do you see where it says 210 West Ontario Street-6574 at the top of this screen?

A. Yes.

Q. And do you see the timestamp at the bottom in blue, 4:28:04 p.m.?

A. Yes.

MR. SOMERVILLE: Okay. I'm going to play it.

(Video played.)

BY MR. SOMERVILLE:

Q. Do you see a blue Jeep in the lane all the way to the left as you're looking at the picture?

A. Yes.

Q. Do you see glare in that window?

A. Yes.

Q. Is that real glare?

A. Like it's from the sun, yes.

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 104 of 285 PageID #:10612
Garrett - cross by Somerville
6262

Q. Okay. I'm going to go to about 20. Okay.

Do you see the run time at the bottom now, 4:28:56 p.m.?

A. 4:29:56.

Q. I'm sorry. 4:29:56 p.m.?

A. Yes.

MR. SOMERVILLE: Thanks for correcting me.

I'm going to press play.

(Video played.)

BY MR. SOMERVILLE:

Q. Do you see a car coming up that far left lane?

A. Yes.

Q. Do you see what looks to be maybe a license plate in the dashboard in front of the passenger?

A. Yes.

Q. Okay. I'm going to zoom in a little bit.

Does it look like the driver there is wearing a light-colored garment?

A. Yes.

Q. And you said Tacarlos was wearing a dark top --

A. Yes.

Q. -- earlier?

MR. SOMERVILLE: May I have a moment, please?

THE COURT: Yes.

MR. SOMERVILLE: I'm not sure to unpublish yet, okay?

May I just have a moment?

(Counsel conferring.)

MR. SOMERVILLE:  One more question.

BY MR. SOMERVILLE:

Q.  Mr. Garrett, did anyone, during your time working at Parkway Gardens, ever come up to you and say, I'm a member of the Black Disciples or the BDs?

A.  No.

MR. SOMERVILLE:  May we please unpublish?

THE COURT:  Yes.

MR. SOMERVILLE:  Nothing further.  Thank you.

MS. BORMANN:  Judge, may we have a sidebar, please?

THE COURT:  Yes.

(Proceedings heard at sidebar:)

MS. BORMANN:  Judge, I'm next.  I have about ten minutes.  Mr. Boyle is after me, and I don't know how much he has.  So if you want to take a break now or if you want to merge on, it's up to you.

THE COURT:  How long do you have, Mr. Boyle?

MR. BOYLE:  About one minute.

THE COURT:  Okay.  Well, then why don't we try to finish.

MS. BORMANN:  Okay.  Then I need to set up my computer.  Bear with me.

THE COURT:  That's fine.  Thanks.

(Proceedings heard in open court:)

MR. GREENBERG:  Because I'm so young, I get all the tech stuff.  Closest to a Millennial.

MS. BORMANN:  No, it's because he has a child who worked for Apple.

All right.  Let's try this.

There we go.

MR. GREENBERG:  I think that should work.  No, it's not working either.

(Counsel conferring.)

MR. GREENBERG:  Can we see the sound?

THE LAW CLERK:  You have to publish for that.

MR. GREENBERG:  That's okay.  It's just the home screen.

THE LAW CLERK:  Right now?

MR. GREENBERG:  Okay.  Thanks.

CROSS-EXAMINATION

BY MS. BORMANN:

Q.  Good afternoon.

A.  Good afternoon.

Q.  How are you?

A.  I'm good.

Q.  I promise this will be short.

I'm going to ask you to view a video that was taken at Parkway Gardens, and then I'm going to ask you some

questions about it, okay?

A.  All right.

MS. BORMANN:  Judge, I have what's been marked as Roberson No. 12.  The government has no objection.  I'm going to ask to publish it at this point maybe.

THE COURT:  Okay.

MS. BORMANN:  Whoops, no, that's not -- hold on. There we go.

(Video played.)

BY MS. BORMANN:

Q.  Sir, I'm going to stop it right here at the 24-second mark with the title that says "Broke Opps," and it says who's producing it and who's shooting it, et cetera.

Sir, do you recognize the place where this is filmed?

A.  Yes.

Q.  Where is that?

A.  Parkway.

Q.  Parkway Gardens that we've been discussing?

A.  Yes.

Q.  Thank you.

I'm going to continue now, and I'm going to try and stop it at the 32-second mark.

(Video played.)

BY MS. BORMANN:

Q.  It's actually -- whoops, I went a little too --

(Video played.)

BY MS. BORMANN:

Q. Right there.

Sir, do you recognize that area?

A. I'm sorry, say that again?

Q. Do you recognize that area?

A. No.

Q. Okay. That is not in Parkway Gardens, right?

A. That's correct.

Q. Okay. Thank you.

I'm going to now move to the 36 second, so 4 seconds from now.

(Video played.)

BY MS. BORMANN:

Q. Sir, do you recognize what is in that frame?

A. Yes.

Q. Okay. And what is that?

A. It's a back door of a walkup that's located in Parkway Gardens.

Q. And does it show the number of the walkup?

A. Yes.

Q. What number is that?

A. 1A.

Q. Do you know who lives in 1A?

A. I do not.

Garrett - cross by Bormann

6267

Q. Okay. Thank you.

Now I'm going to move ahead to about the 42-second mark.

(Video played.)

BY MS. BORMANN:

Q. So I hit it right.

Do you recognize who's in that still frame?

A. Yeah. Right here, yes.

Q. Yeah, who is that?

A. Dayvon Bennett.

Q. And that's the guy known as King Von?

A. That's correct.

Q. Do you recognize that place?

A. Yes.

Q. And where is that place?

A. This is Parkway Gardens.

Q. Thank you.

Now I'm going to move on to about minute 1:23.

(Video played.)

BY MS. BORMANN:

Q. The area I just passed showed a woman whose derriere was faced toward us, and she was doing something called twerking. Did you see that, or do you need me to go backwards?

A. Yeah, go back.

(Video played.)

Garrett - cross by Bormann

6268

MS. BORMANN:  Trying to get this exactly is a little difficult.

(Video played.)

BY MS. BORMANN:

Q.  There we go.

Do you recognize any of the individuals in that still shot?  And that's at minute 1:23.

A.  No.

Q.  Okay.  Is that an apartment at Parkway Gardens?

A.  No.

Q.  Okay.  Thank you.

(Video played.)

BY MS. BORMANN:

Q.  Sir, I'm going to stop the video at 1 minute and 27 seconds.

Do you recognize the individual who's portrayed in that video shot?

A.  Yes.

Q.  Who is that?

A.  Appears to be Boss Top.

Q.  And who is Boss Top?

A.  It's a member of Parkway Gardens.

Q.  He's a resident of Parkway Gardens, right?

A.  Yes.

Q.  And he's also a rapper, correct?

Garrett - cross by Bormann

6269

A.  That's correct.

Q.  Not as famous as King Von?

A.  That's correct.

Q.  And not as famous as Chief Keef?

A.  That's correct.

Q.  But nevertheless, a rapper who's pretty well known?

A.  Yes.

Q.  Now I'm going to go on to the very end.  Bear with me. I'm going to stop at 1:47.

        (Video played.)

BY MS. BORMANN:

Q.  Sir, do you see the three individuals depicted in that still shot?

A.  Yes.

Q.  Is the one on the very left Boss Top who you identified earlier?

A.  Yes.

Q.  And is the one on the right King Von who you identified earlier?

A.  Yes.

Q.  Do you recognize the person in the middle?

A.  Yes.

Q.  Who is that?

A.  Devonte.

Q.  That's the gentleman, Gleesh, that you were talking about

with Ms. Domph when she was questioning you earlier, right?

A. Yes, that's correct.

Q. Thank you.

Now we're going to go all the way to the end? 10 minutes and 49 seconds.

(Video played.)

BY MS. BORMANN:

Q. Sir, that's a shot of one of the buildings at Parkway Gardens, right? This is stopped now at the 2-minute-and-49-second mark.

A. Yes, that's correct.

Q. Do you recognize what building number that is?

A. I want to say 6414.

Q. Okay. And the three initials on the top of it, OTF, are you familiar with those?

A. Yes, in a way.

Q. Okay. Is that a record label for Lil Durk?

A. Yes.

Q. Okay. Thank you.

MS. BORMANN: Judge, at this point, we can unpublish, and I'm going to ask to move it in with the consequent marks. Thank you.

THE COURT: Okay. Any objection?

MR. JULIEN: No objection.

THE COURT: It's admitted.

(Defendant Exhibit Roberson No. 12 received in evidence.)

MS. BORMANN:  Thank you.

BY MS. BORMANN:

Q.  I want to ask you a little bit about the way Parkway Gardens is situated.

You told us about one of the buildings earlier, you guessed that that one, the building that was shown at the very end was on the 6400 block, right?

A.  Yes.

Q.  Are you familiar with a building by the name of 6356?

A.  Yes.

Q.  Okay.  And how many floors is 6356?

A.  Eight.

Q.  Eight floors?

A.  Yes.

Q.  And the apartments in those -- in that 6356 building, how many bedrooms are in those apartments?

A.  Can go anywhere between three to four, depends.

Q.  Right.

That particular building is intended for family, right?

A.  Yes.

Q.  Okay.  So are you familiar with a woman by the name of Sarah Roberson?

Garrett - cross by Bormann

6272

A. No.

Q. Okay.

A. Doesn't ring a bell.

Q. That's okay.

And how about a fellow by the name of Stefan Sykes, S-Y-K-E-S?

A. No.

Q. So if they were family members of Kenneth Roberson who were living at 6356, you wouldn't know them?

A. Right.

Q. Okay. When people live in such a big development like Parkway, there are a lot of people that come and go pretty much all day and all night, right?

A. That's correct.

Q. And when Mr. Julien asked you about my client, Mr. Roberson over here, you said, I think, he looks familiar but you don't know him, right?

A. Yes.

Q. And that would, of course, be consistent with somebody who had family living at Parkway Gardens and visited occasionally, right?

A. Yes.

MS. BORMANN: If I may have a moment?

THE COURT: Sure.

MS. BORMANN: Judge, I have nothing further.

Thank you, sir.

THE WITNESS:  All right.

MR. BOYLE:  May I, Judge?

THE COURT:  Yes you.

                    CROSS-EXAMINATION

BY MR. BOYLE:

Q.  Good afternoon, Mr. Garrett.

A.  Good afternoon.

Q.  My name is Patrick Boyle.  I'm one of the attorneys for Mr. Ralph Turpin.

    You've testified, I think, several times now that you began working security at Parkway Gardens in 2014?

A.  Yes.

Q.  And I believe it was also your testimony to the jury that you continued to work security there until about January of 2021.

A.  That's correct.

Q.  And I believe it was your testimony that part of your duties was to familiarize yourself with the residents at Parkway Gardens and also the guests that would visit Parkway Gardens, correct?

A.  That's correct.

Q.  And you did your duty over those years, correct?

A.  That's correct.

Q.  In your years at Parkway Gardens, did you ever encounter

my client, Mr. Ralph Turpin?

And he's the gentleman in the Navy jacket and shirt.

A. Don't recall seeing him, no.

Q. You don't remember seeing him?

A. Uh-uh.

Q. So no memory of Ralph Turpin being at Parkway Gardens from 2014 to 2021?

A. Not that I can remember, no.

MR. BOYLE: Thank you, sir.

THE COURT: Any further cross?

I'm not seeing any.

Let's just please go on the sidebar.

(Proceedings heard at sidebar:)

THE COURT: How long do you have for the redirect?

MR. JULIEN: Ten minutes.

THE COURT: Okay. Then let's just finish that.

(Proceedings heard in open court:)

THE COURT: Okay. Redirect.

REDIRECT EXAMINATION

BY MR. JULIEN:

Q. Good afternoon, Mr. Garrett.

A. Afternoon.

Q. I want to start with some questions you were asked about surveillance video.

So I'm going to show you what Mr. Somerville showed

you, one of the things he showed you, as Government Exhibit 2001-3.

And I'm going to fast forward to the 15-minute -- get as close as I can to the 15-minute-15-second mark.

So I'll just start from 15:13.

(Video played.)

MR. JULIEN: Do I have the wrong -- there we go.

BY MR. JULIEN:

Q. So I played from the 15:13 mark to 15-minute-27 mark.

Do you remember being shown this by Mr. Somerville a couple minutes ago?

A. Yes.

Q. And do you remember he asked you, if this car backed up, the logical conclusion would be that you couldn't see who got in or out of the car?

A. That's correct.

Q. And you indicated that it was blocked by the tree; is that right?

A. That's correct.

Q. Based on your familiarity with Parkway Gardens and the cameras and viewing this video, did it appear that this black car that backed out of this frame backed into the community center lot?

A. Yes, that's correct.

Q. So you'd theoretically be able to see it from a different

angle?

A. That's correct.

Q. I'm going to show you Government Exhibit 2001-1.

And by the way, this timestamp is 3:58 p.m. Is that fair?

A. Yes.

MR. JULIEN: This tracking isn't perfect. I got as close as I can get it where I need to get to.

So I'm going to play from the 1-hour-7-minute-21-second mark for a couple seconds.

(Video played.)

BY MR. JULIEN:

Q. And I actually paused it after about one second.

I want to direct your attention to the right side of the screen here. Do you see what appears to be a black sedan there?

A. That's correct.

Q. And is this view that we're looking at right now consistent generally with this black sedan being parked underneath that tree we were just looking at in Government Exhibit 2001-3?

A. That's correct.

Q. And the timestamp right now at the top is about 3:52 p.m.; is that right?

A. Yes.

Garrett - redirect by Julien

6277

MR. JULIEN: All right. I'm going to play this for a couple seconds.

(Video played.)

MR. JULIEN: So I paused it the 1-hour-7-minute-37-second mark.

BY MR. JULIEN:

Q. Did you see that time jump?

A. Yes.

Q. To now 3:57?

A. Yes.

Q. Did it appear that this car, this black sedan, started to reverse?

A. That's correct.

MR. JULIEN: All right. I'm going to keep playing.

(Video played.)

BY MR. JULIEN:

Q. So I just played from the 1:07 about 44-second mark to the 56-second mark, 1:07:56.

Did you see anybody get in or out of the black sedan during that portion of what I just played?

A. No.

THE COURT: Can we go on the sidebar really quickly?

(Proceedings heard at sidebar:)

THE COURT: This is not published. I don't know if that's --

MR. JULIEN: That was not intentional.

THE COURT: Okay.

(Proceedings heard in open court:)

MR. JULIEN: So it's been brought to my attention that I got out of the gate a little bit too hot and the jury wasn't seeing this.

So I'm going to ask that, your Honor, we publish this, and I'm going to try to power through this quickly.

(Video played.)

MR. JULIEN: All right. So I'm going to come back to Government Exhibit 2001-3.

Sorry to have to do this, but I'm going to ask you these questions a little bit -- I'm going to get through it quicker.

So I'm showing you from the 15-minute-12-second mark and I'm going to show you about 10 seconds.

(Video played.)

MR. JULIEN: All right. I paused it at the 15-minute-27-second mark.

BY MR. JULIEN:

Q. Did you see the black sedan back off the camera?

A. Yes, that's correct.

Q. And is it 3:58 p.m., according to the timestamp at the top?

A. Yes, that's correct.

MR. JULIEN: I'm going to show you Government Exhibit 2001-1, and I'm going to go to -- get as close as I can to the 1 -- I'm just going to call it 1:07:36.

So I'll play it from here, 1:07:21.

(Video played.)

BY MR. JULIEN:

Q. Now, 1:07:25, where I just paused it, do you see a black sedan on the right of the screen?

A. Yes.

Q. And is that consistent with the car, the black sedan, being up underneath that tree we were looking at in the last frame?

A. Yes, that's correct.

Q. Is the timestamp at the top about 3:52 p.m., according to the timestamp?

A. Yes.

MR. JULIEN: I'm going to keep playing Government Exhibit 2001-1.

(Video played.)

BY MR. JULIEN:

Q. Now, pausing it at 1:07:38, did you start to see this black sedan reverse in the parking lot?

A. Yes.

Q. Is it now, according to this timestamp, about 3:57 p.m.?

A. Yes.

(Video played.)

MR. JULIEN: All right. So I paused it at the 1:08:27 second mark.

BY MR. JULIEN:

Q. During that stretch of the video that I just played, did you see anybody get in or out of the Ford Fusion?

A. No.

Q. And this is a view you would not have been able to see from underneath that tree until the car pulled back underneath the tree?

A. That's correct.

Q. Is it about 3:58 now, according to this timestamp?

A. That's correct.

Q. And from where the car is parked at right now, you think you'd be able to see this back underneath the tree in 2001-3 that we were looking at before?

A. Yes, that's correct.

Q. I want to change gears a little bit, come back to ask you some questions that you might have been asked this morning by Ms. Domph.

You were asked -- and I'm not going to show you the picture necessarily, but there was a group photograph that you were shown by Ms. Domph, and I think you identified Ezell on the left of that picture, and Christopher was sitting down with his hands up over his face like this in the picture. And

Ms. Domph asked you about someone who you identified as Welch. Do you remember that?

A.  Yes.

Q.  Ms. Domph asked you if Welch was tall?

A.  Yes.

Q.  Is Welch a slim person, a bigger person, or something in between?

A.  He's a bigger person.

Q.  Would you say that Welch and Christopher have a different build?

A.  Yes.

Q.  In what way?

A.  One is tall, slim, the other one is kind of heavyset.

Q.  Which one is tall and slim?

A.  Christopher is tall and slim.

Q.  I think Ms. Domph at one point in her cross-examination of you asked you about the doorjambs in banks, and specifically whether or not there were height indicators in those doorjambs.

Do you remember being asked that?

A.  Yes.

Q.  And one of the reasons that she asked, and I think you indicated this, is because you can't tell necessarily looking at a video how tall someone is; is that right?

A.  Yes.

Q. Can you tell if there are other frames of reference in a video?

A. Um --

Q. For example, like a height indicator?

A. No. I didn't see a height indicator in the video, no.

Q. I mean hypothetically now, so like the bank scenario.

A. Okay.

Q. Would you be able to tell, if there was some sort of indicator or frame of reference in a video, how tall someone might be?

MS. DOMPH: Objection, speculation.

THE COURT: Overruled.

BY MR. JULIEN:

Q. You can answer.

A. No.

Q. If, for example, there was someone in the video standing next to another person --

A. Okay.

Q. -- would you be able to say, maybe they're the same height, maybe one person is taller than the other?

A. Yes.

MS. DOMPH: Objection, same objection.

THE COURT: Overruled.

BY MR. JULIEN:

Q. If you were looking at a video and you -- it was an area

you were familiar with, so let's say a window in Parkway Gardens like that one that I just zoomed in on, or someone in a stairwell, do you think you might be able to say, looking at those things you're familiar with, how tall or short somebody is?

A. Yes.

MR. JULIEN: So let me show you what we talked about a little earlier, Government Exhibit 2000. And I'm going to go to the 4-minute-31-second mark, and I'm going to play it for about four seconds.

(Video played.)

BY MR. JULIEN:

Q. Earlier, did you indicate that the person where I paused at now at the 4-minute-36-second mark on the right, that that person was Christopher?

A. Yes.

Q. Does that person, Christopher, appear to you to be taller than the person on the left?

A. That's correct.

Q. Based on your familiarity with Parkway Gardens and presumably the stairwell, does it appear that the person you identified as Christopher appears to be tall in where I have Government Exhibit 2000 paused?

A. Yes, that's correct.

MR. JULIEN: I'm going to fast forward a little bit

to about the 12-minute-12-second mark, and I'm going to let this play for a couple seconds.

(Video played.)

MR. JULIEN: So I've paused Government Exhibit --

MR. SPIELFOGEL: Your Honor, I'd ask for a sidebar, please.

THE COURT: Yes.

(Proceedings heard at sidebar:)

MR. SPIELFOGEL: Your Honor, the government did direct, and defense did cross --

Can you hear me?

MR. JULIEN: Yeah.

MR. SPIELFOGEL: I'm sorry.

They did direct, we did cross, they never asked this witness anything about the part of the video that they are about to, I believe, attempt to ask him about.

They should not be allowed to do that because they had the opportunity to play this entire video and have him make identifications out of any part of it. And at this point, it's beyond the cross and it's -- he's already gone through and made his identifications.

MS. DOMPH: And, Judge, I didn't touch the videos. It's beyond the scope of my cross. I did still photos that were posed, essentially.

MR. JULIEN: Your Honor, I don't think it's beyond

the scope of cross. And I'm going to tell you, I do not plan to ask him for an identification here necessarily. I think this is within the scope, because what I do plan to ask is, I'm going to focus his attention on Thomas and Roberson and simply ask if the person on the right appears to be taller than the person on the left relative to each other and the window that I had just focused him on when no one was in the frame.

And I think it's within the scope of the cross based on where they left off and talking about you can't tell how tall someone is based on looking at a video, that's why you have to have doorjambs -- or the height indicator in the bank doorjamb.

MS. DOMPH: Judge, the jury can decide the differential for themselves.

THE COURT: So, I think it does fall within the scope of the cross because I know the cross did not actually play the video, but I think once you get into the topic of height indicators and what is in doorjambs at the bank and, you know, whether you can tell height off surveillance video with or without those indicators, I think this topic is now fair.

So I'll overrule the objection.

MS. DOMPH: Judge, I just want to put on the record that it's also entering the land of expert testimony.

THE COURT: I don't think it is because it's based on

his personal experience with Parkway Gardens. And he, having spent many years working there, reasonably could speak to whatever personal knowledge he may have about the height of the windows.

And he also -- it's not going into an identification. It's now just asking him about the -- well, according to what Mr. Julien just said, it's looking at the two figures in the video and talking about their relative height, relative to each other and relative to the windows. And the windows is -- the height of the windows is within his direct personal knowledge and experience, having worked at Parkway Gardens for the length of time that he did, which was six or seven years.

MS. DOMPH: Judge, the height of the windows is not in evidence. So if he doesn't know the height of the windows, then this is improper questioning.

THE COURT: I -- well, we know from the questioning that he worked at Parkway Gardens for a very long time. He's been able to identify different buildings. He's been asked, you know, by different questioners to identify a place as whether that's Parkway Gardens, and he has identified that.

He also did work there for six to seven years, which is a long time, and it's enough to be asked questions about that topic.

(Proceedings heard in open court:)

BY MR. JULIEN:

Q. So, Mr. Garrett, I'm going to direct your attention -- we're paused right now at the 12-minute-34-second mark of Government Exhibit 2000.

I'm going to direct your attention -- I've just zoomed in on the left side of the screen. And I don't want you to tell me who anybody is. If you know, I don't want you to tell me.

What I want to ask you is does the person on the right in this picture appear to be taller than the person on the left in this picture?

A. That's correct.

Q. Does the person on the right appear to you to be tall based on your familiarity with Parkway Gardens and relative to this window that is also in the picture?

A. That's correct.

Q. You were asked a number of questions on cross-examination by Ms. Domph if you were focused on Christopher by FBI agents when you met with them early on in -- should I say September of 2020.

Do you remember that?

A. Yes.

Q. And whether you were focused on Christopher in grand jury and at other times when you met with law enforcement. Do you remember that?

A. Yes.

Garrett - redirect by Julien

6288

Q. Have you ever been forced to identify someone or felt pressure to identify someone when you were shown a picture?

A. No.

Q. At multiple times, have you indicated that you weren't familiar with someone or didn't recognize someone?

A. Yes, that's correct.

Q. As a matter of fact, I showed you Government Exhibit 507. Do you remember when I showed you Government Exhibit 507 during your direct examination yesterday?

A. Yes.

Q. You indicated you didn't know who this person was?

A. That's correct.

Q. Did they look familiar?

A. Yes.

Q. Yesterday I asked you, or today, if -- maybe it was yesterday -- if you recognized or saw Marcus Smart in the courtroom. Do you remember that?

A. Yes.

Q. And you told me you didn't. Do you remember that?

A. I didn't see him, yes.

Q. Do you remember earlier this morning I focused you -- focused you on about the 47-second mark of Government Exhibit 2000, which I'll show you again.

So the 44-second mark. Do you remember me asking you if you recognized someone?

A. Yes.

Q. And you indicated to me you didn't recognize anyone.

A. That's correct.

Q. You wouldn't indicate that you didn't recognize someone or that you did recognize someone that you really didn't recognize, would you?

A. That's correct.

MR. JULIEN: Give me one moment, your Honor.

THE COURT: Yes.

(Counsel conferring.)

MR. JULIEN: Nothing further, your Honor.

THE COURT: Okay. Any further cross?

MR. SOMERVILLE: Yes, your Honor.

I know we're near the lunch. This is going to take a few minutes. Keep going or break?

THE COURT: You know, let's just go on the sidebar quickly.

(Proceedings heard at sidebar:)

THE COURT: How long do you estimate?

And also, are there other recrosses and, you know, maybe more redirect?

MR. BOYLE: Not by Defendant Turpin.

MR. BARNETT: Not from Smart.

MS. GIACCHETTI: Not by Liggins.

MS. DOMPH: No, Judge.

MR. JULIEN: It's hard to say whether there's a re-redirect without seeing this, but I don't imagine so.

THE COURT: Okay.

MR. KLING: I will tell you, Judge, if the jury's stuck going downstairs to 2 by now, there's not going to be any food for them as well, very shortly.

THE COURT: Okay. So, I mean, how long do you estimate?

MR. SOMERVILLE: Ten.

THE COURT: Ten? Okay. I had wanted to try and finish this, but maybe let's just pause at this point because it's 1:00. Thanks.

(Proceedings heard in open court:)

THE COURT: Okay. At this point we're actually going to take the lunch break. So we'll be back in an hour at 2:00.

And same reminders as always, no research, discussion or reading news about the case.

And, sir, you're on the stand. Please don't discuss your testimony with anyone.

(Jury exits courtroom.)

(Witness exits courtroom.)

THE COURT: Okay. Anything to discuss before the break?

MS. WALGAMUTH: One thing from the government, your Honor.

6291

So we attempted to confer with Roberson's counsel about the issue related to the videos they seek to use during RW's testimony, which we do still anticipate will begin this afternoon.

In the time once court started, he sent -- Mr. Greenberg sent about four videos over the course of the morning. He has declined to provide timestamps or identify what the purpose he seeks to use those videos for.

So, unfortunately, the parties haven't been able to confer any further. And I just want to flag that. So to not waste the jury's time once we start that testimony, the government would recommend if your Honor would entertain it, leaving some time at the end of the lunch break before the jury returns so that those can be discussed for the first time, and we can address the legal arguments for those because we do anticipate objections.

But particularly where we don't know what the purpose is, what timestamps, or what portions they want to use. And one of the videos is 11 minutes long, another one's about 5. So they're not hours-long video, but they will take some time to review over the lunch break as well, especially without knowing the purpose.

MR. GREENBERG: So, Judge, I -- I don't know -- you know, I guess it's me, but when I send an email of a video and I say, in this one from the 7:35 mark -- the video's a few

6292

weeks old.  I think that's a timestamp, the 7:35 mark.  And then the video ends shortly after that.

The other ones -- I don't know what they want from me.  What I was told was -- I provided short videos, one of which has already been played this morning, which is the King Von song that was played.

I played this, this one that's from 7:35, the witness is pulling out a gun and going to shoot everybody in the room because they have taken out -- they've accused him of being a rat and taken out a brick of cheese.

In other one, they already had it from Mr. Spielfogel, which they acknowledge, where the witness is saying that he's lying about everything he's going to -- or much of what he's going to testify about today.

It's, what, Keith, five minutes?  Four minutes?

MS. WALGAMUTH:  Your Honor, just to shortchange this --

MR. GREENBERG:  A few minutes and they've had that. I don't know.

And what I got asked during the morning break was that I had to tell them what I wanted to use them for.

Now, I'm old school.  If I ask questions and I think that I've got something impeaching on the video that I can play, then I'm going to go to play it.  And if they think that it's improper impeachment, they're going to object, we're

going to put on the headphones, and we're going to have to have a sidebar.

But I am not going to sit down and tell the government before a witness testifies why I might want to use a particular piece of the video or what I'm going to play it for. And I'm not going to do that, anymore than they're going to give me their questions that they type out in advance.

MS. WALGAMUTH: Your Honor, I would just like to correct the record and maybe clarify some things.

So there were a total of four videos that Mr. Greenberg has identified over the course of the morning.

The first is a video that Mr. Spielfogel previously addressed, and I had a conversation with Mr. Spielfogel about his intention to use that potentially as a prior inconsistent statement for impeachment purposes. And I also shared with Mr. Greenberg that if it is used in that limited sense, consistent with the rules, we don't anticipate an objection.

However -- and he did, it is true that he identified a 7:35 mark of a video that we have strong objections to for the basis. But he also sent two other videos, one's 11-and-a-half minutes, the other is almost three minutes long. And we specifically asked if there is a timestamp or, you know, an intentional purpose for this, whether it's impeachment or otherwise. He declined to do so.

So it's unfortunate. We would like not to use up the

Court's time if we could reach a consensus or at least an understanding, but I think, unfortunately, we're in a position where they're unwilling to provide more information. So I think it will have to be addressed with the Court, and we'll hear it for the first time then. And then at that point, I'll have watched the videos over the lunch hour, and we can address the legal arguments.

But we do anticipate objecting. And consistent with your Honor's order or direction yesterday, I believe you requested that there be prior disclosure so that we weren't in this position where we have extended sidebars to potentially view videos and have the jury take longer breaks for that purpose.

MR. GREENBERG: Judge, one video is five minutes and 25 seconds where the witness says -- it's about Ms. Barnes and her killing, and he says that King Von didn't do it and he lied about it. He lies about it.

One is the video that's 2 minutes and 55 seconds that Ms. Bormann played today without objection.

One is a video that's 9 minutes and 1 second, where I already told them it's at the 7-minute mark.

And the other one -- I guess I don't know what they're talking about. The other one is a rap video that the witness dropped a few days ago where he talks about snitching on people. It's his own words. And again, it's a song. It's

6295

a 2-minute-and-something song.

THE COURT: I guess --

MR. GREENBERG: So I don't -- I don't get it.

THE COURT: Well, okay, as a general matter, I agree that, you know, you shouldn't have to give your entire cross outline to the government in advance, but there is something in between that, particularly when you're talking about long videos, where I do think that there is some utility in previewing and identifying with some specificity where in the video you're going to be using it because otherwise the entire discussion we've just had for the last however minutes it's been since the jury left would have all been on a sidebar in the middle of your cross.

So I -- and I don't think that's a great or productive thing to do with the jury's time. And so I -- here's what we should do: Forward to me, please, along with the government, everything that you've sent the government, identifying the timestamps so that I can also see the timestamps so that I can prep for the ruling. And then we'll come back early. I told the jury 2:00 p.m. I don't want to go much past 2:00 p.m. because I'm trying to adhere to what I announce to them.

So we can come back in 45 minutes from now, which I think is the kind of minimum time the marshals can handle for the turn-around time over lunch. And unfortunately -- and

6296

then we'll get done whatever we can by 2:00 p.m.

I will try very hard not to let us run much past 2:00 p.m., because I've announced that to the jury already, and I want to stop this whole I announce a break to them and then it takes way longer than that. I don't think that's a productive use of their time.

So forward me, please, all the same stuff that you sent to the government. I'll take my own look at it over the next 45 minutes. We'll talk with whatever time we have before 2:00 p.m., and we'll go forward.

MR. GREENBERG: Judge, just to be clear, there's only one video with a timestamp where I said I was going to play it at 7:35 where he's accused of being a rat and he pulls out a gun. And that's relevant and admissible for a number of reasons, not just as impeachment evidence.

And the other ones, one is a four- or five-minute video where he says the entire story that he's going to spend the afternoon telling the jury is a complete lie.

I probably would play that, all of that, because when you -- and I'm happy to send them to you, but when you listen to all these people, you know, talk in these videos, it's not, like, yes or no. It's just a stream of consciousness that goes on that while he's on Ecstasy and stoned out of his mind.

And the other one is the video that was already played today in its entirety for the jury. So I don't

6297

understand what timestamps I should have in there.

And the last one is a song he plays -- he wrote.

So if I were going to play that, I would play it in its entirety. And I would play it if he starts talking about how, you know, he's in danger because he's speaking and he's coming out and he's saying something, because on that, he is doing exactly what he'd then be saying he's in danger here for.

So the only video with a timestamp is the one video which I timestamped for them at 7 minutes and 35 seconds. I'm happy to share them with you. My guess is when you return from lunch, you will have a pounding headache.

THE COURT: Okay. So do I understand correctly that there's one video with a timestamp. The part of that video that you're looking to play is from that timestamp through the end of the video?

MR. GREENBERG: No, like, 15 seconds of it.

THE COURT: 15 seconds of it.

MR. GREENBERG: He puts the gun away.

THE COURT: And then for the other videos, you're intending to play the entire videos?

MR. GREENBERG: Well, one of them's already been played.

THE COURT: Okay.

MR. GREENBERG: One of them I would play the

entire -- it's the witness's own video.

THE COURT: Okay.

MR. GREENBERG: And the other one I would probably play the entirety of it because he is saying -- for five minutes he's explaining how he lied in this story he tells about the death of Ms. Barnes, and he says why I lied and the whole thing. So it's all relevant to impeach.

I'm happy to share them with you, Judge. I'm going to see -- I think I have a flash drive, and I'm going to put them on a flash drive. The government already has them. I can't email them because you might have problems opening them. So I'm going to see if I can put them on a flash drive.

MS. WALGAMUTH: I'm happy to email the correspondence you already sent me, Steve, although I believe that includes another 11-and-a-half-minute video from this morning. Is that no longer a part of your videos?

MR. GREENBERG: I don't know which one. They've all got names.

MS. WALGAMUTH: This is an 11-minute-25-second video, FBG Butta reveals who really killed --

(Court reporter clarification.)

MS. WALGAMUTH: I'm sorry, Kathy.

FBG Butta reveals who really killed KI, which is an 11-minute-and-25-second video that you sent me this morning, and you did not provide timestamps or a purpose on that one.

6299

That's separate from the 5-minute-and-35-second video -- 5-minute-25-second video that we've already -- I think we've already discussed that one. That was what Mr. Spielfogel had shared earlier to the parties.

I think we've -- consistent, depending on how it is -- he seeks -- I understand that Mr. Spielfogel intended specific clips that may specifically address a prior inconsistent statement.

We would object to the entire video coming in. And I'll note that that 5-minute portion is, I believe, part 3 of a multi-part interview. So that also raises rule of completeness issues about other portions of that interview that the government may seek to introduce in response. I'll review that again during the lunch hour.

But there was an additional video. But it sounds like Mr. Greenberg is now representing that is not one of the videos he will share.

MR. GREENBERG: The one that FBG Butta reveals who killed Gakirah, is that what you talked about?

MS. WALGAMUTH: I think this sort of highlights the issue we've been having, where we've been getting different responses. And, in fact, in this colloquy, your Honor, it's now been clarified a different way that, in fact, he does intend to seek to use the Parkway -- I believe it's the "Broke Opps" music video that was played for Mr. Garrett. This

6300

morning before we began the court day with the jury, he said that he was not using that video with this witness.

So it's just -- we are continually having some movement. I think we would still like to discuss the relevance or purpose of that video from Parkway Gardens.

MR. GREENBERG: Judge, I'll send you the videos, and you can look at them and make whatever determination. I'm hungry.

THE COURT: Are the videos on YouTube, or no?

MR. GREENBERG: Yes.

THE COURT: So then --

MR. GREENBERG: I can send you the links.

THE COURT: That would be great. I'll just look on YouTube.

And so any links and any timestamps would be helpful, just so I can have reviewed before we reconvene to talk about it.

We'll now leave for 45 minutes, which takes us all the way to 2:00 p.m. So we are going to have to spend no more than, like, 10 minutes on this when we come back, and then we're going to go with the jury.

MS. WALGAMUTH: Thank you, your Honor.

THE COURT: Thanks.

(Court adjourned, to reconvene at 2:00 p.m.)

6301

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,               )
                                        )
                 Plaintiff,             )
-vs-                                    )  Case No. 21 CR 618
                                        )
CHARLES LIGGINS, KENNETH                )  Chicago, Illinois
ROBERSON, TACARLOS OFFERD,              )  December 5, 2023
CHRISTOPHER THOMAS, MARCUS              )  2:03 p.m.
SMART and RALPH TURPIN,                 )
                                        )
                 Defendants.            )

VOLUME 29
TRANSCRIPT OF PROCEEDINGS - TRIAL
BEFORE THE HONORABLE MARTHA M. PACOLD AND A JURY

APPEARANCES:

For the Government:     MR. JASON A. JULIEN
                        MR. SEAN HENNESSY
                        MS. ANN MARIE E. URSINI
                        MS. CAITLIN S. WALGAMUTH
                        Assistant U.S. Attorneys
                        219 S. Dearborn Street
                        Chicago, IL 60604
                        (312) 353-3500
                        jason.julien@usdoj.gov
                        sean.hennessy@usdoj.gov
                        annmarie.ursini@usdoj.gov
                        caitlin.walgamuth@usdoj.gov

For Defendant           MS. CYNTHIA LOUISE GIACCHETTI
Liggins:                Law Office of Cynthia Giacchetti
                        53 West Jackson, Suite 1035
                        Chicago, IL 60604
                        (312) 939-6440
                        Cg@cgdefense.com


         * * * * * * * * * * * * * * * * * *


       PROCEEDINGS REPORTED BY CERTIFIED STENOGRAPHER
            TRANSCRIPT PRODUCED WITH A COMPUTER

6302

APPEARANCES:    (Continued)

For Defendant                    MR. GREGORY T. MITCHELL
Liggins:                         Law Office of Gregory T. Mitchell
                                 19150 Kedzie Avenue, Suite 205
                                 Homewood, IL 60430
                                 (708) 799-9325
                                 Mitchlaw00@sbcglobal.net

For Defendant
Roberson:                        MR. STEVEN GREENBERG
                                 Greenberg Trial Lawyers
                                 53 West Jackson, Suite 315
                                 Chicago, IL 60604-6060
                                 (312) 879-9500
                                 Steve@greenbergcd.com

                                 MS. CHERYL T. BORMANN
                                 Cheryl Bormann
                                 53 West Jackson, Suite 315
                                 Chicago, IL 60604-6060
                                 (312) 588-5011
                                 Cheryl.t.bormann@gmail.com

For Defendant Offerd:            MR. JOHN SOMERVILLE
                                 9924 S. Walden Parkway
                                 Chicago, IL 60643-1702
                                 (773) 505-1706
                                 Jville62@gmail.com

                                 MR. RICHARD S. KLING
                                 Chicago-Kent Law Offices
                                 565 W. Adams, 6th Floor
                                 Chicago, IL 60661
                                 (312) 906-5075
                                 Rkling@kentlaw.iit.edu

For Defendant
Thomas:                          MS. ELLEN R. DOMPH
                                 Law Offices of Ellen R. Domph
                                 53 West Jackson, Suite 1544
                                 Chicago, IL 60604
                                 (312) 922-2525
                                 Edomph@gmail.com

                                 MR. KEITH ALLAN SPIELFOGEL
                                 190 S. LaSalle Street, Suite 540
                                 Chicago, IL 60603
                                 (312) 236-6021
                                 Spielfogel@sbcglobal.net

6303

APPEARANCES: (Continued)

For Defendant
Smart:                          MR. MARC M. BARNETT
                                Law Offices of Marc M. Barnett
                                53 West Jackson, Suite 1442
                                Chicago, IL 60604
                                (312) 217-5019
                                Barnett.marc163@gmail.com

                                MS. MICHELLE MARIN
                                Criminal Defense Lawyer of Chicago
                                53 West Jackson Boulevard
                                Chicago, IL 60604
                                (312) 719-0376
                                Criminaldefenseofchicago@gmail.com

For Defendant
Turpin:                         MR. PATRICK EAMON BOYLE
                                Law Offices of Patrick E. Boyle
                                155 North Michigan Avenue, Suite 562
                                Chicago, IL 60601
                                (312) 565-2888
                                Privpat3@hotmail.com

                                MR. JOSHUA B. ADAMS
                                Law Offices of Joshua B. Adams, PC
                                900 W. Jackson Blvd., Suite 7 East
                                Chicago, IL 60607
                                (312) 566-9173
                                Josh@adamsdefenselaw.com

Also Present:                   Ms. Christine Case, FBI
                                Mr. Domonique Dixon, FBI

Court Reporter:

            KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                    Official Court Reporter
                  United States District Court
            219 South Dearborn Street, Suite 2328A
                    Chicago, Illinois  60604
                  Telephone:  (312) 435-5569
               Kathleen_Fennell@ilnd.uscourts.gov

6304

(Proceedings heard in open court; jury out:)

THE COURT: Ready to resume?

MS. WALGAMUTH: Yes, your Honor.

THE COURT: Let me just ask for just, I guess, no more than five minutes of argument from each of you on these videos. I watched them, or I tried to watch them, but it would help to hear a little bit more about which part of it you're referring to and the -- kind of just a little bit more framing.

And, then, is the cross going to happen before the afternoon break?

MS. WALGAMUTH: Your Honor, at this point, I don't anticipate it will. I think based on the schedule and the time, I anticipate we may still be on direct at the end of the day today.

THE COURT: Okay.

MS. WALGAMUTH: So, if you want to hold this now or do you want to have the discussion after court ends today? I think that would be an option. I think we probably will still be in the middle of -- in his direct based on the pace of the next two witnesses.

THE COURT: All right.

Then I would say based on that, let's hold the discussion at the end of the day instead of delaying with the jury now.

MS. WALGAMUTH: That works for --

THE COURT: Let's pick back up with the jury.

MS. WALGAMUTH: Thank you, your Honor.

THE COURT: Okay.

All right. Everyone ready?

MR. JULIEN: Yes, your Honor.

THE COURT: Okay.

(Jury enters courtroom.)

THE COURT: We can resume with the recross.

TERRANCE GARRETT, GOVERNMENT WITNESS, PREVIOUSLY SWORN

RECROSS EXAMINATION

BY MR. SOMERVILLE:

Q. Good afternoon, Mr. Garrett.

A. Good afternoon.

Q. I'd like to go back to a question that Mr. Julien asked -- you okay?

A. All right.

Q. I'd like to take you back to a question that Mr. Julien asked you about the video camera coverage between the two parking lots at Parkway Gardens, okay?

A. Okay.

MR. SOMERVILLE: I'd like to publish what's in evidence as Government's Exhibit 2001-3.

May we publish?

THE COURT: Yes.

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 148 of 285 PageID #:10656
Garrett - recross by Somerville
6306

BY MR. SOMERVILLE:

Q. Do you see that, sir?

A. Yes.

Q. And do you call that the small parking lot?

A. It's on the side of the parking lot, yes.

Q. All right.

A. It's just a small --

Q. Let's call it the parking lot with a tree in front of the camera, okay?

A. Okay.

Q. Now, Mr. Julien said that when this black car backs up out of this spot, it goes into the view of the other camera, 6434, right?

A. Yes.

Q. And you said there, you would see if anyone was getting in or out of this car on the other camera, right?

A. That's correct.

Q. Now, I'm going to play it. And tell me -- but as he's getting in again, let's note the jump, okay? I'm going to play it at -- I got a run-time of 15:15. Press play.

(Video played.)

BY MR. SOMERVILLE:

Q. Boom, it jumped there, right? The camera skipped?

So, you don't know what happened before the person was actually -- or after the person actually got in the car

and shut the door because that -- that's not recorded, right?

A.  Once he get in and close the door, that's it, yes.

Q.  Well, the door never actually fully closed on the video, did it?

A.  From what I can see, no.

Q.  I'm sorry?

A.  No.

Q.  No.

So, the video cut off before the door shut, right?

A.  Yes.

Q.  So, you don't know what happened after the video cut off, right?

A.  Motions.  No, you don't know what happened.

Q.  All right.

(Video played.)

BY MR. SOMERVILLE:

Q.  Now it's going to go in reverse.  I just put it in reverse.  Now the car is going in reverse.

I'm playing at 15:20.  See the car going in reverse?

A.  Yes.

Q.  All right.

Now, a question about the two cameras:  The cameras have different times up at the top, right?

A.  Yes.

Q.  So, what's happening in one camera, like this camera, it

says 3:58:26 p.m.; the other camera is going to have a different time, correct?

A.  Yes.

Q.  Do you know the differences between the two cameras?

A.  One is 6430 site.  The other one is a different camera that's showing.  Everything is based on movement.  So, if movement is taking place in one spot, the camera will record that.  But if it goes into the other spot, then --

Q.  Right.

A.  -- it will pick up.

Q.  And that was a bad question, I suppose.

Do you know the time difference between what's happening on one camera and what's happening on the other?

A.  No, unless you have both cameras pulled up together at the same time.

Q.  You didn't do an analysis of that, did you?

A.  No.

Q.  So, you don't know what the time difference is when the 6434 camera says one time, it's a different time on the 6430 site, correct?

A.  Right, unless I have both cameras together.

Q.  All right.

So, I'm going to play it in reverse.  A car backed up there.  Okay?

(Video played.)

BY MR. SOMERVILLE:

Q. It stopped. And here you say you can't see through the tree, right?

A. Right. That's correct.

Q. And I stopped it at 15:27, and it says 3:58 and 30 seconds p.m.

Now, I'm going to go to the other camera because you said to Mr. Julien that the other camera you'll be able to see if anybody gets in or out of the car, right?

A. That's correct.

MR. SOMERVILLE: Can we unpublish --

THE COURT: Yes.

MR. SOMERVILLE: -- 6430?

And may we now please publish 60- -- Government Exhibit 2001-1.

THE COURT: Yes.

BY MR. SOMERVILLE:

Q. Now, we go to the -- this is the community center camera, right?

A. Yes.

Q. Now, I'm going to play it, and what we should see, the black car back up.

(Video played.)

BY MR. SOMERVILLE:

Q. See it backing up there?

A. Yep.

Q. Okay.

And here's where you told the jury that here's where you'll see if anybody's getting in and out of the car, right?

A. That's correct.

Q. What happens if the camera jumps and it doesn't record right now? You're not going to be able to see people getting in or out, will you?

A. Not if it jump, no.

Q. Do you know if it jumps right now?

A. Well, I have to see it. It's not playing, so --

Q. Well, you said it would show people getting in and out the car, didn't you?

A. Well, I don't see anybody getting in and out of the car now.

Q. All right.

Let's play it to 1:07:49. Tell me if it jumps and it doesn't record.

(Video played.)

BY MR. SOMERVILLE:

Q. I stopped it. It says 3:57 and 56 seconds here, where you say you can see people getting in and out, if they're getting in and out. Watch it jump.

(Video played.)

BY MR. SOMERVILLE:

Q.  Did you see the camera jump, the timestamp?

A.  Yes.

Q.  So, you don't know what happened while it wasn't recording, correct?

A.  That's correct.

Q.  And now even after this most critical moment, there are a bunch of jumps after this, aren't there?

Let's go to 1:08:33, talk about the reliability of this camera system.

(Brief pause.)

BY MR. SOMERVILLE:

Q.  All right.  It's at 3:58 and 55.  At 3:58:57, tell me if it jumps three minutes and 35 seconds, okay?

A.  Okay.

(Video played.)

BY MR. SOMERVILLE:

Q.  Did it just jump three minutes and 35 seconds?

A.  Yes, it did.

Q.  So, you don't know what happened while it wasn't recording, correct?

A.  That's correct.

Q.  Let's go to 1:09:01 on a run time.

All right.  What's the timestamp up at the top?  4:03 p.m.?

A.  That's correct.

Garrett - recross by Somerville

6312

Q. Let's see if it jumps 1 minute and 19 seconds, okay?

(Video played.)

BY MR. SOMERVILLE:

Q. Boom. Did it jump 1 minute, 19 seconds?

A. That's correct.

Q. Now it says 4:04:20 p.m.?

A. Yes.

Q. All right. Let's go to one more, look at the reliability of this camera system. We'll go to 1:09:19.

(Brief pause.)

BY MR. SOMERVILLE:

Q. All right. Let's see if it jumps 2 minutes and 1 second now. The timestamp at the top says 4:04:37 p.m., correct?

A. That's correct.

Q. All right.

Let's see if it jumps to 4:06:39.

(Video played.)

BY MR. SOMERVILLE:

Q. Did it?

A. Yes.

Q. Another jump.

Finally, I'm going to wrap it up here. So, this is the point it says 3:58 and 30 seconds where the camera -- the trees totally block the view of the black car, right?

A. Yes.

Q.  Now I'm going to play it forward.

(Video played.)

BY MR. SOMERVILLE:

Q.  The black car is pulling back into the view of this camera, right?

A.  That's correct.

Q.  And it stops there?

A.  Yes.

Q.  All right.

Let's go to 18:29 of a run-time and see if there's a jump.

(Brief pause.)

BY MR. SOMERVILLE:

Q.  Okay.  What's the timestamp at the top there?  4:01 and 45 seconds p.m.?

A.  Yes.

Q.  All right.  Let's see if there's a jump when I press it.

(Video played.)

BY MR. SOMERVILLE:

Q.  Did you see it jump to 4:01:54?

A.  Yes.

Q.  Okay.

Let's go to another jump at 1900.  Okay.  Do you see the timestamp 4:02:27 p.m.?

A.  Yes.

Q. Tell me if there's an 18-second jump from 4:02:29 to 4:02:47, okay?

(Video played.)

BY MR. SOMERVILLE:

Q. Did it jump like that?

A. Yes.

Q. So, when the cameras are not rolling, you don't know what's going on, right?

A. Yes.

Q. Let's go to 19:33, after this.

(Brief pause.)

BY MR. SOMERVILLE:

Q. Okay. The timestamp is 4:03:22, correct?

A. That's correct.

Q. Let's see if it jumps to 4:03:31, okay?

(Video played.)

BY MR. SOMERVILLE:

Q. Did it do that?

A. Yes.

Q. All right. Last jump. I got one more.

All right. I'm going to predict that at -- okay. The timestamp up there is 4:05:41 p.m., correct?

A. That's correct.

Q. All right. Tell me if it jumps to 4:05:52, okay?

(Video played.)

BY MR. SOMERVILLE:

Q.  Boom.  Did it jump again?

A.  Yes.

MR. SOMERVILLE:  I ask to unpublish.  I guess I did.

Tender the witness.

MR. JULIEN:  This will be real quick, Judge.

FURTHER REDIRECT EXAMINATION

BY MR. JULIEN:

Q.  Mr. Garrett, are the camera systems, the recording being activated by new movement?

A.  If it's -- if it record, yes.  It depends on where it is. It's -- movement does activate them.

Q.  So, it's not jumping; it's movement turning the cameras on?

A.  Yes.

MR. JULIEN:  Nothing further, Judge.

THE COURT:  Any other cross?

MR. SOMERVILLE:  Thank you, Mr. Garrett.

Nothing further, your Honor.

THE COURT:  Any further questioning?

(No response.)

THE COURT:  I'm not seeing any.  So, thank you very much, sir.  You may be excused.

(Witness excused.)

THE COURT:  The government may call its next witness.

Coleman - direct by Julien

6316

MR. JULIEN:  Government calls Desma Coleman to the stand.

(Witness sworn.)

DESMA COLEMAN, GOVERNMENT WITNESS, DULY SWORN

DIRECT EXAMINATION

BY MR. JULIEN:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Could you please state your name and spell your name.

A.  Desma Coleman.  D-e-s-m-a, C-o-l-e-m-a-n.

Q.  Ms. Coleman, do you know who Carlton Weekly is?

A.  Yes.

Q.  I'm going to show you what's been admitted into evidence.

MR. KLING:  Judge, I'm sorry, could you ask her to direct her voice into the mike?

THE COURT:  Yes, please.  If you could please just pull the microphone a little bit closer to you and speak into it.  Thank you very much.

MR. JULIEN:  And, Judge, may we publish this exhibit as admitted?

THE COURT:  Yes.

BY MR. JULIEN:

Q.  I'm showing you what's admitted into evidence as Government Exhibit 500-3.

A.  Uh-huh.

Coleman - direct by Julien

6317

Q. Do you recognize the person depicted in Government Exhibit 500-3?

A. Yes.

Q. Who is that?

A. Duck.

Q. Do you know his real name?

A. Carlton.

Q. How long have you known who Duck is?

A. A long time.

Q. Ten years, twenty years?

A. Over ten years.

Q. Do you know who someone named Gakirah Barnes is?

A. Yes.

Q. I'm showing you what's admitted in evidence as Government Exhibit 574. Who is that in Government Exhibit 574?

A. Kirah.

Q. You say Kirah?

A. Yes.

Q. That's what you call her?

A. Yes. Gakirah.

Q. Do you call her anything else?

A. Kirah, KI.

Q. Ms. Coleman, do you have information about who murdered Gakirah Barnes?

A. Yes.

Q. Is that what you're here to talk about?

A. Yes.

Q. Did you know Gakirah personally?

A. Yes.

Q. How long did you know Gakirah?

A. Over ten years.

Q. Were the two of you close?

A. Yes.

Q. How did you know her?

A. We was almost together every day.

Q. So, you told me you had information about who murdered her. Were you there when it happened?

A. Yes.

Q. Did you see it happen?

A. Yes.

Q. Did you see who did it?

A. Yes.

Q. Do you remember what day it was?

A. April 11th, 2014.

Q. Can you tell us where you were and who was present on around the time that it happened?

A. Walking from my grandma house. Me, Gakirah, Butta, Creshaun.

Q. You said by your grandmother's house. Generally speaking, what part of town are we talking about?

Coleman - direct by Julien

6319

A.   The south side.

Q.   Any particular cross streets?

A.   Woodlawn, 64th and Eberhart.

Q.   64th and Eberhart, was that -- if you know, was that GD territory?

A.   Yes.

Q.   Had you seen Duck over there?

A.   Yes.

Q.   And you mentioned a couple of the names.  I'm going to show you now what's admitted in evidence as Government Exhibit 558.

Do you recognize the person depicted in Government Exhibit 558?

A.   Yes.

Q.   Who is that?

A.   Butta.

Q.   Do you know Butta's real name?

A.   Rakeem.

Q.   How do you know Rakeem or Butta?

A.   Hanging out.  Friend.

Q.   Did y'all hang out in that same area?

A.   Yes.

Q.   How long have you known who Butta is?

A.   About ten years or so.

Q.   I'm showing you now what's admitted in evidence as

Coleman - direct by Julien

6320

Government Exhibit 568. Do you recognize the people depicted in Government Exhibit 568?

A. Yes.

Q. Who are those people?

A. Gakirah and But- -- Rakeem.

Q. Which one's Rakeem, which one's Gakirah?

A. Rakeem is the one with the jacket blue, and Kirah's the one with the pictures on her shirt.

Q. So, you told us that it was Rakeem or Butta, Gakirah, Creshaun, and y'all were hanging out around your grandmother's residence, 64th and Eberhart?

A. Uh-huh.

Q. What happened?

A. We was standing there approximately five or ten minutes or so. In the process of us talking, getting ready to go on about our day, a person walk up and lift the gun up and started shooting at us.

Q. Before the person started shooting, did you hear that person say anything?

A. No. The other people around us did.

Q. The other people around you said something?

A. Yes.

Q. What did you hear people say?

A. It's a hit.

Q. What happened after you heard somebody say it's a hit?

Coleman - direct by Julien

6321

A.   Everybody got to ducking and running.  Approx- --

Q.   What were the -- sorry.  Go ahead.

A.   Approximately we standing there as the shots got to coming towards us.

Q.   So, this person that you saw walk up and lift a gun, did they eventually start shooting?

A.   Yes.

Q.   Did you see that unfold?

A.   Yes, as he was lifting the gun out.

Q.   You said he was lifting the gun.  Did you see this person's face?

A.   Yes.

Q.   Did you know this person before that day?

A.   Well, yeah.

Q.   Had you seen him around before that day?

A.   Yes.

Q.   I'm showing you what's admitted in evidence as Government Exhibit 537.  Do you recognize the person depicted in Government Exhibit 537?

A.   Yes.

Q.   Who is that?

A.   That's Von.

Q.   Is that the person who was shooting?

A.   Yes.

Q.   Tell us what happened once Von started shooting.

A.   After he got to shooting and realizing that the shots was coming toward us, I ran.  But before I ran, my focus was on Kirah because we were so close.  I thought she was on the side of me.  But she wasn't.

Q.   Where was she?

A.   She was getting shot down.

Q.   Is that something that you saw happening?

A.   Yes.

Q.   What happened after Von finished shooting Gakirah?

A.   He kept shooting towards, like, where I was running at, where I ran to.

Q.   You were running away from Von while he was shooting at you?

A.   Yes.

Q.   Do you know if anyone else got shot that day?

A.   Yes.

Q.   Who?

A.   Butta.

Q.   What happened after the shooting stopped?

A.   I ran to Kirah, see if she was okay, but she wasn't.  She was coughing on her blood, choking on -- and I just picked up the phone and called the ambulance.

Q.   You said you picked up the phone and called an ambulance?

A.   Yeah.

Q.   And what, if anything, happened after you called for an

Coleman - direct by Julien

6323

ambulance?

A.  We was getting threatened, like, days later.  He ride down on us just threatening us and say what he say, tell us to move around.

Q.  You said days later he came around threatening you?

A.  Yes.

Q.  Who is the he you're talking about?

A.  Von.  Von.

Q.  What happened days later when you say he came around threatening you?

A.  He made us run.

Q.  Did he say anything that made you run?

A.  He told us, bitch, move around.

MR. GREENBERG:  I'm sorry, I didn't hear that.

BY THE WITNESS:

A.  He said, bitch, move around.

MR. GREENBERG:  Thank you.

BY MR. JULIEN:

Q.  Prior to Von murdering Gakirah, did you know where he was from?

A.  Yes.

Q.  Where was he from?

A.  Parkway.

Q.  You ever heard of people refer to something called O-Block?

Coleman - direct by Julien

6324

A.  Yes.

Q.  What's that?

A.  Parkway.

Q.  Do you know where that's at?

A.  64th and King Drive.

Q.  Was Von an O-Block person?

A.  Yes.

Q.  Were there issues between people from the place where you used to hang out, 64th and Eberhart, and people from Parkway Gardens around that time?

A.  Yeah.

Q.  What kinds of issues?

A.  Fights, shootouts.

Q.  Do you know where some of these fights used to go down at?

A.  They had fights on 64th and Vernon, stores, yeah.

Q.  So, can you explain to us people who aren't as familiar with that area, where is 64th and Vernon in relation to Parkway Gardens, which is at 64th and King, and 64th and Eberhart?

A.  In the middle of King Drive and Eberhart is Vernon.

Q.  Is it like a halfway point?

A.  Yeah.  The middle point, yeah.

Q.  Did you know or did you observe why fights used to go down around 64th and Eberhart?

A.  No.

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 167 of 285 PageID #:10675
Coleman - direct by Julien
6325

Q. Who were the fights in between that you used to observe or that you knew about?

A. Know about Kirah's or Wooski's or something like that.

Q. So, people from that area --

A. Yeah, people from --

Q. -- and people from Parkway?

A. -- the area, yes.

Q. I want to show you a couple more pictures, Ms. Coleman. I'm going to show you one right now that's also admitted in evidence. It's Government Exhibit 515-1.

Do you know the person depicted in Government Exhibit 515-1?

A. Yes.

Q. Who is that?

A. Tacarlos.

Q. Do you know Tacarlos' last name?

A. Offerd.

Q. How do you know Tacarlos?

A. We're like cousins.

Q. How long have you known Tacarlos?

A. All my life.

Q. What's your relationship with Mr. Offerd like right now?

A. We don't talk.

Q. Was there a point in time wherein when it changed going from something, I don't know, different to what it is right

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 168 of 285 PageID #:10676
Coleman - direct by Julien
6326

now?

A.  When Kirah got killed.

Q.  What happened with respect to Kirah being killed that changed your relationship with Mr. Offerd?

MR. KLING:  Judge, may we have a sidebar?

THE COURT:  Yes.

(Proceedings had at sidebar:)

MR. KLING:  I object based on relevance.  What is the relevance of her situation now or why her situation changed?  That's absolutely irrelevant, and it's unfairly prejudicial.

MR. JULIEN:  I don't think it's irrelevant.  I think what she's going to say is he's an O-Block person, Offerd.  He was friends and whatnot with Mr. Bennett.  And he didn't see -- he found the situation maybe funny or, you know, made light of it because Ms. Barnes was from that area, STL or 64th and Eberhart, and Mr. Offerd was from or associated with people from Parkway.  And that's why they had the falling out.

THE COURT:  That is relevant.  So, I'm going to overrule the objection.

MS. DOMPH:  Judge, while we're on the sidebar, I didn't want to interrupt, but we would renew -- and I think you said we didn't have to do it, but we had filed pretrial that the murder of Gakirah Barnes was not relevant to this case, in that it was remote in time; that none of the defendants were participants; some of them were children at

the time.  I believe we filed that pretrial.  But I want to make sure that's renewed and ongoing.

MS. GIACCHETTI:  For all defendants, Judge.

MR. BARNETT:  And that'd be for all defendants, yes.

MR. JULIEN:  We just reincorporate our previous arguments why it is relevant and should be admissible.

THE COURT:  Okay.  And I understand.

Both this objection and the prior objection that Mr. Kling -- so, I understand, I guess, why you're both objecting.  But I do think that both for the reasons I gave before trial and then also at this point, I haven't heard anything that changes my ruling from pretrial.  And it does go to enterprise and motive.

MS. DOMPH:  I was just renewing, Judge, just --

THE COURT:  Understood.

MS. DOMPH:  -- for the record.

MR. KLING:  And, Judge, without belaboring the issue, if he wants to ask her whether she knows that Mr. Offerd is a member of O-Block, that's fine.  But why the relationship changed is getting into prejudicial information.  It's attempting to get the jury to be empathic with her because of the killing, and that's improper.

MS. GIACCHETTI:  And, Judge, I guess the other issue that occurs to me because I didn't know that this was going to be such granular testimony, I don't know what she's going

Coleman - direct by Julien

6328

to -- if she's going to say something that Mr. Offerd said. And this is kind of a family discussion. It should not come in against any of the other defendants as it's not in furtherance of the conspiracy.

So, I don't know what's coming next, but if it is some kind of discussion or statement, then there is a problem on behalf of all the other defendants.

MR. KLING: And Mr. Offerd has not been given any notice or discovery with respect to any conversations or statements.

THE COURT REPORTER: Mr. Kling, repeat.

MR. KLING: Judge, and Mr. Offerd has not been given any notice or discovery regarding any purported conversations or statements.

MS. GIACCHETTI: Which I guess is why I didn't think to make this earlier, because I never saw that. There's an in-furtherance issue here for the rest of us.

MR. JULIEN: That's just not true, Judge, in terms of there being a discovery issue.

Ms. Coleman's grand jury transcript, I believe, is attached to our response to the motions to suppress identifications. And in the grand jury, we had this conversation and she said -- I'm summarizing because I don't have the transcript in front of me -- he didn't understand why -- he being Mr. Offerd -- why Ms. Coleman felt the way

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 171 of 285 PageID #:10679
Coleman - direct by Julien
6329

that she felt about Gakirah because she was from the area that she was from and Offerd was from the area he was from.

But we had this conversation on the record in the grand jury. Everybody has the transcript. It's a part of the public record. There is no issues with producing this information.

MS. GIACCHETTI: I apologize. It was in there. However, Judge, as I remember it, anything -- I thought we were supposed to be notified if the statement was being offered in furtherance because of the lack of that identification in the Santiago. We jumped ahead of all the ones that were in the Santiago, as you know. But I thought we had a procedure where, you know, this type of thing was going to be fronted.

So, again, I'm sorry. If it was in there, it was there, but I didn't really note it and I haven't -- didn't realize that there was going to be an in-furtherance issue or, obviously, I would have read -- would have notified you earlier.

THE COURT: I think, you know, if the statement that she makes or the testimony she gives goes to the existence of the enterprise, then it can be admissible against all defendants and doesn't need to be admissible through the Santiago route. If it is instead a statement that's being offered to show that it's in furtherance of the conspiracy,

then that is a different issue, which does need to go through the Santiago process and --

MR. JULIEN: It's not.

THE COURT: -- it turns on what is it?

MR. JULIEN: It's not being offered to prove in furtherance of. This is 2014. So, years before.

It goes to show enterprise, that it exists. Just like all the rest of her testimony today goes to prove up the existence of the enterprise, but not here's a statement that Mr. Offerd made in furtherance of either the narrow conspiracy that we talked about or even the more broad one. It's just, I don't understand why you feel sympathy or why you're upset that my friend murdered your friend, and they don't have a relationship as a result.

MR. BOYLE: Judge, I would suggest that Mr. Julien is right. This is in the grand jury. It's Page 35 of her testimony. It just raises a potential nother concern. And I don't -- can anticipate this not being elicited. But she interpreted Mr. Offerd's statement as some kind of unfeeling, cruel joke because he took that opportunity to question the sexuality of Ms. Barnes. So, that raises another level of potential prejudice and irrelevance to the enterprise. So, I'm just flagging that.

THE COURT: Okay. I don't know if there's a way to ask it to avoid that whole issue.

Coleman - direct by Julien

6331

MR. JULIEN:  I can lead through it.  I'll lead through it.

THE COURT:  Okay.  So --

MS. GIACCHETTI:  Again, Judge, I understand you've ruled.  But we are making the objection that the statement shouldn't come in against --

THE COURT REPORTER:  Ms. Giacchetti --

THE COURT:  Sorry, there's a question from the court reporter.

MS. GIACCHETTI:  I understand you've ruled.  I'm just clarifying that we believe this should not be admissible against the other defendants.  It's a very personal, between family members conversation.  And it's not in furtherance; could not be considered in any way some adoptive statement by the rest of us.

MR. BARNETT:  Your Honor, maybe this might be helpful.  The action of the killing of Gakirah might be considered -- might be considered in furtherance.  But the feelings that they had afterwards between two people are personal, and that's not in furtherance of any enterprise or conspiracy.

So, we have to be a bit careful about what we're letting in as furtherance of the enterprise.  The action that took place might be considered -- I'm not suggesting that I believe it is, but I can see that.  But I cannot see the

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 174 of 285 PageID #:10682
Coleman - direct by Julien
6332

feelings between family members over the death of a person. That's not in furtherance of any enterprise. That's just personal feelings of the family.

MR. JULIEN: Your Honor, it's relevant because Mr. Offerd said among the things that he didn't understand why she felt the way that she felt was because Ms. Barnes was from where Ms. Barnes was from, and that's what makes this relevant.

MS. GIACCHETTI: So, actually, the statement has all to do with whether she's gay that I'm reading in the -- it says, why did you say he took it as a joke? Because he had asked me why would I feel how I feel, like why I'm so close to her, if she was gay or if she was a boy when really she wasn't. She was still a female.

It's all about you feel so bad because -- it's all about being gay. I don't see anything that Mr. Julien has proffered here. She said he took it as a joke because he had asked me why would I feel -- they were talking about her feelings. He was talking about her feelings. He didn't say anything about because she's from -- I'm looking at it now. I'm not seeing anything. Maybe somebody else is seeing something I'm not seeing. But that isn't -- I don't know. I -- Mr. Offerd's counsel.

I'm not seeing what Mr. Julien is claiming she's going to say. And it's a totally different answer to say that

the problem had to do with the two -- where people were from when the problem had to do with, it looks like, him questioning her sexuality. That's all I'm -- and, again, I'm reading this off of the top of my head. I may be missing something. But all I'm seeing here is an issue of sexuality.

MR. JULIEN: There's probably some context missing. So, I'll take it back. I'll just ask an open-ended question, then, if people -- I can either lead through it because I was there and I remember the context that this came up, which I'm sure is present in the transcript. And if people have a problem with me leading, I'll ask the question that I had asked before, lob it up to her, and I expect her answer's going to be what I proffered it to be and not for some improper purpose.

MS. GIACCHETTI: What are you leading? Are you leading what's in the grand jury about the sexuality?

MR. JULIEN: I'm leading with the fact that Offerd and Bennett were friends and Offerd didn't understand why Ms. Coleman was upset that Offerd's friend, fellow gang member, had murdered one of her friends -- I think she didn't say this in court, but she said it in the grand jury -- her Godsister, and among the reasons why Mr. Offerd didn't understand why she was upset was because Ms. Barnes was from that area and associated with who she associated with.

MS. GIACCHETTI: I'm going to have to ask Mr.

Offerd's counsel, who probably has a better understanding what was said here, if that's what was said here because I'm not seeing it.

MR. KLING:  That's exactly what was said, Judge.  I don't understand her feelings are relevant to enterprise and her feelings particularly with respect to the sexual orientation of the young woman who was shot.

THE COURT:  Well, okay.  So, if her answer is going to be about the feelings as to sexual orientation of the victim, then obviously that's irrelevant.  If -- and it is prejudicial under 403.  If it's the where are the people from, then that is relevant, I think, to enterprise, even though it's her -- to the existence of the enterprise.  It doesn't have to be in furtherance.

MR. BOYLE:  I was just flagging it because if the question is asked the way it was asked at the grand jury -- question from the prosecutor:  And why did you say he took it as a joke?  And the answer is all about the victim's sexuality.

MS. GIACCHETTI:  Right.

MR. BOYLE:  That's why I'm flagging it.  And if -- I don't think it should come in at all.  I think --

MS. GIACCHETTI:  No.

MR. BOYLE:  I think the objection should be sustained.

If it does come in, I do think you would have to lead because if this is asked that open-ended way again, why wouldn't she just give the exact same answer she gave at the grand jury?

MS. GIACCHETTI: So, this was noticed --

MR. JULIEN: Your Honor, here's a report --

MS. GIACCHETTI: -- in the --

MR. JULIEN: -- that was also produced in discovery. This is a report from September -- excuse me, February 24th, 2023, and this is a conversation that I participated in with Ms. Coleman. And this is an agent's report of it.

Among the things that were written, Offerd and Coleman were very close until her friend Barnes was killed in the street beef between the Gangster Disciples and Black Disciples escalated.

MS. GIACCHETTI: That's not a conversation in which Offerd says, this was okay, ha-ha, because she's from another place. This is just nowhere -- well, at least, again, I haven't followed it all because I didn't understand -- I'm not saying how that answers -- that isn't what you're proffering as what she would answer or what you would lead her to answer.

MR. JULIEN: I think it is. And it goes on: Coleman knew that Offerd wasn't involved with Barnes' murder, but he was affiliated with the O-Block guys that were allegedly involved with the incident. Offerd is from the Parkway

Gardens neighborhood.

Again, Judge, this is a report. I participated in this conversation. Obviously, I was the one asking her questions in the grand jury. There's some context -- I don't have the grand jury transcript in front of me, but this is the context for the question and answer that we have. And I can lead to avoid this improper, irrelevant basis if it seems like we're all on the same page that there is a sufficient basis in the record, discovery and otherwise, that Ms. Barnes was murdered as a result of this conflict.

There was some conversation about the fact that Offerd was allied with one faction of the conflict, or one side, and Ms. Barnes was allied with another. That's all I'm getting at. That information is in the record. It's been produced.

MS. GIACCHETTI: It's not in there as a conversation. It's in there as a fact she acknowledged. I can't deal with what the notice or what the issues are with Mr. Offerd. I'm assuming his counsel is ready to do that.

But what I'm saying is that there's no way that this should come in against us because now it's coming in quite differently than is in either of the documents we sent, and it is not in furtherance of a conspiracy or enter- -- it's not in furtherance of anything. It's family matters.

THE COURT: I mean, can the government just rephrase

so it gets away from the -- what you've proffered sounds fine, and you can get into that. I just think if -- is the government -- are you specifically intending to ask about her feelings or --

MR. JULIEN: Towards Offerd. I mean, they had a falling-out over this.

THE COURT: Okay.

So, I think there's enough in the proffer from the government which goes -- which explains how the government reasonably believes that she might -- that she will -- the government thinks reasonably that she would testify that they had a falling-out and it had to do with the location of the people, where they were from. And, so, based on that, I'm going to overrule the objection.

I do see -- so, this is not about whether it's in furtherance. This is apparently being offered as direct evidence of the enterprise. So, that's the basis on which I'm allowing it. It's not an in-furtherance type of statement. For that same reason, it doesn't need to be going through the Santiago proffer process.

And I also would ask that the government avoid that discussion of the other motive that was in the grand jury transcript about the victim's sexual orientation because that is irrelevant and unduly prejudicial under 403.

MR. KLING: Judge, and I would just add we will have

a continuing objection to her feelings as being irrelevant and not showing anything with respect to enterprise. How she felt is irrelevant. Whether or not there was O-Block is one thing. How she felt is irrelevant.

THE COURT: And --

MR. GREENBERG: Judge, if I may, she's going to say this, and then how are we going to cross her on it without getting into the other 403 issues of prejudice? Her feelings about someone and why she wants to disassociate from someone are her feelings. That's not evidence of an enterprise. That's a reaction that she has based on her perception. But that's not positive evidence.

THE COURT: I already explained my ruling, and the objection is overruled. I understand there's a standing objection, and it's overruled.

(Proceedings had in open court:)

BY MR. JULIEN:

Q. Ms. Coleman, I'm going to try to pick up where we left off. Did you have a falling-out with Mr. Offerd?

A. No.

Q. You said you did not have a falling-out?

A. No.

Q. Okay.

What happened?

A. We just stopped talking.

Coleman - direct by Julien

6339

Q. You said what now?

A. We just stopped talking.

Q. Y'all stopped talking. Okay.

Is part of the reason, or maybe all of the reason, you all stopped talking, did it relate to --

MR. GREENBERG: Objection, Judge. Leading.

THE COURT: Overruled.

BY MR. JULIEN:

Q. Was at least part of the reason, or maybe all of the reason, that you and Offerd stopped talking Ms. Barnes being murdered by Mr. Bennett?

A. Yes.

Q. Was at least part of that -- by the way, without being specific, did you have some conversation -- I don't want you to tell me what he said, but did you have some conversation with Mr. Offerd about the fact that Ms. Barnes was murdered?

A. I just -- no. It was just stated what his friend did.

Q. I see.

So, you had a conversation with Mr. Offerd about the fact that Von murdered Ms. Barnes?

A. Yes.

Q. And that Von and Offerd were friends?

A. Yes.

Q. You don't talk anymore as a result of that?

A. No.

Coleman - direct by Julien

6340

Q.  I'm going to show you a couple more exhibits.

MR. JULIEN:  And, your Honor, these are not admitted in evidence.  May we unpublish?

THE COURT:  Yes.

BY MR. JULIEN:

Q.  I'm showing you what's marked as Government Exhibit 1005-1, 1005-2, 1005-3, and 1005-4.  Coming back to 1005-1.

Ms. Coleman, do you recognize the person or persons depicted in those four pictures I just showed you?

A.  Yes.

Q.  Who do you recognize that to be?

A.  Los.

Q.  The person we've been talking about for the last couple minutes?

A.  Yes.

Q.  Do these pictures, Government's Exhibit 1005-1, -2, -3, and -4, fairly and accurately depict the person you know to be Tacarlos or Los?

A.  Yes.

MR. JULIEN:  Your Honor, at this time I move to admit Government Exhibits 1005-1, -2, -3, and -4 into evidence.

THE COURT:  They're admitted.

(Government Exhibit Nos. 1005-1, -2, -3, and -4 received in evidence.)

MR. JULIEN:  Permission to publish?

THE COURT: Yes.

BY MR. JULIEN:

Q. Who did you say the person was in Government Exhibit 1005-1?

A. Los.

Q. How about in 1005-2?

A. Los.

MR. KLING: Judge, objection. Asked and answered.

THE COURT: Overruled.

BY MR. JULIEN:

Q. 1005-3?

A. Los.

Q. And 1005-4?

A. Los.

Q. I'm going to show you another exhibit that's admitted in evidence, Ms. Coleman, and that's Government Exhibit 501. Do you recognize the person depicted in Government Exhibit 501?

A. No.

Q. Do you know someone named Marcellia?

A. Yes.

Q. Who is that?

A. Marcellia, his sister.

Q. You said his sister?

A. Yes.

Q. Whose sister?

Coleman - direct by Julien

6342

A. The person on the photo.

Q. So, talking about Government Exhibit 501, you know this person has a sister named Marcellia?

A. Yes.

Q. Were you friends with Marcellia?

A. Yes.

Q. How do you know that this person in Government Exhibit 501 is -- has some relation to Marcellia?

A. Pictures.

Q. You've seen this person --

A. From being around --

Q. -- in pictures?

A. From being around Marcellia, yes.

Q. You've seen him around Marcellia also?

A. No.

Q. What do you mean when you say him being around Marcellia?

A. Far as like dropping her off at where we was or -- that's it. I don't know him personally.

Q. When you say dropping Marcellia off at where she was, what do you mean by that?

A. At Kira house on Eberhart.

Q. I didn't hear you. I'm sorry.

A. Kira house on Eberhart.

Q. What's the last thing you said?

A. Kira -- the --

Coleman - direct by Julien

6343

Q.  Oh, Kira's house on Eberhart?

A.  Yes.

Q.  I'm sorry.

So, Marcellia would come to Kira's house on Eberhart?

A.  Yes.

Q.  How do you know -- how are you familiar with this person that we're talking about from Marcellia coming to Kira's house on Eberhart?

A.  Just --

MR. MITCHELL:  Objection, Judge.  She indicated she is not familiar with him.

MR. KLING:  And foundation.  When?  Who was there?

MS. GIACCHETTI:  Judge, could we have a sidebar, please?

THE COURT:  We can -- yes.

(Proceedings had at sidebar:)

MS. GIACCHETTI:  Your Honor, when we litigated the motions relating to identification, I believe the standard was that the person had to have some personal viewing of the person they were identifying.  It's my understanding that she's going to make an identification of a video -- part of a video.  So, I'm back to the motions.

When -- we filed a motion as to her.  And the standard, as I understood, was that it had to be someone who actually saw and had some knowledge of what the person looked

like. She's basically saying, I saw him from photos, I don't know him personally. She didn't name him.

Her basis for then looking at a surveillance video and making any identification is well beyond the threshold that you've set in this case.

MR. JULIEN: I think an objection came in right when she was about to say how she saw him before. And I think she's having a little bit of trouble expressing herself. So, I said, do you know this person? And she said, no. Then I said, do you know who Marcellia is? And she said, yeah, it's his sister, which is kind of an inconsistent answer, which is why we're having this whole round and around and around. And she said, yeah, seeing him in pictures, and I've seen him from -- or familiar, whatever she said -- from Marcellia coming to Kirah's house on Eberhart.

And, so, I'm trying to understand and get her to explain what she means when she said -- and I think I know what she's going to say, but what matters is what she says in here. What does she mean when she said, I saw a person obviously leave their house, come to where I lived at, where I hung out at and that's how I know who this is, this being the person in 501.

THE COURT: Yeah. I think so far it's not clear what she's saying. And she did give answers that may or may not indicate that she has seen him in person dropping off his

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 187 of 285 PageID #:10695
Coleman - direct by Julien
6345

sister at the house.  And, so, I think we should just get clarity on what she meant by that.  And based on the answers that she gives, we'll know whether or not --

MR. MITCHELL:  Then, Judge, can we get more foundation with respect to these drop-offs, appearance at this house?  Summer, winter?  Can we get something?

THE COURT:  I think it's fair to just -- to try and ask more about that, as well.

Okay.  Thanks.

(Proceedings had in open court:)

BY MR. JULIEN:

Q.  So, I'm going to try my best to ask you what I just asked you.  What did you mean when you said that -- and I don't want to put words in your mouth, but you were talking about Marcellia coming over to Kirah's place on Eberhart, right?

A.  I said Kira.  That's a different person.

Q.  Oh, I see.  Okay.

So, you were talking about Marcellia coming over to Kira's house on Eberhart?  Still 64th and Eberhart?

A.  Yes.

Q.  Okay.

How are you familiar with, or however you would describe it, the person who's on the screen in 501 based on Marcellia coming over to Kira's house?

A.  Say that again.

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 188 of 285 PageID #:10696
Coleman - direct by Julien
6346

Q.   Yeah, I'm just trying to figure out how you know who this is, based on Marcellia coming over to Kira's house.

A.   Only by that being her brother.  That's all.

Q.   Yeah, but -- I'm sorry if this is a little -- could you explain it?  Like did you see him?  Did she show you pictures of him?  How are you familiar with -- how do you know that this is her brother based on her coming over to Kira's house?

A.   Yeah, us talking and seeing pictures, hanging.  Me and Kira was together.

Q.   Have you ever seen this person in 501, like laid eyes on him --

A.   No.

Q.   -- in real life?  Okay.

You just know that this is Marcellia's brother?

A.   That's it.  That's all.

Q.   Ms. Coleman, I'm going to show you what has been admitted in evidence as Government Exhibit 2000, and I'm going to show you three places in it.

MS. GIACCHETTI:  Judge, could we have a sidebar, please?

THE COURT:  Yes.

(Proceedings had at sidebar:)

MS. GIACCHETTI:  I just want to clarify that there will be no attempt to identify Mr. Liggins in the video.  I just --

MR. JULIEN: No.

MS. GIACCHETTI: Thank you. I didn't -- I had to ask just to make sure.

THE COURT: Okay. Also, I know the line that I've been drawing, that I've drawn for some time now, is that they have to see them in person at least once. The Rule 701 doesn't say -- it doesn't have in it the exact requirements of what makes something helpful to the jury. And, you know, it could be that it could be something short of seeing this person in person if they have a reason to really familiarize themselves with the person from photos that the jury lacks.

And, so, you know, it might be helpful, but I know that that's the line I've drawn to this point. So, if the government is -- I guess if the government is not intending to use the identification, then I think it's helpful in the sense that it takes this issue off the table.

MR. JULIEN: I hate to do it this way, Judge, but that was kind of the decision point for me. And some of this is -- we're doing it live to see what she's going to say and what she doesn't. I know what she said in grand jury. Based on the bright line, I was going to pivot a different direction. But --

MS. GIACCHETTI: Judge, and I think that's what we should do. She's clearly -- she said over and over, I don't know him. This is -- I think we should stick with the line

that's been established, at least as to this witness as we're in the middle of this examination.

THE COURT: I'm sorry, what was going to be the question again?

MR. JULIEN: So, what I was intending to show her now is just Offerd, who she's identified. I know she's identified Liggins in grand jury based on her familiarity with being friends with his sister. I think she also indicated at some point she knew Liggins' brother Sheroid. But based on depending on how that went, I was also going to show her what she identified in grand jury as Liggins at the 14:52 mark. Based on that answer and the bright line, I wasn't.

MS. GIACCHETTI: And I'm asking you to agree with that ruling rather than change the ruling at this point. And I understand your Honor's ruling has variations, but this one couldn't be closer. She doesn't -- she doesn't know him. She has not seen him physically sufficiently to be able to help the jury, that she could possibly be helpful to this jury in identifying him in a surveillance video.

And the government appears willing to do it, so I think we could move on. She cannot possibly be helpful. She has not had -- she has no personal contact. She's just said she hasn't seen him. I don't know how many pictures she could possibly look at of somebody's brother and identify them years and years later.

MR. KLING: Which is a requirement, Judge, obviously, of Federal Rule of Evidence 602. You have to have personal knowledge.

MS. GIACCHETTI: And, Judge, this, as you know, is an identification case. And given the centrality of that issue, I think that she should not be testifying. She can't be help- -- she doesn't have the basis for it, and she can't be helpful to the jury.

THE COURT: Okay. I do think that --

MS. GIACCHETTI: It's consistent with Eady, Judge. This is -- Eady actually probably had more -- Eady and I think there was another one. Mr. Thomas with Wiley. Those have been the rulings that where somebody doesn't have any personal way to having seen it. You know, Eady had claimed he saw social media pictures. We didn't go there. Wiley claimed he had, I believe, social media of Mr. Thomas. He was not allowed to testify. The ruling shouldn't change for Mr. Liggins here.

MR. JULIEN: I won't ask her about it, Judge.

THE COURT: Okay.

MR. JULIEN: You know, before I go down this path, I might just want to clarify one thing. Because I think she indicated that she's seen Mr. Liggins around the neighborhood, but didn't know his name. I just want to clarify that. And if her answer is still no, then I'll proceed in the fashion

that we talked about and I'll just -- I'll leave it alone.

THE COURT: Okay. I think that's fair to clarify.

MR. JULIEN: So, I'm specifically referring to Page 44 of her grand jury transcript, Line 1. And I can -- I don't necessarily want to impeach her, but she says -- on the previous page, I asked, how do you know then that that's Charles Liggins? And her answer was, um, because him and his sister and his other brother, they used to come on Eberhart before things got bad.

MR. BOYLE: That's all true, Judge, but, I mean, she has testified consistently today because the question before that is, have you ever interacted with Charles Liggins in person before? No. And, then, there's the follow-up about, well, she had some relationship with the sister and she might have seen him around the neighborhood. So, all that stuff is there. So --

THE COURT: Right, but then the next question is -- and this is still on 44: I see. So, would you say that you have seen him over in your neighborhood but you just didn't have any personal interactions?

Answer: Correct.

MR. BOYLE: Yes.

THE COURT: So, then it --

MR. BOYLE: It's there. Is that enough? Is that sufficient? And if that's what she's going to say today. So,

Coleman - direct by Julien

6351

I guess we're going to find out.

THE COURT:  Yes.

MR. JULIEN:  Find out.

THE COURT:  Okay.

(Proceedings had in open court:)

BY MR. JULIEN:

Q.  Ms. Coleman, actually, before I show you Government Exhibit 2000, I just -- I want to try and clarify something. Have you seen the person depicted in 501 on Eberhart or in your neighborhood on Vernon ever before?

A.  No.

Q.  You never laid eyes on him?

A.  No.

Q.  Okay.

So, now I'm going to show you what's admitted as Government Exhibit 2000.  And I'm going to show this to you in about three places.  So, I'll fast forward it to the 24-second mark.  And I pause at the 25-second mark.

Generally speaking, are you familiar with what's depicted on the screen right now?

A.  Parkway.

Q.  How do you know that that's Parkway?

A.  Going over there with my granny.

Q.  You said going over there with, who?

A.  My grandmother.

MR. JULIEN:  I'm going to fast forward this about 50 seconds.  Less than that actually.  So, I'm going to play from the 59-second mark.

(Video played.)

MR. JULIEN:  Pause Government Exhibit 2000 at the 1 minute, 8 second mark.

BY MR. JULIEN:

Q.  Ms. Coleman, do you recognize anyone on the screen right now?

A.  Yes.

Q.  Who?

A.  Los.

Q.  And that screen in front of you is a touch screen.  If you would, could you circle or draw on the screen where it is you see Los?

A.  (Witness complies with request.)

Q.  You've just drawn a yellow circle in the bottom right corner; is that right?

A.  Yes.

Q.  I'm going to fast forward to one more place.  I'm going to play Government Exhibit 2000 from the 1 minute, 37 second mark.

(Video played.)

MR. JULIEN:  I paused at the 1 minute, 52 second mark.

Coleman - direct by Julien

6353

BY MR. JULIEN:

Q.  Ms. Coleman, do you recognize anyone on the screen right now?

A.  Yes.

Q.  Who?

A.  Los.  Los getting out the car.

Q.  And would you mind indicating on the screen where it is you see Los having got out the car?

A.  (Witness complies with request.)

Q.  You've just drawn a circle in yellow on the left side; is that right?

A.  Yes.

MR. JULIEN:  Your Honor, may I have one moment?

THE COURT:  Yes.

(Brief pause.)

MR. JULIEN:  Nothing further, your Honor.

THE COURT:  Okay.  Let's go on sidebar quickly.

(Proceedings had at sidebar:)

THE COURT:  Any estimates of the length of the cross? I'm just trying to figure out whether to take the break.

MS. GIACCHETTI:  We have no cross.

MR. BARNETT:  We have no cross, either.

MR. GREENBERG:  15 minutes to a half hour.

THE COURT:  Okay.  So, based on that, I guess we should just take the break now.

MR. BARNETT: Makes sense.

THE COURT: Okay.

(Proceedings had in open court:)

THE COURT: We're going to take the afternoon break. We'll be back in 15 minutes. Members of the jury, please no research, discussing, or reading news about the case.

Ma'am, you're on the stand, so please don't discuss your testimony with anyone during the break.

Thank you very much.

(Jury exits courtroom.)

THE COURT: All right. Anything to discuss?

MR. JULIEN: Not from the government.

THE COURT: Okay. See you back in 15 minutes. Thanks.

(Recess had from 3:15 to 3:41 p.m.)

THE COURT: All right. Are we ready to start?

MR. JULIEN: Yes, your Honor.

THE COURT: How long are we going to go today with the jury and after that?

MR. JULIEN: I think it depends on how we wrap up this cross-examination. We have another witness here who's ready to go, so if this wraps up reasonably soon, we would like to get that person at least started today.

THE COURT: Okay. And before the break, Mr. Greenberg, you estimated the cross was going to be 15 to

Coleman - direct by Julien

6355

30 minutes?

MR. GREENBERG: Yeah, I don't -- probably 15 is probably more than enough.

THE COURT: Okay. Does anyone else have a cross?

MS. GIACCHETTI: No, your Honor.

MS. DOMPH: No.

MR. BOYLE: No.

THE COURT: Okay. So, I guess we'll just see how long cross and redirect go, but if -- if it finishes closer to 4:00, then we could start the next witness.

MR. JULIEN: We want to do that.

THE COURT: Okay. Are we ready for the witness?

MR. JULIEN: Yes.

THE COURT: And then ultimately -- I'm sorry. If -- what time do you anticipate going -- how long would you anticipate?

MS. WALGAMUTH: Your Honor, if we get to the next witness today, his direct will go well past 5:00, so I think we could go -- get a good 25 -- I would be happy to go to 5:00, and then we could pick up the next day, your Honor.

MR. GREENBERG: Well, don't we have to talk about the videos?

MS. WALGAMUTH: Yes. But my understanding is that defendants have all waived their appearances if they need to leave earlier, so we can continue talking as attorneys.

MR. BOYLE: So, the defendants would be excused at 4:30 with the jury; is that what I'm hearing?

MS. WALGAMUTH: We defer to the Court, your Honor; but I think your question was how late to go, and we would recommend going closer to 5:00, especially if we get this next witness on, so that we could accomplish a good amount -- a substantial portion or some of his direct.

THE COURT: Okay. I think it would be -- why don't we continue, and then we'll do a sidebar before the next -- before the next witness.

MS. WALGAMUTH: Thank you.

THE COURT: All right. We're ready for the jury, please.

(Jury enters courtroom.)

THE COURT: All right. Cross-examination?

MR. GREENBERG: Yeah. I'm sorry, Judge. Give me one second.

THE COURT: Sure.

MR. GREENBERG: Does that work? Ah, here we go.

CROSS-EXAMINATION

BY MR. GREENBERG:

Q. Good afternoon. How are you?

A. Hello.

Q. Make sure you speak up. Okay? I'm old. I can't hear like I used to.

Coleman - cross by Greenberg

6357

A.    Hello.

Q.    Hello.  So, is it Desma Coleman or Des --

A.    Desma.

Q.    Desma, with a -- like D-E-S-M-A?

A.    Yep.

Q.    Okay.  So, Desma, I want to ask you a few questions about that day.  Obviously, it was a very upsetting day, right?

A.    Um-hum.

Q.    Something -- have you ever talked about it in court before?

A.    Yes.

Q.    Okay.  You have?  In a court?

A.    Not with all these people.

Q.    Not --

A.    Not with all you people.

Q.    Not with people.  Okay.  And you, of course, talked to the prosecutors about it, right?

A.    Yes.

Q.    Do you know how many times you met with them before you testified?

A.    Several.

Q.    All right.  And did you -- you also testified in front of the grand jury, is that right?

A.    Yes.

Q.    So, did they go over what they were going to talk to you

about today?

A. I guess.

Q. Did they go over the things they were going to talk to you about today?

A. No.

Q. Okay. Did they ever show you that video they showed you?

A. No.

Q. The video you looked at today --

A. Yes.

Q. You saw that, right?

A. Yes.

Q. You saw that before when you were preparing to testify, right?

A. Yes.

Q. All right. I'm not going to play it for you. I'm going to leave that to Mr. Somerville, because he's the video expert.

But when you watched that video, did you talk about who might be in it?

A. Yes.

Q. All right. And when you looked at it, you know, they wanted you to try and figure out who was in it, right?

A. Say --

Q. Do you follow me?

A. Say that again?

Coleman - cross by Greenberg

6359

Q. Sure. When you met with the prosecutors, they said, "We're going to show you a video when you testify," right?

A. Um-hum.

Q. And they said, you know, "Watch the video and let us know if you recognize anyone," right?

A. Um-hum.

Q. Right? I'm sorry.

A. Yes.

Q. Yes?

A. Yeah.

Q. And how many times did you have to watch the video before you recognized anyone?

A. I only watched the video one time.

Q. All right. You watched it one time.

Now, you've been over to Parkway, correct?

A. Yes.

Q. You said your grandma lived there?

A. She's -- no, she stayed on Eberhart, 64th and Eberhart. She hung in Parkway with her friend.

Q. I'm sorry. I don't know if anyone -- can you -- are you speaking into the mic?

A. She stayed on Eberhart, but went to Parkway to see a friend.

Q. So, you would go with your grandma when your grandma would go see her friend at Parkway?

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 202 of 285 PageID #:10710
Coleman - cross by Greenberg
6360

A.   Yes.

Q.   Okay.  And I take it you don't do that now?

A.   No.

Q.   When did you used to do that?

A.   Before things got to where it was.

Q.   So, back before 2014?

A.   Yeah.

Q.   Did you ever go back there after that?

A.   No.

Q.   All right.  And how many -- in 2014, you were 21 years old?

A.   Yep.

Q.   So, for how long had you been going over to Parkway?

A.   Grammar school to high school, I'd say.

Q.   All right.  So, for years, right?  Over 10 years?

A.   Yeah.

Q.   Okay.  And so it wouldn't be unusual for people at Parkway to recognize you because you'd been there, right?

A.   I guess.

Q.   And it wasn't unusual for your grandma to go visit her friend in Parkway, right?

A.   I mean, it's a regular day, like any other.

Q.   Okay.  For a second there, I could hear you, and now I can't hear you again.

A.   She went over there frequently, like, all the time.

Q. All right. Did you know people who lived in Parkway?

A. No.

Q. Did you go to school with people who were from Parkway?

A. No.

Q. Did you play sports growing up with people, or were you in, you know, clubs with people from Parkway?

A. No.

Q. Okay. Were you playing sports with people who lived -- the area you were from?

A. I don't play sports.

Q. Well, did you do any activities when you were growing up?

A. No.

Q. No? You just hung out in the neighborhood?

A. Yep.

Q. Okay. When you were hanging out in the neighborhood, would you sometimes hang out with people from Parkway?

A. No.

Q. So, that was even before 2014, right?

A. Um-hum.

Q. Yes?

A. Yes.

Q. Okay. Did you go to school with Gakirah?

A. No.

Q. Did you go to school with -- did you say Jayro?

A. Who?

Q. Jayro or Jayron? Who were you out there with on the day Gakirah got murdered? Who was out there?

A. Rakeem, Creshaun and Gakirah.

Q. Okay. I thought you -- Rashon? Is that what you said?

A. Creshaun.

Q. Creshaun. That's the one I got wrong. Okay.

Now, Gakirah was about four years younger than you, right?

A. Yeah.

Q. All right. But you were really good friends?

A. Um-hum.

Q. Would it be a fair statement that she was older than her age would have indicated?

A. If you want to put it like that.

Q. Okay. Well, how would you put it?

A. She was her.

Q. What do you mean?

A. She still did -- we still did what kids do. So, I wouldn't say she was older than me or made it play older than me.

Q. She had a reputation in the neighborhood, didn't she?

A. I guess, yeah.

Q. Okay. And what was that?

A. Gakirah.

Q. Well, what was her reputation?

Coleman - cross by Greenberg

6363

A. Hanging out in the streets, being her.

Q. Okay. She was living a street life, wasn't she?

A. Yeah.

Q. And you weren't, or were you?

A. I went to school, and I lived the street life, yes, I did.

Q. Okay. So, you were going to school and living a street life and hanging out with Gakirah, right?

A. Yes.

Q. And then how about Butta?

A. I didn't hang with him, *per se*, unless he was around Kirah.

Q. I'm sorry. What?

A. I hung around him when he came around Kirah.

Q. And how often was that?

A. Oh, every now and then. Sometimes Kirah would be in her -- her own thing, so she went with him all the time.

Q. Were they brother and sister?

A. No.

Q. Did they act like they were brother and sister?

A. Yes.

Q. So, would they -- would you say they were best friends?

A. Yes.

Q. But they didn't hang out very much?

A. Until she wanted to do her own thing girly-wise.

Q. I'm sorry. I didn't follow that.

A. When she wanted to be a girl.

Q. Okay. When she wanted to be a girl, she would hang out with Butta?

A. No. She wouldn't is what I'm saying.

Q. Oh, when she wanted to be a girl, she wouldn't hang out with Butta?

A. Correct.

Q. And that's when she would hang out with you?

A. Correct.

Q. Okay. What about when she wanted to live the street life, who would she hang out with?

A. Her street friends.

Q. Well, who were they?

A. Butta and whoever else she hung with.

Q. Well, were you a street friend?

A. I mean, yeah.

Q. Okay. When you say you were living on the streets, were you in a gang back then?

A. No, I wouldn't say that, no.

Q. Were you affiliated with a gang?

A. I guess so.

Q. Okay. So, what gang were you affiliated with?

A. The GDs, I guess.

Q. All right. When did you become affiliated, I guess, with the GDs?

A.   I hung around there -- I lived over there at -- since 1999, so -- it's 2023 now.

Q.   Are you still affiliated with the GDs?

A.   No.  I'm a mother of two kids.

Q.   Okay.  Do you still live over there?

A.   No.

Q.   When did you move from there?

A.   About six years ago, six, seven years ago.

Q.   So, around 2016, 2017?

A.   Yeah.  That's when I got pregnant with my son.

Q.   All right.  Before COVID, right?

A.   Yes.

Q.   And up until then, were you still sort of affiliated with the GDs?

A.   Yes.

Q.   When -- I don't want to get too far into what happened that day because I saw it's still upsetting to you, but you said you were out there with her when this happened, right?

A.   Yes.

Q.   And you talked to the police after it happened, didn't you?

A.   Yes.

Q.   And when you talked to the police, did you tell them what you had observed?

A.   Yes.

Coleman - cross by Greenberg

6366

Q. Did you get shot that day?

A. No.

Q. So, Rakeem got shot, Gakirah got shot, right?

A. Yes.

Q. Did you know someone named Tony Williams?

A. Yes.

Q. And who's Tony Williams?

A. A friend.

Q. Okay. Where was he that day?

A. Sitting on the porch.

Q. Sitting on his porch?

A. Um-hum.

Q. And where were -- where was he in relation to Gakirah?

A. Nothing, friends.

Q. No. Where was he?

A. Where was he --

Q. Physically. Like, where was he? He was on the porch. Where was she?

A. She was on the bottom of the porch.

Q. So, when she got shot, she was on the porch?

A. Yes.

Q. Okay. And you were where?

A. In front of -- standing in front of the porch.

Q. So, like the sidewalk?

A. Yes.

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 209 of 285 PageID #:10717
Coleman - cross by Greenberg
6367

Q. When you say the porch, you're talking about like the porch we all see where you kind of walk up to the first floor of a building?

A. No.

Q. Okay. What kind of --

A. It's a house.

Q. Right. Was it a walk-up, like we typically see in Chicago, you've got to walk up five or six steps?

A. Yeah, but you're stepping in the front before you walk up to the house.

Q. So, she was standing in the front yard?

A. Yes.

Q. Okay. And where was Butta?

A. Standing next to her.

Q. All right. So, did you see the shooter before they started shooting?

A. Yes. I was standing in front.

Q. So, you saw -- where did they come from?

A. 65th Street.

Q. I mean, did they just come walking down the street?

A. Yes.

Q. All right. Did you see them get out of a car or anything?

A. No.

Q. Okay. And you were where in relation to 65th Street?

A. Standing towards 65th Street. On 54th standing towards

Coleman - cross by Greenberg

6368

65th Street.

Q. So, how far from 65th?

A. A house.

Q. All right. You -- and the person -- did they come around the corner or something?

A. Yes.

Q. So, you saw them come around the corner. Did they have a gun out?

A. He lifted it out as he hit the corner.

Q. Okay. And at that point, what did you do?

A. I looked. As I looked, shots came, and I ran.

Q. All right. Which way did you run?

A. Towards 64th.

Q. So, you just ran down the block away, right?

A. Yes, couple of houses down.

Q. Did you ever look back as you were running, if you remember?

A. Yeah. That's when I saw Kirah hit the porch.

Q. Okay. When you say hit the porch, you mean start running up the porch?

A. No. She hit the porch as in being gunned down.

Q. She got shot and fell on the porch?

A. Yes.

Q. All right. What about Butta?

A. I didn't look to see where he was.

Q. Well, did he take off running?

A. Yes.

Q. Did you see which way he took off running?

A. No.

Q. Do you know if he ran into the house?

A. No.  Everybody ran.

Q. Everybody ran.  Okay.  And what about this Williams guy?
Where was he?

A. He was sitting on the porch ahead of Kirah.

Q. Okay.  So, he was with you guys also?

A. He was already sitting on the porch.  No, he wasn't
with us.

Q. Okay.  He was just sitting up on the porch already?

A. Yes.

Q. And you told all this to the police, right?

A. Yes.

Q. And you told the police right after it happened, right?

A. Yes.

Q. And then you told us that this Bennett, so King Von, came
by and basically threatened you, right?

A. Yes.

Q. And you told that to the police after it happened, right?

A. Right.

        MR. JULIEN:  Your Honor, can we have a sidebar?

        THE COURT:  Yes.

(Proceedings heard at sidebar:)

MR. JULIEN:  Your Honor, what she said to the police is hearsay, so out-of-court statements being offered for the truth of the matter.  Mr. Greenberg hasn't sought to impeach her with anything that she has said previously.

And where I suspect this is going is to an area that's not -- it's not relevant.  So, she reported this to the police.  The police reported this to Cook County State's Attorney's Office.  Ultimately, the Cook County State's Attorney's Office declined to prosecute the case for the reasons they declined to prosecute the case.

And I suspect what he's trying to do is impeach this witness with the fact the Cook County State's Attorney's Office declined to prosecute the case, which is why we keep hearing, "And you told this to the police.  And you told this to the police."

Again, things she said out of court are hearsay unless what he's trying to do is impeach her, and so far there hasn't been an inconsistency.

THE COURT:  Okay.  Mr. Greenberg?

MR. GREENBERG:  Judge, this goes to the dispute and the existence of the enterprise, and I'll tie it all up.

THE COURT:  Okay.  If it's going to the point that they declined to prosecute, I don't see the relevance of that decision.  So, if this is where this is headed, meaning if

this is headed towards making the point that there was a decision by the prosecutors not to prosecute, I do not see the relevance.

MR. GREENBERG:  That wouldn't be admissible, Judge.

THE COURT:  Right.

MR. GREENBERG:  I wouldn't ask that.

THE COURT:  Okay.  What is the -- where is it headed, though?

MR. GREENBERG:  Judge, it goes to her bias.  And it goes also to -- you know, they say that she says things and it shows the existence of the enterprise, and I'm trying to show her bias, that she's -- I can move on.  That's fine.

THE COURT:  Okay.

(Proceedings heard in open court:)

BY MR. GREENBERG:

Q.  So, over the years, you would see Dayvon Bennett out, right?

A.  Yes.

Q.  And Dayvon Bennett, you're aware, got killed in Atlanta, unrelated to anything here, right?

A.  I guess.

Q.  Well, you know what happened to Dayvon Bennett, don't you?

A.  I don't know anything concerning him.

Q.  I'm sorry.  What?

A.  I don't follow anything concerning him.

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 214 of 285 PageID #:10722
Coleman - cross by Greenberg
6372

Q. You don't follow anything concerning him. Okay.

And you said you were affiliated with the GDs, right?

A. Yes.

Q. And part of being in the GDs would be if something like this happened, to avenge it, right?

A. Say that again?

Q. It would be to avenge it if something like this happened, right?

A. Rephrase. Like, I don't know what you --

Q. Well, you're familiar with how the GDs operate, aren't you?

A. I -- no. What are you saying?

Q. Well, you're familiar with what -- when someone does something to someone, like Gakirah, who is a member of your gang, the gang doesn't just sit idly by, right?

A. Well, yeah, they did.

Q. They did?

A. Yeah.

Q. So, you're saying that King Von committed this murder and then just continued to hang out like nothing ever happened --

A. Most certainly did.

Q. -- for the next six-plus years?

A. Nine years.

Q. Nine years. And no one did anything about it?

A. Not a thing.

6373

Q. Okay. And, of course, if King Von didn't do it, then no one should do anything to him, right?

A. I wouldn't even be sitting right here.

MR. GREENBERG: Can I have one minute, Judge?

THE COURT: Sure.

BY MR. GREENBERG:

Q. One last thing. Are you aware of whether Gakirah was carrying guns that day?

A. No.

Q. Okay.

A. We just had got out of school.

Q. You just got out of what?

A. School.

Q. Clue?

A. School.

Q. School. Thank you.

Did they have metal detectors at the schools back then?

MR. JULIEN: Objection. Relevance.

MR. GREENBERG: It will be tied up, Judge, through another witness.

THE COURT: Okay. So, overruled. So, you can answer.

BY THE WITNESS:

A. She didn't have a gun on her. We was just changing out of

school clothes, so, I mean --

MR. GREENBERG: Okay. Thank you.

MR. BOYLE: No questions, your Honor.

THE COURT: Any other cross? I'm not seeing any.

Any redirect?

MR. JULIEN: No, your Honor.

THE COURT: Okay. Thank you very much, ma'am. You may be excused.

(Witness excused.)

THE COURT: The government may call its next witness.

MS. WALGAMUTH: Thank you, your Honor. The government calls Rakeem Wilton to the stand. And I understand he's on his way.

Your Honor, while we're waiting, do you want to have a quick sidebar?

THE COURT: Sure.

(Proceedings heard at sidebar:)

MS. WALGAMUTH: I just thought we had the moment. Do you want to check in about the timing for today? His direct will go past -- I will anticipate over an hour, so we could -- we're happy to go past 4:30 if the parties are willing and your Honor wants to do that.

THE COURT: Okay. How late are -- I'm available to stay until however late you need, so to make use of the time, we can go to 5:00 with the jury if everyone's available for

that.

MS. WALGAMUTH: We are, Judge.

MS. GIACCHETTI: We're available.

THE COURT: Okay. And then after that, I would say we should stop, both to let the jury go and also because the defendants will need to go. But if there's more we need to discuss, the lawyers can stay after that; or if the defendants would like to stay, the defendant can stay after that as well. We just then need to absolutely finish by 5:30.

MS. GIACCHETTI: Judge, I think we've got the waiver on the record, and it would cover that also.

THE COURT: Okay. So, let's go with the jury until 5:00, and I will let the jury know that now.

MS. WALGAMUTH: And, your Honor, if I get to a stopping point just before 5:00, I can let you know as well; but I'll plan to go to 5:00. Thank you.

THE COURT: Okay. That sounds good. Thanks.

(Proceedings heard in open court:)

(Witness sworn.)

THE WITNESS: Yep.

RAKEEM WILTON, GOVERNMENT'S WITNESS, DULY SWORN.

DIRECT EXAMINATION

BY MS. WALGAMUTH:

Q. You can take a seat. Thank you. Good afternoon.

A. Good afternoon.

Q. Can you please state and spell your last name for the record.

A. My last name is Wilton, W-I-L-T-O-N.

Q. What about your first name?

A. Rakeem.

Q. Mr. Wilton, do you go by any nicknames?

A. Yeah, I do.

Q. What's your nickname?

A. My name Butta.

Q. Is that Butta?

A. Yeah, B-U-T-T-A.

Q. B-U-T-T-A?

A. Um-hum.

Q. And did you receive a subpoena to be here today?

A. I did.

Q. How old are you, Mr. Wilton?

A. I'm 29.

Q. And how far did you go in school?

A. I graduated high school.

Q. Are you here today because you have information about STL and O-Block?

A. I am STL. I am STL.

Q. Thank you. And if you can make sure you're speaking a little bit in the microphone so everyone can hear you.

A. All right.

Q. So, you said you are STL?

A. Yeah.

Q. And do you know Carlton Weekly?

A. That's my brother.

Q. And you said he's your brother. Is he your brother in blood?

A. That's my kid's uncle. That's my kid's uncle.

Q. I'm going to show you a photo that's been admitted as Government's Exhibit 500-3.

MS. WALGAMUTH: Your Honor, may we please publish this to the jury?

THE COURT: Yes.

BY MS. WALGAMUTH:

Q. Do you see that photo on your screen, Mr. Wilton?

A. Yeah.

Q. Who's that?

A. That's Duck. That's Carlton Dequan Weekly. That's my brother.

Q. That's Carlton Weekly?

A. That's my brother.

Q. And you called him Duck. Do you refer to him as Duck?

A. I do.

Q. And you said that while you call him your brother, he's actually the uncle to a child of yours?

A. Yeah.

Q. And so how long have you known Duck?

A. I've known him my whole life, like 20 -- I would say like 27 years, 28 years.

Q. You say he's your brother. Were you close with Duck?

A. Yeah. We come from the projects, same projects, same blocks. It's my brother.

Q. So, I want to talk about why you're testifying at trial.

A. Right.

Q. Have you received payment from the FBI?

A. No, I did not.

Q. So, you received no payment for cooperating in this case?

A. Hell, no. I mean, no, I didn't get no money. Ain't nobody paying me.

Q. I didn't hear you. Could you --

A. I said no, I didn't get no money. Ain't nobody paying me.

Q. So, nobody paid you?

A. No.

Q. And do you expect any payment from the FBI for testifying today?

A. Hell, no.

Q. So, why are you testifying today?

A. Well, I got subpoenaed today, but overall, you know, that's my brother.

Q. Your brother, you mean talking about Duck?

A. Yeah.

Q. So, I want to talk a little bit about your criminal history.

A. Right.

Q. Have you been convicted of any felonies?

A. Yeah, I have.

Q. Do you have two prior felony convictions?

A. Yeah, I do.

Q. I'm going to walk through each one. Okay?

First on August 12th of 2013, were you convicted of aggravated use of a weapon?

A. Yeah.

Q. And were you sentenced to one year in prison?

A. Yeah.

Q. And for your second felony, is it true that on August 22nd, 2016, you pled guilty to conspiracy to commit murder?

A. Yeah.

Q. And as part of your plea, did you cooperate?

A. Yeah.

Q. And were you sentenced to eight years' imprisonment for that crime?

A. Yeah, yeah.

Q. And did you serve about four years and four months in custody?

A. Yeah, like four-and-a-half years.

Q. Four-and-a-half years?

A. Yeah.

Q. And were you released on parole in September of 2019?

A. Yeah, yeah.

Q. I want to ask you a little bit about that conspiracy to commit murder conviction. Okay?

A. Sure.

Q. So, was an individual murdered in that case?

A. Yeah, my friend.

Q. Your friend was murdered?

A. Yep.

Q. Can you explain who you were with that day?

A. It was my friend from out of town. He's from Cali, named Blood. He came down here to do a feature with us and died. Him and the dude -- him and the victim shot each other.

THE COURT: And, sir, can I just ask you, please, to move the microphone a little bit closer to you.

THE WITNESS: Okay.

THE COURT: Okay. And sorry. Can you just repeat what you said.

THE WITNESS: I said it was a friend. He came from Cali, did a feature with us. And him and the victim shot each other, and my friend end up dying. So, they charged us with his murder.

MR. KLING: Judge, can we have foundation, please.

Objection.

THE COURT:  So, you can ask questions about foundation.

BY MS. WALGAMUTH:

Q.  So, I just want to clarify.  You said your friend.  Is your friend named Blood or you call him Blood?

A.  Yeah, that's his name, Blood.

Q.  And about what year was this?

A.  2015.

Q.  Okay.  You said your friend Blood came down from California, and you were with him that day?

A.  Yeah.

Q.  And were you with anyone besides Blood that afternoon -- or that day?

A.  Yeah, Lil Gay -- I mean Lil Jay.

Q.  Lil Jay, is that a nickname?

A.  Jeff McGraw.  He's my rappy.

Q.  Lil Jay is -- can you say his name one more time?  I didn't hear you.

A.  Lil Jay, Jeff McGraw.

Q.  And so were you with Lil Jay or Jeff McGraw and Blood that day?

A.  Yeah.

Q.  Was this the daytime or the nighttime?

A.  This was like evening, afternoon-ish, like 2:00 o'clock,

3:00 o'clock.

THE COURT: I'm sorry, sir. Can you just please pull the mic a little closer.

THE WITNESS: It was like 2:00 o'clock.

BY MS. WALGAMUTH:

Q. And you testified that Blood and someone you called the victim shot each other, is that correct?

A. Yeah.

Q. And when you say, "victim," what do you mean by that?

A. We had -- there was another guy on the case. He survived. My friend didn't. He was the victim. He did a dying declaration and stated that we was trying to rob him or some actual shit, but that's not the case.

Q. So, you're saying the victim is someone who was shot as well?

A. Yeah.

Q. And he survived?

A. Yeah.

Q. Did you shoot this victim?

A. No, I did not.

Q. Do you know who did shoot him?

A. Yeah.

Q. Who?

A. Yeah, Blood. They shot each other.

Q. Did you shoot anybody that evening?

A.  No, I didn't.

Q.  Did you have a gun that day?

A.  I did.

Q.  Did you shoot that gun?

A.  No, I didn't.

Q.  And you pled guilty to this conspiracy to commit murder, correct?

A.  Yeah, I did.

Q.  Okay.

MS. WALGAMUTH:  Your Honor, may we un-publish?

THE COURT:  Yes.

MS. WALGAMUTH:  Thank you.

BY MS. WALGAMUTH:

Q.  I want to turn now to present day for a second.

A.  Can you repeat that again?

Q.  Yeah.  I want to turn now to the present day.

A.  Okay.

Q.  What do you do to make money now?

A.  So, I'm a YouTuber, man.  That's all.  I entertain.

Q.  You entertain on YouTube?

A.  Yeah.

Q.  Do you participate in interviews on YouTube?

A.  Yeah.

Q.  And does that involve being interviewed on other users' channels?

A.   Yeah, other platforms, you know what I'm saying, street platforms, YouTube.

Q.   Are you invited to those interviews?

A.   Yeah.  I actually get paid to be there.

Q.   You get paid to go to those interviews?

A.   Yeah, I get paid to do everything I'm doing except for what I'm doing right now.

Q.   Okay.  And for about how many years have you been doing interviews on YouTube?

A.   I got paid like 100 K in 2019 when I first came home, so I've been doing this shit since like 2019.

Q.   Do you also post your own content on YouTube?

A.   Yeah, I do.

Q.   And about how long have you been posting your own content on YouTube?

A.   Should be like a year now, like a year.  Yeah, like a little bit -- like a year-and-a-half.

Q.   Okay.  And what is your channel name when you post on YouTube?

A.   My channel name is just like Carlton's, but my -- mine is FBG Butta, and he's FBG Duck.

Q.   So, is your user name FBG Butta on YouTube?

A.   Yeah, that's me.

Q.   And what type of content do you post on your own YouTube?

A.   I mainly talk about, like, dead people, bro, like -- I

mean, like that's my side, no matter what side.  I talk about, like, old stories that happened, about all dead people.  I try not to incriminate nobody alive.

Q.  So, you said old stories about dead people.

A.  Yeah.

Q.  Are those dead members of gangs?

A.  Yeah, yes.

Q.  And you said, "my side."  Do you mean STL?

A.  Yeah.

Q.  Now, is everything that -- let's talk first about the interviews you participate in.

When you go to an interview, is everything that happens in that interview reality, or is some of it staged?

A.  No, a lot of -- like, okay, so you've got to understand, it's entertainment.  You know?  Like, YouTube is the new BET, VH1, you know, so a lot of the content is made up.  Like, not all of it's real.  Some of it just be fun, the content. You know, the more views, the more money.

Q.  So, the more views, the more money; is that what you said?

A.  Yeah.

Q.  So, you try to make fun content or entertainment to get more views?

A.  Yeah, entertaining content, you know.

Q.  And what about some of the things you say on those interviews?  Is everything you say in those interviews

100 percent the truth?

A.  No, not everything because you've got to think about it, some of the content is made up.  Like I say, I'm an entertainer.  You know what I'm saying?  FBG are entertainers.  It's a group for entertainers.

Q.  I want to talk about a recent interview you had with someone named J Mane?  Are you familiar with J Mane?

A.  Yeah, that's my homey.

Q.  Is it true that in an interview on YouTube, it appeared that you pulled a gun on him?

A.  It was a prop.

Q.  It was a prop gun?

A.  Yeah.  Look close at the barrel.  It's shaded in, but you can still see the orange tip on it.

Q.  So, is that an example of entertainment?

A.  Yeah.  He gave me a big ass block of cheese off the fucking profit.  Excuse my language.  It's entertainment.

And that's my brother.  Why am I going to make the money with my brother instead of making it with an outside person?  That doesn't even make sense.

Q.  So, you said J Mane is your brother.  Do you have a conflict with J Mane in real life?

A.  No, ain't no static to me and J Mane.  We cool.  This is all entertainment.  That's all we doing.  It's all entertainment.

So, a lot of the shit -- I mean a lot of the stuff that we do is more so we trolling. It's entertainment.

Q. You said you troll?

A. Yeah.

Q. What do you mean by troll?

A. You know, antagonize, just really making a funny out of a sticky situation.

Q. Okay. I want to switch gears and talk about -- go back to talk about your upbringing. Okay?

What area did you grow up in?

A. I'm initially from the 39th, Ida B. Wells, little town. And once the project buildings got tore down, we went to 63rd. So, that's where I've been at.

Q. Okay. So, you said when the project buildings got torn down. Do you remember about when that was?

A. I do not. Well, the projects got torn down actually in '07, but my OG had moved us out in '96. Like we moved out in '96, '97.

Q. So, you moved out of the project buildings in '96, '97, is that correct?

A. Yeah.

Q. And I think you said you moved from there to 63rd?

A. Yeah, 62nd and Eberhart.

Q. 62nd and Eberhart?

A. Yeah.

Q. And in general, what area -- is that in Chicago?

A. Yeah.

Q. What area of the city is that in?

A. It's Washington Park area, right, if I'm not mistaken?

Q. Is that the South Side?

A. Yeah, South Side, for sure. It's southeast. So, would be like East 63rd Street, so southeast.

Q. And when you were living in -- are you still living in that area, 62nd and Eberhart area?

A. Of course not. That don't even fill my pay grade. Why would I do that?

Q. All right. So, is the area that you -- when you were at the 62nd and Eberhart, were you in a gang?

A. Who, me?

Q. Yeah.

A. Yeah.

Q. What was that gang's name?

A. At the time, it was Jaro City.

Q. Jaro City?

A. Yeah.

Q. You said at the time. When did it change from Jaro City?

A. When Tooka died, maybe 2010, 2011. Yeah, 2010.

Q. I want to take a step back. So, you say Jaro City, and that changed to Tooka?

A. Tookaville.

Q. Tookaville. And are you in a -- when you were in a gang, were you in a broader name for a gang?

A. I don't even know what that mean.

Q. That's fair. It was a bad question.

So, you say Jaro City or Tookaville. Are members of Jaro City and Tookaville part of a larger gang? Did you go by anything?

A. Yeah, I mean like a few of us, but we went -- we not just Gangster Disciples. We got Vice Lords, Blackstones, MCs, BDs. We was a mixed adverse group, bro.

Q. When you say we, what was the mixed group?

A. Huh?

Q. Who was the "we" that you said was a mixed group of gangs?

A. STL, Jaro. We was a mixed group.

Q. What did you consider yourself, if anything?

A. Who, me?

Q. Yeah.

A. I was a Gangster Disciple.

Q. Gangster Disciple. You mentioned several names, Jaro City, Tookaville, STL.

A. All the same thing.

Q. All the same thing. Explain to me what that means. Why were there multiple names?

A. People die.

Q. So, when someone dies, what happens?

A.  We normally make a block for them, if we're making another block.

Q.  Is that a way to honor somebody?

A.  I mean, most days, nowadays.

Q.  What does STL stand for?

A.  St. Lawrence.

Q.  And what is St. Lawrence?

A.  It's the block we hung on as kids.

Q.  And you said Jaro City is another name for STL?

A.  Yeah.

Q.  And you said Tookaville is another name for that same group?

A.  Yeah, yeah.

Q.  What year did you join the gang?

A.  I've been initiated since '94.

Q.  About how old were you in 1994?

A.  I was just trolling.  I was just born.  But no, seriously, though, like I feel I've been a gangster my whole life.

Q.  When did you start claiming Gangster Disciple?

A.  '98.

Q.  '98?

A.  '98, 2000.

Q.  '98, 2000.  About how old were you then?

A.  I was probably like 6, 7.

Q.  How old?

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 233 of 285 PageID #:10741
Wilton - direct by Walgamuth
6391

A.   Probably like 6, 7.  I was a shorty.

Q.   You were a shorty?  What does it mean to be a shorty?

A.   I was a kid, like real -- I was too young to be joining any gang, man, but that's what I wanted to do.

Q.   That's what you wanted to do?

A.   Yeah.

Q.   And are you -- do you still consider yourself a member of STL?

A.   No, you know, I dropped my flag maybe like nine months ago, 10 months ago.  It's been going on a year, bro.

Q.   When you say you dropped your flag nine, 10 months ago, does that mean you stopped claiming the gang?

A.   Yeah, I did.  Niggers ain't right out of their mind.

Q.   So, nine, 10 months ago, that's in 2023?

A.   Yeah.

Q.   Do you still hang out with members of STL after you stopped claiming the gang?

A.   No, actually, I don't, bro.  I actually don't, though.

Q.   So, in 2023, you don't hang out with members of STL?

A.   I hang with myself, my people.  I don't hang -- STL, what STL?  STL is extinct.  There's no such thing as STL no more. All of their ass dead, no more.

Q.   So, I want to ask you more about that.  You said STL is distinct today in 2023.  What do you mean by extinct?

A.   I'm saying they -- who remain from STL?  Ain't nobody

alive from STL.

Q.  So, all the members of STL are dead?

A.  For the most part.

Q.  Is Duck a member -- was Duck a member of STL?

A.  Yeah, at a point.  But Duck was FBG.  Duck was our entertainer.  Duck wouldn't have a slide and shit like that. Duck's ass went to the studio.  Duck wasn't in the streets with us like that for real.  He's just a face because he a rapper.  That's how I knew him to be.

Q.  Did Duck associate with STL members?

A.  Yeah, yeah.

Q.  And in 2020, I want to go back to 2020, did you associate with -- were you -- you said you were a member of the gang in 2020?

A.  In 2020?

Q.  Um-hum.

A.  I ain't gonna lie.  2020, I was in jail.  I was in jail.

Q.  Were you still claiming STL in 2020?

A.  Hell, no.

Q.  Were you in jail for all of 2020?

A.  Majority of it.

Q.  What about before July of 2020?

A.  Yeah, I was out.  I went to July 1st.

Q.  All right.  So, before July 1st in 2020, you were out of jail?

Wilton - direct by Walgamuth

6393

A.   Hell, yeah.

Q.   Were you hanging with STL members then?

A.   I was hanging with Duck, but like I said, Duck is a rapper.  FBG, he's an entertainer.  Like, who STL?  What's STL?  They extinct gang.

Q.   They're extinct today?

A.   Yeah, they been extinct for quite some time, though.

Q.   Let's talk about when STL was around.

A.   The splacks (phonetic) was there.

Q.   So, when you were a gang member of STL, when you were a member of STL, did you have a term for rival gang members?

A.   Who, the opps?

Q.   Opps, you said?

A.   Yeah.

Q.   Does that mean opposition?

A.   Hell, yeah.

Q.   When you were a member of STL, did STL have any gang rivals?

A.   Yeah, they did.

Q.   What gang was a rival of STL?

A.   BDs.

Q.   BDs?  The Black Disciples?

A.   Hell, yeah.

Q.   Have you heard of the term "O-Block'?

A.   Hell, yeah -- yeah, yeah.

Q. What's O-Block?

A. It was made after a dead person.

Q. It was made after a dead person?

A. Yeah.

Q. Is it a gang?

A. I mean, if that's what they want to call themselves.

Q. It's a group of people?

A. It's definitely a group.

Q. And who was the dead person it was made out after?

A. Odee Perry.

Q. Was O-Block a rival of STL in 2020?

A. Yeah, for sure. But ain't no such thing as STL in 2020. We talking about TW and stuff like that. I keep saying, STL is extinct, you know.

Q. STL is extinct in 2023, you said?

A. I mean, obviously. In 2020.

MR. BOYLE: Objection. Misstates the testimony.

BY MS. WALGAMUTH:

Q. I just want to hear your answer.

A. I'm actually saying they've been extinct since 2020. You asked what was you doing in 2020, and I said not hanging with STL because they extinct.

Q. So, they were extinct in 2020?

A. Yeah.

Q. And that's because the members were dead?

Wilton - direct by Walgamuth

6395

A.   Yeah.

Q.   And that includes Duck?

A.   Yeah.  Duck was like an, told you, entertainer.  Duck wasn't really in the -- he wasn't in the streets gang.  You can't write because Duck posted up, not for real.  Duck was an entertainer.  Duck stayed in the studio as a rapper.  He did rapper shit.  You feel me?

Q.   And why wasn't Duck in the streets?

A.   Everybody got their role.  He could have been in the streets, but why?  That's our way on.  That's our money.  So, we kept him away from the streets.  He go to the studio. Everybody else is going to be outside running streets and stuff like that.  He go to the studio, get the bag, bring a bag in.

Q.   I want to talk more about -- we'll go back to Duck in a second and his time in the studio.

        You were talking about O-Block.  You said O-Block were BDs, Black Disciples?

A.   Yeah.

Q.   And do you know the term "cliqued up"?

A.   Cliqued up, that's like motherfuckers, what, hang with each other, groups of people hanging with each other.

Q.   Does cliqued up have a term with respect to gangs or gang factions?

A.   Can you repeat that again?

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 238 of 285 PageID #:10746
Wilton - direct by Walgamuth
6396

Q. Does cliqued up mean anything when you're talking about a specific gang?

A. I mean, that's like -- yeah, cliqued up is like we from over here, they from over there, but we fuck with them, so we don't -- now we all together.

Q. You say, "We all together," meaning one gang is together with another gang?

A. Yeah. That's cliqued up.

Q. And when you say you're from different parts or different gangs, they have the same rivals then?

A. Yeah, more than likely. That days, a lot of these niggers just be goofies serving themselves rewards of not doing something, not doing parts in those days, you know, in real life.

Because a lot of times, we don't even be knowing niggers, but they know who we is because they just trying to get in where they fit in. They want to -- what's the word I'm looking for? I already said, they want to insert themselves in something that really don't involve them.

Q. And when you say "we," what is the "we" you're talking about?

A. I didn't say, "we." I say, "they."

Q. You say they want to assert themselves --

A. In shit that don't even concern them.

Q. Okay.

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 239 of 285 PageID #:10747
Wilton - direct by Walgamuth
6397

A.   They align themselves in wars and beefs that don't got nothing to do with them and this, you know.

Q.   Let's focus on 2020.  Okay?  You said cliqued up with respect to gangs.  Were you aware in 2020 whether O-Block was cliqued up with other gangs?

A.   Man, who ain't cliqued up with their ass, bro?  They cliqued up with the whole city.

Q.   They cliqued up with the whole city?

A.   Hell, yeah.  You know how that shit go.  Anybody want a little attention, motherfuckers in the city, like, ride dick. And that's what these guys been doing.

Q.   I want to break that down a little bit.  You said cliqued up with the whole city.  Do you mean O-Block was cliqued up with multiple other gangs?

A.   Shit, you explain to me how they ain't.  Shit, O-Block, Front Street, Lamron, there's a lot of their ass.  One side of the Bs, normally toward the whole -- any BDs, yeah, they cliqued up with the whole fucking shit -- the whole city.

Q.   I'm going to make sure I understand you.  You said any BDs --

A.   Yeah.

Q.   -- were cliqued up with O-Block?

A.   Yeah, they was dick riding, thinking they gonna get on.

        MR. GREENBERG:  Judge, can we get foundation?  I guess that's an objection.

THE COURT:  You can ask questions about foundation.

MS. WALGAMUTH:  Thank you, your Honor.

BY MS. WALGAMUTH:

Q.  All right.  I just want to make sure we understand each other, Mr. Wilton.

So, in 2020, you were out of custody for a period, until July; and you said you were -- you previously testified that you were a -- considered yourself a GD since you were young.

A.  Yeah.

Q.  And you only stopped claiming STL in 2023 -- or nine, 10 months ago, you said?

A.  Yeah, I dropped my Gangster Disciple flag in 2023.

Q.  So, before 2023 when you dropped your flag, you still considered yourself a GD?

A.  Yeah.

Q.  And did other -- to your knowledge, did other people consider you a GD?

A.  No, they didn't.  I had some whole other shit going on with this fag boy named Lil Jay, he and me, he was -- he had motherfuckers --

Q.  All right.

A.  -- playing for a loop.  So, no.

Q.  Okay.  Let's focus on this.  So, you were a GD until 2023.  So, let's talk about 2020.

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 241 of 285 PageID #:10749
Wilton - direct by Walgamuth
6399

Q.   Would you consider yourself a GD in 2020?

A.   Yeah.

Q.   Did you have concerns about rivals of the GDs?

A.   Hell, no.  I ain't gonna lie.  I was fresh out.  I wasn't even worried about no rivals, none of that.  Three kids, fresh out of jail from doing my seven years.  I wasn't thinking about no opps.  I was thinking about how to get some money and take care of my family because I was grown as hell when I came home.  I was 26 years old when I came home.

Q.   Okay.  So, you weren't thinking about rivals yourself, but were you aware of rivals of the GDs then?

A.   Of course.  And I'm Butta, too, so of course I gotta be worried.

Q.   You gotta be worried about rivals?

A.   Yeah, you know.

Q.   So, when you're worried about rivals, do you know who those rivals are of the GDs?

A.   Man, at this point, it just be a lot of -- the BDs.  That's all I know.

Q.   So, the BDs are rivals of the GDs?

A.   That's all I know, cous'.

Q.   All right.  And that was in 2020?

A.   Yeah.

Q.   And so O-Block are BDs, right?  You testified about that?

A.   I mean, for the most part.  Half of them is.

Q. And you said that O-Block was cliqued up with the whole city. So, what I want to talk about is -- ask you some questions about is who they were cliqued up with.

So, in 2020, who was O-Block cliqued up with?

MR. GREENBERG: Judge, I would renew my foundation objection.

BY THE WITNESS:

A. I don't really know like --

THE COURT: Overruled. You may answer.

BY THE WITNESS:

A. I don't really know like every gang. Like I said, I'm older. I've been in jail for a long time. So, I'm just coming home. All I know is the old opps. I don't know about no new niggers. Like I said, a lot of people insert themselves in shit that don't fucking got shit to do with them.

BY MS. WALGAMUTH:

Q. And I'm just asking you about 2020 when you had the GD flag and O-Block was a rival. So, you said, I think, you said Lamron earlier. What's Lamron?

MR. BOYLE: Objection.

BY THE WITNESS:

A. It's a street.

MR. BOYLE: All right. Misstates the evidence and leading.

MS. WALGAMUTH: Your Honor, if we could have a sidebar.

THE COURT: Yes.

(Proceedings heard at sidebar:)

MS. WALGAMUTH: I could be mistaken, your Honor, but in his first answer about cliqued up with, he listed Lamron. I didn't ask him at that point because I was providing more foundation.

MR. BOYLE: I didn't hear that.

MS. WALGAMUTH: When he was talking about cliqued up with the city.

MR. BOYLE: If he did, I apologize, but --

THE COURT: I don't know whether he said, "Lamron."

MR. GREENBERG: He did, Judge.

MS. GIACCHETTI: He did say he was clicked up with the whole city.

MR. GREENBERG: He mentioned Lamron.

MS. WALGAMUTH: I'm happy to ask him again, but thank you.

MR. GREENBERG: I live in the city, and I am not cliqued up with him.

MS. DOMPH: I can't hear you, Mr. Greenberg. You whisper.

MR. GREENBERG: I said I live in the city, and I am not cliqued up with Mr. Wilton.

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 244 of 285 PageID #:10752
Wilton - direct by Walgamuth
6402

MR. BOYLE: His most recent answer about who's cliqued up with who is he started by saying, "I don't know." And then he kind of rambles on, and then whatever may be useful to the government gets repeated as a question. I just -- but I'll withdraw the objection I just made.

THE COURT: Okay.

(Proceedings heard in open court:)

BY MS. WALGAMUTH:

Q. Now, Mr. Wilton, I'm going to try to ask you the same question.

You said -- you mentioned earlier in your testimony something called Lamron. What's Lamron?

A. It's just a street.

Q. What do you mean by street?

A. Just like St. Lawrence. It's a street. It's a block. It's a street.

Q. Does it have another meaning besides a street?

A. Huh?

Q. Does it have another meaning besides a street?

A. Shit. Lamron. Normal. It's Lamron.

Q. It's Lamron?

A. Yeah.

Q. You said -- is it something besides just a street?

MR. KLING: Judge, asked and answered three times now.

THE COURT: Overruled. You may answer.

BY THE WITNESS:

A. It's a street. It's a block. It's a block.

BY MS. WALGAMUTH:

Q. Is it a rival?

A. It's just like --

MR. KLING: That's leading.

BY THE WITNESS:

A. Just like St. Lawrence is a block, just like STL's a block. You know? What is STL? A block, right? They say we a gang. So Lamron is a block.

BY MS. WALGAMUTH:

Q. And you mentioned the BDs and the GDs?

A. Yeah.

Q. Some other gangs.

A. It's a block.

Q. Is there a gang associated with the block of Lamron? Is there a gang that has territory or associated with the block of Lamron?

A. What, the BDs?

Q. The BDs?

A. Yeah.

Q. What about the term -- I guess one other question for you. You said Lamron's a street. Is the street called Lamron, or is the street called something else?

A. It's called Normal, spelled backwards.

Q. The street's called Normal?

A. Yeah.

Q. And what about 300? Are you familiar with the term "300"?

A. Ain't it all the same thing, right?

Q. What do you mean by the same thing?

A. Lamron, 300, O-Block. It's all the same thing.

Q. So, 300 is the same thing as Lamron. Is it also BDs?

A. It's the same thing. It's all the same thing.

Q. I'm just trying to understand you. You say it's the same thing. Are they the same people or another group of BDs?

A. It's technically the same people. They just spread it out. There's a lot of them.

Q. So, Lamron, 300 are the same people, and those people are BDs. Is that -- I want to make sure I understand what you're testifying.

A. Yeah, yeah.

Q. And you also said that's the same thing about O-Block. Do you mean they're cliqued up with O-Block, or they're the same people?

A. They're the same. They are the same people, even though you re-rocking the same question on me, you playing on my brain. I keep -- they're the same, O-Block, 300, Lamron. It's all the same thing, you know.

It ain't gonna change just because the question was

asked different, bro.  I keep saying, they all the same.

Q.  I'm just trying to understand you, Mr. Wilton.

Have you heard of the term "THF"?

A.  Yeah.  It's like a rap group, right?

Q.  Is it a rap group?

A.  I mean, for the most part, that's what I know.

Q.  What does it stand for?

A.  Now that, I can't tell you, because I really don't know.
I know of people.  I don't really know the whole abbreviation
thing, Woop.

Still, like I say, I been gone a long time in jail,
man, so a lot of this shit really I don't know a lot; but the
actual abbreviation, I don't know it.

Q.  I'm asking you about 2020.  You don't remember it today.
That's -- is that what you're saying, you don't know the name
THF, what it stands for?

A.  Yeah.  I know it's a rap group.  It's like five of them
little guys, like five of them rappers, four or five.  It's
like four or five rappers.

Q.  What about THF 46?

A.  It's the same thing.

Q.  Also a rap group?

A.  Yeah.  Ain't like two, three of those signed to Lil Durk,
right?

Q.  Are you familiar with THF referring to an area?

MR. BOYLE:  Objection.  I think it's been asked and answered.

MR. KLING:  And leading.

THE COURT:  Overruled.

BY MS. WALGAMUTH:

Q.  You can answer the question.

A.  Can you repeat the question for me, please.  Thank you.

Q.  I can try.  So, beside a rap group, are you familiar with THF referring to an area of the city?

A.  Outside of rap, I think they like 44th, 45th, something like that.

Q.  So, it refers to an area of the city?

A.  Yeah.

Q.  And are people in that area of the city associated with any gang?

A.  I mean, like I just told you, they rappers, so -- and I just said, they signed to Lil Durk, too.  I also stated that THF was a rap group, and I also said there's like two or three of those signed to Lil Durk.  So, I think I pretty much answered that question.

Q.  Well, the -- you didn't answer -- the question I asked you was:  Are they associated with a gang?

A.  I know it as a rap group, right?  Dude though.  Right?  I know the rappers.  I'm an entertainer myself, so I pay attention more to the entertainer side of things than the

other bullshit.

Q. What's that?

A. I don't know. Maybe -- if -- they gang affiliations. You know? I listen to the music. I do music, you know? Outside of that --

Q. So, there are gang affiliations with THF?

A. I don't know. I know they fuck with Lil Durk.

Q. What does that mean? What does it mean to fuck with Lil Durk with respect to a gang association?

A. Shit, they rappers. He a rapper. They rappers. You feel me?

MS. WALGAMUTH: Your Honor, could we have a quick sidebar?

THE COURT: Yes.

(Proceedings heard at sidebar:)

MS. WALGAMUTH: I've hit a point that I think would be a natural breaking point for the day before I get into a different section that I think will take us past 5:00, so I just wanted to flag that for your Honor.

THE COURT: Okay. So, I think at this point, we just -- we pause for the day, pick back up tomorrow.

MR. GREENBERG: Or just keep going, Judge. I mean, we're trying to maximize the jury's time. Let's maximize it.

MS. GIACCHETTI: We have an additional 15 minutes. We might as well use it.

MR. GREENBERG: Agreed.

THE COURT: I know. We talked about that. I did say, though, that if the government hit a reasonable stopping point, then we could stop before then. So I -- I think it's fine to stop at this point.

MS. WALGAMUTH: Thank you.

MR. BOYLE: And everyone agreed that he's been asked what THF is at this stage?

MS. DOMPH: Yes.

MR. BOYLE: I mean, is that the transition point? We're moving on from that? Because it's been asked several times.

MS. WALGAMUTH: The transition is moving to a different section of his testimony, but I think that we would be free to go back.

But I think the distinction that Mr. Boyle doesn't maybe agree with, but the government's understanding is that THF and other rap labels that the defendants have suggested are rap labels are also associated with gangs. So, to be a rap label does not preclude the association of or the original naming of a gang or gang affiliation.

MR. BOYLE: Judge, for this specific witness, that's been his answer. It's not been the defendants' answer. This is the person who's been asked that question repeatedly, and his first answer every time is, "They rappers. They rappers.

They rappers."

MR. BARNETT: He said it four times.

MS. GIACCHETTI: So, it's not the government's theory. It's what comes out of the witness's mouth, and he's pretty much answered this question multiple times.

MS. WALGAMUTH: And, your Honor, just for the sake of this moment, I hit a natural breaking point because I wasn't going to ask any follow-up questions about THF. I was going to move to another section.

But I just wanted to say that I think that Mr. Boyle's articulation of the testimony is -- I won't quite agree with it, that there are two different pieces I asked him about, and he got into the second piece and acknowledged the gang affiliation. But I don't intend to follow up on that at this point.

MR. BARNETT: Okay. That's fair enough, Judge.

THE COURT: All right. So, what time are we going to be ready for the jury tomorrow? I would like to set 9:30 as usual, but does anyone have any reason to think we need more time?

MR. BARNETT: I personally tomorrow cannot be here before that 9:15 at the earliest. I apologize. Usually I'm here every day on time, but I cannot be here tomorrow until 9:15.

THE COURT: Okay. That's fine. Does anyone have a

reason to think that we'd need more than 15 minutes of time before we start with the jury at 9:30?

MS. WALGAMUTH: Your Honor, for the government, not if we use the time until 5:00 or a little bit later to address Mr. Roberson's videos. I think that is the one issue on the agenda. If we use that time this afternoon, then I think 15 minutes should be -- if there's anything that comes up tomorrow.

THE COURT: Anyone else have issues they intend to raise? If I tell them 9:30, we're going to start at 9:30.

MR. BARNETT: That's fine.

MS. WALGAMUTH: That would be great for the government. Thank you, your Honor.

THE COURT: Okay.

(Proceedings heard in open court:)

THE COURT: Okay. We're going to pause at this time. We're going to begin tomorrow at 9:30.

To the members of the jury, please, again, don't research, discuss, or read news about the case.

Sir, you are on the stand, so please don't discuss your testimony overnight with anyone.

THE WITNESS: All right.

(Jury exits courtroom.)

THE COURT: Thank you, sir.

MS. DOMPH: You need to admonish.

THE COURT: And you may be excused for the evening. You do remain on the stand. Please don't discuss your testimony with anyone. Thank you.

MR. GREENBERG: Is he -- I don't know if he heard you, Judge.

THE COURT: Sir, I just wanted to check. I wanted to make sure, did you catch -- did you hear that last point? Please just don't discuss your testimony with anyone overnight.

THE WITNESS: Okay. I heard it.

THE COURT: Okay. Thank you, sir.

THE WITNESS: All right.

(Witness exits courtroom.)

THE COURT: Okay. We have a few minutes until 5:00. Which part of this -- so, at this time, would the defendants like to stay or -- for the argument we're going to have on the videos for cross?

MR. GREENBERG: Judge, this should be really quick because the one they complained about that we didn't give them a bookmark on, they asked the witness about. It was -- I don't understand.

THE COURT: Okay. Let me just pause. How long is this argument going to take? Are the defendants going to stay here for it, or not, before we get into the actual discussion?

MS. GIACCHETTI: Apparently, some of the defendants

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 254 of 285 PageID #:10762
Wilton - direct by Walgamuth
6412

want to stay, Judge.

THE COURT: Okay.

MS. GIACCHETTI: That's the answer.

THE COURT: Okay. We will then need to conclude this discussion tonight by, I would say, 5:15 at the latest, ideally closer to 5:00. We'll be back at 9:15 tomorrow. That is the total time that we have to deal with this. I'm not going to have long breaks.

So, if you're not able to present everything you would like from the defense's perspective in that time that we have, that is just -- it's going to -- that's the time we have. So, we're going to move forward with whatever arguments we can do in that time.

MR. GREENBERG: Judge, with all due respect, I don't understand why this is the defense's and you're sort of cautioning us. This is -- these are videos, one of which the government has had for a long time, one of which they asked about on direct examination that they claim they know nothing about.

I don't -- I don't even understand what we're talking about here. And you're telling us that we have to do everything. We don't nitpick their case and tell them, you know, they have to do everything in advance.

And with all due respect, Judge, I'm getting a lot of sort of feeling that over on this side of the room, we're

doing something wrong. And, you know, we're asking to abide by prior rulings. We're asking that the Rules of Evidence be followed.

And they're sitting over there, with all due respect to my colleagues on the other side of the room, and saying, "We don't know anything about this stuff," but it's baked in to their direct examination. And if you look at the 302s, they asked about this video and this YouTube video and this discussion with this person he had. They know about all this. This is all fake.

THE COURT: Okay. The reason I raised the timing -- the reason I'm mentioning the timing is because we're having an ongoing issue of short time, and we have a limited amount of time with the jury.

MR. GREENBERG: Right.

THE COURT: And what is occurring over the last few days and maybe even weeks is that we are using time with the jury for legal arguments, thereby slowing the case. And I am making an attempt, as far as just efficiency, efficient use of time with the jury, to manage that issue.

And as a result, I need to alert -- and the reason this is relevant to the defense is because defendants also have not been waiving their presence, which they're fully entitled to do. I don't in any way fault defendants for making that decision. But what it results in is because we

then also have logistical constraints with the Marshals, we have pretty definite time frames that we have with both defendants and the jury.

And as a result, I am managing that issue. That's all that's about. That's not --

MR. GREENBERG: Okay. That's fine, Judge.

THE COURT: It's not about what you're raising.

MR. GREENBERG: Okay.

THE COURT: I'm just telling everyone in advance so that everyone's aware, we have a certain amount of time to make legal arguments. That amount of time is limited by the time we have with the jury, and it is also limited by the amount of time that we have with defendants present.

And I'm not going to allow people to just consume time with the jury. If the defendants are late getting here in the morning, is what I'm basically saying, that time is going to cut into your time to argue and present legal issues because I'm not going to let people just extend the legal arguments through time with the jury.

MR. GREENBERG: That's fine.

THE COURT: That is the only reason I'm mentioning this. It's not out of some kind of issue with one side or the other.

MS. GIACCHETTI: Judge, I don't know where we went sideways here. My client is waiving his presence for legal

arguments so that we have the optimum opportunity to present legal issues to the Court. He understands that, and he waives it. We appreciate your letting us do it.

I'm hoping that perhaps other defendants and defense counsel can discuss it and be clear on the record that by waiving their presence, we get additional time to present fully legal arguments to you, which of course, I would think everybody would want.

MR. KLING: And Mr. Offerd earlier waived his presence.

MS. DOMPH: Yes. I think we all did.

THE COURT: But then just now I heard that some defendants were not waiving their presence. And so that's why I gave again the explanation of what's happening as a result of this confluence of different factors, which again, I'm not -- I'm not blaming anyone for it. It's just I'm stating the factors that are leading to what is occurring.

MR. GREENBERG: Okay. So let's start the argument, Judge. If it comes time that everyone has to leave, then we'll -- they'll leave.

MS. GIACCHETTI: And if we need the time in the morning, everyone -- all the defendants need to agree that we can argue legal matters in the morning even if they're not here yet. The trial is not going to start. Nothing is going to happen in front of the jury. But these are just legal

arguments.

MR. KLING: And, Judge, if you could take a poll of all of us, I think all of us are on the same page on that.

MR. SPIELFOGEL: We already did this. We already went through it.

THE COURT: We did do it, but then just now I heard that some defendants do not waive their presence. So that was inconsistent with what I heard before. So, let me take another poll of that.

Do the defendants waive their presence in the morning so that we can address legal issues before the defendants are here in the morning?

MR. KLING: Mr. Offerd does.

MS. GIACCHETTI: Mr. Liggins does.

MR. GREENBERG: Mr. Roberson does.

MR. BOYLE: Mr. Turpin does.

MR. BARNETT: Then Mr. Smart will, too.

MR. SPIELFOGEL: So, our client has made it clear that he's talking about just for today, and he's not talking about tomorrow, so --

THE COURT: In other words --

MR. SPIELFOGEL: Yeah, you're right, Judge.

THE COURT: Presence is waived for tomorrow morning?

MR. SPIELFOGEL: No. He's telling --

MS. DOMPH: So we can -- so I understand.

THE COURT: It sounds like there is not a clear -- there's not clarity on the answer to that question. So, I think what that means is let's go until 5:15 right now with defendants.

MR. BARNETT: Your Honor, yes. Let's just proceed.

THE COURT: Proceed. Right.

MR. BARNETT: Instead of talking about it, let's just proceed. We're all here. Let's proceed.

THE COURT: I know. But I had to explain what I was doing because Mr. Greenberg told me that I was blaming --

MR. BARNETT: Understood.

THE COURT: -- defendants, which I absolutely am not. I am just explaining why I'm managing the schedule the way I am.

MR. BARNETT: Understood.

THE COURT: Okay. So, now, it is 4:55. We have to end here by 5:15. Tomorrow we'll arrive at 9:15. We are going to start with the jury at 9:30. That leaves us a total of about 30 minutes.

I will give initially -- who's objecting?

MR. GREENBERG: The government.

THE COURT: The government's objecting.

MS. WALGAMUTH: Yes, your Honor. The government is objecting. There has been -- I believe now there are five videos. I believe Mr. Greenberg only sent you three. I don't

believe he sent you the fourth one, which is the one he was just referring to with the J Mane interview about pulling the gun.

He also mentioned this afternoon, or at the lunch break, although that was contrary to the understanding this morning, that he plans to show this witness "Broke Opps" video, which while that's been admitted, I think we still have some objections as to relevance and scope of direct.

But candidly, it's hard to argue the basis for objection when, except for one video that we've already discussed with Mr. Thomas's counsel -- and I understand Mr. Thomas's counsel intends to use it potentially as a prior inconsistent statement and limit the five-minute video to those inconsistent statements, which are, I think, one to two clips, which we have shared with defense counsel we don't object to. Mr. Greenberg has stated he intends to use the entire five-minute video, which we would have an objection about.

But beyond that, I think there is just an unknown basis for even the basis to use these, whether they intend to admit them, publish them, impeachment, or for other purposes.

So, I'm happy to give you my broad objections, but it may -- I defer to you whether you would like to hear from defense about their purpose first or the portions, and then we can more narrowly tailor our argument, if needed.

THE COURT: Okay. I'm just -- before we actually start talking, let's -- I'm going to ask Mr. Greenberg to discuss this for five minutes tops, and then the government to have five minutes tops to discuss this. And then we can proceed from there.

But just to try to keep it efficient, let's start with at least that. If we need more argument beyond that, we can then do more.

MR. GREENBERG: Okay. So, Judge, one of the videos that was shared with you and the government is "FBG Butta Reveals Who Killed Gakirah Barnes," and then in quotes, "Von Did Not Kill Kirah. I was right there."

That is the -- we'll call it the Spielfogel video that was shared a long time ago. I have watched the video and rewatched the video, and I am -- it's -- was actually a four-part video. He talks about -- four different segments; but on this segment, he talks about the murder that the other witness talked about. The government has asked him about this incident, and I believe in their trial prep also asked him about this video.

Now that you've had an opportunity to observe the witness, perhaps you would share my viewpoint that it's very difficult to parse out, that he's all over the place when he's talking; and so it's difficult to play a specific, distinct 10- or 15-second clip of what he says.

At the beginning, the first 30 seconds are not relevant, and I probably wouldn't play it. He's getting an Italian beef sandwich. But after that, I think it's almost impossible to splice.

If the government has discussed -- and this is one of the problems of having, you know, six separate people and things only being shared maybe with some people. If they have specific clips that they have already approved of, perhaps that would have been a way to address all of this instead of just objecting, objecting, objecting, would have been to suggest, "Well, we have already discussed this with someone, and we have specific clips from this video we approve of."

Another one of the videos is a video -- and I'm happy to play it for the Court now -- where he takes out a gun, rocks the gun, and -- racks the gun, I'm sorry, and says that he's going to shoot the block of cheese. That is an interview with someone named J Mane, where the witness has now said it was a prop.

I have told the government where I intend to start playing it. It's about 3 or 4 seconds before he pulls the gun out. And I intend to play it through the time that he puts the gun back in his waistband, a total of approximately 30 seconds or so.

They just asked the witness about that. So again, I fail to understand what the issue is.

Another video is where he has rapped about individuals that he is exposing; and depending on his testimony, it may become relevant, things that he has said in that video. I don't know yet. Frankly, given what he's said already, I don't know that any of it would be relevant.

I have not said that I intend to play the King Von video with this particular witness because I didn't intend to play the King Von video with this particular witness.

The only other video, and it's one that I did share, but I didn't include earlier today, would be perhaps the Morgan Wallen video based on what the witness has said about it being a record label; but I'm not sure if we would be playing that or not, depending on what his answers are. And that is a very short TikTok of Lil Durk giving Morgan Wallen an OTF gold chain, which is like the chain that Von wears in his video.

So, I don't -- again, I don't understand what the problem is; and that's why I'm having difficulty, and that's why I'm so frustrated. I appreciate someone telling me how to try my case, and it seems like it 's been getting done by certain people on the other side of the room every time we go to do anything.

You know, I think we should be able to try our case. I think if they have an objection, they should make an objection. And the Court should rule on the objection. And

that's what I think.

But to claim that they are shocked or surprised or they're being sandbagged is just absolutely ridiculous.

And I came in under my time.

THE COURT: You did, and let me turn to the government.

MS. WALGAMUTH: Thank you, your Honor. Well, I believe Mr. Greenberg forwarded you some of our correspondence about this, so I think if you were able to review that, you'll see that we're not trying to -- this is a surprise, that the sort of what's being shown has been changing. What we're trying to do is be efficient here.

So, to use that time, he identified four videos. The first is this "FBG Butta K.I. Part 3," which is 5 minutes and 25 seconds. As I stated in my correspondence with Mr. Greenberg and I've shared with other counsel, if that is being sought, there are two portions -- and Mr. Spielfogel and I have not spoken about the specific portions, except that he mentioned there were one or two clips.

In reviewing the 5 minutes and 25 seconds, I've identified two portions that are short, under a minute each, in which the witness states that Von didn't kill Kirah; and so to the extent that that is an inconsistent statement with his testimony, I think that -- and I've shared this with Mr. Greenberg by e-mail and the other parties, that that would

be -- we wouldn't object to those limited portions.

The suggestion to play the whole 5 minute and 35 seconds or 25 seconds is our objection. Other portions are just hearsay. They include commenting on another individual who identified Von, commenting on that individual's statement to the police. There's no basis for that. That's not -- I don't anticipate that to be an inconsistent statement.

And to use that would be for a hearsay purpose or under 403 would be confusing and just have no probative value in this case. With respect -- so, that's that first video. And as I made clear both in correspondence and in court, we would not object to limited portions that are specifically tied to any particular inconsistent statement in accordance to the rules and 613 specifically.

The second video he talked about was the gun with J Mane, and as -- after receiving this video from Mr. Greenberg, I did ask the witness on direct about it. He stated it was a prop gun.

Mr. Greenberg did not identify any purpose for showing the video itself. I can -- if my -- if the purpose is that he believes that showing the video will somehow show that this is inconsistent and the gun is, in fact, real, that may be an issue, but I don't understand how that could be done. The witness has talked about it. He can cross him on it. But that would be our issue with that video specifically.

And if the purpose is to suggest he's a bad actor, that would be improper under the rules.

The third video is the rap video by this witness called, "Exposed." I do not believe that -- I believe this is one of the ones Mr. Greenberg shared with you. Again, he stated no purpose. He hasn't articulated why he may use it; but if it is to suggest that the lyrics in there are relevant, that would be hearsay, and I don't know what other purpose it is.

So, we can reserve our objection until he gets to a point where he decides to use it. But again, putting a 2-minute-50-second rap video for this witness, I don't know what purpose, and he has not articulated one that would be relevant at all.

And finally, the Morgan Wallen, Lil Durk, what he shared with the government in one of his, I believe it was 15 e-mails last night at 10:00 p.m. was a full music video. I don't believe I've seen or received a copy of this TikTok video in which Lil Durk gives -- as he's articulated, gives an OTF necklace to Morgan Wallen. I don't know what relevance basis that would have at all.

Would that be hearsay to suggest it's the truth of the matter asserted, and it's an assertion by Lil Durk in gifting this necklace and that has some meaning? That would be an improper purpose.

I do anticipate this would be well beyond the scope of the direct of this witness, who is, as he said, a member of STL. And I think he would say he is not a member or participated in the OTF record label.

But again, that is just -- there's no relevance. The probative value here is minimal, and I think it is just confusing to the jury.

But I have not seen that video. I have not -- that's not been shared with me at all, so -- to my knowledge, and so I can't comment on it specifically because I don't have a link or a viewing of that.

MR. GREENBERG: Judge, if -- if the government counsel would like to have shared with me what portions of the 5-minute "Von Didn't Kill Gakirah" they think is admissible instead of keeping it a secret because apparently, they've discussed it with others, I'm happy to look at that and see if we can come to some agreement.

I happen to think the entire thing is admissible and necessary for context. You've got that video, and you can look at it.

If the Court would like, I am more than happy to play the 15 or 20 seconds of what I like to refer to as the cheese video, which is where they -- he racks the gun and so forth. And your Honor can look at it, and I think it's pretty apparent.

I think it's also apparent why they have -- there's other reasons why it's admissible. He's a convicted felon. He has guns. The government isn't charging him. We've all seen cases where the government sees on social media someone having a gun and, in fact, does stuff. They didn't even investigate this.

In fact, they're trying to tell the jury that it's a Styrofoam prop, which is just absurd. It's also not orange on the end, which is what he said.

I'm happy to play it, Judge. I actually have it cued up, if you'd like to see it.

THE COURT: Okay. Let's just back up one second to the first. So, the first video was the one where the government doesn't object to certain portions that apparently -- I guess you've discussed with Mr. Spielfogel. So, on that one, why don't you discuss those portions with Mr. Greenberg, and then we can check back on whether there's an agreement on that.

MR. GREENBERG: Okay.

MS. WALGAMUTH: Yes, your Honor. And just to be clear, to the extent that there is an inconsistent statement, which I do anticipate there will be, to these -- this recording, so, yes, I can share those. And I will also confer with Mr. Spielfogel to see if they're the same. We have not discussed the actual time-second marks, but we're aware of the

statements, so I will happily do that.

THE COURT: Okay. If -- once you do that, is there a chance that that issue is agreed, or is there still going to be a dispute over how much of that can be played?

MR. GREENBERG: If we don't agree, Judge, I'm sure we can resolve it. If your Honor would watch the whole thing, it's five minutes; and then in the morning, if there's still a dispute, we can resolve it.

THE COURT: I watched it earlier. I'll rewatch it tonight. And we can resolve it in the morning. We just have 15 minutes in the morning.

Okay. Next is the cheese video.

MR. GREENBERG: Right. Would you like to see it, Judge?

THE COURT: Sure. Yes, please.

MR. GREENBERG: If you give me one second, Judge, to make sure I can get the sound to work here. So, we have to publish it. I think it's the entire portion for that.

MR. KLING: Judge, while Mr. Greenberg is cueing that up, we also have a Tiffany Huff issue that needs to be resolved if the government intends on calling her tomorrow. She was the witness who was in the courtroom.

THE COURT: Okay. Is that a possibility, that she's coming tomorrow?

MR. JULIEN: No. I think we indicated yesterday,

Wilton - direct by Walgamuth

6428

she's represented by counsel, and that's not something that can happen until the 12th or the 13th.

MR. KLING: Okay.

MR. BARNETT: That was a motion I did file, your Honor. And I was under the impression she wasn't coming until next week, so I wouldn't be prepared to attempt to make even the small argument I'm going to make; but I don't think I'm prepared to do that right now.

MR. JULIEN: I don't think we need to discuss --

MR. BARNETT: There wouldn't be time. I don't think there would be time.

MR. JULIEN: Mr. Barnett and I are on the same page. I don't think we need to discuss TH today.

THE COURT: Okay. All right. So then let's -- it looks like the video is teed up.

MR. GREENBERG: Are you ready?

THE COURT: Yes, please.

MR. GREENBERG: And I'm starting it, Judge, at the 7:13 mark.

(Video played.)

MR. GREENBERG: I wouldn't start it -- I would start it a little bit -- at the 7:30 mark.

THE COURT: I think I did watch this. I looked at the 7:38 mark.

MR. GREENBERG: This is where we would start playing

it, Judge.

(Discussion between counsel, not within hearing.)

(Video played.)

MR. GREENBERG:  That's what -- do you want me to play it again, Judge?

THE COURT:  That's okay.  I think I saw it earlier, and then this was helpful just now.

So, you're -- he testified about this on direct.

MR. GREENBERG:  Yes.

THE COURT:  And he said it was a prop and that they sometimes troll people or I don't know if it's those exact words, but that was the gist.  And you now want to play it to show that it was not a prop?

MR. GREENBERG:  Well, to show it wasn't a prop, and frankly, it's -- you know, the government hasn't done anything about it, although I don't know that that's through questioning and that might just be argument.

But it's not a prop, Judge.  He's a convicted felon. He's carrying guns.  He's pulling out guns.  It's absolutely admissible.

MR. KLING:  And said there was an orange thing on the end where you could tell it's plastic, and there was no orange thing on that video.

MR. GREENBERG:  I don't think plastic things make those noises.

MS. WALGAMUTH: Your Honor, I don't believe his testimony, he said anything about an orange tip to the gun.

MR. JULIEN: He did.

MR. GREENBERG: He did.

MS. WALGAMUTH: He didn't say the color was orange. I don't believe there was a reference to the word "orange."

MR. KLING: He did. He said there was an orange piece at the end that --

MS. WALGAMUTH: Well, I'll check the transcript, and I may stand corrected.

But, your Honor, I think what Mr. Greenberg just said -- I guess what we would agree with your question, is it to suggest to the witness that it wasn't, in fact, a prop gun, because showing the video -- for him to prove that it was real? Because if the purpose is, as Mr. Greenberg suggests, that it is real and the government is not charging him, then that is -- I think this is two different issues here.

So, is it the fact that it is inconsistent and he thinks that somehow showing the witness the gun and asking him again if it was a prop will be -- I don't understand how -- I don't think from looking at that video you can tell that gun is real. He testified under oath that it was a prop.

MS. GIACCHETTI: Perhaps the jury could. Isn't it a jury decision?

MR. GREENBERG: Can we get a show of hands from the

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 273 of 285 PageID #:10781
Wilton - direct by Walgamuth
6431

Marshals?

MR. BOYLE: We've got about 10 experts here.

THE COURT: So, he did say -- at least according to the rough draft transcript, he said, "Yeah, look close at the barrel. It's shaded in, but you can still see the orange tip on it."

So then the question is whether it's somehow impeaching of his testimony that this was a prop. I mean, so, I mean, does that change the government's view of this, if it's --

MS. WALGAMUTH: I think if -- I guess our issue is that if they're suggesting that they're just going to show it to him and say, "Is there an orange tip on the gun on the barrel like you testified," and try to prove an inconsistent statement, beyond that, our question is maybe that can be shown to him for a prior inconsistent statement. It should not be admitted as an exhibit, which would be improper 404(b), unless they intend to prove up that this was, in fact, a real gun, which I don't believe they plan to do. I could be mistaken about that, Mr. Greenberg.

MR. GREENBERG: Judge, we just want to play this for the witness and the jury to impeach him. That's really it, to impeach him.

And they brought it out. They brought this out that it's a fake gun. And it's not fake. Anyone who watches it

doesn't think it was a fake gun.

MR. BOYLE: And the witness --

MR. GREENBERG: The guy sitting right next to him didn't think it was fake. If you let the video keep going, there's a whole discussion about it, which we're not going to try and play; but there's a whole discussion about it.

MS. WALGAMUTH: And, your Honor, I think the testimony by this witness is it was a setup and a planned, staged entertainment thing between him and J Mane, and it was part of the interview.

MR. BOYLE: And the witness also volunteered himself the fact that it was a prop, and you know it was a prop because it still had that orange tip on it. And the jury -- that needs to be published so the jury can see that and they can determine the credibility of this witness.

MR. GREENBERG: That's the jury's thing. It's not --

THE COURT: Okay. It does say -- right before, "Yeah, look close," it's, "Isn't it true that in an interview on YouTube, it appeared that you pulled a gun on him?

"Answer: It was a prop.

"Question: It was a prop gun?

"Answer: Yeah. Look close at the barrel. It's shaded in, but you can still see the orange tip on it."

So, he -- he did say it was a prop. Let me -- so --

MS. DOMPH: This is an easy one.

THE COURT: I think I now understand the arguments. Let me just think by tomorrow about what that means in terms of whether it can be played versus admitted. Because if something is being used for impeachment, what are the consequences of that?

MR. GREENBERG: Judge, we're not seeking to admit it. I just said -- we're just seeking to play it. We want to publish it when we play it for the witness so the jury can make their own determination. We don't have to admit it.

THE COURT: Okay.

MR. GREENBERG: We're not seeking to. We're just seeking to use --

MR. BOYLE: That's all of our position.

THE COURT: Okay.

MS. WALGAMUTH: And, your Honor, I think the government's suggestion is that there's also prejudice and 404(b) of the attacks on this. So, if the issue is whether there's an orange tip to the gun, a still image from this video would be sufficient to show that.

MS. GIACCHETTI: Judge, the government keeps telling us that they can't be told how to try their case, and now they're trying to tell us how to try our case.

THE COURT: Okay. At least now, I think I understand what the arguments are on that one, so I'll look at that and see what can be played. I understand that the defense is not

trying to admit. They're just trying to play it.

Okay. Next is the video where he rapped about individuals he is -- he's exposing. I guess the government was saying they don't know yet what -- well, no, the defense is saying they don't know yet what they're going to want to use this for. It depends on what he testifies to. And the government was also saying they don't see a non-hearsay purpose.

So, I guess that's all we know at this point on that one. Is that fair?

MS. WALGAMUTH: From the government, yes, your Honor. And I'll just note that I don't -- I'm not sure if this is one that you've reviewed, but there are references -- under 403 grounds and confusion to the jury and waste of time, there's a lot of references well outside of the case, other individuals, other statements, and so at -- the whole video is certainly not relevant and would be confusing and should be precluded under 403 in addition to just we don't have an understanding of what basis, if any, he would use it.

But if it's not for an -- for impeachment on a specific statement, then I think it would be for hearsay purposes for the truth of the matter asserted.

THE COURT: Is it one of the ones that's in the e-mail string? I did try and watch all of those.

MR. GREENBERG: What video is it, Judge? Which one?

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 277 of 285 PageID #:10785
Wilton - direct by Walgamuth
6435

I didn't hear it.

THE COURT: The third one where he raps about individuals he's exposing. I guess I don't remember seeing that one in the --

MR. GREENBERG: Yeah, that was in the e-mail, Judge.

THE COURT: It was?

MR. GREENBERG: Yeah, but I can -- let me tell you where.

THE COURT: I tried to watch all of them, but there were a lot of different ones. And sometimes they repeated, and it was hard to follow.

MR. GREENBERG: They repeated? I sent three --

THE COURT: In the string, if you start at the beginning and start playing one by one.

MR. GREENBERG: Yeah, it does that automatically. YouTube automatically does that.

THE COURT: I just meant in the e-mail string, as people were replying to e-mails and repasting the same links over and over, there's like, many, many links. So, I was going one by one through the links trying to watch, so there was a lot.

Okay. First link in your second e-mail is potentially this one. Okay. So, I'll look at that one overnight so that we're prepared. If you in the morning could try to confer about that, since it's still open, and see if

you can make any more progress, I would appreciate it. I also understand you're both saying it might depend on what his testimony is.

MR. GREENBERG: Yeah, it's unlikely that we would use that video, Judge.

THE COURT: Okay.

MR. GREENBERG: And I've shared the Morgan Wallen one with --

THE COURT: Okay. The Morgan Wallen video, I saw a full music video that I watched over lunch, but I did not see a TikTok video that I recall.

MR. GREENBERG: Do you want me to send that one to you?

THE COURT: Please, thanks. It sounds like that one is pretty short.

That one, if it is an assertion of gifting the necklace, what is the -- I guess what's the non-hearsay basis for that?

MR. GREENBERG: I'm sorry. What's the relevance of --

THE COURT: What's the relevance of that TikTok and --

MR. GREENBERG: He's giving it -- the relevance is enterprise, that OTF is not a gang reference, Judge. It's, in fact, a record label. And we have the incorporation

documents, I believe we've shared with the government previously --

MS. BORMANN: We have.

MR. GREENBERG: -- from when it was incorporated more than a decade ago. It's Lil Durk's record label.

And so, certainly, the inference there, Judge, is that a major person is not just going to be getting gang stuff. A major country star, in fact, a country star who I believe is -- made being pretty conservative a lynchpin of his persona. And here, he's getting this necklace. And if, it was, in fact, a gang necklace, he would not be getting that necklace.

But the government, they have all of these people come in and really, with no foundation, say, "OTF is this, and OTF is a gang, and only the family, and it's part of Lamron and 600," and all of this other stuff, and they go on and on and on about it.

And we have these limited pieces of evidence to counter that and to show that, in fact, it is not that. It is this record label. We also expect that we'll be putting in the record -- the records from the Secretary of State showing it's a record label.

But I know that there's -- there's videos the government has introduced where people are wearing OTF necklaces, along with other jewelry, including O-Block

Case: 1:21-cr-00618 Document #: 497 Filed: 01/31/24 Page 280 of 285 PageID #:10788
Wilton - direct by Walgamuth
6438

necklaces; and there has been some testimony that that is gang identification jewelry, and so we should be allowed to bring this in.

THE COURT: Okay. We do need to conclude here. It's definitely -- we have to wrap up by 5:30, and so we need to wrap up.

But I guess any final comments on that last video?

MS. WALGAMUTH: Your Honor, just to respond briefly, I think Mr. Greenberg just clearly articulated a hearsay purpose, that this assertion of Lil Durk putting an OTF necklace on a conservative country singer suggests that this is a rap label and not a gang symbol. That, by definition, is hearsay, truth for the matter asserted, because the assertion of gifting this necklace means that it does not mean a gang affiliation.

That's just improper. There's no basis to admit that. There's no hearsay exception for that. Nor do I think that this will be within the scope of this witness's direct examination.

And I don't -- I was not clear from his statement about whether the foundational records of the record label OTF was going to be sought to be introduced in cross-examination with this witness, but I -- I do not know if he will -- he has no -- I will suspect that he will say he doesn't recognize that and he's not familiar with the fact

that OTF is a registered entity or business. So, I don't know if that would even come in at all, and we'd probably object on that basis, too.

MR. KLING: And, Judge, I don't know what statement are they objecting to? There's no statement.

MR. GREENBERG: And, Judge --

MS. GIACCHETTI: The gift is an action.

MR. GREENBERG: They've already agreed to the admission of records, and I kind of feel bad for myself that I've made such a poor impression that counsel thinks that I'm going to try and authenticate Secretary of State corporation records through Mr. Wilton. I really have to go back to school, I guess, and Professor Kling's class to think that I'm going to do that. I'm not introducing these records through this guy, the Secretary of State corporation records.

MS. WALGAMUTH: I'll just note, your Honor, that Mr. Greenberg and Roberson counsel has not disclosed any witness beyond their gang expert, so I don't know who they intend to put forth these records. And I raise that only because Mr. Greenberg raised it in the context of this video and somehow how it related to whether this video could come in on cross-examination.

But I do recall, and I don't have the date in front of me, your Honor set a deadline for witnesses that will be called or intend to be called by the defense after Mr. --

after the opening statement by the Roberson team; and Mr. Roberson did not provide any witnesses or disclose any witnesses to the government and has not to date.

MR. GREENBERG: We're going to call Mr. Julien, because he agreed to stipulate to the records.

MR. KLING: The records are self-authenticating, Judge.

MR. JULIEN: No, I didn't.

MR. KLING: They're admissible under the Federal Rules. They are clearly self-authenticating.

MR. JULIEN: No, I didn't. You provided us a copy. But it's 5:27, Judge, and we can -- as you indicated, we have to wrap this up.

We received a copy of the records. We certainly did not have a conversation about stipulation or anything like that. We can. We can talk about it, but we have not.

MS. BORMANN: Judge, to be clear, I gave a copy to everybody. They're self-authenticating. They're certified copies of records, period. It does not require a witness.

MR. JULIEN: We went to the expense of -- I put on a witness and put in Secretary of State records. You need a witness to put in Secretary of State records, even if they are self-authenticating. But I know it's past 5:15, and we have to wrap this up, but it doesn't really work like that.

MR. GREENBERG: We'll get Jesse White in and put him

on the list.

MR. KLING: Judge, given that Tiffany Huff is no longer a witness tomorrow, we are going to run out of witnesses. May I inquire from you or the government what witnesses are left for tomorrow and Thursday.

MR. JULIEN: I don't understand --

MR. KLING: We're going to run through them before tomorrow.

MR. JULIEN: Excuse me. It did not have her on it. And I would just refer you to the previous e-mail that did not have her on it for this week. And yesterday, I indicated she couldn't appear this week, so this wasn't a issue. I'll forward the e-mail that I sent with the witness order for this week; but she's not the next witness, even if she were going to appear, which she's not, after this witness.

MR. KLING: Unless there's another e-mail and if you could forward it, we'd appreciate it. The last e-mail I have for this week was including Tiffany Huff.

THE COURT: We do need to wrap up here. So, please just coordinate about this offline. I'll see everyone at 9:15 tomorrow.

MS. WALGAMUTH: Thank you, your Honor.

THE COURT: Thanks, everyone.

MR. BARNETT: Thank you, your Honor.

MR. BOYLE: Thank you, your Honor.

(Court adjourned, to reconvene 12/6/23 at 9:15 a.m.)

*  *  *  *  *

C E R T I F I C A T E

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Kathleen M. Fennell*

_____

*/s/ Joseph A. Rickhoff*

_____

*/s/ Charles R. Zandi*                December 6, 2023

_____    _____
Official Court Reporters                 Date
United States District Court
Northern District of Illinois
Eastern Division

I N D E X

PAGE

TERRANCE GARRETT

Direct Examination By Mr. Julien                    6181
Cross-Examination By Ms. Domph                      6190
Cross-Examination  By Mr. Somerville               6241
Cross-Examination By Ms. Bormann                    6264
Cross-Examination By Mr. Boyle                      6273
Redirect Examination By Mr. Julien                  6274
Recross Examination By Mr. Somerville               6305
Further Redirect Examination By Mr. Julien          6315

DESMA COLEMAN

Direct Examination By Mr. Julien                    6316
Cross-Examination By Mr. Greenberg                  6356

RAKEEM WILTON

Direct Examination  By Ms. Walgamuth               6375

INDEX TO EXHIBITS

GOVERNMENT EXHIBIT                                  RECEIVED

  Nos. 1005-1, -2, -3, and -4                       6340

DEFENDANT'S EXHIBIT                                 RECEIVED

 Thomas No. 7                                       6217
 Thomas No. 8                                       6220
 Thomas No. 9                                       6224
 Thomas No. 10                                      6226
 Thomas No. 11                                      6229
 Roberson No. 12                                    6271