**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 21 CR 618-5** |
| | ) | |
| **MARCUS SMART,** | ) | **The Honorable** |
| | ) | **Martha M. Pacold,** |
| **Defendant.** | ) | **Judge Presiding.** |

**DEFENDANT MARCUS SMART'S MOTON FOR JUDGMENT**
**OF ACQUITTAL OR, IN THE ALTERNATIVE, NEW TRIAL**

Now comes Defendant, MARCUS SMART, by and through his attorneys, MARC M. BARNETT and MICHELLE MARIN, and hereby moves this Honorable Court, pursuant to Federal Rule of Criminal Procedure 29 for the entry of an order granting a judgment of acquittal on Counts One and Six of the superseding indictment or, in the alternative, a new trial pursuant to Rule 33. In support thereof, Defendant Marcus Smart states as follows:

## I. INTRODUCTION

Marcus Smart was found guilty at trial of engaging in the affairs of an enterprise (O-Block) through a pattern of racketeering in violation of 18 U.S.C. §1959, and participating in a conspiracy to murder Carlton Weekly on August 4, 2020. (Counts One and Three)  The Defendant was also found guilty of discharging a firearm which caused the death of Carlton Weekly. (Count Two).  The Defendant was also found guilty of engaging in racketeering activity by committing an assault on Victim 1 with a dangerous weapon, and discharging a firearm in relation to the assault on Victim 1. (Counts Four and Five)  However, Marcus Smart was found not guilty of engaging in racketeering activity by committing an assault on Victim 2 with a dangerous weapon, and

1

discharging a firearm in relation to the assault on Victim 2. (Counts Six and Seven) Having been found to have committed the murder of Carlton Weekly as part of that RICO conspiracy, Marcus Smart is facing a potential life sentence.

As discussed in our motion, the evidence presented to the jury was insufficient to establish the necessary elements of the charged offense beyond a reasonable doubt on Counts One through Five. Therefore, this Court should enter a judgment of acquittal on Counts One through Five pursuant to Rule 29.

As set forth in our motion for a new trial, Mr. Smart's convictions for these offenses were obtained as a result of errors committed which prejudiced the Defendant. Accordingly, this Court should grant a new trial pursuant to Rule 33.

## II.  <u>MOTION FOR JUDGMENT OF ACQUITTAL</u>

Pursuant to Federal Rule of Criminal Procedure 29, the Defendant moves this Court to enter a judgment of acquittal on Counts One through Five. Under Rule 29, the Defendant is entitled to a judgment of acquittal on these counts because the government failed to present sufficient evidence from which a rational trier of fact could find beyond a reasonable doubt that the Defendant knowingly conspired with others to commit a racketeering offense and that he murdered Carlton Weekly and assaulted Victim 1 in furtherance of his position in the RICO enterprise.

Sufficiency of the evidence challenges require the Court to determine if the evidence, viewed in the light most favorable to the government, could support the conviction. *United States v. Garcia*, 919 F.3d 489, 502-04 (7th Cir. 2019)(granting judgment of acquittal in narcotics case because government's evidence filled evidentiary "gaps with inferences of guilt by association or evidence of an individual's mere presence somewhere criminal activity may have occurred.");

*United States v. Musgraves*, 831 F.3d 454, 462 (7th Cir. 2016)(setting aside conspiracy and firearms convictions for insufficient evidence); *United States v. Weimert,* 819 F.3d 351, 354 (7th Cir. 2016)(while "we have sometimes said that [insufficiency challenges raise] a nearly insurmountable hurdle . . . the hurdle is not actually insurmountable though.")(reversing mail fraud conviction and citing cases reversing on insufficiency grounds). The Seventh Circuit has also observed that "the height of the hurdle depends directly on the strength of the government's evidence." *United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019), quoting *United States v. Garcia*, 919 F.3d 489, 496–97 (7th Cir. 2019). "If the evidence would not allow a civil case to survive a motion for summary judgment or a directed verdict, then the case has no business being given to a jury in a criminal trial." *Id.*; *see also United States v. Lee*, 558 F.3d 638, 644-46 (7th Cir. 2009)(setting aside money laundering convictions based on failure of government to prove essential element of criminally derived proceeds of criminal activity); *United States v. Thornton*, 539 F.3d 741, 749-51 (7th Cir. 2008)(setting aside attempted bank robbery conviction based on failure of government to prove essential element of actual intimidation); *United States v. Pearson,* 113 F.2d 758, 761 (7th Cir. 1997). This same standard applies to a defendant's request for a judgment of acquittal:

> A motion for acquittal may not be granted if, viewing the evidence in the light most favorable to the prosecution, there is relevant evidence from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. *United States v. Roman,* 728 F.2d 846, 857 (7th Cir. 1984). When applying this standard, a judge must, of course, keep in mind that it is the [finder of fact] which has the exclusive authority to assess the witnesses' credibility, resolve evidentiary conflicts and draw reasonable inferences from the evidence presented. *Id.*

*Pearson,* 113 F.3d at 761.

3

This long-line of acquittals demonstrates that a guilty verdict can be sustained *only* if the government introduces sufficient *credible and probative* evidence that the defendant was guilty of each element of the offense on each of the charges beyond a reasonable doubt. *Neder v. United States,* 527 U.S. 1, 15 (1999); *In re Winship,* 397 U.S. 358, 364 (1970). Failure to prove an essential element entitles a defendant to an acquittal. *Jones v. United States,* 526 U.S. 227 (1999). Giving the government the benefit of the reliable witness testimony, and all the inferences which reasonably can be drawn from that evidence, it has failed to demonstrate that a conspiratorial agreement existed between the Defendant and others and that the Defendant was a member of that agreement. In addition, as will be discussed, the government's case against Marcus Smart was particularly weak, (making the hurdle not only surmountable but surmounted), and necessitating the convictions on Counts One through Five to be set aside as not being supported by proof beyond a reasonable doubt.

> *The Government Failed to Prove Marcus Smart Participated In The Murder of Carlton Weekly and the Assault on Victim 1*

The government failed to prove Marcus Smart's participation in the murder of Carlton Weekly and his conviction must be set aside. As a starting point to our discussion of this murder, the government's theory of the case can be distilled down to Ralph Turpin saw Carlton Weekly in a store on Oak Street on August 4, 2020; that Turpin notified someone; that several individuals supposedly entered two cars located at Parkway Gardens, a Chrysler and a Ford Fusion – but there was no video or testimony identifying the individuals when they entered the two vehicles. Nevertheless, the two vehicles were recorded leaving the parking lot of Parkway Gardens at 4:04 p.m.; the two vehicles were recorded at various locations on their way to Oak Street; and the shooters were recorded jumping out of the two vehicles, began shooting at 4:26 p.m., got back into

the cars and left the scene.

One car, the Chrysler, returned to Parkway Gardens which was captured on video. There was testimony regarding the return, but Marcus Smart was never identified as being in the Chrysler. The second car, the Ford Fusion, arrived at the Midway Autohaus car dealership.[1] There was no video of the arrival of the Fusion at the dealership. However, Alex Trybulec testified that he received a text message from Offerd on August 4, 2020, at 4:35 p.m. in which Offerd stated that he was "on his way" to the dealership. (Tr 6903)   Trybulec indicated that Offerd arrived at the dealership "between 30 minutes to an hour from the 4:35 text." (Tr 6910)   Mr. Trybulec testified as follows about Offerd returning the Ford Fusion on August 4th:

> Q.  Did you see him arrive?
> A.  Yes.
> Q.  Can you describe where you were that you saw him arrive in the vehicle?
> A.  I remember specifically because I came out – because I was nervous about the car coming back, so I was out for a smoke break, and he pulled in to the parking lot as soon as I, like, looked towards the parking lot.
> Q.  So, you saw Mr. Offerd pull in to the parking lot?
> A.  Yes.
> Q.  And was he driving the Ford Fusion?
> A.  Yeah.
> Q.  And did you see him park and exit the vehicle as well?
> A.  Yes.
> Q.  Was anyone else in the vehicle with Mr. Offerd when he pulled in to the –
> A.  No.
> Q.  Just him in the – when he pulled in to Midway, he was by himself?
> A.  Yes.
> Q.  What, if anything, did Mr. Offerd do after he parked or after he parked the Ford Fusion in the parking lot?

---

[1]   The evidence adduced at trial showed that Tacarlos Offerd purchased the Ford Fusion from Midway Autohaus on July 28, 2020. (Tr. 6874)   Alex Trybulec was the finance manager at Midway Autohaus at the time and was involved in processing Offerd's loan application. (Tr. 6873-74)   The price of the Ford Fusion was $12,501, Offerd made a down payment of $3,500, leaving a balance due of $9,001. (Tr 6880)   In his credit application, Offerd submitted pay stubs, which did not pass scrutiny and resulted in the rejection of Offerd's loan, and the need for Offerd to return the Ford Fusion to the dealership and a refund of Offerd's down payment.

> A.   He just parked and grabbed, like, a hoodie out of the back. And
> then, yeah, that was it.
> (Tr 6910-11)

It is abundantly clear that Marcus Smart was not in the Ford Fusion.   After giving Mr.

Offerd a check, Mr. Trybulec went on to testify:

> Q.   … Did you see where Mr. Offerd went after he left the car at
> Midway?
> A.   He just walked – walked down the street.
> Q.   Where did he walk to?
> A.   I believe someone picked him up.
> Q.   You believe someone picked him up.   Did you see the car that
> picked him up?
> A.   It was a black car, another black car.
> Q.   Were you able to see if anyone was in the car?
> A.   Yeah.
> Q.   Who was in the car – let's talk – was there a driver in the car?
> Let's start there.
> A.   Yes.
> (Tr 6912)

After stating that he recognized the other driver as a female who came into the dealership

with Offerd on the day Offerd purchased the car, Mr. Trybulec testified:

> Q.   And besides the driver, could you tell if there was anyone else
> in the vehicle?
> A.   No.
> (Tr 6913)

In addition, Mr. Trybulec did not testify that he saw anybody else standing around the other

black vehicle or get into the black vehicle.   If anyone was standing near the black vehicle, Mr.

Trybulec would certainly have seen them and the government would have elicited and developed

the presence of individuals around the black vehicle waiting for Offerd.

Tiffany Huff – the woman who helped and accompanied Offerd to the dealership when

Offerd purchased the car – testified that on the morning of August 4th, she and Offerd discussed

returning the Ford Fusion, that she would meet Offerd at the dealership, and give him a ride back.

(Tr 7480-81)   The government introduced numerous text messages between Offerd and Huff.   In each and every text message and phone conversation Offerd had with Tiffany Huff, Offerd speaks in the singular: "**He** was on the way to the dealership" (Tr 7484); "**I'm** on the way to the dealership, text me the address and meet **me** there." (Tr 7485).

According to Huff, she arrived at the dealership on August 4th before Offerd arrived, but could not say what time she arrived. (Tr 7486)   Offerd eventually walked up to her car and knocked on the window to get her attention and let her know that he "was finna go clean out his car, and he was going to get his check from the dealership," and that Offerd "proceeded towards the dealership." (Tr 747486-87)   Huff went on to state that two other people got into her car and assumed it was Muwop and Zell. (Tr 7488)   According to Huff, Offerd simply said, "to E's house" and that nobody in the car said anything on the ride over there. (Tr 7499-7501)

In addition, as the government conceded in its opening statement, several occurrence witnesses at the scene of the shooting did not identify anyone, let alone Marcus Smart.

There was substantial evidence related to tracking the movement of cell phones connected to various individuals on August 4, 2020.   However, there was absolutely no evidence tracking the movements of a cell phone connected to Marcus Smart on August 4, 2020.   In addition, the government did not introduce any text statements made by Marcus Smart in which Mr. Smart implicated himself in this murder. Conversely, the government has introduced statements by other individuals via cell phone messages, phone calls, personal meetings, and other communications. However, not one of them ever mentions Marcus Smart or refers to him.

There was no scientific evidence, no DNA, no fingerprints, or physical evidence putting Marcus Smart on Oak Street when Duck was shot.

In sum, the evidence failed to establish beyond a reasonable doubt that Marcus Smart was

in the Ford Fusion when it left Parkway Gardens on August 4th, headed towards Oak Street, and was eventually returned to Midway Autohaus. The only witness who saw Offerd arrive in the Ford Fusion at the dealership was Alex Trybulec, and his testimony was clear, unbiased, and unimpeached – Offerd was alone in the Fusion when he pulled into the dealership.

A Rule 29 motion calls on the court to distinguish between reasonable inferences and speculation. Each step in the inferential chain must be supported by evidence that allows the jury to "draw reasonable inferences from basic facts to ultimate facts." *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012). "Although a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation." *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir 2001). "Speculation cannot be the basis for proof in the civil context much less the basis for proof beyond a reasonable doubt." *United States v. Groves*, 470 F.3d 311, 324 (7th Cir. 2006); *see also United States v. Allen*, 383 F.3d 644 (7th Cir. 2004) (reversing 922(g) conviction and stating: "While the district judge's inferences were reasonable, we reversed. The question was not whether a logical set of inferences could show the charge was possibly or even likely true, but whether it could be inferred beyond a reasonable doubt that the defendant was guilty as charged.") (emphasis in original).

Accordingly, this Court should enter an order granting Marc Smart's Rule 29 motion and set aside the verdict.

### III.   **MOTION FOR NEW TRIAL**

Pursuant to Federal Rule of Criminal Procedure 33, the Defendant moves this Court to enter an order for a new trial. Rule 33 authorizes the court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33. The "interests of justice" apply to "a variety of situations in which the substantial rights of the defendant have been jeopardized by

errors or omissions during trial." *United States v. Hamdan,* 910 F.3d 351, 357 (7th Cir. 2018) (quotation and citation omitted). A court may grant a new trial if erroneous evidentiary rulings had a substantial influence over the jury and the verdict was inconsistent with substantial justice. *United States v. Owens,* 424 F.3d 649, 653 (7th Cir. 2005); *see also United States v Maclin,* 915 F.3d 440, 444 (7th Cir. 2019) (Rule 33 requires a new trial "only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict."). Judge granting a new trial in a criminal case under the authority of Rule 33 need assign no reason other than it is required in the interest of justice. *United States v. Smith,* 331 U.S. 469 (1947).

**Allowing the Identification of Marcus Smart by Martel Wiley**

Marcus Smart filed a motion *in limine* which sought to preclude the identification of Marcus Smart by Martel Wiley. (Dkt. No. 343) On October 26, 2023, this Court ruled on a number of pretrial matters. In denying the motion *in limine*, this Court made the following findings and determinations:

> MW, as background, is a paid FBI informant. He was a former high-ranking member of the Black Disciples who lived in the Parkway Gardens from 2007 until 2011. MW did not witness any of the events on August 4, 2020. …
>
> On May 31, 2021, MW testified in the grand jury. He identified five defendants at different points of the Camtasia video and explained how he knew each one.
>
> MW identified Smart, that is also known as Muwop, in the Camtasia video. MW explained that Smart used to hang out with MW's step-kids and that MW has known Smart since the sixth grade. MW stated that MW has known who Smart is since 2011 or 2012. MW identified Liggins in the video and stated that he has known Liggins since 2000.
>
> On October 3, 2023, MW posted a video on YouTube. On the video, MW discussed the video that he watched to identify the witnesses, and he appears to be referring to the Camtasia video; and

MW stated, quote, "You couldn't see them on the camera," end quote. …

MW stated, quote, "I know all these guys except Muwop and C Thang," end quote. …

As to Smart, Smart argues that the grand jury testimony establishes at best that MW was aware that MW's step-kids played with Smart in the sixth grade. Smart argues that the grand jury testimony does not establish any physical or personal interaction between MW and Smart when Smart was **12** years old in the sixth grade.[2] Smart argues that MW does not have the degree of familiarity required for an identification under Rule 701 because MW's interactions with Smart were over 10 years ago and fleeting; therefore, Smart argues that MW's identification would not aid the jury.

Under - - so, there are a few different rules that are applicable here. One is Rule 602, Rule of Evidence 602, which is about the need for personal knowledge. That requires, quote, "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony," end quote.

Here, MW has personal knowledge of both Smart and Liggins. MW knows Smart because MW's step-kids used to play with Smart in middle school. MW knows Liggins because the two of them lived together in Parkway Gardens for several years.

Rule 701 has to do with opinion testimony from lay witnesses. That rule requires that if a witness is not testifying as an expert, testimony in the form of opinion is limited to one that is, A, rationally based on the witness's perception; B, helpful to clearly understanding the witness's testimony or to determining a fact in issue; and, C, not based on scientific, technical, or otherwise specialized knowledge within the scope of Rule 702.

The relevant question is whether MW had the degree of familiarity with Smart and Liggins to be helpful to the jury. See *United States v. Jett,* 908 F.3d 252, 271, Seventh Circuit 2018; *United States v. Tinsley,* 62 F.4th 376, Seventh Circuit 2023. *Jett* and *Tinsley* affirm several principles that guide witness identifications under Rule 701.

In *Jett,* it says that under Rule 701, a witness can match a defendant

---

[2] This Court should take judicial notice that a child enters the sixth grade at the age of 11.

to surveillance footage only if there is a basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury. When the same match can be made by the jury, the witness is superfluous, and the testimony should not be admitted. That's from *Jett* at 271. See also *Tinsley* 62 F.4h at 386. Another principle is that identification testimony is inappropriate when there is only a fleeting interaction with the defendant because fleeting interaction is not the sort of familiarity that the Seventh Circuit has generally thought to be helpful to a jury under Rule 701. And that's also from *Jett* at 272 and *Tinsley* at 386.

The principles from those cases, of course, are binding. Those cases are binding. But I find this case just distinguishable from *Jett* and *Tinsley*. In *Jett* and *Tinsley*, the identifications were made by law enforcement officers during an investigation. Absent the investigation, the officers would not have had an independent reason for identifying the defendants. Here, MW had reasons apart from the investigation to know both Smart and Liggins. …

MW's identification of Smart and Liggins will help the jury. MW has had more than a fleeting interaction with Smart and Liggins. Because MW has knowledge of Smart and Liggins that predates the surveillance video, his identification of Smart and Liggins in the video is not superfluous, and is more likely to correctly identify the defendant from the photograph than is the jury. That's from *Jett*, 908 F.3d at 271. …

Finally, both defendants argue that MW's interactions with them, with Smart and Liggins before MW's identifications - - the defendants are arguing that those interactions are too old. However, neither defendant cites a case that establishes a bright line rule about how recently a witness must have seen or interacted with the defendant.

Instead, the test is broader than that, and it just focuses on the degree of familiarity. And for the reasons I've given, I'm satisfied that MW has enough familiarity with both Smart and Liggins to make an identification under Rule 701.
(Tr 2039-2046) (Emphasis added and footnote number 2 added).

However, at trial, after Martel Wiley identified Marcus Smart in some photographs as

Muwop, this colloquy took place between Wiley and the prosecutor:

Q. How do you know who Muwop is?

11

**A.  I know of him.   I don't know him.   Like I know of him.   I seen - - seen him.   But I don't know him.   I don't know him.**

Q.  You don't have a personal relationship with him?

A.  Yeah, I don't have a personal relationship.

Q.  Have you ever seen him in person?

A.  Yeah.

**Q.  When was the last time you think you saw him?**

**A.  Years.   Like he probably was a kid.**  Like he probably was younger than what he is now.   He was way younger than what he is now. …

Q.  Do you see the person you - - by the way, do you know his real name?

A.  Marcus, I think.   Yeah
.

**Q.  Do you see the person you know as Marcus or Muwop here in the courtroom?**

**A.  You know what?   I don't see him.   I don't see him.**
(Tr 5807-5808) (Emphasis added.)

After that exchange between the prosecutor and Wiley on direct examination, Marcus

Smart's attorney requested a hearing at sidebar and the following colloquy took place:

MR. BARNETT:   I'm having a bit of a problem to understand how he can identify that person if he can't identify the person in the courtroom and he says he didn't know him.   That would have been a motion I would have made before this trial had I known that he said, I don't know him and I only knew him in the sixth grade.

That is so prejudicial to this jury that I'm asking you to instruct the jury that that identification is improper.   It's totally improper.   On what basis could he say that?   I can't tell it's him.   I can't tell it's him based on what I just saw.   And now he's going to name him and he says he doesn't know him and he didn't know him - - and the last time he saw him was in the sixth grade?

And, so, this is just way too far, Judge. And had I known this - - I did make the motion to not admit his - - and you overruled - - you didn't sustain it because he said he knew him. But now he's saying he doesn't - - he knew him in the sixth grade and can't identify him in the courtroom. How is he doing this?

This is just way of an overreach. And I'm asking you to instruct the jury that the identification is improper. Had I known this and you known this originally, you would not have permitted it. I know you wouldn't have. …

Your Honor, we know that the basis of your ruling was personal knowledge. And he said, I've known him since the sixth grade. And in my motion, I said just knowing him since the sixth grade doesn't mean he's known him all through. He is not making this identification based on any knowledge of Marcus Smart. He's making it off the picture. Okay? Because he doesn't - - he said he didn't know him.

At this point, we can renew motions. I'm renewing it. It goes against everything you ruled on. Everything you ruled on. He does not know this man. Okay? And knowing him from - - he even says it on the stand that he doesn't know him since the - - I don't know what he looks like; I knew him when he was in the sixth grade when he was a kid. And now that's good enough? …

THE COURT: Okay. I'm going to overrule the objection. …

A lay witness is generally allowed to testify about the identity of a person in a surveillance photograph or video if there is a basis for concluding that the witness is more likely to correctly identify the defendant from the photograph or video than is the jury. *United States v. Jett,* 908 F.3d 252, 271. Seventh Circuit 2018. …

I think - - and, also, witnesses may match a defendant to surveillance footage if the witness is better situated than the jury to identify the defendant correctly. See *Tinsley,* 62 F.4h at 386; *Mendiola,* 707 F.3d at 742; *Jackman,* 48 F.3d at 4 to 5, which says that **lay opinion testimony identifying a defendant from surveillance photographs is admissible at least when the witness possesses sufficient relevant familiarity with the defendant that the jury cannot also possess, and when the photographs are neither so unmistakably clear or so hopelessly obscure that the witness is no better suited than the jury to make the**

13

**identification**.

Here, the challenge is that the witness is not sufficiently familiar with the defendant.   It's not so much about the quality of the photo or video - - or really the video that's here.

MR. BARNETT:   Certainly, the - - I would certainly claim that the quality of the video is part of this - - part of my objection, clearly.

THE COURT:   Okay.   Well, I will consider it to be part of the objection, as well, then.

But I think on both of those fronts, the - - so, the issue is whether he's basically testified to sufficient familiarity with Mr. Smart to be able to have any better basis to identify him than the jury.   So, is he in a better position to identify him than the jury based on his personal knowledge of Mr. Smart?   And, then, there's also a question about the quality of the video.

**So, he did say here today that he does not know him in the sense that he doesn't have a relationship with him.   He also said that he knew him when he was much younger, in around the sixth grade.   So, that's a while ago.   It's very true that between the sixth grade and now, of course, Mr. Smart's appearance would have changed.**   At the same time, the standard of personal knowledge is - - for purposes of Rule 602 and 701 is fairly low.

So, under - - and I know this is out of circuit, but *United States v. Bush,* 405 F.3d 909 at 916, Tenth Circuit, 2005, says courts have been liberal in determining the extent of perception required to satisfy the first requirement of Rule 701 and have preferred to leave to juries any assessment of the weight to be given to such testimony when there exists questions regarding the quantity or quality of perception.

**I understand that in certain cases from the Seventh Circuit when a law enforcement officer tries to identify someone based off of photos based on only brief, fleeting interactions with them, that is not enough.**   But I think that there is some difference between - - you've got to also look at the context in which someone has known someone.   Seeing someone briefly as an agent is different from seeing someone in quote-unquote, real life separate from any investigation.   And although it is long ago, that to me, it crosses the low threshold of personal knowledge and becomes a matter of weight for the jury.

14

MR. BARNETT: **Just to be clear so I can get the record straight, this witness said, I don't know him, I have not seen him since the sixth grade, cannot identify him in the courtroom; and he is able to see a video that is absolutely impossible to determine - - you can't see his face, you can't see anything, and that's better than the jury's ability to see the video?**

In other words, that - - this witness is helping the jury? In what way other than to give his opinion? In what way? I don't understand that.

THE COURT: Because I think the way that - - in terms of the quality of the video - - so, **the *Jackman* case, which is the First Circuit case, held that lay opinion testimony identifying a defendant from surveillance photos is admissible at least when the witness possessed sufficiently relevant familiarity with the defendant that the jury cannot possess**, and when the photographs are not either so unmistakably clear or so hopelessly obscure that the witness is not better suited than the jury to make the identification.

And I think with a number of points in this video, it falls directly within that type of video. It's not either so unmistakably clear or so hopelessly obscure that the witness is no better suited that the jury to make the identification. It's falling in kind of the middle ground where things such as, you know, build or gait or things of that nature, separate and apart from someone's face, can be helpful to the jury.

Now, I understand his - - you know, you could say, okay, well, build and gait may differ from someone having seen them back in the sixth grade to now. I think it's - - that's sort of - - that's one of these fact questions that's then up to the jury. So, I think it crosses the minimum threshold of personal knowledge. It's perhaps, you know - - **the line I was drawing before was if someone has literally never set eyes on this person in their real life as opposed to a photo, then they're not better positioned to identify someone from a photo. This is different. He has set eyes on him. He doesn't have a relationship with him. But that's not necessary. It's - -**

MR. BARNETT: Well, Judge - -

THE COURT: **- - seeing him in real life.**

15

(Tr 5811-5818) (Emphasis added.)

The Court erred when it employed a "seeing him in real life" standard for allowing Martell Wiley to identify Marcus Smart in the Camtasia video. It must be remembered that the agent in *Jett* also saw the defendant in real life. See *Jett,* 908 F.3d at 271-72 (the agent made personal observations of the defendant while executing a search warrant and noticed that the defendant now looked thinner and his facial hair was a little different). Notwithstanding the agent seeing Jett in real life, the Seventh Circuit held that this "is not the sort of familiarity with a defendant that we have generally thought helpful to a jury under Rule 701." *Id.* at 272. The Seventh Circuit Panel in *Jett* explained that a "close association" is the type of familiarity necessary to satisfy Rule 701, citing *United States v. Stormer,* 938 F.2d 759, 762 (7th Cir. 1991) (witness had "worked with [the defendant] for several years); and *United States v. Towns,* 913 F.2d 434, 445 (7th Cir. 1990) (witness was the defendant's former girlfriend who had a "close association with him"). *Jett,* 908 F.3d 272. Our Appellate Court affirmed this guiding principle in *Tinsley* and held that "identification testimony is 'helpful to a jury' when the witness's familiarity is based on longer periods of "close association." *Tinsely,* 62 F.4th 376, 386 (7th Cir. 2023) (quoting *Jett,* 908 F.3d at 272).

As noted above, in overruling ruling the defendant's objection, this Court relied on *United States v. Jackman,* 48 F.3d 1 (1st Cir. 1995) for the proposition that "lay opinion testimony identifying a defendant from surveillance phots is admissible at least when the witness possessed sufficiently relevant familiarity with the defendant that the jury cannot possess." (Tr 5815) However, *Jackman* aligns and agrees with the Seventh Circuit's mandate for a "close association" with the defendant, and bolsters Smart's position that Martel Wiley should not have been allowed

16

to identify Marcus Smart.

In *Jackman,* three individuals were allowed to identify Jackman as the individual in photographs taken by the bank's surveillance camera wearing a Florida Marlins baseball cap and a bulky winter coat when robbing the bank in 1992.   The three individuals were Jackman's ex-wife, Deborah Jackman, and two acquaintances of Jackman, Harry Stetson and David Hurlock. Deborah had known Jackman since 1972, they were married from 1976 until 1990, and continued to see each other every other weekend when the defendant exercised his visitation rights and would pick up and return their children.   She also testified that Jackman had worn a dirty-blond mustache for many years, that he wore baseball caps, and that the coat worn by the robber was similar to one worn by Jackman before the couple separated. *Jackman,* 48 F.3d at 3.   Hurlock testified that he had known Jackman since 1986, and that Jackman was a customer at his convenience store, that both he and Jackman were involved in coaching youth baseball teams from 1987 until 1990, that Jackman came into his store in late 1990 wearing a bulky jacket similar to the one in the bank robbery photo, that they discussed coaching youth basketball, and that Jackman wore baseball caps the vast majority of times he had seen him. *Id.*   Stetson testified that he had known Jackman since 1985 when Jackman and his former wife lived next door to him, and that Jackman lived with Stetson for about six months after Jackman and his wife separated, and that he continued to see Jackman occasionally until November 1991. *Id.*

In stark contrast to the "close association" in *Stormer, Towns*, and *Jackman,* Martel Wiley candidly admitted that he did not know Marcus Smart, that Wiley only knows **of** him, and that he and Marcus have never had a personal relationship. (Tr 5807)   In addition, Wiley testified that the last time he saw Marcus was briefly from afar was when Marcus was just a young kid. (Tr 5807)[3]

---

[3]   When Martel Wiley testified at trial on November 30, 2023, Wiley indicated that he was 39 years old. (Tr 5727)

On top of that, Wiley testified that he was not able to identify Marcus Smart in court. (Tr 5808)

It is abundantly clear that it was error to allow Martel Wiley to identify Marcus Smart in the Camtasia video. While the Camtasia video was a critical component of the government's case, there was a huge and glaring evidentiary void in the Camtasia video – the Camtasia video did not capture anyone actually getting into the Chrysler or Ford Fusion before the vehicles departed Parkway Gardens and headed to Oak Street. As a result, the government's theory boiled down to: the individuals going up and down the stairwell at Parkway Gardens must have been the individuals who got into the Chrysler and Ford Fusion and headed to Oak Street. The stairwell "identification" by Wiley bolstered the prosecution's theory of the case.

It must also be remembered that there was substantial evidence related to tracking the movement of cell phones connected to various individuals on August 4, 2020. However, there was absolutely no evidence tracking the movements of a cell phone connected to Marcus Smart on August 4, 2020. In addition, the government did not introduce any text statements made by Marcus Smart in which Mr. Smart implicated himself in this murder. Conversely, the government has introduced statements by other individuals via cell phone messages, phone calls, personal meetings, and other communications. However, not one of them ever mentions Marcus Smart or refers to him.

In addition, no one identified Marcus Smart at Oak Street on August 4, 2020. Furthermore, there was no scientific evidence, no DNA, no fingerprints, or physical evidence putting Marcus Smart on Oak Street when Duck was shot.

In sum, the evidence failed to establish beyond a reasonable doubt that Marcus Smart was in the Ford Fusion when it left Parkway Gardens on August 4th, headed towards Oak Street, and

---

Marcus Smart was born in 1999 and was 23 years old on November 30, 2023. In other words, Wiley is 16 years older than Marcus Smart.

was eventually returned to Midway Autohaus. The only witness who saw Offerd arrive in the Ford Fusion at the dealership was Alex Trybulec, and his testimony was clear, unbiased, and unimpeached – Offerd was alone in the Fusion when he pulled into the dealership.

While the government may argue that Tiffany Huff placed Marcus Smart in the proximity of the dealership around the time Offerd returned the Ford Fusion to the car dealer, Huff did not see when or how Marcus Smart arrived. In addition, when juxtaposed with the other evidence adduced at trial, Huff's testimony would have warranted a jury instruction regarding mere presence and association, which this Court denied.[4]

**Admission of Drill Rap Videos**

Prior to trial, the defense filed a motion *in limine* seeking to bar the introduction of two drill rap videos. The government indicated that it intended to admit a video clip of defendant Smart performing part of his song with the lyrics, "dude from 63rd couldn't get back up," as evidence of his association and familiarity with O-Block, its enterprise, and its racketeering activities. Likewise, the government asserted that it wanted to admit Dayvon Bennett's song "Took Her to the O" and accompanying video "as evidence of defendants' motive to kill Weekly, and their identity as the shooters." (Dkt. No. 288, page 2)

Dude from 63rd

According to the government, Marcus Smart states in the opening transcript: "I wanted to see if y'all fuck with this shit right here, I did this shit for a cypher, but we ain't never do it," followed by the following lyrics of this drill video:

> Muwop from the O, I'm with them get back up
> If you looking tough, push your shit back boy

---

[4] Marcus Smart requested that Criminal Instruction 5.07 be given, which relates to the defendant's presence/activity/ association is insufficient by itself to prove his participation in the crime. The government did not include 5.07 in its proposed jury instructions, and objected to Mr. Smart's request that 5.07 be given. (Dkt. No. 280)

> Dude from 63rd couldn't get back up
> Knock the motor out the car, when we spin wrap up
> Know a boss clapped up, yeah we had to mask up
> Another body that's a plus,
> Dunk a nigga like I'm Russ,
> Pockets full of …

The government argued that the video establishes Marcus Smart's "association and familiarity with O-Block, its enterprise, and its racketeering activities." However, the government could have established Marcus Smart's association by simply playing the portion, and only that portion, of the song that includes the lyrics, "Muwop from the O." The remainder of the video should not have been played, as its unfair prejudice far outweighed its probative value.

<u>Took Her to the O</u>

According to the government, Dayvon Bennett a/k/a King Von, released a video on or about February 21, 2020 entitled "Took Her to the O." The government readily admitted that this video "is a fictional account of Bennett shooting and killing Weekly." (Dkt. No. 288, page 5) It is fiction because (1) the alleged shooting(in Bennett's fantasy video) provides no indication when Bennett shot and killed Weekly – but at minimum, it supposedly happened over six months before Weekly was shot and killed in August 2020; (2) Bennett's shooting of Weekly presumably occurred in the vicinity of O-Block; (3) Bennett's fantasy video has Bennett acting alone when Bennett shoots and kills Weekly in February 2020; and (4) Bennett's fantasy video alludes that the shooting was result of someone, presumably Weekly, throwing a brick at Bennett's "whip."

The government argued that Bennett's fantasy video is "evidence of defendants' motive to kill Weekly, and their identity as the shooters." (Dkt. No. 288, page 2) Bennett's fantasy video clearly failed to support the government's basis for wanting to introduce Bennett's fantasy video into evidence. In addition, it is abundantly clear that Bennett's fantasy video only confused the

jury and should have been excluded in its entirety. Furthermore, Bennett's fantasy video should not have been played, as its unfair prejudice far outweighs its probative value.

In *United States v. Stephenson,* 550 F.Supp.3d 1246, 1252 (M.D. Fla. 2021)*,* the defendant was charged with drug trafficking and possession of a firearm in furtherance of a drug trafficking offense. The government sought to introduce three videos which depicted the defendant of bragging about his narcotics trafficking activity, the threatened use of violence to protect his drug turf, and his possession of a firearm. The district court granted the defendant's motion *in limine* to exclude the videos.

In *United States v. Williams,* No. 3:13-CR-764, 2017 WL 4310712, at *7 (N.D. Cal. Sept. 28, 2017), the court addressed the difficulty with establishing the probative value of rap lyrics in that the lyrics are a "form of artistic expression." The district court recognized the challenge of differentiating between reality and fantasy, which can occur with any form of artistic expression. *Id.* Because the rap videos at issue depicted images of "young African-American men, guns, and drugs atop musical lyrics" that belittled other "African-American men, women, and cooperating witness," the court found it was irrefutable that some of the videos scenes could "arouse an emotional response, evoke a sense of horror, or appeal to an instinct to punish" to the jury. *Id.* at *7. The court accepted that rap lyrics constitute valid forms of artistic expression, and thereby found that admitting such lyrics into a criminal proceeding would only blur the thin line between fact and fiction and would therefore be unduly prejudicial. *Id.* at *7-8.

In *United States v. Johnson,* 469 F.Supp.3d 193, 222 (S.D. N.Y. 2019), the court found that the government's intention to introduce rap lyrics had "little to no probative value, [but] the references to violence and possible allusions to police misconduct, and the use of profanity,

21

present a risk of unfair prejudice to the Defendants." Accordingly, the district court excluded the rap video excerpts as both irrelevant and because their probative value was substantially outweighed by the risk of unfair prejudice. *Id.*

In the instant case, the prejudice to Marcus Smart by admitting the videos and their lyrics greatly outweighed any probative value.

## Admission of Tiffany Huff's Testimony

Prior to trial both parties agreed to the separation of witnesses and that their witnesses would be excluded from being present in the courtroom. This agreement by the parties is consistent with Federal Rule of Evidence 615. Federal Rule of Evidence 615 provides in pertinent part: "At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own." Four weeks into the trial, it came to light that a government witness, Tiffany Huff, had been present in the courtroom numerous times on an ongoing basis since the trial began.

In *United States v. Hargrove,* 929 F.2d 316, 320 (7th Cir. 1991) the Seventh Circuit succinctly observed that "Rule 615 was designed to thwart witnesses from fashioning their testimony to that which has already been given and to help in detecting testimony that is less than truthful." (citing *Geders v. United States,* 425 U.S. 80, 87 (1976). *See also United States v. Gammon,* 961 F.2d 103, 105 (7th Cir. 1992) (same).

When there is a violation of Rule 615, the Seventh Circuit has held that "[a]bsent evidence of prejudice, collusion, or willful violation, it is within the district court's discretion to allow a witness to testify after a Fed.R.Evid. 615 violation." *Scott v. United, States,* 72 F.3d 132 (7th Cir. 1995) (quoting *Gammon,* 961 F.2d at 105).

While there was no evidence of collusion, it was incumbent upon each party to monitor the courtroom to ensure compliance with the sequestration order with respect to their witnesses. In this particular case, there was a team of prosecutors and case agents in the courtroom everyday – who not only interviewed the prospective witness multiple times, but also had the prospective witness testify before the grand jury in this matter. The prosecution clearly knew that Tiffany Huff was a prospective witness. Moreover, this was clearly not a situation where the witness inadvertently "popped in" and was momentarily present. To the contrary, the prospective witness was present in the courtroom numerous times on an ongoing basis since the trial started four weeks earlier. As the Seventh Circuit commented in *United States v. Calhoun,* 510 F.2d 861, 868 (7th Cir. 1975), "[t]he best answer might be that the lawyer was not 'successfully doing his job' when he asked for the separation of witnesses ruling, and then failing in any way to police the courtroom."

In *Calhoun,* the Seventh Circuit upheld the district court's ruling excluding two witnesses who had been in the courtroom both days of the two-day trial. In so doing, the Seventh Circuit held that there was a preponderance of evidence that (a) the attorney knew of the witnesses' presence in the courtroom during each of the two days; (b) the attorney was at fault in not respecting the ruling he had asked the court to make; (c) there was no way for the opposing side to know who might be called as witnesses; and (d) that there was no resulting prejudice in excluding the witnesses. *Calhoun,* 510 F.2d at 869.

In *Hargrove,* the district court allowed Connie Becker to testify even though Baker was in the courtroom when Michael Beckett testified, in direct violation of Rule 615. The Seventh Circuit upheld the district court's decision because Baker was a "surprise witness whom the

23

government did not intend to call."   Moreover, Baker was called in rebuttal solely to testify to the lack of police coercion and not to the substance of what Michael Beckett had said about Hargrove. *Hargrove,* 929 F.2d at 320-21.

In *Gammon,* the district court conducted an "exclusion hearing" and the Seventh Circuit found that it was not an abuse of discretion to allow a witness to testify where the witness had "inadvertently entered the courtroom" during one witness' testimony. *Gammon,* 961 F.2d at 105.

In stark contrast to *Gammon,* the Seventh Circuit upheld the district court's ruling to exclude a witness for violating Rule 615 in *United States v. Tedder,* 403 F.3d 836, 840 (7th Cir. 2005).   In doing so, the Panel in *Tedder* bluntly held that if the party "wanted this witness available for rebuttal, he should have kept him out of the courtroom." *Id.*

Here, the prospective witness was not being called as a "surprise witness" for rebuttal. Rather, the government called Tiffany Huff in its case in chief.   The prejudice to Marcus Smart and the other defendants was readily apparent, as the Tiffany Huff was present during opening statements and was privy to the government's theory of the case and testimony the government wants to extract from the various witnesses, including the prospective witness, and trial testimony leading up to her being called as a witness.

### IV.   ADOPTING ARGUMENTS OF CO-DEFENDANTS

Marcus Smart adopts the arguments of his co-defendants as they may apply to him with respect to his motion for acquittal pursuant to Rule 29, and to his motion for a new trial pursuant to Rule 33.

WHEREFORE, Defendant Marcus Smart respectfully requests that this Court grant this motion for acquittal pursuant to Rule 29 or, in the alternative, grant him a new trial pursuant to

Rule 33 of the Federal Rules of Criminal Procedure.

Respectfully submitted,

/s/ Marc M. Barnett
MARC M. BARNETT
53 W. Jackson Boulevard, Suite 1442
Chicago, Illinois 60604
(312) 719-0376
Attorney for Marcus Smart