**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | **No. 21 CR-618-1** |
| **v.** | **)** | |
| | **)** | **Honorable Martha M. Pacold** |
| **CHARLES LIGGINS,** | **)** | |
| **Defendant.** | **)** | |

**DEFENDANT CHARLES LIGGINS' POST-TRIAL MOTIONS FOR JUDGMENT OF ACQUITTAL OR ALTERNATIVELY, FOR A NEW TRIAL**

Now comes Defendant, CHARLES LIGGINS, by and through his attorneys CYNTHIA GIACCHETTI and GREGORY MITCHELL, and hereby moves this Honorable Court, pursuant to Federal Rules of Criminal Procedure 29 and 33 to enter judgments of acquittal as to Counts One, Two, Three, Six and Seven, or in the alternative, for entry of an order granting Mr. Liggins a new trial as to each of those counts.[1].

## I. INTRODUCTION

Charles Liggins was charged in the Superseding Indictment as follows: committing a violent crime in aid of racketeering, namely the murder of Carlton Weekly, in violation of Title 18 U.S.C. 1959(a)(1) and 2 (Count One); using a firearm in relation to a crime of violence resulting in the death of Carlton Weekly in violation of Title 18 U.S.C.

[1] We note that the following arguments in some instances mirror arguments also contained in the Post Trial Motions filed on behalf of Christopher Thomas. Given that the same law applies to both defendants, that the arguments involve many of the same witnesses, and that counsel for Mr. Liggins and Mr. Thomas have worked together on this and other pleadings, we believe this is most efficient. The alternative procedure of the two defendants adopting arguments by reference to portions of the other defendant's posttrial motions would be unduly confusing and difficult for the Court to follow. Therefore, we have instead repeated such arguments within this document where they are applicable.

924(j) and 2 (Count Two); conspiracy to commit a violent crime in aid of racketeering, namely the murder of Carlton Weekly, in violation of Title 18 U.S.C. 1959(a)(5) (Count Three); committing a violent crime in aid of racketeering namely the assault with a dangerous weapon of Davon Brinson in violation of Title 18 U.S.C. 1959(a)(3) and 2 (Count Four); using a firearm in relation to a crime of violence, namely the assault with a dangerous weapon of Davon Brinson, in violation of Title 18 U.S.C. 924(c)(1)(A) and 2 (Court Five); committing a violent crime in aid of racketeering namely the assault with a dangerous weapon of Cashae Williams in violation of Title 18 U.S.C. 1959(a)(3) and 2 (Count Six); and using a firearm in relation to a crime of violence, namely the assault with a dangerous weapon of Cashae Williams, in violation of Title 18 U.S.C. 924(c)(1)(A) and 2 (Count Seven).

Jury selection began on October 10, 2023. On January 17, 2024, the jury returned a verdict finding Mr. Liggins guilty of Counts 1,2, 3, 6 and 7 and not guilty of Counts 4 and 5.

Prior to trial, counsel for Mr. Liggins filed numerous pre-trial motions. At trial, Mr. Liggins's counsel made numerous motions, opposed numerous government motions, made numerous objections to evidence offered by the government, challenged rulings of the Court, submitted and objected to jury instructions, and otherwise advocated for Mr. Liggins. Moreover, at the beginning of the trial the Court ruled that objections and arguments made by co-defendants would also be considered as made on Mr. Liggins' behalf unless he opted out. All of these motions and objections were fully argued by the parties, sometimes on multiple occasions, and the Court ruled on each of these objections, motions and arguments.

Consequently, Counsel cannot itemize each and every ruling or error of the Court. By these post-trial motions Mr. Liggins does not waive any errors that were preserved by

written motion, by objection during trial, or otherwise, or that may be found after a more thorough review of the complete transcript of the proceedings and the record. These post-trial motions will focus on those areas of dispute that alone, or in combination, entitle Mr. Liggins to a judgment of acquittal or, in the alternative, a new trial.

## II. MOTION FOR JUDGMENT OF ACQUITTAL-RULE 29 [2]

Rule 29 requires the entry of a judgment of acquittal where "after viewing the evidence in the light most favorable to the United States, the trial court finds that no reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). However, this standard "does not require the defendant to demonstrate that no evidence at all supports the conviction, but rather that the evidence cannot support a finding of guilt beyond a reasonable doubt." *United States v. Rahman*, 34 F.3d 1331, 1337 (7th Cir. 1994). The "no evidence" standard was rejected in *Jackson,* where the Supreme Court held that "while a 'mere modicum' of evidence may satisfy a 'no evidence' standard…it could not by itself rationally support a conviction beyond a reasonable doubt." *Jackson,* 443 U.S. at 320, *Rahman,* 34 F. 3d at 1337.

Furthermore, circumstantial evidence can only be used to support "reasonable" inferences, not speculation and conjecture. *See, e.g., United States v. Beckner,* 134 F.3d 714 (5th Cir. 1998); *Ward v. Lockhart,* 841 F.2d 844, 847-848 (8th Cir. 1988): *United*

[2] All of the defendants, including Charles Liggins, made Rule 29 motions for judgment of acquittal at the end of the Government's case and again at the end of all the evidence. (Tr. 8776). Specific arguments on the Rule 29 motion were made orally by counsel for Charles Liggins (Tr. 8769-8776) and, per the Court's order Liggins also adopted the oral arguments made on behalf of co-defendants. (Tr. 8777-8802, 8845-8851, 8863-8869.) After the oral argument the Court took the Rule 29 motions under advisement and they are still pending. (Tr. 8869) Defendant Liggins incorporates here all the oral arguments made on behalf of himself as well as his co-defendants.

*States v. Frol,* 518 F.2d 1134, 1137 (9th Cir. 1975); *United States v. Campbell,* 702 F.2d 162, 167 (D.C.Cir. 1983).

Based on the evidence and theory presented by the Government at trial, each of the counts of conviction against Charles Liggins required the Government to prove beyond a reasonable doubt that on August 4, 2020, Charles Liggins was on Oak Street shooting a firearm with others that resulted in the murder of Carlton Weekly and the assault with a dangerous weapon of Cashae Williams[3]. In addition to his presence at and involvement in that shooting, the Government was required to establish beyond a reasonable doubt that "O-Block" was an enterprise engaged in racketeering activity and that Defendant Liggins' alleged actions on Oak Street were for the purpose of maintaining and increasing his position in the alleged O-Block enterprise.

A. THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THAT CHARLES LIGGINS PARTICIPATED IN THE AUGUST 4, 2020, SHOOTING ON OAK STREET

The Government's evidence at trial failed to prove that Liggins was a participant in the shooting on Oak Street on August 4, 2020, that resulted in Carlton Weekly's murder and injury to Cashae Williams. That evidence, even when viewed in the light most favorable to the government, was so deficient that no reasonable trier of fact could have found beyond a reasonable doubt that Charles Liggins was a participant in the shooting on Oak Street on August 4, 2020.

[3] Although Count Three charges conspiracy to murder Carlton Weekly, there was no evidence of Charles Liggins' involvement in that conspiracy independent from the evidence of his alleged participation with others in the shooting on Oak Street. Thus, the Government had to prove Charles Liggins' participation in the shooting on Oak Street in order to prove he was involved in the conspiracy charged in Count Three.

No one who was present on Oak Street at the time of the shooting testified that Charles Liggins was present at that location, much less involved in the shooting. Video footage of the Oak Street shooting was introduced. However, no witness identified Charles Liggins in that video footage. No forensic or physical evidence put Charles Liggins on Oak Street at the time of the shooting. In fact, the Government's forensic cell site analysis established that during the time of the murder Charles Liggins' phone was not on Oak Street but was in fact at Parkway Gardens. (Tr. 7267-7268)

There was no evidence that Charles Liggins made any statement admitting to involvement in the shooting. No witness testified to overhearing any conversation between Charles Liggins and any of the alleged coconspirators discussing the murder. Although the Government claimed that the defendants at Parkway Gardens were notified that Carlton Weekly was on Oak Street by a phone call allegedly made by Defendant Ralph Turpin, there was no proof of any such phone call to any of the defendants, much less to Charles Liggins. Thus, even the initial incident that allegedly precipitated the shooting was not proved.

Instead, the Government's claim that Charles Liggins was involved in the shooting on Oak Street is based solely on identifications made by four witnesses—David Sloan, Martell Wiley, Tiffany Huff and Terrance Garrett. None of those four witnesses was on Oak Street at the time of the murder. None of those four witnesses identified Charles Liggins in the video footage of the shooting on Oak Street. Instead, the witnesses purported to identify Charles Liggins going up and down a stairwell at Parkway Gardens before and after the time of the murder from Parkway Gardens' security video. (Camtasia Video Govt. Ex. 2000). However, none of the four witnesses were in the stairwell at the time the security video was recorded, so none of the four witnesses had any personal

knowledge of who actually was going up or down the stairs at the time.

Instead, the witnesses were directed to look at poor quality security video of persons walking or running in unlit stairwells with dark shadows and distorting back lighting. There were no clear, full-face. well-lit views of the persons these witnesses identified as Charles Liggins. Some were twisted dark side views of persons without clear, identifiable, or unique facial details; others were of persons seen only from the back. By itself, the poor quality and limited perspective of the video which the witnesses viewed alone establishes that their identification testimony is insufficient to support Charles Liggins' convictions.

Additionally, none of the four witnesses had sufficient familiarity with Charles Liggins' appearance in August of 2020 to make an identification sufficient to support these convictions.

David Sloan initially claimed to have lived at Parkway Gardens from 2011 to 2018 and to have hung around there until 2021. It was eventually established that starting in 2015 Sloan was living primarily in North Dakota, either with his family or in jail. And it was undisputed that Sloan was in jail from May 2020 through March of 2021. After repeatedly failing to name Charles Liggins as a member or leader of O-Block on direct examination, the Government simply fed Sloan Mr. Liggins' name. (Tr. 5229-5235). However, Sloan immediately clarified that he never had any personal relationship with Charles Liggins. (Tr. 5235, 5313). On cross examination Sloan went even farther, admitting that in fact he had never personally met or spoken to Charles Liggins. (Tr. 5606).

Based on the evidence presented, Sloan simply had no basis of knowledge from which to make a physical identification of Charles Liggins as of August 4, 2020. Adding

to Sloan's lack of knowledge regarding Charles Liggins's appearance at that time, Sloan was a paid informant who had received over $20,000, was still on the Government payroll, received immunity for his testimony, was hoping that his testimony would help him obtain a favorable disposition in a pending state gun case, and falsely reported to the FBI at the beginning of the trial that the defendants had recently murdered his brother.

Similarly, the witness Martell Wiley had insufficient knowledge of Charles Liggins to make an identification of him in the security video. Wiley testified that he was in Parkway Gardens from approximately 2006 to 2011 when he moved out, many years before August 2020. Wiley did not testify to any personal contact or relationship with Charles Liggins such that he would have knowledge of Liggins physical appearance in 2011, much less in 2020. Wiley claimed to have met Charles Liggins in 2008 or 2009, more than a decade before the shooting. When asked how many times he saw Charles Liggins at Parkway Gardens, Wiley's answer was "a few times." (Tr. 5788). Adding to this lack of sufficient knowledge on which to base an identification, Wiley was a paid informant who received almost $25,000 from the FBI, although on the stand Wiley denied receiving most of that money and claimed the FBI was lying about the payments. This was only one of the many lies Wiley told on the stand, many of which were established by stipulation. (Tr. 8750-8752.)

The third identification witness, Tiffany Huff, testified that she had never seen Charles Liggins in person. She never spent any time with Charles Liggins and did not know him personally. Huff had seen Charles Liggins only on social media video and photographs during the time period from 2010 to 2016. (Tr. 7376-7382, 7410-7413). Again, this exposure is an insufficient basis on which to make any identification, much

less an identification of a person on unclear security video. Ms. Huff, who admitted she felt intimidated and threatened by the prosecution and who sat in the courtroom in violation of the witness exclusion order, was nevertheless shown the Camtasia video at 14:52 and said she could “assume” the person in the stairwell was Charles Liggins. (Tr. 7418). Huff’s “assumption” is simply insufficient.

The fourth identification witness, Terrance Garrett. was a security guard at Parkway Gardens from 2014-2020. (Tr. 6111) Garrett testified that there were approximately 2000 tenants at Parkway Gardens in approximately 694 units. As to his familiarity with Charles Liggins, Garrett claimed that he had seen and talked to Charles Liggins inside Parkway Gardens during the course of his tenure there. (Tr. 6136). However, there was no evidence presented as to when, where, or how often this contact took place such as to establish sufficient knowledge of Charles Liggins’ physical appearance in August of 2020 to make an identification, particularly in light of the size and sprawling nature of the complex as well as the number of persons living and gathering there.

Moreover, Terrance Garret was biased in favor of assisting law enforcement, which undermined his identification of persons in the Parkway stairwell as Mr. Liggins. Garrett had focused his education and spent most of his career in law enforcement adjacent work. He studied criminal law, held a variety of security jobs, applied to CPD, and had a pending application at the Cook County Sheriff’s Office. Indeed, Garrett knew before looking at the video that law enforcement believed that the Oak Street shooters were from Parkway Gardens because he helped to collect the video for them. As explained in the testimony of Dr. Geoffrey Loftus, such bias further calls into question the reliability of Garrett’s identification testimony.

However, even if the identifications of Charles Liggins made by these four witnesses are accepted as true and accurate, all that testimony would establish is that Charles Liggins went up and down a stairwell at Parkway Gardens on August 4, 2020. Being at Parkway Gardens on August 4, 2020, is not the crime charged. The Government had to establish beyond a reasonable doubt that on August 4, 2020, Charles Liggins was on Oak Street with a gun in his hand shooting at Carlton Weekly and Cashae Williams.

There was no evidence establishing that Charles Liggins got into the Chrysler that went from Parkway Gardens to Oak Street before the shooting. There was no evidence that Charles Liggins was on Oak Street shooting a firearm. There was no evidence that Charles Liggins drove back from Oak Street to Parkway Gardens in the Chrysler. No witness identified Charles Liggins in Parkway Gardens exiting the Chrysler. Therefore, even if the four witnesses' identifications of Charles Liggins in a Parkway Gardens stairwell before and after the shooting is accepted, that evidence is insufficient to establish Charles Liggins' guilt of the crimes for which he was convicted.

Under Rule 29, the Government cannot fill evidentiary gaps with unreasonable inference and rank speculation. But that is what the Government has done in this case. A Rule 29 motion requires the Court to distinguish between reasonable inferences and speculation. Each step in the inferential chain must be supported by evidence that allows the jury to "draw reasonable inferences from basic facts to ultimate facts." *Coleman v. Johnson,* 132 S. Ct. 2060, 2064 (2012). "Although a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation." *Piaskowski v. Bett,* 256 F.3d 687, 693 (7th Cir. 2001). "Speculation cannot be the basis for proof in the civil

context much less the basis for proof beyond a reasonable doubt." *United States v. Groves,* 470 F.3d 311, 324 (7th Cir. 2006).

Moreover, even when inferences are reasonable that is still not enough. The evidence must also satisfy the beyond a reasonable doubt standard. In *United States v. Allen,* 383 F.3d 644 (7th Cir. 2004) the Seventh Circuit reversed a bench trial conviction, finding that the trial judge's inferences were reasonable but the evidence still failed to satisfy the beyond a reasonable doubt standard. In *United States v. Garcia,* 919 F.3d 489, 501 (7th Cir. 2019) the Seventh Circuit described its decision in *Allen* as follows: "While the district judge's inferences were reasonable, we reversed. The question was not whether a logical set of inferences could show the charge was possibly or even likely true, but whether it could be inferred beyond a reasonable doubt that the defendant was guilty as charged."

The *Garcia* decision is particularly instructive as to the danger of relying on inferences from circumstantial evidence which, even if those inferences are reasonable, still fail to prove the defendant guilty beyond a reasonable doubt. In *Garcia* the Seventh Circuit reversed the trial court's denial of a judgment of acquittal in a drug case where there was no direct evidence of the defendant's possession or distribution of drugs. The Government's case consisted of recorded conversations involving the defendant and a person who headed a drug trafficking organization, testimony regarding surveillance of the defendant meeting with the drug king pin, and agent testimony interpreting the recorded conversations as "drug code."

The Seventh Circuit, after discussing a number of "sufficiency-of-the- evidence" cases, held that the evidence was insufficient. The Seventh Circuit warned that "a judge must take special care to guard against the possibility that a defendant might be found

guilty by either speculation or mere association". *Id.* at 503. Acknowledging that the recorded conversations "were certainly suspicious" and that "it is possible, perhaps even likely that Garcia was guilty in fact", the Court held that the evidence was not sufficient and reversed the convictions. *Id.* at 504.

In this case, as discussed above, the Government had no evidence that Charles Liggins was a participant in the Oak Street shooting. The four identification witnesses, even if believed, only identified Charles Liggins going up and down the stairwells of Parkway Gardens. Neither these witnesses nor anyone else provided any testimony putting Charles Liggins on Oak Street with a gun in his hand.

As they tried to do in *Garcia,* the Government attempted to fill this crucial evidentiary void with agent testimony "interpreting" video footage, social media posts, and drill rap music videos. As they tried to do in *Garcia,* the Government attempted to infer guilt from evidence that Charles Liggins associated with King Von and some of the other defendants and took part in a music genre that told stories of urban violence. However, like *Garcia* and the cases discussed therein, such evidence is insufficient even if a series of reasonable inferences can be made that might support a suspicion of criminality. Like *Garcia,* Charles Liggins convictions in this case cannot stand and judgments of acquittal should be entered on all counts.

## B. THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THAT O-BLOCK WAS A RICO ENTERPRISE ENGAGED IN RACKETEERING ACTIVITY AT THE TIME OF THE OAK STREET SHOOTING IN AUGUST 2020

All of Charles Liggins' counts of conviction required the Government to establish beyond a reasonable doubt that at the time of the Oak Street shooting O-Block was a RICO enterprise engaged in racketeering activity. The Government's evidence failed to

do so. Therefore, even if this Court concludes that the evidence was sufficient to establish that Charles Liggins participated in the murder of Carleton Weekly and the shooting of Cashae Williams, a judgment of acquittal is still required for failure to sufficiently establish these two elements.

The Superseding Indictment charged that the O-Block street gang was an "association in fact" enterprise. (Count One Par. 2) The Supreme Court in *Boyle v. United States*, 556 U.S. 938, 944 (2009) held that a racketeering enterprise can be a group of individuals associated in fact provided that they are "associated together for a common purpose of engaging in a course of conduct." The court further stated that in order to be an "association in fact" the enterprise must have a structure stating, "we agree with petitioner that an association-in-fact enterprise must have a structure. In the sense relevant here, the term structure means the way in which parts are arranged or put together to form a whole and the interrelation or arrangement of parts in a complex entity." The court held that the enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity to permit these associates to pursue the enterprise's purpose. *Boyle v. United States*, 556 U.S. at 2244. It also must be established that the enterprise "is an entity separate and apart from the pattern of activity in which it engages". *United States v. Turkette,* 452 U.S. 576, 583 (1981).

The evidence presented at trial failed to establish that "O-Block" constituted an association in fact enterprise. To the contrary, the evidence did not establish that the members of O-Block associated together for a common criminal purpose or that the required structure existed.

In an attempt to establish that O-Block was a criminal enterprise engaged in racketeering activity the government called David Sloan, Martell Wiley, and Rakeem

Wilton. Put simply, the combined testimony of these three witnesses was so lacking that no rational jury could have concluded that the government proved beyond a reasonable doubt that O-Block was an enterprise engaged in racketeering activity at the time of the Oak Street shooting.

David Sloan was the government's first witness on the issue of enterprise. However, as previously described, Sloan was not at Parkway Gardens at the time of the murder. Since approximately 2015 he had been living primarily in North Dakota. Moreover, he was in jail from May 2020 to March of 2021. Thus, Sloan did not have personal knowledge as to any alleged O-Block enterprise at the time of the Oak Street shooting.

Moreover, Sloan's testimony concerning the issue of the enterprise's structure was repeatedly impeached by his statements in a tape recorded interview with the FBI. In that interview Sloan told the agents he wasn't inducted or brought into O-Block but became an O-Block member simply by living and growing up in the neighborhood. Contrary to his direct testimony concerning guns at Parkway Gardens, Sloan told the agents that anything he ever got, he got on his own. He explained that no one was doing anything or giving anything to him. "We were getting shit on our own." Sloan told the agents he never provided a gun to anyone and that when he got a gun, he got it from "my people, family."

On the issue of drug distribution, an alleged racketeering activity, Sloan told the agents that he was selling weed. When asked where he got the weed, Sloan said he could get the weed from just about anywhere. There were hundreds of places to get it from and that getting weed "was like going to the store and getting a bag of chips." Sloan was asked at that interview what would happen to an O-Block member if they didn't shoot at rival gang members. He answered, "I mean shit, shit, nothing really, like—it's like—it's not even

really like when you see it." He then explained that there were a lot of people in and out of his block that are "not on nothing." When asked during the interview whether there were leaders of O-Block giving orders he told them:

> Everybody do, like I say, yes, be in your own group. So if we want to go out and we want to do this, we don't need permission from – we don't need permission from them. We do what we want to do. Everybody do what they want to do. Don't nobody get no orders, don't -- it ain't none of that. No, none of that structure. No, it ain't none of that, none of that. Everybody do what they want to do.

(TT. Vol. 26, pgs. 5502-5520, Vol. 39, pgs. 8754-8755).

David Sloan's testimony had to be considered with caution and great care given that he received immunity, was paid over $20,000 for his cooperation, and was hoping the FBI would assist him in obtaining a lesser sentence on a pending state court firearms charge. (Tr. Vol. 25, pg. 5225; Vol. 26, pgs. 5494-5500, 5540). However, even if David Sloan's testimony is accepted, he did not have the personal knowledge required to establish that O-Block was a criminal enterprise engaged in racketeering activity in August of 2020 as required by each of the counts of conviction.

Martell Wiley was also called by the Government in an attempt to establish the required O-Block RICO enterprise. As with Sloan, Wiley did not have a basis for personal knowledge of the alleged enterprise in August of 2020. Wiley admitted that he moved from Parkway Gardens in approximately 2010 and he did not provide any foundation for personal knowledge that O-Block constituted a RICO enterprise contemporaneous with the Oak Street shooting nearly ten years later.

Wiley had no personal knowledge sufficient to support testimony establishing an enterprise after he left Parkway Gardens. But as to what enterprise structure may have existed even before he left, Wiley provided the following testimony.

> Q. Okay. How about in 2008, was that [people going to the back for a meeting, none of which he even attended] still happening?
>
> A. No, it got looser. It got loose, like, like every man for they self. Like, it started getting loose.
>
> Q. What about in 2010 when you were about to leave?
>
> A. Oh, it was way loose. It was way, like, loose cannon. Everybody who had a gun thought they was the man, you know, anybody.
>
> Q. Were people giving orders back in 2010?
>
> A. No, not in 2010. Nah, it wasn't no orders or none of that. It was like loose. It was like every man for they self. You know, your crowd, whoever you hang with, that's who you ran with, like. It was like that. (TT. Vol. 27, pg. 5775).

Wiley's testimony did not establish the necessary enterprise structure; it corroborated Sloan's statements that there was no structure. No one gave orders. No one gave you permission to do what you wanted to do. You just did it. There was no hierarchy. You got what you needed from your people and family, not from an enterprise/gang. It was every man for himself. That is simply not the structure required for a RICO enterprise as set forth in *Boyle*.

Wiley was also a witness whose testimony had to be considered with caution and great care because of the benefits he received. He had worked for years as a paid informant although on the stand he denied receiving the funds the FBI paid to him. (TT. Vol. 28, pgs. 5956-5963; Vol. 39, pg. 8750). His testimony was riddled with lies, including his explanations for his criminal convictions and his description of his You Tube videos. Wiley told multiple lies on the stand about his interaction with the FBI the falsity of which was established by stipulation. (TT. Vol. 27, pgs. 5740-5741; Vol. 28, pgs. 5963-5969; Vol 39, pgs. 8750-8752). These were not lies Wiley told to a friend on the street. These were

lies Wiley insisted upon in court, as a government witness, under oath, before the jury.

Wiley's testimony about O-Block criminal activity was further impeached by the fact that at the time he claimed O-Block members were involved in criminal activity at Parkway Gardens he was actively working as a paid informant. However, again by stipulation, Wiley never reported any such O-Block gang or criminal activity to the FBI. (Tr. p. 8751)

However, even if Wiley's testimony is accepted, it is insufficient. He did not have a basis for personal knowledge of O-Block in August of 2020 and his description of how O-Block allegedly operated in 2008 and 2010 established that there was no structure and people just operated on their own. Thus, Wiley's testimony failed to establish that O-Block was an association in fact with a common criminal purpose and structure in August of 2020 such as to satisfy the elements required for each of the counts of conviction.

The Government was required not only to present sufficient proof that O-Block met all the requirements of a RICO enterprise in August of 2020, but also that the charged enterprise was engaged in racketeering activity. The racketeering activity charged in the Superseding Indictment was murder in violation of Illinois law and narcotics trafficking in violation of federal law. (Superseding Indictment Par. 5(a)(b).)

In order to prove the racketeering activity of murder the Government called Rakeem Wilton. Like Sloan and Wiley, Wilton treated the court proceedings with a total lack of respect and was impeached on the main topics on which he was called to testify---the murders of Gakirah Barnes and Dale Fischer. As is set forth below in the Motion for New Trial section of this motion, Wilton's testimony as to both of these murders should have been excluded.

It was the government's theory that Gakirah Barnes was killed by an alleged O-Block member, King Von, in retaliation for Barnes, a rival gang member of O-Block, having murdered Odell Perry, a supposed associate of O-Block. Barnes was Wilton's half-sister. Wilton claimed to be a witness to that murder. Prior to the trial in 2020 or 2021 Wilton made a You Tube video concerning the killing of Gakirah Barnes. In that video Wilton explained to his audience that he witnessed the Gakirah Barnes' murder and that King Von had not committed that murder:

> What I know is on my daddy, Von didn't kill Kirah, period, that and I ain't say that because Von didn't kill Kirah, O-Took, O-Took. I got shot, too. I was right there. I got shot, too. I saw the MF who popped up. He did -- he's dead, and it was some grown N" -- you name the person -- "O Fuzz Gray. King Von didn't have shit to do with that shit. Fuck that shit. That shit's a facade."

(TT. Vol. 31, pgs. 6833-6836)

On direct-examination Wilton first told the jury he did not witness the murder. (TT. Vol. 30, pg. 6482). He was then confronted by the AUSA with his grand jury testimony in which he had stated the opposite. He eventually was asked whether his testimony in the grand jury, as opposed to his testimony before the jury, was the truth to which he replied, "yeah." (TT. Vol. 30, pgs. 6484-6485,).

On cross-examination Wilton's further inconsistencies as to the Barnes murder were revealed. He could not recall a conversation with agents in March of 2018, but had no trouble denying that he told them that at the time of the shooting Barnes was carrying two pistols, one Baretta with a 30-round magazine and one Smith and Wesson .40 caliber handgun with a 30-round magazine. He also denied telling the agents that another person who was with him and Barnes at the time of the shooting, Creshaun, had a .45-caliber pistol with a green laser. Most importantly, he did not remember telling the

agents that the reason he was able to identify King Von as the person who shot Barnes was that the shooter was missing a tooth and had a birth mark. In fact King Von had neither characteristic. (Vol. 31, pgs. 6823-6826). All Wilton's lapses in memory and denials as having previously told the agents about the shooter's description were cleared up through stipulated evidence that he indeed made those statements. (TT. Vol. 39, pgs. 8755-8756).

As to the murder of Dale Fisher, Wilton told two entirely different versions of who was involved in that murder. He did not recall telling agents the first time he was interviewed concerning that murder that he had seen D-Rose and King Von get out of a tan Buick with guns during the shooting. He also could not recall a second interview on October 23, 2020, in which he told agents that he was 10 to 15 feet away from King Von and D-Rose when they shot Dale Fischer (TT. Vol. 31, pg. 6832). What Wilton said in both interviews was stipulated to by the government. (TT. Vol. 39, pg. 8756) Finally, in March of 2023, Wilton testified before the grand jury with a new version of who shot Dale Fischer. This time he came up with two entirely different people. He testified that he saw T-Roy and James Johnson exit a car and observed T-Roy standing over Fischer, shooting him. (TT. Vol. 39, pg. 6838).

Even if Rakeem Walton's testimony regarding the Barnes and Fisher murders is accepted as true, that testimony was insufficient to satisfy the required element that the charged O-Block enterprise was engaged in racketeering activity at the time of the Oak Street shooting. The Gakirah Barnes murder occurred in 2014 and the Dale Fischer murder occurred in 2011, many years before August of 2020. Wilton's testimony simply does not establish that the alleged O-Block enterprise was engaged in racketeering activity anywhere near the time of the Carlton Weekly shooting.

In addition, Rakeem Wilton did not implicate Charles Liggins or any of his codefendants as participating in either of these murders. Thus, there was no connection between the Barnes and Fisher murders and the alleged enterprise that the Government maintains was responsible for the Carlton Weekly shooting. The fact that violent acts occur in a geographic neighborhood is simply not proof that people who may live in that neighborhood are responsible for that violence.

The charged racketeering activity in the Superseding Indictment also included narcotics trafficking in violation of federal law. Here again the Government relied upon the testimony of David Sloan, which has been addressed earlier and which argument is incorporated here. Most saliently, even if David Sloan's testimony is believed it was insufficient to establish narcotics trafficking in violation of federal law and it related to a time period ending in 2010, which fails to prove the alleged enterprise was involved in drug trafficking in August 2020. The Government also argued that recorded jail calls of Defendant Roberson established that the enterprise was engaged in narcotics trafficking. Again these jail calls, while they may have suggested Roberson's individual dealing in selling narcotics, did not establish that this drug dealing was done as a part of the alleged O-Block enterprise. Moreover, the Roberson phone conversations occurred in late February of 2021, more than six months after the August 2020 shooting. Thus this evidence did not and cannot establish that the alleged O-Block enterprise was engaged in racketeering activity in August of 2020.

Thus, the Government's evidence was insufficient to prove that O-Block was a RICO enterprise engaged in racketeering activity at the time of the Carlton Weekly shooting and a judgment of acquittal must be entered as to all convictions against Charles Liggins.

## C. THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THAT CHARLES LIGGINS PARTICIPATED IN THE MURDER OF CARLTON WEEKLY AND THE ASSAULT OF CASHAE WILLIAMS FOR THE PURPOSE OF MAINTAINING OR INCREASING HIS POSITION IN THE O'BLOCK ENTERPRISE

All of Charles Liggins' counts of conviction required the Government to establish beyond a reasonable doubt that Charles Liggins participated in the murder of Carlton Weekly and the assault of Cashae Williams for the purpose of maintaining or increasing his position in the alleged O-Block enterprise. The Government's evidence failed to do so. Therefore, even if this Court concludes that the evidence was sufficient to establish that Charles Liggins participated in the murder of Carleton Weekly and the shooting of Cashae Williams, a judgment of acquittal is still required for failure to sufficiently establish this element.

First, for the same reasons argued above, the testimony of Sloan, Wiley and Wilton was not sufficient to establish that Charles Liggins was a member of the alleged "enterprise engaged in racketeering activity."

Sloan was asked multiple times to name members and leaders of O-Block. He did not name Charles Liggins until Mr. Liggins name was fed to him by the Government. But Sloan then admitted he had no personal relationship with Charles Liggins and had never even met or talked to him. (Tr. 5313, 5606). Sloan further admitted he had "no knowledge of Mr. Liggins being or doing anything." (Tr. 5582). Sloan described no actions by Charles Liggins that might establish that Liggins was a member of the alleged enterprise. Sloan did not testify that Charles Liggins was present at any meetings, involved in providing any firearms, or involved in ordering or participating in "sliding" on "ops"or any other violent activities.

Similarly, Wiley testified that he saw Charles Liggins only "a few times." (Tr. 5788). Wiley described no actions by Charles Liggins that might establish Liggins was a member of the alleged enterprise. Wiley did not testify that Charles Liggins was present at any meetings, involved in providing any firearms, or involved in ordering or participating in "sliding" on "ops" or any other violent activities.

Rakeem Wilton, who testified regarding alleged O-Block murders, did not testify to Charles Liggins being involved in any of those murders or any other violent activities. In fact, Wilton did not identify Charles as a member of O-Block or provide any other testimony regarding Mr. Liggins.

Thus, the Government's evidence failed to establish that Charles Liggins was a member of the alleged O-Block RICO enterprise, much less that he had a position in O-Block that would be maintained or increased as a result of participating in the shooting on Oak Street.

Second, as to the purpose of the murder/assault, the Government presented no evidence of any statements made by Charles Liggins admitting involvement in these violent acts, much less explaining the reason he might have participated in them. There was no evidence regarding any discussion among the alleged co-participants reflecting any such reason or intent behind the violent acts. There was no evidence Charles talked about the shooting to anyone—much less that he bragged about it such that it would somehow increase or maintain his alleged position in the charged O-Block Enterprise.

Third, based on their arguments the Government theory as to the reason for the shooting appeared to be that Charles Liggin's was so infuriated and incensed by Carlton Weekly's music videos that Liggins decided to kill Weekly. Again, this theory was a pure speculation by the Government in its argument—there was no evidence of any kind that

Charles Liggins saw those videos, much less that the videos put him into a murderous rage. Moreover, even if there were evidence, rather than speculation, that this was the impetus for the murder, Liggins' purpose would appear to be personal animosity or revenge, not, as is required for these convictions, "to maintain or increase his position in the O-Block Enterprise."

Thus, the Government's evidence was insufficient to prove that Charles Liggins participated in the murder of Carlton Weekly and the assault of Cashae Williams for the purpose of maintaining or increasing his position in the alleged O-Block enterprise and a judgment of acquittal must be entered as to all convictions against Charles Liggins.

## III. MOTION FOR A NEW TRIAL-Rule 33

In the event this Court does not grant Charles Liggins' Rule 29 motion for a judgment of acquittal notwithstanding the verdicts on Counts One, Two, Three, Six and Seven this Court should grant Charles Liggins a new trial in light of errors committed at trial and in the interest of justice.

A motion for a new trial may be granted and a judgment vacated under Federal Rule of Criminal Procedure 33 "if the interest of justice so requires." Under this standard, trial courts are given wide discretion to make that determination. *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019). Upon reviewing the evidence at trial, a new trial should be granted in cases where a "reasonable possibility" exists that an identified "trial error had a prejudicial effect on the jury's verdict." *Id.* The trial court is entitled to "weigh the evidence and in so doing evaluate for itself the credibility of witnesses." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).

Moreover, "if the complete record . . . leaves a strong doubt as to the defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal, the district

court may be obliged to grant a new trial." *United States v. Morales*, 910 F.2d 467, 468 (7th Cir. 1990) modifying *United States v. Morales,* 902 F.2d 604, 608 (7th Cir. 1990); *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989) (indicating that a new trial is warranted where the evidence preponderates heavily against the verdict such that it would be a miscarriage of justice to let the guilty verdict stand).

In short, a motion for a new trial may be granted if a trial error contributed to an unfair outcome *or* if the weight of the evidence leaves doubt regarding the defendant's guilt of the charged offenses. We submit that under either prong, Charles Liggins is entitled to a new trial.

## A. CHARLES LIGGINS SHOULD BE GRANTED A NEW TRIAL BASED ON TRIAL ERRORS WHICH DEPRIVED HIM OF A FAIR TRIAL

1. The Court erred in denying Defendant Charles Liggins' Motion to Suppress the Identification Testimony of Individual MW and/or Exclude Such Testimony Pursuant to Federal Rules of Evidence 602, 701, and 403 or to Order an Evidentiary Hearing on these Motions (UNDER SEAL Dkt. #172) and Motion to Reconsider Ruling (UNDER SEAL Dkt. #347); Charles Liggins' Motion to Suppress the Identification Testimony of Individual DS and/or to Exclude Such Testimony Pursuant to Federal Rule of Evidence 602, 701, and 403 or to Order An Evidentiary Hearing on these Motions (UNDER SEAL Dkt.#179); Charles Liggins' Motion to Suppress Identification Testimony of Individual TG and/or to Exclude Such Testimony Pursuant to Federal Rules of Evidence 701 and 403 or to Order an Evidentiary Hearing on These Motions (UNDER SEAL Dkt. #171); and Charles Liggins' Motion to Suppress the Identification Testimony of Individual TH and/or Exclude Such Testimony Pursuant to Federal Rules of Evidence 701 and 403 (UNDER SEAL Dkt. #174). These Motions used initials because they were filed before the witnesses' names were made

part of the public record. The record now reflects that these motions applied to witnesses Martell Wiley (MW), David Sloan (DS), Terrance Garrett (TG) and Tiffany Huff (TH) . The Court denied these motions as set forth in rulings contained in Sealed Transcript of October 3, 2023 (Ruling on Dkt. # 171 & #172); Sealed Transcript of October 4, 2023 (ruling on Dkt. #174 and 179) and TT. 2039-2046. (Ruling on Dkt. #347). In support, the arguments made in these written motions as well as the further oral arguments made in their support are fully adopted and incorporated herein.

2. The Court erred in denying Defendant Liggins' requests for evidentiary hearings contained each of the four Motions to Suppress described in Paragraph 1. All four of these suppression motions set out facts indicating that the particular witness' identification was the result of suggestive identification procedures that violated the due process clause of the Fifth Amendment. *Perry v. New Hampshire,* 565 U.S. 228, 245 (2012); *United States v. Vines,* 9 F.4th 500, 507 (7th Cir. 2021.) The Court's denial of evidentiary hearings (Dkt. #291) denied Charles Liggins' rights under the Due Process Clause to develop the record fully as to the suggestive procedures employed to obtain the identification testimony. In support of this argument Defendant adopts and incorporates the arguments contained in the Motions to Suppress filed as to each of these witnesses referenced in Paragraph 1 above as well as the oral arguments on this issue.

3. The Court erred in admitting the identification testimony of Martell Wiley, David Sloan, Terrance Garrett and Tiffany Huff as that testimony was the result of suggestive identification procedures that violated Charles Liggins' rights under the Due Process Clause of the Fifth Amendment. In support of this argument Defendant adopts and incorporates the arguments contained in the Motions to Suppress filed as to each of these witnesses referenced in Paragraph 1 above as well as the oral arguments on this issue.

4. The Court erred in admitting the identification testimony of Martell Wiley, David Sloan, Terrance Garrett and Tiffany Huff as that testimony constituted improper lay opinion testimony and was inadmissible pursuant to Federal Rule of Evidence 701. In support of this argument Defendant adopts and incorporates the arguments contained in the Motions to Suppress filed as to each of these witnesses referenced in Paragraph 1 above as well as the oral arguments on this issue.

5. The Court erred in admitting the identification testimony of Martell Wiley, David Sloan, Terrance Garret and Tiffany Huff because each of these witnesses lacked sufficient personal knowledge of Charles Liggin's physical appearance in August of 2020 such as to satisfy Federal Rules of Evidence 602 and 701. Section IIA of this pleading details the lack of sufficient personal knowledge of each of the four witnesses: David Sloan (P. 6); Martell Wiley (P. 7); Tiffany Huff (P. 7-8); Terrance Garrett (P. 8).

While acknowledging the necessity of sufficient personal knowledge as a requirement of both Rule 602 an Rule 701, the Court erroneously applied a "more than a fleeting interaction" and a "low threshold of personal knowledge" standard. (TT. 2039-2047, 5814-5819) The Court failed to consider not only the limited nature of the witnesses' exposure to Charles Liggins' but also ignored the importance of the time period of that exposure. The issue was whether the witnesses had the requisite degree of familiarity with Charles Liggins' appearance on August 4, 2020, not years and years earlier. Moreover, the Seventh Circuit caselaw requires longer period of "close association." *See, e.g., United States v. Tinsley,* 62 F.4th 376, 386 (7th Cir. 2023); *United States v. Jett,* 908 F.3d 252, 272 (7th Cir. 2018); *United States v. Stormer,* 938 F.2d 759, 762 (7th Cir. 1991); *United States v. Towns,* 913 F.2d 434, 445 (7th Cir. 1990). None of the four witnesses had a "close association" with Charles Liggins—of any length. Thus, the identification testimony of these

four witnesses failed to satisfy Rule 602 and Rule 701 and introduction of their testimony was error. In support of this argument Defendant adopts and incorporates the arguments contained in the Motions to Suppress filed as to each of these witnesses referenced in Paragraph 1 and the oral arguments made on this issue.

6. The Court erred in admitting the identification testimony of Martell Wiley, David Sloan, Terrance Garrett, and Tiffany Huff because the portions of the Camtasia Video (Govt. Ex 2000) containing the persons in the stairwell that they identified as Charles Liggins lacked sufficient clarity to make an admissible reliable identification. In support of this argument the Defendant adopts and incorporates the arguments contained in the Motions to Suppress filed as to each of these witnesses referenced in Paragraph 1 and the oral arguments made on this issue.

7. The Court erred in allowing Terrance Garrett to testify as to his identification of Charles Liggins in the Camtasia Video over the objections of Defendants Liggins and Thomas that the discovery provided in regard to Garrett's prior identifications was insufficient. At trial, Defendants Liggins and Thomas repeatedly objected to preclude Garrett's identification testimony based on discovery and *Brady/Giglio* violations. The defense laid out in detail how the government had failed to provide the discovery necessary to conduct an effective cross-examination of Garrett. (TT. Vol. 22, pgs. 4735-4774; Vol. 28, pgs. 5902-5935). The court overruled the objections and permitted Garrett to testify to identifications that should have been excluded. (TT. Vol. 28, pgs. 6011-6013).

8. The Court erred in allowing Tiffany Huff to testify to her identification of Charles Liggins in the Camtasia Video after her direct testimony at trial established that Ms. Huff had never seen Charles Liggins in person but only on social media. (TT. 7376-

7382, 7410-7413). The Court had previously ruled that a witness's lack of personal interaction with a defendant rendered such identification testimony insufficient under Rules 601, 602, 701 and 403. (See e.g. Sealed Transcript October 4, 2023 p. 35-36; TT. 5814-5819 ("…the line I was drawing before was if someone has literally never set eyes on this person in real life as opposed to a photo…" ). Defendant objected prior to the identification testimony being elicited from Ms. Huff but the Court overruled that objection despite the Court's earlier ruling that such foundation for identification testimony was insufficient. Admission of this testimony violated Federal Rules of Evidence 602, 701 and 403. In support of this argument Defendant adopts and incorporates the arguments made, both in writing and orally, in the original Motion to Suppress Ms. Huff's identification testimony (UNDER SEAL Dkt.#174) and the arguments made orally regarding admissibility of such identification testimony. (TT. 7399-7409, 7415-7417.)

9. The Court erred in allowing Tiffany Huff to testify that she "can assume" the person at 14:52 in the Camtasia video was Charles Liggins over objection by Defense Counsel. (TT. 7418-7419). This testimony was inadmissible speculation and should have been stricken.

10. The Court erred in allowing Tiffany Huff to identify Charles Liggins in the Camtasia video when, in violation of the Court's order excluding witnesses, Ms. Huff had been sitting in the courtroom a few feet away from Mr. Liggins on multiple days prior to her testimony. When this fact was revealed, Defense Counsel immediately moved to preclude Ms. Huff from testifying. In support of this argument Defendant adopts and incorporates the arguments made at trial regarding this issue and in related written motions. (TT. 5035-5039, 6148-6149, 6925-6929, 6934-48; UNDER SEAL Dkt. #387)

as well as the arguments set out in Paragraphs 1 to 5 and 7 to 8 above. Given the insufficiency under Rules 602, 701, and 403 of Ms. Huff's familiarity with Charles Liggins, allowing Ms. Huff to make an identification of Charles Liggins in the Camtasia video after she sat in the courtroom looking at him for days in violation of the Court's order was error.

11. The Court erred in denying Defendant Liggins' and Thomas' Motion to Exclude Expert Testimony regarding Firearm Toolmark Identification. Defendant hereby adopts and incorporates the arguments made in that motion. (Dkt. 246; Ruling, Dkt. 320).

12. The Court erred in denying Defendant Liggins' and Thomas' Objections to Government's Preliminary Exhibit List. In support, Defendant adopts and incorporates the arguments contained in that Motion and all arguments and objections made orally relating to these Exhibits. (UNDER SEAL Dkt. #270)

13. The Court erred in granting the Government's Motion for an Anonymous Jury. (Dkt #258). In support, Defendant adopts and incorporates the arguments made in response to that Motion both in writing and orally. (Response Dkt. #290; Transcript 9/29/23 p. 102-108).

14. The Court erred in granting the Government's Motion to Admit Evidence as Direct Evidence or Alternately 404(b) Evidence (Dkt. #208) In support, Defendant adopts and incorporates the arguments made in response to that Motion both in writing (Dkt. #317) and orally.

15. The Court erred in granting the Government's Consolidated Motions in Limine. (Dkt. #238) In support Defendant adopts and incorporates the arguments made in response to that Consolidated Motion both in writing (Dkt. #269) and orally.

16. The Court erred in granting the Government's *Santiago* Proffer and Motion to Admit Evidence under FRE 801(d)(2)(E) (Dkt. #266). In support Defendant adopts and incorporates the arguments made in response to that pleading both in writing (Dkt. # 266) and orally.

17. The Court erred when it admitted Govt. Exhibit 403-1, a video of Carlton Weekly's purported "dying declaration", "excited utterance" or "statement of then existing physical condition." The Government moved in its Consolidated Motions in Limine (Dkt. 238) to introduce video footage of Weekly laying on the street after he was shot. The video had an audio of Weekly saying he was hit everywhere and that he couldn't feel. Liggins and Thomas objected in their response to the government's motion argued that the video should be excluded on the basis of relevance under FRE 401 as well as being unfair prejudice under FRE 403. (Dkt. 269, pgs. 14-16). Pre-trial arguments were heard on October 3, 2023 in the morning session (TT. pgs. 37-51). The video was introduced through Officer Carly Cervantez. (TT. Vol. 36, pg. 7942). The video was extremely graphic. It depicted Mr. Weekly in the painful process of dying from his injuries. Neither the disturbing video nor Mr. Weekly's statements had any relevance or probative value. The nature of Mr. Weekly's death was conceded by the defense and there were no issues at trial as to his death that required any such "proof." The Government's relevance argument was a smokescreen to admit highly emotional evidence that was not relevant or admissible under FRE 401. The video should have been excluded in its entirety under FRE 402. Moreover, the unfair prejudice outweighed any miniscule probative value so that under FRE 403 it should not have been admitted into evidence.

18. The Court erred in allowing into evidence Government exhibit 403-1A. The exhibit consisted of a photograph of Mr. Weekly and Mr. Brinson lying in the street. The Court had previously admitted the above referenced video clip of Mr. Weekly lying in the street after being shot. (Government Exhibit 403-1, TT. Vol. 36, pgs. 8111-8135). The introduction of Exhibit 403-1A, combined with the introduction of Exhibit 403-1, denied Mr. Liggins the right to a fair trial and should have been precluded under FRE 401, 402 and 403.

19. The Court erred when it allowed into evidence the following music videos:

a. "Dead Bitches" (Government Exhibit 601): This is a video made by Carlton Weekly. Thomas and Liggins objected to its introduction pre-trial in their Preliminary Objections to the Government's Preliminary Exhibit List. (Dkt. 270). Arguments were heard pre-trial on October 4, 2023. (October 4, 2023, TT. pgs. 53-59, 77-78). In addition to arguing that the government could not authenticate the video, the defense argued that the video was irrelevant in that there was no evidence that Charles Liggins ever saw or was even aware of the video. Without that connection, the video was irrelevant and not probative as it could not establish a motive for Liggins' participation in the murder. Any such motive was purely speculative and had no evidentiary basis. During trial Thomas and Liggins, along with other counsel, again objected to its introduction. (TT. Vol. 21, pgs. 4415-4427, Ruling, pgs. 4427-4429).

b. "I'm from 63rd" (Government Exhibits 605-1 and 605-2) These exhibits are clips for another video made by Carlton Weekly. As argued in connection with the "Dead Bitches" video above, this video was irrelevant in that there was no evidence that Charles Liggins ever saw or was even aware of the video. Without that connection, the video was irrelevant and not probative as it could not establish a motive for Liggin's

participation in the murder. Any such motive was purely speculative and had no evidentiary basis.

c. "Took Her to the O" (Government Exhibits 602-1, 602-2): Thomas and Liggins objected to this music video's introduction pre-trial in their Preliminary Objections to the Government's Preliminary Exhibit List on the basis that authenticity could not be established, that the video was irrelevant to the murder of Weekly, and that it should be excluded under FRE 403. (Dkt. 270). Arguments were heard on the motion at the October 4, 2023 hearing. Counsel again objected at trial to the video's introduction and to any agent's interpretations of the lyrics. (TT. Vol. 21, pgs. 4446-4448, 4456).

d. Liggins also joined in the objections made by defendants Offerd and Smart to the introduction of clips and stills from "Dude from 63rd Street Couldn't Get Back Up" and "Never Change"(Govt. Exs. 603-1, 603-1B, 603-1D, 604).

As to each of these videos, Defendant adopts and incorporates all arguments made by the defense in writing and orally to preclude introduction of this evidence

20. The Court erred when it allowed into evidence testimony relating to the murders of Gakirah Barnes and Dale Fischer. Liggins and Thomas objected to the introduction of this evidence in their Response in Opposition To the Government's Motion to Admit Certain Acts as Direct Evidence of Charged Offenses or, in the Alternative, Pursuant to Federal Rule of Evidence 404(b) (Government Motion, Dkt. 209; Defense Response, Dkt. 317; TT. Vol. 29, pg. 6326-63). The Court overruled the defense objections on October 11, 2023. (October 11, 2023, pgs. 52-56). As to this evidence, the Defendant incorporates and adopts all arguments made by the defense in writing and orally objecting to introduction of this evidence.

The Gakirah Barnes murder occurred in 2014. The murder of Dale Fischer in 2011.

Both of these murders occurred long before 2020 and, therefore, shed no light as to whether O-Block was a criminal enterprise engaged in racketeering activity in 2020. These murders had no relevance to the charged 2020 offenses, which all related to the specific shooting of Weekly and others on Oak Street on August 4, 2020. The Superseding Indictment set forth only August 4, 2020 as the time period for the existence of the alleged O-Block criminal enterprise and neither the Barnes nor the Fischer murders are mentioned in the Superseding Indictment.

The testimony at trial did not establish that any of the defendants on trial were involved in either the Barnes or the Fischer murders. The Government's main witness regarding these murders, Rakeem Wilton, claimed to have been present for these murders and named the participants.[4] Wilton did not name or identify Charles Liggins as a participant in either of these two murders. In fact, there was no evidence that Charles Liggins was involved in any way with these two murders. Furthermore, Wilton did not identify Charles Liggins as a member of any group much less any enterprise responsible for these murders.

Thus, there was no basis to admit the evidence regarding the Barnes and Fischer murders against Charles Liggins. The evidence was not direct evidence of the crimes charged against Charles Liggins in the Superseding Indictment and had no probative value in proving those charges. Alternatively, the evidence was not admissible against Charles Liggins as "other crimes" evidence under Rule 404(b) since Charles Liggins was not involved in these "other crimes." At best it was propensity evidence—the propensity

[4] Desma Coleman also testified to being present for the Gakirah Barnes murder. She did not name or identify Charles Liggins or any other defendant as a participant in that murder.

being that other persons living in the same neighborhood as Charles Liggins committed violent acts.

Introduction of this evidence was extremely prejudicial. The evidence itself was graphic and disturbing, particularly given the youth of the two victims and the callousness of the violence. The ultimate impact was that the Government was allowed to implicate Charles Liggins in acts of murder just because they occurred in the neighborhood where he resided. This clear error alone requires reversal of Charles Liggins' convictions.

21. The Court erred when it permitted certain law enforcement witnesses to testify as to matters about which they had no personal knowledge. Instead they improperly testified as to their own opinions, inferences, and interpretations of the evidence; improperly bolstered the government's theory of the case; testified to hearsay regarding aspects of the investigation in which they were not involved; and usurped the function of the jury in this case.

a. FBI Agent Case: FBI Agent Case had no personal knowledge of the events of August 4, 2020. In fact, she was not the investigating case agent who gathered the evidence. Despite this complete lack of knowledge, she was allowed to opine regarding the meaning and significance of numerous pieces of evidence and to narrate the video evidence based on her own personal interpretation as to what she saw. (TT. 3796-3808, 3817-3827, 3830-3865, 3871-3876, 3888-3907, 3970-3975, 8250-8256, 8257-8263, 8269, 8274-8278, 8289-8333) Defense counsel repeatedly objected to Agent Case's testimony as being improper, both before her testimony, at breaks, and during objections during the testimony. (TT. 3572-3584, 3594-3629, 3741-3760, 3808-3816, 3827-3829, 3865-3873, 8251-8254, 8263-8269, 8269-8273).

By use of the repeated question of "do you see anything of interest to the investigation here," Agent Case was allowed, over repeated defense objection, to testify that she had viewed the Camtasia video dozens of times and that many times she would notice something in the video that she hadn't noticed before. She would then focus on a portion of the Camtasia video and interpret it consistent with the Government's theory of the case. Eventually the Court ruled that the defendants had a standing objection to Agent Case's testimony. (TT. 3878-3879).

The Camtasia video was in evidence. The jury had the ability to watch that video and draw whatever reasonable inferences it wished to draw from it. Under the guise of "explaining the investigation" the questions to Agent Case were purposely aimed at allowing her to improperly make inferences from the evidence that fit the Government's theory of the offense; to essentially "identify" the defendants, including Charles Liggins, on portions of the video although she did not have any personal knowledge on which to base such identifications and no other witness had made such identifications; and to fill the numerous evidentiary gaps in the Government's case with speculation.

Agent Case had absolutely no personal knowledge of the events shown in the Camtasia video on which to base her inferences. Agent Case was in no better position than the jury to interpret the video. It was the jury's function to interpret and make reasonable inferences from the evidence. Agent Case's testimony usurped this responsibility of the jury and impinged upon the jury's role as factfinder.

Agent Case's testimony was not based on personal knowledge as required by FRE 602 and did not satisfy the requirements of lay opinion evidence under Rule 701. Agent Case improperly testified to her inferences about the video and other evidence; those inferences were solely the province of the jury. *See also, United States v. Noel,* 581 F.3d

490 (7th Cir. 2009); *United States v. Cunningham,* 462 F.3d 708 (7th Cir. 2006).

In addition, Agent Case was allowed over repeated defense objection to testify as to forensic analyses, including fingerprints and DNA, that were performed by others. (TT. 8262-8274). This testimony was clearly hearsay. Most importantly, its admission was a violation of Defendant Liggins Constitutional right to confrontation of the witnesses against him. Admission of this evidence was of constitutional magnitude and alone requires reversal.

b. CPD officer Grzegorz Bajorek: CPO Bajorek had no personal knowledge of the events of August 4, 2020. But he was allowed to narrate large swathes of video as if he did. Countless objections were made as to his testimony, including improper bolstering. (TT. 3348-3362, 3367-3373, 3378-3383, 3402-3463). In his testimony Bajorek described vehicles that he believed "related to the investigation." He described the movements of persons to whom he was paying particular attention, attributing culpability to them. The officer's opinion about "what was what" had no relevance to the actual facts of the case but was the officer's personal "version" of the events, although he had no personal knowledge of those events.

Over consistent objection, the Court admitted CPO Bajorek's testimony under Rule 701. It did not meet the standards of that rule. He was in no better position than the jury to review the video and his testimony served to usurp the domain of the jury. His testimony unduly impinged on the jury's role as factfinder and improperly bolstered the government's *theory* as to what happened on Oak Street. *See also, United States v. Noel,* 581 F.3d 490 (7th Cir. 2009); *United States v. Cunningham,* 462 F.3d 708 (7th Cir. 2006).

The testimony of both of these law enforcement witnesses should have been

excluded. By use of this method of witness questioning and agent testimony, the Government improperly filled major gaps in their evidence with rank speculation. As to each of these witnesses, Defendant adopts and incorporates all objections and arguments made by the defense in writing and orally to preclude introduction of this testimony.

22. The Court erred in allowing Government Exhibits 301-24, 301-27, 301-32, and 301-37 into evidence. In their Response to the Government's Consolidated Motion in Limine, Thomas and Liggins objected to these medical examiner photographs as being unduly prejudicial and of minimal, if any, probative value under Rule 403. (Gov. Motion, Dkt. 238, Defense Response, Dkt. 269). At trial, the government sought to introduce one medical examiner graph and four photographs. The defense did not object to the graph but did object to the four photographs. Those exhibits were admitted over objection. (TT. Vol. 33 pg. 7354). Defendant adopts and incorporates all arguments made in writing and orally as to this issue.

23. The Court erred in allowing into evidence testimony of David Sloan's prior testimony before the grand jury under FRE 801(d)(1)(B). The court ruled that under 801(d)(1)(B), Sloan's prior consistent statements were admissible to rehabilitate his credibility after it was attacked on cross-examination. (TT. Vol. 26, pgs. 5660-5671). The court's interpretation of the rule exceeded its confines. It should have been excluded.

24. The Court erred in failing to instruct the jury that no evidence existed that defendants had or would retaliate against witnesses or threaten their safety.

FBI agent Kevin Doyle was questioned as to why he did not obtain certain cell phone records. He testified that, "Specifically we had concerns about witness safety.

There had been retaliation against witnesses in the past with this group." (TT. Vol. 20 pg. 4104). Lengthy arguments ensued after this testimony during which the defense requested the Court to instruct the jury that "there is no evidence that any of the defendants were involved in any way in any threatening behavior towards any witness. The statement is stricken and you are ordered to disregard it." (TT. Vol. 20, pg. 4153).

The Court did strike the answer and told the jury not to consider it, but failed to instruct the jury that no such evidence existed. (TT. Vol. 20, pg. 4178). The court's failure to inform the jury that no such evidence existed allowed the jury, having heard extremely prejudicial testimony of witness retaliation and concern for witness safety, to consider nonexistent evidence. The prejudice was exacerbated because the jury was anonymous, thus highlighting concern for their own safety. Striking the answer was insufficient to eliminate the prejudice caused by Doyle's testimony. Failure to give the requested instruction denied Charles Liggins his Constitutional right to due process and a fair trial.

25. The Court erred in allowing into evidence Government Exhibits 3001 and 3002 and clips from those exhibits (3001-1 through 6 and 3002-1 through 4). These exhibits were recordings of Cook County jail phone calls purportedly made by Co-Defendant Roberson more than six months after the Oak Street shooting in which Roberson allegedly discussed drugs. The defense objected on the basis that Roberson's calls were not relevant to the charges against the defendants, were inadmissible hearsay, and were inadmissible 404(b) evidence. The defense further objected to Roberson's calls being admitted as co-conspirator statements against all of the defendants. (Response to Santiago Proffer Dkt. #266; TT. Vol. 37, pgs. 8167-8201; Ruling, pgs. 8193-8200). In addition, Defendant Liggins objected that statements in these recordings attributed to him were not relevant and were not admissible against him pursuant to FRE 404(b).

Further, Defendant Liggins objected that statements in these recordings made by Roberson regarding "Murda" were not relevant, were hearsay, and were not made in furtherance of the conspiracy such as to be admitted against Defendant Liggins as co-conspirator statements. (Tr. 8136-8139, 8172-8193)

This evidence should have been excluded for the reasons argued. Defendant hereby adopts and incorporates all arguments made in writing and orally regarding this evidence.

26. The Court erred in allowing into evidence Government Exhibits 3000-1 and 3000-2. (Ruling Tr. 9/29/23 p. 123-126). These exhibits purported to be clips from a recorded jail call between Defendant Charles Liggins and a Charee Wiley.

The call took place on October 14, 2021, more than 14 months after the Oak Street shooting. Defendant Liggins objected that this call was not relevant and had no probative value because the call was not temporally or contextually linked to the Oak Street shooting. (Dkt. #269 and #270). Defendant also argued the call should be excluded under Rule 403. The Court overruled those pretrial objections but noted that the Government must still lay the proper foundation at trial. (Tr. 9/29/23 p. 123-126.) Late in the trial the Government moved to introduce the exhibits because of cross examination of Agent Case by codefendant's counsel. Defendant again objected that such cross examination did not make the exhibits relevant and continued to object to relevance. Defendant also raised objections that the appropriate foundation had not been laid for admissibility as there was no evidence as to how the recording was made and no evidence that the recording truly and accurately reflected the conversation. The Court overruled these objections and admitted the exhibits. (TT. 8490-8499.)

In addition to the lack of relevance, probative value and foundation, the particular statement highlighted by the Government, which they claimed was Charles Liggins telling others to get rid of their phones, was actually identified by Agent Prostko as being made by Charee Wiley not by Charles Liggins. Moreover, the statement was partially marked as "U/I" meaning unintelligible. Both of these facts further diluted any possible probative value.

This evidence should have been excluded for the reasons argued. Defendant hereby adopts and incorporates all arguments made in writing and orally regarding this evidence.

27. The Court erred when, after Exhibits 3000-1 and 3000-2 were erroneously admitted and played, Agent Case was asked whether the investigation revealed that "multiple O-Block members and associates were directing people to unsend messages and get new phones." Defendants immediately objected as the answer was clearly hearsay but that objection was overruled by the Court. (Tr. 8589-8593). This testimony should have been excluded as hearsay.

28. The Court erred in admitting Government Exhibits 506-1, 506-3, 506-5, and 506-7. These were photos of tattoos on Charles Liggins body. These photos were irrelevant to the charges against Mr. Liggins, had no probative value, and were highly prejudicial.

29. The Court erred in disallowing defense expert Geoffery Loftus to testify to the specifics of this case. The court erred in sustaining the government's objection to Dr. Loftus' testimony concerning a hypothetical question about the reliability of identifications with certain factors present. (TT. Vol 38, pgs. 8656-8660)

30. The Court erred in overruling Defendants' objections as to multiple government exhibits that were admitted into evidence.

31. The Court erred in overruling Defendants' objections to testimony of various witnesses.

32. The Court erred in overruling Defendants' motions to strike certain jurors for cause.

33. The Court erred in denying Defendants' various Motions for Mistrial.

34. The Court erred in instructing the jury, including overruling defense objections to Government instructions, failing to give modifications to Government instructions requested by the defense, and failing to give jury instructions submitted by the defense. (Dkt. 423, 425, 426). Defendant hereby adopts and incorporates all written submissions , objections made, and oral arguments made in regard to jury instructions during the jury instruction conference (TT. Vol 40, 41 and 42) and during trial.

35. The Court erred in refusing to give (a) Defendant Thomas & Liggins Instruction 4 regarding gang membership (Dkt. 423 p. 6) (TT. 9021-9028); (b) Defendant Thomas & Liggins Instruction 6 defining enterprise (Dkt. 423 p. 9) (TT, 9058-9064); and (c) Defendant Thomas & Liggins Amended Alternative Instructions 5, 7, 8, 9, 10, 11 and 12 regarding the required elements of the charged offenses. (Dkt. 425 p. 3-16) (TT. 9028-9043) which instructed the jury that all elements had to be present on August 4, 2020, the date of the charged offenses, and that the Government had to prove that the O'Block street gang existed. The elements instructions given by the Court as to every count (1) failed to require the jury to find all elements existed on August 4, 2020, as charged in the Superseding Indictment and (2) assumed the existence of the O'Block street gang, a fact that was in issue and which the Government

was required to prove beyond a reasonable doubt for conviction on every count. Defendant hereby adopts and incorporates all written submissions and oral arguments made in regard to these instructions.

36. The Court erred in giving the Government's aiding and abetting instructions over defense objection and rejecting the defense's alternatives and modifications to those instructions. Defendant hereby adopts and incorporates all written submissions and oral arguments made in regard to the aiding and abetting instructions.

37. The Court erred when, in the middle of defense closing arguments, the Court changed the aiding and abetting instruction, read the changed instruction to the jury twice (TT. 9711 and 9858), and then submitted it to the jury as Supplemental Instruction No. 61. Defendant hereby adopts and incorporates all arguments made regarding this instruction.

38. The Court erred in giving the changed aiding and abetting Supplemental Instruction No. 61 as it was inapplicable, confusing, misstated the law and was incomplete as given. Defendant hereby adopts and incorporates all arguments made regarding this instruction, including TT. 9678-9696, 9706-9711, 9958, 10152-10172, 10238-10256.

39. The Court erred in refusing to give the pattern instruction regarding Evidence of Other Acts evidence. (Instruction 14) offered by Defendants Roberson and Liggins in regard to jail call recordings of Defendant Roberson made months after the charged offenses which the Government interpreted as evidence of narcotics trafficking. (TT. 8921-8937, 9278.) Defendant hereby adopts and incorporates all arguments made regarding this instruction.

40. The Court erred in taking Mr. Liggins Motions for judgment of acquittal after the close of the government's case and at the close of all the evidence under advisement and submitting the case to the jury. Those motions should have been granted. In support Mr. Liggins adopts and incorporates the arguments made orally at the time and the arguments contained in his Rule 29 Motion herein.

41. Mr. Liggins hereby adopts and expressly reasserts and preserves all written pleadings, pretrial and trial motions, objections, and arguments, oral and written made before, during, and after trial by Mr. Liggins or by his codefendants.

42. Mr. Liggins hereby adopts any and all issues and arguments raised in the post-trial motions filed by his codefendants that may be applicable to him.

43. These trial errors in cumulation deprived Defendant Liggins of his constitutional right to a fair trial and require that in the interest of justice Mr. Liggins be given a new trial. *United States v. Santos,* 201 F.3d 953, 965 (7th Cir. 2000).

B. CHARLES LIGGINS SHOULD BE GRANTED A NEW TRIAL BECAUSE PERMITTING THESE VERDICTS TO STAND ON THE EVIDENCE PRESENTED WOULD BE A MISCARRIAGE OF JUSTICE

Charles Liggins faces a sentence of life imprisonment after a trial in which not one witness testified to seeing him shooting at Carlton Weekly or Cashae Williams on August 4, 2020. Mr. Liggins is not seen on the video footage of the shooting and not one piece of physical or forensic evidence puts him at the scene. Charles Liggins made no confession to law enforcement or statement to any other person admitting to participation in the shooting.

The guilty verdicts rest on the testimony of four persons who had, at best, minimal contact with Mr. Liggins identifying him in the stairwell at Parkway Gardens before and after the murder. That testimony was used to speculate, without any evidence, that

Charles Liggins got into a Chrysler that went to Oak Street, got out of the Chrysler and fired a weapon, and returned to Parkway Gardens in the Chrysler after the shooting.

The guilty verdicts also rest on the testimony of three witnesses who were called to prove that Charles Liggins was a member of an alleged O-Block RICO enterprise engaged in racketeering activity. The testimony of each of these witnesses was heavily impeached and required under the law to be considered with caution and great care. These witnesses' demeanor exhibited disrespect to and distain of the Court and the judicial process. These witnesses had numerous motives to lie, told multiple versions of events, and perjured themselves so brazenly that their falsehoods were the subject of stipulations between the parties.

While Rule 29 requires the Court to give the benefit of witness credibility findings and inferences to the government, in deciding a motion for a new trial the Court weighs the evidence, including evaluating for itself the credibility of the witnesses. Thus the Court can consider the very limited and dated contact that the identification witnesses had with Charles Liggins and their motives to lie. The Court can consider the significant motives to lie and the multiple impeachment of the three witnesses who testified about enterprise and racketeering activity, as well as their demeanor. The Court can consider the major gaps in the Government's evidence and the amount of speculation required to fill those evidentiary voids.

But, most importantly, the Court can and must perform the difficult but necessary analysis of whether the weight of the evidence creates doubt as to Charles Liggins' guilt, even if that evidence is strong enough to withstand a Rule 29 challenge. If so, it would be a miscarriage of justice to let the guilty verdicts stand and the Court has the power, indeed the obligation, to grant a new trial. *See, United States v. Washington,* 184 F.3d 653, 657-

659 (7th Cir. 1999); *United States v. Morales,* 902 F.2d 604, 608 (7th Cir. 1990), modified by *United States v. Morales,* 910 F.2d 467 (7th Cir. 1990); *United States v. Reed,* 875 F.2d 107, 114 (7th Cir. 1989). In this case it would be a miscarriage of justice to let the guilty verdicts against Charles Liggins stand and we respectfully ask this Court to grant him a new trial on this basis.

## IV. CONCLUSION

Pursuant to Rule 29, the evidence at trial was insufficient for the jury to find Charles Liggins guilty beyond a reasonable doubt of the offenses upon which he was convicted. Consequently, this Court should grant Defendant Charles Liggins' motion for judgment of acquittal on all counts of conviction.

Alternatively, pursuant to Rule 33, the errors set forth above, singly or in combination, deprived Charles Liggins of a fair trial. Consequently, this Court should grant Mr. Liggins' motion for a new trial. Or, also pursuant to Rule 33, this Court should grant Mr. Liggins a new trial because the weight of the evidence is such that it would be a miscarriage of justice to let the guilty verdicts stand.

Respectfully submitted,

/s/ Cynthia Giacchetti
Cynthia Giacchetti
One of the Attorneys for
Charles Liggins

CYNTHIA GIACCHETTI
Law Office of Cynthia Giacchetti
53 W. Jackson Blvd. Suite 1035
Chicago, IL 60604
T: (312) 939-6550

GREGORY T. MITCHELL
19150 Kedzie Avenue—Suite 205
Homewood, Illinois 60430
T: 708-799-9325